No. 14-1952

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

_____

PEDRO LOPEZ, individually and on behalf of a class of
individuals similarly situated; ABEL CANO, individually and on
behalf of a class of individuals similarly situated; KEVIN
SLEDGE, individually and on behalf of a class of individuals
similarly situated; CHARLES DEJESUS, individually and on behalf
of a class of individuals similarly situated; RICHARD BROOKS,
individually and on behalf of a class of individuals similarly
situated; THE MASSACHUSETTS HISPANIC LAW ENFORCEMENT
ASSOCIATION, individually and on behalf of a class of
individuals similarly situated; ROBERT ALVAREX, individually and
on behalf of a class of individuals similarly situated; SPENCER
TATUM, individually and on behalf of a class of individuals
similarly situated; SHUMEAND BENFOLD, individually and on behalf
of a class of individuals similarly situated; ANGELA WILLIAMS-
MITHCELL, individually and on behalf of a class of individuals
similarly situated; GWENDOLYN BROWN, individually and on behalf
of a class of individuals similarly situated; LYNETTE PRAILEAU,
individually and on behalf of a class of individuals similarly
situated; TYRONE SMITH, individually and on behalf of a class of
individuals similarly situated; EDDY CHRISPIN, individually and
on behalf of a class of individuals similarly situated; DAVID E.
MELVIN, individually and on behalf of a class of individuals
similarly situated; STEVEN MORGAN, individually and on behalf of
a class of individuals similarly situated; WILLIAM E. IRAOLO,
individually and on behalf of a class of individuals similarly
situated; JOSE LOZANO, individually and on behalf of a class of
individuals similarly situated; JOSE LOZANO, individually and on
behalf of a class of individuals similarly situated; COURTNEY A.
POWELL, individually and on behalf of a class of individuals
similarly situated; JAMES L. BROWN, individually and on behalf
of a class of individuals similarly situated; GEORGE CARDOZA,
individually and on behalf of a class of individuals similarly
situated; LARRY ELLISON, individually and on behalf of a class
of individuals similarly situated; DAVID SINGLETARY,
individually and on behalf of a class of individuals similarly
situated; CHARISSE BRITTLE POWELL, individually and on behalf of
a class of individuals similarly situated; CATHENIA D. COOPER-
PATERSON, individually and on behalf of a class of individuals
similarly situated; MOLWYN SHAW, individually and on behalf of a

class of individuals similarly situated; LAMONT ANDERSON,
individually and on behalf of a class of individuals similarly
situated; GLORIA KINKEAD, individually and on behalf of a class
of individuals similarly situated; KENNETH GAINES, individually
and on behalf of a class of individuals similarly situated;
MURPHY GREGORY, individually and on behalf of a class of
individuals similarly situated; JULIAN TURNER, individually and
on behalf of a class of individuals similarly situated; NEVA
GRICE, individually and on behalf of a class of individuals
similarly situated; DELORES E. FACEY, individually and on behalf
of a group of individuals similarly situated; LISA VENUS,
individually and on behalf of a class of individuals similarly
situated; RODNEY O. BEST, individually and on behalf of a class
of individuals similarly situated; KAREN VANDYKE, individually
and on behalf of a class of individuals similarly situated;
ROBERT C. YOUNG, individually and on behalf of a class of
individuals similarly situated; ROYLINE LAMB, individually and
on behalf of a class of individuals similarly situated; LYNN
DAVIS, individually and on behalf of a class of individuals
similarly situated; JAMES A. JACKSON, individually and on behalf
of a class of individuals similarly situated; JUAN ROSARIO,
individually and on behalf of a class of individuals similarly
situated; LOUIS ROSARIO, JR., individually and on behalf of a
class of individuals similarly situated; OBED ALMEYDA,
individually and on behalf of a class of individuals similarly
situated; DEVON WILLIAMS, individually and on behalf of a class
of individuals similarly situated; JULIO M. TOLEDO, individually
and on behalf of a class of individuals similarly situated,

Plaintiffs-Appellants,

v.

MARISOL NOBREGA, individually and on behalf of a class of
individuals similarly situated,

Plaintiff,

v.

CITY OF LAWRENCE, MASSACHUSETTS; CITY OF METHUEN, MASSACHUSETTS;
COMMONWEALTH OF MASSACHUSETTS; PAUL DIETL, in his capacity as
Personnel Administrator for the Commonwealth of Massachusetts;
JOHN MICHAEL SULLIVAN, in his capacity as Mayor of the City of
Lawrence, Massachusetts; WILLIAM MANZI, III, in his capacity as
Mayor of the City of Methuen, Massachusetts; APPOINTING

AUTHORITY FOR THE CITY OF LOWELL, MICHAEL O'BRIEN, in his
capacity as City Manager of the City of Worcester,
Massachusetts; CITY OF BOSTON, MASSACHUSETTS; CITY OF
SPRINGFIELD, MASSACHUSETTS; DOMENIC J. SARNO, JR., in his
capacity as Mayor for City of Springfield; MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY; DANIEL GRABAUSKAS, in his capacity as
General Manager; BOARD OF TRUSTEES OF THE MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,

Defendants-Appellees,

WILLIAM F. MARTIN, in his capacity as Mayor of the City of
Lowell, Massachusetts; KONSTANTINA B. LUKES, in her capacity as
Mayor of the City of Worcester, Massachusetts,

Defendants.

_____

On Appeal from a Judgment of the United States
District Court of Massachusetts

Case No. 07-11693
The Honorable George A. O'Toole, Jr.

_____

**PLAINTIFFS-APPELLANTS' BRIEF**

_____


**Counsel for Plaintiffs-Appellants**

Harold L. Lichten, C.A.B. 22114
Benjamin Weber, C.A.B. 1159650
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
617)-994-5800

Stephen Churchill, C.A.B. 30464
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3262
steve@fairworklaw.com


DATED:  February 27, 2015

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant, The Massachusetts Hispanic Law Enforcement Association hereby states that its corporate status was revoked in 2012 and is an unincorporated association.

**TABLE OF CONTENTS**

TABLE OF CONTENTS............................................. ii

TABLE OF AUTHORITIES.......................................... v

JURISDICTIONAL STATEMENT...................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW...................... 1

STATEMENT OF THE CASE......................................... 2

   I. PROCEDURAL HISTORY ...................................... 2

   II. STATEMENT OF FACTS .................................... 4

      A.  INTRODUCTION AND HISTORICAL BACKGROUND ................ 4

      B.  ADVERSE IMPACT OF THE BOSTON AND STATEWIDE EXAMS ....... 5

      C. BOSTON'S PROMOTIONAL EXAM HISTORY. ..................... 8

      D. DUTIES OF POLICE SERGEANTS ........................... 10

      E. THE CONSTRUCTION OF THE 2005, 2006, 2007, AND 2008 EXAMS. ................................................. 11

      F. THE EDUCATION AND EXPERIENCE COMPONENT ................ 14

      G. THE WEIGHTING OF COMPONENTS .......................... 16

      H. PASSING SCORES AND USE OF EXAM SCORES AS RANKING DEVICE. 16

      I. LESS DISCRIMINATORY ALTERNATIVES ..................... 18

SUMMARY OF ARGUMENT.......................................... 21

ARGUMENT..................................................... 25

   I. THE COURT ERRED AS A MATTER OF LAW TO THE EXTENT IT FOUND THAT A TEST FOR THE SUPERVISORY POSITION OF POLICE SERGEANT WAS VALID WHERE SUPERVISORY AND OTHER RELATED SKILLS NECESSARY TO PERFORM THE JOB OF POLICE SERGEANT WERE NOT AND COULD NOT BE PROPERLY TESTED FOR BY A MULTIPLE CHOICE ROTE MEMORY EXAMINATION. ...................................... 25

   II. THE DISTRICT COURT'S COMPLETE FAILURE TO CONSIDER OR ADDRESS WHETHER THE "MINIMALLY VALID" EXAMINATION COULD BE USED AS A STRICT RANK ORDER SELECTION DEVICE IS CLEAR REVERSIBLE ERROR. ................................................ 35

III. THE COURT ERRED TO THE EXTENT THAT IT FOUND THAT THE E&E RATING MADE AN OTHERWISE INVALID EXAMINATION VALID. ...... 40

IV.  THE DISTRICT COURT IGNORED OTHER MAJOR FLAWS IN THE CONSTRUCTION OF THE 2005 AND 2008 EXAMS WHICH PREVENTED A FINDING THAT THEY WERE VALID. ............................ 43

A. HRD Failed to Conduct an Adequate Job Analysis. ........ 44

1. The Court Erred in Crediting the 1991 Testability Analysis. ............................................... 51

2. The Written Exams Failed to Measure a Representative Sample of the Job. ....................................... 55

B. The Questions Failed to Test for the Critical KSAs. .... 57

V.  THE COURT'S OPINION THAT THERE MAY NOT BE EQUALLY VALID LESS DISCRIMINATORY ALTERNATIVES IS CLEARLY ERRONEOUS. ...... 59

A. Boston Used The Most Discriminatory Test Possible, And Failed To Consider Other Way to Assess Job Knowledge; 59

B. The Court Erred In Its Analysis of Less Discriminatory Alternatives. ......................................... 60

C. The Plaintiffs Clearly Demonstrated Appropriate Less Discriminatory Alternative Procedures That Would Have Had More Validity. ......................................... 66

1. Use of the written multiple choice test to qualify for further consideration, not as a rank order device. ....... 66

2. Banding. .............................................. 69

3. Use of a scored written multiple-choice test with the addition of other components. ........................... 70

4. Restructuring the job knowledge test to test for understanding, not memorization. ........................ 70

VI.  THE DISTRICT COURT ERRED IN RULING THAT THE PLAINTIFFS FAILED TO PROVE A PRIMA FACIE CASE OF ADVERSE IMPACT WITH RESPECT TO THE SMALLER JURISDICTIONS. .................. 72

A.  A PRIMA FACIE CASE OF ADVERSE IMPACT IS A MODEST BURDEN THAT CAN BE SATISFIED WITH MULTIPLE FORMS OF EVIDENCE. . 72

B. THERE WAS UNDISPUTED EVIDENCE ESTABLISHING ADVERSE IMPACT..............................................76

C. THE DISTRICT COURT ERRED WHEN PLACING DISPOSITIVE WEIGHT
ON CERTAIN FORMS OF EVIDENCE........................ 83

CONCLUSION................................................ 92

## <u>TABLE OF AUTHORITIES</u>

### Cases

<u>Albermarle Paper co. v Halifax Local</u>, 425 422 U.S. 405 (1975) 27, 43

<u>Allen v. City of Chicago</u>, 2002 WL 31176003 (N.D. Ill. 2002)... 39

<u>Banks v. East Baton Rouge Parish School Bd.</u>, 320 F.3d 570 (5th Cir. 2003) ................................................ 75

<u>Bazile v. City of Houston</u>, 858 F. Supp.2d 718 (S.D. Tex. 2012) ...................................................... 51, 58

<u>Bigby v. City of Chicago</u>, 1984 WL 49001 (N.D. Ill. 1984)..... 39, 57, 63

<u>Black Law Enforcement Officers Ass'n v. City of Akron</u>, 824 F.2d 475 (6th Cir.1987) .......................................... 43

<u>Boston Chapter, N.A.A.C.P., Inc. v. Beecher</u>, 504 F.2d 1017 (1st Cir. 1974) .............................................. passim

<u>Boston Police Superior Officers Federation v. City of Boston</u>, 147 F.3d 13 (1st Cir. 1998) ................................... 8

<u>Boston Police Superior Officers Fed'n v. Civil Serv. Comm'n</u>, 35 Mass. App. Ct. 688, 624 N.E.2d 617 (1993) ................... 34

<u>Brackett v. Civil Service Commission</u>, 447 Mass. 233 (2006)..... 8

<u>Bradley v. City of Lynn</u>, 443 F. Supp.2d 145 (D. Mass. 2006) ...................................................... passim

<u>Brunet v City of Columbus</u>, 1 F. 3d 390 (6th Cir. 1993).... 26, 37

<u>Bunch v. Bullard</u>, 795 F.2d 384 (5th Cir. 1986)................ 90

<u>Burney v. City of Pawtucket</u>, 559 F. Supp. 1089 (D.R.I. 1983).. 78

<u>Capaci v. Katz & Besthoff</u>, 711 F.2d 647 (5th Cir. 1983)....... 88

<u>Carr v. Department of Personnel Administration</u>, Civil Service Commission No. G-1461 (Dec. 21, 1989) ....................... 34

<u>Castro v. Beecher</u>, 459 F.2d 725 (1st Cir. 1972)............... 8

<u>City and County of San Francisco v. Fair Employment and Housing Commission</u>, 236 Cal. Rptr. 716 (Ct. of App. 1st Dist. 1987) . 31

<u>United States v. City of Chicago</u>, 573 F.2d 416 (7th Cir. 1978) 48

Connecticut v. Teal, 457 U.S. 440 (1982)...................... 84

Costa v. Markey, 706 F.2d 1 (1st Cir. 1983)................... 85

Cotter v. City of Boston, 323 F.3d 160 (1st Cir. 2003)........ 8

Donahue v. City of Boston, 304 F.3d 110 (1st Cir. 2002)....... 85

E.E.O.C. v. Hennepin Cnty., 623 F. Supp. 29 (D. Minn. 1985)... 65

Eldredge v. Carpenters 46 N. California Counties Joint
  Apprenticeship and Training Comm., 833 F.2d 1334 (9th Cir.
  1987) ..................................................... 88

Ensley Branch of NAACP v. Scibels, 616 F.2d 812 (5th Cir. 1980)
  ........................................................... 37

Firefighters Institute for Racial Equality v. City of St. Louis,
  549 F.2d 506 (8th Cir. 1977) .............................. 27

Fudge v. City of Providence Fire Dep't, 766 F.2d 650 (1st Cir.
  1985) ..................................................... 89

Guardians Association of New York City Police Department v. City
  of New York, 630 F.2d (2d Cir. 1973) .................. passim

Guardians, 490 F.2d 387 (2d Cir. 1973)................... 29, 40

Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324
  (1977) ................................................ 73, 90

Isabel v. City of Memphis, 404 F.3d 404 (6th Cir. 2005)... 51, 75

Johnson v. City of Memphis, 770 F.2d 484 (6th Cir. 2014)...... 64

Jones v. City of Boston, 752 F.3d 38 (1st Cir. 2014)...... 73, 74

Jones v. New York Human Resources Dep't, 391 F. Supp. 1064
  (S.D.N.Y. 1975) ........................................... 88

Kirkland v. New York State Department of Correctional Services,
  374 F. Supp. 1361 (S.D. N.Y. 1974) ........................ 28

Langlois v. Abington House. Authority, 207 F.3d 43 (1st Cir.
  2000) ................................................. 72, 74

League of United Latin American Citizens v. City of Santa Ana,
  410 F. Supp. 873 (C.D. Cal. 1976) ......................... 89

Lilly v. Harris-Teeter Supermarket, 720 F.2d 326 (4th Cir. 1983)
  ........................................................... 88

Lopez v. Com., 463 Mass. 696, 711, 978 N.E.2d 67 (2012)........ 3

Lopez v. State, 588 F.3d 69 (1st Cir. 2009).................... 3

Massachusetts Ass'n of Minority Law Enforcement Officers v.
  Abban, 434 Mass. 256, 748 N.E.2d 455 (2001) .............. 9, 62

Massachusetts Association of Afro-American Police, Inc. v.
  Boston Police Dept., 780 F.2d 5 (1st Cir. 1985) .............. 8

NAACP v. City of Corinth, 83 F.R.D. 46 (N.D. Miss. 1979)...... 88

Nash v. Consolidated City of Jacksonville, FL, 837 F.2d 1534
  (11th Cir. 1988) ........................................... 33

Officers for Justice v. Civil Service Commission of San
  Francisco, 371 F. Supp. 1328 (N.D. Cal. 1973) ........... 30, 37

Paige v. California, 291 F.3d 1141 (9th Cir. 2002)............ 88

Phillips v. Cohen, 400 F.3d 388 (6th Cir. 2005).............. 75

Police Officers for Equal Rights v. City of Columbus, 644 F.
  Supp. 393 (S.D. Oh. 1985) ............................... passim

Pratt v. Dietl, No. 09-1254 (Suffolk Sup. April 15, 2009). 17, 18

Reynolds v. City of Chicago, 296 F.3d 524 (7th Cir. 2002)..... 91

Rivera v. City of Wichita Falls, 665 F.2d 531 (5th Cir. 1982). 75

Salas v. Wisconsin Dept. of Corrections, 2006 WL 1049469 (W.D.
  Wis. 2006) ................................................. 91

Sanchez v. City of Santa Ana, 928 F. Supp. 1494 (C.D. Cal. 1995)
  ........................................................... 79

Torres v. City of Chicago, 2000 WL 549588 (N.D. Ill. 2000).... 91

U.S. v. City of Montgomery, 775 F. Supp. 1450 (D. Ala. 1991).. 63

U.S. v. City of New York, 683 F. Supp. 2d 225 (E.D.N.Y. 2010). 75

U.S. v. New York Bd. of Educ., 448 F. Supp. 2d 397 (E.D.N.Y.
  2006) ..................................................... 92

United States v. City of Chicago, 549 F.2d 415 (7th Cir. 1977) 31

United States v. City of Yonkers, 609 F. Supp. 1281 (S.D.N.Y.
  1984) ..................................................... 88

Vanguard Justice Society v. Hughes, 471 F. Supp. 670 (D. Md.
  1979) ..................................................... 29

Vanguard Justice Society v. Hughes, 592 F. Supp. 245 (1984).. 29,
  37, 65

Vulcan Pioneers Inc. v. New Jersey Department of Civil Service,
  625 F. Supp. 527 (D.N.J. 1985) ........................... 32, 87

Waisome v. Port Authority of New York and New Jersey, 948 F.2d
  1370 (2d Cir. 1991) ......................................... 78

Walls v. Mississippi State Dept. of Public Welfare, 542 F. Supp.
  281 (N.D. Miss.) ............................................ 78

Watson v. Fort Worth Bank & Trust, 487 U.S. 977 (1988)........ 72

**Statutes**

28 U.S.C. § 1291............................................. 11

29 C.F.R. § 1607.14.................................... 25, 35, 53

29 C.F.R. § 1607.15......................................... 60

29 C.F.R. § 1607.4(D) ...................................... 84

29 C.F.R. § 1607.5(g)................................... 44, 45

42 U.S.C. §§ 2000e.................................... 12, 34

M.G.L. c. 31 § 6A and B..................................... 74

M.G.L. c. 31, § 5(l)....................................... 13

M.G.L. c. 4, § 7........................................... 13

**Other Authorities**

Iannone Textbook Principles of Supervision................... 43

The Civil Rights Act of 1991 and Less Discriminatory
  Alternatives in Disparate Impact Litigation, 106 Harv. L. Rev.
  1621 (1993) ............................................... 74

**Rules**

Fed. R. App. P. 4(a)(1)(A).................................. 11

**Regulations**

Adoption of Questions and Answers To Clarify and Provide a
  Common Interpretation of the Uniform Guidelines on Employee
  Selection Procedures, 44 Fed. Reg. 11996 (1979) ......... 94, 98

## JURISDICTIONAL STATEMENT

The district court entered judgment in favor of all defendants on September 5, 2014. (R.136).[1] The officers filed a timely notice of appeal on September 9, 2014. (R.138). As a result, this Court has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Whether the district court erred in finding that a written job-knowledge test used as a strict rank-ordering device was valid under the Uniform Guidelines where the evidence demonstrated that the test failed to differentiate between better performing candidates and failed to measure a representative sample of the knowledges, skills, and abilities required for the position of sergeant and where it tested for only for rote memorization.

2.  Whether the district court erred in finding that a written test that is indisputably not valid under the Uniform Guidelines may become valid through the addition of a training and experience rating that fails to accurately measure any

---

[1]    Citations to the record will be as follows: "R." refers to the Record Appendix and "RS." refers to the documents in the separate appendix for documents filed under seal.

1

knowledges, skills, or abilities of test takers and adds little to their final test scores.

3.   Whether the district court erred in finding that the plaintiffs failed to establish the existence of equally valid less discriminatory alternatives where the consensus among judges and scientific experts is that adding components such as structured interviews or assessment centers or merely banding the final scores both increases validity and decreases adverse impact.

4.  Whether the district court erred by requiring plaintiffs to prove a prima facie case of adverse impact through one narrow type of statistical analysis, where there was an abundance of undisputed evidence, in multiple forms that have been recognized as sufficient by this and other courts, that the challenged exams had an adverse impact on minority police officers.

## STATEMENT OF THE CASE

**I.   PROCEDURAL HISTORY**

The initial complaint was filed on September 11, 2007. (R.25). The then-current plaintiffs moved for class certification on January 15, 2008. (R.28). On June 9, 2008, that motion was denied as to the liability stage and denied without prejudice as to the potential remedy stage. (R.32).

On July 1, 2010, the officers filed a seventh amended complaint ("Complaint"). (R.48, 62-74).[2] The Complaint was brought by 46 plaintiffs and alleged two counts: disparate impact race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. (Count I), and disparate impact race discrimination under Massachusetts law, M.G.L. c. 151B (Count II). (R.63-67, 73). Both counts were alleged against the MBTA and six Massachusetts cities, including Lawrence, Methuen, Lowell, Worcester, Boston, and Springfield. (R.67-68, 73).

The case proceeded to a bench trial before the district court (O'Toole, J.), which lasted 18 days between July 12, 2010 and September 17, 2010. (R.49-56, 140-2542). On September 5, 2014, the district court issued its Findings of Facts, Conclusions of Law, and Order for Judgment. (R.89-135). The court concluded that all defendants were entitled to judgment in their favor. (R.135). Judgment entered that same day. (R.136). The officers filed a notice of appeal on September 9, 2014. (R.138).

---

[2]    The initial complaint named the Massachusetts Human Resources Division ("HRD") as a defendant, but this Court ruled they were not an employer. Lopez v. State, 588 F.3d 69, 72-73 (1st Cir. 2009). Later, in Lopez v. Com., 463 Mass. 696, 711, 978 N.E.2d 67, 80 (2012), the SJC held that under ch. 151B, the plaintiffs could proceed against the state defendants. That case is now pending this appeal.

## II.  STATEMENT OF FACTS

### A. INTRODUCTION AND HISTORICAL BACKGROUND

This case was brought in 2007, by a group of minority police officers (black and Hispanic). (R.1, 62-74). Each of the plaintiffs took either the 2005, 2006, 2007 or 2008 police sergeants' examination and were not promoted. (R.63-67). Each exam was administered by the Commonwealth of Massachusetts Human Resources Division (HRD). (R.97). The two exams for Boston (2005 and 2008) had some questions unique to Boston as described below.

Each Massachusetts community had the option of developing its own promotional exam. M.G.L. c. 31, § 5(l). However, in this case, all of the exams were constructed and designed by HRD.

Each of the exams consisted of two elements – a written closed book multiple choice test consisting of 80 questions which are taken directly out of textbooks placed on a "reading list" and which accounts for 80% of the exam score, and a so-called education and experience ("E&E") rating which nominally accounts for 20% of the exam score.[3] (R.305-06, 2556). Because every applicant receives at least 14 of the 20 points, (R.306, 2179-85, 4556-67) the E&E actually accounts for no more than 6% of the exam score.

---

[3] Pursuant to Massachusetts law, some military veterans may receive an additional two points added to their final exam score. M.G.L. c. 4, § 7 (R. 306, 2557-58).

4

The 80 questions either quoted or closely paraphrased text from the reading list. (R.434-36, 2556-59). The test maximized rote memorization. Candidates needed to receive a score of 70 to pass the exam.[4] (R.324). That cut-off score was not established based upon any scientific criteria. (R.325). If a candidate passed the examination, he was then ranked by score on the HRD list of qualified candidates for his or her municipality. (R.307-08). Selections can only be by the municipality from the top candidates using what is known as the 2N + 1 rule. (R.308). This means that if there is one vacancy only, the top three candidates can be selected. However, in most jurisdictions, particularly Boston, candidates were selected in strict order based upon their rank on the list. (R.1295, 1769, 1831).

**B.  ADVERSE IMPACT OF THE BOSTON AND STATEWIDE EXAMS**

At trial, all of the experts agreed that minorities are known to perform worse on the kinds of multiple-choice job-knowledge tests at issue in this case. (R.353-55, 436-40, 448, 1389, 2189-90, 2431). It is not surprising, therefore, that the evidence powerfully and consistently indicated that minorities performed measurably worse on the challenged exams. That evidence included differences in the average scores of minority versus non-minority candidates, differences in promotion rates,

---

[4]   For the 2008 exam, the passing score was lowered to 64. (R.2695-2715).

differences in passing rates, and more.

All experts agreed that differences in the average scores of minority versus non-minority candidates (also known as "mean score differences") can establish adverse impact. (R.2456-57). That is particularly true where promotions were made in strict rank order based on exam scores. A group with a higher average score (here, non-minorities) is likely to get promoted at higher rates.

For the 2005 and 2008 Boston exams, the average scores for non-minority candidates were 6.4 and 6.6 points higher, respectively, than the average scores for minority candidates. (R.4313). These differences were highly statistically significant, with a p-value of 0.0000001 or lower. (R.4313).[5] Likewise, the statewide exams that were used by all of the smaller jurisdictions had average score differences that were also stark (ranging from 3.4 to 5.0 points) and highly statistically significant. (R.4315, 4319).[6] Such differences are outcome determinative. (R.1173).

Second, these differences in average scores resulted, as expected, in statistically significant different promotion

---

[5]  This p-value means that the probability the disparate outcomes occurred by chance was less than 1 out of 10,000,000.
[6]  At trial, experts for both sides agreed that when the same exam is used across jurisdictions (as it was here for the non-Boston defendants), it is appropriate to look at the combined results when evaluating whether it had an adverse impact. (R.314-15, 319, 359, 392, 2495).

rates, with non-minorities getting promoted at higher rates than minorities. For Boston's 2005 exam, minorities were promoted at about a quarter of the rate of non-minorities. (R.4313). For the 2008 exam, minorities were promoted at about 1/20th the rate that non-minorities were promoted. (R.4313). Although Boston's 2005 and 2008 exams were different from the statewide exams to the extent they covered some Boston-specific material, the structure of all of the exams was otherwise identical: 80 closed-book, multiple-choice questions, requiring candidates to recall verbatim facts from assigned materials.

Third, plaintiffs presented further statistics about mean score differences, promotion rates, and passing rates (R.4307-4327), which collectively pointed to the inescapable conclusion that the challenged exams posed a substantial roadblock to minority advancement. Because of the smaller numbers in some jurisdictions, some of those analyses were statistically significant and some were not, but they consistently supported a finding of adverse impact. In terms of passing rates, for example, the officers' provided the following undisputed figures (R.4308):

| Exam | Minority Passing Rate | Non-Minority Passing Rate |
|---|---|---|
| 2005 Statewide | 31.8% | 50.9% |
| 2006 Statewide | 59.7% | 74.5% |
| 2007 Statewide | 56.8% | 68.4% |
| 2008 Statewide | 59.0% | 65.7% |

| 2005 Boston | 43.3% | 70.3% |
| 2008 Boston | 63.4% | 87.3% |

Given that such exams are universally recognized as posing greater hurdles to minorities, it comes as no surprise that minorities were grossly underrepresented in the sergeant ranks of the defendant jurisdictions. For example, in Lawrence (R.3207-3208, 3209-12), Lowell (R.3142), Springfield (R.1704-1705, 3008), and Worcester (R.3023-24, 3073-3087), the percentage of minority sergeants is *less than half* the percentage of minority police officers, meaning there is a sharp drop in minority representation at the promotional stage.

### C. BOSTON'S PROMOTIONAL EXAM HISTORY.[7]

Between 1985 and up until the time of trial, a period of over 25 years, Boston appears to have utilized HRD's statewide examination (the multiple choice written test) on all but three occasions, 1985, 1992, and 2002. The 1985 exam resulted in no

---

[7] There is a long and unfortunate history of discrimination with respect to the use of police exams in Massachusetts and Boston particularly. See Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Massachusetts Association of Afro-American Police, Inc. v. Boston Police Dept., 780 F.2d 5, 6 (1st Cir. 1985); Boston Police Superior Officers Federation v. City of Boston, 147 F.3d 13, 15 (1st Cir. 1998); Brackett v. Civil Service Commission, 447 Mass. 233, 245 (2006); Cotter v. City of Boston, 323 F.3d 160, 164-65 (1st Cir. 2003). Plaintiffs believe this history will be discussed in a soon-to-be filed brief of one of the amicus, and will not be repeated here. However, a review of these cases demonstrates that the City of Boston and HRD were well aware of the systemic discriminatory effect that these multiple choice tests have had on minority candidates.

adverse impact at the passing rate. (R.3297).[8] In 1992, an examination was given which consisted of the written multiple choice examination, and a structured oral interview. See Massachusetts Ass'n of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 262, 748 N.E.2d 455, 460 (2001). This added component helped close the gap between minority and non-minority scores. (R.449-51). In 2002, Boston hired a company which designed a multi-component examination process. However, Boston removed one component, a "performance review system" before the test was given. The video exercise/assessment center component had a significantly lower level of disparate impact on minority candidates than the written multiple choice part of the test. (R.450, 861-63). The consultants who designed the 2002 multi-component test for Boston determined that 60% of the job of police sergeant should be tested using components other than a written job knowledge test. (R.1994).

In 2005 and 2008, Boston returned to the same 80/20 multiple choice job knowledge test that had resulted in such extraordinary disparate impact over the years. Predictably, the 2005 and 2008 Boston Police Sergeant's examination had such

---

[8] In 1987, Boston gave a multi-component exam, but discarded the results when an allegation was made that some video scenarios had been tainted, even though that was allegation was later rejected by the Civil Service Commission years after the examination results were certified. See Carr v. Personnel Administrator, discussed later herein (R.3362-92).

severe disparate impact on minority candidates, and was so
highly statistically significant, that the City of Boston did
not even contest the issue of adverse impact.[9] (R.108).

### D.  DUTIES OF POLICE SERGEANTS

Police sergeants are first-level supervisors with direct
responsibilities for supervising patrol officers on the street.
(R.210-12, 1688-89, 4688-89). A police sergeant spends a
majority of his time in a patrol car supervising other officers,
and responding to serious emergency situations. Id. A police
sergeant must have good interpersonal skills, leadership
ability, and the ability to implement policies like community
policing. (R.213, 669, 875-76, 1243, 1689, 1830). Sergeants, as
first-line supervisors, must deal with critical situations in
the field with calmness and respect for the community. (R.204-
14, 1689, 1792). The critical difference between a patrol
officer and a police sergeant is the fact that the sergeant must
assume supervisory responsibilities. (R.212). The experts all
agreed that a sergeant must have the ability to persuade,
negotiate, be flexible, and to manage stress. (R. 213, 669, 875-
76, 1243, 1689, 1830).

---

[9]    For example, for the 2008 exam, as of trial, 8.6% (23) of
non-minorities on the list had been promoted, while only 0.5%
(1) minority who passed was promoted. Id.
    There was also a severe mean score difference for
minorities on the two tests of 6.4 and 6.6 points respectively.
(R.4311).

Boston purported to rely on two studies – one from 1991 and one from 2000, which assessed the knowledge, skills and abilities necessary to hold the position of police sergeant. Both studies determined that certain supervisory skills and abilities were critical for the job including the;

a) Ability to make and carry out decisions quickly;

b) Ability to give clear, concise verbal orders;

c) Ability to communicate orally and in writing;

d) Ability to bring calm to control surroundings when in stress-producing situations;

e) Ability to establish rapport with persons from different ethnic, cultural and economic backgrounds;

f) Skill in implementing community policing procedures and techniques;

g) Interpersonal skills;

h) Presentation skills;

i) Ability to instill confidence;

j) Ability to think under pressure; and

k) Ability to plan and organize properly.

(R.3927-33, 4059-65).

### E.   THE CONSTRUCTION OF THE 2005, 2006, 2007, AND 2008 EXAMS.

Unlike virtually every large city in the country, HRD used the same basic written test for the years 2005 through 2008 that

11

it has used for the last forty years. The exam contains 80
questions which are taken from a group of textbooks,
supplemented for Boston, with rules and regulations of the BPD.
(R.2556-59). A reading list is provided to candidates in the
spring, and the test is given in the fall. Virtually all of the
questions come verbatim out of the texts. (R.434-36, 2609,
2644).

The test questions were written by a lay person employed by
HRD, who did not testify in this case, and whose credentials are
uncertain. (R.410, 435-36, 465-67, 472, 477-78, 1625, 2158). All
of the questions were closed-book, meaning that applicants had
to recall the texts by memory. (R.434-36, 2556-59). The
defendants' own experts testified that at least part of the test
should have been open book. (R.2422-23, 2426-27). Further,
virtually all of the questions did not test for anything other
than rote memorization. (R.476-77, 611-44, 1510-11).

The court indicated that the test questions were ultimately
derived from test outlines based on the 1991 validation report
and a 2000 job analysis. (R.120). Each report identified well
over 100 "knowledges, skills and abilities" ("KSA's") that were
critical to performing the position of police sergeant. (R.3927-
33, 4058-66). In the 1991 validation report, each of the
critical KSA's was put into one of three categories: a) tested
on the written test, b) covered by the "E&E" component, or c)

12

not tested at all. (R.3927-33). Similarly, in the 2000 job
analysis, 155 critical KSA's were identified. (R. 4058-66).
However, because the City of Boston had already determined to
only use a written examination, all of the skills and abilities
that were not testable by a written examination (which included
most of the supervisory skills and abilities) were placed in the
"not tested" category. Id. HRD took approximately 13 knowledges
and 2 skills and decided that they would test for those,
ignoring all of the other important skills and abilities.
(R.2640-43). (R.3928). The written test did not test for most of
the skills and abilities that were identified as critical to the
position of police sergeant. (R. 3929-3933).

There were a number of similar problems identified
regarding the construction, of the 2005 and 2008 Boston exam.
These are discussed in more detail in Section IV. Briefly, the
job analysis was created by having 11 so-called subject matter
experts look at each potential knowledge, skill and ability, and
assess independently the importance of such KSA, whether it was
critical for the job, and whether it was regularly performed.
(R.4000, 4042-56). In all there were 20,000 possible responses
for the 11 subject matter experts, but inexplicably, there was
100% agreement on all 20,000 listed skills and abilities,
meaning that every subject matter expert agreed on every
category – an impossibility. (R.4000, 4042-56).

13

F.    THE EDUCATION AND EXPERIENCE COMPONENT

The court adopted Dr. Outtz's opinion (R.1892, 2111-12, 2185) (R.410-11, 415) that only with the addition of the E&E component did the exam achieve "minimal" validity. (R.2112).

However, Dr. Outtz was unable to assess the validity of the E&E component because he demonstrated only a limited understanding of how it worked. (R.2173-85). Dr. Outtz agreed that an "E&E" component of a promotional exam only added somewhere in the range of 1-4% to the validity of a test. (R.2160-65). The E&E rating, uses the same point formula for all police and fire promotions from sergeant to chief. (R.2611-18, 4819-27). All candidates eligible to sit for the test automatically get 14 points. (R.304-07, 2179). Candidates can get points for: a) police work experience, b) post-secondary degrees, c) courses taught, and d) licenses held. (R.2618). For post-secondary degrees, the range of points is 0 for no degrees to 12 for PhD but when multiplied by the weight of 20% this point range becomes 0 – 2.4. Moreover, as a result of the so-called Quinn bill, codified at M.G.L. ch. 41, §108L, most police officers in Massachusetts have at least a bachelor's degree, some have a master's degree, and virtually no one has a PhD. So the real range for educational credit is less than one point. (R.2618). For courses taught, candidates can get anywhere from 0 (no courses) to 1.5 (ten courses) resulting in a weighted range

14

of 0 – 0.3. Id. In reality, few candidates will have taught ten courses so the realistic range is much smaller. Finally for licenses held, candidates can get anywhere from 0 (no licenses) to 2 points (for two or more licenses) resulting in a weighted range of 0 – 0.4. Id. The combined effect of these four categories is a point range of .84 (representing a police officer with three years of experience and no degrees, no courses taught and no licenses) to 6.16 (a police officer with 12+ years of experience, a PhD, 10+ courses taught and 2+ licenses) resulting in a maximum spread of 4.96 points. Id. But because most candidates will fall in the middle of the two extremes, the education and experience component ends up having very little practical effect.

More significantly, candidates do not get any points for more relevant experience. For example, a platoon sergeant in the U.S. Marine Corps, supervising and training forty Marines gets no points. (R.1303). No points are given for completing a course at the FBI. (R.253-54). Dr. Outtz agreed that such experience was relevant and should have been counted in considering such candidates for police promotion.[10] (R.2173-78).

---

[10] Further, as described herein, in the 1991 validity study, HRD took a number of skills and abilities and attributed them to the E&E rating, without any logical foundation. Thus, the following skills were listed as being testable by the E&E: 1) knowledge of proper behavior in the courtroom; 2) knowledge of various communities within the department's jurisdiction and the factors

15

### G.    THE WEIGHTING OF COMPONENTS

It is undisputed that in determining content validity of an exam, it is important that the components be weighted based upon their relative importance of the critical KSA's which they test for. 29 C.F.R. § 1607.14 (R. 1942-43, 1994-95, 2431-32). See also Outtz Brief, 2009 WL 796281 at pg. 12-13 (discussing need to justify weights). In this case, the defendants offered no evidence to support any justification for the relative weights assigned to the two components of the exam, 80% for the written and 20% for the education and experience.

### H.    PASSING SCORES AND USE OF EXAM SCORES AS RANKING DEVICE.

Defendants put on no evidence to justify the use of 70 as a passing score on the written multiple choice test, despite the fact that there are professionally accepted practices for setting passing levels, and there was significant adverse impact at the passing level. (R.324-25).

More importantly, no evidence was presented to support the use of the multiple choice exam as a strict rank order device. Rather, there was substantial evidence which demonstrated that

---

that make them unique; 3) skills in perceiving and reacting to the needs of others; 4) ability to write; 5) ability to be confidential; 6) ability to accept responsibility; 7) knowledge of the limit of one's own authority; 8) skills at interviewing and interrogation; and 9) knowledge of procedure/technique when major disaster occurs. There is simply no showing that any of these KSA's are covered by HRD's pro forma education and experience rating system.

the exam was not proper for use as a rank order device. <u>Ensley Branch of NAACP v. Seibels</u>, 616 F.2d 812, 822 (5th Cir. 1980) (use of a test for ranking "is justified only if there is evidence showing that those with a higher test score do better on the job than those with a lower test score").

In 2008, the City of Boston's own consultant, Dr. Jacobs, recommended that, because the test had no way of differentiating the best candidate with test score ranges, that the results be "banded."[11] (R.4232-33). Thus anyone who received a score within a seven-point band would be considered to have achieved the same score. (R.457-59, 4232-33). HRD and Boston agreed to do this, but later dropped the plan when the union challenged it. (R.1231-32). <u>See</u> <u>also</u> <u>Pratt v. Dietl</u>, No. 09-1254 (Suffolk Sup. April 15, 2009). Dr. Outtz agreed that the results should have been banded. (R.2043).

Neither HRD nor Boston ever demonstrated that individuals who performed higher on the exam performed better on the job. Such a "criterion validity" study would have been highly

---

[11]    The range of the band was to be determined by error of measurement, or reliability, of the exam. (R.4232-33). Dr. Wiesen testified that the "'reliability of a test' refers to the degree to which you would expect candidates to get the same score if they were tested again using a similar test." (R.457). HRD recommended a band of 11.25 points (R.4235), but HRD ultimately attempted to create a seven-point band. <u>Pratt v. Dietl</u>, No. 09-1254 (Suffolk Sup. April 15, 2009) (attached in Addendum). Regardless, Defendants' expert testified that the recommended band was "fairly wide." (R.2145).

relevant. (R.504). On the contrary, Commissioners Davis and O'Toole testified that the tests do not identify the best sergeants.[12] (R.662, 667-70, 1241, 1243-45).

## I.   LESS DISCRIMINATORY ALTERNATIVES

None of the defendants attempted to use alternative tests from 2005 to 2008. No defendant obtained an estimate or made any inquiry into financial feasibility. Boston Police Department's operating budget for fiscal year 2006 was $234 million. (R.668). At the time of trial it had grown to $300 million. (R.1224). The Boston Police Department never requested funding for an alternative procedure in 2005 or 2008. (R.1291). Moreover, Commissioner Davis had recommended raises for the twenty or so members of his command staff, which would cost $1 million per year. (R.1224-26). Dr. Outtz testified that Defendants could have used the 2000 job analysis to prepare the 2005 or 2008 exam, thereby saving hundreds of thousands of dollars. (R.2018).

Experts for both sides agreed that there were available, scientifically-validated, and commonly used alternative police promotional exams.[13] (R.673-75, 814, 894, 2083-89, 2423-24).

---

[12]   Indeed, the Massachusetts Association of Major Police Chiefs passed a resolution in July 2010 advocating for the right to use greater assessment tools beyond written tests. (R.1823-25).

[13]   Such alternatives included: 1) Using the multiple choice job knowledge test as a hurdle, not as a scored instrument, and using other less discriminatory components to score and rank

These alternative procedures are used in conjunction with or in place of the written multiple choice job knowledge test that have such severe adverse impact on minority candidates. (R.2427-30). Indeed, all of the experts strongly supported their use. Dr. Silva's company always uses multiple components in their police promotional exams including oral work samples, written work samples, career review boards, open book tests, utilizing visual components to test situational judgment, and assessment centers. (R.2427-30).

Similarly, Dr. Outtz has made his career implementing multiple component, less discriminatory promotional exams for police and firefighters, and he has advocated extensively for the use of such tests. (R.2083, 2088). He advocated for such tests in the brief that he co-authored before the U.S. Supreme Court in Ricci v. DiStefano. See Br. of Industrial-Organizational Psychologists as Amici Curiae, 2009 WL 796281 (R.1874-76, 2083, 2087-88). In addition, Dr. Silva testified favorably about the use of career review boards, like the one

---

candidates; 2) Banding the scores as recommended by defendants'
experts; 3) Using the multiple choice job knowledge test as a
scored instrument along with other components that would have
added validity to the exam process and which are known to create
much less adverse impact; and 4) Design a job knowledge test,
but to construct the questions and utilize a format which is
known to have less adverse impact.
Id.

Boston was going to use in 2002 but then discarded. (R.1588-89, 2429-30).

Dr. Outtz, Dr. Wiesen, and Dr. Fields also supported the use of job knowledge tests that test for the same knowledges in an alternative format having less adverse impact. Dr. Outtz testified that it is more appropriate to ask knowledge questions in a manner that more closely approximates the job. (R.474-75, 823-28, 839-49853-54, 2186-87, 2422-23). Dr. Outtz testified about "construct irrelevant variance," which refers to the possibility that test scores can be more dependent on the form of the test than on the actual job-related abilities of the test taker. (R.2203). Dr. Outtz and Dr. Fields testified that minority candidates perform better on tests with open-ended questions such as "what would you do" as opposed to forced multiple choice, one right answer tests (e.g., "What is the right answer?"). (R.825, 2087).

A third option was to use banding, which HRD's consultant recommended following the 2008 exam. (R.4232-33). Banding accounts the inherent lack of reliability of written tests that attempt to predict job performance. (R.456-57). Indeed, Dr. Outtz himself favors banding. (R.2035-36). Dr. Outtz also recommended a type of banding called a "sliding band," in which the band would change after each promotion from the list. (R.2038-39).

Another scoring alternative is to use the job-knowledge test as a hurdle (with a scientifically-determined cutoff score), and then ranking the remaining candidates based on other components designed to test other critical KSAs, such as supervisory and interpersonal skills. (R.455-56; 843-44, 2414-15).

## SUMMARY OF ARGUMENT

The district court's decision upholding multiple choice rote memory tests that had severe adverse impact on minority candidates, particularly when used as a rank order device, is in conflict with Title VII, and the Uniform Guidelines. Nearly unanimous case law holds that the ability to supervise is what differentiates a police officer from a police sergeant or lieutenant. A pen and paper rote memory job knowledge test which does not and cannot test for such skills cannot meet Title VII's requirement of job relatedness and business necessity. Such pen and paper tests simply do not test for a sufficient representative sample of the essential skills and abilities necessary to be a police supervisor and therefore cannot satisfy the Uniform Guidelines. (pgs. 34-44).

Even if the District Court's conclusion that the test was "minimally valid" stood, still the Uniform Guidelines and unanimous case law would prohibit its use as a strict rank order device, which is how Boston used it, and therefore it still

21

violates Title VII. (pgs. 44-49). Further, to the extent that the court concluded that the test was only valid by reason of the inclusion of the E&E rating, that conclusion is not supportable. The E&E rating only accounted for several percentage points of the total score (not the 20% which it purported to represent), because all candidates got 14 points to start, nearly all candidates had education degrees by reason of the Quinn bill, and other available points were negligible. Thus, the E&E rating had little effect on scores. In addition, its point system was the same for police and fire positions and was neither validated nor logical. (pgs. 50-52)

The district court also ignored major flaws in the construction of the 2005 and 2008 exams which prevented a finding of validity. These included major credibility problems with the KSA ratings, failure to develop test questions from the KSA ratings, the construction of poorly written test questions, and the total failure to consider whether the test questions, as constructed, actually tested for real understanding of the subject matter. (pgs. 52-68).

The District Court set a nearly impossible burden with respect to whether the defendants had equally valid, less discriminatory alternatives available to them. First, the court erred by relying on one tentative attempt by the City of Boston to add components to its discriminatory examination procedure in

2002. In fact, in prior instances alternative components did
substantially reduce adverse impact. (pgs. 68-85). Second, the
court ignored overwhelming evidence that alternative selection
procedures, such as structured oral interviews, structured
performance review systems, in-basket and video assessment
center exercises, had been proven to have significantly less
adverse impact than a multiple choice written exam, but were
equally valid.

Further, the court improperly and unlawfully rejected
reasonable alternatives including the use of "banding" and a
"performance review system," solely on the ground that these
might be in conflict with the state Civil Service Law or the
union's contract. However, case law is unanimous that Title VII
trumps any local or state impediments to designing valid
examinations. Further, the court failed to address plaintiffs'
suggestion that the multiple choice job knowledge test be used
as a qualifying test, rather than as a scored rank order device,
and that selections be based on rankings derived from the
alternative components known to have significantly less adverse
impact. Indeed, all of the then former and current Police
Commissioners for the City of Boston strongly supported the use
of performance to make such selections.

Finally, the court erred by not even considering whether
adverse impact could have been significantly reduced by

restructuring the job knowledge test to utilize a testing format that is known to have less discriminatory impact, while still testing for the same information.

The district court's ruling that the plaintiffs failed to prove a prima facie case of adverse impact with respect to the smaller jurisdictions was erroneous as a matter of law. (pg. 85-101). The district court failed to follow long-standing legal authority establishing that plaintiffs can prove a prima facie case with multiple forms of evidence, including the very kinds of undisputed evidence present in this case – that is, evidence that minorities are known to perform worse on the types of exams at issue here, evidence that minorities obtained lower average scores on the exams, evidence that minorities were promoted at lower rates, and evidence that use of the same types of exams has resulted in a gross under-representation of minorities in the sergeant ranks. Instead, the district court erroneously placed dispositive weight on one factor: smaller numbers in the non-Boston jurisdictions. Numerous other courts have repeatedly and soundly rejected such a narrow inquiry.

24

**ARGUMENT**

I.   **THE COURT ERRED AS A MATTER OF LAW TO THE EXTENT IT FOUND THAT A TEST FOR THE SUPERVISORY POSITION OF POLICE SERGEANT WAS VALID WHERE SUPERVISORY AND OTHER RELATED SKILLS NECESSARY TO PERFORM THE JOB OF POLICE SERGEANT WERE NOT AND COULD NOT BE PROPERLY TESTED FOR BY A MULTIPLE CHOICE ROTE MEMORY EXAMINATION.**

The District Court held that even though the 2005 and 2008 Boston Police Sergeant`s exam had a long standing and severe adverse impact on minority police officer candidates they did not violate Title VII because they were "minimally valid," and it was not clear that there were equally valid less discriminatory alternatives. If affirmed, the court's decision would reverse the significant progress that Title VII disparate impact cases have had on the elimination of gross racial and ethnic disparities in the ranks of Police departments around the country, and would sanction the use of outdated pen and paper promotional tests that have an established history of severe adverse impact while also failing to select the most qualified candidates.

Having demonstrated adverse impact (at least for the 2005 and 2008 BPD exams) the burden shifted to the Defendants to prove that the exams were "job-related and consistent with business necessity." Uniform Guidelines on Employee Selection, 29 C.F.R. § 1607.14. This requirement of demonstrating the "validity" of the exam is governed by the Uniform Guidelines.

25

Both the Guidelines and subsequent court decisions lay out
detailed professional standards for proving the validity of a
selection process. In addition to the technical requirements for
demonstrating validity, there is a more fundamental requirement
"that the content of the selection procedure is representative
of important aspects of performance on the job for which the
candidates are to be evaluated" 29 C.F.R. § 1607.5(B). The
Guidelines and case law recognize three methods of validation,
only two of which are relevant here; "content validity" and
"criterion validity" 29 C.F.R. § 1607.5(A). Criterion validity
empirically measures whether performance on the test correlates
with performance on the job, (i.e. as in studying police
sergeant incumbents who previously took the test and determining
if their scores on the test correlate with their subsequent
performance on the job). Brunet v. City of Columbus, 1 F. 3d
390, 407 (6th Cir. 1993) (study demonstrated higher correlation
coefficient between score on test and performance on job). Here,
defendants rely on a "content validity" strategy which requires
proof that, the test is actually "predictive of or significantly
correlated with important elements of work behavior which
comprise or are relevant to the job for which the candidates are
being evaluated". Albermarle Paper Co. V. Halifax Local, 425 422
U.S. 405, 431 (1975). As shown below the court erred as a matter
of law in finding the tests valid, because they were not

26

representative of the most important aspects of the job, and were not shown to be predictive of job performance.

In 1977, the Eighth Circuit held in a virtually identical case:[14]

> The [fire] captain's exam admittedly failed to test the one major attribute that separates a firefighter from a fire captain, that of supervisory ability... there was no attempt to test supervisory skills prior to selecting the new captains. The city admits this lack of proper testing but claims...the method of doing it...is too expensive...both experts agree that there is no good pen and paper test for evaluating supervisory skills...as the court understands it, the written test could be a screening device only, eliminating those persons who obviously did not possess the requisite job knowledge to perform at the captain's level. The assessment center could then be used to rank those persons who successfully complete the written exam.

Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506, 511-514 (8th Cir. 1977). The Eighth Circuit thereby reversed the holding of the district court that a multiple choice job knowledge test was valid for selecting fire captains, and ordered judgment for the plaintiffs. In coming to its conclusion, the Eighth Circuit relied on an earlier Second Circuit decision, Kirkland v. New York State Department of Correctional Services, 374 F. Supp. 1361, 1378 (S.D. N.Y. 1974) affirmed 520 F.2d 420 (2d Cir. 1975)("More serious perhaps than specific item flaws is the fact that regardless…of the

---

[14] Fire captains are front line officers in the field just like Boston Police Sergeants. 549 F. 2d at 509.

attributes it is intended to measure…it fails to examine a number of traits, skills and abilities which witnesses for both sides singled out as important to the sergeant job. Among these are leadership, understanding, ability to empathize with persons from different backgrounds and ability to cope with crisis situations.").

Significantly, defendant's own expert Dr. Outtz, was the co-author of a brief in Ricci v. DiStefano, (Outtz Brief, 2009 WL 796281 at *10), in which he and other distinguished industrial psychologists argued that the New Haven Fire Lieutenant's exam was invalid because the written exam did not test for supervisory ability.("The omission from the testing domain of a KSAO that is an important job prerequisite – known in I-O psychology as "criterion deficiency" – A test that makes no attempt to measure one or more critical KSAO's cannot be validated under established standards.")

Numerous other courts have agreed that a police (or fire) promotional test that did not test for the skills and abilities necessary to perform such a supervisory position was not valid. In Vanguard Justice Society v. Hughes, 471 F. Supp. 670 (D. Md. 1979), the court held directly that a written promotional exam for a police sergeant could not meet validity standards because:

> The types of skills measured by the
> questions on the examination, including
> reading ability and rote memorization, do

28

> not include all or most of the skills that
> empirical studies have found relevant to the
> performance of police work: in effect, the
> sergeant's examination simply requires a
> detailed knowledge of the contents of less
> than a dozen books. In contrast, successful
> performance of the sergeant's position
> demands a variety of skills and traits which
> the sergeant's examination fails to
> consider.

471 F. Supp. at 737.[15] Several years later, a second and more

comprehensive police sergeant's exam was also struck down by the

same court. <u>Vanguard Justice Society v. Hughes</u>, 592 F. Supp. 245

(1984). There the exam consisted of a multiple choice job

knowledge test, a promotional appraisal and oral examination.[16]

In striking down the second examination, the court, quoting

<u>Guardians Association of New York City Police Department v. City</u>

<u>of New York</u>, 490 F.2d 387 (2d Cir. 1973), emphasized:

> The reason for a requirement that the
> content of an exam be representative is to
> prevent either the use of some minor aspect
> of the job as the basis for selection or the
> needless elimination of some significant
> parts of the job requirements from the
> selection process entirely...thus it is
> reasonable to insist that the test measure
> important aspects of the jobs, at least
> those for which appropriate measurement is
> feasible but not that it measures all
> aspects regardless of significance.

---

[15] The court also found troubling that the examination was
constructed by members of the Baltimore Civil Service Commission
who had no expertise in drafting proper questions.

[16] Significantly, the court found that the promotional appraisal
aspect of the exam had no adverse impact between blacks and
whites.

Id. at 266.[17] In <u>Officers for Justice v. Civil Service Commission</u> <u>of San Francisco</u>, 371 F. Supp. 1328, 1338 (N.D. Cal. 1973), the court reached the same result in yet another police sergeant examination case which consisted primarily of a job knowledge test which the court described as; "essentially...measuring the ability of the candidates to read and remember material from volumes of police work, sociology, and related fields."

> Supervision is one of the major factors separating the job of police officer from that of a police sergeant...the test was invalid because "the sergeant's position demands a variety of skills and traits which the sergeant examination fails to consider.

> The types of skills measured by the questions on the examination including reading ability and rote memorization ability do not include all or most of the skills that empirical studies have found relevant to the performance of police work. In effect, the sergeant's examination simply requires a detailed knowledge of the contents of less than a dozen books. In contrast, successful performance of the sergeant's position demands a variety of skills and traits which the sergeant examination fails to consider.

Id. See also <u>City and County of San Francisco v. Fair Employment</u> <u>and Housing Commission</u>, 236 Cal. Rptr. 716, 724-25 (Ct. of App. 1st Dist. 1987) (because "supervision is the primary function for the position of fire lieutenant and ability to supervise is not tested for" the "written tests are not appropriate measures

---

[17] In this case what Boston did was worse, the weights recommended by M&M, 40 written, 40 oral, and 20 T&E, became 80 written and 20 T&E.

of supervisory skills. We doubt that any paper and pencil test can measure this ability.").

Similarly, courts have found multiple choice promotional exams invalid because they failed to test for a sufficient representative sample of the actual job, and because it is imperative that there be a demonstration that "the tasks and abilities tested for on the examination substantially represent equivalent tasks on the job." United States v. City of Chicago, 549 F.2d 415 (7th Cir. 1977). In Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. 393 (S.D. Oh. 1985), the court struck down a police sergeant's examination much like the test here,[18] because "the items being tested" did not "closely approximate the tasks to be performed in the position sought by the candidate for promotion" at 414, and did not properly "consist of suitable samples of the essential knowledge, skills or behaviors composing the job in question" quoting 29 C.F.R. § 1607.14(C)(4). Moreover the court rejected the assumption that certain job "knowledge was associated with certain behaviors and a prerequisite to performing certain tasks." Id. at 415-16.

---

[18] As discussed later herein, the court also found that the defendants could not justify an experience rating requirement regarding three years of time and grade and the court found that such a requirement (which in that case did have disparate impact) had no justification because it was not borne out by any validity study. Id. at pg. 413.

31

> For example... it is quite possible to
> imagine a situation where a knowledgeable
> auto mechanic has a poor driving record or a
> situation where a gun collector has never
> had occasion to fire any of his weapons...
> proceeded on the assumption that knowledge
> of certain matters translates into capable
> performance of necessary skills, behaviors
> or tasks...cannot serve to validate these
> examinations which disparately impacted
> plaintiffs class.

Id. This is the essential defect with the district court's

analysis as well as the examination itself. The record is barren

of any evidence suggesting that the fact that a sergeant

applicant had read and memorized Iannone "Principals of

Supervision," demonstrate that that person had the skills and

abilities to be a good supervisor. Indeed, Commissioner Paul

Evans, Davis, O'Toole and Professor Nolan all testified to the

opposite. (R.220). The court ignored the issue.

In Vulcan Pioneers Inc. v. New Jersey Department of Civil

Service, 625 F. Supp. 527 (D.N.J. 1985), affirm'd 832 F.2d at

815-816 (3d Cir. 1987), the state defendants claimed that their

job knowledge municipal police promotional test was valid

because their expert determined that there were supervisory

questions on the exam. The court disagreed holding that the fire

captain test:

> focused upon abilities easily testable by
> paper and pencil tests, which have been
> found by other courts to be inherently
> incapable of measuring the single attribute
> that most separates firefighters from fire

32

> captains – the ability to supervise...such
> tests,...suffered for having qualities
> common to written tests: they tested
> reading, memory and test-taking ability over
> any knowledge or abilities required for the
> job...in so testing, many important
> abilities were omitted; less important ones
> were included.

Id. at 547.[19] Accord, Nash v. Consolidated City of Jacksonville,
FL, 837 F.2d 1534 (11th Cir. 1988) cert. granted, judgment
vacated, 490 U.S. 1103 (1989) and opinion reinstated, 905 F.2d
355 (11th Cir. 1990).

The district court also ignored a prior decision of the
Massachusetts Civil Service Commission, affirmed by the
Massachusetts Appeals Court, that was directly on point holding
that a Boston Police promotional exam which eliminated
supervisory components, was not a valid or fair test of the
necessary qualifications of the job of a superior officer.[20] Carr
v. Department of Personnel Administration, Civil Service
Commission, No. G-1461 (Dec. 21, 1989)(R.3362-92), affirmed
Boston Police Superior Officers Fed'n v. Civil Serv. Comm'n, 35
Mass. App. Ct. 688, 693-94, 624 N.E.2d 617, 620-21 (1993). In

---

[19] In affirming Vulcan Pioneers, 832 F.2d at 815-16 (3d Cir. 1987)
the Third Circuit noted that "a test that purports to sample
work behavior should closely approximate that work situation."
Similarly, in Isabel v. City of Memphis, 404 F.3d 404 (6th Cir.
2005), the Sixth Circuit also affirmed that a police sergeant's
promotional exam violated Title VII because it did not do so.
[20] The Carr decision totally undermines the District Court's
suggestion that the BPD had limited options because of the
restrictions allegedly placed upon it by the Civil Service Law,
ch. 31.

that case, a group of white officers challenged the City's

decision to eliminate the assessment component of a Boston

Police promotion exam given in 1987. Finding that the job

analysis demonstrated that the lieutenant's position involved

60% supervisory skills, the Commission held,

> Once supervisory skills are recognized as an
> important part of the job of lieutenant, it
> follows that a valid promotional exam for
> lieutenant must test for such skills, the
> DPA and intervenors claim that the multiple
> choice and training experience components of
> the exam do in fact test for such skills.
> This claim is not persuasive. While it is
> true that several of the multiple choice
> questions derived from the Iannone Textbook
> Principles of Supervision, the ability to
> answer these questions involves rote memory,
> not the application of supervisory
> principles.

Id. at pg. 20-21.

In sum, the district court's decision must be reversed

because it does not even address, let alone analyze, what is at

the very core of this case, whether a written multiple choice

job knowledge test standing virtually alone, and which had high

adverse impact against minority candidates, and which does not

test for the most important skills necessary to be a sergeant –

supervisory ability – can ever be valid. Given that the Uniform

Guidelines require that such tests at least be representative of

the important knowledges, skills and abilities necessary for the

job, and that the multiple choice tests in this case simply

omitted testing for the most important supervisory skills and abilities, the test cannot be valid.

**II.  THE DISTRICT COURT'S COMPLETE FAILURE TO CONSIDER OR ADDRESS WHETHER THE "MINIMALLY VALID" EXAMINATION COULD BE USED AS A STRICT RANK ORDER SELECTION DEVICE IS CLEAR REVERSIBLE ERROR.**

Even if somehow the Court's conclusion that the process was "minimally valid" stood, the opinion would still require reversal, because a separate but related body of law governs the determination of when a selection device with adverse impact can be used to make "rank order" selections. A "minimally valid" test is not enough. The Uniform Guidelines address this issue directly, but again the court entirely ignored the issue; see 29 C.F.R. § 1607.5(g) ("Evidence which may be sufficient to support the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines....the user should have sufficient evidence of validity and utility to support the use on a ranking basis..."). See also §1607.14(B)(6) ("Users should evaluate each selection procedure to ensure it is appropriate for operational use, including establishment of cut-off scores or rank ordering.")

Further, §1607.14(C)(9) entitled "Ranking Based On Content Validity Studies" states:

> If a user can show, by a job analysis or otherwise, that a higher score on a content

35

valid selection procedure is likely to
result in better job performance, the
results may be used to rank persons who
scored above the minimum levels. Where
selection procedures supported solely or
primarily by content validity is used to
rank job candidates, the selection procedure
should measure those aspects of performance
which differentiate among levels of job
performance.

These requirements for rank ordering are further elucidated

in the *Uniform Employee Selection Guidelines Interpretation and*

*Clarification (Questions and Answers)* published in the Federal

Register. Specifically, Question 62 provides:

To justify ranking under such validity
strategies therefore, the user needs to show
mathematical support for the proposition
that persons who receive higher scores on
the procedures are likely to perform better
on the job.... **Where the content and context
of the selection procedure are unlike those
of the job, as, for example, in many paper
and pencil job knowledge tests, it is
difficult to infer an association between
levels of performance on the procedure and
on the job...to justify use of such a test
for ranking, it would also have to be
demonstrated from empirical evidence either
that mastery of more difficult work
behaviors, or that mastery of a greater
scope of knowledge corresponds to a greater
scope of important work behaviors.**

(emphasis applied). Courts have thus universally recognized the

clear distinction between an exam's use to qualify for a

position and the use of scores as a strict rank order selection

device. Bradley v. City of Lynn, 443 F. Supp.2d 145 at 172-173

(D. Mass. 2006); Brunet, 1 F.3d at 410 ; Guardians, 630 F.2d at

36

103 (if test scores produce disparate racial results, an employer who wants to use rank ordering of the scores for hiring decisions faces a substantial task in demonstrating that rank ordering is sufficiently justified to be used); Ensley Branch of NAACP, 616 F.2d at 822  (use of a test for ranking "is justified only if there is evidence showing that those with a higher test score do better on the job than those with a lower test score"). Vanguard Justice Society, 592 F. Supp. at 254, 267. ["[t]he inference that higher scores closely correlate with better job performance must be closely scrutinized. This close scrutiny is required because a test may have enough validity for making gross distinctions between those qualified and unqualified for a job yet may be totally inadequate...to show positive correlation with job performance."]

As demonstrated in the previous section what differentiates a police supervisor (sergeant) from a police officer is the ability to supervise. See, e.g., Officers for Justice, 371 F. Supp. at 1338 ("successful performance of the sergeant's position demands a variety of skills and traits which the sergeant examination fails to consider."). Here, the evidence is undisputed that critical skills and abilities necessary to be a Boston Police Sergeant were not tested for by the written exam. Indeed, virtually every "critical skill" and "ability" identified in the 2000 job analysis was not tested for in the

exams (R.2555, 2640-43, 3927-33). Since these skills and

abilities are what differentiates a good police sergeant, the

exam could not be used as a rank order device.

In Guardians, (2d Cir. 1980) the court emphasized the

special scrutiny that must be applied when a public employer

seeks to use test results on a rank order basis:

> Whereas here the test scores reveal a
> disparate racial impact...appropriateness of
> inferring that higher scores closely
> correlate with better job performance must
> be closely scrutinized. This close scrutiny
> is required because rank ordering makes such
> a refined use of the test's basic power to
> distinguish between those who are qualified
> to perform the job and those who are not...
>
> A test may have enough validity for making
> gross distinctions between those qualified
> and unqualified…yet may be totally
> inadequate to yield passing grades that show
> positive correlation with job
> performance...but when test scores have a
> disparate racial impact, an employer
> violates Title VII if he uses them in ways
> that lack significant relationship to job
> performance…permissible use of rank ordering
> requires a demonstration of such substantial
> test validity that it is reasonable to
> expect that one or two point differences in
> the scores can reflect differences in job
> performance.

630 F.2d at 100.

In the present case, given that Boston's own expert agreed

that the written test did not have even minimal validity

(without the addition of the small E&E component) it could not

38

possibly withstand the higher scrutiny to be used a strict rank order selection device.

Here, there was no criterion validity study, demonstrating higher test scores reflect better performance as a police sergeant. The defendants provided no basis for determining that the written test had the ability to differentiate between the better candidates, and, in fact, defendants' own expert conceded that banding within seven-point spreads was appropriate because the test was unable to differentiate whether the highest scorers would be the best sergeants. (R.2043).[21]

In contrast, courts have affirmed promotional systems where there were multiple components and the written m/c test was used only as a qualifying exam prior to the scoring of the other components. See Allen v. City of Chicago, 2002 WL 31176003, *4-5 (N.D. Ill. 2002). Significantly, the merit selection and assessment center components were found to have no disparate impact on minorities. The court upheld this process when used as a rank order device because the written test was only used as a qualifier.

Here, not only did the lower court make no findings justifying the use of this exam for rank ordering purposes, but

---

[21] Bigby v. City of Chicago, 1984 WL 49001, *9 - 10 (N.D. Ill. 1984) (Chicago police lieutenant's examination could not be used as a rank order device since the defendants had not "demonstrated that scores are a valid predictor of performance on the job.")

the evidence does not permit such a determination. The
defendants did not show that the selection procedure "measure(d)
those aspects of performance which differentiate among levels of
job performance." 29 C.F.R. §1607.14(C)(9).

Finally, the City of Boston did not even attempt to
demonstrate "criterion validity." It did not attempt to take
incumbent police sergeants, have supervisors rate their
performance, and then compare those ratings with their
performance on the sergeant's job knowledge test.[22] While
Guardians does permit a demonstration of content validity
without a criterion validity study, Guardians makes clear that
there is a heavy burden.

Finally, the lower court's failure to even deal with the
issue of rank ordering is grounds for reversal.

### III.  THE COURT ERRED TO THE EXTENT THAT IT FOUND THAT THE E&E RATING MADE AN OTHERWISE INVALID EXAMINATION VALID.

The court conceded that the written examination itself was
not valid under the Uniform Guidelines, because it did not test
for a representative sample of the knowledges, skills and
abilities necessary for the job. (R.123-24 (Order at p. 35-36);
R.2112). The court accepted Dr. Outtz's view that the process

---

[22] Because sergeants taking the lieutenant's exam have to take
the same 80 questions on the lieutenant's test, this would have
been very easy to do. The Boston Police Department could have
taken the incumbent sergeant test scores and compared that
statistically to their job performance.

was "minimally" valid because of the presence of the so-called
E&E rating. However, neither Dr. Outtz nor the court properly
analyzed or understood the E&E rating, and their conclusion is
unsupportable. (R.124 (Order at p. 36); 2173-85).

The E&E rating was not devised professionally or from a job
analysis. Rather, the E&E is an anachronism that has been used
by the Civil Service system for as far back as anyone can
remember. The point system is the same for all firefighter
promotional exams. (R.2618, 4819). Further, while the E&E
component purports to comprise 20% of the final score it at best
accounts for no more than 2-4%. (R.2179-84). All candidates get
14 points automatically by virtue of their being eligible to sit
for the sergeant's exam. Moreover, because most officers have
college degrees because of the so-called "Quinn bill" (that
provides police officers in the City of Boston with an
additional 10 or 15% of their salary for a Bachelor's degree),
nearly all candidates have earned such degrees already.
(R.1596).

Dr. Outtz conceded that the E&E component would only add
somewhere in the range of 1-4% to the written test (R.2160-65).
Further, he did not know how the weighting of the E&E component
was determined. Moreover, the E&E is facially irrational. If a
four-year police officer with a bachelor's degree in English
goes on to get a PhD in English, he gets an additional 4 points,

41

which weighted to 20% becomes .8 points. If that same officer instead had ten additional prior years as a police officer, he would get an additional 3.9 points, which becomes .78 points when weighted. Thus, a PhD in English is weighted equivalently to ten years of police experience when the two are unrelated. Further, if an officer completes specialized State or Federal training courses the E&E rating gives no credit.

In the 1991 job analysis, HRD illogically determined that certain KSAs could be tested for by the E&E rating. For example, the KSA "have knowledge of external and internal factors affecting patrol operations, e.g., community influences, political influences, political organization and structure" is listed as being tested by the E&E rating (R.3928 (KSA 39)). Yet there is no evidence showing how the E&E rating tests for this type of knowledge.[23] In short, the E&E rating was not properly validated; the point assignments and weightings are based on tradition, not professional analysis, and the variability of scores is negligible. Accordingly, the court`s conclusion that the E&E component made the invalid written test "minimally valid" is both legally and factually clearly erroneous.

---

[23]  Other examples of KSAs deemed "testable" through the E&E include "knowledge of local ordinances," "knowledge of the types and availability of public and private organizations for proving recreational services," "skill in perceiving and reacting to the needs of others," "ability to be confidential," and "ability to accept responsibility." (R.3927-30).

IV.  **THE DISTRICT COURT IGNORED OTHER MAJOR FLAWS IN THE CONSTRUCTION OF THE 2005 AND 2008 EXAMS WHICH PREVENTED A FINDING THAT THEY WERE VALID.**

As stated above, a written job knowledge test used as a rank-ordering device "should measure those aspects of performance which differentiate among levels of job performance."  29 C.F.R. § 1607.14(C)(9). The employer must, therefore, demonstrate, "by professionally acceptable methods, [that the test is] predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 480 (6th Cir.1987) (emphasis added) (brackets in original) (internal quotation marks omitted) (quoting Albemarle Paper Co., 422 U.S. at 431).

At the very least, this requires that the test-makers 1) "must have conducted a suitable job analysis," and 2) "they must have used reasonable competence in constructing the test itself." Guardians, 630 F.2d at 95. These considerations are "particularly crucial to an exam validated on content grounds." Id. at 95 n.14.

In holding that the 2005 and 2008 exams (in conjunction with the E&E ratings) were "minimally valid," however, the court erroneously ignored major flaws in the development of both the job analysis and the tests themselves. As a result, the exams

43

failed to differentiate between who would be the better-performing sergeants. Thus, the exams cannot be found to be valid under the guidelines. 29 C.F.R. § 1607.14(C)(9).

### A.    HRD Failed to Conduct an Adequate Job Analysis.

An adequate job analysis involves an assessment "of the important work behavior(s) required for successful performance and their relative importance." 29 C.F.R. § 1607.14(C)(2). Indeed, the "work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job." Id. The job analysis must, therefore, focus on the "critical behaviors" of a position to support validity. Police Officers for Equal Rights v. City of Columbus, at 415.

In Guardians, the Second Circuit held that "only if the relationship of abilities to tasks is clearly set forth can there be confidence that the pertinent abilities have been selected for measurement." 630 F.2d at 96. As Dr. Wiesen testified, "the closer the test reflects the actual job tasks, the more content validity the test has. So as you get further and further away from how you actually performed the task or the job, your content validity is less." (R.330).

In 2000, after compiling a list of approximately 217 tasks and 160 KSAs for the Boston sergeant's position, Boston's

consultant asked 11 subject matter experts ("SMEs")[24] to rate the tasks and KSAs by answering five multiple choice questions related to the tasks and another five multiple-choice questions related to the KSAs.[25] (R.3980-4143).

Yet impossibly, the 11 SMEs expressed complete agreement on all 10 multiple choice questions for each of the approximately 218 tasks and 160 KSAs. (R.4006-28, 4044-56). For such a result, each SME would have had to agree completely on over 20,000 ratings.[26] Dr. Wiesen testified that such unanimity "strains

---

[24]   The 11 SMEs were police sergeants. (R.4000).

[25]   For the KSAs, the SMEs were asked: 1) Does this KSA relate to the job (yes or no), 2) When is the KSA learned (before or after assignment to the job), 3) How long does the KSA take to learn (quickly or over a longer period), 4) How does having this KSA differentiate performance? (high, moderate, or little), and 5) Is this KSA required to perform the job effectively? (required, desirable, or not required). (R.4042-43).

For the tasks, the SMEs ratings were asked: 1) How often do you perform this task (regularly, periodically, or occasionally); 2) How important is this task to the job (very important, important, or not important); 3) Was it necessary for you to perform this task satisfactorily when you started the job (yes or no); 4) What is this task's relationship to performance (performance of this task clearly separates the best workers, generally the better workers seem to perform this task better, or most perform this task equally well; and 5) What dimensions is the task applicable to (oral communication, interpersonal skills, problem, identification and analysis, judgment, and/or planning and organizing).  (R.4004-05).

[26]   (218 tasks x 5 ratings + 160 KSAs x 5 ratings) x 11 SMEs = 20,790 total ratings.

credulity."[27] (R.469). The court just ignored this fundamental flaw in the job analysis.

Furthermore, the ratings themselves are implausible. For example, the SMEs implausibly expressed complete agreement that such tasks were performed on a daily basis: "conducts internal investigations;" "sets up command posts at scenes of robberies, homicides, fires, etc.;" and "talks with leaders of demonstrations."[28] (R.469-70, 4012, 4022, 4033-34, 4038 (Tasks 65, 72, 74, 87)). It "strains credulity" that that all sergeants set up command posts and speak with leaders of demonstrations on a daily basis.

The KSA ratings are similarly implausible. The SMEs were asked to rate each KSA for how much having the KSA would differentiate between sergeants (high, moderate, or little). Each of the 155 KSAs rated as being related to the job were also rated as highly differentiating between job performance levels.[29] (R.4044-56). As a result, the job analysis gives the same weight

---

[27]    Defendants' expert, Dr. Outtz, testified that that he was not troubled by the unanimous ratings because, he claimed, the tasks and KSAs for which there was not a unanimous opinion were discarded. (R.1924-25). There is absolutely no support for this in the record. Rather, out of the 218 tasks and the 160 KSAs identified by Morris and McDaniel, all of the tasks and all of the KSAs were rated, and all of them were rated unanimously. (R.4006-28, 4044-56).

[28]    The SMEs were asked, "How often do you perform this task?" (R.4004) (emphasis added).

[29]    The five KSAs which were rated as not being related to the position were not rated further.

to the "knowledge of arrest laws" as it does to "knowledge of human personality traits." (R.4044-46, 4058-59). Moreover, the SMEs were asked to identify which KSAs were learned on the job, as opposed to learned before being promoted. None of the 155 KSAs were rated as being learning on the job.[30] (R.4046-48, 4060-61).

More importantly, the 2000 analysis fails to link the KSAs to their applicable tasks, which is, as Dr. Fields testified, the important final step in the job analysis. (R.855-56). Generally, test makers use those links between the tasks and the KSAs to develop a test plan to determine what testing methods and what questions should be used to test for the various KSAs.[31] (R.856). That was not done here.

Instead of providing such links between the KSAs and the tasks, the SMEs were asked to link each task to a "dimension" of the position that applied to that particular task, including oral communication; interpersonal skills; problem ID and analysis; judgment; and planning and organizing. (R.4005). Even this abbreviated version of linking, however, was not carried

---

[30] Dr. Wiesen testified that these ratings were "highly implausible."

(R.470-71).

[31]    Dr. Outtz also testified that one of the key parts of the job analysis is to "show the connection between the knowledge, skills, and abilities that are important and the tasks that you say are important."  (R.1927).

through. Instead, the SMEs unanimously linked each task to all
of the dimensions. (R.4006-28). This created an absurd result.
For example, tasks such as "cares for and cleans weapons;"
"monitors radio broadcasts;" "enters data into and accesses data
from computer system;" "drives motor vehicles;" and "pursues
suspects on foot" were rated as requiring both oral
communication and interpersonal skills. (R.4006-28, 4031, 4036,
4037, 4039).

Having failed to identify the KSAs needed to perform the
tasks necessary for the sergeant's position, the 2000 job
analysis does not support validity. City of Chicago, 573 F.2d at
426 ("It is not enough ... that the various functions of a
[position] are tested—there must be a correlation between the
importance of a job function as determined by the job analysis
and the weight given to this function on the examination.");
City of New York, 637 F. Supp. 2d at 111 (job analysis for
firefighters was insufficient because "the City has offered no
evidence of 'the relationship of abilities to tasks'").

Boston claimed that HRD also relied on the 1991 Validation
Report to meet its burden on validity. (R.1880, 2018, 3213-
3349). The district court, meanwhile, erroneously focused on the
1991 job analysis. (R.118-20 (Order at p. 31-32)). The 2005 and
2008 exams utilized only the 2000 job analysis. The 2008 test
outline derived straight from the KSAs listed in the 2000 job

48

analysis.[32] The 1991 job analysis, therefore, is irrelevant to the validity of the 2005 and 2008 exams and the court's decision to rely on it constitutes clear error.

Moreover, the 1991 job analysis does not support validity. First, the 1991 report was too old to support a finding of validity. According to Dr. Outtz, a job analysis "is useful and current for approximately five to eight years if the job doesn't change. If the job changes, then you do another job analysis." (R.1882). The court mischaracterized Dr. Outtz's opinion by finding that a job analysis could be reliable beyond eight years if the job has not changed. (R.117 (Order at p. 29)).

In fact, there is ample evidence on the record that the duties of sergeants had, indeed, changed dramatically since 1991. The Boston police department implemented community policing policies in the early 2000s, which required different skills and abilities of sergeants. (R.1284, 4828-29). Moreover,

---

[32]

| 2008 Outline (R.2640) | 2000 Job Analysis (R.4058) |
|---|---|
| KSA 7: "Knowledge of pertinent Federal, State (Massachusetts General Law) and Municipal laws . . .: | KSA 7: "Knowledge of Massachusetts general law . . ." |
| KSA 3: "Knowledge of Department rules . . . including those governing deadly force . . ." | KSA 3: "Knowledge of deadly force." |
| KSA 1: "Knowledge of apprehension and arrest techniques . . ." | KSA 1: ""Knowledge of apprehension and arrest techniques." |

Dr. Outtz testified that he did not study the Boston police sergeants position. (R.2049-51).

Second, the job analysis procedure is not described in the 1991 report. This severely undercuts its validity as the Uniform Guidelines require that content validity studies contain detailed documentation. 29 C.F.R. § 1607.15(C). A court may find that an exam is not valid where proper documentation is lacking. City of Columbus, 644 F. Supp. 393 at 415.

The court found that DPA identified KSAs and tasks and "developed a 'linkage of the important KSAPs to the frequent and critical tasks of these jobs from' SMEs." (R.118 (Order at p. 30) (citing R.3217). This finding is clearly erroneous.

The court cited to the introduction of the 1991 job analysis, which stated that the intent was to have the SMEs generate links between the KSAs. (R.3217). The record shows, however, that HRD compiled the list of necessary KSAs without SMEs. In the Appendices to the 1991 report, it is stated that the SMEs failed to produce "useable information" for the KSAs. (R.3937-70). Instead, HRD personnel designated which KSAs were thought to be "required at hire or appointment" based on their own discretion. (R.3937, 3939). The assumptions of job analysts "cannot serve to validate" an exam.  City of Columbus, 644 F. Supp. at 416.

The Seventh Circuit has held that, to satisfy the "representative sample" requirement under the Uniform Guidelines, the employer must demonstrate that an employment test does not fail to test a significant skill required by the position. Gillespie, 771 F.2d at 1045 (citing Guardians, 630 F.2d at 99). In other words, a "test is content valid if the items being tested closely approximate the tasks to be performed in the position being sought by the candidates for promotion." City of Columbus, 644 F. Supp. at 414 (citations omitted). Generally, therefore, a written job knowledge test cannot test for enough of the "job domain" to predict job performance. Bazile v. City of Houston, 858 F. Supp.2d 718, 770 (S.D. Tex. 2012); Isabel v. City of Memphis, 404 F.3d 404, 413 (6th Cir. 2005). A written exam, for example, cannot test for important supervisory skills and abilities, such as, "leadership; command presence; interpersonal communication; supervision; and decision making." Bazile, 858 F. Supp. 2d at 770.

> 1.  The Court Erred in Crediting the 1991 Testability Analysis.

The district court found that the 2005 and 2008 exams tested a "representative sample" of the job because, based on the 1991 "testability analysis," "more than half of the KSAs identified as pertinent to the job of sergeant were tested." (R.120 (Order at p. 32)). This finding was clearly erroneous.

51

There is no evidence in the record, however, that the 2005 or 2008 exams utilized the 1991 job analysis or the "testability analysis." Furthermore, it was clearly erroneous to find that the "testability analysis" supported validity.

In 1991, once the job analysis was finished, DPA (HRD's predecessor) reviewed the KSAs to determine their "feasibility for assessment by means of a written, multiple-choice, test format." (R.3232). To do this, DPA personnel performed a "testability analysis" of the KSAs that they had designated as critical to the sergeant's position. (R.600, 3927-33). The "testability analysis" was used to develop the test outline. (R.601). The "testability analysis" separated the critical KSAs into three categories: a) tested on the written test; b) covered by the education and experience component; and c) not tested. (R.3927-33).

Dr. Outtz testified that the "testability analysis" supported validity because it listed just more than 50 percent of the KSAs as testable on either the written test or the E & E component. (R.1889). If the court had actually looked at the "testability analysis," however, it would have seen how little of the KSAs were actually measurable.

The 1991 report acknowledged that many of the KSAs simply could not be measured by a written exam. (R.3232).

Indeed, the "testability analysis" found that many of the critical KSAs were not measureable on a written test or through an E&E component. These included several critical knowledges, including the "knowledge of local ordinances" and "knowledge of all departmental rules, regulations, standards, policies and procedures." (R.3927-33).

More importantly, the "testability analysis" found that many more critical skills and abilities could not be tested in writing. (R.423-26, 3927-33). The district court, however, failed to address what effect of the omission of these skills and abilities had on validity.[33]

Moreover, many of the remaining KSAs that were identified as testable were, in fact, not measureable by a written test or the E&E component.[34] (KSA 127).[35] Dr. Wiesen further testified

---

[33] Furthermore, the court mischaracterized the record in making the cursory finding that "more than half of the KSAs identified as pertinent to the job were tested." (R.120 (Order at p. 32)). According to the 1991 report, as a result of the "testability analysis," 70 of the 156 critical KSA could be tested for the position of sergeant on either the written test or through the E & E component. (R.3232).

[34] For example, the analysis designated the following KSAs as testable on a written exam: skill in identifying problems, securing relevant information from both oral and written sources (KSA 84); ability to confront problems (KSA 90); ability to motivate staff (KSA 96); ability to supervise (KSA 97); ability to develop alternative solutions to problems (KSA 108); ability to maximize human potential of subordinates through training and developmental activities (KSA 109); ability to deal effectively with the public (KSA 123); ability to discipline subordinates (KSA 124); ability to develop new policies and procedures to achieve department goals (KSA 127); ability to identify abnormal

that abilities that require "interpersonal skills," such as the
ability to influence others and ability to understand the
motivations of others, are not measureable on a written exam.
(R.432).

Furthermore, while 24 of the KSAs were deemed testable by
the E & E component, the E&E was not a proper mechanism for
testing these KSAs. The district court failed to explain how the
E&E component could test for KSAs such as "skill in perceiving
and reacting to the needs of others" (KSA 85); "skill in
interviewing and interrogation" (KSA 80); and "ability to accept
responsibility" (KSA 103). The E&E component was not capable of
measuring such critical KSAs. (R.556).

Dr. Outtz, meanwhile, did not perform a careful review of
the "testability analysis." He merely counted up the marks in
each column, without regard to the actual KSAs that were being
measured.[36] (R.1889). The district court's decision to credit Dr.
Outtz's testimony without looking to the record was clear error.

---

behavior and/or characteristics of individuals under the
influence of narcotics (KSA 131). (R.3929-30).
[35]    Dr. Wiesen testified:

I've written many multiple-choice test questions on many
topics. Developing a question to test the ability to
develop new policies, I think, would be impossible because
in a multiple-choice question you provide answers.

(R.429).
[36]    Dr. Outtz testified that the exams were valid because:

2.    The Written Exams Failed to Measure a
      Representative Sample of the Job.

The record shows that the 2005 and 2008 exams did not test
for the KSAs identified on the "testability analysis." The
questions were written by an HRD employee, Guy Paris,
exclusively from test outlines, not the lists of KSAs or the
testability analysis. (R.465-66); (R.121-22 (Order at p. 33-
34)). These outlines show that very few of the KSAs identified
in the 2000 job analysis were tested on the exams.

In fact, the test outline for the 2008 Boston exam shows
that of the 155 KSAs listed in the 2000 job analysis, only 13
KSAs were used to develop the test questions for the sergeant's
position.[37] (R.2640-43). Of those 13 KSAs, 11 were knowledges and
two were abilities, with no skills tested. Id. Under the Uniform
Guidelines, "a selection procedure measuring a skill or ability

---

Based upon the number of Xs in the right column compared to
the total number of knowledges, skills and abilities, no,
because the Xs in the two columns to the left of that, that
is, the education and the experience and the written test,
by my calculations represent over 50 percent of all the
knowledges, skills and abilities that were isolated or
identified as being important and required for sergeant.
And that is more than enough to indicate a representative
sample of the knowledges, skills and abilities.

(R.1889).
[37]    Similarly, once the test questions were written, the SMEs
were brought in to rate the difficulty and readability of the
test questions.  (R.4805-09). The rating sheet shows that only
13  KSA were used for the whole sergeant's exam. (R.1934, 4805-
09)

should either closely approximate an observable work behavior, or its product should closely approximate an observable work behavior." 29 C.F.R. § 1607.14(C)(4). HRD did not attempt to link the questions to any KSAs for the 2005 exam. Rather, HRD generated a test outline that gave weights to certain "competency areas."[38] (R.2555, 4786-87).

Moreover, there was no attempt by HRD to include questions that measured the most important KSAs. Dr. Wiesen testified that HRD "went to considerable efforts to identify the knowledge, the skills, abilities, and personal characteristics required for someone who wants to be a police sergeant." (R.467). But instead of utilizing the extensive list of KSAs, the outlines, such as the 2005 outline, were based on general subject areas, such as "operational skills," "employee development," and "employee relations."  (R.2555). While these competency areas were "shorthand notation for some number of these knowledges, skills, and abilities" the end result was that "it's almost as if the job analysis was never done." (R.467). (emphasis added).

---

[38]    Dr. Wiesen, looking at the 2005 Boston exam outline, testified:

[Guy Paris] used the test outline together with the reading material that was announced to the test takers. And he was not given any definitions of the testing areas, was not given the job analysis that was related to the test outline, but he used his best judgment to try to select material from the textbooks to cover the competency areas.

(R.465-66).

Similarly, the district court was only able to point to vague subject matter areas such as "police management issues" and "crime-related issues" when it reviewed the 2005 exam. (R.121 (Order at p. 33)). An important part of test validation, however, is the "retranslation" of test items to job dimensions. Bigby v. City of Chicago, 1984 WL 49001, at *6 aff'd, 766 F.2d 1053 (7th Cir. 1985). This is not possible where the test is based only on broad subject matter areas.

### B.    The Questions Failed to Test for the Critical KSAs.

The court also failed to address whether the actual questions tested for anything at all other than rote memory.[39] Dr. Outtz testified that multiple choice tests with one forced right answer have the greatest disparate impact among minority candidates (for reasons not yet scientifically explained. (R.2087, 2246-47). Dr. Outtz also explained that, when the same information is asked differently, such as with a contextual problem ("situational judgment" questions), there is less disparate impact between minority and non-minority test scores

---

[39]    The court fails to mention that the questions were not written by testing experts, but were written by a lay employee of HRD employee with no expertise and who did not testify. (R.410, 435-36, 2157-58). While the courts do not require test developers to use experts to develop tests, "the decision to forgo such assistance should require a Court to give the resulting test careful scrutiny." Guardians, 630 F.2d at 96 (citing Kirkland, 520 F.2d at 425-26; Vulcan Society, 490 F.2d at 395-96).

and such a format better tests for the candidates' understanding rather than rote memory. (R.2087-88). As Dr. Wiesen testified, the questions were drafted directly from the reading material and would "measure word knowledge and reading rather than the knowledge that the questions were intended to measure."[40] (R.466, 474). Dr. Wiesen also pointed out that most of the questions on the sergeant's exam started out with the words "according to" and the answer was taken almost verbatim from the textbook or rule on the reading limit. (R.434-36). The courts, meanwhile, have held that tests that are "little more than a test of reading comprehension and memory," are not valid. City of Columbus, 644 F. Supp. at 416; Bazile, 858 F. Supp. 2d at 770.

Additionally, the district court ignored evidence that HRD itself found many of the exam questions were flawed. Following the 2007 statewide exam, HRD decided that 18 of the 80 questions (over 20%) for sergeant were flawed and either gave all test takers credit for any question or gave credit for more than one answer. (R.478).

The court's failure to even address this issue is clear and reversible error.

---

[40]   This is particularly for the questions addressed to supervision. It is one thing to say, as one of the questions asked, according to the "synoptic theory," what is the right answer? (RS.56 at Question 26), when a proper question would ask a candidate how they should react in a situation calling for such judgment. (R.623).

## V.   THE COURT'S OPINION THAT THERE MAY NOT BE EQUALLY VALID LESS DISCRIMINATORY ALTERNATIVES IS CLEARLY ERRONEOUS.

### A.   Boston Used The Most Discriminatory Test Possible, And Failed To Consider Other Ways to Assess Job Knowledge.

Even if somehow the sergeant's test was job related and consistent with business necessity, plaintiffs may still prevail by showing that there were equally valid and less discriminatory alternatives available. Bradley, 443 F. Supp. 2d at 156. The burden of proving equally valid and less discriminatory alternatives is subject to the same standard of proof in civil cases – plaintiffs must show by a preponderance of the evidence, meaning that it is more likely than not that there were equally or more valid tests that would have likely had lower levels of disparate impact. Id. at 175. Plaintiffs "have no obligation to provide the exact floorplan," or to have proposed the alternative before the exam was given. Id.

Predictably, both the 2005 and 2008 written multiple choice job knowledge tests resulted in severe adverse impact. (R.353-55, 436-40, 448, 1389, 2189-90, 2431). If the City was seeking to design the most discriminatory testing alternative possible, it would have used exactly the test that it used. The City knew from the start that this test would have severe adverse impact.[41]

---

[41] Indeed, the 1991 so-called validity test, demonstrated that the written test had a huge relentless adverse impact on minority candidates. (R.3297).

Therefore, it is hard to understand how the court could conclude that there were no alternatives that would lessen the adverse impact of the promotional process, when the process used by the City had the highest level of adverse impact possible. Not only did these tests had very high levels of adverse impact, they had relatively low validity, because they only tested for knowledge, not skills and abilities.

### B.    The Court Erred In Its Analysis of Less Discriminatory Alternatives.

In the present case, the court's treatment of the less discriminatory alternative ("LDA" hereinafter) issue is both extremely cursory, and wrong as a matter of law. First the experts, and the court agreed that adding job-related components, such as a structured oral interview, assessment center, or performance review, to the exam process increases – not decreases – the validity of the exam. (R.134 (Order at p. 46), 441, 838, 846, 848-49, 2423-26, 2432-33, 2441-42, 4549). Adding such components increases an exam's validity, while decreasing adverse impact, because they increase the critical skills and abilities for the job that are assessed and generally decrease adverse impact. (R.439-40, 2085, 2198, 2205). Thus, it is undisputed that the plaintiffs satisfied their burden of showing that there were alternative testing procedures available with equal or more validity.

60

However, on the question of whether additional components proposed by the plaintiffs would be less discriminatory, the court concluded that because the prior Boston 2002 exam that added one or more components did not significantly improve selection ratios, the plaintiffs had not proved that there were less discriminatory alternatives. (R.134 (Order at p. 46)). The court's analysis is both factually and legally incorrect.

The court had overwhelming expert testimony and scientific studies which demonstrated that other components such as the structured interview, assessment center, or performance review, have equal or greater validity than a job knowledge test, while at the same time significantly less adverse impact on minority candidates. (R.444-49, 827-28, 2426, 2442, 2450-51). For example, Dr. Fields testified that she administered around 80 police sergeant promotional exams and that she was able to reduce adverse impact by using multi-component exams. (R.894-95). Both Dr. Silva's firm, E.B. Jacobs, and Dr. Outtz, meanwhile, have not devised any police promotional examinations for the last 20 years that rely only on a written test because they lack the increased validity resulting from having multiple components. (R.2087-89, 2423-26).

The court, however, ignored the evidence and, instead, looked at the results of one exam (the 2002 test) to declare

61

that the consensus reached by the experts in the field of industrial psychology was wrong.[42] (R.135 (Order at p. 47)).

The Sixth Circuit rejected exactly this kind of ad hoc analysis in City of Memphis, 770 F.3d at 477, holding that "past practice alone does not suffice" to determine available testing alternatives. Id. at 477 (quoting Allen, 351 F.3d at 315-17). So too here, Boston cannot forever escape liability by saying it once attempted a multi-component test and did not significantly improve adverse impact.

More importantly, when Boston used other components, such as in 1985, 1992, and the assessment center in 2002, on each occasion those other components did in fact significantly reduced adverse impact. Dr. Wiesen addressed this in his testimony and it was unrebutted. He found that the 2002 test not only reduced the adverse impact at the selection rate (albeit mildly) but the assessment center itself significantly reduced

---

[42]    To the extent that the court may have also relied on the 1992 sergeants exam, which included a written exam and the use of assessors, for its conclusion that added components do not reduce adverse impact (R.128-29), this finding was clearly erroneous.  While the 1992 exam included a structured oral interview, a review of the briefs filed in the Abban, 748 N.E.2d 455 (the case which challenged the manner of selections from the 1992 exam) demonstrates a significant reduction in adverse impact. In fact, while several minority candidates with scores of 84 were promoted over several white candidates with scores of 85, there was no violation of the 4/5's rule. Abban, Brief of Boston Police Patrolmen's Association, 2000 WL 34607839, *7 (Mass.), at *7.

adverse impact on minority candidates compared to its written test. (R.449-51). Similarly, the adverse impact of .85 at the passing rate on the 1985 exam satisfied the four-fifths rule. (R.3297).

Furthermore, the court fails to explain its cursory reliance on its mistaken interpretation of the 2002 data (and the 1992 data) and does not discuss the overwhelming scientific literature regarding how these other components have been widely recognized as indisputably having significantly less adverse impact. Moreover, it ignores the evidence of the use of multiple-component exams across the country that had little or no adverse impact on minority candidates. See, e.g., Bigby v. City of Chicago, 1984 WL 49001 *3-4  (on oral interviews and performance ratings black police sergeants performed nearly the same as white candidates). U.S. v. City of Montgomery, 775 F. Supp. 1450, 1454 (D. Ala. 1991) ("Past experience in other law enforcement settings suggested that African American candidates would perform better on the [oral interview] than on the written test vis-a-vis white candidates."); Allen v. City of Chicago, 2002 WL 3117600, *3-4 (Merit selection component has no adverse impact on minority candidates.); Johnson v. City of Memphis, 770 F.2d 484, 472 (6th Cir. 2014) (1996 police sergeant exam had little adverse impact).

The city did not even attempt to find other alternatives instead deciding that it should not spend the money to do it. But allowing costs to be a significant factor in looking at the issue of less discriminatory alternatives would essentially eviscerate the protections Congress enacted in 1991. The Civil Rights Act of 1991 and Less Discriminatory Alternatives in Disparate Impact Litigation, 106 Harv. L. Rev. 1621, 1629-31 (1993).

Equally concerning is the court's holding that Boston need not have a structured performance review system such as the one it sought to implement in 2002 because such a system would run afoul of the union's collective bargaining agreement. However, the CBA only addresses supervisor performance evaluations, and Massachusetts enacted specific legislation authorizing promotional decisions to include measures of past job performance. See M.G.L. c. 31, §6A and B. In any event, as many courts have held, state law cannot trump the federal Civil Rights Act. Brown v. City of Chicago, 8 F. Supp. 2d 1095, 1112 (N.D. Ill. 1998) ("By passing the Civil Rights Act of 1964 . . . Congress intended to supercede all provisions of State law which require or permit the performance of an act which can be determined to constitute an unlawful employment practice under the terms of Title VII of the Act or are inconsistent with any of its purposes.") (quotation marks and citation omitted);

Vanguard Justice Soc., 592 F. Supp. at 268 (citing Guardians,
630 F.2d at 105); E.E.O.C. v. Hennepin Cnty., 623 F. Supp. 29,
32 (D. Minn. 1985). The performance review process that the City
tried to implement was a highly structured and scored process
assessing skills and abilities necessary to perform the job of
Sergeant that could best be tested for by prior performance and
achievement. Indeed, then Commissioner Paul Evans strongly
supported it. (R.4828-29) ("Just as we have changed the way we
do police work, we must change the way we promote. We need to
understand that our promotional system remains mired in a
tradition that has become obsolete and disconnected from the way
we do business today. We must become willing to reward police
work, not memorization skills. . . . It is my hope and
expectation that in the future, promotions will continue to be
based on merit and consider all aspects of an officer's
abilities, including past performance."). Ignoring the record
was, therefore, clearly erroneous.

The court makes the same legal error with respect to
"banding," which was endorsed by Boston, its expert consultant,
and HRD. Although Boston and HRD implemented banding in 2008
because of the disparate impact resulting from not doing so, and
the experts' conclusions that there was no way to judge the
better performing candidates, the court held that it was not
realistically available in 2005 (for reasons which he does not

articulate) and in 2008 (because a state court had enjoined it).
To be clear, the Superior Court enjoined the use of banding in
2008 only because the city and the state had not gone through
the proper "rule" making procedure. Pratt, at p. 10 (Add. 124)
("The proposed banding may well prove to be a better and fairer
approach to assessing candidates for promotion . . . however,
such a significant alteration . . . should have put through the
review process set out by the Legislature in c. 31, § 4.").
Moreover, as discussed above, Title VII requirements trump any
local or state provision that would bar the use of alternative
less discriminatory procedures.

The court's conclusion that "banding" was not an available
alternative was, therefore, clearly erroneous.

    **C.**   **The Plaintiffs Clearly Demonstrated Appropriate Less
Discriminatory Alternative Procedures That Would Have
Had More Validity.**

       1.   Use of the written multiple choice test to
qualify for further consideration, not as a rank
order device.

A properly developed job knowledge test can play an
appropriate role in a police Sergeant`s promotional process. The
expert witnesses and the former police commissioners agree on
this. Utilizing appropriate industrial psychology methods for
determining an appropriate qualifying score, the multiple-choice
job knowledge test could have served as a first hurdle with only

66

candidates achieving a score demonstrating reasonable
competence, being permitted to proceed further, a technique used
in many cities, and defendants' experts. See, e.g., Adams, 469
F.3d at 609; (R.455, 840, 2414). Indeed such a use is indicated
because there is really little evidence that someone who
received a 92 on the test would be a better police sergeant than
someone who scored an 85. Candidates who scored above this cut-
off then proceed and be ranked based on scores from components
that are known to have less discriminatory impact such as
structured oral interviews, video scenarios, performance
reviews, situational judgment tests, etc. As discussed above,
such a process would have far less discriminatory impact,[43] and
it would significantly reduce the cost of additional assessment
center type components because candidates not obtaining the
qualifying score would be eliminated. There is no reason why the
city couldn't have used the written multiple-choice test as a
qualifier, much as it uses a psychological or physical agility

---

[43] In fact, while the district court seemed to reject the
plaintiffs' suggestion of less discriminatory alternatives based
in part upon the prior experience of Boston, it is worth noting
that in each of those other situations, Boston continued to use
the written test as a strict rank order device, along with the
other component, and gave a significant percentage of points to
that written exam. The court does not even discuss the fact that
if the written test had been used as a hurdle, rather than as a
scored device, it was certain to have reduced adverse impact,
even with respect to Boston's experience.

test as a qualifier for entry level police officers. Brunet, 1 F.3d at 406.

Boston cannot claim that such a process would decrease the validity of the examination.[44] Any small reduction in validity would be more than offset by the added validity from adding one or more other components to the examination. It is undisputed that other components that assess supervisory/interpersonal skills adds significant validity to a promotional process for police supervisors. (R. 441, 673-75, 814, 848, 894, 2083-89, 2423-26, 2432-33, 4549). Moreover, the evidence is unrefuted that minorities perform substantially better on these alternative tests, often eliminating any differences in performance but in all cases substantially reducing such disparities. (439-40, 2085, 2198, 2205). Thus, it is not speculative that adjusting the scoring of the multiple choice test and adding other components was a less discriminatory alternative.

---

[44] Plaintiffs are not suggesting that the pass/fail score of 70 be the cut-off score. Rather, the qualifying score be determined by expert analysis to reflect reasonable competence. For example, since all lieutenant candidates who are already sergeants took the same 80 questions for the Lt's exam, (RS.2) the qualifying score could have been set as the  score achieved by at least 80% of the Lieutenant candidates.

2.   Banding.

Boston could also have used banding, and wanted to do so.
Banding would have been equally as effective and defendant's own
expert recommended bands of seven points. (R.2043). Further, a
review of the exam scores shows that if there had been banding,
Boston would have been able to reach far more minorities, and
then could have used a more reliable and less discriminatory
alternative to select within those seven-point bands, such as
past performance.[45] The evidence therefore shows that by using a
banding technique, the defendants would have been able to reach
and select many more qualified minority candidates, and then
applied other criteria – i.e. performance, to select within the
bands, as Commissioner Davis testified he does when selecting
detectives. (R.1234-36).

---

[45] There are two ways to band: 1) static bands and 2) sliding
bands. Dr. Outtz recommended "sliding band," in which the band
would change after each promotion from the list. (R.2038-39).
    Looking at the scores for 2005 (R.2560-73) and the 2008
exam (R.2695-2715), it is possible to see what impact a sliding
band would have had. Just by looking at the lowest score
reached, which was an 85 on both exams at the time of trial, the
effects of banding at that score are profound. In 2005, only 74
minorities were reachable for promotion at the 85 score mark,
but with a 11.25-point band, which was recommended by EB Jacobs
(R.4234-35), 349 minorities to be reachable for promotion. Even
with only a five-point band, 185 minorities would have been
reachable for promotion.  Similarly, an 11.25 sliding band on
the 2008 exam would have raised the number of minorities
reachable for promotion from 124 to 717.

3.   Use of a scored written multiple-choice test with
     the addition of other components.

Alternatively, the plaintiffs presented evidence that the
multiple-choice test could have been used as a scored device in
addition to other components such as an assessment center and
performance review, similar to the test design that was
initially adopted in 2002. Indeed, in virtually every other
large city in the United States that still uses a scored
multiple-choice job knowledge test, it is done so in conjunction
with other components which test for the supervisory skills of a
police sergeant. (R.454-55)[46]

4.   Restructuring the job knowledge test to test for
     understanding, not memorization.

The court accepted at face value, that a multiple-choice
job knowledge test was valid, but it does not follow that there
were no less discriminatory but equally valid job knowledge
tests that could have been used. Indeed, defendants' only expert
on validity, Dr. Outtz has been a leading proponent of
alternative job knowledge tests that have less adverse impact

---

[46]   The court appears to reject this alternative based upon the
2002 test data, yet again that data shows that there was
actually a reduction of adverse impact. In 2002 based on the
professional job analysis BPD's experts determined that the
knowledge test should be only 40% of the overall exam score. Yet
ironically, the court here approved the use of the multiple-
choice test as 80% of the entire grade (and in actuality more
like 97% when one considers the training and experience rating).
This complete inconsistency in positions is yet another
troubling aspect of the court's decision.

but have equal validity. (R.2083-89). The M/C questions in this case required rote memorization of college level texts along with some BPD rules and regulations. The questions do not test for "situational judgment." Dr. Outtz and Dr. Fields all testified, that minority candidates perform better on knowledge tests which are more open-ended and ask what "would you do", or require a written answer as to what the person should do, as opposed to a forced multiple choice one correct answer test. (R.825, 2087). Dr. Outtz testified he has reduced adverse impact this way. (R.2087).

But the court assumes that the HRD test as written had no less discriminatory alternatives. The court simply chose to ignore the evidence as to how such knowledge could have been tested using formats with less disparate impact. Thus, to the extent that a job knowledge test was necessary and part of a valid promotional exam process, it does not follow that this multiple-choice test had to be used, and there was no evidence suggesting that the test as constructed was the only way to assess this job knowledge. Accordingly, a less discriminatory, and equally valid alternative was to retain the job knowledge test, use it as a scored device, but devise alternative formats that had been proven to be less discriminatory to minority candidates.

**VI.   THE DISTRICT COURT ERRED IN RULING THAT THE PLAINTIFFS FAILED TO PROVE A PRIMA FACIE CASE OF ADVERSE IMPACT WITH RESPECT TO THE SMALLER JURISDICTIONS.**

Based on the undisputed evidence in this case, there is only one possible conclusion about the adverse impact of the challenged exams: minorities performed worse on those exams, and that lower performance was based on race, not chance. Instead of reaching this inescapable conclusion, the district court conducted an unduly narrow inquiry that focused solely on whether there was statistically-significant evidence – at the individual jurisdiction level – that minorities were promoted at rates lower than white candidates.  Based on binding authority from this Court and the Supreme Court, and as discussed in more detail below, the district court was required to consider a broader range of evidence. That broader range of evidence, most of which was undisputed, established a prima facie case of adverse impact as a matter of law.

**A.   A PRIMA FACIE CASE OF ADVERSE IMPACT IS A MODEST BURDEN THAT CAN BE SATISFIED WITH MULTIPLE FORMS OF EVIDENCE.**

There is no "single test" that a plaintiff must satisfy to establish a prima facie case of adverse impact. Langlois v. Abington House. Authority, 207 F.3d 43, 50 (1st Cir. 2000), citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995-96 n.3 (1988) (plurality).  When looking at evidence of disparate impact in a case such as this, it is important to keep the big

72

picture in mind – as stated by the Supreme Court, the "fine
tuning of the statistics could not have obscured the glaring
absence of minority" hires. Int'l Brotherhood of Teamsters v.
United States, 431 U.S. 324, 342 n.23 (1977).

A showing of adverse impact commonly relies on expert
testimony by statisticians. That is, statistical experts ask

> [w]hether the outcomes of an employment practice are
> correlated with a specified characteristic, such as
> race, and, if so, whether the correlation can
> reasonably be attributed to random chance. The
> customary yardstick for making this latter
> determination is called 'statistical significance.'

Jones v. City of Boston, 752 F.3d 38, 43 (1st Cir. 2014). To
"assess the likelihood that an observed difference" was the
result of real differences or simply chance, "statisticians
calculate the probability of observing a difference equal to or
greater than that which actually occurred, *assuming equal
opportunity*." Id. (emphasis added). This probability is called a
"p-value." Id. Typically, a result is considered "statistically
significant" if the p-value is less than five percent (or 0.05).
Id. In other words, if the probability is less than five percent
(0.05, 0.04, 0.03, or lower) that a given outcome (such as race-
based differences in passing rates or average test scores)
occurred purely by chance, then adverse impact has been
demonstrated at a "statistically-significant" level. Where there

is undisputed evidence of a statistically-significant correlation between the outcomes of a selection device and race, that evidence is sufficient to meet a plaintiff's prima facie burden, regardless of the "practical significance" of that correlation. Id. at 53.

Another common measure of adverse impact is known as the "four-fifths rule," which is set forth in the Equal Employment Opportunity Commission's Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines"). Under this rule, "[a] selection rate for any race…which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded…as evidence of disparate impact." 29 C.F.R. § 1607.4(D). This Court has "approved use of the four-fifths rule as a pertinent benchmark in the employment context." Langlois, 207 F.3d at 50, citing Boston Police Superior Officers, 147 F.3d at 21. Although the four-fifths rule may *support* a finding of adverse impact, a plaintiff's inability to show a violation of the four-fifths rule does not preclude a finding of adverse impact. Jones 752 F.3d at 51-52.

Although these forms of evidence are commonly used in disparate impact cases, neither a finding of statistical significance nor a violation of the four-fifths rule is a required element of a plaintiff's prima facie case. Indeed, this

Court previously ruled that a finding of disparate impact can be
made based on evidence that an exam – indeed, the very type of
exam at issue in this case – is known to have an adverse impact
on minorities. Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504
F.2d 1017, 1020-21 (1st Cir. 1974). More generally, given the
importance of keeping the big picture in mind, courts repeatedly
have ruled that disparate impact can be established though a
wide range of evidence. See, e.g., Phillips v. Cohen, 400 F.3d
388, 401 (6th Cir. 2005) (relying on non-statistical evidence,
including information about actual hiring and employment
practices, to support finding of disparate impact); Isabel v.
City of Memphis, 404 F.3d at 412-13 (plaintiffs are not limited
to any one form of statistical evidence); Banks v. East Baton
Rouge Parish School Bd., 320 F.3d 570, 579 (5th Cir. 2003)
(courts may rely on "statistical or non-statistical evidence [to
establish] a prima facie case of disparate impact") (citation
omitted); Rivera v. City of Wichita Falls, 665 F.2d 531, 536
(5th Cir. 1982), abrogated on other grounds Patterson v. McLean
Credit Union, 491 U.S. 164 (1989) (courts can find adverse
impact based on observed disparities and "decisive pattern[s]
emerging from a history of experiences"); U.S. v. City of New
York, 683 F. Supp. 2d 225, 240-42 (E.D.N.Y. 2010) (supporting
finding of disparate impact discrimination based on history of

hiring, population data, and comparisons to hiring practices of other large municipal agencies).

Given the undisputed underrepresentation of minority sergeants in the defendant jurisdictions in this case, the officers' burden of proving a prima facie case of adverse impact is presumptively low: "When widespread minority underemployment is shown to exist in a given occupation, primary selection devices should not be immunized from study by placing an unrealistically high threshold burden upon" plaintiffs. Beecher, 504 F.2d at 1020-21. After all, the purpose of the prima facie test is merely to determine whether the employer should shoulder the burden of justifying its use of a challenged business practice, and "[t]his is a burden a public employer should not be unwilling to assume." Id. at 1020 (citation and internal quotation marks omitted). All of the defendant jurisdictions must shoulder that burden here.

### B.   THERE WAS UNDISPUTED EVIDENCE ESTABLISHING ADVERSE IMPACT.

Three undisputed facts loom large in this case: (1) multiple choice job knowledge tests are known to have an adverse impact on minorities, (2) these same types of tests have been used throughout Massachusetts for decades, and (3) there is a severe underrepresentation of minorities in superior officer ranks across the Commonwealth. The first fact, standing alone,

is sufficient to carry the officers' burden of establishing a prima facie case of adverse impact. See Beecher, 504 F.2d at 1021 ("What in our view conclusively tips the scale in plaintiffs' favor is the uncontroverted testimony, from experts called by both sides, that black and Spanish surnamed candidates typically perform more poorly on paper-and-pencil tests of this type."). But that fact does not stand alone; it stands with numerous other forms of evidence confirming that the written exams in this case had an adverse impact on minorities.

If this case began with any doubt that the 2005-2008 exams followed the expected pattern of lower scores by minority candidates – and there was no good reason for any doubt given the historical record – that uncertainty was gone by the end of the trial. Indeed, the statistics for Boston were so stark that it did not even contest the issue. For example, for the 2005 and 2008 Boston exams, the average scores for minority candidates were 6.4 and 6.6 points lower, respectively, than the average scores for non-minority candidates. (R.4313). These differences were, to put it mildly, highly statistically significant, with a p-value of 0.0000001 or lower (id.), meaning that it was next to impossible to have occurred by chance.[47]

It is well established that such evidence of average score

---

[47]  This p-value means that the probability the disparate outcomes occurred by chance was less than 1 out of 10,000,000.

differences (also known as "mean score differences") supports a finding of adverse impact. See, e.g., Waisome v. Port Authority of New York and New Jersey, 948 F.2d 1370, 1377-78 (2d Cir. 1991) (disparate impact established based on "evidence that the scores of members of a protected group were clustered at the low end of the grading scale"); Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. at 433  (relying on difference in mean scores, among other evidence, to find disparate impact); Walls v. Mississippi State Dept. of Public Welfare, 542 F. Supp. 281, 293 (N.D. Miss.), aff'd in relevant part, 730 F.2d 306 (5th Cir. 1984) (same); Burney v. City of Pawtucket, 559 F. Supp. 1089, 1096, 1099-1100 (D.R.I. 1983) (same, rejecting "bottom line" defense).

Mean score differences are particularly significant where, as here, promotions were made in strict rank order based principally on the written exam scores. Given that a single point makes a significant difference in promotional opportunities, lower average scores will result in a lack of equal opportunity, as courts have recognized. See, e.g., Bradley, 443 F. Supp. 2d at 168 ("The effect of using examination scores…for rank ordering, is to bunch minorities at the bottom of the eligible list. … Ranking by examination score thus disproportionately has precluded minority candidates from hiring consideration…."); Sanchez v. City of Santa Ana, 928 F.

78

Supp. 1494, 1502 (C.D. Cal. 1995) (noting that while being on an
eligibility list made one technically qualified for promotion,
"an applicant's placement on the eligibility list clearly
determined whether he had a realistic opportunity for
promotion").

The defendants' own expert acknowledged that average score
differences can establish adverse impact, writing that

> a test or selection procedure has adverse impact if
> test scores of applicants who are members of a
> protected class are (statistically) significantly
> lower than those of non-minority applicants, or if the
> selection rate for such applicants is less than 80
> percent of the selection rate for non-minority
> applicants. If either condition exists, an employer
> must provide validity evidence to substantiate the
> appropriateness of the test.

(R.2456-57).

The district court initially recognized that this type of
evidence is relevant. Slip op. at 15 ("Comparisons can be done
as appropriate at other potentially significant points, such as
the passing score on the test, the effective passing score (at
which one is eligible as a practical matter for hire or
promotion), *or mean group scores* (how well groups as a whole
perform, comparatively)") (emphasis added). Inexplicably,
however, the district court concluded its adverse impact
analysis without discussing the officers' evidence of
statistically-significant differences in the average scores of

79

minority and non-minority candidates.

Given the substantial and statistically-significant disparities between minority and non-minority test scores from the Boston exams, it is not surprising that minorities had substantially lower promotion rates. For Boston's 2005 exam, the adverse impact ratio for promotions (that is, the rate at which minorities were hired divided by the rate at which non-minorities were hired) was 0.28, meaning that minorities were promoted at about a quarter of the rate of non-minorities. (R.4313). The p-value for that outcome was 0.00004, meaning that it was close to certain that the different promotion rates resulted from race as opposed to chance. (R.4313). For the 2008 exam, the adverse impact ratio for promotions was 0.05 (meaning that minorities were promoted at about 1/20th the rate that non-minorities were promoted), with a highly statistically-significant p-value of 0.00002. (R.4313).

Although Boston's 2005 and 2008 exams covered some Boston-specific material, the structure of the test was otherwise identical to the statewide tests given in 2005-2008: 80 closed-book, multiple-choice questions, requiring candidates to recall verbatim facts from assigned materials. As a result, the severe adverse impact of the Boston exams is relevant to the claims against the other jurisdictions. The Uniform Guidelines

specifically recognize the appropriateness of a broad inquiry

that looks at all relevant evidence:

> Where the user's evidence concerning the impact of a
> selection procedure indicates adverse impact but is based
> upon numbers which are too small to be reliable, evidence
> concerning the impact of the procedure over a longer period
> of time *and/or evidence concerning the impact which the
> selection procedure had when used in the same manner in
> similar circumstances elsewhere* may be considered in
> determining adverse impact.

29 C.F.R. § 1607.4(D) (emphasis added).

Moreover, and again unsurprisingly, the statewide exams

that were used by all of the smaller jurisdictions had average

score differences that were stark, just as they were for the

Boston exams:

| Year of Exam | Average Score Difference | p-value |
|---|---|---|
| 2005 | 5.0 | ≤ 0.0000001 |
| 2006 | 3.9 | ≤ 0.0000001 |
| 2007 | 4.5 | ≤ 0.0000001 |
| 2008 | 3.4 | 0.009 |

(R.4315, 4319). In other words, and as expected, minority

candidates obtained scores that were 3.4 to 5.0 points lower, on

average, than non-minority candidates, and those differences

almost certainly did not occur by chance. In a promotional

context where every point matters, those disparities are

dramatic and consequential.

Given these consistent results, and given the

Commonwealth's decades-long reliance on this same testing

mechanism, it is no surprise that minorities have been grossly

underrepresented in the sergeant ranks of the defendant jurisdictions. For example, of **Lawrence**'s 22 sergeants in 2008, only two (9%) were minorities. (R.3207-3208). In 2008, the last year for which such data was in evidence, Lawrence had 124 patrol officers, 35 of whom (28%) were minorities, meaning there was a sharp drop in minority representation in superior ranks. (R.3209-3212). Likewise, **Lowell** had two minority sergeants out of a total of 30, meaning only 6.6% of its sergeants were minorities.  (R.3142). In 2008, Lowell had 181 patrol officers, 35 of whom (19%) were minority. (R.3142). Of **Springfield**'s 40 sergeants, only four (10%) were minorities. (R.1704-1705, 3008). In contrast, minorities constituted approximately one-third (33%) of the patrol officers in Springfield.  (R.1704). As of 2008, **Worcester** had 57 sergeants, only four of whom (7.6%) were minorities. (R.3023-24). At the same time, seventeen percent (65 of 378) of all Worcester police officers were minorities. (R.3073-3087). In each of these jurisdictions, therefore, minorities were underrepresented at the sergeant rank compared to their representation at the patrol officer rank. Simply put, minorities may get hired as police officers, but they quickly hit a roadblock with promotions.

There was undisputed evidence, therefore, that the exams at issue in this case had precisely the effect that was expected: minorities performed worse than non-minorities, and the

correlation between race and test performance was highly statistically significant. The longstanding use of these exams, meanwhile, resulted in a glaring underrepresentation of minorities at the sergeant rank. Based on this evidence, the district court erred as a matter of law when ruling that the officers failed to establish a prima facie case of adverse impact.

Even though this undisputed evidence was sufficient, there was other evidence, as well. In fact, virtually every analysis – and there were many – reached the same conclusion, indicating that minorities performed worse on the exams and were promoted at lower rates.[48] Because of the smaller numbers in some jurisdictions, some of those analyses were statistically significant and some were not, but they consistently supported a finding of adverse impact.

### C.   THE DISTRICT COURT ERRED WHEN PLACING DISPOSITIVE WEIGHT ON CERTAIN FORMS OF EVIDENCE.

Notwithstanding the undisputed evidence that minority candidates are known to perform worse, and did perform worse, on the types of exams at issue in this case, and notwithstanding the evidence that minorities were underrepresented in the superior officer ranks of the defendant jurisdictions, the non-

---

[48]   In a number of tables introduced into evidence, Dr. Wiesen provided detailed statistics about mean score differences, passing rates, and promotion rates. (R.4307-4327).

Boston jurisdictions contested adverse impact, arguing that
smaller numbers make it more difficult (and essentially
impossible in some cases) to establish adverse impact,
particularly when looking at bottom-line promotion rates.  The
district court adopted that position when ruling that the
officers failed to establish a prima face case. (Slip op. at 21-
28). In reaching this conclusion, the district court made at
least two fundamental errors, both of which arose from an
unduly-narrow focus on certain forms of evidence.

First, the district court improperly limited its focus to
bottom-line promotion statistics. That is, the district court's
analysis focused on whether the officers could demonstrate
statistically-significant differences in terms of actual
promotions within each individual jurisdiction.  In doing so, it
did precisely what both the Supreme Court and this Court have
said is improper. After all, the proper focus of an adverse
impact analysis is on the question of *equal opportunity*, not
simply on bottom-line promotion statistics. Connecticut v. Teal,
457 U.S. 440, 441, 450-51, 453 n.12 (1982). See also Adoption of
Questions and Answers To Clarify and Provide a Common
Interpretation of the Uniform Guidelines on Employee Selection
Procedures ("Uniform Guidelines Q&A"), 44 Fed. Reg. 11996,
11999-12000 (1979) (Q26, noting that "bottom-line concept" is
limited to exercise of prosecutorial discretion; it does not

84

limit the enforcement of Title VII). This means that a plaintiff need not establish a bottom-line effect on promotions, and an employer cannot point to bottom-line statistics as a dispositive defense. Id. ("The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria.") (emphasis in original).

This Court repeatedly has recognized that the focus at the first stage of a disparate impact case appropriately is placed on the question of equal opportunity, not on bottom line outcomes. See Donahue v. City of Boston, 304 F.3d 110, 119 (1st Cir. 2002) (relevant harm in adverse impact case is the "inability to compete on an equal footing"); Costa v. Markey, 706 F.2d 1, 5 (1st Cir. 1983) ("The Court's focus must be on the first step in the employment process that produces an adverse impact on a group protected by Title VII, not the end result of the employment process as a whole."); Beecher, 504 F.2d at 1019, 1021 (plaintiff must demonstrate only that challenged test "is more of a hurdle for minority members than for others;" and "question is whether the test denied applicants equal protection of the laws by creating 'built-in headwinds'").

Second, the district court erred in ruling that it was improper to look at aggregated statistics, which was one form of

evidence upon which the officers relied. The defendants'
statistical expert criticized the use of *some* aggregated
statistics, leading the district court to reject *all* aggregated
statistics, with no analysis about the relevant differences
between various types of aggregation. (Slip op. 17-21). Whatever
the theoretical problems with aggregation in some circumstances,
there is at least one aggregated statistic that the district
court omitted from its analysis, even though its relevance was
acknowledged by the defendants' own expert: statewide test
results.

As discussed above, the statewide test results demonstrated
highly statistically-significant differences in the scores of
minorities and non-minorities. And those differences plainly
matter, because test scores effectively determined who was
promoted. If minority candidates get test scores that are five
points lower, on average, than non-minorities, then they will be
facing precisely the types of "built-in headwinds" that Title
VII is intended to redress. Beecher, 504 F.2d at 1021.

At trial, the defendants' expert agreed that when the same
exam is used across jurisdictions (as it was here for the non-
Boston defendants), it is appropriate to look at the combined
results when evaluating whether it had an adverse impact:

> Q. So for any given test, the 2005 statewide test,
> you're just looking at a group of -- there's no
> overlap; all those applicants are taking the test just

once, right?
A. That's correct.
Q. So in that situation it's not unreasonable to take
a look at the statewide results to see how, for
example, black candidates scored and how white
candidates scored?
A. Right. I stand corrected, yes. In that situation,
across jurisdictions, it is appropriate to combine,
and that would be an appropriate use.

(R.2495).

The officers' statistical expert agreed, testifying that
"the best approach to the aggregation is statewide within any
one year." (R.319). As he further explained:

The test that was given in the various municipalities
was the same test.  So if we want to find out what the
impact of that test is, the best way to do that is to
get as much data as we can about that test, and that
would be to look at the data from every person that
took the test.  And by looking at the data from every
person that took the test, we would have the most
reasonable set of data to evaluate the adverse impact,
if any, of that statewide test.

(R.359). His opinion about the appropriateness of aggregation is

supported by accepted practice among industrial psychologists.

(R.314-15, 392).

Courts repeatedly have embraced aggregation as an

appropriate way to examine disparate impact. See, e.g., Bradley,

443 F. Supp. 2d at 167 (finding aggregation reasonable), citing

Vulcan Pioneers, Inc. v. N.J. Dep't of Civil Serv., 625 F. Supp.

at 534-35, 544-45  (collecting cases and finding aggregation

across municipalities and across years appropriate where state-

administered firefighter promotion exam and exams were extremely similar across years). See also Paige v. California, 291 F.3d 1141, 1148 (9th Cir. 2002) (concluding that "it is a generally accepted principle that aggregated statistical data may be used where it is more probative than subdivided data"); Eldredge v. Carpenters 46 N. California Counties Joint Apprenticeship and Training Comm., 833 F.2d 1334, 1339 (9th Cir. 1987) ("Aggregated data presents a more complete and reliable picture."); Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 336 n.17 (4th Cir. 1983) ("[B]y significantly increasing the absolute numbers in the data, chance will more readily be excluded as a cause of any disparities found."); Capaci v. Katz & Besthoff, 711 F.2d 647, 654 (5th Cir. 1983) (permitting aggregation in order to accomplish meaningful statistical analysis); United States v. City of Yonkers, 609 F. Supp. 1281, 1289 (S.D.N.Y. 1984) (finding prima facie case under Title VII with aggregated data); NAACP v. City of Corinth, 83 F.R.D. 46, 61 (N.D. Miss. 1979) (finding that aggregated data across four years showed "a strong indication that the city's selection process operated to the detriment of black applicants"); Jones v. New York Human Resources Dep't, 391 F. Supp. 1064, 1074 (S.D.N.Y. 1975) (aggregating results of five exams to find that whites passed at a rate of three times the rate of minorities); League of United Latin American Citizens v. City of Santa Ana, 410 F. Supp. 873,

903 (C.D. Cal. 1976) (aggregating data across two exams in disparate impact case over defendant's objection that sample size was too small). See also Uniform Guidelines Q&A , 44 Fed. Reg. at 11999-12000 (Q21: "if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact;" Q27: "[i]f the test is administered and used in the same fashion for a variety of jobs, the impact of that test can be assessed in the aggregate.").

Aggregation has not been allowed where the individual tests or employment procedures at issue were too different. See, e.g., Bradley, 443 F.3d at 167, citing Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 656-57 (1st Cir. 1985) (aggregation across jurisdictions was inappropriate where exams were too different). But that problem does not exist in this case. In terms of statewide aggregation for each exam, all applicants took the exact same test, so there were no differences.

If a plaintiff never could establish disparate impact without a statistically-significant outcome at the jurisdiction level, the effect would be to insulate some employers from liability, even in the face of other evidence suggesting a disparate impact. Some employers will never have a large enough data pool to result in a statistically-significant outcome, even where an exam is known to be biased. See, e.g., Waisome, 948

89

F.2d at 1379 (in cases involving small or marginal samples, other indicia raising an inference of discrimination must be examined") (citations omitted); Bunch v. Bullard, 795 F.2d 384, 395 (5th Cir. 1986) (Title VII does not "permit an employer to escape liability for discriminatory tactics merely because his work force is not vast enough to provide meaningful data for a sophisticated statistical evaluation.").

The attempt to hide behind small numbers also ignores how a long-time reliance on an unfair testing process may lead to smaller numbers. The striking lack of minority sergeants in jurisdictions across the Commonwealth is a fact that cannot be lost on minority police officers. Faced with a decision about whether to spend hours per day, for months on end, to study for a test that is biased against them, it is not unreasonable to expect that some minority officers would chose not to take the exam. See International Brotherhood of Teamsters v. United States, 431 U.S. at 365  (ongoing discrimination deters others in adversely impacted group from seeking employment opportunities). Those decisions would lead to smaller sample sizes and, potentially, to an underestimate of the size of the disparate impact, because "only especially motivated and competent minority members [would take] the test." Beecher, 504 F.2d at 1021 n.6. This Court previously recognized that these

possibilities create another reason for not giving employers cover based on a myopic focus on small sample sizes. Id.

The district court concluded that plaintiff Robert Alvarez was not Hispanic, relying on the definition of "Hispanic" used by the Commonwealth's Human Resources Division. In reaching this conclusion, the district court erred as a matter of law. There is no authority for limiting the reach of Title VII or chapter 151B to those falling within a state agency's definition of a protected category. Unlike some racial categories, the term "'Hispanic' is unique, encompassing the concepts of both race and national origin in a way that the terms 'white,' 'black' and 'Asian' do not." Torres v. City of Chicago, 2000 WL 549588, *2 (N.D. Ill. 2000) (citation omitted). Regardless of its designation as a race or a national origin, it is "used to refer to individuals of Spanish-speaking descent, whether from Spain itself or from Spanish-speaking Latin-American countries." Salas v. Wisconsin Dept. of Corrections, 2006 WL 1049469, *6 (W.D. Wis. 2006).

There was undisputed evidence at trial that Alvarez properly is characterized as Hispanic. His father was Spanish and spoke both English and Spanish. (R.1309-10). See Reynolds v. City of Chicago, 296 F.3d 524, 530 (7th Cir. 2002) (finding as Hispanic a plaintiff whose mother was Hispanic, regardless of whether plaintiff spoke Spanish); U.S. v. New York Bd. of Educ.,

448 F. Supp. 2d 397, 422 (E.D.N.Y. 2006) (recognizing relevance of ancestral heritage and finding as "Hispanic" a plaintiff whose grandfather was born in Mexico). Alvarez self-identifies as Hispanic. (R.1303, 1309). Indeed, he identified himself as Hispanic before and after he began working for Lowell. (R.1321-22, 1349-50). Lowell likewise recognized him as a minority. (R.1348-49). Alvarez previously brought a claim of discrimination against Lowell based on his Hispanic identity, and the jury found that he was in a protected category. (R.1350-51). As a result, there was ample, undisputed proof that he is Hispanic, and the district court's finding to the contrary was erroneous.

## **CONCLUSION**

For the foregoing reasons, the plaintiff-appellants respectfully submit that the district court's entry of judgment was erroneous and should be reversed.

Respectfully submitted,


PEDRO LOPEZ, et al.
By their attorneys,


/s/ Harold Lichten
Harold Lichten, C.A.B. 22114
Benjamin Weber, C.A.B. 1159650
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrlaw.com
bweber@llrlaw.com



Stephen Churchill, C.A.B. 30464
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3262
steve@fairworklaw.com



Dated:    February 27, 2015

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.    This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 21,069 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The Court has granted the plaintiffs' motion to extend the word limit to not more than 21,085 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Microsoft Office Word with Courier New, 12-point type space.


/s/ Harold Lichten    
Harold Lichten

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2015, I electronically filed the foregoing brief with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties are registered as ECF filers and that they will be served by the CM/ECF system:


Charles Dunstan Boddy
Jr. Richard D'Agostino
Office of the City Attorney
200 Common St., Ste. 306
Lawrence, MA 01840

Anne L. Radazzo
25 Westwind Dr.
Methuen, MA 01844

Kerry M. Regan
City of Methuen
Office of the City Solicitor
41 Pleasant St., Suite 311
Methuen, MA 01844

Iraida J. Alvarez
Robert Lawrence Quinan, Jr.
Sookyoung Shin
MA Attorney General's Office
1 Ashburton Place, 20th Floor
Boston, MA 02108

Rachel M. Brown
Shaprio Haber & Urmy LLP
Seaport East
2 Seaport Lane
Boston, MA 02210

Christine Patricia O'Connor
City of Lowell
375 Merrimack St.,
3rd Fl.
Lowell, MA 01852

Daniel C. Brown
Joshua Ryan Coleman
Tim D. Norris
Collins, Loughran & Peloquin P.C.
320 Norwood Park South
Norwood, MA 02062

Kay H. Hodge
John Matthew Simon
99 High St., Suite 1601
Boston, MA 02201

Lisa Skehill Maki
City of Boston Law Department
One City Hall Plaza
Room 615
Boston, MA 02201

Robert P. Morris
Morgan, Brown & Joy LLP
200 State St.,11$^{th}$Fl.
Boston, MA 02109

Maurice Martin Cahillane
Egan, Flanagan & Cohen PC
67 Market St.
Springfield, MA 01102

Harry P. Carroll
John Thomas Liebel

96

Edward M. Pikula
City of Springfield
Law Department
36 Court St.
Springfield, MA 01103

William G. Cullinan
O'Connor Martinelli & Cohn
1391 Main St., Ste. 1022
Springfield, MA 01103

Kevin Sean McDermott
MBTA Law Department
10 Park Plaza, Suite 7760
Boston, MA 02116


                    /s/ Harold Lichten
                       Harold Lichten

ADDENDUM

# Table of Contents

U.S.C. §2002e-2.................................................1

29 CFR 1607.5..................................................7

29 CFR 1607.14................................................14

Order for Judgment, Doc. #347 ................................17

M.G.L. c. 151B................................................64

M.G.L. c. 31 §5..............................................112

M.G.L. c. 4 §7...............................................114

Pratt v. Dietl...............................................124

Uniform Guidelines...........................................135

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 21. Civil Rights (Refs & Annos)
      Subchapter VI. Equal Employment Opportunities (Refs & Annos)

42 U.S.C.A. § 2000e-2

§ 2000e-2. Unlawful employment practices

Currentness

<Notes of Decisions for 42 USCA § 2000e-2 are displayed in two separate documents. Notes of Decisions for subdivisions I to V are contained in this document. For Notes of Decisions for subdivisions VI to end, see second document for 42 USCA § 2000e-2.>

(a) Employer practices

It shall be an unlawful employment practice for an employer--

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(b) Employment agency practices

It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

(c) Labor organization practices

It shall be an unlawful employment practice for a labor organization--

**(1)** to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

**(2)** to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities,

or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

**(3)** to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

(d) Training programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

(e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin; educational institutions with personnel of particular religion

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

(f) Members of Communist Party or Communist-action or Communist-front organizations

As used in this subchapter, the phrase "unlawful employment practice" shall not be deemed to include any action or measure taken by an employer, labor organization, joint labor-management committee, or employment agency with respect to an individual who is a member of the Communist Party of the United States or of any other organization required to register as a Communist-action or Communist-front organization by final order of the Subversive Activities Control Board pursuant to the Subversive Activities Control Act of 1950 [50 U.S.C.A. § 781 et seq.].

(g) National security

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency to fail or refuse to refer any individual for employment in any position, or for a labor organization to fail or refuse to refer any individual for employment in any position, if--

**(1)** the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United

States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

**(2)** such individual has not fulfilled or has ceased to fulfill that requirement.

(h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

(i) Businesses or enterprises extending preferential treatment to Indians

Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

(j) Preferential treatment not to be granted on account of existing number or percentage imbalance

Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

(k) Burden of proof in disparate impact cases

**(1)(A)** An unlawful employment practice based on disparate impact is established under this subchapter only if--

**(i)** a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**(ii)** the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

**(B)(i)** With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

**(ii)** If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

**(C)** The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

**(2)** A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.

**(3)** Notwithstanding any other provision of this subchapter, a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act [21 U.S.C.A. § 801 et seq.] or any other provision of Federal law, shall be considered an unlawful employment practice under this subchapter only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

(l) Prohibition of discriminatory use of test scores

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

(n) Resolution of challenges to employment practices implementing litigated or consent judgments or orders

**(1)(A)** Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

**(B)** A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws--

**(i)** by a person who, prior to the entry of the judgment or order described in subparagraph (A), had--

**(I)** actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

**(II)** a reasonable opportunity to present objections to such judgment or order; or

**(ii)** by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

**(2)** Nothing in this subsection shall be construed to--

**(A)** alter the standards for intervention under rule 24 of the Federal Rules of Civil Procedure or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;

**(B)** apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a class represented or sought to be represented in such action, or of members of a group on whose behalf relief was sought in such action by the Federal Government;

**(C)** prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or

**(D)** authorize or permit the denial to any person of the due process of law required by the Constitution.

**(3)** Any action not precluded under this subsection that challenges an employment consent judgment or order described in paragraph (1) shall be brought in the court, and if possible before the judge, that entered such judgment or order. Nothing in this subsection shall preclude a transfer of such action pursuant to section 1404 of Title 28.

**CREDIT(S)**

(Pub.L. 88-352, Title VII, § 703, July 2, 1964, 78 Stat. 255; Pub.L. 92-261, § 8(a), (b), Mar. 24, 1972, 86 Stat. 109; Pub.L. 102-166, Title I, §§ 105(a), 106, 107(a), 108, Nov. 21, 1991, 105 Stat. 1074-1076.)

Notes of Decisions (5251)

§ 2000e-2. Unlawful employment practices, 42 USCA § 2000e-2

42 U.S.C.A. § 2000e-2, 42 USCA § 2000e-2
Current through P.L. 113-294 (excluding P.L. 113-235, 113-283, 113-287, and 113-291) approved 12-19-2014

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XIV. Equal Employment Opportunity Commission
                Part 1607. Uniform Guidelines on Employee Selection Procedures (1978) (Refs & Annos)
                    Technical Standards

29 C.F.R. § 1607.14

§ 1607.14 Technical standards for validity studies.

Currentness

The following minimum standards, as applicable, should be met in conducting a validity study. Nothing in these guidelines is intended to preclude the development and use of other professionally acceptable techniques with respect to validation of selection procedures. Where it is not technically feasible for a user to conduct a validity study, the user has the obligation otherwise to comply with these guidelines. See sections 6 and 7 above.

A. Validity studies should be based on review of information about the job. Any validity study should be based upon a review of information about the job for which the selection procedure is to be used. The review should include a job analysis except as provided in section 14B(3) below with respect to criterion-related validity. Any method of job analysis may be used if it provides the information required for the specific validation strategy used.

B. Technical standards for criterion-related validity studies--

(1) Technical feasibility. Users choosing to validate a selection procedure by a criterion-related validity strategy should determine whether it is technically feasible (as defined in section 16) to conduct such a study in the particular employment context. The determination of the number of persons necessary to permit the conduct of a meaningful criterion-related study should be made by the user on the basis of all relevant information concerning the selection procedure, the potential sample and the employment situation. Where appropriate, jobs with substantially the same major work behaviors may be grouped together for validity studies, in order to obtain an adequate sample. These guidelines do not require a user to hire or promote persons for the purpose of making it possible to conduct a criterion-related study.

(2) Analysis of the job. There should be a review of job information to determine measures of work behavior(s) or performance that are relevant to the job or group of jobs in question. These measures or criteria are relevant to the extent that they represent critical or important job duties, work behaviors or work outcomes as developed from the review of job information. The possibility of bias should be considered both in selection of the criterion measures and their application. In view of the possibility of bias in subjective evaluations, supervisory rating techniques and instructions to raters should be carefully developed. All criterion measures and the methods for gathering data need to be examined for freedom from factors which would unfairly alter scores of members of any group. The relevance of criteria and their freedom from bias are of particular concern when there are significant differences in measures of job performance for different groups.

(3) Criterion measures. Proper safeguards should be taken to insure that scores on selection procedures do not enter into any judgments of employee adequacy that are to be used as criterion measures. Whatever criteria are used should represent

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

important or critical work behavior(s) or work outcomes. Certain criteria may be used without a full job analysis if the user can show the importance of the criteria to the particular employment context. These criteria include but are not limited to production rate, error rate, tardiness, absenteeism, and length of service. A standardized rating of overall work performance may be used where a study of the job shows that it is an appropriate criterion. Where performance in training is used as a criterion, success in training should be properly measured and the relevance of the training should be shown either through a comparison of the content of the training program with the critical or important work behavior(s) of the job(s), or through a demonstration of the relationship between measures of performance in training and measures of job performance. Measures of relative success in training include but are not limited to instructor evaluations, performance samples, or tests. Criterion measures consisting of paper and pencil tests will be closely reviewed for job relevance.

(4) Representativeness of the sample. Whether the study is predictive or concurrent, the sample subjects should insofar as feasible be representative of the candidates normally available in the relevant labor market for the job or group of jobs in question, and should insofar as feasible include the races, sexes, and ethnic groups normally available in the relevant job market. In determining the representativeness of the sample in a concurrent validity study, the user should take into account the extent to which the specific knowledges or skills which are the primary focus of the test are those which employees learn on the job.

Where samples are combined or compared, attention should be given to see that such samples are comparable in terms of the actual job they perform, the length of time on the job where time on the job is likely to affect performance, and other relevant factors likely to affect validity differences; or that these factors are included in the design of the study and their effects identified.

(5) Statistical relationships. The degree of relationship between selection procedure scores and criterion measures should be examined and computed, using professionally acceptable statistical procedures. Generally, a selection procedure is considered related to the criterion, for the purposes of these guidelines, when the relationship between performance on the procedure and performance on the criterion measure is statistically significant at the 0.05 level of significance, which means that it is sufficiently high as to have a probability of no more than one (1) in twenty (20) to have occurred by chance. Absence of a statistically significant relationship between a selection procedure and job performance should not necessarily discourage other investigations of the validity of that selection procedure.

(6) Operational use of selection procedures. Users should evaluate each selection procedure to assure that it is appropriate for operational use, including establishment of cutoff scores or rank ordering. Generally, if other factors remain the same, the greater the magnitude of the relationship (e.g., correlation coefficient) between performance on a selection procedure and one or more criteria of performance on the job, and the greater the importance and number of aspects of job performance covered by the criteria, the more likely it is that the procedure will be appropriate for use. Reliance upon a selection procedure which is significantly related to a criterion measure, but which is based upon a study involving a large number of subjects and has a low correlation coefficient will be subject to close review if it has a large adverse impact. Sole reliance upon a single selection instrument which is related to only one of many job duties or aspects of job performance will also be subject to close review. The appropriateness of a selection procedure is best evaluated in each particular situation and there are no minimum correlation coefficients applicable to all employment situations. In determining whether a selection procedure is appropriate for operational use the following considerations should also be taken into account: The degree of adverse impact of the procedure, the availability of other selection procedures of greater or substantially equal validity.

(7) Overstatement of validity findings. Users should avoid reliance upon techniques which tend to overestimate validity findings as a result of capitalization on chance unless an appropriate safeguard is taken. Reliance upon a few selection procedures or criteria of successful job performance when many selection procedures or criteria of performance have been

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

studied, or the use of optimal statistical weights for selection procedures computed in one sample, are techniques which tend to inflate validity estimates as a result of chance. Use of a large sample is one safeguard: cross-validation is another.

(8) Fairness. This section generally calls for studies of unfairness where technically feasible. The concept of fairness or unfairness of selection procedures is a developing concept. In addition, fairness studies generally require substantial numbers of employees in the job or group of jobs being studied. For these reasons, the Federal enforcement agencies recognize that the obligation to conduct studies of fairness imposed by the guidelines generally will be upon users or groups of users with a large number of persons in a job class, or test developers; and that small users utilizing their own selection procedures will generally not be obligated to conduct such studies because it will be technically infeasible for them to do so.

(a) Unfairness defined. When members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences in scores are not reflected in differences in a measure of job performance, use of the selection procedure may unfairly deny opportunities to members of the group that obtains the lower scores.

(b) Investigation of fairness. Where a selection procedure results in an adverse impact on a race, sex, or ethnic group identified in accordance with the classifications set forth in section 4 above and that group is a significant factor in the relevant labor market, the user generally should investigate the possible existence of unfairness for that group if it is technically feasible to do so. The greater the severity of the adverse impact on a group, the greater the need to investigate the possible existence of unfairness. Where the weight of evidence from other studies shows that the selection procedure predicts fairly for the group in question and for the same or similar jobs, such evidence may be relied on in connection with the selection procedure at issue.

(c) General considerations in fairness investigations. Users conducting a study of fairness should review the A.P.A. Standards regarding investigation of possible bias in testing. An investigation of fairness of a selection procedure depends on both evidence of validity and the manner in which the selection procedure is to be used in a particular employment context. Fairness of a selection procedure cannot necessarily be specified in advance without investigating these factors. Investigation of fairness of a selection procedure in samples where the range of scores on selection procedures or criterion measures is severely restricted for any subgroup sample (as compared to other subgroup samples) may produce misleading evidence of unfairness. That factor should accordingly be taken into account in conducting such studies and before reliance is placed on the results.

(d) When unfairness is shown. If unfairness is demonstrated through a showing that members of a particular group perform better or poorer on the job than their scores on the selection procedure would indicate through comparison with how members of other groups perform, the user may either revise or replace the selection instrument in accordance with these guidelines, or may continue to use the selection instrument operationally with appropriate revisions in its use to assure compatibility between the probability of successful job performance and the probability of being selected.

(e) Technical feasibility of fairness studies. In addition to the general conditions needed for technical feasibility for the conduct of a criterion-related study (see section 16, below) an investigation of fairness requires the following:

(i) An adequate sample of persons in each group available for the study to achieve findings of statistical significance. Guidelines do not require a user to hire or promote persons on the basis of group classifications for the purpose of

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

making it possible to conduct a study of fairness; but the user has the obligation otherwise to comply with these guidelines.

(ii) The samples for each group should be comparable in terms of the actual job they perform, length of time on the job where time on the job is likely to affect performance, and other relevant factors likely to affect validity differences; or such factors should be included in the design of the study and their effects identified.

(f) Continued use of selection procedures when fairness studies not feasible. If a study of fairness should otherwise be performed, but is not technically feasible, a selection procedure may be used which has otherwise met the validity standards of these guidelines, unless the technical infeasibility resulted from discriminatory employment practices which are demonstrated by facts other than past failure to conform with requirements for validation of selection procedures. However, when it becomes technically feasible for the user to perform a study of fairness and such a study is otherwise called for, the user should conduct the study of fairness.

C. Technical standards for content validity studies--

(1) Appropriateness of content validity studies. Users choosing to validate a selection procedure by a content validity strategy should determine whether it is appropriate to conduct such a study in the particular employment context. A selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the content of the job. Selection procedures which purport to measure knowledges, skills, or abilities may in certain circumstances be justified by content validity, although they may not be representative samples, if the knowledge, skill, or ability measured by the selection procedure can be operationally defined as provided in section 14C(4) below, and if that knowledge, skill, or ability is a necessary prerequisite to successful job performance.

A selection procedure based upon inferences about mental processes cannot be supported solely or primarily on the basis of content validity. Thus, a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure traits or constructs, such as intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability. Content validity is also not an appropriate strategy when the selection procedure involves knowledges, skills, or abilities which an employee will be expected to learn on the job.

(2) Job analysis for content validity. There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job.

(3) Development of selection procedures. A selection procedure designed to measure the work behavior may be developed specifically from the job and job analysis in question, or may have been previously developed by the user, or by other users or by a test publisher.

(4) Standards for demonstrating content validity. To demonstrate the content validity of a selection procedure, a user should show that the behavior(s) demonstrated in the selection procedure are a representative sample of the behavior(s) of the job in question or that the selection procedure provides a representative sample of the work product of the job. In the case

of a selection procedure measuring a knowledge, skill, or ability, the knowledge, skill, or ability being measured should be operationally defined. In the case of a selection procedure measuring a knowledge, the knowledge being measured should be operationally defined as that body of learned information which is used in and is a necessary prerequisite for observable aspects of work behavior of the job. In the case of skills or abilities, the skill or ability being measured should be operationally defined in terms of observable aspects of work behavior of the job. For any selection procedure measuring a knowledge, skill, or ability the user should show that (a) the selection procedure measures and is a representative sample of that knowledge, skill, or ability; and (b) that knowledge, skill, or ability is used in and is a necessary prerequisite to performance of critical or important work behavior(s). In addition, to be content valid, a selection procedure measuring a skill or ability should either closely approximate an observable work behavior, or its product should closely approximate an observable work product. If a test purports to sample a work behavior or to provide a sample of a work product, the manner and setting of the selection procedure and its level and complexity should closely approximate the work situation. The closer the content and the context of the selection procedure are to work samples or work behaviors, the stronger is the basis for showing content validity. As the content of the selection procedure less resembles a work behavior, or the setting and manner of the administration of the selection procedure less resemble the work situation, or the result less resembles a work product, the less likely the selection procedure is to be content valid, and the greater the need for other evidence of validity.

(5) Reliability. The reliability of selection procedures justified on the basis of content validity should be a matter of concern to the user. Whenever it is feasible, appropriate statistical estimates should be made of the reliability of the selection procedure.

(6) Prior training or experience. A requirement for or evaluation of specific prior training or experience based on content validity, including a specification of level or amount of training or experience, should be justified on the basis of the relationship between the content of the training or experience and the content of the job for which the training or experience is to be required or evaluated. The critical consideration is the resemblance between the specific behaviors, products, knowledges, skills, or abilities in the experience or training and the specific behaviors, products, knowledges, skills, or abilities required on the job, whether or not there is close resemblance between the experience or training as a whole and the job as a whole.

(7) Content validity of training success. Where a measure of success in a training program is used as a selection procedure and the content of a training program is justified on the basis of content validity, the use should be justified on the relationship between the content of the training program and the content of the job.

(8) Operational use. A selection procedure which is supported on the basis of content validity may be used for a job if it represents a critical work behavior (i.e., a behavior which is necessary for performance of the job) or work behaviors which constitute most of the important parts of the job.

(9) Ranking based on content validity studies. If a user can show, by a job analysis or otherwise, that a higher score on a content valid selection procedure is likely to result in better job performance, the results may be used to rank persons who score above minimum levels. Where a selection procedure supported solely or primarily by content validity is used to rank job candidates, the selection procedure should measure those aspects of performance which differentiate among levels of job performance.

D. Technical standards for construct validity studies--

(1) Appropriateness of construct validity studies. Construct validity is a more complex strategy than either criterion-related or content validity. Construct validation is a relatively new and developing procedure in the employment field, and there is at present a lack of substantial literature extending the concept to employment practices. The user should be aware that the effort to obtain sufficient empirical support for construct validity is both an extensive and arduous effort involving a series of research studies, which include criterion related validity studies and which may include content validity studies. Users choosing to justify use of a selection procedure by this strategy should therefore take particular care to assure that the validity study meets the standards set forth below.

(2) Job analysis for construct validity studies. There should be a job analysis. This job analysis should show the work behavior(s) required for successful performance of the job, or the groups of jobs being studied, the critical or important work behavior(s) in the job or group of jobs being studied, and an identification of the construct(s) believed to underlie successful performance of these critical or important work behaviors in the job or jobs in question. Each construct should be named and defined, so as to distinguish it from other constructs. If a group of jobs is being studied the jobs should have in common one or more critical or important work behaviors at a comparable level of complexity.

(3) Relationship to the job. A selection procedure should then be identified or developed which measures the construct identified in accord with subparagraph (2) above. The user should show by empirical evidence that the selection procedure is validly related to the construct and that the construct is validly related to the performance of critical or important work behavior(s). The relationship between the construct as measured by the selection procedure and the related work behavior(s) should be supported by empirical evidence from one or more criterion-related studies involving the job or jobs in question which satisfy the provisions of section 14B above.

(4) Use of construct validity study without new criterion-related evidence--

(a) Standards for use. Until such time as professional literature provides more guidance on the use of construct validity in employment situations, the Federal agencies will accept a claim of construct validity without a criterion-related study which satisfies section 14B above only when the selection procedure has been used elsewhere in a situation in which a criterion-related study has been conducted and the use of a criterion-related validity study in this context meets the standards for transportability of criterion-related validity studies as set forth above in section 7. However, if a study pertains to a number of jobs having common critical or important work behaviors at a comparable level of complexity, and the evidence satisfies subparagraphs 14B (2) and (3) above for those jobs with criterion-related validity evidence for those jobs, the selection procedure may be used for all the jobs to which the study pertains. If construct validity is to be generalized to other jobs or groups of jobs not in the group studied, the Federal enforcement agencies will expect at a minimum additional empirical research evidence meeting the standards of subparagraphs section 14B (2) and (3) above for the additional jobs or groups of jobs.

(b) Determination of common work behaviors. In determining whether two or more jobs have one or more work behavior(s) in common, the user should compare the observed work behavior(s) in each of the jobs and should compare the observed work product(s) in each of the jobs. If neither the observed work behavior(s) in each of the jobs nor the observed work product(s) in each of the jobs are the same, the Federal enforcement agencies will presume that the work behavior(s) in each job are different. If the work behaviors are not observable, then evidence of similarity of work products and any other relevant research evidence will be considered in determining whether the work behavior(s) in the two jobs are the same.

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

§ 1607.14 Technical standards for validity studies., 29 C.F.R. § 1607.14

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92–261); 42 U.S.C. 2000e–8, 2000e–12.

Notes of Decisions (72)

Current through Feb. 12, 2015; 80 FR 7966.

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XIV. Equal Employment Opportunity Commission
            Part 1607. Uniform Guidelines on Employee Selection Procedures (1978) (Refs & Annos)
                General Principles

29 C.F.R. § 1607.5

§ 1607.5 General standards for validity studies.

Currentness

A. Acceptable types of validity studies. For the purposes of satisfying these guidelines, users may rely upon criterion-related validity studies, content validity studies or construct validity studies, in accordance with the standards set forth in the technical standards of these guidelines, section 14 below. New strategies for showing the validity of selection procedures will be evaluated as they become accepted by the psychological profession.

B. Criterion-related, content, and construct validity. Evidence of the validity of a test or other selection procedure by a criterion-related validity study should consist of empirical data demonstrating that the selection procedure is predictive of or significantly correlated with important elements of job performance. See section 14B below. Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated. See 14C below. Evidence of the validity of a test or other selection procedure through a construct validity study should consist of data showing that the procedure measures the degree to which candidates have identifiable characteristics which have been determined to be important in successful performance in the job for which the candidates are to be evaluated. See section 14D below.

C. Guidelines are consistent with professional standards. The provisions of these guidelines relating to validation of selection procedures are intended to be consistent with generally accepted professional standards for evaluating standardized tests and other selection procedures, such as those described in the Standards for Educational and Psychological Tests prepared by a joint committee of the American Psychological Association, the American Educational Research Association, and the National Council on Measurement in Education (American Psychological Association, Washington, DC, 1974) (hereinafter "A.P.A. Standards") and standard textbooks and journals in the field of personnel selection.

D. Need for documentation of validity. For any selection procedure which is part of a selection process which has an adverse impact and which selection procedure has an adverse impact, each user should maintain and have available such documentation as is described in section 15 below.

E. Accuracy and standardization. Validity studies should be carried out under conditions which assure insofar as possible the adequacy and accuracy of the research and the report. Selection procedures should be administered and scored under standardized conditions.

F. Caution against selection on basis of knowledges, skills, or ability learned in brief orientation period. In general, users should avoid making employment decisions on the basis of measures of knowledges, skills, or abilities which are normally learned in a brief orientation period, and which have an adverse impact.

G. Method of use of selection procedures. The evidence of both the validity and utility of a selection procedure should support the method the user chooses for operational use of the procedure, if that method of use has a greater adverse impact than another method of use. Evidence which may be sufficient to support the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines. Thus, if a user decides to use a selection procedure on a ranking basis, and that method of use has a greater adverse impact than use on an appropriate pass/fail basis (see section 5H below), the user should have sufficient evidence of validity and utility to support the use on a ranking basis. See sections 3B, 14B (5) and (6), and 14C (8) and (9).

H. Cutoff scores. Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force. Where applicants are ranked on the basis of properly validated selection procedures and those applicants scoring below a higher cutoff score than appropriate in light of such expectations have little or no chance of being selected for employment, the higher cutoff score may be appropriate, but the degree of adverse impact should be considered.

I. Use of selection procedures for higher level jobs. If job progression structures are so established that employees will probably, within a reasonable period of time and in a majority of cases, progress to a higher level, it may be considered that the applicants are being evaluated for a job or jobs at the higher level. However, where job progression is not so nearly automatic, or the time span is such that higher level jobs or employees' potential may be expected to change in significant ways, it should be considered that applicants are being evaluated for a job at or near the entry level. A "reasonable period of time" will vary for different jobs and employment situations but will seldom be more than 5 years. Use of selection procedures to evaluate applicants for a higher level job would not be appropriate:

(1) If the majority of those remaining employed do not progress to the higher level job;

(2) If there is a reason to doubt that the higher level job will continue to require essentially similar skills during the progression period; or

(3) If the selection procedures measure knowledges, skills, or abilities required for advancement which would be expected to develop principally from the training or experience on the job.

J. Interim use of selection procedures. Users may continue the use of a selection procedure which is not at the moment fully supported by the required evidence of validity, provided: (1) The user has available substantial evidence of validity, and (2) the user has in progress, when technically feasible, a study which is designed to produce the additional evidence required by these guidelines within a reasonable time. If such a study is not technically feasible, see section 6B. If the study does not demonstrate validity, this provision of these guidelines for interim use shall not constitute a defense in any action, nor shall it relieve the user of any obligations arising under Federal law.

K. Review of validity studies for currency. Whenever validity has been shown in accord with these guidelines for the use of a particular selection procedure for a job or group of jobs, additional studies need not be performed until such time as the validity

study is subject to review as provided in section 3B above. There are no absolutes in the area of determining the currency of a validity study. All circumstances concerning the study, including the validation strategy used, and changes in the relevant labor market and the job should be considered in the determination of when a validity study is outdated.

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92–261); 42 U.S.C. 2000e–8, 2000e–12.

Notes of Decisions (599)

Current through Feb. 12, 2015; 80 FR 7966.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-11693-GAO

PEDRO LOPEZ, et al.,
Plaintiffs,

v.

CITY OF LAWRENCE, et al.,
Defendants.

FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT
September 5, 2014

O'TOOLE, D.J.

## I.    Introduction

The individual plaintiffs are current or former police officers employed by the cities of

Boston, Lawrence, Lowell, Methuen, Springfield, or Worcester, or by the Massachusetts Bay

Transportation Authority ("MBTA"). Each of the plaintiffs is self-described as either African-

American or Hispanic. Each took at least one civil service examination administered by the

Human Resources Division ("HRD"), an agency of the Commonwealth of Massachusetts,[1] for

promotion to the rank of sergeant within his or her respective police forces during the years

2005, 2006, 2007 or 2008, and, based largely on the resulting test scores, was not promoted or

was promoted after white police officers from the same jurisdiction who took the same exam. By

this lawsuit, the plaintiffs claim that the defendants' reliance on the HRD civil service exam in

selecting candidates to promote resulted in unlawful "disparate impact" discrimination on the

basis of race or ethnicity in violation of Title VII of the Civil Rights Act of 1964 and of Chapter

---

[1]  HRD is an agency within the Executive Office of Administration and Finance.

151B of the General Laws of Massachusetts.[2] They seek injunctive and declaratory relief, as well as appropriate compensatory damages.

## II.    Proceedings

By a prior order , this Court bifurcated this action into two stages, the first to address the defendants' respective liability claims and a second, if necessary, to determine appropriate remedies. The plaintiffs' motion for class certification was denied as to the liability stage and denied without prejudice as to the potential remedial stage.

As originally brought, this action included claims against the Commonwealth of Massachusetts and HRD, which is charged under state law with the responsibility to prepare and administer written examinations for hiring and promotion to public employer positions subject to the State's civil service law. This Court had earlier denied the state defendants' motion to dismiss the claims against them, but that ruling was reversed on appeal. See Lopez v. Massachusetts, 588 F.3d 69, 90 (1st Cir. 2009). Consistent with the direction of the Court of Appeals, the state defendants were dismissed from the suit.

The liability phase of the case was tried against the municipal and MBTA defendants in a lengthy bench trial.[3] This memorandum and order resolves the factual and legal issues presented at trial.

_____

[2]  The parties agree that the legal analysis of a disparate impact claim of employment discrimination under Mass. Gen. Laws ch. 151B, § 4 is the same as analysis of such a claim under Title VII. See White v. Univ. of Massachusetts, 574 N.E.2d 356, 358 (Mass. 1991) ("The analysis of a discrimination claim is essentially the same under the State and Federal statutes."); see also Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 529 n.10 (Mass. 2005) (referring to federal standards for disparate impact claims under Massachusetts law). Accordingly, the discussion herein will focus on the well-developed principles of federal law, applicable to both the federal and state claims.

### III.  **Legal Context**

Before addressing and resolving disputed factual issues on the basis of the trial evidence, it will be useful to summarize pertinent principles of law.

### A.  Disparate Impact Discrimination Generally

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, prohibits any employment practice that has "a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Unlike claims of disparate treatment, disparate impact claims do not require proof of an intent to discriminate. Ricci v. DeStefano, 557 U.S. 557, 577 (2009); Bradley v. City of Lynn, 443 F. Supp. 2d 145, 155 (D. Mass. 2006); see also, Sch. Comm. of Braintree v. Massachusetts Comm'n Against Discrimination, 386 N.E.2d 1251, 1254 (Mass. 1979) (addressing claims under Mass. Gen. Laws ch. 151B). The purpose of a disparate impact claim is to "'root[] out 'employment policies that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Bradley, 443 F. Supp. 2d at 155 (quoting EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 600-01 (1st Cir. 1995)).

There are potentially three steps involved in the proof of a disparate impact employment discrimination claim. First, a plaintiff has the initial burden of proving that a challenged employment practice has a disparate adverse impact on employees of a particular racial, ethnic or other protected group. Bradley, 443 F. Supp. 2d at 156 (citing 42 U.S.C. § 2000e-2(k)(1)(A)). Second, after a plaintiff has demonstrated such a disparate impact, the burden shifts to the employer to prove that the challenged practice is nonetheless "job-related and consistent with

---

[3] In addition to the municipal defendants and the MBTA itself, the plaintiffs have sued various officials of those entities. There is no need separately to address the individual defendants; their fates fall or rise with those of their respective entities.

3

business necessity." Id. at 157 (quoting Steamship Clerks, 48 F.3d at 601-02); see also 42 U.S.C. § 2000e-2(k)(1)(A)(i) (requiring employer "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"); id. § 2000e(m) ("The term 'demonstrates' means meets the burdens of production and persuasion."). If that is shown, then the claim may be defeated. However, in a third step, if the employer has shown that a practice or policy is job-related and consistent with business necessity, a plaintiff can still prevail by demonstrating that there is "another selection device without a similar discriminatory effect that would also serve the employer's legitimate interest." Bradley, 443 F. Supp. 2d at 157. To reiterate, a claim of disparate impact discrimination does not require proof of an intent to discriminate. In fact, such a claim may be established even when the employer acts in good faith to avoid discrimination.

There is no "single test" to establish disparate impact. Langlois v. Abington Hous. Auth., 207 F.3d 43, 50 (1st Cir. 2000) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995-96 n.3 (1988) (plurality opinion)). Instead, "courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis." Watson, 487 U.S. at 995 n.3.

One frequently used benchmark for identifying and measuring disparate impact is what commonly referred to as the "four-fifths rule," articulated in the Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines") adopted by the Equal Employment Opportunity Commission ("EEOC"). 29 C.F.R. § 1607.4(D)[4] The four-fifths rule is not really a rule but a "rule of thumb," a rough guide suggested by the EEOC for assessing the

---

[4] EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 257 (1991) (Because "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations," the agency's guidelines receive weight only to the extent of their "power to persuade." (internal citations and quotations omitted)).

4

existence of disparate impact to be addressed by enforcement actions. <u>See</u> <u>Watson</u>, 487 U.S. at

995 n.3. According to the EEOC's Uniform Guidelines,

> A selection rate for any race, sex, or ethnic group which is less than four-fifths ($^4/_5$) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D).

> The utility of the four-fifths rule may vary in different factual circumstances:

> Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant.

<u>Id.</u> Additionally,

> Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact.

<u>Id.</u>

The four-fifths rule was used by the parties and their experts. However, since the trial the

First Circuit has counseled against too much reliance on the four-fifths rule. <u>Jones v. City of</u>

<u>Boston</u>, 752 F.3d 38, 51 (1st Cir. 2014). For one thing, it may "lead to anomalous results." <u>Id.</u> It

is not a precise measurement tool (it was not meant to be), and its principal utility in litigation

may be to assist plaintiffs in making a sufficient prima facie demonstration of disparate impact.

<u>See</u> <u>Langlois</u>, 207 F.3d at 50.

5

Disparate impact is itself a statistical construct; it is an inference of discriminatory practice from statistical evidence. See Ricci, 557 U.S. at 587 (describing a prima facie showing of disparate impact as "essentially a threshold showing of a significant statistical disparity . . . and nothing more"); Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 658 (1st Cir. 1985) (a prima facie showing of disparate impact exists where "statistical tests sufficiently diminish chance as a likely explanation"). In Jones, the First Circuit recently emphasized the importance of preferring the analytic rigor of statistical analysis to the imprecise rule of thumb that the four-fifths rule supplies. 752 F.3d at 43, 52.

> Statisticians, by contrast, customarily approach data such as this more precisely. They ask whether the outcomes of an employment practice are correlated with a specific characteristic, such as race, and, if so, whether the correlation can reasonably be attributed to random chance. . . .
>
> To assess the likelihood that an observed difference in outcomes resulted from mere chance, statisticians calculate the probability of observing a difference equal to or greater than that which actually occurred, assuming equal opportunity. They call this probability the "p-value." Statisticians usually apply the label "statistically significant" to the observed differential outcomes if the p-value is less than five percent . . . .
>
> Essentially, a finding of statistical significance means that the data casts serious doubt on the assumption that the disparity was caused by chance.

Id. at 43 (internal citations omitted). The difficulty that plaintiffs often face in seeking to establish statistical significance is that large sample sizes are often required to show that the disparity is statistically significant. Id. at 53. As discussed further below, the plaintiffs here have that problem with every defendant employer except Boston.

The Uniform Guidelines also address when an employer's selection method is "job-related," such that its use might be justified notwithstanding some adverse impact on a particular group. Industrial psychologists generally describe a selection method that measures a candidate's knowledge, skills, and abilities (often expressed as KSAs) against the actual needs of the job as

6

being a "valid" selection tool. For an employer who seeks to justify a particular selection tool as "job-related," it is important to establish the tool's "validity" in this sense. Validity refers to the accuracy of inferences that an employer seeks to make about a candidate's suitability for the job on the basis of outcome, such as a test score, from a selection instrument. For example, an employer may administer an exam and hire individuals with the highest exam scores, the inference relied on being that the candidates with higher scores are more qualified than those with lower scores.

The Uniform Guidelines address the validity of selection instruments. See 29 C.F.R. § 1607.5. Industrial psychologists and the Guidelines recognize alternate possible measures of validity: criterion validity, content validity, and construct validity. Id. § 1607.5(A). The defendants in this case rely on content validity to justify use of the written civil service exams as a tool for selecting candidates for promotion from patrol officer to sergeant.

> Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated.

Id. § 1607.5(B); see also id. § 1607.14(C). The other measures – criterion and construct validity – are not in issue.

The first step for content validation is the performance of a job analysis. Id. § 1607.14(C)(2). The next step is to ensure that there is a link between the selection procedure and the critical KSAs necessary for successful performance of the job as identified by the job analysis. Id. § 1607.14(C)(4). In addition, where a selection procedure relies on prior training or experience as a selection criterion, that criterion should be justified based on the relationship between the specific training, experience, and the job's requirements. Id. § 1607.14(C)(6). The use of a ranking device requires a separate demonstration that there is a relationship between

higher scores and better job performance. Id. § 1607.14(C)(9). A selection tool that validly assesses whether the candidate has KSAs necessary and appropriate to the job can be deemed job-related and consistent with business necessity for Title VII purposes.

As noted above, even if a selection tool is shown to be job-related and consistent with business necessity, it still may be condemned as discriminatory under the disparate impact theory if the plaintiff can show that there are other valid selection tools that generate less adverse impact on minority candidates. The inquiry then turns to specific alternate selection tools available to be used and the likelihood of reducing adverse impact by their use in place of the employer's chosen tool.

B.      The Civil Service Regime and Written Job Knowledge Tests

The Court of Appeals summarized the Massachusetts civil service regime as it applies to Massachusetts police departments:

> Under Massachusetts law, plaintiffs' positions as city and MBTA police officers are subject to the state civil service law. See Mass. Gen. Laws ch. 31, § 48 (applying the civil service law to positions in the MBTA); id. § 51 (applying the civil service law to civil service offices in cities).
>
> The state civil service law states that the purpose of its requirements is to ensure that employees in civil service positions are recruited, chosen, and promoted based on principles of merit, not on political affiliation, race, age, gender, religion, national origin, or other factors unrelated to individual ability. Id. § 1. "[T]he fundamental purposes of the civil service system [are] to guard against political considerations, favoritism, and bias in governmental employment decisions . . . and to protect efficient public employees from political control." Cambridge v. Civil Serv. Comm'n, 43 Mass. App. Ct. 300, 682 N.E.2d 923 (1997).

Lopez, 588 F.3d at 74.

> By law, municipal police promotions must be made on the basis of competitive examinations, whether on the basis of the HRD examination or some other test. Mass. Gen. Laws ch. 31, §§ 59, 65. HRD is given statutory authority to establish the form and content of these examinations. Id. § 16. However, HRD's discretion in this area is bounded. By statute, all examinations must "fairly test the

8

> knowledge, skills and abilities which can be practically and reliably measured and which are actually required" to perform the job, a requirement that may significantly limit both the form and the substance of an examination. Id. And HRD must consult with labor representatives and professionals in the field to determine what skills and abilities are relevant for promotion to police sergeant or any other position. Id.

Id. at 77.

Massachusetts police and fire departments subject to civil service laws have two general options for promotional examinations. They may use statewide examinations developed by HRD, or they may seek approval from HRD to develop and use their own promotional exams. See Mass. Gen. Laws ch. 31 § 5(l) (giving HRD power to delegate administrative functions to cities and towns). For the years at issue, all defendants elected the first option, relying on HRD to design and administer the exams. Municipalities do not participate in the design or administration of the statewide exam in the absence of a delegation.

For each of the years in question, the HRD promotional exam for sergeants consisted of two elements: a written, closed-book exam consisting of 80 multiple-choice questions, and an "education and experience" ("E&E") rating. The E&E rating principally took account of relevant prior employment and academic coursework that a candidate had either taken or taught. The written exam accounted for 80% of the final score; the E&E component was assigned a 20% weight. Based on a 100-point scale, a candidate needed a score of 70 or above to pass the exam. In addition to the scoring of the exam, under Massachusetts law certain military veterans and long-service employees receive preference in the form of additional points that are added to their final exam score. Mass. Gen. Laws ch. 31, §§ 26 (veterans), 59 (long-service employees).

Participants in the test process are ranked by their combined score. HRD then prepares and certifies an "eligibility list" for each appointing jurisdiction, identifying those test-takers who may be considered for appointment to existing vacancies. Id. § 25. The number of names on

9

the eligibility list is determined by the formula 2n+1, where n is the number of vacant positions. Id. § 27. Thus, if a municipality had one job vacancy to which the list was applicable, the list would contain the candidates with the three highest scores (2x1+1=3). If there were three vacancies, the eligibility list would have the candidates with the top seven scores (2x3+1=7). In this case, it was the general practice of all employers except the MBTA to make selections in strict rank order according to the HRD eligibility list. The MBTA treated all candidates on the list as having scored equally and proceeded to make selections from that group principally on the basis of oral interviews of those candidates.

It should be noted that for statewide exams, HRD establishes an eligibility list for any municipality that requests one. Id. § 25. The list that is furnished to the municipality by HRD shows only those certified by HRD as eligible for appointment. The municipality does not receive information from HRD concerning other test-takers whose scores did not make them eligible for consideration under the 2n+1 rule. In other words, a municipality would not typically know which candidates did not score well enough to make the eligibility list, nor would the municipality know the race or ethnicity of test-takers who did not make the eligibility list. Consequently, the eligibility list alone would not ordinarily be a basis on which a municipality could determine whether there had been an adverse impact on minority test-takers or not.

Candidates may administratively appeal various issues pertaining to an examination, including "whether an examination . . . was a fair test of the applicant's fitness actually to perform the primary or dominant duties of the position for which the examination was held. . . ." Id. § 22. After administrative disposition of an appeal, further judicial review may be available. Id. § 44. Duties of the Massachusetts Civil Service Commission include adjudicating disputes concerning the content and administration of promotional examinations, any HRD decision or

action that affects an applicant, and any employment action taken by an appointing authority. Id. § 2(b)-(c). The Commission also "has the power to review any rules proposed by HRD, and, if the Commission concludes that a given rule violates a merit-based approach to employment decisions, it can, upon, a three-fifths vote, disapprove of the rule." Lopez, 588 F.3d at 75.

Under some circumstances, a municipal employer may skip over, or "bypass," a candidate on the list who would, by reason of his or her exam score, otherwise be selected for the vacancy. Id. § 27. But the employer must have a defensible reason for the bypass. Id. "If an appointing authority makes [a]…promotional appointment from a certification of any qualified person other than the qualified person whose names appear highest, and the person whose name is highest is willing to accept such appointment, the appointing authority shall immediately file with the [personnel] administrator a written statement of his reasons for appointing the person whose name was not highest." Id.; see also PAR 08(4), (5); PAR 09 (2).[5] An applicant who has been thus bypassed, i.e., not selected despite having a higher score than the selected applicant, can appeal to the Civil Service Commission, which must decide "whether the appointing authority has sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority." City of Cambridge v. Civil Service Comm'n, 682 N.E.2d 923, 925 (Mass. App. Ct. 1997). A justifiable reason for a bypass might be, for example, a candidate's history of disciplinary infractions. Id. at 927 ("Prior misconduct has frequently been a ground for not hiring or retaining a police officer."). The candidate's race or ethnicity would

---

[5] PAR references are to HRD's Personnel Administration Rules. They "establish standards for the conduct of the civil service merit system of employment. In addition, these rules include standards governing state employment apart from civil service where rule making is required of the administrator by statute. They are intended to provide a system of uniform standards implementing applicable law for use by appointing authorities in the employment processes of recruitment and examination of applicants for public service positions, selection among applicants for appointment and promotion, performance evaluation and layoff." PAR 01.

11

ordinarily not be a justifiable reason for a bypass. <u>Massachusetts Ass'n of Minority Law</u> <u>Enforcement Officers v. Abban</u>, 748 N.E.2d 455, 461-62 (Mass. 2001) ("The commission, and the Superior Court judge on review, correctly concluded that without the consent decree's mandate, race, a consideration specifically identified by the Legislature in G.L. c. 31, § 1(e), as inconsistent with basic merit principles, cannot be used to justify a bypass.").

As noted above, municipalities may elect to design and conduct their own promotional examination pursuant to a delegation agreement between HRD and the municipality. <u>See</u> Mass. Gen. Laws ch. 31, §§ 9-11. However, even with respect to municipalities that have entered into a delegation agreement, HRD retains the right to approve the actions of the appointing authority. The appointment process after a local delegation is subject to the same rules regarding bypass and appeal or other challenge. It would also be subject to potential limitations imposed under collective bargaining agreements.

## IV.   Police Promotional Exams Litigation

The lower rates at which minority police officers in Massachusetts municipalities have been hired and promoted compared to non-minority officers has been a subject of considerable litigation over the past several decades. In 1970, black and Hispanic plaintiffs brought suit in this Court challenging hiring practices of the Boston Police Department ("BPD" or "Department"), including specifically the use of written examinations, as racially discriminatory and a denial of equal protection of the laws. After some litigation, the Court entered a consent decree requiring, among other things, that written examinations prepared and administered by the state Department of Personnel Administration ("DPA"), the predecessor to what is now HRD, be "validated in conformity with the Testing Guidelines of the Equal Employment Opportunity Commission, 29 C.F.R. §1607.1 et seq." <u>Castro v. Beecher</u>, 365 F. Supp. 655, 662 (D. Mass.

1973); see also Castro v. Beecher, 334 F. Supp. 930 (D. Mass. 1971), aff'd in part and rev'd in part, 459 F.2d 725 (1st Cir. 1972). Because the decree was addressed to DPA, it effectively applied to any municipality that used the statewide exam in hiring new police officers. The history of the Castro consent decree is summarized in Sullivan v. City of Springfield, 555 F. Supp. 2d 246, 248-50 (D. Mass. 2008).

In 1978, an association of black police officers filed suit against BPD and DPA alleging racially discriminatory practices affecting promotions from the rank of police officer to sergeant. See Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dept., 973 F.2d 18, 19 (1st Cir. 1992) (reciting history). In 1980 this Court again entered a consent decree, pursuant to which the defendants were limited to using promotional tests that were "specially validated as anti-discriminatory and fair." Stuart v. Roache, 951 F.2d 446, 448 (1st Cir. 1991). The consent decree was to expire in 1985, but because no validated promotional exams had been given by that time, the decree was extended for another five years to 1990.

Between 1985 and 1990, BPD administered a "validated-fair" exam, but promotions still fell short of the target goals set forth in the consent decree, and so the Court extended the decree again to permit an additional "validated-fair" exam to be given in an attempt to achieve the target goals. Id. An equal protection challenge by white police officers claiming to be disadvantaged by the continuing consent decree was rejected. See id. at 455 ("[T]he race-conscious relief here at issue represents a narrowly tailored effort, limited in time, to overcome the effects of past discrimination. As such, it is lawful. . . . And, the efforts in favor of eligible black police officers that it mandates therefore do not violate any statute of the Constitution of the United States."). The consent decree finally expired by its terms in 1995.

HRD administered another promotional exam for sergeants in 1996. In an effort to achieve more minority promotions, BPD bypassed some white officers on the certified list in order to promote three black officers who had scored one point lower on the exam. The white officers who were bypassed brought suit, claiming a violation of their equal protection rights. This Court rejected their claims, and the Court of Appeals affirmed, concluding that the promotions of three black officers constituted a narrowly tailored effort to overcome the continuing effects of past discrimination in hiring and was therefore not unlawful. Cotter v. City of Boston, 323 F.3d 160, 169-72 (1st Cir. 2003). A similar ruling also entered in a case involving a bypass promotion of a minority candidate to the rank of lieutenant based on a 1992 exam. See Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 19-25 (1st Cir. 1998).

Similar cases involving other police departments include Sullivan v. City of Springfield, 561 F.3d 7 (1st Cir. 2009) (City of Springfield) and Brackett v. Civil Serv. Comm'n, 850 N.E.2d 533 (Mass. 2006) (MBTA).

**V.      Disparate Impact of the Challenged HRD Exams for Sergeants**

It is widely recognized among industrial organizational psychologists, including the four experts who testified at trial, that minority candidates as a group tend to perform less well relative to non-minority candidates as a group on written multiple-choice examinations such as the HRD-prepared sergeants promotional exams given in 2005, 2006, 2007, and 2008. Put in the language of disparate impact litigation, such exams are said to have an adverse impact on minority candidate pools, compared to non-minority pools. Commonly, adverse impact is assessed as the ratio of success rates of minority test-takers to the success rates of non-minority test-takers. Thus, as noted above, the EEOC has devised its "four-fifths" rule of thumb: "A selection rate for any race . . . which is less than four-fifths (4/5) (or eighty percent) of the rate

for the group with the highest rate will generally be regarded…as evidence of disparate impact." 29 C.F.R. § 1607.4(D).[6]

For purposes of assessing adverse impact, comparisons of success for different candidate pools can be done at various points. For example, adverse impact can be assessed at selection rates: what proportion of minority candidates are selected for hiring or promotion compared to the proportion of non-minorities selected. For example, suppose 10 minority candidates and 20 non-minority candidates compete for 5 available promotions, and 1 minority and 4 non-minority candidates are ultimately selected for promotion. The selection rate for the minority pool (1 of 10 or 10%) is compared with the selection rate for the non-minority pool (4 of 20 or 20%), producing an adverse impact ratio of .10/.20 or 50%. Comparisons can be done as appropriate at other potentially significant points, such as the passing score on the test, the effective passing score (at which one is eligible as a practical matter for hire or promotion), or mean group scores (how well groups as a whole perform, comparatively).

Reliance on statistical analysis to assess whether unlawful employment discrimination has occurred must be done cautiously, consistent with the limitations of the method, and there are circumstances where statistical methods are, by reason of their inherent limitations, unreliable tools for the purpose. One problem is the case of small statistical samples. With respect to small data sets, adverse impact ratios, standing alone, can be misleading. See Jones, 752 F.3d at 53; Fudge, 766 F.2d at 657-59.

For example, when a data set is small the shift of a single person from non-selection to selection for a job can alter an apparent conclusion regarding the presence of adverse impact. To illustrate, suppose of the thirty candidates in the example above one additional minority

---

[6] The reverse is not true. A selection tool that satisfies the four-fifths test is not necessarily non-discriminatory. Jones, 752 F.3d at 52.

candidate was promoted, so that two minority candidates and three non-minority candidates were promoted. The adverse impact ratio would shift from 0.50 to 1.33 (20% minority success rate / 15% non-minority success rate). The EEOC's guidance recognizes the problem of the "shift of one":

> If the numbers of persons and the difference in selection rates are so small that it is likely that the difference could have occurred by chance, the federal agencies will not assume the existence of adverse impact, in the absence of other information . . . Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group.

See Questions and Answers on the Federal Executive Agency Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11, 996 (1979).

Importantly, proposed conclusions from small data sets can lack statistical significance. Assigning statistical significance is an attempt to ascertain whether apparent differences are the product of chance or of some other factor, such as a discriminatory selection method. In general, statisticians regard a selection result as statistically significant when the probability that the result is due to chance is less than 5%. Jones, 752 F.3d at 46-47, 47 n.9 (collecting cases where 5% is identified as statistically significant). It is common for small data sets to fail to produce results that are statistically significant.

Small data sets can also be statistically unstable. As defense expert Dr. Jacinto Silva explained, even where it is assumed that there are no performance differences between different groups, statistical analysis may yet indicate that there are by showing "false positive" adverse impact. (See Trial Ex. 197.) In other words, even on the assumption that there was no actual difference in the mean test scores between two groups, it can be a not uncommon consequence of the smallness of the sample sizes that adverse impact will appear. Consider an illustration from

Exhibit 197 using a municipality not a party to this suit. One minority officer and 18 non-minority officers of the Peabody Police Department took the 2006 sergeants exam. There were two promotions, both non-minority. On the assumption that there was no difference in performance on the test between the two groups, there was, according to Dr. Silva's analysis, an 89% chance that the data, conventionally assessed, would nonetheless suggest the presence of adverse impact. Suppose, for example, that among the 19 test-takers, the one minority candidate had the tenth highest score – that is, right in the middle of all the scores. Assuming for illustrative purposes a more or less even distribution of scores, the mean score averages for the one minority and 18 non-minorities would be exactly or very close to the same. Nonetheless, there would be a strong indication of adverse selection impact. That indication would be a product of the small numbers, however, and thus unreliable as a measure of actual adverse impact.

As Dr. Silva noted, while the EEOC has not directly addressed what might constitute a problematically small sample, it has used an example in which it characterized a sample of 100 as small. According to Dr. Silva, researchers have found that adverse impact ratios can be an unstable test with samples as large as 200 to 400 individuals. By these or any other similar standards, the sample sizes for each of the municipal defendants except Boston, including the MBTA, for the test years in question would qualify as "small," and would be subject to the cautions and limitations applicable to the statistical analysis of small populations.

In an attempt to overcome this problem of proof with respect to the smaller departments, the plaintiffs propose that test data for each relevant year should be aggregated for all municipalities across the Commonwealth that participated in the promotional exams for that year. So, for example, the plaintiffs argue that to assess whether the City of Methuen's use of the

HRD-sponsored test in 2006 had an adverse impact on minority candidates for promotion to sergeant in the Methuen Police Department that year, the Court should assess whether the HRD-sponsored test had an aggregate adverse impact statewide on promotions to sergeant, across all employing municipalities.

Aggregation of data across employing municipalities may be appropriate in some cases, but it is not appropriate in this case. Under Massachusetts law, a municipality may promote to sergeant only officers already employed in its own police department. Mass. Gen. Laws ch. 31, § 59. It may not select its sergeants from the ranks of police officers employed by other municipalities. As a result, a municipality's promotions should be assessed with respect to the pool of candidates actually available for appointment to the rank of sergeant. That pool consists of the candidates in its own department only. What adverse impact, if any, the test might have with respect to another municipality's candidate pool is simply not relevant.

Implicit in the plaintiff's aggregation argument is the assumption that there will be no difference by municipality in the composition of their respective pools of minority sergeant candidates, particularly with respect to vulnerability to adverse impact from the test. There is no reason to suppose, and no evidence on the point was produced at trial, that the assumption will necessarily prove to be true. There are a number of reasons why there may be substantial differences in the candidate pools in different municipalities. Since each pool of promotional candidates is comprised of persons hired by each municipality, variations in original selection procedures and subsequent in-service training, for example, could result in substantial variance in performance on the statewide exam between municipalities. Candidates in a department with strong training programs could be expected to be better prepared than candidates in a department with lax training programs.

Like small numbers, aggregation of pools of different sizes can produce anomalies, including one that statisticians refer to as Simpson's Paradox. Dr. Silva addressed this problem in Trial Exhibit 198. That exhibit presented a table showing the promotions made by two different hypothetical jurisdictions from their respective candidate pools. The pools were of different sizes. For each jurisdiction, the selection rate for minority and non-minority candidates was assumed to be identical. In other words, the assumption was that there was no adverse impact within either jurisdiction. When the data were aggregated, however, a false positive adverse impact was indicated, the result of combining different sample sizes and different selection rates. See Federal Judicial Center, Reference Manual on Scientific Evidence 233-35 (3d ed. 2011).

The plaintiffs also propose aggregating data for particular jurisdictions across exam years. For example, the City of Lawrence used the exam in 2006 and 2008. To ameliorate the problems arising from small sample size in each of the years, the plaintiffs propose assessing the combined results of those two test cycles. While that suggestion might have some superficial appeal, it has not been shown to be a reliable analysis technique. Forty-six Lawrence officers took the promotional exam in 2006, 10 minorities and 36 non-minorities. Forty-two took the exam in 2008, 15 minorities and 27 non-minorities. The numbers cannot simply be added together to conclude that there were 88 separate test-takers of whom 25 were minority and 63 were non-minority. Rather, it is very likely that there would be overlap in the various pools, since it is not uncommon for officers to take tests more than once. What the effect would be of the same test-takers in both years would necessarily be a matter for speculation. One test taker might be simply not qualified for promotion; his presence in the pool in both years might exaggerate the likelihood of failure for an aggregated pool. Another test taker might have benefitted from a lack of success the first time and with familiarity with the process and perhaps

heightened preparation and thus succeeded in the second process. There is simply no way to adjust for the possible variations that could distort interpretation of the aggregated data.

The plaintiffs' expert, Dr. Joel Wiesen, relied on aggregated data, both over time and across jurisdictions, for most of his essential conclusions about the adverse impact of the HRD-sponsored exams. Because I reject the use of aggregated data, I find his conclusions unpersuasive.

With this background, on the basis of the evidence adduced at trial, I make the following findings regarding the existence of adverse impact in promotions to sergeant by the various defendants:

The use of the HRD-sponsored sergeant's promotional exam by the City of Boston in 2005 and 2008 in each year had a significant adverse impact on black and Hispanic test-takers. Boston does not contest, indeed concedes, this finding. It rests its defense in the case on its contention that the exam was nonetheless job-related and consistent with business necessity and that the plaintiffs are unable to demonstrate an adequate alternative that could be used with less adverse impact. Those matters are addressed further below.

On the other hand, as to each of the other municipal defendants and the MBTA, the statistical evidence relied on by the plaintiffs is not sufficient by itself – and it stands essentially by itself – to persuasively establish that the use of the HRD-sponsored exam by those employers was the cause of an adverse impact on minority promotion rates in those various jurisdictions. The principal problem is the small sizes of the relevant data sets, for the reasons discussed above.

The plaintiffs had relied in their claims of adverse impact on the proposition that statistical data should be aggregated across jurisdictions. I have rejected that approach, as discussed above. Without aggregation, the plaintiffs' statistical case against the jurisdictions other than Boston falls apart.

### A.    Worcester

Plaintiff Spencer Tatum, an African-American, participated in HRD-sponsored sergeants examinations for the Worcester Police Department in 2006 and 2008. The following table reflects the results of these exams.[7]

| Worcester | | |
|---|---|---|
| Year | 2006 | 2008[8] |
| Minority Test-Takers | 10[9] | 8 |
| Minority Appointments | 1 | 0 |
| Minority Appointment Rate | 9% | 0% |
| Non-Minority Test-Takers | 51 | 47 |
| Non-Minority Appointments | 6 | 1 |
| Non-Minority Appointment Rate | 12% | 2% |
| Adverse Impact Ratio | 0.90 | 0 |

For 2006, the ratio of minority appointments to non-minority appointments is .90, suggesting under the four-fifths rule (though not proving) the absence of adverse impact. As of the time of trial, only one appointment had been made from the 2008 exam, and an adverse impact ratio is not calculable.

In any event, in light of the small numbers involved, the difference in appointment rates between minorities and non-minorities in Worcester for both the 2006 exam and the 2008 exam

---

[7] The data in this and the following sections are generally derived from Trial Exhibit 197.

[8] The data for 2008 are from Trial Exhibit 175.

[9] In Exhibit 197, Dr. Silva had reported that in 2006 there were 11 minority test-takers and 50 non-minority test-takers. At trial, Dr. Silva corrected the data to 10 minorities and 51 non-minorities. The error was apparently due to an incorrect self-report by one of the test-takers. (Trial Tr., day 17, at 20.)

21

are not statistically significant. According to Dr. Silva, the Fisher's Exact p-value for the 2006

exam is rounded to 1.0, suggesting that the difference in appointment rate may well be the result

of random chance.

### B. Springfield

Plaintiffs James A. Jackson, Juan Rosario, Louis Rosario, Jr., Obed Almeyda, Devon

Williams, and Julio M. Toledo participated in HRD-sponsored sergeants exams in 2005 and

2007 for the Springfield Police Department.[10]

The 2005 and 2007 exams resulted in the following data for Springfield:

| Springfield | | |
|---|---|---|
| Year | 2005 | 2007 |
| Minority Test-Takers | 18 | 16 |
| Minority Appointments | 0 | 2 |
| Minority Appointment Rate | 0% | 12.5% |
| Non-Minority Test-Takers | 28 | 20 |
| Non-Minority Appointments | 6 | 6 |
| Non-Minority Appointment Rate | 21% | 30% |
| Adverse Impact Ratio | 0 | 0.42 |

While both the 2005 and 2007 exams indicated adverse impact as to the appointment rate

under the four-fifths rule, the results were not statistically significant. The p-value for the 2005

exam was .07 and for 2007 the p-value was .26. A p-value of .05 is commonly used by social

scientists as necessary to reject the "null hypothesis." Since the statistics for both years do not

meet that standard, the null hypothesis – here, that there is no adverse impact – cannot be

rejected on statistical calculation alone. Additionally, as Exhibit 197 indicates, for both years

---

[10] It appears that the Springfield plaintiffs did not timely file a necessary pre-suit claim with the Massachusetts Commission Against Discrimination with respect to the eligibility list from the 2005 exam, and therefore have no viable claims regarding that exam.

there was a substantial possibility of a false positive adverse impact finding. As Dr. Silva explained, the high false positive estimate results from

> a combination . . . of the small sample size, the small number of minorities, the selection ratio. Those three things contribute to the false positive rate. . . . With a small sample size, the data is always unstable.

(Tr. 17: 44-45.)

In sum, the statistical evidence is unconvincing as to the existence of adverse impact.

It may also be significant that in the relevant years promotions to sergeant were made using the eligibility list generated from the exams, supplemented by an interview process and a review of the candidates' department work history. The evidence does not show whether or how the interviews and/or work history of applicants may have affected appointments.

C.     Lowell

Plaintiff Robert Alvarez participated in the HRD-sponsored sergeants exam in 2006 for the Lowell Police Department.

The Lowell 2006 sergeants exam resulted in the following appointment data.

| Lowell | |
|---|---|
| Year | 2006 |
| Minority Test-Takers | 7 |
| Minority Appointments | 0 |
| Minority Appointment Rate | 0% |
| Non-Minority Test-Takers | 36 |
| Non-Minority Appointments | 7 |
| Non-Minority Appointment Rate | 19% |
| Adverse Impact Ratio | 0 |

Again, because of the small numbers, the statistical evidence is not reliable to show that the use of the HRD-sponsored exam caused an adverse impact. The insufficiency of the data to support any reliable statistical conclusions is demonstrated by a shift-of-one analysis. If one minority test taker (instead of none) and 6 non-minority test-takers (instead of 7) were appointed,

then the adverse impact ration would be .86, suggesting no adverse impact under the four-fifths

rule. Moreover, the p-value for the plaintiff's proffered adverse impact ratio (per Dr. Wiesen) in

the selection rate for promotions 2006 exam is .58, indicating a lack of statistical significance.

Status of Alvarez as an Aggrieved Plaintiff

Lowell also challenged Alvarez's standing to claim discrimination on the ground that he

has not shown himself to be "Hispanic" and thus a "minority" entitled to complain about the

sergeants exam's discriminatory impact on such minority officers. Although his claim would fail

for the reasons just discussed, because the parties thoroughly addressed his status at trial, it is

appropriate to resolve this issue.

The evidence indicated that Alvarez was born in Boston and was raised by a foster family

in Boston-area suburbs, including Somerville and Billerica. (Tr. 9: 118-19, 146; Trial Ex. 136.)

On his birth certificate, his birth mother and father are described as white. (Tr. 9: 126-27; Trial

Ex. 136.) His birth certificate also indicates that his father, whom Alvarez apparently never met

and with whom he has never spoken, was born in Manila, Philippines. (Tr. 9: 115-16; Trial Ex.

136.)

Alvarez does not speak Spanish. (Tr. 9: 113.) He was not raised in a home where Spanish

was the primary language. (Id.) At times he has identified himself as white, even when Hispanic

was an identified option (Tr. 9: 123-27; Trial Exs. 138, 139) and at other times he has self-

identified as Hispanic. (Tr. 9: 103.)

An unambiguous definition of "Hispanic" for purposes of anti-discrimination laws has

long eluded both courts and legislators. For instance, for record-keeping purposes, EEOC has

used "Hispanic" in reference to "persons of Mexican, Puerto Rican, Cuban, Central or South

American, or other Spanish culture or origin, regardless of race." See 29 C.F.R. § 1607.4. This,

by itself, is not helpful in resolving Alvarez's claim to be considered Hispanic on the basis of Filipino ancestry. It is of interest that the EEOC requires that employers report employees with origins from the "original peoples" of the Philippines as "Asian or Pacific Islander." EEOC Instruction Booklet for EEO-1 Report (2006). The trial record includes no evidence whether Alvarez's father had ancestors who were properly considered among the "original peoples" of the Philippines.

Definitions used by HRD provide a bit more guidance. HRD defines "Hispanic" as an "individual who (or whose family) originates from a Spanish-speaking country in the Western Hemisphere and who either speaks Spanish or was raised in a household where Spanish was the primary language." (Aff. of Sally McNeely ¶ 5 (Ex. 205) (dkt. no. 307).)[11] HRD categorizes an individual who (or whose family) originates from the Philippines as Asian, not Hispanic. (Id. ¶ 6.) Under HRD's definition, Alvarez, whose father originated in the Philippines and who does not speak Spanish and was not raised in a household where Spanish was the primary language, would not be classified as Hispanic for Civil Service purposes.

In this case, it seems appropriate to defer to HRD's understanding of the term "Hispanic." Applying that understanding, Alvarez does not qualify, and his claim would fail for this additional reason.

D.   Lawrence

Plaintiffs Pedro J. Lopez, Richard Brooks, and Kevin Sledge took the sergeants exam in both 2006 and 2008 for the Lawrence Police Department. The results of that exam can be summarized as follows:

---

[11] The definition apparently derives from two federal consent decrees arising out of unrelated litigation involving allegations of discrimination.

| Lawrence | | |
|---|---|---|
| Year | 2006 | 2008 |
| Minority Test-Takers | 10 | 15 |
| Minority Appointments | 0 | 0 |
| Minority Appointment Rate | 0% | 0% |
| Non-Minority Test-Takers | 36 | 27 |
| Non-Minority Appointments | 3 | 1 |
| Non-Minority Appointment Rate | 8% | 4% |
| Adverse Impact Ratio | 0 | 0 |

Again, the small data sets prevent any reliable conclusion from statistical analysis alone. A shift-of-one analysis illustrates this. If in 2006 there was one minority appointment (as opposed to none) and two non-minority appointments (as opposed to three), the resulting adverse impact ratio (2.0) would satisfy the four-fifths rule of thumb. Additionally, of course, because of the small numbers, any adverse impact ratios for either year would not be statistically significant.

E.    Methuen

Plaintiff Abel Cano, who is Hispanic, participated in the HRD-sponsored sergeants exam in 2006 and 2008 for the Methuen Police Department. The following data summarize results from those exams.

| Methuen | | |
|---|---|---|
| Year | 2006 | 2008 |
| Minority Test-Takers | 4 | 3 |
| Minority Appointments | 0 | 0 |
| Minority Appointment Rate | 0% | 0% |
| Non-Minority Test-Takers | 19 | 15 |
| Non-Minority Appointments | 1 | 0 |
| Non-Minority Appointment Rate | 5% | 0% |
| Adverse Impact Ratio | 0 | |

There are no statistically reliable indicators that show minority applicants in Methuen were adversely affected by either the 2006 or 2008 sergeants promotional exams. The results of the adverse impact analysis by the plaintiffs' expert of the selection rates in Methuen in both the 2006 and 2008 sergeants promotional examinations were not statistically significant.

26

F.   MBTA

Plaintiffs Royline Lamb and Lynn Davis, who are both African-American, participated in the HRD-sponsored sergeants exam in 2005 for the MBTA Police Department, and Lamb participated also in the 2007 exam. Davis did not receive a passing score on the 2005 exam. She was informed that she did not pass the exam when the results were published by HRD several months after she took the exam. She did not take the 2007 HRD exam for promotion to sergeant. Lamb did not receive a passing score on either exam. Like Davis, he learned of his failure to pass the 2005 exam several months after its administration.

On September 24, 2008, Davis and Lamb filed charges of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") pursuant to Mass Gen. Laws, ch. 151B, §4. The applicable statute of limitations for filing a charge of discrimination at the MCAD is 300 days from the discriminatory act. Mass. Gen. Laws ch. l51B, §5. Davis did not take the 2007 HRD exam for promotion to sergeant so her claim, relating only to the 2005 exam, was untimely under applicable statute of limitations, and it must be dismissed. Allston v. Massachusetts, 661 F. Supp. 2d 117, 123 (D. Mass. 2009). For similar reasons, Lamb's claim regarding the 2005 exam is likewise time-barred.

Limitations issues aside, the existence of disparate impact has not been proven. Since neither Davis nor Lamb passed the exam, the focus for examining possible adverse impact is on the relative rates at which minorities and non-minorities passed the exam. The adverse impact ratio for passing rates for 2005, as computed by Dr. Wiesen, was .32. For 2007, it was .96. (See Trial Exs. 83, 197.) The p-value for the 2005 test was 0.31, well outside the range of statistical significance. Not surprisingly, for 2007 the p-value was 1.00.

In summary, for all jurisdictions except Boston, the plaintiffs have not carried their burden of proving a prima facie case of disparate impact from any of the challenged exams.

## VI.    Job-Relatedness / Business Necessity

As discussed above, only for Boston have the relevant plaintiffs shown sufficient adverse impact on minority promotions to warrant an inference of disparate impact discrimination. Under governing principles, the next question is whether Boston has demonstrated that the civil service examination nonetheless was job-related and consistent with business necessity, and thus lawful. See 42 U.S.C. § 2000e-2(k)(1)(A)(i). Boston bears the burden of proof as to this issue. Id.

As previously discussed, industrial organizational psychologists refer to a selection instrument that is job-related and consistent with business necessity as one that is "valid" for the selection process. Dr. James Outtz, a prominent industrial psychologist and Boston's expert witness, explained the concept of validity as it is understood in the field of industrial psychology:

> In my field, from a scientific standpoint, validity refers to the accuracy of inferences that you wish to make on the basis of scores from a selection instrument: Are those inferences accurate? For example, if you give an exam and you hire people at the – who score the highest on that exam, the inference is that those people are more qualified than people who scored lower. If you give an exam for people to get admitted into college, and you admit students whose scores are up at the upper distribution, you are making the inference they are more qualified than students who have lower scores. Validity refers to evidence that is garnered to establish the accuracy of those inferences. In a more simplistic way, it's whether a test measures what it's supposed to measure.
>
> That is the essence of validity, to allow one to predict at a level great than – significantly greater than chance as to how well someone will perform.

(Tr. 14: 15-16.)

Massachusetts Civil Service law requires promotional appointments within police departments, including the Boston police department, to be made after competitive examination. Mass. Gen. Laws ch. 31, § 59. Such examinations are ordinarily prepared by HRD. Id. § 16.

Specifically, the examinations used by Boston in 2005 and 2008 were prepared by HRD. Such examinations must "fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required to perform the primary or dominant duties of the position for which the examination is held." Id. As noted, an examination that does reliably test those KSAs is deemed to be "valid" for the purpose of identifying the candidates best suited for selection.

In order to create a valid examination, it is necessary first to conduct a job analysis to determine what the job actually entails. The job analysis seeks to identify the tasks that make up the job and the KSAs required to perform these tasks. This is typically accomplished by consultation with persons familiar with the position in question, generally referred to as "subject matter experts," or SMEs.

Once the job analysis has been done, it is necessary to develop a test that will measure the necessary KSAs. While a test plan should measure as many of the pertinent KSAs as practical, under the EEOC's Uniform Guidelines on Employee Selection Procedures, see 29 CFR §§1607.14(C)(4) and 1607.15(C)(4) (pertaining to content validity), a testing instrument need only assess a representative sample of the KSAs required for the job. Once a test plan is developed, it is necessary to develop the actually content of the examination and to have it reviewed by SMEs.

The continuing validity over time of a job analysis and any test instrument developed in reliance on it depends on whether and to what degree the demands of the job may change over time. As a rule of thumb, industrial psychologists regard a job analysis performed within five to eight years of an examination to be reliable, but sometimes an older one can still be appropriate if the requirements of the job itself have remained more or less the same. Additionally, an older job analysis might be reevaluated and updated in a later review.

The position of sergeant in the Boston police department is a supervisory one. Sergeants are typically field supervisors for patrol officers. It is essential that sergeants be familiar with constitutional and statutory legal principles pertinent to their jurisdiction, as well as departmental regulations and policies. The Boston Police Commissioner and a former Boston Police lieutenant both testified at trial that it is critical to a police sergeant's ability to effectively perform as a supervisor that he or she know and understand relevant law. When patrol officers need information or clarification, the first thing they do is to call their sergeant. An effective way of testing whether a candidate for sergeant has the necessary knowledge is through a written job knowledge test.

The 2005 and 2008 written exams prepared by HRD relied in substantial part on a content validation study for a promotional exam for sergeant that was conducted in 1991 by DPA, HRD's predecessor. In preparing the Validation Report, DPA first "conducted a comprehensive job analysis of superior officer ranks, including…sergeant…" (Trial Ex. 40, Bates Stamp page 247). A principal feature of this analysis was "[g]athering of available job information from Massachusetts police departments, as well as job analysis reports, survey instruments and other information from jurisdictions outside the Commonwealth." (Id. at 249).

In addition, DPA "[d]eveloped and administered a task inventory questionnaire designed to identify the frequent and critical tasks and duties," and "a knowledge, skills, abilities and personnel characteristics (KSAPs) inventory questionnaire designed to identify the important KSAPs required at the time of appointment." (Trial Ex. 40, Bates Stamp page 249). DPA also developed a "[l]inkage of the important KSAPs to the frequent and critical tasks of these jobs from" SMEs, "designed and use[d]…structural group discussions to gather information from SMEs about the Education and Experience (E&E) component of DPA's selection procedures,"

30

46

and "gather[ed] information from SMEs about the recommended reading list from which the multiple choice written examination questions for the police promotional exams are derived." (Id. at 250).

The preparation of the Validation Report also included work by a Job Analysis Team ("JAT"). The JAT requested and received job descriptions for sergeant from Massachusetts police departments covered by Civil Service. The JAT also submitted a task inventory questionnaire for sergeant, covering 136 task or duty statements, to a sampling of persons at 76 police departments in Massachusetts. The JAT received 824 responses, a response rate of 78%. DPA used the responses to develop task profiles for sergeants. Specifically, it developed a list of KSAs that it distributed to SMEs for their review and comment, who were generally superior officers serving in Massachusetts police departments. (Trial Ex. 40, at Bates Stamp page 257). The JAT also convened a group of nine SMEs from Massachusetts police departments to review a master list of tasks that had been identified by the general survey as important and frequently performed.

Exams to be developed after the job analysis was completed were also to include a new E&E component pursuant to which incumbents would receive points for past educational achievements and work experience that in combination with their raw score on the written civil service exam become the score by which they will be ranked and placed on civil service eligibility lists.

The JAT designed a structured discussion guide to identify what educational degrees, certificates, or licenses were important for sergeants under consideration, as well as relevant prior work experience. The JAT arranged for SMEs from various Massachusetts police

departments to participate in discussion groups to obtain feedback regarding the E&E component.

A "testability analysis" identified KSAs that could be assessed under both the written exam and the E&E. (Attachment EE to the 1991 Validation Report, Trial Ex. 41, at Bates Stamp pages 4272-4278). The testability analysis showed that more than half of the KSAs identified as pertinent to the job of sergeant were tested. This was sufficient to meet the "representative sample" requirement of the Uniform Guidelines. (Tr. 14: 41-43.)

In addition to performing a job analysis, the JAT prepared a reading list that could be used by candidates to prepare for the exam to be given. The job knowledge questions on the exam would be based on information directly presented by materials on the reading list. The purpose was to permit a candidate to study effectively for the eventual exam by reading the materials on the list. The list was compiled based on input from SMEs.

In 2000, a consulting firm, Morris & McDaniel, performed a job analysis for the position of sergeant in the Boston Police Department, and that analysis was used in the development of Boston's subsequent 2002 sergeant exam. The job analysis was not as full a validation study as was done in 1991, but it generally supported the use of a written job knowledge test for a sergeants promotional exam.

Consistent with its prior practice in preparing other police promotional exams for Boston, the exams prepared by HRD for the position of BPD sergeant in 2005 and 2008 were based on a test plan that can be traced to the 2000 job analysis prepared by Morris & McDaniel, which itself can be traced to the 1991 job analysis, including particularly the KSAs identified in those documents.

In the regular process of developing the 2005 exam, HRD consulted with a panel of BPD captains (i.e., SMEs), some of whom were deputy superintendents, who recommended a reading list that had been periodically updated over time, but was consistent with the 1991 job analysis. The 2005 BPD promotional exam included certain questions specific to BPD, and as a result, the reading list included BPD rules, procedures, and special orders.

The 2005 sergeants promotional exam for Boston tested KSAs identified throughout the 1991 and 2000 job analyses related to the following subject matter areas: questions 5, 6, 8, 10, 57-60, and 62-67 addressed police management issues; questions 9, 11, 14, 16, 23, and 30 addressed crime-related issues; questions 19, 20, and 26 addressed crime scene issues; questions 21, 47, 49, and 50 addressed interrogation; questions 22, 24, and 25 addressed child abduction; question 27 addressed hostages; questions 41 through 46 addressed arrest procedures; questions 51 through 54 and 56 addressed searches.

The results of the examination for promotion to lieutenant provide some further evidence of validity of the 2005 sergeants exam. The 2005 written exams for the sergeant and lieutenant positions at BPD in 2005 had 53 items in common. Candidates for promotion to lieutenant, who were necessarily all then-incumbent sergeants, had an 89% passing rate on these common questions, whereas the passing rate for patrol officers seeking promotion to sergeant on the same questions was only 63%. The high passing rate for incumbent sergeants on the common questions is evidence that those questions were related to the sergeants' actual performance of their jobs. In other words, the sergeants scored well on those questions because the questions addressed issues related to their actual work experience. This fact tends to contradict any argument that the 1991 job analysis on which the test plan was partially based was dated and outmoded.

In the promotional process in 2008, Boston again utilized the services of HRD to prepare a sergeants promotional exam. This exam, like the 2005 exam, included BPD-specific questions. In preparation for this exam, HRD again prepared a test plan showing areas of knowledge to be tested and the number of items to be devoted to each area.

As with the 2005 exam, SMEs updated the reading list for candidates. Documents from HRD show that for the 2008 sergeant promotional exam for Boston, SMEs reviewed test items, indicated which KSA the item was linked to, assessed the difficulty level of the item, and recommended whether or not the item should be used. As with the 2005 exam, the 2008 sergeants promotional exam for Boston contained a number of questions focusing on specific rules, regulations and special orders of BPD.

The 2008 sergeants promotional exam for Boston tested KSAs identified throughout the 1991 and 2000 job analyses and related documents. (See Trial Ex. 45.) For example, questions 21 and 36 addressed juvenile issues; questions 2, 3, 33, 42, 47, 50, and 58 addressed various crime-related issues; questions 4 through 6, 22, 40, 41, and 51 addressed searches; questions 7 and 8 addressed firearm issues; questions 23 through 30, 34, 48, 49, 53, and 70 through 73 addressed police management issues; questions 9 through 16 addressed rules and regulations of BPD; questions 31, 32, 35, 37, 74, and 75 addressed community policing; questions 43 and 52 addressed interrogation; questions 54 through 57 addressed illegal drugs; and questions 76 through 80 addressed the ability to read and understand reading charts.

In an effort to assist candidates who would be taking promotional exams, in both 2005 and 2008 BPD engaged an outside consultant to provide extensive tutoring for any interested candidate. Prior to the 2005 promotional exam, BPD offered tutorials and study materials for

candidates at no cost. Prior to the 2008 exam, BPD similarly provided compact discs containing lectures prepared by the consultant for use by officers on their own time.

For both the 2005 and 2008 promotional exams for Boston, candidates for police sergeant completed an "Education and Experience Rating Sheet" in accordance with instructions thereto. Section III of the E&E Rating Sheet asked candidates to provide information on their police experience. As a matter of statutory law, police officers must have three years' experience to be eligible to apply for promotion to sergeant. Mass. Gen. Laws ch. 31, § 59. In addition, seniority – based on the number of years on the job – is generally recognized as relevant to the ability to perform well in a supervisory position such as sergeant.

Section IV of the E&E Rating Sheet asked candidates to indicate whether they had earned various academic degrees or certifications in various specified subject areas. As part of the 1991 Validation Report, SMEs had agreed that these subject areas were related to the position of sergeant.

Section V of the E&E Rating Sheet requests candidates to indicate if they had taught any courses above the high school level in the same subject areas for which credit is given if a degree is earned in that area. The SMEs who participated in the 1991 Validation Report concluded that the ability to teach a course evidenced oral communication skills important to the position of sergeant.

Dr. Outtz, the industrial psychologist, opined at trial that the tests as administered for Boston in 2005 and 2008 were "minimally valid." He acknowledged the utility of a written job knowledge test in selecting candidates for promotion to sergeant, but noted that use of such a test by itself would not support a conclusion of validity, because it could not measure some skills and abilities (as distinguished from knowledge) essential to the position, such as leadership, decision-

making, interpersonal relations, and the like. However, because he thought that such skills and abilities were attested to by the E&E component, the threshold of validity was crossed.

After consideration of the evidence as a whole, I find and conclude that Dr. Outtz's opinion rests on adequate grounds and is therefore correct: the exams in question were minimally valid. The exams satisfied the technical standards for content validity studies. 29 C.F.R. § 1607.14(C). They addressed a representative sample of the KSAs of the sergeant position. Id. § 1607.14(C)(1), (4). They were based on job analyses that considered the important tasks necessary to the successful performance of the job. Id. § 1607.14(C)(2). They took account of prior relevant work experience as well as relevant training and education. Id. § 1607.14(C)(6).

There is no doubt that Dr. Outtz also thought that the content validity of the exams could have been improved by the use of additional test elements, such as an assessment center (see infra). However, for assessing validity, the fact that it could have been better does not mean necessarily that it was not good enough to be deemed sufficient. The key question regarding the content validity of a selection method is whether it reliably predicts a candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job. I am satisfied on the evidence that Boston carried its burden of showing that the exams in question satisfied that criterion.

A selection method that is valid under the considerations discussed above can be deemed to be "job related" and "consistent with business necessity" under the statutory standard. 42 U.S.C. § 2000e-2(k)(1)(A)(i). I find that the City of Boston has successfully demonstrated by the evidence that that standard has been met.

**VII.    Availability of  an Equally Valid, Less Discriminatory Alternative**

      A.    General principles

If an employer has established that its selection method is "job related for the position in question and consistent with business necessity," as I have concluded Boston has done here, the plaintiffs may nonetheless succeed in their claims of disparate impact discrimination if they are able to establish that there was an "alternative employment practice" that Boston refused to adopt that was equally valid and would have had a lesser discriminatory impact. 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C); Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975); see also Ricci, 557 U.S. at 587.

The expert witnesses for both sides in this case agreed on two propositions about the use of written job knowledge tests in making promotions from police officer to sergeant. First, they agreed that properly developed written examinations are generally valid for that purpose. Second, they agreed that, as a general matter, the scores achieved by black and Hispanic test-takers on such written examinations in the aggregate tend to be consistently lower than the scores achieved by non-minority test-takers in the aggregate. In other words, experience has demonstrated that in the aggregate the use of written exams alone tends to have an adverse impact on minority applicants for promotion. Consequently, one of the major projects for industrial psychologists in the last several decades has been to try to develop selection methods that have the same validity as written job knowledge tests – that is, methods that select the better qualified applicants for promotion over the lesser qualified – but have a lesser or no adverse impact on minority applicants in the aggregate.

Commonly, the approach has been to supplement written job knowledge tests by adding other components to the overall selection method. A number of different options can be used to provide such supplementation. Some options that have been used include so-called "assessment centers," which may use oral interviews, role-playing exercises, writing samples, in-basket exercises, and group exercises. Explicit consideration of prior work performance is another option.[12]

Some of the municipal defendants in this case, including Boston, have utilized a number of these methods to supplement a written exam for certain hiring or promotion decisions. For example, for the purpose of selecting a chief of police in the 1990s, Lowell used a structured interview, a mock press conference, an in-basket exercise, and an essay. Springfield and MBTA interview candidates who are on the certified Civil Service list, as well as considering prior work. Boston's prior use of an assessment center is discussed below.

Assessment centers are generally used only as a supplement to, rather than a substitute for, written job knowledge exams for a couple of reasons. In the first place, civil service regimes typically require public employers to use written exams as a merit selection tool. That is true in Massachusetts for promotion within municipal police departments. See Mass. Gen. Laws ch. 31, § 59. Moreover, for many of the KSAs required for the job, written job knowledge tests are highly valid and thus preferred to other possible ways of assessing those KSAs. There are some practical reasons as well. Assessment center exercises can require considerably more resources to administer, including both money and personnel, and thus can be cumbersome and expensive. As a result, the practicality of their use tends to be inversely proportionate to the number of job candidates to be assessed. For example, it is easier and much less costly to have a multi-

---

[12] With respect to the 2002 BPD sergeants exam, consideration of prior work performance was prohibited by the applicable collective bargaining agreement. (See Trial Ex. 133 at pg. 41.)

38

component selection method for chief of police where there may be a relatively small pool of candidates than it would be for the rank of sergeant where, in Boston's case, the pool of interested candidates typically numbers several hundred. That is why some jurisdictions, such as Springfield and MBTA, use assessment centers as a second step after an original pool of test-takers has been narrowed by grade ranking.

B.   Boston's Testing History

1.   1973-1998

Prior litigation concerning claims of discrimination in hiring and promotions in the Boston Police Department has been summarized above. Throughout most of that time, and certainly from the 1980s on, the Department has pursued the goal of reducing or eliminating disparate impact in its hiring and promotional selection methods and thus increasing the number of minorities in all ranks, including sergeants. Initially, under the consent decrees, the approach had been to seek a remedy in affirmative promotion formulas. Thus, with regard to promotions to sergeant and other supervisory ranks in BPD, this Court entered a consent decree in 1979. The decree "contained various affirmative action provisions designed to increase the number of black officers promoted to sergeants." Massachusetts Ass'n. of Afro-Am. Police, Inc. v. Boston Police Dept., 780 F.2d 5, 6 (1st Cir. 1985). Under the MAAAP decree, BPD was authorized to select individual African-American candidates for sergeant out of strict rank order as determined by results from an examination process, up to a potential 20% of all promotions.

As the legal landscape shifted in more recent years, however, the emphasis turned to fine-tuning selection methods with an eye toward reducing or eliminating adverse impact of the testing methods so that the cohorts from which selections would be made would not be discriminatorily constituted. In 1987, BPD, through a delegation agreement with DPA, retained

39

Morris & McDaniel to prepare a sergeants and lieutenants promotional exam that would include a multiple choice written examination, an in-basket exercise, a video performance exercise, a leaderless group exercise, and an education and experience component. The in-basket, video performance, and leaderless group exercises constituted the assessment center. Unfortunately, the integrity of the assessment center component was compromised by the leak of information about its contents before the examination, and the Personnel Administrator of DPA concluded that the assessment center scores could not be used in making promotional decisions. As a result, only the multiple choice exam and the education and experience components were used.

After extension of the MAAAP decree, BPD administered a "validated-fair" exam in June 1991. After the administration of the 1991 exam, the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO") (MAAAP's successor organization) challenged the exam's validity on the ground that it did not comport with the Equal Employment Opportunity Commission's Uniform Guidelines. See Boston Police Superior Officers Fed., 147 F.3d at 15-16. MAMLEO's legal challenge was settled by means of an amendment to the MAAAP consent decree, which provided, among other things, "that the BPD would establish the next eligibility lists for promotion to sergeant…using selection procedures 'of a significantly different type and/or scope.'" Id. at 16.

In 1992, a sergeants exam was administered which consisted of a written exam and a presentation by candidates to a group of assessors, consisting of police commanders from throughout New England. Boston's costs for the 1992 exam were in the range of $500,000. After the administration of the 1992 exam, Boston bypassed some white candidates on the certified eligibility list to reach and promote some black officers who had slightly lower scores. The white officers filed a complaint with the Civil Service Commission challenging the bypasses. The

Commission agreed that the bypasses were not justified and ruled against the promotion of the

black officers. The Commission's order was ultimately upheld by the Massachusetts Supreme

Judicial Court. See Massachusetts Ass'n. of Minority Law Enforcement Officers v. Abban, 748

N.E.2d 455 (Mass. 2001). Consequently, despite the inclusion of an assessment center in the

selection process, there was no improvement in minority promotions. In 1998, BPD participated

in the statewide promotional exam for sergeants prepared and administered by HRD. The exam

did not include an assessment center.

### 2.    2002 Promotional Exam

After the 1998 exam, then Police Commissioner Paul Evans convened a committee in an

effort to increase minority representation in the promotional ranks. Based on the committee's

recommendation, the Department decided to include an assessment center in its next promotional

process for the ranks of sergeant, lieutenant, and captain, along with a written exam, and it

obtained an authorized delegation from HRD to do so. Under the delegation, BPD was

responsible for funding and administering the exam, subject to HRD's oversight. BPD again

retained Morris & McDaniel to prepare and administer the exam. It was in this connection that

Morris & McDaniel performed the 2000 job analysis of the position of sergeant at BPD

discussed in the validity section above.

Under the delegation agreement, the 2002 promotional examination for sergeant was to

consist of a written test (weighted at 40% of the total score), an assessment center (32%), a

performance review system (8%), and the required education and experience component (20%).

The assessment center for sergeants consisted of a "situational exercise using multiple scenarios

with oral responses." (Trial Ex. 151 at 3.) The performance review portion was to be based on a

candidate's work history. However, the City's collective bargaining agreement with the Boston

41

Police Patrolmen's Association, the union representing patrol officers (and thus all the candidates for promotion to sergeant), prohibited the Department from using past performance as a factor in evaluating a candidate's qualification for promotion. As a result, Commissioner Davis removed the performance review portion from the exam protocol. The examination as administered consisted of a written test (40 points), an assessment center (40 points), and education and experience (20 points).

Morris & McDaniel was paid more than $1.2 million to develop and administer the 2002 promotional exams for sergeant, lieutenant, and captain. In addition, other expenses associated with the 2002 examination process included transporting, housing, and training a substantial number of police officers from throughout the county who acted as the assessors for the purpose of the assessment center exercise.

Based on the results of the 2002 promotional exam, BPD promoted 69 candidates to sergeant, consisting of 58 whites, 9 African-Americans, and 2 Hispanics. Even with the inclusion of the assessment center in the 2002 exam process, there remained a substantial difference in the promotion rates of minority and non-minority candidates.

At trial, one of the plaintiffs' experts, Dr. Cassi Fields, suggested that the adverse impact of the total scores could have been reduced if, instead of weighting the written exam and the assessment center equally at 40 points, the exam were to be weighted at 20 and the assessment center at 60 points. There is an initial problem with simply altering the weights by fiat; such jiggering with the numbers would be proper only if the revised 20/60 formula could be assessed to be just as valid as the 40/40 formula, and there is no evidence on that point. In any event, one of the defense experts, Dr. Silva, testified that he had tested Dr. Fields' proposition by comparing the test results using the two alternate weighting possibilities and found that the number of

42

minorities promoted did not change. Using the 40/40 formula, 9 blacks and 2 Hispanics were promoted, while using the 20/60 formula, 8 blacks and 3 Hispanics would have been promoted, but the total minority promotions in either case would have still been 11. Dr. Silva also testified that when he eliminated the oral component entirely and gave the written and E&E components their usual weights of 80% and 20%, 10 minorities would have been promoted, compared to the 11 minorities who were promoted under the original test. In other words, the addition of the assessment center component in the 2002 resulted in one additional minority promotion to sergeant than would have occurred under a test consisting of only the written exam and the E&E component. That is a rather small payoff for the effort and money expended to achieve it.

In summary, Boston made a substantial effort, including the expenditure of well over a million dollars, in devising its 2002 sergeants promotional exam under a delegation from HRD to supplement the written job knowledge test with other elements, including an oral exercise, with the objective of mitigating adverse impact on minority test-takers, but the effort did not succeed.

### 3.    Planning for 2005 and 2008 Exams

When the 2005 and 2008 promotional exams were being contemplated, BPD was operating under budgetary constraints. Former Police Commissioner Kathleen O'Toole testified that she favored the use of an assessment center, but there were no funds available for that purpose. Expense can be a legitimate consideration in evaluating the use of alternatives to a written exam. See Watson, 487 U.S. at 998 (Opinion of O'Connor, J.) ("Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.") The Department adopted various measures in order to deal with budget issues, including offers of early retirement as a means to avoid the necessity of layoffs of younger

43

officers, and the reduction or elimination of various programs, including its cadet and mounted unit programs. Expending funds to design and administer exams with assessment centers or other additions to the written test under delegation authority as in 2002 was unrealistic under existing budgetary conditions. The same was true in 2008.

Also significant was the failure of the 2002 test, which included an assessment center to supplement the written exam, to have resulted in a material improvement in minority promotions. That exam had been carefully designed and implemented. It was at least doubtful that expending a similar effort would have had greater success in 2005, especially when there may have been a financial incentive to cut corners on the design and execution of such an exam. In brief, the significant cost to design and administer the 2002 exam including an assessment center was not in retrospect supported by gains in the rate of minority promotions. Consequently, for the 2005 and 2008 exams, Boston returned to the prior practice of using the significantly less costly HRD prepared exams, supplemented as usual by Boston-specific questions.

C.      Banding

One other potential alternative merits some discussion: "banding." Under the Massachusetts Civil Service regime, once an eligibility list has been generated based on the final scores on the examination, a municipal employer ordinarily must promote candidates in strict rank order in accordance with the list. Thus, a candidate who has scored 89 on the exam will be appointed before a candidate who has scored 88. Critics of this strict procedure argue that for real world work purposes, persons who score one point apart on a written exam are effectively equally qualified and that effective equivalence should be realistically recognized in the promotion process.

Banding would treat scores within a certain number of points of each other as essentially the same grade. For example, if the band width were to be set at three points, then persons scoring 89, 88, and 87 on the exam would be treated as having the same score. Hypothetically, if non-minority candidates scored 89 and 88 and a minority candidate scored 87, under this banding application, the minority candidate would be selectable for promotion, having the same banded score as the others, whereas in a strict rank order regime, the minority candidate would not be selectable. The desired effect would be to increase the number of selectable minorities and thus, hopefully, the number actually selected. All the testifying experts agreed that banding can be a tool to reduce adverse impact without compromising an "employer's legitimate interest in efficient and trustworthy workmanship." Albemarle, 422 U.S. at 425 (internal quotations omitted).

The prospect of potential banding strategies does not help the plaintiffs, however, because the plaintiffs have not shown that the banding technique was realistically available as an alternative to selection in strict rank order for either of the tests in question. For the 2005 test, it does not appear it was contemplated. In contrast, in 2008 HRD actually proposed to change its practice in scoring exams for the statewide sergeants exam to employ a banding strategy, and it appears BPD supported that proposal. However, application of the banding proposal would have substantially altered the statutory "bypass" procedures, and a justice of the Massachusetts Superior Court enjoined the use of banding to score the 2008 police promotional exams on the ground that such a substantial change in HRD's rules and procedures could only be made in a formal rulemaking proceeding under Section 4 of Chapter 31 of the General Laws (encaptioned

45

61

"New or amended rules; hearings; publication"), which had not occurred. Pratt v. Dietl, SUVC No. 2009-01254, Memorandum of Decision and Order on Plaintiffs' Motion for a Preliminary Injunction, Apr. 15, 2009. As a result, banding was not actually available as an option to BPD for the 2008 exam.[13]

> D.    Conclusions Regarding an Actually Available Alternative Selection Method

To prevail, the plaintiffs must show that in 2005 and 2008 Boston had available to it an alternative method of selecting officers for promotion to sergeant that was as valid as the exams actually administered and that would have had a less discriminatory impact on minority candidates. 42 U.S.C. § 2000e-2(k)(1)(A)(ii); Albemarle, 422 U.S. at 425. The statute "requires [the] plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it." Allen v. City of Chicago, 351 F.3d 306, 313 (7th Cir. 2003) (stating that a "vague and indefinite proposal" may not qualify as an "alternative employment practice" under the statute).

What the plaintiffs have been able to demonstrate is that industrial psychologists have in their toolbox various alternatives or supplements to written multiple choice tests that as a general matter tend to result in less adverse impact on minority groups in promotional testing. What they have not been able to show is that there was a particular alternative selection method available for the years in questions about which it could confidently be said that it would have reduced adverse impact on minority candidates for promotion to sergeant in the Boston Police

---

[13] Moreover, even if banding had been allowed for the 2008 exam, it is impossible to gauge what its effect might have been in increasing the number of minority promotions. Without banding, under the state statute the employer could bypass the two higher scoring candidates and appoint the minority candidate, but the employer would have to justify its decision to the Civil Service Commission. See Massachusetts Ass'n of Minority Law Enforcement Officers, 748 N.E.2d 455. A justification that the choice was race-conscious (to increase the number of minority sergeants, for example) could be subject to challenge under the Massachusetts Civil Service statute as inconsistent with "basic merit principles." Id. at 461-62. It might also be of dubious validity under federal law. See Ricci, 557 U.S. 557.

Department. The 2002 test, which weighted an oral assessment center equally with the written test, failed to lessen adverse impact to any substantial degree or to increase other than marginally the number of minority promotions. The plaintiffs have not offered any evidence that would warrant a conclusion that repeating that experiment in 2005 or 2008 would likely have – as opposed to might possibly have – reduced adverse impact and increased minority promotions. That is not enough to carry their burden on this issue.

I therefore conclude that the plaintiffs have not carried their burden of demonstrating by the evidence that there was an alternative employment practice with equal validity and less adverse impact that was available and that BPD refused to adopt. See 42 U.S.C. § 2000e-2(k)(1)(A)(ii). BPD is entitled to prevail on the plaintiffs' disparate impact claims.

## VIII.    Conclusions and Order for Judgment

For all the foregoing reasons, I conclude that none of the individual plaintiffs has proved at trial his or her claim for disparate impact discrimination under 42 U.S.C. § 2000e-2(k). Though the reasons vary as to different defendants, all defendants are entitled to have judgment entered in their favor.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

47

Massachusetts General Laws Annotated
 Part I. Administration of the Government (Ch. 1-182)
  Title XXI. Labor and Industries (Ch. 149-154)
   Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin, Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 1

§ 1. Definitions

Effective: September 24, 2014
Currentness

As used in this chapter

1. The term "person" includes one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and the commonwealth and all political subdivisions, boards, and commissions thereof.

2. The term "employment agency" includes any person undertaking to procure employees or opportunities to work.

3. The term "labor organization" includes any organization which exists and is constituted for the purpose, in whole or in part, of collective bargaining or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection in connection with employment.

4. The term "unlawful practice" includes only those unlawful practices specified in section four.

<[ Subsection 5 effective until September 24, 2014. For text effective September 24, 2014, see below.]>

5. The term "employer" does not include a club exclusively social, or a fraternal association or corporation, if such club, association or corporation is not organized for private profit, nor does it include any employer with fewer than six persons in his employ, but shall include the commonwealth and all political subdivisions, boards, departments and commissions thereof. Notwithstanding the provisions of any general or special law nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, and which limits membership, enrollment, admission, or participation to members of that religion, from giving preference in hiring or employment to members of the same religion or from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained.

<[ Subsection 5 as amended by 2014, 148, Sec. 7 effective September 24, 2014. For text effective until September 24, 2014, see above.]>

5. The term "employer" does not include a club exclusively social, or a fraternal association or corporation, if such club, association or corporation is not organized for private profit, nor does it include any employer with fewer than six persons in

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.     1

his employ, but shall include an employer of domestic workers including those covered under section 190 of chapter 149, the commonwealth and all political subdivisions, boards, departments and commissions thereof. Notwithstanding the provisions of any general or special law nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, and which limits membership, enrollment, admission, or participation to members of that religion, from giving preference in hiring or employment to members of the same religion or from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained.

<[ Subsection 6 effective until September 24, 2014. For text effective September 24, 2014, see below.]>

6. The term "employee" does not include any individual employed by his parents, spouse or child, or in the domestic service of any person.

<[ Subsection 6 as amended by 2014, 148, Sec. 8 effective September 24, 2014. For text effective until September 24, 2014, see above.]>

6. The term "employee" does not include any individual employed by his parents, spouse or child.

7. The term "commission", unless a different meaning clearly appears from the context, means the Massachusetts commission against discrimination, established by section fifty-six of chapter six.

8. The term "age" unless a different meaning clearly appears from the context, includes any duration of time since an individual's birth of greater than forty years.

9. The term "housing or housing accommodations" includes any building, structure or portion thereof which is used or occupied or is intended, arranged or designed to be used or occupied, as the home, residence or sleeping place of one or more human beings.

10. The term "publicly assisted housing accommodations" includes all housing accommodations in

(a) housing constructed after July first, nineteen hundred and fifty, and

(1) which is exempt in whole or in part from taxes levied by the commonwealth or any of its political subdivisions;

(2) which is constructed on land sold below cost by the commonwealth or any of its political subdivisions or any agency thereof, pursuant to the federal housing act of nineteen hundred and forty-nine;

(3) which is constructed in whole or in part on property acquired or assembled by the commonwealth or any of its political subdivisions or any agency thereof through the power of condemnation or otherwise for the purpose of such construction; or

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(4) for the acquisition, construction, repair or maintenance of which the commonwealth or any of its political subdivisions or any agency thereof supplies funds or other financial assistance;


(b) housing which is located in a multiple dwelling, the acquisition, construction, rehabilitation, repair or maintenance of which is, after October first, nineteen hundred and fifty-seven, financed in whole or in part by a loan, whether or not secured by a mortgage, the repayment of which is guaranteed or insured by the federal government or any agency thereof; provided, that such a housing accommodation shall be deemed to be publicly assisted only during the life of such loan and such guaranty or insurance; and


(c) housing which is offered for sale, lease or rental by a person who owns or otherwise controls the sale of the same, and which is part of a parcel of ten or more housing accommodations located on land that is contiguous, exclusive of public streets, if (1) the acquisition, construction, rehabilitation, repair or maintenance of such housing accommodations is after October first, nineteen hundred and fifty-seven, financed in whole or in part by a loan whether or not secured by a mortgage, the repayment of which is guaranteed or insured by the federal government or any agency thereof; provided, that such a housing accommodation shall be deemed to be publicly assisted only during the life of such loan and guaranty or insurance; or (2) a commitment issued by a government agency after October first, nineteen hundred and fifty-seven, is outstanding that acquisition of such housing accommodations may be financed in whole or in part by a loan, whether or not secured by a mortgage, the repayment of which is guaranteed or insured by the federal government or any agency thereof.


11. The term "multiple dwelling" means a dwelling which is usually occupied for permanent residence purposes and which is either rented, leased, let or hired out, to be occupied as the residence or home of three or more families living independently of each other. A "multiple dwelling" shall not be deemed to include a hospital, convent, monastery, asylum or public institution, or a fireproof building used wholly for commercial purposes except for not more than one janitor's apartment and not more than one penthouse occupied by not more than two families. The term "family", as used herein, means (a) a person occupying a dwelling and maintaining a household either alone or with not more than four boarders, roomers or lodgers; or (b) two or more persons occupying a dwelling, either living together and maintaining a common household, or living together and maintaining a common household with not more than four boarders, roomers or lodgers. A "boarder", "roomer" or "lodger" residing with a family means a person living within the household who pays a consideration for such residence and does not occupy such space within the household as an incident of employment therein.


12. The term "contiguously located housing" means (1) housing which is offered for sale, lease or rental by a person who owns or at any time has owned, or who otherwise controls or at any time has controlled, the sale of ten or more housing accommodations located on land that is contiguous (exclusive of public streets), and which housing is located on such land, or (2) housing which is offered for sale, lease or rental and which at any time was one of ten or more lots of a tract whose plan has been submitted to a planning board as required by THE SUBDIVISION CONTROL LAW, as appearing in sections eighty-one K to eighty-one GG, inclusive, of chapter forty-one.


13. The term "other covered housing accommodations" includes all housing accommodations not specifically covered under subsections 10, 11 and 12 which are directly or through an agent made generally available to the public for sale or lease or rental, by advertising in a newspaper or otherwise, by posting of a sign or signs or a notice or notices on the premises or elsewhere, by listing with a broker, or by any other means of public offering.


14. The term "commercial space" means any space in a building, structure, or portion thereof which is used or occupied or is intended, arranged or designed to be used or occupied for the manufacture, sale, resale, processing, reprocessing, displaying,

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

storing, handling, garaging or distribution of personal property; and any space which is used or occupied, or is intended, arranged or designed to be used or occupied as a separate business or professional unit or office in any building, structure or portion thereof.

15. The term "housing development" means multi-apartment units operated as contiguously located housing accommodations.

16. The term "qualified handicapped person" means a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap.

17. The term "handicap" means (a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment, but such term shall not include current, illegal use of a controlled substance as defined in section one of chapter ninety-four C.

18. The term "sexual harassment" shall mean sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment.

19. The term "handicapped person" means any person who has a handicap.

20. The term "major life activities" means functions, including, but not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

21. The term "accessible" means that housing is functional for and can be safely and independently used by a physically or mentally handicapped person and complies with rules or regulations established by the commission.

22. The term "genetic information", shall mean any written, recorded individually identifiable result of a genetic test as defined by this section or explanation of such a result or family history pertaining to the presence, absence, variation, alteration, or modification of a human gene or genes. For the purposes of this chapter, the term genetic information shall not include information pertaining to the abuse of drugs or alcohol which is derived from tests given for the exclusive purpose of determining the abuse of drugs or alcohol.

23. The term "genetic test", shall mean any tests of human DNA, RNA, mitochondrial DNA, chromosomes or proteins for the purpose of identifying genes or genetic abnormalities, or the presence or absence of inherited or acquired characteristics in genetic material. For the purposes of this chapter, the term genetic test shall not include tests given for the exclusive purpose of determining the abuse of drugs or alcohol.

**Credits**

Added by St.1946, c. 368, § 4. Amended by St.1950, c. 697, §§ 1, 2; St.1957, c. 426, §§ 1, 6; St.1959, c. 239, § 1; St.1962, c. 627; St.1963, c. 197, § 1; St.1963, c. 469; St.1963, c. 613, § 1; St.1965, c. 213, § 1; St.1966, c. 405; St.1969, c. 216; St.1979,

c. 710, § 1; St.1983, c. 533, § 2; St.1984, c. 266, § 4; St.1986, c. 588, § 2; St.1987, c. 473, § 2; St.1989, c. 516, § 1; St.1989, c. 722, §§ 11, 12; St.1995, c. 179, § 14; St.2000, c. 254, § 3; St.2014, c. 148, §§ 7, 8, eff. Sept. 24, 2014.


Notes of Decisions (225)

M.G.L.A. 151B § 1, MA ST 151B § 1
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XXI. Labor and Industries (Ch. 149-154)
Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin, Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 2

§ 2. Policies; recommendations

Currentness

The commission, as established by section fifty-six of chapter six, shall formulate policies to effectuate the purposes of this chapter and may make recommendations to agencies and officers of the commonwealth or its political subdivisions in aid of such policies and purposes.

**Credits**
Added by St.1946, c. 368, § 4.

Notes of Decisions (4)

M.G.L.A. 151B § 2, MA ST 151B § 2
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Massachusetts General Laws Annotated
>   Part I. Administration of the Government (Ch. 1-182)
>     Title XXI. Labor and Industries (Ch. 149-154)
>       Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
>       Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 3

§ 3. Functions, powers and duties of commission

Effective: July 1, 2012

Currentness

The commission shall have the following functions, powers and duties:

1. To establish and maintain its principal office in the city of Boston and such other offices within the commonwealth as it may deem necessary.

2. To meet and function at any place within the commonwealth.

3. To appoint such attorneys, clerks, and other employees and agents as it may deem necessary, fix their compensation within the limitations provided by law, and prescribe their duties.

4. To obtain upon request and utilize the services of all executive departments and agencies.

5. To adopt, promulgate, amend, and rescind rules and regulations suitable to carry out the provisions of this chapter, and the policies and practice of the commission in connection therewith.

6. To receive, investigate and pass upon complaints of unlawful practices, as hereinafter defined, alleging discrimination because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, children, marital status, veteran status or membership in the armed services, the receiving of public assistance, or handicap of any person alleging to be a qualified handicapped person. The term "sexual orientation" shall mean having an orientation for or being identified as having an orientation for heterosexuality, bisexuality, or homosexuality. The commission through its chairman may appoint a single commissioner to hold public hearings, as hereinafter provided, and to otherwise act on its behalf in connection therewith; provided, however, that a person aggrieved by the decision of said single commissioner may, within ten days of said decision, file an appeal for rehearing or review by the commission.

7. To hold hearings, subpoena witnesses, compel their attendance, administer oaths, take the testimony of any person under oath, and in connection therewith, to require the production for examination of any books or papers relating to any matter under investigation or in question before the commission. The commission may make rules as to the issuance of subpoenas by individual commissioners.

No person shall be excused from attending and testifying or from producing books, records, correspondence, documents or other evidence in obedience to the subpoena of the commission, on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture; but no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, except that such individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying.

8. To create such local or regional advisory boards as in its judgment will aid in effectuating the purposes of this chapter. Each advisory board shall consist of not less than eleven members. To the extent reasonably possible the members of each board shall include representatives of owners and brokers of residential property; major lending and credit institutions; major private employers; a local personnel or civil service administrator; local post-secondary educational institutions; local labor organizations; minority racial, ethnic and linguistic groups; women; elderly and handicapped persons; and recipients of public assistance. The members of such advisory boards shall serve without pay but shall be reimbursed for their actual and necessary expenses. The commission may provide technical and clerical assistance to the advisory boards.

9. To issue such publication and such results of investigations and research as in its judgment will tend to promote good will and minimize or eliminate discrimination because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry.

10. To render each year to the governor and to the general court a full written report of its activities and of its recommendations.

11. To adopt an official seal.

12. To give its opinion upon questions submitted to it by any employer, employment agency or labor organization concerning whether any existing or proposed requirement for employment or for membership in such organization is a bona fide occupational qualification. Copies of such opinions shall be maintained in the files of the commission at its office and shall be available during regular business hours for public inspection. An opinion, or a request therefor, given under this subsection shall not operate to interfere with any proceeding under section five.

13. To adopt, promulgate, amend, and rescind rules and regulations, jointly with the attorney general, for the purpose of carrying out the provisions of subsection 13 of section four, including special regulations applicable to neighborhoods or areas found by the commission, with the concurrence of the attorney general, to be threatened with deterioration or instability associated with the entry or prospective entry into such neighborhoods or areas of a person or persons of a particular age, race, color, religion, national or ethnic origin, or economic level.

14. To accept gifts, contributions or bequests of funds or other aid from any source, whether public or private and from federal, state or other governmental bodies for the purpose of furthering the commissions mandate; provided, however, that all amounts received pursuant to this paragraph shall be deposited with the treasurer and made available to the commission for expenditure for any purposes authorized by this chapter.

15. To set, charge and retain fees and costs, subject to section 3B of chapter 7, including, but not limited to, training fees and costs incurred responding to requests under the commonwealth's public records law; provided, that the commission may,

where appropriate, provide for the waiver of the fees; to retain reasonable attorney's fees and costs awarded to a prevailing complainant, under section 5, when one of its attorneys presents the charge of discrimination before the commission on behalf of the prevailing complainant. All amounts received under this clause shall be deposited to the General Fund.

**Credits**

Added by St.1946, c. 368, § 4. Amended by St.1950, c. 697, §§ 3 to 5; St.1960, c. 163, § 1; St.1965, c. 397, §§ 1 to 3; St.1966, c. 410; St.1968, c. 218; St.1969, c. 877; St.1971, c. 923; St.1972, c. 786, § 1; St.1976, c. 463, § 2; St.1983, c. 533, § 3; St.1989, c. 516, §§ 2, 3; St.1990, c. 150, §§ 318, 319; St.1991, c. 323, § 1; St.1992, c. 286, § 221; St.2000, c. 254, §§ 4, 5; St.2003, c. 26, § 437, eff. July 1, 2003; St.2011, c. 199, § 6, eff. July 1, 2012.

Notes of Decisions (20)

M.G.L.A. 151B § 3, MA ST 151B § 3
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

**End of Document**                                                                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
   Part I. Administration of the Government (Ch. 1-182)
      Title XXI. Labor and Industries (Ch. 149-154)
         Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
         Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 3A

§ 3A. Employers' policies against sexual harassment;
preparation of model policy; education and training programs

Currentness

(a) All employers, employment agencies and labor organizations shall promote a workplace free of sexual harassment.

(b) Every employer shall:

(1) adopt a policy against sexual harassment which shall include:

(i) a statement that sexual harassment in the workplace is unlawful;

(ii) a statement that it is unlawful to retaliate against an employee for filing a complaint of sexual harassment or for cooperating in an investigation of a complaint for sexual harassment;

(iii) a description and examples of sexual harassment;

(iv) a statement of the range of consequences for employees who are found to have committed sexual harassment;

(v) a description of the process for filing internal complaints about sexual harassment and the work addresses and telephone numbers of the person or persons to whom complaints should be made; and

(vi) the identity of the appropriate state and federal employment discrimination enforcement agencies, and directions as to how to contact such agencies.

(2) provide annually to all employees an individual written copy of the employer's policy against sexual harassment; provided, however, that a new employee shall be provided such a copy at the time of his employment.

(c) The commission shall prepare and provide to employers subject to this section a model policy and poster consistent with federal and state statutes and regulations, which may be used by employers for the purposes of this section.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.                    1

(d) An employer's failure to provide the information required to be provided by this section shall not, in and of itself, result in the liability of said employer to any current or former employee or applicant in any action alleging sexual harassment. An employer's compliance with the notice requirements of this section shall not, in and of itself, protect the employer from liability for sexual harassment of any current or former employee or applicant.

(e) Employers and labor organizations are encouraged to conduct an education and training program for new employees and members, within one year of commencement of employment or membership, which includes at a minimum the information set forth in this section. Employers are encouraged to conduct additional training for new supervisory and managerial employees and members within one year of commencement of employment or membership, which shall include at a minimum the information set forth in subsection (b), the specific responsibilities of supervisory and managerial employees and the methods that such employees should take to ensure immediate and appropriate corrective action in addressing sexual harassment complaints. Employers, labor organizations and appropriate state agencies are encouraged to cooperate in making such training available.

**Credits**
Added by St.1996, c. 278, § 1.

Notes of Decisions (2)

M.G.L.A. 151B § 3A, MA ST 151B § 3A
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
   Part I. Administration of the Government (Ch. 1-182)
      Title XXI. Labor and Industries (Ch. 149-154)
         Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
         Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 4

§ 4. Unlawful practices

Effective: July 1, 2012 to April 6, 2015
Currentness

It shall be an unlawful practice:

1. For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

1A. It shall be unlawful discriminatory practice for an employer to impose upon an individual as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such individual to violate, or forego the practice of, his creed or religion as required by that creed or religion including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or holy day and the employer shall make reasonable accommodation to the religious needs of such individual. No individual who has given notice as hereinafter provided shall be required to remain at his place of employment during any day or days or portion thereof that, as a requirement of his religion, he observes as his sabbath or other holy day, including a reasonable time prior and subsequent thereto for travel between his place of employment and his home, provided, however, that any employee intending to be absent from work when so required by his or her creed or religion shall notify his or her employer not less than ten days in advance of each absence, and that any such absence from work shall, wherever practicable in the judgment of the employer, be made up by an equivalent amount of time at some other mutually convenient time. Nothing under this subsection shall be deemed to require an employer to compensate an employee for such absence. "Reasonable Accommodation", as used in this subsection shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employee shall have the burden of proof as to the required practice of his creed or religion. As used in this subsection, the words "creed or religion" mean any sincerely held religious beliefs, without regard to whether such beliefs are approved, espoused, prescribed or required by an established church or other religious institution or organization.

Undue hardship, as used herein, shall include the inability of an employer to provide services which are required by and in compliance with all federal and state laws, including regulations or tariffs promulgated or required by any regulatory agency having jurisdiction over such services or where the health or safety of the public would be unduly compromised by the absence of such employee or employees, or where the employee's presence is indispensable to the orderly transaction of business and his or her work cannot be performed by another employee of substantially similar qualifications during the period of absence, or where the employee's presence is needed to alleviate an emergency situation. The employer shall have the burden of proof to show undue hardship.

1B. For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

1C. For the commonwealth or any of its political subdivisions, by itself or its agent, because of the age of any individual, to refuse to hire or employ or to bar or discharge from employment such individual in compensation or in terms, conditions or privileges of employment unless pursuant to any other general or special law.

1D. For an employer, an employment agency, the commonwealth or any of its political subdivisions, by itself or its agents, to deny initial employment, reemployment, retention in employment, promotion or any benefit of employment to a person who is a member of, applies to perform, or has an obligation to perform, service in a uniformed military service of the United States, including the National Guard, on the basis of that membership, application or obligation.

2. For a labor organization, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, or ancestry of any individual, or because of the handicap of any person alleging to be a qualified handicapped person, to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer unless based upon a bona fide occupational qualification.

3. For any employer or employment agency to print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry or record in connection with employment, which expresses, directly or indirectly, any limitation, specification or discrimination as to the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry, or the handicap of a qualified handicapped person or any intent to make any such limitation, specification or discrimination, or to discriminate in any way on the ground of race, color, religious creed, national origin, sex, gender identity, sexual orientation, age, genetic information, ancestry or the handicap of a qualified handicapped person, unless based upon a bona fide occupational qualification.

3A. For any person engaged in the insurance or bonding business, or his agent, to make any inquiry or record of any person seeking a bond or surety bond conditioned upon faithful performance of his duties or to use any form of application in connection with the furnishing of such bond, which seeks information relative to the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of the person to be bonded.

3B. For any person whose business includes granting mortgage loans or engaging in residential real estate-related transactions to discriminate against any person in the granting of any mortgage loan or in making available such a transaction, or in the terms or conditions of such a loan or transaction, because of race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, children, national origin, genetic information, ancestry, age or handicap. Such transactions shall include, but not be limited to:

(1) the making or purchasing of loans or the provision of other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or the making or purchasing of loans or the provision of other financial assistance secured by residential real estate; or

(2) the selling, brokering, or appraising of residential real estate.

In the case of age, the following shall not be an unlawful practice:

(1) an inquiry of age for the purpose of determining a pertinent element of credit worthiness;

(2) the use of an empirically derived credit system which considers age; provided, however, that such system is based on demonstrably and statistically sound data; and provided, further, that such system does not assign a negative factor or score to any applicant who has reached age sixty-two;

(3) the offering of credit life insurance or credit disability insurance, in conjunction with any mortgage loan, to a limited age group;

(4) the failure or refusal to grant any mortgage loan to a person who has not attained the age of majority;

(5) the failure or refusal to grant any mortgage loan the duration of which exceeds the life expectancy of the applicant as determined by the most recent Individual Annuity Mortality Table.

Nothing in this subsection prohibits a person engaged in the business of furnishing appraisals of real property from taking into consideration factors other than those hereinabove proscribed.

3C. For any person to deny another person access to, or membership or participation in, a multiple listing service, real estate brokers' organization, or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against such person in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, children, national origin, genetic information, ancestry, age, or handicap.

4. For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

4A. For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

5. For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

6. For the owner, lessee, sublessee, licensed real estate broker, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other person having the right of ownership or possession or right to rent or lease, or sell or negotiate for the sale of such accommodations, or any agent or employee of such a person, or any organization of unit owners in a condominium or housing cooperative: (a) to refuse to rent or lease or sell or negotiate for sale or otherwise to deny to or withhold from any person or group of persons such accommodations because of the race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status of such person or persons or because such person is a veteran or member of the armed forces, or because such person is blind, or hearing impaired or has any other handicap; (b) to discriminate against any person because of his race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, ancestry, or marital status or because such person is a veteran or member of the armed forces, or because such person is blind, or hearing impaired or has any other handicap in the terms, conditions or privileges of such accommodations or the acquisitions thereof, or in the furnishings of facilities and services in connection therewith, or because such a person possesses a trained dog guide as a consequence of blindness, or hearing impairment; (c) to cause to be made any written or oral inquiry or record concerning the race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry or marital status of the person seeking to rent or lease or buy any such accommodation, or concerning the fact that such person is a veteran or a member of the armed forces or because such person is blind or hearing impaired or has any other handicap. The word "age" as used in this subsection shall not apply to persons who are minors nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in housing developments assisted under the federal low income housing tax credit and intended for use as housing for persons 55 years of age or over or 62 years of age or over, nor to residency in communities consisting of either a structure or structures constructed expressly for use as housing for persons 55 years of age or over or 62 years of age or over if the housing owner or manager register biennially with the department of housing and community development. For the purpose of this subsection, housing intended for occupancy by persons fifty-five or over and sixty-two or over shall comply with the provisions set forth in 42 USC 3601 et seq.

For purposes of this subsection, discrimination on the basis of handicap includes, but is not limited to, in connection with the design and construction of: (1) all units of a dwelling which has three or more units and an elevator which are constructed for first occupancy after March thirteenth, nineteen hundred and ninety-one; and (2) all ground floor units of other dwellings consisting of three or more units which are constructed for first occupancy after March thirteenth, nineteen hundred and ninety-one, a failure to design and construct such dwellings in such a manner that (i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons; (ii) all the doors are designed to allow passage into and within all premises within such dwellings and are sufficiently wide to allow passage by handicapped persons in wheelchairs; and (iii) all premises within such dwellings contain the following features of adaptive design; (a) an accessible route into and through the dwelling; (b) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (c) reinforcements in bathroom walls to allow later installation of grab bars; and (d) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

7. For the owner, lessee, sublessee, real estate broker, assignee or managing agent of other covered housing accommodations or of land intended for the erection of any housing accommodation included under subsection 10, 11, 12, or 13 of section one, or other person having the right of ownership or possession or right to rent or lease or sell, or negotiate for the sale or lease of such land or accommodations, or any agent or employee of such a person or any organization of unit owners in a condominium or housing cooperative: (a) to refuse to rent or lease or sell or negotiate for sale or lease or otherwise to deny or withhold from any person or group of persons such accommodations or land because of race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed forces, blindness, hearing impairment, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment or other

handicap of such person or persons; (b) to discriminate against any person because of his race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed services, blindness, or hearing impairment or other handicap, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment in the terms, conditions or privileges of such accommodations or land or the acquisition thereof, or in the furnishing of facilities and services in the connection therewith or (c) to cause to be made any written or oral inquiry or record concerning the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, marital status, veteran status or membership in the armed services, blindness, hearing impairment or other handicap or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment, of the person seeking to rent or lease or buy any such accommodation or land; provided, however, that this subsection shall not apply to the leasing of a single apartment or flat in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence. The word "age" as used in this subsection shall not apply to persons who are minors nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in housing developments assisted under the federal low income housing tax credit and intended for use as housing for persons 55 years of age or over or 62 years of age or over, nor to residency in communities consisting of either a structure or structures constructed expressly for use as housing for persons 55 years of age or over or 62 years of age or over if the housing owner or manager register biennially with the department of housing and community development. For the purpose of this subsection, housing intended for occupancy by persons fifty-five or over and sixty-two or over shall comply with the provisions set forth in 42 USC 3601 et seq.

7A. For purposes of subsections 6 and 7 discrimination on the basis of handicap shall include but not be limited to:

(1) a refusal to permit or to make, at the expense of the handicapped person, reasonable modification of existing premises occupied or to be occupied by such person if such modification is necessary to afford such person full enjoyment of such premises; provided, however, that, in the case of publicly assisted housing, multiple dwelling housing consisting of ten or more units, or contiguously located housing consisting of ten or more units, reasonable modification shall be at the expense of the owner or other person having the right of ownership; provided, further, that, in the case of public ownership of such housing units the cost of such reasonable modification shall be subject to appropriation; and provided, further, that, in the case of a rental, the landlord may, where the modification to be paid for by the handicapped person will materially alter the marketability of the housing, condition permission for a modification on the tenant agreeing to restore or pay for the cost of restoring, the interior of the premises to the condition that existed prior to such modification, reasonable wear and tear excepted;

(2) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling; and

(3) discrimination against or a refusal to rent to a person because of such person's need for reasonable modification or accommodation.

Reasonable modification shall include, but not be limited to, making the housing accessible to mobility-impaired, hearing-impaired and sight-impaired persons including installing raised numbers which may be read by a sight-impaired person, installing a door bell which flashes a light for a hearing-impaired person, lowering a cabinet, ramping a front entrance of five or fewer vertical steps, widening a doorway, and installing a grab bar; provided, however, that for purposes of this subsection, the owner or other person having the right of ownership shall not be required to pay for ramping a front entrance of more than five steps or for installing a wheelchair lift.

Notwithstanding any other provisions of this subsection, an accommodation or modification which is paid for by the owner or other person having the right of ownership is not considered to be reasonable if it would impose an undue hardship upon the owner or other person having the right of ownership and shall therefore not be required. Factors to be considered shall include, but not be limited to, the nature and cost of the accommodation or modification needed, the extent to which the accommodation or modification would materially alter the marketability of the housing, the overall size of the housing business of the owner or other person having the right of ownership, including but not limited to, the number and type of housing units, size of budget and available assets, and the ability of the owner or other person having the right of ownership to recover the cost of the accommodation or modification through a federal tax deduction. Ten percent shall be the maximum number of units for which an owner or other person having the right of ownership shall be required to pay for a modification in order to make units fully accessible to persons using a wheelchair pursuant to the requirements of this subsection.

In the event a wheelchair accessible unit becomes or will become vacant, the owner or other person having the right of ownership shall give timely notice to a person who has, within the previous twelve months, notified the owner or person having the right of ownership that such person is in need of a unit which is wheelchair accessible, and the owner or other person having the right of ownership shall give at least fifteen days notice of the vacancy to the Massachusetts rehabilitation commission, which shall maintain a central registry of accessible apartment housing under the provisions of section seventy-nine of chapter six. During such fifteen day notice period, the owner or other person having the right of ownership may lease or agree to lease the unit only if it is to be occupied by a person who is in need of wheelchair accessibility.

Notwithstanding any general or special law, by-law or ordinance to the contrary, there shall not be established or imposed a rent or other charge for such handicap-accessible housing which is higher than the rent or other charge for comparable nonaccessible housing of the owner or other person having the right of ownership.

7B. For any person to make print, or publish, or cause to be made, printed, or published any notice, statement or advertisement, with respect to the sale or rental of multiple dwelling, contiguously located, publicly assisted or other covered housing accommodations that indicates any preference, limitation, or discrimination based on race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, national origin, genetic information, ancestry, children, marital status, public assistance recipiency, or handicap or an intention to make any such preference, limitation or discrimination except where otherwise legally permitted.

8. For the owner, lessee, sublessee, or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent or lease, commercial space: (1) To refuse to sell, rent, lease or otherwise deny to or withhold from any person or group of persons such commercial space because of race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry handicap or marital status of such person or persons. (2) To discriminate against any person because of his race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, handicap or marital status in the terms, conditions or privileges of the sale, rental or lease of any such commercial space or in the furnishing of facilities or services in connection therewith. (3) To cause to be made any written or oral inquiry or record concerning the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, handicap or marital status of a person seeking to rent or lease or buy any such commercial space. The word "age" as used in this subsection shall not apply to persons who are minors, nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in self-contained retirement communities constructed expressly for use by the elderly and which are at least twenty acres in size and have a minimum age requirement for residency of at least fifty-five years.

9. For an employer, himself or through his agent, in connection with an application for employment, or the terms, conditions, or privileges of employment, or the transfer, promotion, bonding, or discharge of any person, or in any other matter relating to the employment of any person, to request any information, to make or keep a record of such information, to use any form of application or application blank which requests such information, or to exclude, limit or otherwise discriminate against any person by reason of his or her failure to furnish such information through a written application or oral inquiry or otherwise regarding: (i) an arrest, detention, or disposition regarding any violation of law in which no conviction resulted, or (ii) a first conviction for any of the following misdemeanors: drunkenness, simple assault, speeding, minor traffic violations, affray, or disturbance of the peace, or (iii) any conviction of a misdemeanor where the date of such conviction or the completion of any period of incarceration resulting therefrom, whichever date is later, occurred five or more years prior to the date of such application for employment or such request for information, unless such person has been convicted of any offense within five years immediately preceding the date of such application for employment or such request for information.

No person shall be held under any provision of any law to be guilty of perjury or of otherwise giving a false statement by reason of his failure to recite or acknowledge such information as he has a right to withhold by this subsection.

Nothing contained herein shall be construed to affect the application of section thirty-four of chapter ninety-four C, or of chapter two hundred and seventy-six relative to the sealing of records.

9 ½. For an employer to request on its initial written application form criminal offender record information; provided, however, that except as otherwise prohibited by subsection 9, an employer may inquire about any criminal convictions on an applicant's application form if: (i) the applicant is applying for a position for which any federal or state law or regulation creates mandatory or presumptive disqualification based on a conviction for 1 or more types of criminal offenses; or (ii) the employer or an affiliate of such employer is subject to an obligation imposed by any federal or state law or regulation not to employ persons, in either 1 or more positions, who have been convicted of 1 or more types of criminal offenses.

9A. For an employer himself or through his agent to refuse, unless based upon a bonafide occupational qualification, to hire or employ or to bar or discharge from employment any person by reason of his or her failure to furnish information regarding his or her admission, on one or more occasions, voluntarily or involuntarily, to any public or private facility for the care and treatment of mentally ill persons, provided that such person has been discharged from such facility or facilities and can prove by a psychiatrist's certificate that he is mentally competent to perform the job or the job for which he is applying. No application for employment shall contain any questions or requests for information regarding the admission of an applicant, on one or more occasions, voluntarily or involuntarily, to any public or private facility for the care and treatment of mentally ill persons, provided that such applicant has been discharged from such public or private facility or facilities and is no longer under treatment directly related to such admission.

10. For any person furnishing credit, services or rental accommodations to discriminate against any individual who is a recipient of federal, state, or local public assistance, including medical assistance, or who is a tenant receiving federal, state, or local housing subsidies, including rental assistance or rental supplements, because the individual is such a recipient, or because of any requirement of such public assistance, rental assistance, or housing subsidy program.

11. For the owner, sublessees, real estate broker, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other covered housing accommodations, or other person having the right of ownership or possession or right to rent or lease or sell such accommodations, or any agent or employee of such person or organization of unit owners in a condominium or housing cooperative, to refuse to rent or lease or sell or otherwise to deny to or withhold from any person such accommodations because such person has a child or children who shall occupy the premises with such person or to discriminate against any person in the terms, conditions, or privileges of such accommodations

or the acquisition thereof, or in the furnishing of facilities and services in connection therewith, because such person has a child or children who occupy or shall occupy the premises with such person; provided, however, that nothing herein shall limit the applicability of any local, state, or federal restrictions regarding the maximum number of persons permitted to occupy a dwelling. When the commission or a court finds that discrimination in violation of this paragraph has occurred with respect to a residential premises containing dangerous levels of lead in paint, plaster, soil, or other accessible material, notification of such finding shall be sent to the director of the childhood lead poisoning prevention program.

This subsection shall not apply to:

(1) Dwellings containing three apartments or less, one of which apartments is occupied by an elderly or infirm person for whom the presence of children would constitute a hardship. For purposes of this subsection, an "elderly person" shall mean a person sixty-five years of age or over, and an "infirm person" shall mean a person who is disabled or suffering from a chronic illness.

(2) The temporary leasing or temporary subleasing of a single family dwelling, a single apartment, or a single unit of a condominium or housing cooperative, by the owner of such dwelling, apartment, or unit, or in the case of a subleasing, by the sublessor thereof, who ordinarily occupies the dwelling, apartment, or unit as his or her principal place of residence. For purposes of this subsection, the term "temporary leasing" shall mean leasing during a period of the owner's or sublessor's absence not to exceed one year.

(3) The leasing of a single dwelling unit in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence.

11A. For an employer, by himself or his agent, to refuse to restore certain female employees to employment following their absence by reason of a maternity leave taken in accordance with section one hundred and five D of chapter one hundred and forty-nine or to otherwise fail to comply with the provisions of said section, or for the commonwealth and any of its boards, departments and commissions to deny vacation credit to any female employee for the fiscal year during which she is absent due to a maternity leave taken in accordance with said section or to impose any other penalty as a result of a maternity leave of absence.

12. For any retail store which provides credit or charge account privileges to refuse to extend such privileges to a customer solely because said customer had attained age sixty-two or over.

13. For any person to directly or indirectly induce, attempt to induce, prevent, or attempt to prevent the sale, purchase, or rental of any dwelling or dwellings by:

(a) implicit or explicit representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular age, race, color, religion, sex, gender identity, national or ethnic origin, or economic level or a handicapped person, or a person having a child, or implicit or explicit representations regarding the effects or consequences of any such entry or prospective entry;

(b) unrequested contact or communication with any person or persons, initiated by any means, for the purpose of so inducing or attempting to induce the sale, purchase, or rental of any dwelling or dwellings when he knew or, in the exercise of reasonable care, should have known that such unrequested solicitation would reasonably be associated by the persons solicited with the

entry into the neighborhood of a person or persons of a particular age, race, color, religion, sex, gender identity, national or ethnic origin, or economic level or a handicapped person, or a person having a child;

(c) implicit or explicit false representations regarding the availability of suitable housing within a particular neighborhood or area, or failure to disclose or offer to show all properties listed or held for sale or rent within a requested price or rental range, regardless of location; or

(d) false representations regarding the listing, prospective listing, sale, or prospective sale of any dwelling.

14. For any person furnishing credit or services to deny or terminate such credit or services or to adversely affect an individual's credit standing because of such individual's sex, gender identity, marital status, age or sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object; provided that in the case of age the following shall not be unlawful practices:

(1) an inquiry of age for the purpose of determining a pertinent element of creditworthiness;

(2) the use of empirically derived credit systems which consider age, provided such systems are based on demonstrably and statistically sound data and provided further that such systems do not assign a negative factor or score to any applicant who has reached age sixty-two;

(3) the offering of credit life insurance or credit disability insurance, in conjunction with any credit or services, to a limited age group;

(4) the denial of any credit or services to a person who has not attained the age of majority;

(5) the denial of any credit or services the duration of which exceeds the life expectancy of the applicant as determined by the most recent Individual Annuity Mortality Table; or

(6) the offering of more favorable credit terms to students, to persons aged eighteen to twenty-one, or to persons who have reached the age of sixty-two.

Any person who violates the provisions of this subsection shall be liable in an action of contract for actual damages; provided, however, that, if there are no actual damages, the court may assess special damages to the aggrieved party not to exceed one thousand dollars; and provided further, that any person who has been found to violate a provision of this subsection by a court of competent jurisdiction shall be assessed the cost of reasonable legal fees actually incurred.

15. For any person responsible for recording the name of or establishing the personal identification of an individual for any purpose, including that of extending credit, to require such individual to use, because of such individual's sex or marital status, any surname other than the one by which such individual is generally known.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

16. For any employer, personally or through an agent, to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business. For purposes of this subsection, the word employer shall include an agency which employs individuals directly for the purpose of furnishing part-time or temporary help to others.

In determining whether an accommodation would impose an undue hardship on the conduct of the employer's business, factors to be considered include:--

(1) the overall size of the employer's business with respect to the number of employees, number and type of facilities, and size of budget or available assets;

(2) the type of the employer's operation, including the composition and structure of the employer's workforce; and

(3) the nature and cost of the accommodation needed.

Physical or mental job qualification requirement with respect to hiring, promotion, demotion or dismissal from employment or any other change in employment status or responsibilities shall be functionally related to the specific job or jobs for which the individual is being considered and shall be consistent with the safe and lawful performance of the job.

An employer may not make preemployment inquiry of an applicant as to whether the applicant is a handicapped individual or as to the nature or severity of the handicap, except that an employer may condition an offer of employment on the results of a medical examination conducted solely for the purpose of determining whether the employee, with reasonable accommodation, is capable of performing the essential functions of the job, and an employer may invite applicants to voluntarily disclose their handicap for purposes of assisting the employer in its affirmative action efforts.

16A. For an employer, personally or through its agents, to sexually harass any employee.

17. Notwithstanding any provision of this chapter, it shall not be an unlawful employment practice for any person, employer, labor organization or employment agency to:

(a) observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this section, except that no such employee benefit plan shall excuse the failure to hire any person, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any person because of age except as permitted by paragraph (b).

(b) require the compulsory retirement of any person who has attained the age of sixty-five and who, for the two year period immediately before retirement, is employed in a bona fide executive or high policymaking position, if such person entitled to an immediate nonforfeitable annual retirement benefit from a pension, profit-sharing, savings or deferred compensation plan, or any combination of such plans, of the employer, which equals, in the aggregate, at least forty-four thousand dollars.

(c) require the retirement of any employee who has attained seventy years of age and who is serving under a contract of unlimited tenure or similar arrangement providing for unlimited tenure at an independent institution of higher education, or to limit the employment in a faculty capacity of such an employee, or another person who has attained seventy years of age who was formerly employed under a contract of unlimited tenure or similar arrangement, to such terms and to such a period as would serve the present and future needs of the institution, as determined by it; provided, however, that in making such a determination, no institution shall use as a qualification for employment or reemployment, the fact that the individual is under any particular age.

18. For the owner, lessee, sublessee, licensed real estate broker, assignee, or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other covered housing accommodations, or other person having the right of ownership or possession, or right to rent or lease, or sell or negotiate for the sale of such accommodations, or any agent or employee of such person or any organization of unit owners in a condominium or housing cooperative to sexually harass any tenant, prospective tenant, purchaser or prospective purchaser of property.

Notwithstanding the foregoing provisions of this section, it shall not be an unlawful employment practice for any person, employer, labor organization or employment agency to inquire of an applicant for employment or membership as to whether or not he or she is a veteran or a citizen.

Notwithstanding the provisions of any general or special law nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting admission to or giving preference to persons of the same religion or denomination or from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained.

Notwithstanding the foregoing provisions of this section, (a) every employer, every employment agency, including the division of employment and training, and every labor organization shall make and keep such records relating to race, color or national origin as the commission may prescribe from time to time by rule or regulation, after public hearing, as reasonably necessary for the purpose of showing compliance with the requirements of this chapter, and (b) every employer and labor organization may keep and maintain such records and make such reports as may from time to time be necessary to comply, or show compliance with, any executive order issued by the President of the United States or any rules or regulations issued thereunder prescribing fair employment practices for contractors and subcontractors under contract with the United States, or, if not subject to such order, in the manner prescribed therein and subject to the jurisdiction of the commission. Such requirements as the commission may, by rule or regulation, prescribe for the making and keeping of records under clause (a) shall impose no greater burden or requirement on the employer, employment agency or labor organization subject thereto, than the comparable requirements which could be prescribed by Federal rule or regulation so long as no such requirements have in fact been prescribed, or which have in fact been prescribed for an employer, employment agency or labor organization under the authority of the Civil Rights Act of 1964, from time to time amended. [1] This paragraph shall apply only to employers who on each working day in each of twenty or more calendar weeks in the annual period ending with each date set forth below, employed more employees than the number set forth beside such date, and to labor organizations which have more members on each such working day during such period.

|  | Minimum Employees |
|---|---|
| Period Ending. | or Members. |
| June 30, 1965................................................................................................ | 100 |
| June 30, 1966................................................................................................ | 75 |

June 30, 1967.................................................................................................................................................50

June 30, 1968 and thereafter.........................................................................................................................25

Nothing contained in this chapter or in any rule or regulation issued by the commission shall be interpreted as requiring any employer, employment agency or labor organization to grant preferential treatment to any individual or to any group because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry of such individual or group because of imbalance which may exist between the total number or percentage of persons employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization or admitted to or employed in, any apprenticeship or other training program, and the total number or percentage of persons of such race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry in the commonwealth or in any community, section or other area therein, or in the available work force in the commonwealth or in any of its political subdivisions.

19. (a) It shall be unlawful discrimination for any employer, employment agency, labor organization, or licensing agency to

(1) refuse to hire or employ, represent, grant membership to, or license a person on the basis of that person's genetic information;

(2) collect, solicit or require disclosure of genetic information from any person as a condition of employment, or membership, or of obtaining a license;

(3) solicit submission to, require, or administer a genetic test to any person as a condition of employment, membership, or obtaining a license;

(4) offer a person an inducement to undergo a genetic test or otherwise disclose genetic information;

(5) question a person about their genetic information or genetic information concerning their family members, or inquire about previous genetic testing;

(6) use the results of a genetic test or other genetic information to affect the terms, conditions, compensation or privileges of a person's employment, representation, membership, or the ability to obtain a license;

(7) terminate or refuse to renew a person's employment, representation, membership, or license on the basis of a genetic test or other genetic information; or

(8) otherwise seek, receive, or maintain genetic information for non-medical purposes.

<[ There is no paragraph (b).]>

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Credits**

Added by St.1946, c. 368, § 4. Amended by St.1947, c. 424; St.1950, c. 697, §§ 6 to 8; St.1955, c. 274; St.1957, c. 426, §§ 2, 3; St.1959, c. 239, § 2; St.1960, c. 163, § 2; St.1961, c. 128; St.1963, c. 197, § 2; St.1965, c. 213, § 2; St.1965, c. 397, §§ 4 to 6; St.1966, c. 361; St.1969, c. 90; St.1969, c. 314; St.1971, c. 661; St.1971, c. 726; St.1971, c. 874, §§ 1 to 3; St.1972, c. 185; St.1972, c. 428; St.1972, c. 542; St.1972, c. 786, § 2; St.1972, c. 790, § 2; St.1973, c. 168; St.1973, c. 187, §§ 1 to 3; St.1973, c. 325; St.1973, c. 701, § 1; St.1973, c. 929; St.1973, c. 1015, §§ 1 to 3; St.1974, c. 531; St.1975, c. 84; St.1975, c. 367, § 3; St.1975, c. 637, §§ 1, 2; St.1978, c. 89; St.1978, c. 288, §§ 1, 2; St.1979, c. 710, § 2; St.1980, c. 343; St.1983, c. 533, §§ 4 to 6; St.1983, c. 585, § 7; St.1983, c. 628, §§ 1 to 3; St.1984, c. 266, §§ 5 to 7; St.1985, c. 239; St.1986, c. 588, § 3; St.1987, c. 270, §§ 1, 2; St.1987, c. 773, § 11; St.1989, c. 516, §§ 4 to 7 and 9 to 14; St.1989, c. 544; St.1989, c. 722, §§ 13 to 23; St.1990, c. 177, § 341; St.1990, c. 283, §§ 1, 2; St.1996, c. 262; St.1997, c. 2, § 2; St.1997, c. 19, §§ 105, 106; St.1998, c. 161, § 532; St.2000, c. 254, §§ 6 to 23A; St.2001, c. 11, §§ 1, 2; St.2004, c. 355, § 1, eff. Dec. 22, 2004; St.2006, c. 291, §§ 1, 2, eff. Dec. 6, 2006; St.2010, c. 256, § 101, eff. Nov. 4, 2010; St.2011, c. 199, § 7, eff. July 1, 2012.

Notes of Decisions (2110)

Footnotes

1    42 U.S.C.A. § 2000a.

M.G.L.A. 151B § 4, MA ST 151B § 4

Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XXI. Labor and Industries (Ch. 149-154)
      Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
      Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 4

§ 4. Unlawful practices

Effective: April 7, 2015
Currentness

It shall be an unlawful practice:

1. For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

1A. It shall be unlawful discriminatory practice for an employer to impose upon an individual as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such individual to violate, or forego the practice of, his creed or religion as required by that creed or religion including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or holy day and the employer shall make reasonable accommodation to the religious needs of such individual. No individual who has given notice as hereinafter provided shall be required to remain at his place of employment during any day or days or portion thereof that, as a requirement of his religion, he observes as his sabbath or other holy day, including a reasonable time prior and subsequent thereto for travel between his place of employment and his home, provided, however, that any employee intending to be absent from work when so required by his or her creed or religion shall notify his or her employer not less than ten days in advance of each absence, and that any such absence from work shall, wherever practicable in the judgment of the employer, be made up by an equivalent amount of time at some other mutually convenient time. Nothing under this subsection shall be deemed to require an employer to compensate an employee for such absence. "Reasonable Accommodation", as used in this subsection shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employee shall have the burden of proof as to the required practice of his creed or religion. As used in this subsection, the words "creed or religion" mean any sincerely held religious beliefs, without regard to whether such beliefs are approved, espoused, prescribed or required by an established church or other religious institution or organization.

Undue hardship, as used herein, shall include the inability of an employer to provide services which are required by and in compliance with all federal and state laws, including regulations or tariffs promulgated or required by any regulatory agency having jurisdiction over such services or where the health or safety of the public would be unduly compromised by the absence of such employee or employees, or where the employee's presence is indispensable to the orderly transaction of business and his or her work cannot be performed by another employee of substantially similar qualifications during the period of absence, or where the employee's presence is needed to alleviate an emergency situation. The employer shall have the burden of proof to show undue hardship.

1B. For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

1C. For the commonwealth or any of its political subdivisions, by itself or its agent, because of the age of any individual, to refuse to hire or employ or to bar or discharge from employment such individual in compensation or in terms, conditions or privileges of employment unless pursuant to any other general or special law.

1D. For an employer, an employment agency, the commonwealth or any of its political subdivisions, by itself or its agents, to deny initial employment, reemployment, retention in employment, promotion or any benefit of employment to a person who is a member of, applies to perform, or has an obligation to perform, service in a uniformed military service of the United States, including the National Guard, on the basis of that membership, application or obligation.

2. For a labor organization, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, or ancestry of any individual, or because of the handicap of any person alleging to be a qualified handicapped person, to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer unless based upon a bona fide occupational qualification.

3. For any employer or employment agency to print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry or record in connection with employment, which expresses, directly or indirectly, any limitation, specification or discrimination as to the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry, or the handicap of a qualified handicapped person or any intent to make any such limitation, specification or discrimination, or to discriminate in any way on the ground of race, color, religious creed, national origin, sex, gender identity, sexual orientation, age, genetic information, ancestry or the handicap of a qualified handicapped person, unless based upon a bona fide occupational qualification.

3A. For any person engaged in the insurance or bonding business, or his agent, to make any inquiry or record of any person seeking a bond or surety bond conditioned upon faithful performance of his duties or to use any form of application in connection with the furnishing of such bond, which seeks information relative to the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of the person to be bonded.

3B. For any person whose business includes granting mortgage loans or engaging in residential real estate-related transactions to discriminate against any person in the granting of any mortgage loan or in making available such a transaction, or in the terms or conditions of such a loan or transaction, because of race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, children, national origin, genetic information, ancestry, age or handicap. Such transactions shall include, but not be limited to:

(1) the making or purchasing of loans or the provision of other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or the making or purchasing of loans or the provision of other financial assistance secured by residential real estate; or

(2) the selling, brokering, or appraising of residential real estate.

In the case of age, the following shall not be an unlawful practice:

(1) an inquiry of age for the purpose of determining a pertinent element of credit worthiness;

(2) the use of an empirically derived credit system which considers age; provided, however, that such system is based on demonstrably and statistically sound data; and provided, further, that such system does not assign a negative factor or score to any applicant who has reached age sixty-two;

(3) the offering of credit life insurance or credit disability insurance, in conjunction with any mortgage loan, to a limited age group;

(4) the failure or refusal to grant any mortgage loan to a person who has not attained the age of majority;

(5) the failure or refusal to grant any mortgage loan the duration of which exceeds the life expectancy of the applicant as determined by the most recent Individual Annuity Mortality Table.

Nothing in this subsection prohibits a person engaged in the business of furnishing appraisals of real property from taking into consideration factors other than those hereinabove proscribed.

3C. For any person to deny another person access to, or membership or participation in, a multiple listing service, real estate brokers' organization, or other service, organization, or facility relating to the business of selling or renting dwellings, or to discriminate against such person in the terms or conditions of such access, membership, or participation, on account of race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, children, national origin, genetic information, ancestry, age, or handicap.

4. For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

4A. For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

5. For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

6. For the owner, lessee, sublessee, licensed real estate broker, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other person having the right of ownership or possession or right to rent or lease, or sell or negotiate for the sale of such accommodations, or any agent or employee of such a person, or any organization of unit owners in a condominium or housing cooperative: (a) to refuse to rent or lease or sell or negotiate for sale or otherwise to deny to or withhold from any person or group of persons such accommodations because of the race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status of such person or persons or because such person is a veteran or member of the armed forces, or because such person is blind, or hearing impaired or has any other handicap; (b) to discriminate against any person because of his race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, ancestry, or marital status or because such person is a veteran or member of the armed forces, or because such person is blind, or hearing impaired or has any other handicap in the terms, conditions or privileges of such accommodations or the acquisitions thereof, or in the furnishings of facilities and services in connection therewith, or because such a person possesses a trained dog guide as a consequence of blindness, or hearing impairment; (c) to cause to be made any written or oral inquiry or record concerning the race, religious creed, color, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry or marital status of the person seeking to rent or lease or buy any such accommodation, or concerning the fact that such person is a veteran or a member of the armed forces or because such person is blind or hearing impaired or has any other handicap. The word "age" as used in this subsection shall not apply to persons who are minors nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in housing developments assisted under the federal low income housing tax credit and intended for use as housing for persons 55 years of age or over or 62 years of age or over, nor to residency in communities consisting of either a structure or structures constructed expressly for use as housing for persons 55 years of age or over or 62 years of age or over if the housing owner or manager register biennially with the department of housing and community development. For the purpose of this subsection, housing intended for occupancy by persons fifty-five or over and sixty-two or over shall comply with the provisions set forth in 42 USC 3601 et seq.

For purposes of this subsection, discrimination on the basis of handicap includes, but is not limited to, in connection with the design and construction of: (1) all units of a dwelling which has three or more units and an elevator which are constructed for first occupancy after March thirteenth, nineteen hundred and ninety-one; and (2) all ground floor units of other dwellings consisting of three or more units which are constructed for first occupancy after March thirteenth, nineteen hundred and ninety-one, a failure to design and construct such dwellings in such a manner that (i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons; (ii) all the doors are designed to allow passage into and within all premises within such dwellings and are sufficiently wide to allow passage by handicapped persons in wheelchairs; and (iii) all premises within such dwellings contain the following features of adaptive design; (a) an accessible route into and through the dwelling; (b) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (c) reinforcements in bathroom walls to allow later installation of grab bars; and (d) usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

7. For the owner, lessee, sublessee, real estate broker, assignee or managing agent of other covered housing accommodations or of land intended for the erection of any housing accommodation included under subsection 10, 11, 12, or 13 of section one, or other person having the right of ownership or possession or right to rent or lease or sell, or negotiate for the sale or lease of such land or accommodations, or any agent or employee of such a person or any organization of unit owners in a condominium or housing cooperative: (a) to refuse to rent or lease or sell or negotiate for sale or lease or otherwise to deny or withhold from any person or group of persons such accommodations or land because of race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed forces, blindness, hearing impairment, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment or other

handicap of such person or persons; (b) to discriminate against any person because of his race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, or marital status, veteran status or membership in the armed services, blindness, or hearing impairment or other handicap, or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment in the terms, conditions or privileges of such accommodations or land or the acquisition thereof, or in the furnishing of facilities and services in the connection therewith or (c) to cause to be made any written or oral inquiry or record concerning the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, marital status, veteran status or membership in the armed services, blindness, hearing impairment or other handicap or because such person possesses a trained dog guide as a consequence of blindness or hearing impairment, of the person seeking to rent or lease or buy any such accommodation or land; provided, however, that this subsection shall not apply to the leasing of a single apartment or flat in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence. The word "age" as used in this subsection shall not apply to persons who are minors nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in housing developments assisted under the federal low income housing tax credit and intended for use as housing for persons 55 years of age or over or 62 years of age or over, nor to residency in communities consisting of either a structure or structures constructed expressly for use as housing for persons 55 years of age or over or 62 years of age or over if the housing owner or manager register biennially with the department of housing and community development. For the purpose of this subsection, housing intended for occupancy by persons fifty-five or over and sixty-two or over shall comply with the provisions set forth in 42 USC 3601 et seq.


7A. For purposes of subsections 6 and 7 discrimination on the basis of handicap shall include but not be limited to:


(1) a refusal to permit or to make, at the expense of the handicapped person, reasonable modification of existing premises occupied or to be occupied by such person if such modification is necessary to afford such person full enjoyment of such premises; provided, however, that, in the case of publicly assisted housing, multiple dwelling housing consisting of ten or more units, or contiguously located housing consisting of ten or more units, reasonable modification shall be at the expense of the owner or other person having the right of ownership; provided, further, that, in the case of public ownership of such housing units the cost of such reasonable modification shall be subject to appropriation; and provided, further, that, in the case of a rental, the landlord may, where the modification to be paid for by the handicapped person will materially alter the marketability of the housing, condition permission for a modification on the tenant agreeing to restore or pay for the cost of restoring, the interior of the premises to the condition that existed prior to such modification, reasonable wear and tear excepted;


(2) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling; and


(3) discrimination against or a refusal to rent to a person because of such person's need for reasonable modification or accommodation.

Reasonable modification shall include, but not be limited to, making the housing accessible to mobility-impaired, hearing-impaired and sight-impaired persons including installing raised numbers which may be read by a sight-impaired person, installing a door bell which flashes a light for a hearing-impaired person, lowering a cabinet, ramping a front entrance of five or fewer vertical steps, widening a doorway, and installing a grab bar; provided, however, that for purposes of this subsection, the owner or other person having the right of ownership shall not be required to pay for ramping a front entrance of more than five steps or for installing a wheelchair lift.

Notwithstanding any other provisions of this subsection, an accommodation or modification which is paid for by the owner or other person having the right of ownership is not considered to be reasonable if it would impose an undue hardship upon the owner or other person having the right of ownership and shall therefore not be required. Factors to be considered shall include, but not be limited to, the nature and cost of the accommodation or modification needed, the extent to which the accommodation or modification would materially alter the marketability of the housing, the overall size of the housing business of the owner or other person having the right of ownership, including but not limited to, the number and type of housing units, size of budget and available assets, and the ability of the owner or other person having the right of ownership to recover the cost of the accommodation or modification through a federal tax deduction. Ten percent shall be the maximum number of units for which an owner or other person having the right of ownership shall be required to pay for a modification in order to make units fully accessible to persons using a wheelchair pursuant to the requirements of this subsection.

In the event a wheelchair accessible unit becomes or will become vacant, the owner or other person having the right of ownership shall give timely notice to a person who has, within the previous twelve months, notified the owner or person having the right of ownership that such person is in need of a unit which is wheelchair accessible, and the owner or other person having the right of ownership shall give at least fifteen days notice of the vacancy to the Massachusetts rehabilitation commission, which shall maintain a central registry of accessible apartment housing under the provisions of section seventy-nine of chapter six. During such fifteen day notice period, the owner or other person having the right of ownership may lease or agree to lease the unit only if it is to be occupied by a person who is in need of wheelchair accessibility.

Notwithstanding any general or special law, by-law or ordinance to the contrary, there shall not be established or imposed a rent or other charge for such handicap-accessible housing which is higher than the rent or other charge for comparable nonaccessible housing of the owner or other person having the right of ownership.

7B. For any person to make print, or publish, or cause to be made, printed, or published any notice, statement or advertisement, with respect to the sale or rental of multiple dwelling, contiguously located, publicly assisted or other covered housing accommodations that indicates any preference, limitation, or discrimination based on race, color, religion, sex, gender identity, sexual orientation which shall not include persons whose sexual orientation involves minor children as the sex object, national origin, genetic information, ancestry, children, marital status, public assistance recipiency, or handicap or an intention to make any such preference, limitation or discrimination except where otherwise legally permitted.

8. For the owner, lessee, sublessee, or managing agent of, or other person having the right of ownership or possession of or the right to sell, rent or lease, commercial space: (1) To refuse to sell, rent, lease or otherwise deny to or withhold from any person or group of persons such commercial space because of race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry handicap or marital status of such person or persons. (2) To discriminate against any person because of his race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, handicap or marital status in the terms, conditions or privileges of the sale, rental or lease of any such commercial space or in the furnishing of facilities or services in connection therewith. (3) To cause to be made any written or oral inquiry or record concerning the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information, ancestry, handicap or marital status of a person seeking to rent or lease or buy any such commercial space. The word "age" as used in this subsection shall not apply to persons who are minors, nor to residency in state-aided or federally-aided housing developments for the elderly nor to residency in self-contained retirement communities constructed expressly for use by the elderly and which are at least twenty acres in size and have a minimum age requirement for residency of at least fifty-five years.

9. For an employer, himself or through his agent, in connection with an application for employment, or the terms, conditions, or privileges of employment, or the transfer, promotion, bonding, or discharge of any person, or in any other matter relating to the employment of any person, to request any information, to make or keep a record of such information, to use any form of application or application blank which requests such information, or to exclude, limit or otherwise discriminate against any person by reason of his or her failure to furnish such information through a written application or oral inquiry or otherwise regarding: (i) an arrest, detention, or disposition regarding any violation of law in which no conviction resulted, or (ii) a first conviction for any of the following misdemeanors: drunkenness, simple assault, speeding, minor traffic violations, affray, or disturbance of the peace, or (iii) any conviction of a misdemeanor where the date of such conviction or the completion of any period of incarceration resulting therefrom, whichever date is later, occurred five or more years prior to the date of such application for employment or such request for information, unless such person has been convicted of any offense within five years immediately preceding the date of such application for employment or such request for information.

No person shall be held under any provision of any law to be guilty of perjury or of otherwise giving a false statement by reason of his failure to recite or acknowledge such information as he has a right to withhold by this subsection.

Nothing contained herein shall be construed to affect the application of section thirty-four of chapter ninety-four C, or of chapter two hundred and seventy-six relative to the sealing of records.

9 ½. For an employer to request on its initial written application form criminal offender record information; provided, however, that except as otherwise prohibited by subsection 9, an employer may inquire about any criminal convictions on an applicant's application form if: (i) the applicant is applying for a position for which any federal or state law or regulation creates mandatory or presumptive disqualification based on a conviction for 1 or more types of criminal offenses; or (ii) the employer or an affiliate of such employer is subject to an obligation imposed by any federal or state law or regulation not to employ persons, in either 1 or more positions, who have been convicted of 1 or more types of criminal offenses.

9A. For an employer himself or through his agent to refuse, unless based upon a bonafide occupational qualification, to hire or employ or to bar or discharge from employment any person by reason of his or her failure to furnish information regarding his or her admission, on one or more occasions, voluntarily or involuntarily, to any public or private facility for the care and treatment of mentally ill persons, provided that such person has been discharged from such facility or facilities and can prove by a psychiatrist's certificate that he is mentally competent to perform the job or the job for which he is applying. No application for employment shall contain any questions or requests for information regarding the admission of an applicant, on one or more occasions, voluntarily or involuntarily, to any public or private facility for the care and treatment of mentally ill persons, provided that such applicant has been discharged from such public or private facility or facilities and is no longer under treatment directly related to such admission.

10. For any person furnishing credit, services or rental accommodations to discriminate against any individual who is a recipient of federal, state, or local public assistance, including medical assistance, or who is a tenant receiving federal, state, or local housing subsidies, including rental assistance or rental supplements, because the individual is such a recipient, or because of any requirement of such public assistance, rental assistance, or housing subsidy program.

11. For the owner, sublessees, real estate broker, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other covered housing accommodations, or other person having the right of ownership or possession or right to rent or lease or sell such accommodations, or any agent or employee of such person or organization of unit owners in a condominium or housing cooperative, to refuse to rent or lease or sell or otherwise to deny to or withhold from any person such accommodations because such person has a child or children who shall occupy the premises with such person or to discriminate against any person in the terms, conditions, or privileges of such accommodations

or the acquisition thereof, or in the furnishing of facilities and services in connection therewith, because such person has a child or children who occupy or shall occupy the premises with such person; provided, however, that nothing herein shall limit the applicability of any local, state, or federal restrictions regarding the maximum number of persons permitted to occupy a dwelling. When the commission or a court finds that discrimination in violation of this paragraph has occurred with respect to a residential premises containing dangerous levels of lead in paint, plaster, soil, or other accessible material, notification of such finding shall be sent to the director of the childhood lead poisoning prevention program.

This subsection shall not apply to:

(1) Dwellings containing three apartments or less, one of which apartments is occupied by an elderly or infirm person for whom the presence of children would constitute a hardship. For purposes of this subsection, an "elderly person" shall mean a person sixty-five years of age or over, and an "infirm person" shall mean a person who is disabled or suffering from a chronic illness.

(2) The temporary leasing or temporary subleasing of a single family dwelling, a single apartment, or a single unit of a condominium or housing cooperative, by the owner of such dwelling, apartment, or unit, or in the case of a subleasing, by the sublessor thereof, who ordinarily occupies the dwelling, apartment, or unit as his or her principal place of residence. For purposes of this subsection, the term "temporary leasing" shall mean leasing during a period of the owner's or sublessor's absence not to exceed one year.

(3) The leasing of a single dwelling unit in a two family dwelling, the other occupancy unit of which is occupied by the owner as his residence.

<[ Subsection 11A effective until April 7, 2015. For text effective April 7, 2015, see below.]>

11A. For an employer, by himself or his agent, to refuse to restore certain female employees to employment following their absence by reason of a maternity leave taken in accordance with section one hundred and five D of chapter one hundred and forty-nine or to otherwise fail to comply with the provisions of said section, or for the commonwealth and any of its boards, departments and commissions to deny vacation credit to any female employee for the fiscal year during which she is absent due to a maternity leave taken in accordance with said section or to impose any other penalty as a result of a maternity leave of absence.

<[ Subsection 11A as amended by 2014, 484, Sec. 2 effective
April 7, 2015. For text effective until April 7, 2015, see above.]>

11A. For an employer, or an employer's agent, to refuse to restore certain employees to employment following an absence by reason of a parental leave taken pursuant to section 105D of chapter 149 or to otherwise fail to comply with that section, or for the commonwealth and any of its boards, departments and commissions to deny vacation credit to an employee for the fiscal year during which the employee is absent due to a parental leave taken pursuant to said section 105D of said chapter 149, or to impose any other penalty as a result of a parental leave of absence.

12. For any retail store which provides credit or charge account privileges to refuse to extend such privileges to a customer solely because said customer had attained age sixty-two or over.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

13. For any person to directly or indirectly induce, attempt to induce, prevent, or attempt to prevent the sale, purchase, or rental of any dwelling or dwellings by:

(a) implicit or explicit representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular age, race, color, religion, sex, gender identity, national or ethnic origin, or economic level or a handicapped person, or a person having a child, or implicit or explicit representations regarding the effects or consequences of any such entry or prospective entry;

(b) unrequested contact or communication with any person or persons, initiated by any means, for the purpose of so inducing or attempting to induce the sale, purchase, or rental of any dwelling or dwellings when he knew or, in the exercise of reasonable care, should have known that such unrequested solicitation would reasonably be associated by the persons solicited with the entry into the neighborhood of a person or persons of a particular age, race, color, religion, sex, gender identity, national or ethnic origin, or economic level or a handicapped person, or a person having a child;

(c) implicit or explicit false representations regarding the availability of suitable housing within a particular neighborhood or area, or failure to disclose or offer to show all properties listed or held for sale or rent within a requested price or rental range, regardless of location; or

(d) false representations regarding the listing, prospective listing, sale, or prospective sale of any dwelling.

14. For any person furnishing credit or services to deny or terminate such credit or services or to adversely affect an individual's credit standing because of such individual's sex, gender identity, marital status, age or sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object; provided that in the case of age the following shall not be unlawful practices:

(1) an inquiry of age for the purpose of determining a pertinent element of creditworthiness;

(2) the use of empirically derived credit systems which consider age, provided such systems are based on demonstrably and statistically sound data and provided further that such systems do not assign a negative factor or score to any applicant who has reached age sixty-two;

(3) the offering of credit life insurance or credit disability insurance, in conjunction with any credit or services, to a limited age group;

(4) the denial of any credit or services to a person who has not attained the age of majority;

(5) the denial of any credit or services the duration of which exceeds the life expectancy of the applicant as determined by the most recent Individual Annuity Mortality Table; or

(6) the offering of more favorable credit terms to students, to persons aged eighteen to twenty-one, or to persons who have reached the age of sixty-two.

Any person who violates the provisions of this subsection shall be liable in an action of contract for actual damages; provided, however, that, if there are no actual damages, the court may assess special damages to the aggrieved party not to exceed one thousand dollars; and provided further, that any person who has been found to violate a provision of this subsection by a court of competent jurisdiction shall be assessed the cost of reasonable legal fees actually incurred.

15. For any person responsible for recording the name of or establishing the personal identification of an individual for any purpose, including that of extending credit, to require such individual to use, because of such individual's sex or marital status, any surname other than the one by which such individual is generally known.

16. For any employer, personally or through an agent, to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business. For purposes of this subsection, the word employer shall include an agency which employs individuals directly for the purpose of furnishing part-time or temporary help to others.

In determining whether an accommodation would impose an undue hardship on the conduct of the employer's business, factors to be considered include:--

(1) the overall size of the employer's business with respect to the number of employees, number and type of facilities, and size of budget or available assets;

(2) the type of the employer's operation, including the composition and structure of the employer's workforce; and

(3) the nature and cost of the accommodation needed.

Physical or mental job qualification requirement with respect to hiring, promotion, demotion or dismissal from employment or any other change in employment status or responsibilities shall be functionally related to the specific job or jobs for which the individual is being considered and shall be consistent with the safe and lawful performance of the job.

An employer may not make preemployment inquiry of an applicant as to whether the applicant is a handicapped individual or as to the nature or severity of the handicap, except that an employer may condition an offer of employment on the results of a medical examination conducted solely for the purpose of determining whether the employee, with reasonable accommodation, is capable of performing the essential functions of the job, and an employer may invite applicants to voluntarily disclose their handicap for purposes of assisting the employer in its affirmative action efforts.

16A. For an employer, personally or through its agents, to sexually harass any employee.

17. Notwithstanding any provision of this chapter, it shall not be an unlawful employment practice for any person, employer, labor organization or employment agency to:

(a) observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this section, except that no such employee benefit plan shall excuse the failure to hire any person, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any person because of age except as permitted by paragraph (b).

(b) require the compulsory retirement of any person who has attained the age of sixty-five and who, for the two year period immediately before retirement, is employed in a bona fide executive or high policymaking position, if such person entitled to an immediate nonforfeitable annual retirement benefit from a pension, profit-sharing, savings or deferred compensation plan, or any combination of such plans, of the employer, which equals, in the aggregate, at least forty-four thousand dollars.

(c) require the retirement of any employee who has attained seventy years of age and who is serving under a contract of unlimited tenure or similar arrangement providing for unlimited tenure at an independent institution of higher education, or to limit the employment in a faculty capacity of such an employee, or another person who has attained seventy years of age who was formerly employed under a contract of unlimited tenure or similar arrangement, to such terms and to such a period as would serve the present and future needs of the institution, as determined by it; provided, however, that in making such a determination, no institution shall use as a qualification for employment or reemployment, the fact that the individual is under any particular age.

18. For the owner, lessee, sublessee, licensed real estate broker, assignee, or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other covered housing accommodations, or other person having the right of ownership or possession, or right to rent or lease, or sell or negotiate for the sale of such accommodations, or any agent or employee of such person or any organization of unit owners in a condominium or housing cooperative to sexually harass any tenant, prospective tenant, purchaser or prospective purchaser of property.

Notwithstanding the foregoing provisions of this section, it shall not be an unlawful employment practice for any person, employer, labor organization or employment agency to inquire of an applicant for employment or membership as to whether or not he or she is a veteran or a citizen.

Notwithstanding the provisions of any general or special law nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting admission to or giving preference to persons of the same religion or denomination or from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained.

Notwithstanding the foregoing provisions of this section, (a) every employer, every employment agency, including the division of employment and training, and every labor organization shall make and keep such records relating to race, color or national origin as the commission may prescribe from time to time by rule or regulation, after public hearing, as reasonably necessary for the purpose of showing compliance with the requirements of this chapter, and (b) every employer and labor organization may keep and maintain such records and make such reports as may from time to time be necessary to comply, or show compliance with, any executive order issued by the President of the United States or any rules or regulations issued thereunder prescribing fair employment practices for contractors and subcontractors under contract with the United States, or, if not subject to such order, in the manner prescribed therein and subject to the jurisdiction of the commission. Such requirements as the commission may, by rule or regulation, prescribe for the making and keeping of records under clause (a) shall impose no greater burden or requirement on the employer, employment agency or labor organization subject thereto, than the comparable requirements which could be prescribed by Federal rule or regulation so long as no such requirements have in fact been prescribed, or which have in fact been prescribed for an employer, employment agency or labor organization under the authority of the Civil Rights

Act of 1964, from time to time amended. [1] This paragraph shall apply only to employers who on each working day in each of twenty or more calendar weeks in the annual period ending with each date set forth below, employed more employees than the number set forth beside such date, and to labor organizations which have more members on each such working day during such period.

|  | *Minimum Employees or Members.* |
|---|---|
| *Period Ending.* | |
| June 30, 1965 | 100 |
| June 30, 1966 | 75 |
| June 30, 1967 | 50 |
| June 30, 1968 and thereafter | 25 |

Nothing contained in this chapter or in any rule or regulation issued by the commission shall be interpreted as requiring any employer, employment agency or labor organization to grant preferential treatment to any individual or to any group because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry of such individual or group because of imbalance which may exist between the total number or percentage of persons employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization or admitted to or employed in, any apprenticeship or other training program, and the total number or percentage of persons of such race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, age, genetic information or ancestry in the commonwealth or in any community, section or other area therein, or in the available work force in the commonwealth or in any of its political subdivisions.

19. (a) It shall be unlawful discrimination for any employer, employment agency, labor organization, or licensing agency to

(1) refuse to hire or employ, represent, grant membership to, or license a person on the basis of that person's genetic information;

(2) collect, solicit or require disclosure of genetic information from any person as a condition of employment, or membership, or of obtaining a license;

(3) solicit submission to, require, or administer a genetic test to any person as a condition of employment, membership, or obtaining a license;

(4) offer a person an inducement to undergo a genetic test or otherwise disclose genetic information;

(5) question a person about their genetic information or genetic information concerning their family members, or inquire about previous genetic testing;

(6) use the results of a genetic test or other genetic information to affect the terms, conditions, compensation or privileges of a person's employment, representation, membership, or the ability to obtain a license;

(7) terminate or refuse to renew a person's employment, representation, membership, or license on the basis of a genetic test or other genetic information; or

(8) otherwise seek, receive, or maintain genetic information for non-medical purposes.

<[ There is no paragraph (b).]>

**Credits**

Added by St.1946, c. 368, § 4. Amended by St.1947, c. 424; St.1950, c. 697, §§ 6 to 8; St.1955, c. 274; St.1957, c. 426, §§ 2, 3; St.1959, c. 239, § 2; St.1960, c. 163, § 2; St.1961, c. 128; St.1963, c. 197, § 2; St.1965, c. 213, § 2; St.1965, c. 397, §§ 4 to 6; St.1966, c. 361; St.1969, c. 90; St.1969, c. 314; St.1971, c. 661; St.1971, c. 726; St.1971, c. 874, §§ 1 to 3; St.1972, c. 185; St.1972, c. 428; St.1972, c. 542; St.1972, c. 786, § 2; St.1972, c. 790, § 2; St.1973, c. 168; St.1973, c. 187, §§ 1 to 3; St.1973, c. 325; St.1973, c. 701, § 1; St.1973, c. 929; St.1973, c. 1015, §§ 1 to 3; St.1974, c. 531; St.1975, c. 84; St.1975, c. 367, § 3; St.1975, c. 637, §§ 1, 2; St.1978, c. 89; St.1978, c. 288, §§ 1, 2; St.1979, c. 710, § 2; St.1980, c. 343; St.1983, c. 533, §§ 4 to 6; St.1983, c. 585, § 7; St.1983, c. 628, §§ 1 to 3; St.1984, c. 266, §§ 5 to 7; St.1985, c. 239; St.1986, c. 588, § 3; St.1987, c. 270, §§ 1, 2; St.1987, c. 773, § 11; St.1989, c. 516, §§ 4 to 7 and 9 to 14; St.1989, c. 544; St.1989, c. 722, §§ 13 to 23; St.1990, c. 177, § 341; St.1990, c. 283, §§ 1, 2; St.1996, c. 262; St.1997, c. 2, § 2; St.1997, c. 19, §§ 105, 106; St.1998, c. 161, § 532; St.2000, c. 254, §§ 6 to 23A; St.2001, c. 11, §§ 1, 2; St.2004, c. 355, § 1, eff. Dec. 22, 2004; St.2006, c. 291, §§ 1, 2, eff. Dec. 6, 2006; St.2010, c. 256, § 101, eff. Nov. 4, 2010; St.2011, c. 199, § 7, eff. July 1, 2012; St.2014, c. 484, § 2, eff. April 7, 2015.

Notes of Decisions (2110)

Footnotes

1       42 U.S.C.A. § 2000a.

M.G.L.A. 151B § 4, MA ST 151B § 4

Current through Chapters 1 to 505 of the 2014 2nd Annual Session

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XXI. Labor and Industries (Ch. 149-154)
            Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin, Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 4A

§ 4A. Conveyance by void instruments; penalty

Currentness

Whoever conveys real property by an instrument which contains a provision which he knows is void under the provisions of section twenty-three B of chapter one hundred and eighty-four shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than one year.

**Credits**

Added by St.1969, c. 523, § 1.

M.G.L.A. 151B § 4A, MA ST 151B § 4A
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XXI. Labor and Industries (Ch. 149-154)
            Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
            Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 5

§ 5. Complaints; procedure; limitations; bar to proceeding; award of damages

Effective: July 1, 2003

Currentness

Any person claiming to be aggrieved by an alleged unlawful practice or alleged violation of clause (e) of section thirty-two of chapter one hundred and twenty-one B or sections ninety-two A, ninety-eight and ninety-eight A of chapter two hundred and seventy-two may, by himself or his attorney, make, sign and file with the commission a verified complaint in writing which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful practice complained of or the violation of said clause (e) of said section thirty-two or said sections ninety-two A, ninety-eight and ninety-eight A which shall set forth the particulars thereof and contain such other information as may be required by the commission. The attorney general may, in like manner, make, sign and file such complaint. The commission, whenever it has reason to believe that any person has been or is engaging in an unlawful practice or violation of said clause (e) of said section thirty-two or said sections ninety-two A, ninety-eight and ninety-eight A, may issue such a complaint. Any employer whose employees, or some of them, refuse or threaten to refuse to cooperate with the provisions of this chapter, may file with the commission a verified complaint asking for assistance by conciliation or other remedial action.

After the filing of any complaint, the chairman of the commission shall designate one of the commissioners to make, with the assistance of the commission's staff, prompt investigation in connection therewith. If such commissioner shall determine after such investigation that no probable cause exists for crediting the allegations of the complaint, the commission shall, within ten days from such determination, cause to be issued and served upon the complainant written notice of such determination, and the said complainant or his attorney may, within ten days after such service, file with the commission a written request for a preliminary hearing before the commission to determine probable cause for crediting the allegations of the complaint, and the commission shall allow such request as a matter of right; provided, however, that such a preliminary hearing shall not be subject to the provisions of chapter thirty A. If such commissioner shall determine after such investigation or preliminary hearing that probable cause exists for crediting the allegations of a complaint relative to a housing practice, the commissioner shall immediately serve notice upon the complainant and respondent of their right to elect judicial determination of the complaint as an alternative to determination in a hearing before the commission. If a complainant or respondent so notified wishes to elect such judicial determination, he shall do so in writing within twenty days of receipt of the said notice. The person making such election shall give notice of such election to the commission and to all other complainants and respondents to whom the probable cause finding relates. The commission, upon receipt of such notice, shall dismiss the complaint pending before it without prejudice and the complainant shall be barred from subsequently bringing a complaint on the same matter before the commission. If any complainant or respondent elects judicial determination as aforesaid, the commission shall authorize, and not later than thirty days after the election is made the attorney general shall commence and maintain, a civil action on behalf of the complainant in the superior court for the county in which the unlawful practice occurred. Any complainant may intervene as of right in said civil action. If the court in such civil action finds that a discriminatory housing practice has occurred or is about to occur, the court may grant any relief which a court could grant with respect to such discriminatory housing practice in a civil action under section nine. Any relief so granted that would accrue to an aggrieved person in a civil action commenced by that aggrieved person under said section nine shall also accrue to that aggrieved person in a civil action under this section. If such commissioner shall determine after such investigation or preliminary hearing that probable cause exists for crediting

the allegations of any complaint and no complainant or respondent has elected judicial determination of the matter, he shall immediately endeavor to eliminate the unlawful practice complained of or the violation of said clause (e) of said section thirty-two or said sections ninety-two A, ninety-eight and ninety-eight A by conference, conciliation and persuasion. The members of the commission and its staff shall not disclose what has occurred in the course of such endeavors, provided that the commission may publish the facts in the case of any complaint which has been dismissed, and the terms of conciliation when the complaint has been so disposed of. In case of failure so to eliminate such practice or violation, or in advance thereof if in his judgment circumstances so warrant, he shall cause to be issued and served in the name of the commission, a written notice, together with a copy of such complaint, as the same may have been amended, requiring the person, employer, labor organization or employment agency named in such complaint, hereinafter referred to as respondent, to answer the charges of such complaint at a hearing before the commission, at a time and place to be specified in such notice. The place of any such hearing shall be the office of the commission or such other place as may be designated by it. Before or after a determination of probable cause hereunder such commissioner may also file a petition in equity in the superior court in any county in which the unlawful practice which is the subject of the complaint occurs, or in a county in which a respondent resides or transacts business, or in Suffolk county, seeking appropriate injunctive relief against such respondent, including orders or decrees restraining and enjoining him from selling, renting or otherwise making unavailable to the complainant any housing accommodations or public accommodations with respect to which the complaint is made, pending the final determination of proceedings under this chapter. An affidavit of such notice shall forthwith be filed in the clerk's office. The court shall have power to grant such temporary relief or restraining orders as it deems just and proper. The case in support of the complaint shall be presented before the commission by one of its attorneys or agents or by an attorney retained by the complainant, and the commissioner who shall have previously made the investigation and caused the notice to be issued shall not participate in the hearing except as a witness, nor shall he participate in the deliberations of the commission in such case except when necessary to decide an appeal to the full commission; and the aforesaid endeavors at conciliation shall not be received in evidence. If an investigating commissioner determines that probable cause exists to credit the allegations of a complainant that a respondent has refused to sell, rent or lease, or to negotiate in the sale, rental, or leasing of, housing accommodations or commercial space and if he determines that such respondent is a nonresident of the commonwealth and cannot be personally served with process in the commonwealth, such investigating commissioner may file a petition in equity in the nature of an in rem proceeding seeking appropriate injunctive relief against such property with respect to which a complaint has been made, including orders or decrees restraining and enjoining any sale, rental, lease, or other disposition of such property which would render it unavailable to the complainant pending the final determination of proceedings under this chapter. Such commissioner shall send by registered mail, with return receipt requested, a copy of such petition to the last address of such respondent known to the commissioner. An affidavit of compliance herewith, and the respondent's return receipt or other proof of actual notice, if received, shall be filed in the case on or before the return day of the process or within such further time as the court may allow. A copy of the order or decree of the court running against such property of a nonresident respondent shall be recorded in the registry of deeds in the county wherein such housing accommodations or commercial space is located, and a copy of such order or decree shall be attached in a conspicuous place to the property which has been the subject of a complaint under section four by the sheriff of the county wherein such property is located, or by his authorized agent or employee. Any person purchasing housing accommodations or commercial space, subsequent to the recording of the order or decree in the registry of deeds, shall be, as a matter of law, bound by the terms of any order which the commission has made or may make relating to such property which has been the subject of an order or decree of the superior court. Any person renting or leasing housing accommodations or commercial space subsequent to the attachment of a copy of an order or decree referred to above by the sheriff of the county wherein such property is located or by his authorized agent or employee shall be, as a matter of law, bound by the terms of any order which the commission has made or may make relating to such property. The respondent may file a written verified answer to the complaint and appear at such hearing in person or otherwise, with or without counsel, and submit testimony. In the discretion of the commission, the complainant may be allowed to intervene and present testimony in person or by counsel. The commission or the complainant shall have the power reasonably and fairly to amend any complaint, and the respondent shall have like power to amend his answer. The commission shall not be bound by the strict rules of evidence prevailing in courts of law or equity. The testimony taken at the hearing shall be under oath and be transcribed at the request of any party. If, upon all the evidence at the hearing the commission shall find that a respondent has engaged in any unlawful practice as defined in section four or violation of said clause (e) of said section thirty-two or said sections ninety-two A, ninety-eight and ninety-eight A, the commission shall state

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

its findings of fact and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful practice or violation of said clause (e) of said section thirty-two or said sections ninety-two A, ninety-eight and ninety-eight A to take such affirmative action, including but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership in any respondent labor organization, as, in the judgment of the commission, will effectuate the purposes of this chapter or of said clause (e) of said section thirty-two or said sections ninety-two A, ninety-eight and ninety-eight A, and including a requirement for report of the manner of compliance. Such cease and desist orders and orders for affirmative relief may be issued to operate prospectively. If, upon all the evidence, the commission shall find that a respondent has not engaged in any such unlawful practice or violation of said clause (e) of said section thirty-two or said sections ninety-two A, ninety-eight and ninety-eight A, the commission shall state its findings of fact and shall issue and cause to be served on the complainant an order dismissing the said complaint as to such respondent. In addition to any such relief, the commission shall award reasonable attorney's fees and costs to any prevailing complainant. A copy of its order shall be delivered in all cases to the attorney general and such other public officers as the commission deems proper. The commission shall establish rules of practice to govern, expedite and effectuate the foregoing procedure and its own actions thereunder. Any complaint filed pursuant to this section must be so filed within 300 days after the alleged act of discrimination. The institution of proceedings under this section, or an order thereunder, shall not be a bar to proceedings under said sections ninety-two A, ninety-eight and ninety-eight A, nor shall the institution of proceedings under said sections ninety-two A, ninety-eight and ninety-eight A, or a judgment thereunder, be a bar to proceedings under this section.

If upon all the evidence at any such hearing the commission shall find that a respondent has engaged in any such unlawful practice relative to housing or real estate or violated clause (e) of said section thirty-two it may, in addition to any other action which it may take under this section, award the petitioner damages, which damages shall include, but shall not be limited to, the expense incurred by the petitioner for obtaining alternative housing or space, for storage of goods and effects, for moving and for other costs actually incurred by him as a result of such unlawful practice or violation. Any person claiming to be aggrieved by such an award of damages may, notwithstanding the provisions of section six and within ten days of notice of such award, bring a petition in the municipal court of the city of Boston or in the district court within the judicial district of which the respondent resides, addressed to the justice of the court, praying that the action of the commission in awarding damages be reviewed by the court. After such notice to the parties as the court deems necessary, it shall hear witnesses, review such action, and determine whether or not upon all the evidence such an award was justified and thereafter affirm, modify or reverse the order of the commission. The decision of the court shall be final and conclusive upon all the parties as to all matters of fact.

If, upon all the evidence at any such hearing, the commission shall find that a respondent has engaged in any such unlawful practice, it may, in addition to any other action which it may take under this section, assess a civil penalty against the respondent:

(a) in an amount not to exceed $10,000 if the respondent has not been adjudged to have committed any prior discriminatory practice;

(b) in an amount not to exceed $25,000 if the respondent has-been adjudged to have committed one other discriminatory practice during the 5-year period ending on the date of the filing of the complaint; and

(c) in an amount not to exceed $50,000 if the respondent has been adjudged to have committed 2 or more discriminatory practices during the 7-year period ending on the date of the filing of the complaint. Notwithstanding the aforesaid provisions, if the acts constituting the discriminatory practice that is the object of the complaint are committed by the same natural person who has been previously adjudged to have committed acts constituting a discriminatory practice, then the civil penalties set forth in clauses (b) and (c) may be imposed without regard to the period of time within which any subsequent discriminatory practice occurred.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Credits**

Added by St.1946, c. 368, § 4. Amended by St.1950, c. 479, § 4; St.1957, c. 426, § 4; St.1961, c. 570; St.1963, c. 613, § 2; St.1965, c. 569; St.1967, c. 483; St.1967, c. 525; St.1968, c. 719, §§ 1, 2; St.1968, c. 727; St.1969, c. 751, §§ 10 to 12; St.1972, c. 212; St.1976, c. 463, § 3; St.1983, c. 628, §§ 4, 5; St.1989, c. 722, §§ 24 to 29; St.2002, c. 223, § 1; St.2003, c. 26, § 438, eff. July 1, 2003.

Notes of Decisions (517)

M.G.L.A. 151B § 5, MA ST 151B § 5
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XXI. Labor and Industries (Ch. 149-154)
Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin, Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 6

§ 6. Review of commission's order; court order for enforcement;
appeals; availability of commission's copy of testimony; limitations

Currentness

Any complainant, respondent or other person aggrieved by such order of the commission may obtain judicial review thereof, and the commission may obtain an order of court for its enforcement, in a proceeding as provided in this section. Such proceeding shall be brought in the superior court of the commonwealth within any county wherein the unlawful practice which is the subject of the commission's order occurs or wherein any person required in the order to cease and desist from an unlawful practice or to take other affirmative action resides or transacts business. Such proceeding shall be initiated by the filing of a petition in such court, together with a written transcript of the record upon the hearing before the commission, and issuance and service of an order of notice as in proceedings in equity. The court shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter upon the pleadings, testimony and proceedings set forth in such transcript an order or decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the commission, with full power to issue injunctions against any respondent and to punish for contempt thereof. No objection that has not been urged before the commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. Any party may move the court to remit the case to the commission in the interests of justice for the purpose of adducing additional specified and material evidence and seeking findings thereon, provided he shows reasonable grounds for the failure to adduce such evidence before the commission. The order or decision of the commission shall be reviewed in accordance with the standards for review provided in paragraph (7) of section fourteen of chapter thirty A. All such proceedings shall be heard and determined by the court as expeditiously as possible and shall take precedence over all other matters before it, except matters of like nature. The jurisdiction of the superior court shall be exclusive and its final order or decree shall be subject to review by the supreme judicial court in the same manner and form and with the same effect as in appeals from a final order or decree in proceedings in equity. The commission's copy of the testimony shall be available at all reasonable times to all parties for examination without cost and for the purposes of judicial review of the order of the commission. The review shall be heard on the record without requirement of printing. The commission may appear in court by one of its attorneys. A proceeding under this section when instituted by any complainant, respondent or other person aggrieved must be instituted within thirty days after the service of the order of the commission.

**Credits**

Added by St.1946, c. 368, § 4. Amended by St.1954, c. 681, § 13; St.1957, c. 426, § 5; St.1987, c. 465, § 38.

Notes of Decisions (47)

M.G.L.A. 151B § 6, MA ST 151B § 6
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XXI. Labor and Industries (Ch. 149-154)
            Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
            Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 7

§ 7. Posting notices setting forth excerpts of statute and other information; refusal to post

Currentness

Every employer, employment agency, real estate agency, rental office, labor union, institutional creditor, proprietor of a business or of a place of public accommodation, or other person, corporation, or group subject to this chapter, shall post in a conspicuous place or places on his premises a notice to be prepared or approved by the commission, which shall set forth excerpts of this chapter and such other relevant information which the commission deems necessary to explain the chapter. Any employer, employment agency, real estate agency, rental office, labor union, institutional creditor, proprietor of a business or of a place of public accommodation, or other person, corporation, or group subject to this chapter, who refuses to comply with the provisions of this section shall be punished by a fine of not less than ten dollars nor more than one hundred dollars. A subsequent violation of this section by the same person, corporation, or group, if such violation occurs more than sixty days from a prior conviction for violation of this section, shall be punished by a fine of not less than one hundred dollars nor more than one thousand dollars.

**Credits**
Added by St.1946, c. 368, § 4. Amended by St.1963, c. 613, § 3; St.1974, c. 483.

Notes of Decisions (1)

M.G.L.A. 151B § 7, MA ST 151B § 7
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext° © 2015 Thomson Reuters. No claim to original U.S. Government Works.                    1

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XXI. Labor and Industries (Ch. 149-154)
      Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
      Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 8

§ 8. Interference with commission; violation of order

Currentness

Any person, employer, labor organization or employment agency, who or which shall wilfully resist, prevent, impede or interfere with the commission or any of its members or representatives in the performance of duty under this chapter, or shall wilfully violate a final order of the commission shall be punished for each offense by imprisonment for not more than one year, or by a fine of not more than five hundred dollars, or by both; but procedure for the review of the order shall not be deemed to be such wilful conduct.

**Credits**
Added by St.1946, c. 368, § 4. Amended by St.1989, c. 722, § 30.

Notes of Decisions (2)

M.G.L.A. 151B § 8, MA ST 151B § 8
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XXI. Labor and Industries (Ch. 149-154)
Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin, Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 9

§ 9. Construction and enforcement of chapter; inconsistent laws; exclusiveness of statutory procedure; civil remedies; speedy trial; attorney's fees and costs; damages

Effective: November 5, 2002

Currentness

This chapter shall be construed liberally for the accomplishment of its purposes, and any law inconsistent with any provision of this chapter shall not apply, but nothing contained in this chapter shall be deemed to repeal any provision of any other law of this commonwealth relating to discrimination; but, as to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive; and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned.

Any person claiming to be aggrieved by a practice made unlawful under this chapter or under chapter one hundred and fifty-one C, or by any other unlawful practice within the jurisdiction of the commission, may, at the expiration of ninety days after the filing of a complaint with the commission, or sooner if a commissioner assents in writing, but not later than three years after the alleged unlawful practice occurred, bring a civil action for damages or injunctive relief or both in the superior or probate court for the county in which the alleged unlawful practice occurred or in the housing court within whose district the alleged unlawful practice occurred if the unlawful practice involves residential housing. The petitioner shall notify the commission of the filing of the action, and any complaint before the commission shall then be dismissed without prejudice, and the petitioner shall be barred from subsequently bringing a complaint on the same matter before the commission. Any person claiming to be aggrieved by an unlawful practice relative to housing under this chapter, but who has not filed a complaint pursuant to section five, may commence a civil action in the superior or probate court for the county in which the alleged unlawful practice occurred or in the housing court within whose district the alleged unlawful practice occurred; provided, however, that such action shall not be commenced later than one year after the alleged unlawful practice has occurred. An aggrieved person may also seek temporary injunctive relief in the superior, housing or probate court within such county at any time to prevent irreparable injury during the pendency of or prior to the filing of a complaint with the commission.

An action filed pursuant to this section shall be advanced for a speedy trial at the request of the petitioner. If the court finds for the petitioner, it may award the petitioner actual and punitive damages. If the court finds for the petitioner it shall, in addition to any other relief and irrespective of the amount in controversy, award the petitioner reasonable attorney's fees and costs unless special circumstances would render such an award unjust. The commission shall, upon the filing of any complaint with it, notify the aggrieved person of his rights under this section.

Any person claiming to be aggrieved by a practice concerning age discrimination in employment made unlawful by section four may bring a civil action under this section for damages or injunctive relief, or both, and shall be entitled to a trial by jury on any issue of fact in an action for damages regardless of whether equitable relief is sought by a party in such action. If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the act or practice complained of was committed with knowledge, or reason to know, that such act or practice violated the provisions of said section four. The provisions set forth in the first, second and third paragraphs shall be applicable to such complaint or action to the extent that such provisions do not conflict with the provisions set forth in this paragraph.

**Credits**

Added by St.1946, c. 368, § 4. Amended by St.1950, c. 697, § 9; St.1963, c. 613, § 4; St.1965, c. 397, § 7; St.1974, c. 478; St.1986, c. 94, § 1; St.1989, c. 722, § 31; St.1990, c. 395; St.1991, c. 323, §§ 2 to 4; St.2002, c. 223, § 2.

Notes of Decisions (326)

M.G.L.A. 151B § 9, MA ST 151B § 9

Current through Chapters 1 to 505 of the 2014 2nd Annual Session

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XXI. Labor and Industries (Ch. 149-154)
            Chapter 151B. Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,
            Ancestry or Sex (Refs & Annos)

M.G.L.A. 151B § 10

§ 10. Partial invalidity

Currentness

If any provision of this chapter or the application thereof to any person or circumstance, shall, for any reason, be held invalid, the remainder of this chapter or the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

**Credits**

Added by St.1946, c. 368, § 4.

M.G.L.A. 151B § 10, MA ST 151B § 10
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title IV. Civil Service, Retirements and Pensions (Ch. 31-32b)
            Chapter 31. Civil Service (Refs & Annos)

M.G.L.A. 31 § 5

§ 5. Powers and duties of administrator

Currentness

In addition to his other powers and duties, imposed upon him by this chapter, chapter seven and chapter thirty the administrator shall have the following powers and duties:

(a) To administer, enforce and comply with the civil service law and rules and the decisions of the commission.

(b) Establish, with the approval of the commission, classification plans for positions in every city and town which are subject to any provisions of this chapter. Upon the establishment of each such classification plan, the administrator shall forthwith make such plan effective. He shall keep said classification plan current and, with like approval, may from time to time amend or change said classification plan. Failure of the commission to approve or reject said amendment or change within ninety days after the request by the administrator for approval thereof shall constitute an approval of said amendment or change.

(c) To approve or disapprove specifications and qualifications submitted by an appointing authority in a city or town or other political subdivision of the commonwealth for any civil service position; and, in the case of any disapproval, to establish such specifications and qualifications when, in his opinion, the appointing authority has failed to furnish satisfactory specifications and qualifications within thirty days after notice to the appointing authority of such disapproval.

(d) To evaluate the qualifications of applicants for civil service positions.

(e) To conduct examinations for purposes of establishing eligible lists.

(f) To establish such mandatory standards for civil service positions as he determines to be necessary, including standards designed to facilitate the employment of handicapped persons, disadvantaged persons and persons who have been convicted of criminal offenses.

(g) To develop and to assist appointing authorities in developing programs and opportunities for the employment of handicapped and disadvantaged persons and for the rehabilitation and employment of persons who have been convicted of criminal offenses.

(h) To maintain records of the following: examinations which have been conducted, eligible lists and registers which have been established, the names of persons certified for original and promotional appointment, and all permanent, provisional and temporary appointments to civil service positions.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.          1

(i) When he shall determine to be necessary, to examine or direct the examination of and to investigate payrolls and bills and accounts for the payment of salaries and compensation for service in civil service positions.

(j) On or before October first each year, to submit a written report to the general court, the governor, the commission, and the state library describing the activities of the division during the previous fiscal year. Such report shall include data on examinations and appointments and any recommendations of the administrator for the improvement of the operation of the division.

(k) To establish a recruitment program to recruit applicants for civil service positions.

(*l* ) To delegate the administrative functions of the civil service system, so far as practicable, to the various state agencies and cities and towns of the commonwealth.

(m) To act as a coordinator and technical assistant in the development and training programs to the various state agencies and cities and towns of the commonwealth.

(n) To establish a schedule of fees to be collected from applicants taking non-promotional civil service examinations, and to provide for the waiver of such fees in appropriate instances.

(o) To establish and act as coordinator of a career management service program for employees of the commonwealth.

(p) To provide training programs and technical expertise on the substantive and procedural issues involved in disciplinary actions involving the various state agencies.

**Credits**

Added by St.1978, c. 393, § 11. Amended by St.1981, c. 767, § 14.

Notes of Decisions (34)

M.G.L.A. 31 § 5, MA ST 31 § 5
Current through Chapters 1 to 505 of the 2014 2nd Annual Session

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title I. Jurisdiction and Emblems of the Commonwealth, the General Court, Statutes and Public
    Documents (Ch. 1-5)
      Chapter 4. Statutes (Refs & Annos)

M.G.L.A. 4 § 7

§ 7. Definitions of statutory terms; statutory construction

Effective: September 9, 2014

Currentness

In construing statutes the following words shall have the meanings herein given, unless a contrary intention clearly appears:

First, "Aldermen", "board of aldermen", "mayor and aldermen", "city council" or "mayor" shall, in a city which has no such body or officer, mean the board or officer having like powers or duties.

Second, "Annual meeting", when applied to towns, shall mean the annual meeting required by law to be held in the month of February, March or April.

Second A, "Appointing authority", when used in connection with the operation of municipal governments shall include the mayor of a city and the board of selectmen of a town unless some other local office is designated as the appointing authority under the provisions of a local charter.

Third, "Assessor" shall include any person chosen or appointed in accordance with law to perform the duties of an assessor.

Third A, "Board of selectmen", when used in connection with the operation of municipal governments shall include any other local office which is performing the duties of a board of selectmen, in whole or in part, under the provisions of a local charter.

<[ There is no clause Fourth.]>

Fifth, "Charter", when used in connection with the operation of city and town government shall include a written instrument adopted, amended or revised pursuant to the provisions of chapter forty-three B which establishes and defines the structure of city and town government for a particular community and which may create local offices, and distribute powers, duties and responsibilities among local offices and which may establish and define certain procedures to be followed by the city or town government. Special laws enacted by the general court applicable only to one city or town shall be deemed to have the force of a charter and may be amended, repealed and revised in accordance with the provisions of chapter forty-three B unless any such special law contains a specific prohibition against such action.

Fifth A, "Chief administrative officer", when used in connection with the operation of municipal governments, shall include the mayor of a city and the board of selectmen in a town unless some other local office is designated to be the chief administrative officer under the provisions of a local charter.

Fifth B, "Chief executive officer", when used in connection with the operation of municipal governments shall include the mayor in a city and the board of selectmen in a town unless some other municipal office is designated to be the chief executive officer under the provisions of a local charter.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.                                     1

Sixth, "City solicitor" shall include the head of the legal department of a city or town.

Sixth A, "Coterminous", shall mean, when applied to the term of office of a person appointed by the governor, the period from the date of appointment and qualification to the end of the term of said governor; provided that such person shall serve until his successor is appointed and qualified; and provided, further, that the governor may remove such person at any time, subject however to the condition that if such person receives notice of the termination of his appointment he shall have the right, at his request, to a hearing within thirty days from receipt of such notice at which hearing the governor shall show cause for such removal, and that during the period following receipt of such notice and until final determination said person shall receive his usual compensation but shall be deemed suspended from his office.

Seventh, "District", when applied to courts or the justices or other officials thereof, shall include municipal.

Eighth, "Dukes", "Dukes county" or "county of Dukes" shall mean the county of Dukes county.

Ninth, "Fiscal year", when used with reference to any of the offices, departments, boards, commissions, institutions or undertakings of the commonwealth, shall mean the year beginning with July first and ending with the following June thirtieth.

Tenth, "Illegal gaming," a banking or percentage game played with cards, dice, tiles or dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks, credit or any representative of value, but excluding: (i) a lottery game conducted by the state lottery commission, under sections 24, 24A and 27 of chapter 10; (ii) a game conducted under chapter 23K; (iii) pari-mutuel wagering on horse races under chapters 128A and 128C and greyhound races under said chapter 128C; (iv) a game of bingo conducted under chapter 271; and (v) charitable gaming conducted under said chapter 271.

Eleventh, "Grantor" may include every person from or by whom a freehold estate or interest passes in or by any deed; and "grantee" may include every person to whom such estate or interest so passes.

Twelfth, "Highway", "townway", "public way" or "way" shall include a bridge which is a part thereof.

Thirteenth, "In books", when used relative to the records of cities and towns, shall not prohibit the making of such records on separate leaves, if such leaves are bound in a permanent book upon the completion of a sufficient number of them to make an ordinary volume.

Fourteenth, "Inhabitant" may mean a resident in any city or town.

<[ There is no clause Fifteenth.]>

Sixteenth, "Issue", as applied to the descent of estates, shall include all the lawful lineal descendants of the ancestor.

Seventeenth, "Land", "lands" and "real estate" shall include lands, tenements and hereditaments, and all rights thereto and interests therein; and "recorded", as applied to plans, deeds or other instruments affecting land, shall, as affecting registered land, mean filed and registered.

Eighteenth, "Legal holiday" shall include January first, July fourth, November eleventh, and Christmas Day, or the day following when any of said days occurs on Sunday, and the third Monday in January, the third Monday in February, the third Monday in April, the last Monday in May, the first Monday in September, the second Monday in October, and Thanksgiving Day. "Legal holiday" shall also include, with respect to Suffolk county only, Evacuation Day, on March seventeenth, and Bunker Hill Day, on June seventeenth, or the day following when said days occur on Sunday; provided, however, that all state and municipal agencies, authorities, quasi-public entities or other offices located in Suffolk county shall be open for business

and appropriately staffed on Evacuation Day, on March seventeenth, and Bunker Hill Day, on June seventeenth, and that section forty-five of chapter one hundred and forty-nine shall not apply to Evacuation Day, on March seventeenth, and Bunker Hill Day, on June seventeenth, or the day following when said days occur on Sunday.

Eighteenth A, "Commemoration day" shall include March fifteenth, in honor of Peter Francisco day, May twentieth, in honor of General Marquis de Lafayette and May twenty-ninth, in honor of the birthday of President John F. Kennedy. The governor shall issue a proclamation in connection with each such commemoration day.

Eighteenth B, "Legislative body", when used in connection with the operation of municipal governments shall include that agency of the municipal government which is empowered to enact ordinances or by-laws, adopt an annual budget and other spending authorizations, loan orders, bond authorizations and other financial matters and whether styled a city council, board of aldermen, town council, town meeting or by any other title.

Nineteenth, "Month" shall mean a calendar month, except that, when used in a statute providing for punishment by imprisonment, one "month" or a multiple thereof shall mean a period of thirty days or the corresponding multiple thereof; and "year", a calendar year.

Nineteenth A, "Municipality" shall mean a city or town.

Twentieth, "Net indebtedness" shall mean the indebtedness of a county, city, town or district, omitting debts created for supplying the inhabitants with water and other debts exempted from the operation of the law limiting their indebtedness, and deducting the amount of sinking funds available for the payment of the indebtedness included.

Twenty-first, "Oath" shall include affirmation in cases where by law an affirmation may be substituted for an oath.

Twenty-second, "Ordinance", as applied to cities, shall be synonymous with by-law.

Twenty-third, "Person" or "whoever" shall include corporations, societies, associations and partnerships.

Twenty-fourth, "Place" may mean a city or town.

Twenty-fifth, "Preceding" or "following", used with reference to any section of the statutes, shall mean the section last preceding or next following, unless some other section is expressly designated in such reference.

Twenty-sixth, "Public records" shall mean all books, papers, maps, photographs, recorded tapes, financial statements, statistical tabulations, or other documentary materials or data, regardless of physical form or characteristics, made or received by any officer or employee of any agency, executive office, department, board, commission, bureau, division or authority of the commonwealth, or of any political subdivision thereof, or of any authority established by the general court to serve a public purpose, or any person, corporation, association, partnership or other legal entity which receives or expends public funds for the payment or administration of pensions for any current or former employees of the commonwealth or any political subdivision as defined in section 1 of chapter 32, unless such materials or data fall within the following exemptions in that they are:

(a) specifically or by necessary implication exempted from disclosure by statute;

(b) related solely to internal personnel rules and practices of the government unit, provided however, that such records shall be withheld only to the extent that proper performance of necessary governmental functions requires such withholding;

(c) personnel and medical files or information; also any other materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy;

(d) inter-agency or intra-agency memoranda or letters relating to policy positions being developed by the agency; but this subclause shall not apply to reasonably completed factual studies or reports on which the development of such policy positions has been or may be based;

(e) notebooks and other materials prepared by an employee of the commonwealth which are personal to him and not maintained as part of the files of the governmental unit;

(f) investigatory materials necessarily compiled out of the public view by law enforcement or other investigatory officials the disclosure of which materials would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest;

(g) trade secrets or commercial or financial information voluntarily provided to an agency for use in developing governmental policy and upon a promise of confidentiality; but this subclause shall not apply to information submitted as required by law or as a condition of receiving a governmental contract or other benefit;

(h) proposals and bids to enter into any contract or agreement until the time for the opening of bids in the case of proposals or bids to be opened publicly, and until the time for the receipt of bids or proposals has expired in all other cases; and inter-agency or intra-agency communications made in connection with an evaluation process for reviewing bids or proposals, prior to a decision to enter into negotiations with or to award a contract to, a particular person;

(i) appraisals of real property acquired or to be acquired until (1) a final agreement is entered into; or (2) any litigation relative to such appraisal has been terminated; or (3) the time within which to commence such litigation has expired;

(j) the names and addresses of any persons contained in, or referred to in, any applications for any licenses to carry or possess firearms issued pursuant to chapter one hundred and forty or any firearms identification cards issued pursuant to said chapter one hundred and forty and the names and addresses on sales or transfers of any firearms, rifles, shotguns, or machine guns or ammunition therefor, as defined in said chapter one hundred and forty and the names and addresses on said licenses or cards;

<[ There is no subclause (k).]>

(*l*) questions and answers, scoring keys and sheets and other materials used to develop, administer or score a test, examination or assessment instrument; provided, however, that such materials are intended to be used for another test, examination or assessment instrument;

(m) contracts for hospital or related health care services between (i) any hospital, clinic or other health care facility operated by a unit of state, county or municipal government and (ii) a health maintenance organization arrangement approved under chapter one hundred and seventy-six *I*, a nonprofit hospital service corporation or medical service corporation organized pursuant to chapter one hundred and seventy-six A and chapter one hundred and seventy-six B, respectively, a health insurance corporation licensed under chapter one hundred and seventy-five or any legal entity that is self insured and provides health care benefits to its employees.

(n) records, including, but not limited to, blueprints, plans, policies, procedures and schematic drawings, which relate to internal layout and structural elements, security measures, emergency preparedness, threat or vulnerability assessments, or any other records relating to the security or safety of persons or buildings, structures, facilities, utilities, transportation or other infrastructure located within the commonwealth, the disclosure of which, in the reasonable judgment of the record custodian, subject to review by the supervisor of public records under subsection (b) of section 10 of chapter 66, is likely to jeopardize public safety.

(o) the home address and home telephone number of an employee of the judicial branch, an unelected employee of the general court, an agency, executive office, department, board, commission, bureau, division or authority of the commonwealth, or of a political subdivision thereof or of an authority established by the general court to serve a public purpose, in the custody of a government agency which maintains records identifying persons as falling within those categories; provided that the information may be disclosed to an employee organization under chapter 150E, a nonprofit organization for retired public employees under chapter 180, or a criminal justice agency as defined in section 167 of chapter 6.

(p) the name, home address and home telephone number of a family member of a commonwealth employee, contained in a record in the custody of a government agency which maintains records identifying persons as falling within the categories listed in subclause (o).

(q) Adoption contact information and indices therefore of the adoption contact registry established by section 31 of chapter 46.

(r) Information and records acquired under chapter 18C by the office of the child advocate.

(s) trade secrets or confidential, competitively-sensitive or other proprietary information provided in the course of activities conducted by a governmental body as an energy supplier under a license granted by the department of public utilities pursuant to section 1F of chapter 164, in the course of activities conducted as a municipal aggregator under section 134 of said chapter 164 or in the course of activities conducted by a cooperative consisting of governmental entities organized pursuant to section 136 of said chapter 164, when such governmental body, municipal aggregator or cooperative determines that such disclosure will adversely affect its ability to conduct business in relation to other entities making, selling or distributing electric power and energy; provided, however, that this subclause shall not exempt a public entity from disclosure required of a private entity so licensed.

(t) statements filed under section 20C of chapter 32.

(u) trade secrets or other proprietary information of the University of Massachusetts, including trade secrets or proprietary information provided to the University by research sponsors or private concerns.

Any person denied access to public records may pursue the remedy provided for in section ten of chapter sixty-six.

Twenty-seventh, "Salary" shall mean annual salary.

Twenty-eighth, "Savings banks" shall include institutions for savings.

<[ There is no clause Twenty-ninth.]>

Thirtieth, "Spendthrift" shall mean a person who is liable to be put under guardianship on account of excessive drinking, gaming, idleness or debauchery.

Thirty-first, "State", when applied to the different parts of the United States, shall extend to and include the District of Columbia and the several territories; and the words "United States" shall include said district and territories.

Thirty-second, "State auditor" and "state secretary" shall mean respectively the auditor of the commonwealth and the secretary of the commonwealth. "State treasurer" or "treasurer of the commonwealth" shall mean the treasurer and receiver general as used in the constitution of the commonwealth, and shall have the same meaning in all contracts, instruments, securities and other documents.

Thirty-third, "Swear" shall include affirm in cases in which an affirmation may be substituted for an oath. When applied to public officers who are required by the constitution to take oaths therein prescribed, it shall refer to those oaths; and when applied to any other officer it shall mean sworn to the faithful performance of his official duties.

Thirty-fourth, "Town", when applied to towns or officers or employees thereof, shall include city.

Thirty-fifth, "Valuation", as applied to a town, shall mean the valuation of such town as determined by the last preceding apportionment made for the purposes of the state tax.

Thirty-sixth, "Water district" shall include water supply district.

Thirty-seventh, "Will" shall include codicils.

Thirty-eighth, "Written" and "in writing" shall include printing, engraving, lithographing and any other mode of representing words and letters; but if the written signature of a person is required by law, it shall always be his own handwriting or, if he is unable to write, his mark.

Thirty-ninth, "Annual election", as applied to municipal elections in cities holding such elections biennially, shall mean biennial election.

Fortieth, "Surety" or "Sureties", when used with reference to a fidelity bond of an officer or employee of a county, city, town or district, shall mean a surety company authorized to transact business in the commonwealth.

Forty-first, "Population", when used in connection with the number of inhabitants of a county, city, town or district, shall mean the population as determined by the last preceding national census.

<[ There is no clause Forty-second.]>

Forty-third, "Veteran" shall mean (1) any person, (a) whose last discharge or release from his wartime service as defined herein, was under honorable conditions and who (b) served in the army, navy, marine corps, coast guard, or air force of the United States, or on full time national guard duty under Titles 10 or 32 of the United States Code or under sections 38, 40 and 41 of chapter 33 for not less than 90 days active service, at least 1 day of which was for wartime service; provided, however, than any person who so served in wartime and was awarded a service-connected disability or a Purple Heart, or who died in such service under conditions other than dishonorable, shall be deemed to be a veteran notwithstanding his failure to complete 90 days of active service; (2) a member of the American Merchant Marine who served in armed conflict between December 7, 1941 and December 31, 1946, and who has received honorable discharges from the United States Coast Guard, Army, or Navy; (3) any person (a) whose last discharge from active service was under honorable conditions, and who (b) served in the army, navy, marine corps, coast guard, or air force of the United States for not less than 180 days active service; provided, however, that any person who so served and was awarded a service-connected disability or who died in such service under conditions other than dishonorable, shall be deemed to be a veteran notwithstanding his failure to complete 180 days of active service.

"Wartime service" shall mean service performed by a "Spanish War veteran", a "World War I veteran", a "World War II veteran", a "Korean veteran", a "Vietnam veteran", a "Lebanese peace keeping force veteran", a "Grenada rescue mission veteran", a "Panamanian intervention force veteran", a "Persian Gulf veteran", or a member of the "WAAC" as defined in this clause during any of the periods of time described herein or for which such medals described below are awarded.

"Spanish War veteran" shall mean any veteran who performed such wartime service between February fifteenth, eighteen hundred and ninety-eight and July fourth, nineteen hundred and two.

"World War I veteran" shall mean any veteran who (a) performed such wartime service between April sixth, nineteen hundred and seventeen and November eleventh, nineteen hundred and eighteen, or (b) has been awarded the World War I Victory Medal, or (c) performed such service between March twenty-fifth, nineteen hundred and seventeen and August fifth, nineteen hundred and seventeen, as a Massachusetts National Guardsman.

"World War II veteran" shall mean any veteran who performed such wartime service between September 16, 1940 and July 25, 1947, and was awarded a World War II Victory Medal, except that for the purposes of chapter 31 it shall mean all active service between the dates of September 16, 1940 and June 25, 1950.

"Korean veteran" shall mean any veteran who performed such wartime service between June twenty-fifth, nineteen hundred and fifty and January thirty-first, nineteen hundred and fifty-five, both dates inclusive, and any person who has received the Korea Defense Service Medal as established in the Bob Stump National Defense Authorization Act for fiscal year 2003.

"Korean emergency" shall mean the period between June twenty-fifth, nineteen hundred and fifty and January thirty-first, nineteen hundred and fifty-five, both dates inclusive.

"Vietnam veteran" shall mean (1) any person who performed such wartime service during the period commencing August fifth, nineteen hundred and sixty-four and ending on May seventh, nineteen hundred and seventy-five, both dates inclusive, or (2) any person who served at least one hundred and eighty days of active service in the armed forces of the United States during the period between February first, nineteen hundred and fifty-five and August fourth, nineteen hundred and sixty-four; provided, however, that for the purposes of the application of the provisions of chapter thirty-one, it shall also include all active service between the dates May seventh, nineteen hundred and seventy-five and June fourth, nineteen hundred and seventy-six; and provided, further, that any such person who served in said armed forces during said period and was awarded a service-connected disability or a Purple Heart, or who died in said service under conditions other than dishonorable, shall be deemed to be a veteran notwithstanding his failure to complete one hundred and eighty days of active service.

"Lebanese peace keeping force veteran" shall mean any person who performed such wartime service and received a campaign medal for such service during the period commencing August twenty-fifth, nineteen hundred and eighty-two and ending when the President of the United States shall have withdrawn armed forces from the country of Lebanon.

"Grenada rescue mission veteran" shall mean any person who performed such wartime service and received a campaign medal for such service during the period commencing October twenty-fifth, nineteen hundred and eighty-three to December fifteenth, nineteen hundred and eighty-three, inclusive.

"Panamanian intervention force veteran" shall mean any person who performed such wartime service and received a campaign medal for such service during the period commencing December twentieth, nineteen hundred and eighty-nine and ending January thirty-first, nineteen hundred and ninety.

"Persian Gulf veteran" shall mean any person who performed such wartime service during the period commencing August second, nineteen hundred and ninety and ending on a date to be determined by presidential proclamation or executive order and concurrent resolution of the Congress of the United States.

"WAAC" shall mean any woman who was discharged and so served in any corps or unit of the United States established for the purpose of enabling women to serve with, or as auxiliary to, the armed forces of the United States and such woman shall be deemed to be a veteran.

None of the following shall be deemed to be a "veteran":

(a) Any person who at the time of entering into the armed forces of the United States had declared his intention to become a subject or citizen of the United States and withdrew his intention under the provisions of the act of Congress approved July ninth, nineteen hundred and eighteen.

(b) Any person who was discharged from the said armed forces on his own application or solicitation by reason of his being an enemy alien.

(c) Any person who has been proved guilty of wilful desertion.

(d) Any person whose only service in the armed forces of the United States consists of his service as a member of the coast guard auxiliary or as a temporary member of the coast guard reserve, or both.

(e) Any person whose last discharge or release from the armed forces is dishonorable.

"Armed forces" shall include army, navy, marine corps, air force and coast guard.

"Active service in the armed forces", as used in this clause shall not include active duty for training in the army national guard or air national guard or active duty for training as a reservist in the armed forces of the United States.

Forty-fourth, "Registered mail", when used with reference to the sending of notice or of any article having no intrinsic value shall include certified mail.

Forty-fifth, "Pledge", "Mortgage", "Conditional Sale", "Lien", "Assignment" and like terms, when used in referring to a security interest in personal property shall include a corresponding type of security interest under chapter one hundred and six of the General Laws, the Uniform Commercial Code.

Forty-sixth, "Forester", "state forester" and "state fire warden" shall mean the commissioner of environmental management or his designee.

<[ Clause Forty-seventh effective until September 9, 2014. For text effective September 9, 2014, see below.]>

Forty-seventh, "Fire fighter", "fireman" or "permanent member of a fire department", shall include the chief or other uniformed officer performing similar duties, however entitled, and all other fire officers of a fire department, including, without limitation, any permanent crash crewman, crash boatman, fire controlman or assistant fire controlman employed at the General Edward Lawrence Logan International Airport, or members of the Massachusetts military reservation fire department.

<[ Clause Forty-seventh as amended by 2014, 313, Sec. 1 effective
September 9, 2014. For text effective until September 9, 2014, see above.]>

Forty-seventh, "Fire fighter", "fireman" or "permanent member of a fire department", shall include the chief or other uniformed officer performing similar duties, however entitled, and all other fire officers of a fire department, including, without limitation, any permanent crash crewman, crash boatman, fire controlman or assistant fire controlman employed at the General Edward Lawrence Logan International Airport, members of the 104th fighter wing fire department or members of the Massachusetts military reservation fire department.

Forty-eighth, "Minor" shall mean any person under eighteen years of age.

Forty-ninth, "Full age" shall mean eighteen years of age or older.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Fiftieth, "Adult" shall mean any person who has attained the age of eighteen.

Fifty-first, "Age of majority" shall mean eighteen years of age.

Fifty-second, "Superior court" shall mean the superior court department of the trial court, or a session thereof for holding court.

Fifty-third, "Land court" shall mean the land court department of the trial court, or a session thereof for holding court.

Fifty-fourth, "Probate court", "court of insolvency" or "probate and insolvency court" shall mean a division of the probate and family court department of the trial court, or a session thereof for holding court.

Fifty-fifth, "Housing court" shall mean a division of the housing court department of the trial court, or a session thereof for holding court.

Fifty-sixth, "District court" or "municipal court" shall mean a division of the district court department of the trial court, or a session thereof for holding court, except that when the context means something to the contrary, said words shall include the Boston municipal court department.

Fifty-seventh, "Municipal court of the city of Boston" shall mean the Boston municipal court department of the trial court, or a session thereof for holding court.

Fifty-eighth, "Juvenile court" shall mean a division of the juvenile court department of the trial court, or a session thereof for holding court.

Fifty-ninth, "Gender identity" shall mean a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth. Gender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose.

**Credits**

Amended by St.1934, c. 283; St.1935, c. 26; St.1936, c. 180; St.1937, c. 38; St.1938, c. 245; St.1941, c. 91, § 1; St.1941, c. 509, § 1; St.1945, c. 242, § 1; St.1945, c. 637, § 1; St.1946, c. 190; St.1948, c. 241; St.1951, c. 215, § 1; St.1953, c. 319, § 2; St.1954, c. 128, § 1; St.1954, c. 627, § 1; St.1955, c. 99, §§ 1, 2; St.1955, c. 403, § 1; St.1955, c. 683; St. 1956, c. 281, §§ 1, 2; St.1957, c. 164, § 1; St.1957, c. 765, § 3; St.1958, c. 140; St.1958, c. 626, § 1; St.1960, c. 299; St.1960, c. 544, § 1; St.1960, c. 812, § 1; St.1962, c. 427, § 1; St.1962, c. 616, § 1; St.1964, c. 322; St.1965, c. 875, §§ 1, 2; St.1966, c. 716; St.1967, c. 437; St.1967, c. 844, § 23; St.1968, c. 24, § 1; St.1968, c. 531, § 1; St.1969, c. 544, § 1; St.1969, c. 831, § 2; St.1970, c. 215, § 1; St.1973, c. 925, § 1; St.1973, c. 1050, § 1; St.1974, c. 205, § 1; St.1974, c. 493, § 1; St.1975, c. 706, § 2; St.1976, c. 112, § 1; St.1976, c. 156; St.1977, c. 130; St.1977, c. 691, § 1; St.1977, c. 977; St.1978, c. 12; St.1978, c. 247; St.1978, c. 478, § 2; St.1979, c. 230; St.1982, c. 189, § 2; St.1983, c. 113; St.1984, c. 363, §§ 1 to 4; St.1985, c. 114; St.1985, c. 220; St.1985, c. 451, § 1; St.1986, c. 534, §§ 1, 2; St.1987, c. 465, §§ 1, 1A; St.1987, c. 522, § 1; St.1987, c. 587, § 1; St.1988, c. 180, § 1; St.1989, c. 665, § 1; St.1991, c. 109, §§ 1, 2; St.1992, c. 133, § 169; St.1992, c. 286, § 1; St.1992, c. 403, § 1; St.1996, c. 204, § 3; St.1996, c. 450, §§ 1 to 4; St.2002, c. 313, § 1; St.2004, c. 116, § 1, eff. Aug. 26, 2004; St.2004, c. 122, § 2, eff. Sept. 1, 2004; St.2004, c. 149, § 8, eff. July 1, 2004; St.2004, c. 349, eff. Dec. 15, 2004; St.2005, c. 130, § 1, eff. Nov. 11, 2005; St.2007, c. 109, § 1, eff. Dec. 5, 2007; St.2008, c. 176, § 2, eff. July 8, 2008; St.2008, c. 308, § 1, eff. Sept. 1, 2008; St.2008, c. 445, § 1, eff. Mar. 30, 2009; St.2010, c. 131, § 5, eff. July 1, 2010; St.2011, c. 176, § 1, eff. Feb. 16, 2012; St.2011, c. 194,

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

§ 3, eff. Nov. 22, 2011; St.2011, c. 199, § 1, eff. July 1, 2012; St.2012, c. 139, § 5, eff. July 1, 2012; St.2013, c. 38, § 4, eff. July 1, 2013; St.2014, c. 313, § 1, eff. Sept. 9, 2014.

Notes of Decisions (154)

M.G.L.A. 4 § 7, MA ST 4 § 7

Current through Chapters 1 to 505 of the 2014 2nd Annual Session

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                        SUPERIOR COURT
                                                   CIVIL ACTION NO. 09-1254


THOMAS PRATT, et al.

vs.

PAUL DIETL, in his official capacity as
Chief Human Resources Officer of the Commonwealth of Massachusetts
and as Executive of the Human Resources Division,
and the CIVIL SERVICE COMMISSION


## MEMORANDUM OF DECISION AND ORDER
## ON THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

In this matter, several police officers who took the 2008 Police Promotional Sergeant, Lieutenant and Captain Examinations (Promotional Exams), and unions[1] which represent them, have challenged the decision of the Massachusetts Human Resources Division (HRD) to employ a new method of issuing scores used to establish the eligibility lists for promotions of police officers. Having heard from the parties and having reviewed their written submissions and the applicable statutes and case law, I find that the plaintiffs' request for a preliminary injunction should be **ALLOWED.**


### Factual and Statutory Background

With some minor differences, the parties are in agreement as to the factual and statutory background, at least for purposes of this preliminary injunction matter. The following summary is taken from the Plaintiffs' Memorandum In Support Of Their Motion For Preliminary Injunction, with which the defendants have indicated their agreement for the purposes of the preliminary

---

[1] While there is some question as to whether the unions have standing in this matter, I have allowed two motions to intervene brought by unions as well as individual plaintiffs so that all of the parties could be heard before the issuance of this decision. The defendants have objected to that intervention and may make appropriate motions to dismiss if such are warranted.

1

injunction issues.

### HRD Personnel Administration Rules

The promotion of police officers within all cities and towns electing coverage under the civil service system is administered and overseen by HRD, pursuant to G.L. c. 31. Under the authority granted to it in G.L. c. 31, §3, HRD has established a set of Personnel Administration Rules (PAR)(Attachment C, Verified Complaint). That section empowers the agency to "make and amend rules which shall regulate the recruitment, selection, training and employment of persons for civil service positions." However, there are certain requirements and oversight within the rule-making process. Section 3 provides that "the [civil service] commission shall review such rules and in the event the commission determines that any proposed rule violates the basic merit principles outlined in this chapter, it may, within fifteen days of receipt of such proposed rule, by a three-fifths vote, disapprove such proposed rule." Section 4 of Chapter 31 calls for HRD to undertake an extensive process to enact new rules or to amend existing ones. (See Attachment 1 to Affidavit of Sally McNeely).

### The Civil Service Promotional System

To gain promotion within the civil service system, police officers take examinations designed, administered, and scored by HRD. See G.L. c. 31, §§5(e)(h), 7, 16; PAR.06. In addition to the examination, HRD also includes an "employment and experience" component in establishing the final marks of an examination. G.L. c. 31, §22. Once the grading is complete, HRD establishes eligibility lists for each promotional position in each community, with the candidates rank-ordered by their scores. G.L. c. 31, §25. Under PAR.07(4), "The examination marks shall be presented on eligible lists in whole numbers." Pursuant to this rule, HRD has listed candidates' scores with a whole number grading system of 1-100 for many years.

When a municipality desires to make a promotion, it submits a requisition to HRD, which certifies to it a list of candidates under the "2N+1" formula. See G.L. c. 31, §27; PAR.08. Thus, if a city needs to fill one sergeant slot, it gets back from HRD a list of the three highest-scoring candidates on the eligibility list. For two sergeants, it gets a list with five names under the "2N+1"

2

formula. When there are tie scores, HRD certifies a list with the fewest names needed to meet that formula. If a municipality seeks to fill one sergeant position, and the eligibility list has officers with scores of 91, 87, and three tied at 86, all five names would be certified for the position.

Once it receives the certified list, the municipality may select from among those on the list, but if it selects a candidate who is not the highest on the list, it must submit reasons for doing so to HRD, which must approve them. G.L. c. 31, §27; PAR.08(3). Higher scoring candidates not selected are considered to have been "bypassed" and may appeal to the Civil Service Commission (the Commission) pursuant to G.L. c. 31, §2(b). Those tied with the selected candidate are not considered bypassed by HRD and have no right of appeal to the Commission.

In her Affidavit, Sally McNeely, formerly the Director of the Organizational Development Group of the HRD, explains how the civil service system has functioned. As an example, she notes that Paul Campbell, one of the named plaintiffs in this matter, achieved the highest raw (not banded) score on the Brookline lieutenant promotional examination in October, 2008. If Brookline requisitioned a certification list for one lieutenant vacancy, and the certification was based on raw (not banded) scores, then Campbell's name would appear first. Next would appear another candidate whose raw score was three points lower on a 1 - 100 point scale. Next would appear the names of two candidates who each achieved raw score four points lower than Campbell's score. Under the system in place now, if Brookline chose to appoint one of the officers other than Campbell, it would have to explain in writing its reasons for doing so and the Administrator of the HRD would have to pass on the validity of the reasons for the bypassing of Mr. Campbell. Campbell would have a right to appeal that decision.

### *The October 2008 Promotional Exam and the Establishment of Eligibility Lists From It*

On October 18, 2008, police officers from many cities and towns throughout the Commonwealth, including the individual plaintiffs, took promotional examinations for the positions of Police Sergeant, Police Lieutenant, and Police Captain. On or about February 13, 2009, HRD began notifying the test-takers of their individual scores. In addition, HRD announced its intention to band scores together when establishing eligibility lists for promotion. Thus, for example, all officers who scored between 85.84 and 92.91 would be placed on a sergeant eligibility list as having

3

scored in "Band 5" Under the prior practice and under PAR.07(4), such candidates would have had their scores rounded to the nearest whole number and their names placed on eligibility lists which were rank-ordered by those whole number scores.

The HRD supplements the plaintiff's statement of facts, with which it is largely in agreement, with information as to how it determined to utilize the banding of scores. According to HRD, it employed an educational consulting firm, EB Jacobs, which specializes in employment testing, to assist it in developing the October 2008 promotional examination. EB Jacobs recommended to HRD the establishment of score bands for the results of that examination. In an affidavit, Rick Jacobs of EB Jacobs set forth the rationale for the use of score bands and explained how bands widths are established for test scores. According to Mr. Jacobs, "Candidates within the same band should be considered equivalent in terms of their performance on the test. Differences in raw scores within a band should be attributable only to the lack of perfect precision in the measurement of candidate performance associated with a particular testing instrument." (Jacobs Affidavit, ¶15).

In a Memorandum to Commissioner Edward Davis of the Boston Police Department (Exhibit D, State Defendants' Opposition To Plaintiffs' Motion For Preliminary Injunction), Ms. McNeely explains the new scoring policy and its impact on the promotion process:

> An applicant's ranking on the 2008 promotional list will be based on the exam score band he or she achieves. Please be advised that promotional candidates in the same exam band score are considered tied. As such, no bypass will occur unless a promotion is made from a lower band when candidates remain unselected in a higher band.

### Proceedings Before The Civil Service Commission

On or about February 18, 2009, the plaintiffs filed an appeal under G.L. c. 31, §2(b) with the Commission challenging the proposed banding of promotional scores as violating PAR.07(4) and Chapter 31 generally. Later, plaintiffs amended their filing to include a request for an investigation under G.L. c. 31, §2(a). The Commission held a pre-hearing conference on March 3, 2009. On March 13, 2009, the Commission dismissed all appeals and rejected all claims for an investigation.

4

(See Attachments A and B, Verified Complaint).[2]

With respect to the individual plaintiffs, the Commission dismissed the §2(b) appeal on the grounds that they were not "'persons aggrieved' who have suffered 'actual harm' to their 'employment status' pursuant to G.L. c. 31, §2(b)." It rejected the unions' appeals on standing grounds. The dismissal of the individual appellant's appeals was based on the view that their claims were anticipatory, since none of them had yet to be harmed by the banding of scores on an eligibility list. The Commission declined to conduct any investigation beyond its own survey of some of the pertinent case law which had addressed the issue of banding and stated that further inquiry would not lead it to conclude differently (differently, apparently, from the courts it cited which had found banding to be an appropriate method of scoring civil service eligibility). The Commission further held that the change in the practice of how the eligibility lists were created did not violate either Chapter 31 or the Personnel Administration Rules.

## DISCUSSION

The plaintiffs seek declaratory relief and an injunction prohibiting the HRD from issuing eligibility lists for promotions of police officers in bands rather than in the format which has been in use for decades. They assert that the use of bands violates HRD's own rules, which rules have not been altered or amended in accordance with the procedure required by G.L. c. 31, §4. Arguing that they have standing to bring their claims under G.L. c. 231A, the declaratory judgment statute, and as an appeal of the actions and decisions of the HRD and the Commission, the plaintiffs assert that they are likely to succeed on the merits of their claims. Further, they argue that the risk of harm to them is of sufficient magnitude that the entry of the requested injunctive relief is mandated.

The defendants counter that the plaintiffs cannot establish the prerequisites for the entry of injunctive relief and, indeed, that they have no standing to maintain this action as they have not suffered any actual harm at this juncture.

### *Standing*

General Laws c. 231A, § 1 authorizes the Superior Court to issue a binding declaration with respect to rights, duties, status and other legal relations. The law enables a person to terminate a

---

[2]The Commission's decisions were by a 3-2 vote, with the dissenting commissioners issuing a minority opinion (See Attachment B, Verified Complaint).

5

controversy or remove uncertainties which may arise either before or after a violation or breach of such right or duty in any case in which an actual controversy has arisen. The plaintiffs assert that under G.L. c. 231A, §2 they may bring a declaratory judgment action in the Superior Court "to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any . . . state agency or official which practices or procedures are alleged to be in violation of the . . . laws of the commonwealth, or are in violation of rules or regulations promulgated under the authority of such laws, which violation has been consistently repeated . . ."

The prerequisites to the bringing of a declaratory judgment action are (1) an actual controversy; (2) standing; (3) joinder of all necessary parties; and (4) the exhaustion of available administrative remedies. *Sch. Comm. of Hudson* v. *Bd. of Educ.*, 448 Mass. 565, 579 (2007); *Marion* v. *Massachusetts Hous. Fin. Agency*, 68 Mass. App. Ct. 208, 210 (2007).

Declaratory relief under G. L. c. 231A is available only when an actual controversy has arisen. See G. L. c. 231A, § 1; *Bello* v. *S. Shore Hosp.*, 384 Mass. 770, 778 (1981). General Laws c. 231A cannot be used to resolve hypothetical or moot questions, to seek judicial rendering of an advisory opinion as a guide to future action, or to entertain mere differences of opinion or speculative contentions. Nonetheless, G. L. c. 231A, § 1 provides that the plaintiff need not suffer actual harm before he or she seeks declaratory relief. The action may be brought "either before or after a breach or violation" has occurred. *Id.* The action may, therefore, be prospective or anticipatory in nature seeking to prevent the threatened harm or injury from taking place. See *Sch. Comm. of Cambridge* v. *Superintendent of Schs.*, 320 Mass. 515, 518 (1946).

An actual controversy within the context of G. L. c. 231A, § 1, is:

"a real dispute caused by the assertion by one party of a legal relation, status or right in which he has a definite interest. and the denial of such assertion by another party also having a definite interest in the subject matter, where the circumstances attending the dispute plainly indicate that unless the matter is adjusted such antagonistic claims will almost immediately and inevitably lead to litigation."

*Bunker Hill Distrib., Inc.* v. *Dist. Attorney for Suffolk County*, 376 Mass. 142, 144 (1978), quoting *Sch. Comm. of Cambridge*, 320 Mass. at 518.

Here, there is an actual controversy because the above three tests are met. First, HRD asserts that its decision to band the promotional scores is within its discretion, while the plaintiffs maintain

6

that such a change in procedure requires adherence to the process set forth in G. L. c. 31, § 4. Second, both parties clearly have interests in the case. Third, given that the HRD intends to issue promotional lists with banded scores and that the plaintiffs are currently awaiting placement on those lists, it is plain that some plaintiffs will claim to be harmed by the new procedure and, in turn, litigate the matter, unless declaratory relief is granted.

In addition to demonstrating an actual controversy, a plaintiff must have standing to maintain a declaratory judgment action. The standing requirement should be liberally construed, although there are limits on the matters that can be heard in an action for declaratory judgment. *Massachusetts Ass'n of Indep. Ins. Agents and Brokers, Inc. v. Comm'r of Ins.*, 373 Mass. 290, 293 (1977). In declaratory lawsuits attacking the validity of statutes or regulations, "[a] party has standing when it can allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." *Id.; Enos* v. *Sec'y of Envtl. Affairs*, 432 Mass. 132, 135 (2000). See *Bonan v. Boston*, 398 Mass. 315, 320 (1986) (standing requires "a definite interest in the matters in contention in the sense that [a plaintiff's] rights will be significantly affected by a resolution of the contested point"). In other words, to have standing, a plaintiff's interest must be within the "zone of interests" protected by the statute or regulatory scheme. *Prof'l Fire Fighters of Massachusetts* v. *Commonwealth*, 72 Mass. App. Ct. 66, 74 (2008). Standing is usually not present unless the government agency owes a duty directly to the plaintiff, which was violated and resulted in legally cognizable injuries. *Enos*, 432 Mass. at 136.

In determining whether standing exists, the court should examine the language of the statute at issue, the nature of the administrative scheme, any adverse effects that might occur if standing is recognized, and the availability of other more definite remedies to the plaintiffs. *Id.* at 135-136. Then, the court should ask whether the plaintiff has identified an interest created for them and a reasonably definite injury to that interest caused by a breach of duty by the agency. See *Prof'l Fire Fighters of Massachusetts*, 72 Mass. App. Ct. at 75.

The general purpose of the civil service system is to "guard against political considerations, favoritism, and bias in governmental employee decisions." *Boston Police Dept.* v. *Collins*, 48 Mass. App. Ct. 408, 412 (2000). The centerpiece of the statutory scheme is hiring and promotion based on "basic merit principles" as defined in G. L. c. 31, § 1. General Laws c. 31, § 3 authorizes the Division to make and amend rules which govern the recruitment, selection, training and employment

7

130

of persons for civil service positions. General Laws c. 31, § 4, one of the provisions at issue in this case, sets forth a process which the Division must undertake to enact a new rule or to amend an existing rule. In general, this process requires the Division to provide notice of the proposed rule change and to conduct a public hearing relative to the proposed rule change. See G. L. c. 31, § 4.

Here, the plaintiffs are contesting the lawfulness of the Division's decision to band scores when establishing eligibility lists for promotions, a rule which was amended without adhering to the requirements set forth in G. L. c. 31, § 4. The plaintiffs assert that their interests will be harmed by the banded scores because the bypass procedure will no longer provide some protection for higher scoring candidates and because cities or towns will no longer have to justify their appointments of lower scoring candidates, unless chosen from a lower band. The plaintiffs also contend that the banded scores will expand the candidate pool, thus increasing the potential that promotions will be based on favoritism and bias, rather than merit. These harms are squarely within the zone of interests protected by G. L. c. 31. In addition, by creating a promotional system that provides fewer safeguards against favoritism and bias, the Division has potentially violated its duty to the plaintiffs. Accordingly, I am persuaded that the plaintiffs have standing to maintain an action under G. L. c. 231A to challenge the banded promotional eligibility lists.

### Likelihood of Success

The plaintiffs contend that the banding of scores violates the HRD's own regulation which mandates that examination marks shall be presented on eligibility lists in whole numbers. Having locked the whole number scoring method into its regulatory scheme, say the plaintiffs, the HRD cannot now change that method without complying with the provisions of G.L. c. 31, §4 which establishes a procedure for such amendments of rules. According to the plaintiffs, the 1 -100 scoring system is "enshrined" in the regulations and a change such as is contemplated by the banding of scores requires that the rule-making process be followed. Since it did not follow that process, the HRD is in violation of the applicable statute, say the plaintiffs, and they have a very substantial likelihood of success on the merits.

The HRD argues that the plaintiffs have not established a likelihood of success on the merits. Pointing to *Ash v. Police Com'r of Boston*, 11 Mass.App.Ct. 650 (1981), the HRD argues that the Administrator, as the "skilled professional authorized by G.L. c. 31 to decide technical matters such as the scoring and interpretation of examinations," *Id.* at 652, has appropriately decided that the

8

banding of scores for the 2008 police promotional examinations is the best method for reporting the scores and preparing the eligibility lists from which promotions may be made. The HRD argues that the banded scores will be reported in whole numbers and, thus, it is in compliance with the applicable provisions of its own rules. Further, the HRD argues that its rationale for the change is reasonable and, thus, under the reasoning of the *Ash* decision, the plaintiffs cannot prevail. The HRD points to the widespread judicial and expert acceptance of the practice of banding and argues that the plaintiffs may well benefit from the banding of the scores.

The practice of banding scores represents a significant departure from the way scores have been reported in the past. While the proposed banding will be reported as whole number bands, the scoring is very different than what appears[3] to have been intended by the requirement that scores be reported in whole numbers. The scoring bands are a significant change in the manner of scoring and establishing the eligibility lists and that change should have been put in place using the procedure established by the Legislature for making a significant change in the rules. G.L. c. 31, §4.

In addition, the new score bands will impact the bypass and appeal procedures established by the statute and the regulations enacted pursuant thereto. As noted in Ms. McNeely's Memorandum to Commissioner Davis, all officers within a score band will be viewed as being tied and thus no bypass will occur unless a promotion is made from a lower band when candidates remain unselected from a higher band. That is also a significant change from the practice which has been in place for decades. Using the example which Ms. McNeely used in her affidavit, the new scoring system would conceivably[4] have a significant impact on Paul Campbell. Under the current system, as the highest scoring candidate on the October 2008 Brookline lieutenant promotional examination, Paul Campbell's name would appear first, followed by a candidate who scored three points lower than Campbell, followed by two other candidates who each scored four points lower than Campbell. If Brookline were to appoint one of the candidates other than Campbell, it would have to submit a written explanation for the bypass of Campbell to the Administrator of the HRD, who would pass on the validity of those reasons. If the decision was adverse to Campbell, he could appeal to the

---

[3] I say "appears" as none of the parties has presented information concerning the timing, the history, or the rationale for PAR.07(4).

[4] I use the word "conceivably" since the actual scores are not used in Ms. McNeely's affidavit.

9

Commission.

Under the proposed score bands, Campbell could conceivably be banded together with these three candidates whom he had outscored, along with any other candidates who scored within the same band width. All of those candidates would be deemed to be tied and the bypass procedure would not be implicated by the selection of any of the candidates within the same band. Brookline would not be required to justify its selection of a lower scoring candidate and the higher scoring candidate would not be entitled to appeal a ruling adverse to him or her. That is a significant alteration in the promotion process which has been established by statute and by rules of the HRD.

The proposed banding may well prove to be a better and fairer approach to assessing candidates for promotion within the civil service framework and Massachusetts may well join the numbers of other jurisdictions which have adopted the banding approach; however, such a significant alteration in the manner in which scores are reported and in which eligibility lists are established should have put through the review process set out by the Legislature in c. 31, §4.

Given that the HRD banding method was established without the requisite review process called for by the statute, the plaintiffs have a reasonable likelihood of success on the merits of their claims.

### *Irreparable Harm*

For the reasons discussed above in the *Standing* section, I believe that the plaintiffs have demonstrated a sufficient risk of harm to meet the harm requirement for the issuance of injunctive relief. In addition, as argued by the plaintiffs, where "a suit is brought either by the government or a citizen acting as a private attorney general to enforce a statute or a declared policy of the Legislature, irreparable harm is not required." *LeClair v. Town of Norwell*, 430 Mass. 328, 331 (1999). In such a situation, I must then evaluate "whether there is a likelihood of success on the merits of a plaintiff's claims and then determine whether 'the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.'" *Id.* at 331-332, quoting *Commonwealth v. Mass. CRINC*, 392 Mass. 79, 89 (1984).

In this case, I find that the plaintiffs have established that they have a reasonable likelihood of success on the merits of their claims. Further, a determination of the issues raised by the plaintiffs will promote the public's interest in "guard[ing] against political considerations, favoritism, and bias

10

in governmental hiring and promotion . . . and ensuring that the system operates on 'basic merit principles,' as defined in G.L. c. 31, §1, absent properly documented and supported bases for departing from such principles in particular cases." *MAMLEO v. Abban*, 434 Mass. 256, 259 (2001). Finally, I do not find that there will be harm to the public caused by the issuance of the injunctive relief sought by the plaintiffs. While the defendants assert that any delay in the implementation of the new scoring method will impact communities which are attempting to fill vacancies on their police forces, I do not so find. There is nothing which prevents the HRD from issuing eligibility lists in the same fashion that it has done so for years.

### Conclusion

For these reasons, I find that a preliminary injunction should enter enjoining the defendants from issuing eligibility lists for the promotion of police officers in score bands rather than in the manner in which it has been doing so until a final resolution of this matter on its merits.

### ORDER

Until a final resolution of this matter on its merits, the defendants are preliminarily enjoined from issuing eligibility lists for promotions of police officers in score bands rather than in the manner in which such score have been reported up to the time of this proposed change.

Dated:  April 15, 2009

Bruce R. Henry
Associate Justice

11

Back | Uniform Guidelines | Home

# UNIFORM EMPLOYEE SELECTION GUIDELINES
# INTERPRETATION AND CLARIFICATION (Questions and Answers)

**Equal Employment Opportunity Commission**

## Table of Contents

I.Purpose and Scope. 3

II.Adverse Impact, the Bottom Line and Affirmative Action. 4

III. General Questions Concerning Validity and the Use of Selection Procedures 10

IV.Technical Standards 14

A. CRITERION-RELATED VALIDITY. 16

B. CONTENT VALIDITY. 18

C. CONSTRUCT VALIDITY. 19

V. Records and Documentation. 19

The following series of questions and answers are designed to clarify and interpret, but not to modify, the uniform Guidelines on Employee Selection Procedures that were adopted on August 25, 1978, by the Equal Employment Opportunity Commission (29 CFR 1607), Office of Personnel Management (5 CFR 300), U.S. Department of Justice (28 CFR, Ch. 1, Part 50), U.S. Treasury Department (31 CFR, Ch. 1, Part 51) and the Office of Federal Contract Compliance Programs (41 CFR, Ch. 60, Part 68-3). Supplemental questions and answers (No. 91 through 93) became effective as of May 2, 1980 (45 F.R. 29350).

## I. Purpose and Scope

**1.** Q. What is the purpose of the Guidelines?

A. The guidelines are designed to aid in the achievement of our nation's goal of equal employment opportunity without discrimination on the grounds of race, color, sex, religion or national origin. The Federal agencies have adopted the Guidelines to provide a uniform set of principles governing use of employee selection procedures which is consistent with applicable legal standards and validation standards generally accepted by the psychological profession and which the Government will apply in the discharge of its responsibilities.

**2.** Q. What is the basic principle of the Guidelines?

A. A selection process which has an adverse impact on the employment opportunities of members of a race, color, religion, sex, or national origin group (referred to as "race, sex, and ethnic group," as defined in Section 16P) and thus disproportionately screens them out is unlawfully discriminatory unless the process or its component procedures have been validated in accord with the Guidelines, or the user otherwise justifies them in accord with Federal law. See Sections 3 and 6. 1 This principle was adopted by the Supreme Court unanimously in Griggs v. Duke Power Co., 401 U.S. 424, and was ratified and endorsed by the Congress when it passed the Equal Employment Opportunity Act of 1972, which amended Title VII of the Civil Rights Act of 1964.

**3.** Q. Who is covered by the Guidelines?

A. The Guidelines apply to private and public employers, labor organizations, employment agencies, apprenticeship committees, licensing and certification boards (see Question 7), and contractors or subcontractors, who are covered by one or more of the following provisions of Federal equal employment opportunity law: Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 (hereinafter Title VII); Executive Order 11246, as amended by Executive Orders 11375 and 12086 (hereinafter Executive Order 11246); the State and Local Fiscal Assistance Act of 1972, as amended; Omnibus Crime Control and Safe Streets Act of 1968, as amended; and the Intergovernmental Personnel Act of 1970, as amended. Thus, under Title VII, the Guidelines apply to the Federal Government with regard to Federal employment. Through Title VII they apply to most private employers who have 15 or more employees for 20 weeks or more a calendar year, and to most employment agencies, labor organizations and apprenticeship committees. They apply to state and local governments which employ 15 or more employees, or which receive revenue sharing funds, or which receive funds from the Law Enforcement Assistance Administration to impose and strengthen law enforcement and criminal justice, or which receive grants or other federal assistance under a program which requires maintenance of personnel standards on a merit basis. They apply through Executive Order 11246 to contractors and subcontractors of the Federal Government and to contractors and subcontractors under federally-assisted construction contracts.

**4. Q.** Are college placement offices and similar organizations considered to be users subject to the Guidelines?

A. Placement offices may or may not be subject to the Guidelines depending on what services they offer. If a placement office uses a selection procedure as a basis for any employment decision, it is covered under the definition of "user". Section 16. For example, if a placement office selects some students for referral to an employer but rejects others, it is covered. However, if the placement office refers all interested students to an employer, it is not covered, even though it may offer office space and provision for informing the students of job openings. The Guidelines are intended to cover all users of employee selection procedures, including employment agencies, who are subject to Federal equal employment opportunity law.

**5. Q.** Do the Guidelines apply only to written tests?

A. No. They apply to all selection procedures used to make employment decisions, including interviews, review of experience or education from application forms, work samples, physical requirements, and evaluations of performance. Sections 2B and 16Q, and see Question 6.

**6. Q.** What practices are covered by the Guidelines?

A. The Guidelines apply to employee selection procedures which are used in making employment decisions, such as hiring, retention, promotion, transfer, demotion, dismissal or referral. Section 2B. Employee selection procedures include job requirements (physical, education, experience), and evaluation of applicants or candidates on the basis of application forms, interviews, performance tests, paper and pencil tests, performance in training programs or probationary periods, and any other procedures used to make an employment decision whether administered by the employer or by an employment agency. See Section 2B.

**7. Q.** Do the Guidelines apply to the licensing and certification functions of state and local governments?

A. The Guidelines apply to such functions to the extent that they are covered by Federal law. Section 2B. The courts are divided on the issue of such coverage. The Government has taken the position that at least some kinds of licensing and certification which deny persons access to employment opportunity may be enjoined in an action brought pursuant to Section 707 of the Civil Rights Act of 1964, as amended.

**8. Q.** What is the relationship between Federal equal employment opportunity law, embodied in these Guidelines, and State and Local government merit system laws or regulations requiring rank ordering of candidates and selection from a limited number of the top candidates?

A. The Guidelines permit ranking where the evidence of validity is sufficient to support that method of use. State or local laws which compel rank ordering generally do so on the assumption that the selection procedure is valid. Thus, if there is adverse impact and the validity evidence does not adequately support that method of use, proper interpretation of such a state law would

require validation prior to ranking. Accordingly, there is no necessary or inherent conflict between Federal law and State or local laws of the kind described.

Under the Supremacy Clause of the Constitution (Art. VI, Cl. 2), however, Federal law or valid regulation overrides any contrary provision of state or local law. Thus, if there is any conflict, Federal equal opportunity law prevails. For example, in Rosenfeld v. So. Pacific Co., 444 F.2d 1219 (9th Cir., 1971), the court held invalid state protective laws which prohibited the employment of women in jobs entailing long hours or heavy labor, because the state laws were in conflict with Title VII. Where a State or local official believes that there is a possible conflict, the official may wish to consult with the State Attorney General, County or City attorney, or other legal official to determine how to comply with the law.

## II. Adverse Impact, the Bottom Line and Affirmative Action

**9.** Q. Do the Guidelines require that only validated selection procedures be used?

A. No. Although validation of selection procedures is desirable in personnel management, the Uniform Guidelines require users to produce evidence of validity only when the selection procedure adversely affects the opportunities of a race, sex, or ethnic group for hire, transfer, promotion, retention or other employment decision. If there is no adverse impact, there is no validation requirement under the Guidelines. Sections 1B and 3A. See also, Section 6A.

**10.** Q. What is adverse impact?

A. Under the Guidelines adverse impact is a substantially different rate of selection in hiring, promotion or other employment decision which works to the disadvantage of members of a race, sex or ethnic group. Sections 4D and 16B. See Questions 11 and 12.

**11.** Q. What is a substantially different rate of selection?

A. The agencies have adopted a rule of thumb under which they will generally consider a selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5ths) or eighty percent (80%) of the selection rate for the group with the highest selection rate as a substantially different rate of selection. See Section 4D. This "4/5ths" or "80%" rule of thumb is not intended as a legal definition, but is a practical means of keeping the attention of the enforcement agencies on serious discrepancies in rates of hiring, promotion and other selection decisions.

For example, if the hiring rate for whites other than Hispanics is 60%, for American Indians 45%, for Hispanics 48%, and for Blacks 51%, and each of these groups constitutes more than 2% of the labor force in the relevant labor area (see Question 16), a comparison should be made of the selection rate for each group with that of the highest group (whites). These comparisons show the following impact ratios: American Indians 45/60 or 75%; Hispanics 48/60 or 80%; and Blacks 51/60 or 85%. Applying the 4/5ths or 80% rule of thumb, on the basis of the above information alone, adverse impact is indicated for American Indians but not for Hispanics or Blacks.

**12.** Q. How is adverse impact determined?

A. Adverse impact is determined by a four-step process.

(1) Calculate the rate of selection for each group (divide the number of persons selected from a group by the number of applicants from that group).

(2) Observe which group has the highest selection rate.

(3) Calculate the impact ratios, by comparing the selection rate for each group with that of the highest group (divide the selection rate for a group by the selection rate for the highest group).

(4) Observe whether the selection rate for any group is substantially less (i.e., usually less then 4/5ths or 80%) than the selection rate for the highest group. If it is, adverse impact is indicated in most circumstances. See Section 4D.

For example:

| Applicants | Hires | Selection Rate/Percent Hired |
|---|---|---|
| 80 White | 48 | 48/80 or 60% |
| 40 Black | 12 | 12/40 or 30% |

A comparison of the black selection rate (30%) with the white selection rate (60%) shows that the black rate is 30/60, or one-half (or 50%) of the white rate. Since the one-half (50%) is less than 4/5ths (80%) adverse impact is usually indicated.

The determination of adverse impact is not purely arithmetic however; and other factors may be relevant. See, Section 4D.

**13.** Q. Is adverse impact determined on the basis of the overall selection process or for the components in that process?

A. Adverse impact is determined first for the overall selection process for each job. If the overall selection process has an adverse impact, the adverse impact of the individual selection procedure should be analyzed. For any selection procedures in the process having an adverse impact which the user continues to use in the same manner, the user is expected to have evidence of validity satisfying the Guidelines. Sections 4C and 5D. If there is no adverse impact for the overall selection process, in most circumstances there is no obligation under the Guidelines to investigate adverse impact for the components, or to validate the selection procedures used for that job. Section 4C. But see Question 25.

**14.** Q. The Guidelines designate the "total selection process" as the initial basis for determining the impact of selection procedures. What is meant by the "total selection process"?

A. The "total selection process" refers to the combined effect of all selection procedures leading to the final employment decision such as hiring or promoting. For example, appraisal of candidates for administrative assistant positions in an organization might include initial screening based upon an application blank and interview, a written test, a medical examination, a background check, and a supervisor's interview. These in combination are the total selection process. Additionally, where there is more than one route to the particular kind of employment decision, the total selection process encompasses the combined results of all routes. For example, an employer may select some applicants for a particular kind of job through appropriate written and performance tests. Others may be selected through an internal upward mobility program, on the basis of successful performance in a directly related trainee type of position. In such a case, the impact of the total selection process would be the combined effect of both avenues of entry.

**15.** Q. What is meant by the terms "applicant" and "candidate" as they are used in the Uniform Guidelines?

A. The precise definition of the term "applicant" depends upon the user's recruitment and selection procedures. The concept of an applicant is that of a person who has indicated an interest in being considered for hiring, promotion, or other employment opportunities. This interest might be expressed by completing an application form, or might be expressed orally, depending upon the employer's practice.

The term "candidate" has been included to cover those situations where the initial step by the user involves consideration of current employees for promotion, or training, or other employment opportunities, without inviting applications. The procedure by which persons are identified as candidates is itself a selection procedure under the Guidelines.

A person who voluntarily withdraws formally or informally at any stage of the selection process is no longer an applicant or candidate for purposes of computing adverse impact. Employment standards imposed by the user which discourage disproportionately applicants of a race, sex or ethnic group may, however, require justification. Records should be kept for persons who were applicants or candidates at any stage of the process.

**16.** Q. Should adverse impact determinations be made for all groups regardless of their size?

A. No. Section 15A(2) calls for annual adverse impact determinations to be made for each group which constitutes either 2% or more of the total labor force in the relevant labor area, or 2% of more of the applicable workforce. Thus, impact determinations should be made for any employment decision for each group which constitutes 2% or more of the labor force in the relevant labor area. For hiring, such determination should also be made for groups which constitute more than 2% of the applicants; and for promotions, determinations should also be made for those groups which constitute at least 2% of the user's workforce. There are record keeping obligations for all groups, even those which are less than 2%. See Question 86.

**17.** Q. In determining adverse impact, do you compare the selection rates for males and females, and blacks and whites, or do you compare selection rates for white males, white females, black males and black females?

A. The selection rates for males and females are compared, and the selection rates for the race and ethnic groups are compared with the selection rate of the race or ethnic group with the highest selection rate. Neutral and objective selection procedures free of adverse impact against any race, sex or ethnic group are unlikely to have an impact against a subgroup. Thus there is no obligation to make comparisons for subgroups (e.g., white male, white female, black male, black female). However, there are obligations to keep records (see Question 87), and any apparent exclusion of a subgroup may suggest the presence of discrimination.

**18.** Q. Is it usually necessary to calculate the statistical significance of differences in selection rates when investigating the existence of adverse impact?

A. No. Adverse impact is normally indicated when one selection rate is less than 80% of the other. The federal enforcement agencies normally will use only the 80% (4/5ths) rule of thumb, except where large numbers of selections are made. See Questions 20 and 22.

**19.** Q. Does the 4/5ths rule of thumb mean that the Guidelines will tolerate up to 20% discrimination?

A. No. The 4/5ths rule of thumb speaks only to the question of adverse impact, and is not intended to resolve the ultimate question of unlawful discrimination. Regardless of the amount of difference in selection rates, unlawful discrimination may be present, and may be demonstrated through appropriate evidence. The 4/5ths rule merely establishes a numerical basis for drawing an initial inference and for requiring additional information.

With respect to adverse impact, the Guidelines expressly state (section 4D) that differences in selection rates of less than 20% may still amount to adverse impact where the differences are significant in both statistical and practical terms. See Question 20. In the absence of differences which are large enough to meet the 4/5ths rule of thumb or a test of statistical significance, there is no reason to assume that the differences are reliable, or that they are based upon anything other than chance.

**20.** Q. Why is the 4/5ths rule called a rule of thumb?

A. Because it is not intended to be controlling in all circumstances. If, for the sake of illustration, we assume that nationwide statistics show that use of an arrest record would disqualify 10% of all Hispanic persons but only 4% of all whites other than Hispanic (hereafter non-Hispanic), the selection rate for that selection procedure is 90% for Hispanics and 96% for non-Hispanics. Therefore, the 4/5 rule of thumb would not indicate the presence of adverse impact (90% is approximately 94% of 96%). But in this example, the information is based upon nationwide statistics, and the sample is large enough to yield statistically significant results, and the difference (Hispanics are 2 1/2 times as likely to be disqualified as non-Hispanics) is large enough to be practically significant. Thus, in this example the enforcement agencies would consider a disqualification based on an arrest record alone as having an adverse impact. Likewise, in Gregory v. Litton Industries, 472 F.2d 631 (9th Cir., 1972), the court held that the employer violated Title VII by disqualifying persons from employment solely on the basis of an arrest record, where that disqualification had an adverse impact on blacks and was not shown to be justified by business necessity.

On the other hand, a difference of more than 20% in rates of selection may not provide a basis for finding adverse impact if the number of persons selected is very small. For example, if the employer selected three males and one female from an applicant pool of 20 males and 10 females, the 4/5ths rule would indicate adverse impact (selection rate for women is 10%; for men 15%; 10/15 or 66 2/3% is less than 80%), yet the number of selections is too small to warrant a determination of adverse impact. In

these circumstances, the enforcement agency would not require validity evidence in the absence of additional information (such as selection rates for a longer period of time) indicating adverse impact. For record keeping requirements, see Section 15A(2)(c) and Questions 84 and 85.

**21**. Q. Is evidence of adverse impact sufficient to warrant a validity study or an enforcement action where the numbers involved are so small that it is more likely than not that the difference could have occurred by chance?

For example:

| Applicants | Not Hired | Hired | Selection Rate/Percent Hired |
|---|---|---|---|
| 80 White | 64 | 16 | 20 |
| 20 Black | 17 | 3 | 15 |

White Selection Rate ..................................... 20

Black Selection Rate ..................................... 15

15 divided by 20 = 75% (which is less than 80%).

A. No. If the numbers of persons and the difference in selection rates are so small that it is likely that the difference could have occurred by chance, the Federal agencies will not assume the existence of adverse impact, in the absence of other evidence. In this example, the difference in selection rates is too small, given the small number of black applicants, to constitute adverse impact in the absence of other information (see Section 4D). If only one more black had been hired instead of a white the selection rate for blacks (20%) would be higher than that for whites (18.7%). Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group.

On the other hand, if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact, warranting the need for validity evidence.

**22**. Q. Is it ever necessary to calculate the statistical significance of differences in selection rates to determine whether adverse impact exists?

A. Yes. Where large numbers of selections are made, relatively small differences in selection rates may nevertheless constitute adverse impact if they are both statistically and practically significant. See Section 4D and Question 20. For that reason, if there is a small difference in selection rates (one rate is more than 80% of the other), but large numbers of selections are involved, it would be appropriate to calculate the statistical significance of the difference in selection rates.

**23**. Q. When the 4/5th rule of thumb shows adverse impact, is there adverse impact under the Guidelines?

A. There usually is adverse impact, except where the number of persons selected and the difference in selection rates are very small. See Section 4D and Questions 20 and 21.

**24**. Q. Why do the Guidelines rely primarily upon the 4/5ths rule of thumb, rather than tests of statistical significance?

A. Where the sample of persons selected is not large, even a large real difference between groups is likely not to be confirmed by a test of statistical significance (at the usual .05 level of significance). For this reason, the Guidelines do not rely primarily upon a test of statistical significance, but use the 4/5ths rule of thumb as a practical and easy-to-administer measure of whether differences in selection rates are substantial. Many decisions in day-to-day life are made without reliance upon a test of statistical significance.

**25**. Q. Are there any circumstances in which the employer should evaluate components of a selection process, even though the overall selection process results in no adverse impact?

A. Yes, there are such circumstances: (1) Where the selection procedure is a significant factor in the continuation of patterns of assignments of incumbent employees caused by prior discriminatory employment practices. Assume, for example, an employer who traditionally hired blacks as employees for the "laborer" department in a manufacturing plant, and traditionally hired only whites as skilled craftsmen. Assume further that the employer in 1962 began to use a written examination not supported by a validity study to screen incumbent employees who sought to enter the apprenticeship program for skilled craft jobs. The employer stopped making racial assignments in 1972. Assume further that for the last four years, there have been special recruitment efforts aimed at recent black high school graduates and that the selection process, which includes the written examination, has resulted in the selection of black applicants for apprenticeship in approximately the same rates as white applicants.

In those circumstances, if the written examination had an adverse impact, its use would tend to keep incumbent black employees in the laborer department, and deny them entry to apprenticeship programs. For that reason, the enforcement agencies would expect the user to evaluate the impact of the written examination, and to have validity evidence for the use of the written examination if it has an adverse impact.

(2) Where the weight of court decisions or administrative interpretations holds that a specific selection procedure is not job related in similar circumstances.

For example, courts have held that because an arrest is not a determination of guilt, an applicant's arrest record by itself does not indicate inability to perform a job consistent with the trustworthy and efficient operation of a business. Yet a no arrest record requirement has a nationwide adverse impact on some minority groups. Thus, an employer who refuses to hire applicants solely on the basis of an arrest record is on notice that this policy may be found to be discriminatory. Gregory v. Litton Industries, 472 F.2d 631 (9th Cir., 1972) (excluding persons from employment solely on the basis of arrests, which has an adverse impact, held to violate Title VII). Similarly, a minimum height requirement disproportionately disqualifies women and some national origin groups, and has been held not to be job related in a number of cases. For example, in Dothard v. Rawlinson, 433 U.S. 321 (1977), the Court held that height and weight requirements not shown to be job related were violative of Title VII. Thus an employer using a minimum height requirement should have evidence of its validity.

(3) In addition, there may be other circumstances in which an enforcement agency may decide to request an employer to evaluate components of a selection process, but such circumstances would clearly be unusual. Any such decision will be made only at a high level in the agency. Investigators and compliance officers are not authorized to make this decision.

**26**. Q. Does the bottom line concept of Section 4C apply to the administrative processing of charges of discrimination filed with an issuing agency, alleging that a specific selection procedure is discriminatory?

A. No. The bottom line concept applies only to enforcement actions as defined in Section 16 of the Guidelines. Enforcement actions include only court enforcement actions and other similar proceedings as defined in Section 16I. The EEOC administrative processing of charges of discrimination (investigation, finding of reasonable cause/no cause, and conciliation) required by Section 706(b) of Title VII are specifically exempted from the bottom line concept by the definition of an enforcement action. The bottom line concept is a result of a decision by the various enforcement agencies that, as a matter of prosecutorial discretion, they will devote their limited enforcement resources to the most serious offenders of equal employment opportunity laws. Since the concept is not a rule of law, it does not affect the discharge by the EEOC of its statutory responsibilities to investigate charges of discrimination, render an administrative finding on its investigation, and engage in voluntary conciliation efforts. Similarly, with respect to the other issuing agencies, the bottom line concept applies not to the processing of individual charges, but to the initiation of enforcement action.

**27**. Q. An employer uses one test or other selection procedure to select persons for a number of different jobs. Applicants are given the test, and the successful applicants are then referred to different departments and positions on the basis of openings available and their interests. The Guidelines appear to require assessment of adverse impact on a job-by-job basis (Section 15A [2][a]). Is there some way to show that the test as a whole does not have adverse impact even though the proportions of members of each race, sex or ethnic group assigned to different jobs may vary?

A. Yes, in some circumstances. The Guidelines require evidence of validity only for those selection procedures which have an adverse impact, and which are part of a selection process which has an adverse impact. If the test is administered and used in the same fashion for a variety of jobs, the impact of that test can be assessed in the aggregate. The records showing the results of the test, and the total number of persons selected, generally would be sufficient to show the impact of the test. If the test has no adverse impact, it need not be validated.

But the absence of adverse impact of the test in the aggregate does not end the inquiry. For there may be discrimination or adverse impact in the assignment of individuals to, or in the selection of persons for, particular jobs. The Guidelines call for records to be kept and determinations of adverse impact to be made of the overall selection process on a job by job basis. Thus, if there is adverse impact in the assignment or selection procedures for a job even though there is no adverse impact from the test, the user should eliminate the adverse impact from the assignment procedure or justify the assignment procedure.

**28**. Q. The Uniform Guidelines apply to the requirements of Federal law prohibiting employment practices which discriminate on the grounds of race, color, religion, sex or national origin. However, records are required to be kept only by sex and by specified race and ethnic groups. How can adverse impact be determined for religious groups and for national origin groups other than those specified in Section 4B of the Guidelines?

A. The groups for which records are required to be maintained are the groups for which there is extensive evidence of continuing discriminatory practices. This limitation is designed in part to minimize the burden on employers for record keeping which may not be needed.

For groups for which records are not required, the person(s) complaining may obtain information from the employer or others (voluntarily or through legal process) to show that adverse impact has taken place. When that has been done, the various provisions of the Uniform Guidelines are fully applicable.

Whether or not there is adverse impact, Federal equal employment opportunity law prohibits any deliberate discrimination or disparate treatment on grounds of religion or national origin, as well as on grounds of sex, color, or race.

Whenever "ethnic" is used in the Guidelines or in these Questions and Answers, it is intended to include national origin and religion, as set forth in the statutes, executive orders, and regulations prohibiting discrimination. See Section 16P.

**29**. Q. What is the relationship between affirmative action and the requirements of the Uniform Guidelines?

A. The two subjects are different, although related. Compliance with the Guidelines does not relieve users of their affirmative action obligations, including those of Federal contractors and subcontractors under Executive Order 11246. Section 13.

The Guidelines encourage the development and effective implementation of affirmative action plans or programs in two ways. First, in determining whether to institute action against a user on the basis of a selection procedure which has adverse impact and which has not been validated, the enforcement agency will take into account the general equal employment opportunity posture of the user with respect to the job classifications for which the procedure is used and the progress which has been made in carrying out any affirmative action program, Section 4E. If the user has demonstrated over a substantial period of time that it is in fact appropriately utilizing in the job or group of jobs in question the available race, sex or ethnic groups in the relevant labor force, the enforcement agency will generally exercise its discretion by not initiating enforcement proceedings based on adverse impact in relation to the applicant flow. Second, nothing in the Guidelines is intended to preclude the use of selection procedures, consistent with Federal law, which assist in the achievement of affirmative action objectives. Section 13A. See also, Questions 30 and 31.

**30**. Q. When may a user be race, sex or ethnic-conscious?

A. The Guidelines recognize that affirmative action programs may be race, sex or ethnic conscious in appropriate circumstances, (See Sections 4E and 13; See also Section 7, Appendix). In addition to obligatory affirmative action programs (See Question 29), the Guidelines encourage the adoption of voluntary affirmative action programs. Users choosing to engage in voluntary affirmative action are referred to EEOC's Guidelines on Affirmative Action (44 FR 4422, January 19, 1979). A user may justifiably be race,

sex or ethnic-conscious in circumstances where it has reason to believe that qualified persons of specified race, sex or ethnicity have been or may be subject to the exclusionary effects of its selection procedures or other employment practices in its work force or particular jobs therein. In establishing long and short range goals, the employer may use the race, sex, or ethnic classification as the basis for such goals (Section 17[3][a]).

In establishing a recruiting program, the employer may direct its recruiting activities to locations or institutions which have a high proportion of the race, sex, or ethnic group which has been excluded or underutilized (section 17[3][b]). In establishing the pool of qualified persons from which final selections are to be made, the employer may take reasonable steps to assure that members of the excluded or underutilized race, sex, or ethnic group are included in the pool (Section 17[3][e]).

Similarly, the employer may be race, sex or ethnic-conscious in determining what changes should be implemented if the objectives of the programs are not being met (Section 17[3][g]).

Even apart from affirmative action programs a user may be race, sex or ethnic-conscious in taking appropriate and lawful measures to eliminate adverse impact from selection procedures (Section 6A).

**31**. Q. Section 6A authorizes the use of alternative selection procedures to eliminate adverse impact, but does not appear to address the issue of validity. Thus, the use of alternative selection procedures without adverse impact seems to be presented as an option in lieu of validation. Is that its intent?

A. Yes. Under Federal equal employment opportunity law the use of any selection procedure which has an adverse impact on any race, sex or ethnic group is discriminatory unless the procedure has been properly validated, or the use of the procedure is otherwise justified under Federal law. Griggs v. Duke Power Co., 401 U.S. 424 (1971); Section 3A. If a selection procedure has an adverse impact, therefore, Federal equal employment opportunity law authorizes the user to choose lawful alternative procedures which eliminate the adverse impact rather than demonstrating the validity of the original selection procedure.

Many users, while wishing to validate all of their selection procedures, are not able to conduct the validity studies immediately. Such users have the option of choosing alternative techniques which eliminate adverse impact, with a view to providing a basis for determining subsequently which selection procedures are valid and have as little adverse impact as possible.

Apart from Federal equal employment opportunity law, employers have economic incentives to use properly validated selection procedures. Nothing in Section 6A should be interpreted as discouraging the use of properly validated selection procedures; but Federal equal employment opportunity law does not require validity studies to be conducted unless there is adverse impact. See Section 2C.

### III. General Questions Concerning Validity and the Use of Selection Procedures

**32**. Q. What is "validation" according to the Uniform Guidelines?

A. Validation is the demonstration of the job relatedness of a selection procedure. The Uniform Guidelines recognize the same three validity strategies recognized by the American Psychological Association:

(1) Criterion-related validity--a statistical demonstration of a relationship between scores on a selection procedure and job performance of a sample of workers.

(2) Content validity--a demonstration that the content of a selection procedure is representative of important aspects of performance on the job.

(3) Construct validity--a demonstration that (a) a selection procedure measures a construct (something believed to be an underlying human trait or characteristic, such as honesty) and (b) the construct is important for successful job performance.

**33**. Q. What is the typical process by which validity studies are reviewed by an enforcement agency?

A. The validity study is normally requested by an enforcement officer during the course of a review. The officer will first determine whether the user's data show that the overall selection process has an adverse impact, and if so, which component selection procedures have an adverse impact. See Section 15A(3). The officer will then ask for the evidence of validity for each procedure which has an adverse impact. See Sections 15B, C, and D. This validity evidence will be referred to appropriate personnel for review. Agency findings will then be communicated to the user.

**34**. Q. Can a user send its validity evidence to an enforcement agency before a review, so as to assure its validity?

A. No. Enforcement agencies will not review validity reports except in the context of investigations or reviews. Even in those circumstances, validity evidence will not be reviewed without evidence of how the selection procedure is used and what impact its use has on various race, sex, and ethnic groups.

**35**. Q. May reports of validity prepared by publishers of commercial tests and printed in test manuals or other literature be helpful in meeting the Guidelines?

A. They may be. However, it is the user's responsibility to determine that the validity evidence is adequate to meet the Guidelines. See Section 7, and Questions 43 and 66. Users should not use selection procedures which are likely to have an adverse impact without reviewing the evidence of validity to make sure that the standards of the Guidelines are met.

The following questions and answers (36-81) assume that a selection procedure has an adverse impact and is part of a selection process that has an adverse impact.

**36**. Q. How can users justify continued use of a procedure on a basis other than validity?

A. Normally, the method of justifying selection procedures with an adverse impact and the method to which the Guidelines are primarily addressed, is validation. The method of justification of a procedure by means other than validity is one to which the Guidelines are not addressed. See Section 6B. In Griggs v. Duke Power Co., 401 U.S. 424, the Supreme Court indicated that the burden on the user was a heavy one, but that the selection procedure could be used if there was a "business necessity" for its continued use; therefore, the Federal agencies will consider evidence that a selection procedure is necessary for the safe and efficient operation of a business to justify continued use of a selection procedure.

**37**. Q. Is the demonstration of a rational relationship (as that term is used in constitutional law) between a selection procedure and the job sufficient to meet the validation requirements of the Guidelines?

A. No. The Supreme Court in Washington v. Davis, 426 U.S. 229 (1976) stated that different standards would be applied to employment discrimination allegations arising under the Constitution than would be applied to employment discrimination allegations arising under Title VII. The Davis case arose under the Constitution, and no Title VII violation was alleged. The Court applied a traditional constitutional law standard of "rational relationship" and said that it would defer to the "seemingly reasonable acts of administrators and executives." However, it went on to point out that under Title VII, the appropriate standard would still be an affirmative demonstration of the relationship between the selection procedure and measures of job performance by means of accepted procedures of validation and it would be an "insufficient response to demonstrate some rational basis" for a selection procedure having an adverse impact. Thus, the mere demonstration of a rational relationship between a selection procedure and the job does not meet the requirement of Title VII of the Civil Rights Act of 1964, or of Executive Order 11246, or the State and Local Fiscal Assistance Act of 1972, as amended (the revenue sharing act) or the Omnibus Crime Control and Safe Streets Act of 1968, as amended, and will not meet the requirements of these Guidelines for a validity study. The three validity strategies called for by these Guidelines all require evidence that the selection procedure is related to successful performance on the job. That evidence may be obtained through local validation or through validity studies done elsewhere.

**38**. Q. Can a user rely upon written or oral assertions of validity instead of evidence of validity?

A. No. If a user's selection procedures have an adverse impact, the user is expected to produce evidence of the validity of the procedures as they are used. Thus, the unsupported assertion by anyone, including representatives of the Federal government or State Employment Services, that a test battery or other selection procedure has been validated is not sufficient to satisfy the

144

Guidelines.

**39.** Q. Are there any formal requirements imposed by these Guidelines as to who is allowed to perform a validity study?

A. No. A validity study is judged on its own merits, and may be performed by any person competent to apply the principles of validity research, including a member of the user's staff or a consultant. However, it is the user's responsibility to see that the study meets validity provisions of the Guidelines, which are based upon professionally accepted standards. See Question 42.

**40.** Q. What is the relationship between the validation provisions of the Guidelines and other statements of psychological principles, such as the Standards for Educational and Psychological Tests, published by the American Psychological Association (Wash., D.C., 1974) (hereinafter "American Psychological Association Standards")?

A. The validation provisions of the Guidelines are designed to be consistent with the generally accepted standards of the psychological profession. These Guidelines also interpret Federal equal employment opportunity law, and embody some policy determinations of an administrative nature. To the extent that there may be differences between particular provisions of the Guidelines and expressions of validation principles found elsewhere, the Guidelines will be given precedence by the enforcement agencies.

**41.** Q. When should a validity study be carried out?

A. When a selection procedure has adverse impact on any race, sex or ethnic group, the Guidelines generally call for a validity study or the elimination of adverse impact. See Sections 3A and 6, and Questions 9, 31, and 36. If a selection procedure has adverse impact, its use in making employment decisions without adequate evidence of validity would be inconsistent with the Guidelines. Users who choose to continue the use of a selection procedure with an adverse impact until the procedure is challenged increase the risk that they will be found to be engaged in discriminatory practices and will be liable for back pay awards, plaintiffs' attorneys' fees, loss of Federal contracts, subcontracts or grants, and the like. Validation studies begun on the eve of litigation have seldom been found to be adequate. Users who choose to validate selection procedures should consider the potential benefit from having a validation study completed or well underway before the procedures are administered for use in employment decisions.

**42.** Q. Where can a user obtain professional advice concerning validation of selection procedures?

A. Many industrial and personnel psychologists validate selection procedures, review published evidence of validity and make recommendations with respect to the use of selection procedures. Many of these individuals are members or fellows of Division 14 (Industrial and Organizational Psychology) or Division 5 (Evaluation and Measurement) of the American Psychological Association. They can be identified in the membership directory of that organization. A high level of qualification is represented by a diploma in Industrial Psychology awarded by the American Board of Professional Psychology.

Individuals with the necessary competence may come from a variety of backgrounds. The primary qualification is pertinent training and experience in the conduct of validation research.

Industrial psychologists and other persons competent in the field may be found as faculty members in colleges and universities (normally in the departments of psychology or business administration) or working as individual consultants or as members of a consulting organization.

Not all psychologists have the necessary expertise. States have boards which license and certify psychologists, but not generally in a specialty such as industrial psychology. However, State psychological associations may be a source of information as to individuals qualified to conduct validation studies. Addresses of State psychological associations or other sources of information may be obtained from the American Psychological Association, 1200 Seventeenth Street, NW., Washington, D.C. 20036.

**43.** Q. Can a selection procedure be a valid predictor of performance on a job in a certain location and be invalid for predicting success on a different job or the same job in a different location?

A. Yes. Because of differences in work behaviors, criterion measures, study samples or other factors, a selection procedure found to have validity in one situation does not necessarily have validity in different circumstances. Conversely, a selection procedure not found to have validity in one situation may have validity in different circumstances. For these reasons, the Guidelines require that certain standards be satisfied before a user may rely upon findings of validity in another situation. Section 7 and Section 14D. See also, Question 66. Cooperative and multi-unit studies are however encouraged, and, when those standards of the Guidelines are satisfied, validity evidence specific to each location is not required. See Section 7C and Section 8.

**44.** Q. Is the user of a selection procedure required to develop the procedure?

A. No. A selection procedure developed elsewhere may be used. However, the user has the obligation to show that its use for the particular job is consistent with the Guidelines. See Section 7.

**45.** Q. Do the Guidelines permit users to engage in cooperative efforts to meet the Guidelines?

A. Yes. The Guidelines not only permit but encourage such efforts. Where users have participated in a cooperative study which meets the validation standards of these Guidelines and proper account has been taken of variables which might affect the applicability of the study to specific users, validity evidence specific to each user will not be required. Section 8.

**46.** Q. Must the same method for validation be used for all parts of a selection process?

A. No. For example, where a selection process includes both a physical performance test and an interview, the physical test might be supported on the basis of content validity, and the interview on the basis of a criterion-related study.

**47.** Q. Is a showing of validity sufficient to assure the lawfulness of the use of a selection procedure?

A. No. The use of the selection procedure must be consistent with the validity evidence. For example, if a research study shows only that, at a given passing score the test satisfactorily screens out probable failures, the study would not justify the use of substantially different passing scores, or of ranked lists of those who passed. See Section 5G. Similarly, if the research shows that a battery is valid when a particular set of weights is used, the weights actually used must conform to those that were established by the research.

**48.** Q. Do the Guidelines call for a user to consider and investigate alternative selection procedures when conducting a validity study?

A. Yes. The Guidelines call for a user, when conducting a validity study, to make a reasonable effort to become aware of suitable alternative selection procedures and methods of use which have as little adverse impact as possible, and to investigate those which are suitable. Section 3B.

An alternative procedure may not previously have been used by the user for the job in question and may not have been extensively used elsewhere. Accordingly, the preliminary determination of the suitability of the alternative selection procedure for the user and job in question may have to be made on the basis of incomplete information. If on the basis of the evidence available, the user determines that the alternative selection procedure is likely to meet its legitimate needs, and is likely to have less adverse impact than the existing selection procedure, the alternative should be investigated further as a part of the validity study. The extent of the investigation should be reasonable. Thus, the investigation should continue until the user has reasonably concluded that the alternative is not useful or not suitable, or until a study of its validity has been completed. Once the full validity study has been completed, including the evidence concerning the alternative procedure, the user should evaluate the results of the study to determine which procedure should be used. See Section 3B and Question 50.

**49.** Q. Do the Guidelines call for a user continually to investigate "suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible?"

A. No. There is no requirement for continual investigation. A reasonable investigation of alternatives is called for by the Guidelines

as a part of any validity study. Once the study is complete and validity has been found, however, there is generally no obligation to conduct further investigations, until such time as a new study is called for. See, Sections 3B and 5K. If a government agency, complainant, civil rights organization or other person having a legitimate interest shows such a user an alternative procedure with less adverse impact and with substantial evidence of validity for the same job in similar circumstances, the user is obliged to investigate only the particular procedure which has been presented. Section 3B.

＊＊

**50**. Q. In what circumstances do the Guidelines call for the use of an alternative selection procedure or an alternative method of using the procedure?

A. The alternative selection procedure (or method of use) should be used when it has less adverse impact and when the evidence shows that its validity is substantially the same or greater for the same job in similar circumstances. Thus, if under the original selection procedure the selection rate for black applicants was only one half (50 percent) that of the selection rate for white applicants, whereas under the alternative selection procedure the selection rate for blacks is two-thirds (67 percent) that of white applicants, the new alternative selection procedure should be used when the evidence shows substantially the same or greater validity for the alternative than for the original procedure. The same principles apply to a new user who is deciding what selection procedure to institute.

**51**. Q. What are the factors to be considered in determining whether the validity for one procedure is substantially the same as or greater than that of another procedure?

A. In the case of a criterion-related validity study, the factors include the importance of the criteria for which significant relationships are found, the magnitude of the relationship between selection procedure scores and criterion measures, and the size and composition of the samples used. For content validity, the strength of validity evidence would depend upon the proportion of critical and/or important job behaviors measured, and the extent to which the selection procedure resembles actual work samples or work behaviors. Where selection procedures have been validated by different strategies, or by construct validity, the determination should be made on a case-by-case basis.

**52**. Q. The Guidelines require consideration of alternative procedures and alternative methods of use, in light of the evidence of validity and utility and the degree of adverse impact of the procedure. How can a user know that any selection procedure with an adverse impact is lawful?

A. The Uniform Guidelines (Section 5G) expressly permit the use of a procedure in a manner supported by the evidence of validity and utility, even if another method of use has a lesser adverse impact. With respect to consideration of alternative selection procedures, if the user made a reasonable effort to become aware of alternative procedures, has considered them and investigated those which appear suitable as a part of the validity study, and has shown validity for a procedure, the user has complied with the Uniform Guidelines. The burden is then on the person challenging the procedure to show that there is another procedure with better or substantially equal validity which will accomplish the same legitimate business purposes with less adverse impact. Section 3B. See also, Albemarle Paper Co. v. Moody, 422 U.S. 405.

**53**. Q. Are the Guidelines consistent with the decision of the Supreme Court in Furnco Construction Corp. v. Waters, -- U.S. --, 98 S.Ct. 2943 (1978) where the Court stated: "Title VII *** does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees."

A. Yes. The quoted statement in Furnco v. Waters was made on a record where there was no adverse impact in the hiring process, no different treatment, no intentional discrimination, and no contractual obligations under E.O. 11246. Section 3B of the Guidelines is predicated upon a finding of adverse impact. Section 3B indicates that, when two or more selection procedures are available which serve a legitimate business purpose with substantially equal validity, the user should use the one which has been demonstrated to have the lesser adverse impact. Part V of the Overview of the Uniform Guidelines, in elaborating on this principle, states: "Federal equal employment opportunity law has added a requirement to the process of validation. In conducting a validation study, the employer should consider available alternatives which will achieve its legitimate purpose with lesser adverse impact."

Section 3B of the Guidelines is based on the principle enunciated in the Supreme Court decision in Albermarle Paper Co. v.

Moody, 422 U.S. 405 (1975) that, even where job relatedness has been proven, the availability of other tests or selection devices which would also serve the employer's legitimate interest in "efficient and trustworthy workmanship" without a similarly undesirable racial effect would be evidence that the employer was using its tests merely as a pretext for discrimination.

Where adverse impact still exists, even though the selection procedure has been validated, there continues to be an obligation to consider alternative procedures which reduce or remove that adverse impact if an opportunity presents itself to do so without sacrificing validity. Where there is no adverse impact, the Furnco principle rather than the Albermarle principle is applicable.

## IV. Technical Standards

**54. Q. How does a user choose which validation strategy to use?**

A. A user should select a validation strategy or strategies which are (1) appropriate for the type of selection procedure, the job, and the employment situation, and (2) technically and administratively feasible. Whatever method of validation is used, the basic logic is one of prediction; that is, the presumption that level of performance on the selection procedure will, on the average, be indicative of level of performance on the job after selection. Thus, a criterion-related study, particularly a predictive one, is often regarded as the closet to such an ideal. See American Psychological Association Standards, pp. 26-27.

Key conditions for a criterion-related study are a substantial number of individuals for inclusion in the study, and a considerable range of performance on the selection and criterion measures. In addition, reliable and valid measures of job performance should be available, or capable of being developed. Section 14B(1). Where such circumstances exist, a user should consider use of the criterion-related strategy.

Content validity is appropriate where it is technically and administratively feasible to develop work samples or measures of operationally defined skills, knowledges, or abilities which, are a necessary prerequisite to observable work behaviors. Content validity is not appropriate for demonstrating the validity of tests of mental processes or aptitudes or characteristics; and is not appropriate for knowledges, skills or abilities which an employee will be expected to learn on the job. Section 14C(1).

The application of a construct validity strategy to support employee selection procedures is newer and less developed than criterion-related or content validity strategies. Continuing research may result in construct validity becoming more widely used. Because construct validity represents a generalization of findings, one situation in which construct validity might hold particular promise is that where it is desirable to use the same selection procedures for a variety of jobs. An overriding consideration in whether or not to consider construct validation is the availability of an individual with a high level of expertise in this field.

In some situations only one kind of validation study is likely to be appropriate. More than one strategy may be possible in other circumstances, in which case administrative considerations such as time and expense may be decisive. A combination of approaches may be feasible and desirable.

**55. Q. Why do the Guidelines recognize only content, construct, and criterion-related validity?**

A. These three validation strategies are recognized in the Guidelines since they represent the current professional consensus. If the professional community recognizes new strategies or substantial modifications of existing strategies, they will be considered and, if necessary, changes will be made in the Guidelines. Section 5A.

**56. Q. Why don't the Uniform Guidelines state a preference for criterion-related validity over content or construct validity?**

A. Generally accepted principles of the psychological profession support the use of criterion-related, content or construct validity strategies as appropriate. American Psychological Association Standards, E, pp. 25-26. This use was recognized by the supreme Court in Washington v. Davis, 426 U.S. 229, 247, fn. 13. Because the Guidelines describe the conditions under which each validity strategy is inappropriate, there is no reason to state a general preference for any one validity strategy.

**57. Q. Are the Guidelines intended to restrict the development of new testing strategies, psychological theories, methods of job analysis or statistical techniques?**

A. No. The Guidelines are concerned with the validity and fairness selection procedures used in making employment decisions, and are not intended to limit research and new developments. See Question 55.

**58**. Q. Is a full job analysis necessary for all validity studies?

A. It is required for all content and construct studies, but not for all criterion-related studies. See Sections 14A and 14B(2). Measures of the results or outcomes of work behaviors such as production rate or error rate may be used without a full job analysis where a review of information about the job shows that these criteria are important to the employment situation of the user. Similarly, measures such as absenteeism, tardiness or turnover may be used without a full job analysis if these behaviors are shown by a review of information about the job to be important in the specific situation. A rating of overall job performance may be used without a full job analysis only if the user can demonstrate its appropriateness for the specific job and employment situation through a study of the job. The Supreme Court held in Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), that measures of overall job performance should be carefully developed and their use should be standardized and controlled.

**59**. Q. Section 5J on interim use requires the user to have available substantial evidence of validity. What does this mean?

A. For purposes of compliance with 5J, "substantial evidence" means evidence which may not meet all the validation requirements of the Guidelines but which raises a strong inference that validity pursuant to these standards will soon be shown. Section 5J is based on the proposition that it would not be an appropriate allocation of Federal resources to bring enforcement proceedings against a user who would soon be able to satisfy fully the standards of the Guidelines. For example, a criterion-related study may have produced evidence which meets almost all of the requirements of the Guidelines with the exception that the gathering of the data of test fairness is still in progress and the fairness study has not yet produced results. If the correlation coefficient for the group as a whole permits the strong inference that the selection procedure is valid, then the selection procedure may be used on an interim basis pending the completion of the fairness study.

**60**. Q. What are the potential consequences to a user when a selection procedure is used on an interim basis?

A. The fact that the Guidelines permit interim use of a selection procedure under some conditions does not immunize the user from liability for back pay, attorney fees and the like, should use of the selection procedure later be found to be in violation of the Guidelines. Section 5J. For this reason, users should take steps to come into full compliance with the Guidelines as soon as possible. It is also appropriate for users to consider ways of minimizing adverse impact during the period of interim use.

**61**. Q. Must provisions for retesting be allowed for job-knowledge tests, where knowledge of the test content would assist in scoring well on it the second time?

A. The primary intent of the provision for retesting is that an applicant who was not selected should be given another chance. Particularly in the case of job-knowledge tests, security precautions may preclude retesting with the same test after a short time. However, the opportunity for retesting should be provided for the same job at a later time, when the applicant may have acquired more of the relevant job knowledges.

**62**. Q. Under what circumstances may a selection procedure be used for ranking?

A. Criterion-related and construct validity strategies are essentially empirical, statistical processes showing a relationship between performance on the selection procedure and performance on the job. To justify ranking under such validity strategies, therefore, the user need show mathematical support for the proposition that persons who receive higher scores on the procedure are likely to perform better on the job.

Content validity, on the other hand, is primarily a judgmental process concerned with the adequacy of the selection procedure as a sample of the work behaviors. Use of a selection procedure on a ranking basis may be supported by content validity if there is evidence from job analysis or other empirical data that what is measured by the selection procedure is associated with differences in levels of job performance. Section 14C(9); see also Section 5G.

Any conclusion that a content validated procedure is appropriate for ranking must rest on an inference that higher scores on the procedure are related to better job performance. The more closely and completely the selection procedure approximates the important work behaviors, the easier it is to make such an inference. Evidence that better performance on the procedure is related to greater productivity or to performance of behaviors of greater difficulty may also support such an inference.

Where the content and context of the selection procedure are unlike those of the job, as, for example, in many paper-and-pencil job knowledge tests, it is difficult to infer an association between levels of performance on the procedure and on the job. To support a test of job knowledge on a content validity basis, there must be evidence of a specific tie-in between each item of knowledge tested and one or more work behaviors. See Question 79. To justify use of such a test for ranking, it would also have to be demonstrated from empirical evidence either that mastery of more difficult work behaviors, or that mastery of a greater scope of knowledge corresponds to a greater scope of important work behaviors.

For example, for a particular warehouse worker job, the job analysis may show that lifting a 50-pound object is essential, but the job analysis does not show that lifting heavier objects is essential or would result in significantly better job performance. In this case a test of ability to lift 50 pounds could be justified on a content validity basis for a pass/fail determination. However, ranking of candidates based on relative amount of weight that can be lifted would be inappropriate.

In another instance, a job analysis may reflect that, for the job of machine operator, reading of simple instructions is not a major part of the job but is essential. Thus, reading would be a critical behavior under the Guidelines. See Section 14C(8). Since the job analysis in this example did not also show that the ability to read such instructions more quickly or to understand more complex materials would be likely to result in better job performance, a reading test supported by content validity alone should be used on a pass/fail rather than a ranking basis. In such circumstances, use of the test for ranking would have to be supported by evidence from a criterion-related (or construct) validity study.

On the other hand, in the case of a person to be hired for a typing pool, the job analysis may show that the job consists almost entirely of typing from manuscript, and that productivity can be measured directly in terms of finished typed copy. For such a job, typing constitutes not only a critical behavior, but it constitutes most of the job. A higher score on a test which measured words per minute typed, with adjustments for errors, would therefore be likely to predict better job performance than a significantly lower score. Ranking or grouping based on such a typing test would therefore be appropriate under the Guidelines.

**63.** Q. If selection procedures are administered by an employment agency or a consultant for an employer, is the employer relieved of responsibilities under the Guidelines?

A. No. The employer remains responsible. It is therefore expected that the employer will have sufficient information available to show: (a) What selection procedures are being used on its behalf; (b) the total number of applicants for referral by race, sex and ethnic group; (c) the number of persons, by race, sex and ethnic group, referred to the employer; and (d) the impact of the selection procedures and evidence of the validity of any such procedure having an adverse impact as determined above.

## A. CRITERION-RELATED VALIDITY

**64.** Q. Under what circumstances may success in training be used as a criterion in criterion-related validity studies?

A. Success in training is an appropriate criterion when it is (1) necessary for successful job performance or has been shown to be related to degree of proficiency on the job and (2) properly measured. Section 14B(3). The measure of success in training should be carefully developed to ensure that factors which are not job related do not influence the measure of training success. Section 14B(3).

**65.** Q. When may concurrent validity be used?

A. A concurrent validity strategy assumes that the findings from a criterion-related validity study of current employees can be applied to applicants for the same job. Therefore, if concurrent validity is to be used, differences between the applicant and employee groups which might affect validity should be taken into account. The user should be particularly concerned with those differences between the applicant group and current employees used in the research sample which are caused by work experience or other work related events or by prior selection of employees and selection of the sample. See Section 14B(4).

**66.** Q. Under what circumstances can a selection procedure be supported (on other than an interim basis) by a criterion-related validity study done elsewhere?

A. A validity study done elsewhere may provide sufficient evidence if four conditions are met (Sec. 7B):

1. The evidence from the other studies clearly demonstrates that the procedure was valid in its use elsewhere.

2. The job(s) for which the selection procedure will be used closely matches the job(s) in the original study as shown by a comparison of major work behaviors as shown by the job analyses in both contexts.

3. Evidence of fairness from the other studies is considered for those groups constituting a significant factor in the user's labor market. Section 7B(3). Where the evidence is not available the user should conduct an internal study of test fairness, if technically feasible. Section 7B(3).

4. Proper account is taken of variables which might affect the applicability of the study in the new setting, such as performance standards, work methods, representative ness of the sample in terms of experience or other relevant factors, and the currency of the study.

**67.** Q. What does "unfairness of selection procedure" mean?

A. When a specific score on a selection procedure has a different meaning in terms of expected job performance for members of one race, sex or ethnic group than the same score does for members of another group, the use of that selection procedure may be unfair for members of one of the groups. See section 16V. For example, if members of one group have an average score of 40 on the selection procedure, but perform on the job as well as another group which has an average score of 50, then some uses of the selection procedure would be unfair to the members of the lower scoring group. See Question 70.

**68.** Q. When should the user investigate the question of fairness?

A. Fairness should be investigated generally at the same time that a criterion-related validity study is conducted, or as soon thereafter as feasible. Section 14B(8).

**69.** Q. Why do the Guidelines require that users look for evidence of unfairness?

A. The consequences of using unfair selection procedures are severe in terms of discriminating against applicants on the basis of race, sex or ethnic group membership. Accordingly, these studies should be performed routinely where technically feasible and appropriate, whether or not the probability of finding unfairness is small. Thus, the Supreme Court indicated in Albermarle Paper Co. v. Moody, 422 U.S. 405, that a validation study was "materially deficient" because, among other reasons, it failed to investigate fairness where it was not shown to be unfeasible to do so. Moreover, the American Psychological Association Standards published in 1974 call for the investigation of test fairness in criterion-related studies wherever feasible (pp. 43-44).

**70.** Q. What should be done if a selection procedure is unfair for one or more groups in the relevant labor market?

A. The Guidelines discuss three options. See Section 14B(8)(d). First, the selection instrument may be replaced by another validated instrument which is fair to all groups. Second, the selection instrument may be revised to eliminate the sources of unfairness. For example, certain items may be found to be the only ones which cause the unfairness to a particular group, and these items may be deleted or replaced by others. Finally, revisions may be made on the method of use of the selection procedure to ensure that the probability of being selected is compatible with the probability of successful job performance.

The Federal enforcement agencies recognize that there is serious debate in the psychological profession on the question of test fairness, and that information on that concept is developing. Accordingly, the enforcement agencies will consider developments in this field in evaluating actions occasioned by a finding of test unfairness.

**71.** Q. How is test unfairness related to differential validity and to differential prediction?

A. Test unfairness refers to use of selection procedures based on scores when members of one group characteristically obtain lower scores than members of another group, and the differences are not reflected in measures of job performance. See Sections 16V and 14B(8)(a), and Question 67.

Differential validity and test unfairness are conceptually distinct. Differential validity is defined as a situation in which a given instrument has significantly different validity coefficients for different race, sex or ethnic groups. Use of a test may be unfair to some groups even when differential validity is not found.

Differential prediction is a central concept for one definition of test unfairness. Differential prediction occurs when the use of the same set of scores systematically over predicts or under predicts job performance for members of one group as compared to members of another group.

Other definitions of test unfairness which do not relate to differential prediction may, however, also be appropriately applied to employment decisions. Thus these Guidelines are not intended to choose between fairness models as long as the model selected is appropriate to the manner in which the selection procedure is used.

**72.** Q. What options does a user have if a criterion-related study is appropriate but is not feasible because there are not enough persons in the job?

A. There are a number of options the user should consider, depending upon the particular facts and circumstances such as:

1. Change the procedure so as to eliminate adverse impact (see Section 6A);

2. Validate a procedure through a content validity strategy, if appropriate (see Section 14C and Questions 54 and 74);

3. Use a selection procedure validated elsewhere in conformity with the Guidelines (see Sections 7-8 and Question 66);

4. Engage in a cooperative study with other facilities or users (in cooperation with such users either bilaterally or through industry or trade associations or governmental groups), or participate in research studies conducted by the state employment security system. Where different locations are combined, care is needed to insure that the jobs studied are in fact the same and that the study is adequate and in conformity with the Guidelines (see Sections 8 and 14 and Question 45).

5. Combine essentially similar jobs into a single study sample. See Section 14B(1).

## B. CONTENT VALIDITY

**73.** Q. Must a selection procedure supported by content validity be an actual "on the job" sample of work behaviors?

A. No. The Guidelines emphasize the importance of a close approximation between the content of the selection procedure and the observable behaviors or products of the job, so as to minimize the inferential leap between performance on the selection procedure and job performance. However, the Guidelines also permit justification on the basis of content validity of selection procedures measuring knowledges, skills, or abilities which are not necessarily samples of work behaviors if: (1) The knowledge, skill, or ability being measured is operationally defined in accord with Section 14C(4); and (2) that knowledge, skill, or ability is a prerequisite for critical or important work behaviors. In addition users may justify a requirement for training, or for experience obtained from prior employment or volunteer work, on the basis of content validity, even though the prior training or experience does not duplicate the job. See Section 14B(6).

**74.** Q. Is the use of a content validity strategy appropriate for a procedure measuring skills or knowledges which are taught in training after initial employment?

A. Usually not. The Guidelines state (Section 14C[1]) that content validity is not appropriate where the selection procedure involves knowledges, skills, or abilities which the employee will be expected to learn "on the job". The phrase "on the job" is intended to apply to training which occurs after hiring, promotion or transfer. However, if an ability, such as speaking and understanding a language, takes a substantial length of time to learn, is required for successful job performance, and is not taught to those initial hires who possess it in advance, a test for that ability may be supported on a content validity basis.

**75**. Q. Can a measure of a trait or construct be validated on the basis of content validity?

A. No. Traits or constructs are by definition underlying characteristics which are intangible and are not directly observable. They are therefore not appropriate for the sampling approach of content validity. Some selection procedures, while labeled as construct measures, may actually be samples of observable work behaviors. Whatever the label, if the operational definitions are in fact based upon observable work behaviors, a selection procedure measuring those behaviors may be appropriately supported by a content validity strategy. For example, while a measure of the construct "dependability" should not be supported on the basis of content validity, promptness and regularity of attendance in a prior work record are frequently inquired into as a part of a selection procedure, and such measures may be supported on the basis of content validity.

**76**. Q. May a test which measures what the employee has learned in a training program be justified for use in employment decisions on the basis of content validity?

A. Yes. While the Guidelines (Section 14C[1]) note that content validity is not an appropriate strategy for knowledges, skills or abilities which an employee "will be expected to learn on the job," nothing in the Guidelines suggests that a test supported by content validity is not appropriate for determining what the employee has learned on the job, or in a training program. If the content of the test is relevant to the job, it may be used for employment decisions such as retention or assignment. See Section 14C(7).

**77**. Q. Is a task analysis necessary to support a selection procedure based on content validity?

A. A description of all tasks is not required by the Guidelines. However, the job analysis should describe all important work behaviors and their relative importance and their level of difficulty. Sections 14C(2) and 15C(3). The job analysis should focus on observable work behaviors and, to the extent appropriate, observable work products, and the tasks associated with the important observable work behaviors and/or work products. The job analysis should identify how the critical or important work behaviors are used in the job, and should support the content of the selection procedure.

**78**. Q. What is required to show the content validity of a paper-and-pencil test that is intended to approximate work behaviors?

A. Where a test is intended to replicate a work behavior, content validity is established by a demonstration of the similarities between the test and the job with respect to behaviors, products, and the surrounding environmental conditions. Section 14B(4).

Paper-and-pencil tests which are intended to replicate a work behavior are most likely to be appropriate where work behaviors are performed in paper and pencil form (e.g., editing and bookkeeping). Paper-and-pencil test of effectiveness in interpersonal relations (e.g., sales or supervision), or of physical activities (e.g., automobile repair) or ability to function properly under danger (e.g., firefighters) generally are not close enough approximations of work behaviors to show content validity.

The appropriateness of tests of job knowledge, whether or not in pencil and paper form, is addressed in Question 79.

**79**. Q. What is required to show the content validity of a test of a job knowledge?

A. There must be a defined, well recognized body of information, and knowledge of the information must be prerequisite to performance of the required work behaviors. The work behavior(s) to which each knowledge is related should be identified on an item-by-item basis. The test should fairly sample the information that is actually used by the employee on the job, so that the level of difficulty of the test items should correspond to the level of difficulty of the knowledge as used in the work behavior. See Section 14C(1) and (4).

**80**. Q. Under content validity, may a selection procedure for entry into a job be justified on the grounds that the knowledges, skills or abilities measured by the selection procedure are prerequisites to successful performance in a training program?

A. Yes, but only if the training material and the training program closely approximate the content and level of difficulty of the job and if the knowledges, skills or abilities are not those taught in the training program. For example, if training materials are at a level of reading difficulty substantially in excess of the reading difficulty of materials used on the job, the Guidelines would not permit justification on a content validity basis of a reading test based on those training materials for entry into the job.

Under the Guidelines a training program itself is a selection procedure if passing it is a prerequisite to retention or advancement. See Section 2C and 14C(17). As such, the content of the training program may only be justified by the relationship between the program and critical or important behaviors of the job itself, or through a demonstration of the relationship between measures of performance in training and measures of job performance.

Under the example given above, therefore, where the requirements in the training materials exceed those on the job, the training program itself could not be validated on a content validity basis if passing it is a basis for retention or promotion.

## C. CONSTRUCT VALIDITY

**81**. Q. In Section 5, "General Standards for Validity Studies," construct validity is identified as no less acceptable than criterion-related and content validity. However, the specific requirements for construct validity, in Section 14D, seem to limit the generalizability of construct validity to the rules governing criterion-related validity. Can this apparent inconsistency be reconciled?

A. Yes. In view of the developing nature of construct validation for employment selection procedures, the approach taken concerning the generalizability of construct validity (section 14D) is intended to be a cautious one. However, construct validity may be generalized in circumstances where transportability of tests supported on the basis of criterion-related validity would not be appropriate. In establishing transportability of criterion-related validity, the jobs should have substantially the same major work behaviors. Section 7B(2). Construct validity, on the other hand, allows for situations where only some of the important work behaviors are the same. Thus, well-established measures of the construct which underlie particular work behaviors and which have been shown to be valid for some jobs may be generalized to other jobs which have some of the same work behaviors but which are different with respect to other work behaviors. Section 14D(4).

As further research and professional guidance on construct validity in employment situations emerge, additional extensions of construct validity for employee selection may become generally accepted in the profession. The agencies encourage further research and professional guidance with respect to the appropriate use of construct validity.

## V. Records and Documentation

**82**. Q. Do the Guidelines have simplified record keeping for small users (employers who employ one hundred or fewer employees and other users not required to file EEO-1, et seq. reports)?

A. Yes. Although small users are fully covered by Federal equal employment opportunity law, the Guidelines have reduced their record-keeping burden. See option in Section 15A(1). Thus, small users need not make adverse impact determinations nor are they required to keep applicant data on a job-by-job basis. The agencies also recognize that a small user may find that some or all validation strategies are not feasible. See Question 54. If a small user has reason to believe that its selection procedures have adverse impact and validation is not feasible, it should consider other options. See Sections 7A and 8 and Questions 31, 36, 45, 66, and 72.

**83**. Q. Is the requirement in the Guidelines that users maintain records of the race, national origin, and sex of employees and applicants constitutional?

A. Yes. For example, the United States Court of Appeals for the First Circuit rejected a challenge on constitutional and other grounds to the Equal Employment Opportunity Commission regulations requiring State and local governmental units to furnish information as to race, national origin and sex of employees. United States v. New Hampshire, 539 F.2d 277 (1st Cir. 1976), cert. denied, sub nom. New Hampshire v. United States, 429 U.S. 1023. The Court held that the record keeping and reporting

requirements promulgated under Title VII of the Civil Rights Act of 1964, as amended, were reasonably necessary for the Federal agency to determine whether the state was in compliance with Title VII and thus were authorized and constitutional. The same legal principles apply to record keeping with respect to applicants.

Under the Supremacy Clause of the Constitution, the Federal law requiring maintenance of records identifying race, sex and national origin overrides any contrary provision of State law. See Question 8.

The agencies recognize, however, that such laws have been enacted to prevent misuse of this information. Thus, employers should take appropriate steps to ensure proper use of all data. See Question 88.

**84**. Q. Is the user obliged to keep records which show whether its selection processes have an adverse impact on race, sex, or ethnic groups?

A. Yes. Under the Guidelines users are obliged to maintain evidence indicating the impact which their selection processes have on identifiable race, sex or ethnic groups. Sections 4 A and B. If the selection process for a job does have an adverse impact on one or more such groups, the user is expected to maintain records showing the impact for the individual procedures. Section 15A (2).

**85**. Q. What are the record keeping obligations of a user who cannot determine whether a selection process for a job has adverse impact because it makes an insufficient number of selections for that job in a year?

A. In such circumstances the user should collect, maintain, and have available information on the impact of the selection process and the component procedures until it can determine that adverse impact does not exist for the overall process or until the job has changed substantially. Section 15A(2)(c).

**86**. Q. Should applicant and selection information be maintained for race or ethnic groups constituting less than 2% of the labor force and the applicants?

A. Small employers and other small users are not obliged to keep such records. Section 15A(1). Employers with more than 100 employees and other users required to file EEO-1 et seq. reports should maintain records and other information upon which impact determinations could be made, because section 15A2 requires the maintenance of such information for "any of the groups for which records are called for by section 4B above." See also, Section 4A.

No user, regardless of size, is required to make adverse impact determinations for race or ethnic groups constituting less than 2% of the labor force and the applicants. See Question 16.

**87**. Q. Should information be maintained which identifies applicants and persons selected both by sex and by race or ethnic group?

A. Yes. Although the Federal agencies have decided not to require computations of adverse impact by subgroups (white males, black males, white females, black females--see Question 17), the Guidelines call for record keeping which allows identification of persons by sex, combined with race or ethnic group, so as to permit the identification of discriminatory practices on any such basis. Section 4A and 4B.

**88**. Q. How should a user collect data on race, sex or ethnic classifications for purposes of determining the impact of selection procedures?

A. The Guidelines have not specified any particular procedure, and the enforcement agencies will accept different procedures that capture the necessary information. Where applications are made in person, a user may maintain a log or applicant flow chart based upon visual observation, identifying the number of persons expressing an interest, by sex and by race or national origin; may in some circumstances rely upon personal knowledge of the user; or may rely upon self-identification. Where applications are not made in person and the applicants are not personally known to the employer, self-identification may be appropriate. Wherever

a self-identification form is used, the employer should advise the applicant that identification by race, sex and national origin is sought, not for employment decisions, but for record-keeping in compliance with Federal law. Such self-identification forms should be kept separately from the application, and should not be a basis for employment decisions; and the applicants should be so advised. See Section 4B.

**89.** Q. What information should be included in documenting a validity study for purposes of these Guidelines?

A. Generally, reports of validity studies should contain all the information necessary to permit an enforcement agency to conclude whether a selection procedure has been validated. Information that is critical to this determination is denoted in Section 15 of the Guidelines by the word "(essential)."

Any reports completed after September 25, 1978, (the effective date of the Guidelines) which do not contain this information will be considered incomplete by the agencies unless there is good reason for not including the information. Users should therefore prepare validation reports according to the format of Section 15 of the Guidelines, and should carefully document the reasons if any of the information labeled "(essential)" is missing.

The major elements for all types of validation studies include the following:

When and where the study was conducted.

A description of the selection procedure, how it is used, and the results by race, sex, and ethnic group.

How the job was analyzed or reviewed and what information was obtained from this job analysis or review.

The evidence demonstrating that the selection procedure is related to the job. The nature of this evidence varies, depending upon the strategy used.

What alternative selection procedures and alternative methods of using the selection procedure were studied and the results of this study.

The name, address and telephone number of a contact person who can provide further information about the study.

The documentation requirements for each validation strategy are set forth in detail in Section 15 B, C, D, E, F, and G. Among the requirements for each validity strategy are the following:

Criterion-Related Validity

A description of the criterion measures of job performance, how and why they were selected, and how they were used to evaluate employees.

A description of the sample used in the study, how it was selected, and the size of each race, sex, or ethnic group in it.

A description of the statistical methods used to determine whether scores on the selection procedure are related to scores on the criterion measures of job performance, and the results of these statistical calculations.

Content Validity

The content of the job, as identified from the job analysis.

The content of the selection procedure.

The evidence demonstrating that the content of the selection procedure is a representative sample of the content of the job.

Construct Validity

A definition of the construct and how it relates to other constructs in the psychological literature.

The evidence that the selection procedure measures the construct.

The evidence showing that the measure of the construct is related to work behaviors which involve the construct.

**90.** Q. Although the records called for under "Source Data", Section 15B(11) and section 15D(11), are not listed as "Essential", the Guidelines state that each user should maintain such records, and have them available upon request of a compliance agency. Are these records necessary? Does the absence of complete records preclude the further use of research data compiled prior to the issuance of the Guidelines?

A. The Guidelines require the maintenance of these records in some form "as a necessary part of the study." Section 15A(3)(c). However, such records need not be compiled or maintained in any specific format. The term "Essential" as used in the Guidelines refers to information considered essential to the validity report. Section 15A(3)(b). The Source Data records need not be included with reports of validation or other formal reports until and unless they are specifically requested by a compliance agency. The absence of complete records does not preclude the use of research data based on those records that are available. Validation studies submitted to comply with the requirements of the Guidelines may be considered inadequate to the extent that important data are missing or there is evidence that the collected data are inaccurate.

**91.** Q. What constitutes a "reasonable investigation of alternatives" as that phrase is used in the Answer to Question 49?

A. The Uniform Guidelines call for a reasonable investigation of alternatives for a proposed selection procedure as a part of any validity study. See Section 3B and Questions 48 and 49. A reasonable investigation of alternatives would begin with a search of the published literature (test manuals and journal articles) to develop a list of currently available selection procedures that have in the past been found to be valid for the job in question or for similar jobs. A further review would then be required of all selection procedures at least as valid as the proposed procedure to determine if any offer the probability of lesser adverse impact. Where the information on the proposed selection procedure indicates a low degree of validity and high adverse impact, and where the published literature does not suggest a better alternative, investigation of other sources (for example, professionally-available, unpublished research studies) may also be necessary before continuing use of the proposed procedure can be justified. In any event, a survey of the enforcement agencies alone does not constitute a reasonable investigation of alternatives. Professional reporting of studies of validity and adverse impact is encouraged within the constraints of practicality.

**92.** Q. Do significant differences between races, sexes, or ethnic groups on criterion measures mean that the criterion measures are biased?

A. Not necessarily. However, criterion instruments should be carefully constructed and data collection procedures should be carefully controlled to minimize the possibility of bias. See Section 14B(2). All steps taken to ensure that criterion measures are free from factors which would unfairly alter the scores of members of any group should be described in the validation report, as required by Section 15B(5) of the Guidelines.

**93.** Q. Can the use of a selection procedure which has been shown to be significantly related to only one or two job duties be justified under the Guidelines?

A. Yes. For example, where one or two work behaviors are the only critical or important ones, the sole use of a selection procedure which is related only to these behaviors may be appropriate. For example, a truck driver has the major duty of driving; and in addition handles customer accounts. Use of a selection procedure related only to truck driving might be acceptable, even if it showed no relationship to the handling of customer accounts. However, one or two significant relationships may occur by chance when many relationships are examined. In addition, in most practical situations, there are many critical and/or important work behaviors or work outcomes. For these reasons, reliance upon one or two significant relationships will be subject to close review, particularly where they are not the only important or critical ones.

**[Questions and Answers 91-93 read as added, effective May 2, 1980.]**

**94. Proposed.** Q. Do federal employment nondiscrimination laws apply to employers and other UGESP-covered entities when they use the Internet and related electronic data processing technologies for recruitment and selection?

A. Yes. Title VII and Executive Order 11246, as amended, apply when covered employers use the Internet and related electronic data processing technologies for recruitment and selection. Title VII covers private and public employers, employment agencies, and labor organizations as these terms are defined at 42 U.S.C. 2000e; id. at 2000e–16 (Federal Government). Title VII covers discrimination on the bases of race, color, religion, sex, or national origin. Executive Order 11246, as amended, which covers Federal Government contractors, their subcontractors, and their vendors, also prohibits employment discrimination because of race, color, religion, sex, or national origin.

**95. Proposed.** Q. Is Internet recruitment, like traditional recruitment, exempt from UGESP requirements?

A. Yes. As a business practice, recruitment involves identifying and attracting potential recruits to apply for jobs. Under UGESP, "recruitment practices are not considered * * * to be selection procedures," 21 and the UGESP requirements geared to monitoring selection procedures do not apply. Just as recruiters traditionally researched paper copies of professional and employer publications and listings to identify potential recruits, so recruiters now search huge bodies of information online—which include new resources such as personal Web sites and a variety of resume databases—for the same purpose. Online recruitment also involves organizing the search results into usable formats.

**96. Proposed.** Q. For recordkeeping purposes, what is meant by the term "applicant" in the context of the Internet and related electronic data processing technologies?

A. The term 'applicant' is discussed in the 1979 set of questions and answers promulgated by the agencies to clarify and provide a common interpretation of UGESP.22 Question & Answer 15 of that publication states:

The precise definition of the term 'applicant' depends upon the user's recruitment and selection procedures. The concept of an applicant is that of a person who has indicated an interest in being considered for hiring, promotion, or other employment opportunities.

In order for an individual to be an applicant in the context of the Internet and related electronic data processing technologies, the following must have occurred:

1. The employer has acted to fill a particular position;
2. The individual has followed the employer's standard procedures for submitting applications; and
3. The individual has indicated an interest in the particular position.

To elaborate on the three prongs of this test:
(1) The employer has acted to fill a particular position.

An example under the first prong is:

Example A: Individuals who register online for Customer Service Representative positions with an Internet and cable television service provider are asked to complete online personal profiles for the employer's resume database. The company acts to fill two vacancies at its Greater New York Service Center, and identifies 200 recruits from the database who have indicated that they are available to work in the New York area. One hundred of these people respond affirmatively and timely to the employer's inquiry about current interest in the particular New York vacancies. Even if the employer chooses to interview only 25 people for the position, all 100 are UGESP "applicants."

(2) The individual has followed the employer's standard procedures for submitting applications. If everyone who applies online must complete an online personal profile, only those individuals who do so can be UGESP applicants. If job seekers must use an electronic kiosk or contact a store manager to apply for a sales position, only those who do so can be UGESP applicants. If an employer e-mails online job seekers to ask if they are currently interested in a particular vacancy, only those who meet the employer's deadline can be UGESP applicants. These procedures and directions must be nondiscriminatory because recruitment and the application processes are subject to Title VII and Executive Order 11246.

(3) The individual has indicated an interest in the particular position. The core of being an "applicant" is asking to be hired to do a particular job for a specific employer. An individual can only accurately assess her interest in an employment opportunity of which she is aware.

With respect to Internet recruiting, this means that people who post resumes in third party resume banks or on personal Web sites are not UGESP "applicants" for all employers who search those sites. By posting a resume, the individual is advertising her credentials to the world and indicating a willingness to consider applying for new positions that may be brought to her attention. The individual is not indicating an interest in a particular position with a specific employer. If an employer contacts this individual about a particular position after finding her resume or personal profile online, and the individual indicates an interest in that position, then the individual becomes a UGESP "applicant," if she also meets the second prong of the test set forth above. Similarly, if an employer contacts an individual about a particular position in response to an unsolicited resume submitted online, and the individual indicates an interest in that position, then the individual becomes a UGESP "applicant" if she also meets the second prong of the test. Furthermore, even if the individual expresses an interest in a whole category of positions in response to an employer's solicitation—for example, marketing opportunities—the individual is not an applicant but is identifying the kinds of positions in which she may be interested. She is not indicating an interest in a particular position with a specific employer. It is only with respect to a particular position that an individual can assess her interest and choose whether or not to apply.

If an individual submits a resume or personal profile repeatedly to the same employer (for example, by adding numerous online job listings to her "shopping cart") or simply sends resumes (for example, by using automated online tools that identify job listings and submit resumes), the individual again is identifying the kinds of positions in which she is interested and is not automatically an applicant.

In certain circumstances, however, actions by a job seeker in response to an employer-hosted job listing will display hallmarks of an actual, individual assessment of interest in a particular position that the employer is acting to fill. For example, a job seeker's interest in a particular position becomes evident when the job seeker complies with an employer's procedural requirements that are unique to that position. Thus, completion and submission of an electronic application form, which form is unique for a particular position, indicates that the job seeker has a specific interest in that particular position.

Example B: Game Park is hiring park rangers, who perform specified duties and receive a starting salary within a particular range. Game Park posts an announcement on its Web page stating that it is accepting applications for its next park ranger training class, which starts in six months, and that all people who complete the required forms within one month will be evaluated for entrance into the class. Job seekers are directed to complete a detailed questionnaire asking about their experience in wildlife management, forest fire prevention, firearm safety and first aid. This profile is only suitable for the position of park ranger; it cannot be used for other Game Park positions. When these profiles are compiled into a database, all of the job seekers will be "applicants" if they satisfy the second prong of the above-referenced test.

**97. Proposed. Q.** Are all the search criteria that employers use subject to disparate impact analysis?

A. Yes. All search criteria used are subject to disparate impact analysis. Disparate impact analysis can be based on Census or workforce data. If a disparate impact is shown, the employer must demonstrate that its criteria are job-related and consistent with business necessity for the job in question. 42 U.S.C. 2000e–2(k).

Example C: An employer has two large printing plants. The company's employment Web page encourages individuals who visit to register to be considered as printers by submitting personal profiles online. Some basic identifying information is required, and one question asks for total years of printing experience. The employer authorizes the hiring of three new printers at one of the plants. To identify job seekers, Human Resources turns to several resources including its internal database. Even before it identifies those who properly followed the employer's online procedures and who are actually interested in these positions at this time, the employer searches the database to identify job seekers with two years printing experience. The search identifies 120 individuals, of whom only 50 express an interest in the positions and followed all the application procedures. These 50 people are UGESP applicants. However, the impact of the employer's screen for two years' printing experience can be analyzed using workforce and Census data. For example, the experience requirement could be assessed based on relevant labor force statistics. If a disparate impact on a protected group were shown, then the employer would have to show that two years of experience was job-related and consistent with business necessity for its printing positions.

**98. Proposed. Q.** Are employment tests, including those administered online, subject to UGESP?

A. Yes. Online tests, including tests of specific or general skills, are selection procedures rather than recruitment under UGESP because the test results are used as "a basis for making employment decisions." 24 Employers and recruiters who use such tests

should maintain records or other information "which will disclose the impact which its tests * * * have upon employment opportunities of persons by identifiable race, sex or ethnic group." 25 If employment tests have a disparate impact, they are lawful only if they are "job-related for the position in question and consistent with business necessity." 42 U.S.C. 2000e–2(k)(1)(A)(i).

**[Questions and Answers 94-98 are proposed guidelines.]**

Back | Uniform Guidelines | Home