No. 14-1952

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

PEDRO LOPEZ, ET AL.,

*Plaintiffs-Appellants*,

v.

THE CITY OF LAWRENCE, ET AL.,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

**BRIEF OF *AMICI CURIAE* NATIONAL URBAN LEAGUE
AND THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE IN SUPPORT OF PLAINTIFFS-APPELLANTS
AND REVERSAL OF THE JUDGMENT BELOW**

Michael L. Foreman
  *Counsel of Record*
PENNSYLVANIA STATE UNIVERSITY
DICKINSON SCHOOL OF LAW
CIVIL RIGHTS APPELLATE CLINIC
329 Innovation Blvd., Suite 118
State College, PA 16803
(814) 865-3832
mlf25@psu.edu
March 5, 2015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Fed. R. App. P., *amici curiae* herein state that they are neither publicly held corporations nor do they have parent corporations that are publicly held.

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………..i

TABLE OF AUTHORITIES…………………………………………...iii

INTEREST OF *AMICI CURIAE*…………………………………………...1

ARGUMENT……………………………………………………………4

I.    THE FIRST CIRCUIT SHOULD REMAND TO ENSURE THAT THE DISTRICT COURT DECIDES THIS CASE CONSISTENT WITH CONGRESS' INTENT AND DISPARATE IMPACT STANDARDS………………………………………………...6

    A.    By Not Considering Other Evidence Of Disparate Impact And Also By Disallowing Aggregation, The Trial Court Erred…....7

    B.    The Trial Court Erred By Resurrecting The Rejected *Ward's Cove* View Of Job Relatedness And Business Necessity In Concluding That A Test Which Is "Minimally Valid" Meets The *Griggs* Standard………………………………………….12

    C.    The Court's Improper Application Of The Less Discriminatory Alternative Requirement Places An Insurmountable Burden On Employees………………………………………………….14

II.    THE DISTRICT COURT ERRED BY IGNORING CONGRESS' INTENT TO SUBJECT STATE AND LOCAL POLICE DEPARTMENTS TO TITLE VII ENFORCEMENT ACTIONS…..17

III.    TO ACHIEVE WHAT CONGRESS INTENDED, DISPARATE IMPACT CLAIMS SHOULD BE ANALYZED CONSISTENT WITH THE GOALS OF TITLE VII AND IN A MANNER THAT RECOGNIZES THE VITAL ROLE IT PLAYS IN ATTEMPTING TO ACHIEVE EQUAL EMPLOYMENT OPPORTUNITY……….21

    A.    Congress Has Repeatedly Rejected Attempts By The Supreme Court To Constrict Disparate Impact's Application.................22

B.    As The Supreme Court Has Constrained An Employer's Ability To Seek Equal Employment Opportunity Through Affirmative Action And Diversity Initiatives, Disparate Impact Theory Must Remain A Realistic Method Of Attacking Discrimination…………………………………………..23

CONCLUSION………………………………………………………...27

# TABLE OF AUTHORITIES

## Cases

*Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014)...................................16

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)....................................... 12, 14

*Allen v. City of Chicago*, 351 F.3d 306 (7th Cir. 2003)...........................................16

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) ........................................................13

*Bos. Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017 (1st Cir. 1974)..............7, 10

*Bos. Police Superior Officers Fed'n v. City of Bos.*, 147 F.3d 13 (1st Cir. 1998) ..25

*Brackett v. Civil Serv. Com'n*, 850 N.E.2d 533 (Mass. 2006).................................25

*Bradley v. City of Lynn*, 443 F. Supp. 2d 145 (D. Mass. 2006)................................8

*Conn. v. Teal*, 457 U.S. 440 (1982) ........................................................................18

*Cotter v. City of Bos.*, 323 F.3d 160 (1st Cir. 2003)................................................25

*Dothard v. Rawlinson*, 433 U.S. 321 (1977) .............................................................7

*Fudge v. City of Providence Fire Dep't*, 766 F.2d 650 (1st Cir. 1985)................7, 8

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ........................................... *passim*

*Grutter v. Bollinger*, 539 U.S. 306 (2003).............................................................24

*Johnson v. City of Memphis*, 770 F.3d 464 (6th Cir. 2014)....................................16

*Jones v. City of Bos.*, 752 F.3d 38 (1st Cir. 2014) ................................................7, 8

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).....................................14

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)...24

iii

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ........................................................... 14, 15

*Runyon v. McCrary*, 427 U.S. 160 (1976) ............................................................21

*Taxman v. Bd. of Educ. of the Twp. of Piscataway*, 91 F.3d 1547 (3d Cir. 1996),
   *cert. denied Piscataway Twp. Bd. of Educ. v. Taxman*, 1997 U.S. LEXIS 7335
   (1997) ...........................................................................................................25

*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989) ...................... 13, 22

**Statutes**

42 U.S.C. § 2000e ................................................................................ 1, 15, 20, 21

Civil Rights Act of 1964, Pub. L. No. 88-352, Title VII (July 2, 1964) ................17

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991).......... *passim*

**Other Authorities**

114 Cong. Rec. H2899-00 (daily ed. Apr. 22, 1968)..............................................18

114 Cong. Rec. S4173-77 (Apr. 17, 1968) .........................................................4, 17

115 Cong. Rec. S6239-41 (June 12, 1969) .............................................................18

116 Cong. Rec. E7656-64 (daily ed. Aug. 14, 1970) ............................................20

118 Cong. Rec. S3460-64 (Mar. 6, 1972)..............................................................17

Emma G. Fitzsimmons, *Video Shows Cleveland Officer Shot Boy in Two Seconds*,
   N.Y. Times, Nov. 26, 2014 ...........................................................................4, 27

Executive Office of Administration & Finance, *About the Human Resources
   Division*, Mass.gov..........................................................................................10

H.R. Rep. No. 81-1434 (Aug. 21, 1970)................................................................20

iv

H.R. Rep. No. 92-238 (1971) .......................................................................17

*Hearings on the EEOA of 1971*, Subcomm. on Labor of the Comm. on Labor and
    Public Welfare, 92d Cong. 454 (1971) ...............................................17

James B. Comey, Director of the Federal Bureau of Investigation, *Hard Truths:
    Law Enforcement and Race*, Feb. 12, 2015 ..................................................5, 27

James L. Outtz & Daniel A. Newman, *A Theory of Adverse Impact*, *in* Adverse
    Impact:  Implications for Organizational Staffing and High Stakes Selection 53
    (James L. Outtz ed., 2010) ........................................................... 11, 21

Kevin M. Clermont & Stewart J. Schwab, *Employment Discrimination Plaintiffs in
    Federal Court:  From Bad to Worse?*, 3 Harv. L. & Pol'y Rev. 103 (2009)......23

S. Rep. No. 91-1137 (1970) ......................................................... 5, 18, 25

S. Rep. No. 92-415 (1971) .......................................................................17

U.S. Commission on Civil Rights, CR1.2:  P39, For All the People… By All the
    People (1969) .............................................................................. *passim*

Wesley Lowery, Carol D. Leonnig, & Mark Berman, *Even before Michael
    Brown's slaying in Ferguson, racial question hung over police*, Wash. Post,
    Aug. 13, 2014...............................................................................4, 27

## Regulations

29 C.F.R. § 1607.3 ....................................................................................12

29 C.F.R. § 1607.4 ...................................................................................7, 9

# INTEREST OF *AMICI CURIAE*[1]

The *amici*—the National Urban League and the National Association for the Advancement of Colored People (NAACP)—submit this brief, on motion, in support of Plaintiffs-Appellants' argument that the holding below violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.

*Amici* are committed to furthering the goals of the Civil Rights Act of 1964 and seek to provide employees with an effective recourse to address systemic denials of equal employment opportunities, specifically those that disparately impact minority applicants.

When analyzing Plaintiffs' disparate impact claims, the district court should have considered the historical context and development of disparate impact under the Civil Rights Act of 1964 and the 1972 amendments. The efficacy of disparate impact theory is its ability to correct systemic denials of equal employment opportunity. The decision below fundamentally departs from the intended purpose of disparate impact theory and its application to state and local municipalities under the law. *Amici* strongly believe that if left uncorrected, the errors of the

---

[1] As required by Local Rule 29(c)(5), *amici curiae* state that: (a) no party's counsel authored this brief in whole or in part; (b) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (c) no person—other than *amici curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

1

district court below will severely weaken the role that Congress intended disparate impact analysis to play in eliminating discrimination in the workplace generally and in state and local law enforcement specifically.

The decision of this court and the analysis employed to reach the decision will directly impact the lives and employment opportunities of the members *amici* are dedicated to serving. While this Court's decision will obviously impact the parties here, it will have a national impact because other courts will look to the decision as a way to achieve equal employment opportunity in law enforcement.

Established in 1910, the National Urban League is the nation's oldest and largest community-based movement devoted to empowering African Americans to enter the economic and social mainstream. Today, the National Urban League, headquartered in New York City, spearheads the non-partisan efforts of its local affiliates. There are 94 local affiliates of the National Urban League located in over 300 communities nationwide providing direct services to more than 2 million people nationwide through programs, advocacy, and research. The mission of the Urban League movement is to enable African Americans to secure economic self-reliance, parity, power, and civil rights. The Urban League seeks to implement that mission by, among other things, empowering all people in attaining economic self-sufficiency through job training, good jobs, homeownership, entrepreneurship, and wealth accumulation. The Urban League also promotes and ensures our civil

2

rights by actively working to eradicate all barriers to equal participation in all aspects of American society, whether political, economic, social, educational, or cultural.

Founded on February 12, 1909, the NAACP is the nation's oldest, largest, and most widely recognized grassroots-based civil rights organization. Its more than half-million members and supporters throughout the United States and the world are the premier advocates for civil rights in their communities, conducting voter mobilization and monitoring equal opportunity in the public and private sectors. The mission of the NAACP is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial hatred and racial discrimination. One of its specific objectives is "to seek enactment and enforcement of federal, state, and local laws securing civil rights."

## ARGUMENT

The district court's decision fundamentally departs from the fabric of Title VII.  In the 1972 amendments to the Civil Rights Act of 1964, Congress emphasized the importance of removing the discriminatory barriers to employment that existed in state and local governments.  Current events serve as a reminder that Congress' concerns, while lessened, remain relevant.

"The events of the past two weeks, triggered by [] tragic and senseless killing[s] . . . threaten to drive the races of this country even further apart."  114 Cong. Rec. S4173-77, at 4174 (Apr. 17, 1968).  Although Senator Brookes made this observation to Congress in 1968 following the assassination of Dr. Martin Luther King, Jr., the words could ring true today.[2]  Congress took a major step toward addressing this divide by seeking to remove barriers to equal employment opportunity for minorities with the 1972 amendments to the Civil Rights Act of 1964.  While our country has come a significant way since then, the racially-

---

[2] *See, e.g.*, Emma G. Fitzsimmons, *Video Shows Cleveland Officer Shot Boy in Two Seconds*, N.Y. Times, Nov. 26, 2014, http://www.nytimes.com/2014/11/27/us/vid    eo-shows-cleveland-officer-shot-tamir-rice-2-seconds-after-pulling-up-next-to-him.html?_r=0;    Wesley Lowery, Carol D. Leonnig, & Mark Berman, *Even before Michael Brown's slaying in Ferguson, racial question hung over police*, Wash. Post, Aug. 13, 2014, http://www.washingtonpost.com/politic    s/even-before-teen-michael-browns-slaying-in-mo-racial-questions-have-hung-over-police/2014/08/13/78b3c5c6-2307-11e4-86ca-6f03cbd15c1a_story.html.

charged events of the past year have brought back to the forefront a discussion about diversity in police forces.[3]

When Congress passed the 1972 amendments, it recognized that state and local law enforcement officers held a unique position in the public eye.  S. Rep. No. 91-1137, at 7 (1970) (statement of Sen. Williams).  Equitable opportunities for minorities in police departments tasked with protecting and serving communities would fulfill the promise of government "by all the people, for all the people."  *Id.* at 7 (statement of Sen. Williams).

While Congress debated the 1972 amendments to the Civil Rights Act, the U.S. Supreme Court in *Griggs v. Duke Power Co.* recognized the theory of disparate (adverse) impact, relying in part on the 1966 U.S. Equal Employment Opportunity Commission ("EEOC") guidelines as a vital means to achieve equal employment opportunity under Title VII.  *See Griggs v. Duke Power Co.*, 401 U.S. 424, 433 (1971).  Since then, the Supreme Court has consistently constricted the use of diversity and affirmative action programs to achieve similar goals.  Despite the Supreme Court's attempts to retreat from the disparate impact theory of equal

---

[3] "Serious debates are taking place about how law enforcement personnel relate to the communities they serve, about the appropriate use of force, and about real and perceived biases, both within and outside of law enforcement."  James B. Comey, Director of the Federal Bureau of Investigation, *Hard Truths:  Law Enforcement and Race*, Feb. 12, 2015, http://www.fbi.gov/news/speeches/hard-truths-law-enforcement-and-race.

opportunity articulated in *Griggs*, Congress explicitly rebuffed the Court by codifying the disparate impact standard in Title VII. *See* Civil Rights Act of 1991, Pub. L. No. 102-166 § 3, 105 Stat. 1071 (1991). As a result, disparate impact theory remains the most effective method for minority police officers to address systemic hurdles—past and present—to equal employment opportunities.

If allowed to stand, the district court's decision would effectively preclude a plaintiff from establishing a disparate impact claim of discrimination. For the reasons discussed below, the district court's decision should be vacated and remanded.

## I. THE FIRST CIRCUIT SHOULD REMAND TO ENSURE THAT THE DISTRICT COURT DECIDES THIS CASE CONSISTENT WITH CONGRESS' INTENT AND DISPARATE IMPACT STANDARDS.

The court's analysis places an impermissibly high burden on plaintiffs to establish their *prima facie* case, an impermissibly low burden on defendants to prove job relatedness, and an impermissibly high burden on plaintiffs to demonstrate a less discriminatory alternative. Plaintiffs address the many errors in the district court's opinion in great detail. *Amici* will not repeat those arguments but will highlight a few key examples of how the district court applied the wrong legal standards and ignored Congressional intent in its analysis.

6

**A.    By Not Considering Other Evidence Of Disparate Impact And Also By Disallowing Aggregation, The Trial Court Erred.**

The Supreme Court has described a plaintiff's initial burden in disparate impact actions as needing to show that "the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern." *Dothard v. Rawlinson*, 433 U.S. 321, 329 (1977). One way of demonstrating disparate impact is through a statistical analysis that shows a statistically significant disparity. *See Jones v. City of Bos.*, 752 F.3d 38, 46 (1st Cir. 2014). A second means, particularly when dealing with small sample sizes, is to look at the totality of the circumstances.[4] *See Bos. Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1021 (1st Cir. 1974); *see also* 29 C.F.R. § 1607.4(D). In this regard, "[the First C]ircuit has held that, where sample sizes are small, *other* evidence of 'disparate impact' may be highly relevant." *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 659 (1st Cir. 1985) (Breyer, J., concurring) (emphasis in original) (citing *Beecher*, 504 F.2d at 1021). This holding is consistent with the EEOC Guidelines that the Supreme Court gave "great deference" to when evaluating disparate impact.[5]

---

[4]  The Supreme Court has accepted statistical evidence of disparate impact without the requirement of formal statistical significance as applied by the First Circuit. *See Ricci v. DeStefano*, 557 U.S. 557, 586-87 (2009). Instead, the Supreme Court has relied on the EEOC's 80% rule 'rule of thumb'. *Id.*

[5] *Griggs*, 401 U.S. at 433-34 ("The administrative interpretation of the Act by the enforcing agency is entitled to great deference. . . . Since the Act and its legislative

7

According to the Guidelines, courts may consider evidence of procedures used in "the same manner in similar circumstances elsewhere" when assessing the procedure's impact on small sample sizes. 29 C.F.R. § 1607.4(D). On both fronts, Plaintiffs carried their burden.

With respect to statistical significance, the district court accepted that the promotional tests had a disparate impact in Boston, while it erroneously rejected the aggregated statistical data that highlighted significant racial disparities among the police departments of the other municipalities that used the same process and a substantially similar test. Record Appendix ("R.") at 108. Consequently, the district court held that the plaintiffs failed to show statistical significance. R. at 109.

This finding constitutes error because aggregation is permissible in this Circuit when statistically valid and other evidence of discriminatory impact is not present. *See Jones*, 752 F.3d at 48 (recognizing that "some form of aggregation . . . may be necessary" when statistically significant data is unavailable); *Fudge*, 766 F.2d at 657 (finding that aggregation is not improper where tests are not sufficiently different to justify independent analysis); *Bradley v. City of Lynn*, 443 F. Supp. 2d 145, 167 (D. Mass. 2006) (citing 29 C.F.R. § 1607.4(D) to conduct

history support the Commission's construction, this affords good reason to treat the guidelines as expressing the will of Congress.").

8

statewide aggregation).  Thus, the court erred when it failed to credit undisputed expert testimony of disparate impact demonstrated by the aggregation of statistically significant state-wide test results in a given year because a substantially similar exam was given in each of the aggregated municipalities.  R. at 105-07; Pls.' Br. at 85-89 (discussing adverse impact).

By prohibiting aggregation in any form and ignoring all of the other evidence of discriminatory impact, the trial court inevitably permits small jurisdictions to "freeze the status quo[,]" which minimizes promotional opportunities for minority officers.  *See Griggs*, 401 U.S. at 430.  This interpretation contradicts the purpose and effectiveness of the disparate impact remedy.

With respect to the totality of the circumstances, *amici* note just three failings of the district court.  First, the district court improperly excluded Boston's test administrations as evidence of procedures used in "the same manner in similar circumstances elsewhere."  29 C.F.R. § 1607.4(D).  Although the trial judge cited the relevant EEOC Guidelines in his opinion, he failed to apply them to the facts of this case.  *See* R. at 93.  All Defendants in this matter used the same process and almost the exact same exam as Boston—the exam that Boston concedes has a disparate impact on minority candidates.  The use of an almost exact replica of the discriminatory Boston exam by the smaller jurisdictions constituted a procedure

9

used in "the same manner in similar circumstances elsewhere[,]" 29 C.F.R. § 1607.4(D), that the trial court should have considered as relevant when reviewing the tests' effects in the smaller municipalities.

Second, the court ignored state-wide and national evidence of the discriminatory impact of paper-and-pen tests similar to the HRD test[6] at issue. The First Circuit has previously determined that "what conclusively tips the scale in plaintiffs' favor is the uncontroverted testimony, from experts . . . that black and Spanish surnamed candidates typically perform more poorly on paper-and-pencil tests of this type." *Beecher*, 504 F.2d at 1021. At trial here, all four experts agreed and the judge found that "minority candidates as a group tend to perform less well relative to non-minority candidates as a group on written multiple-choice examinations such as the HRD-prepared sergeants promotional exams given in 2005, 2006, 2007, and 2008." R. at 102. Indeed, Defendants' expert had little choice but to agree because he has acknowledged that "racial subgroup differences on cognitive tests are so large that they will create substantial reductions in the number of black applicants hired, to an extent that far exceeds the performance

---

[6] The Human Resources Division ("HRD") is part of the Massachusetts Executive Office of Administration and Finance, and is charged with establishing the hiring practices for state and local governments. Executive Office of Administration & Finance, *About the Human Resources Division*, Mass.gov, http://www.mass.gov/anf/employment-equal-access-disability/oversight-agencies/hrd/about-the-human-resources-division.html (last visited Feb. 18, 2015). HRD created the tests at issue in this matter.

advantages of these tests." James L. Outtz & Daniel A. Newman, *A Theory of Adverse Impact*, *in* <u>Adverse Impact: Implications for Organizational Staffing and High Stakes Selection</u> 53, 54-55 (James L. Outtz ed., 2010). Despite this, the trial judge did not consider this as evidence supporting a finding of disparate impact.

Third, Plaintiffs have shown that the written promotional test had a discriminatory impact in each municipality, in most cases resulting in the promotion of zero racial minorities during the testing period. R. at 4312-27 (listing the Weisen tables that depict the disparate impact of the tests in each of the relevant years and jurisdictions).[7] These disparities are particularly significant because in all municipalities other than Boston, candidates are promoted based on rank order established by the written exam results. R. at 98.

Because the court failed to apply appropriate standards relating to statistical significance and totality of the circumstances review, it ignored aggregation data and other relevant evidence of the tests' discriminatory impact. This matter should be remanded so that the district court may make a proper determination with these considerations.

---

[7] Plaintiffs discuss the facts of record that demonstrate the discriminatory impact of the HRD examination at length in their brief. Pls.' Br. at 76-83.

**B.    The Trial Court Erred By Resurrecting The Rejected *Ward's Cove* View Of Job Relatedness And Business Necessity In Concluding That A Test Which Is "Minimally Valid" Meets The *Griggs* Standard.**

The district court's error in failing to find that the promotional exams resulted in a disparate impact is further compounded by its improper analysis of business necessity.  To rebut a plaintiff's showing of disparate impact, a defendant must demonstrate a test's validity by showing that the challenged practice is job related and consistent with business necessity.  *Griggs*, 401 U.S. at 431, 436.  The EEOC has stated, and the Supreme Court has agreed, that "discriminatory tests are impermissible unless shown, by professionally accepted methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the jobs or jobs for which candidates are being evaluated." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975); *see also* 29 C.F.R. § 1607.3(a).

Congress codified both disparate impact claims and the business-necessity-job-relatedness standard in the Civil Rights Act of 1991.  Pub. L. No. 102-166 § 3. The "minimally valid" standard set forth by the district court, *see* R. at 124, is substantially lower than the "predictive of or significantly correlated with important elements of work behavior" standard articulated by the Supreme Court

12

and incorporated into the 1991 Act.  Pub. L. No. 102-166 § 3 (discussing *Griggs*, 401 U.S. at 433 n.9).

The district court's "minimally valid" standard even falls below the now rejected threshold articulated by the Supreme Court in *Wards Cove v. Atonio*.  The *Wards Cove* Court stated that "[t]he touchstone of this inquiry is a reasoned review of the employer's justification for his use of the challenged practice."  *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 659 (1989).  Subsequently, Congress explicitly rejected the *Ward's Cove* standard in its 1991 amendments.  Pub. L. No. 102-166 § 2(2) (rejecting *Ward's Cove*).

*Griggs* required an employer to show that the selection devices at issue "bear a demonstrable relationship to successful performance on the job," or are "demonstrably a reasonable measure of job performance."  *Griggs*, 401 US at 431, 436.  A promotional exam that is "minimally valid" is far removed from this standard and provides no meaningful guidance on what "minimally valid" really means in practice.  The Supreme Court has rejected holdings that are "unhelpful and imprecise" articulations of the legal standard.  *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).

The district court's impermissible creation of a "minimally valid" standard in place of the *Griggs*' standard requires that the district court's opinion be vacated and the case remanded.

13

### C. The Court's Improper Application Of The Less Discriminatory Alternative Requirement Places An Insurmountable Burden On Employees.

To demonstrate a less discriminatory alternative, a plaintiff need only prove that such an alternative exists. *Albemarle*, 422 U.S. at 425 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973)) ("It remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'"); *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009). ("[T]he City could be liable for disparate-impact discrimination . . . if there existed an equally valid, less-discriminatory alternative that served the City's needs but that the City refused to adopt."). A court is not to measure whether an alternative *eliminates* disparate impact, but whether it is *less* discriminatory. *Id.* at 578 ("[A] plaintiff may still succeed by showing that the employer refuses to adopt an available alternative practice that has *less* disparate impact . . .") (emphasis added).

Plaintiffs examine these alternatives in their brief at pages 60 to 71. *Amici* discuss just two alternatives to demonstrate how the district court erred in applying the legal standard. For example, despite acknowledging that "[a]ll the testifying experts agreed that banding can be a tool to reduce adverse impact[,]" the district court rejected banding for the 2008 exam because "a justice of the Massachusetts

14

Superior Court enjoined the use of banding to score the 2008 police promotional exams." R. at 133. This reasoning is particularly suspect in light of the *Ricci* Court's observation that "[a] state court's prohibition of banding, as a matter of municipal law under the charter, may not eliminate banding as a valid alternative under Title VII." *Ricci*, 557 U.S. at 590 (citing 42 U.S.C. § 2000e-7).[8] Plaintiffs' counsel discusses the district court's improper rejection of banding at great length. Pls.' Br. at 20, 23, 39, 65-66, 69.

In another part of the analysis, the district court misapprehended its responsibilities under Title VII with respect to assessment center alternatives. The court was not to measure whether the alternatives presented *eliminated* disparate impact, but whether they were *less* discriminatory. *Ricci*, 557 U.S. at 578 ("[P]laintiff may still succeed by showing that the employer refuses to adopt an available alternative practice that has *less* disparate impact . . .") (emphasis added). This improper analysis led the court to conclude that the "failure" of the 2002 test was partial justification for the exclusion of assessment centers in the 2005 and 2008 exams, leading the district court to the improper conclusion that because assessment centers were not effective in 2002, they would not be effective in the testing cycles at issue. R. at 132, 134-35. Assessment centers, along with a variety of other testing methods—written work samples, oral work samples, career review

---

[8] Elevating state law over Title VII raises obvious Supremacy Clause concerns.

boards—are commonly used throughout the country to ensure equal opportunity in police departments.  R. at 454-59, 480, 840-45, 2427-30.

Unlike the Defendants, police departments across the country have implemented promotion procedures that either examined an applicant's capacities through a variety of methods, or diminished a police department's reliance on discriminatory written test scores.  *See, e.g.*, *Johnson v. City of Memphis*, 770 F.3d 464, 475-78, 485 (6th Cir. 2014) (holding that the five-part test that utilized scenario-based, written, verbal, and logic based testing methods had no less discriminatory alternative); *Adams v. City of Indianapolis*, 742 F.3d 720, 724-25 (7th Cir. 2014) (discussing city's use of three-part test that used written, oral, and profile assessments); *Allen v. City of Chicago*, 351 F.3d 306, 309, 317 (7th Cir. 2003) (holding that a promotional exam that utilized multiple choice, and written work activity and behavioral simulations, or a merit process did not violate Title VII).  By diversifying the methods of examining promotion applicants, police departments have attempted to progress beyond the discriminatory practices identified by the U.S. Commission on Civil Rights ("USCCR") in its 1969 Report, discussed in Part II, *infra*.

The district court failed to consider the ample evidence of less discriminatory alternatives presented to it.  The court's decision allows Defendants to remain tethered to the past and obstinately rely on written examination methods

16

that screen out racial minority officers.  The purpose and history of Title VII, discussed below, demonstrate that such a result is impermissible.

## II.    THE DISTRICT COURT ERRED BY IGNORING CONGRESS' INTENT TO SUBJECT STATE AND LOCAL POLICE DEPARTMENTS TO TITLE VII ENFORCEMENT ACTIONS.

Following the assassination of Dr. Martin Luther King, Jr., Senator Brookes warned Congress of the need to prevent America's impending drift toward a racially segregated—separate and unequal—society.  114 Cong. Rec. S4173-77, at 4174 (Apr. 17, 1968) (statement of Sen. Brookes).  Attempting to address that reality, he introduced a bill that would remove Title VII's state and local government exemption.[9] *Id.*

The importance of removing the state and local government exemption to more effectively implement Title VII's goals was echoed throughout Congress.[10] Indeed, Congress recognized that the obstacles presented by the state

---

[9] The "state and local government exemption" refers to the absence of Title VII application and enforcement in state and local government employment prior to the amendments to the Civil Rights Act that Congress adopted in 1972.  *See* Civil Rights Act of 1964, Pub. L. No. 88-352, Title VII, § 701 (July 2, 1964) (defining "employers").

[10] *See, e.g.*, 118 Cong. Rec. S3460-64 (Mar. 6, 1972) (statement of Sen. Williams); S. Rep. No. 92-415, at 10 (1971) (statement of Sen. Williams); *Hearings on the EEOA of 1971*, Subcomm. on Labor of the Comm. on Labor and Public Welfare, 92d Cong. 454 (1971) (statement of Edward Taylor Anderson, Legislative Associate, Common Cause); H.R. Rep. No. 92-238, at 21-22 (1971) (statement of Rep. Hawkins); H.R. Rep. 91-1434, at 17 (1970) (statement of Rep. Perkins); S.

and local government exemption were "particularly acute in those governmental activities which are most visible to minority communities (notably education, law enforcement, and the administration of justice) with the result that the credibility of the government's claim to exist 'for all the people . . . by all the people' is called into serious question." S. Rep. No. 91-1137, at 7 (1970) (statement of Sen. Williams).

The USCCR[11] detailed this bleak reality in its 1969 report. U.S. Commission on Civil Rights, CR1.2: P39, For All the People… By All the People (1969) [hereinafter "Report"]; *see also Conn. v. Teal*, 457 U.S. 440, 449 n.10 (1982) (referencing the Report). The Report evaluated "the extent and nature of minority group employment by State and local governments," and specifically examined equal opportunity in police departments across seven metropolitan cities. Report, at viii.

---

Rep. No. 91-1137 (1970) (statement of Sen. Williams); 116 Cong. Rec. E7656-64, at 1301 (daily ed. Aug. 14, 1970) (statement of Sen. Mikva); 115 Cong. Rec. S6239-41, at 1788 (June 12, 1969) (statement of Sen. Brookes); 114 Cong. Rec. H2899-00, 2080-81 (daily ed. Apr. 22, 1968) (statement of Rep. Ottinger); *see also Conn. v. Teal*, 457 U.S. 440, 449 (1982).

[11] The USCCR is an "independent, bipartisan agency established by Congress in 1957 and directed to . . . [s]tudy and collect information concerning legal developments constituting a denial of equal protection of the laws under the Constitution [and] . . . [s]erve as a national clearinghouse for information in respect to denials of equal protection of the laws . . ." USCCR Report, at ii.

Most notably, the "[b]arriers and obstacles" obstructing a minority's opportunity for equal employment were substantially greater in police departments than in any other government department. Report, at 71. The various surveys conducted for the Report showed significantly low percentages of employed African American policemen compared to non-African American or non-Hispanic policemen.[12]  Report, at xi, 13. The low employment numbers of minority policemen were a result of "tension, suspicion, and hostility which exist between the Negro community and the police department, [which] are obstacles to the recruitment of black policemen." Report, at 72. Additionally, the Report indicated that almost every surveyed police department continued to implement difficult written examinations, despite the low passage rate and adverse impact on minority applicants. Report, at 74-75.

The Report reveals the context in which Congress passed the Civil Rights Act of 1972. Congress knew that recruitment and promotional techniques used by

---

[12] The following percentages document the number of employed African American policemen to the number of non-African American or non-Hispanic policemen at the time the Report was created: Atlanta, GA (3.9% / 18.4%); Houston, TX (3.0% / 20.4%); Memphis, TN (1.0% / 12.6%); Baton Rouge, LA (3.4% / 16.6%); San Francisco, CA (2.3% / 13.7%); Oakland, CA (3.9% / 22.2%); Philadelphia, PA (12.2% / 32.4%); Detroit, MI (1.9% / 26.1%). *See* Report, at 12-13. Similarly, the defendant municipalities using the HRD sergeants examination appointed minority candidates at disproportionate rates to non-minority candidates. *See* R. at 110-14 (Springfield, 2005 (0% / 21%), 2007 (12.5% / 30%); Lowell, 2006 (0% / 19%); Lawrence, 2006 (0% / 8%)).

state and local police departments had a disparate impact on minority applicants.[13]  In response, Congress amended Title VII through the Civil Rights Act of 1972, and explicitly defined "persons" to include "governments, governmental agencies, [and] political subdivisions . . ."   42 U.S.C. § 2000e(a).  By bringing state and local governments under the purview of the Act, Congress attacked discriminatory employment practices where they were traditionally most pervasive.  H.R. Rep. No. 81-1434, at 9 (Aug. 21, 1970) (statement by Rep. Perkins); 116 Cong. Rec. E7656-64, at 1301 (daily ed. Aug. 14, 1970) (statement of Sen. Mikva).

The legislative history demonstrates that Congress intended Title VII to apply to state and local government employers, particularly police departments, in order to remedy the problematic discrimination that persisted during the 1960s and 1970s and still reverberates today.  On this point, there should be no debate.  James L. Outtz (the Defendants' expert) acknowledges that "[w]e [researchers and practitioners] generally advocate for the following principles, objectives, and

---

[13] The Report also noted that disparate impact in police departments relentlessly continued beyond the recruitment process.  Report, at 83 ("Reports of discriminatory treatment in work assignments, promotions, and personal interaction were more frequent in the police and fire departments than in any other area of government studied by the Commission.").  The Report's statistics revealed that minority policemen were rarely promoted to higher rankings.  *Id.*  Identical to the low minority recruitment numbers, the Report attributed these unfortunate statistics to the adverse written exams.  *Id.* at 83-84.

recognitions for studying (and discussing) adverse impact . . . (f) viewing race and occupational opportunity in historical context (in contrast to ignoring race, opportunity, and history)." Outtz & Newman, *supra* at 54. The historical context illustrates the evils that Title VII was intended to address and must inform a court's application of disparate impact analysis.

### III.    TO ACHIEVE WHAT CONGRESS INTENDED, DISPARATE IMPACT CLAIMS SHOULD BE ANALYZED CONSISTENT WITH THE GOALS OF TITLE VII AND IN A MANNER THAT RECOGNIZES THE VITAL ROLE IT PLAYS IN ATTEMPTING TO ACHIEVE EQUAL EMPLOYMENT OPPORTUNITY.

Justice Stevens has observed that "[t]he policy of the Nation as formulated by the Congress in recent years has moved constantly in the direction of eliminating racial segregation in all sectors of society[,]" which is "now an important part of the fabric of the law." *Runyon v. McCrary*, 427 U.S. 160, 190-91 (1976) (Stevens, J., concurring). The ability to prove unlawful discrimination through disparate impact analysis is an essential part of our country's equal employment opportunity fabric.

Importantly, in 1991, Congress codified the prohibition on discrimination arising under disparate impact analysis, thereby ensuring that disparate impact, as envisioned in *Griggs*, would endure as a vital means of achieving equal opportunity in the workplace. 42 U.S.C. § 2000e-2(k); *see also* Civil Rights Act of 1991, Pub. L. No. 102-166 § 2, 105 Stat. 1071 (1991). Given the racial disparities

21

in police forces nationwide, and the dearth of legal remedies available for employees and employers to achieve equal employment opportunities, courts must apply disparate impact analysis so as to ensure that the promise of Title VII can be achieved.

### A.    Congress Has Repeatedly Rejected Attempts By The Supreme Court To Constrict Disparate Impact's Application.

Where courts have interpreted Title VII inconsistent with its purpose of achieving equal opportunity in the workplace, Congress has acted promptly and decisively to overturn these decisions to renew the promise of Title VII. As discussed in Part I above, *Griggs* set the standard for disparate impact. Over the course of the next 18 years, however, the Court constrained the effectiveness of disparate impact in finding that there was "no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster" and that "the burden of persuasion . . . remains with the disparate-impact plaintiff." *Wards Cove*, 490 U.S. at 659.

Finding that disparate impact analysis had been impermissibly narrowed, in the Civil Rights Act of 1991, Congress declared that "the decision of the Supreme Court in [*Wards Cove*], has weakened the scope and effectiveness of Federal civil rights protections; and legislation is necessary to provide additional protections against unlawful discrimination in employment."    Pub. L. No. 102-166 § 2.

Congress clearly intended that Title VII and disparate impact analysis be interpreted so as to effectively ensure equal opportunity in the workplace.

**B.     As The Supreme Court Has Constrained An Employer's Ability To Seek Equal Employment Opportunity Through Affirmative Action And Diversity Initiatives, Disparate Impact Theory Must Remain A Realistic Method Of Attacking Discrimination.**

In pursuit of equal opportunity in the workplace, there are limited means available for remedying workplace discrimination:  disparate impact claims, disparate treatment claims, and affirmative action programs.  As explained below, however, disparate impact is the only viable method that remains to achieve equal employment opportunity on a systemic level.

Disparate treatment cases are difficult for employees to win.[14]  Although successful cases are an effective means to weed out individual instances of discriminatory practices, they do not achieve equal opportunity on a systemic basis because they do not address institutionalized discrimination like disparate impact

---

[14] Kevin M. Clermont & Stewart J. Schwab, *Employment Discrimination Plaintiffs in Federal Court:  From Bad to Worse?*, 3 Harv. L. & Pol'y Rev. 103, 112 (2009) (explaining that from 1979 to 2006, in pretrial adjudication, employment discrimination plaintiffs won 3.59% of adjudications compared to 21.05% of other plaintiffs; at trial, employment discrimination plaintiffs won 28.47% of cases compared to 44.94% of other plaintiffs.  From 1988 to 2004:  where plaintiffs won a pre-trial verdict, an appeal was 30.23% likely to be reversed, compared to a 10.69% reversal rate where a defendant won a pre-trial verdict.  At trial, plaintiffs who won were 41.10% likely to be reversed on appeal compared to 8.72% reversal rate where a defendant won a trial verdict).

does.  Disparate impact claims are the most realistic means to achieve equal opportunity in the workplace on a systemic level because of how the Supreme Court has limited the permissible application of affirmative action programs in all contexts and diversity justifications in the employment context.

Another method by which police departments sought to achieve equal employment opportunity was through affirmative action plans, but the Supreme Court has constrained the use of these programs under the Fourteenth Amendment.  *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720-22 (2007) (holding that where there is not a history of discrimination, school districts cannot implement affirmative action programs).  Further, although the Supreme Court has approved the use of diversity justifications under the Fourteenth Amendment in the context of education,[15] it has been reluctant to do so in the employment context.  Courts have instead generally disapproved of diversity justifications for use of race in employment hiring, finding that "there is no congressional recognition of diversity as a Title VII objective requiring accommodation."  *Taxman v. Bd. of Educ. of the Twp. of Piscataway*, 91 F.3d 1547, 1558 (3d Cir. 1996), *cert. denied Piscataway Twp. Bd.*

---

[15] *See Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (endorsing Justice Powell's view that diversity in higher education can be a compelling state interest justifying the use of race in affirmative action programs).

24

*of Educ. v. Taxman*, 1997 U.S. LEXIS 7335 (1997).  To date, the Supreme Court has not approved of diversity programs in the employment context when dealing with government entities.

Indeed, Boston and its surrounding municipalities attempted to ensure equal opportunity in their police departments by implementing the Personnel Administration Rule 10 ("PAR 10") to address the existence of employment discrimination within the workplace.[16]  Although PAR 10 was intended to remedy the past history of discrimination in the state, the First Circuit—consistent with Supreme Court precedent—limited its scope and efficacy by requiring that the affirmative action be narrowly tailored and subject to strict scrutiny.  *See Bos. Police Superior Officers Fed'n v. City of Bos.*, 147 F.3d 13, 25 (1st Cir. 1998); *see also Cotter v. City of Bos.*, 323 F.3d 160, 171 (1st Cir. 2003).

The importance of disparate impact claims in achieving equal employment opportunity is not a new revelation; their importance was first recognized by Congress in its 1972 amendment to the Civil Rights Act, where Senator Williams stated that "[e]xperts familiar with [employment discrimination] generally describe the problem in terms of 'systems' and 'effects' rather than simply intentional wrongs."  S. Rep. No. 91-1137, at 7 (1970) (statement of Sen. Williams).  Courts

---

[16] *See Brackett v. Civil Serv. Com'n*, 850 N.E.2d 533, 539 (Mass. 2006) (allowing the use of special certifications based on race, color, national origin, or sex where the department has discriminated against members of that group).

must recognize that Congress intended Title VII and disparate impact claims to address equal employment opportunity on a systemic level—in particular, within state and local governments.

The current state of the law directly affects the issues here. The Defendants—local police departments in Massachusetts—are government employers, and the district court has determined that the programs they use to hire and promote police officers do not act in a discriminatory manner. R. at 123-24. This means that neither disparate treatment litigation, affirmative action programs, nor diversity justifications can be used to achieve equality of opportunity in the workplace.

Plaintiffs must be permitted to seek equal employment opportunity through disparate impact litigation. Here, however, the district court applied an improper and hyper-technical analysis of disparate impact divorced from the historical context of Title VII and Congress' intent in enacting the law. The resultant analysis deprived Plaintiffs of any realistic means to seek equal opportunity in the workplace.

Where police departments determine promotions by systemic reliance on test scores, the First Circuit should ensure that these exams do not persist as "stumbling

blocks" for minority officers.[17]   Because supervisors are primarily responsible for deciding strategy and management, minority representation at a supervisory level is essential for police departments to be effective in diverse cities.

Racial disparity in police departments continues to exist and poses a serious issue throughout the United States, particularly in small municipalities.  The events of the last year have sparked a series of discussions highlighting the issues surrounding the barriers to employment for minority officers in police forces serving smaller communities.[18]   While these discussions are not necessarily indicative of discrimination in this particular case, they do reflect the very real concerns surrounding our response as a nation.  As a result, any court applying the standards for disparate impact should recognize both these concerns and Congressional intent in their analysis.  The district court erred because it did not consider either.

## CONCLUSION

While certain discriminatory hiring practices have been eliminated over the last 46 years, recent events reveal that equal opportunity in police departments

---

[17] Report, at 39-40 ("The written test was reported by several government officials to be a stumbling block for minorities.").

[18] *See, e.g.*, Fitzsimmons, *supra* note 2; Lowery, Leonnig, & Berman, *supra* note 2; Comey, *supra* note 3.

remains inadequate and that tensions between the races persist. Defendants are police departments that have failed to fulfill Congress' promise of governance "by all the people . . . for all the people." A court tasked with evaluating the Defendants' employment practices must be cognizant of the broad social purposes of Title VII that are reflected in its legislative history and the current social climate.

The district court erred by divorcing its analysis of the HRD promotional tests from Congress' explicit goal of eliminating discriminatory obstacles in state and local police departments. Further, the analysis set forth by the district court undermines the purpose of disparate impact theory that Congress repeatedly affirmed: the ability to provide meaningful recourse by eliminating discriminatory practices, procedures, and systems on a systemic basis. The result deprives Plaintiffs and the people of Massachusetts of Congress' promise, and allows the historic warnings and goals of Title VII to remain unheeded and unattained.

Therefore, the decision below should be vacated and remanded.


Respectfully submitted this 5th day of March, 2015.

/s/ Michael L. Foreman

Michael L. Foreman
  *Counsel of Record*
PENNSYLVANIA STATE UNIVERSITY

28

DICKINSON SCHOOL OF LAW
CIVIL RIGHTS APPELLATE CLINIC
329 Innovation Blvd., Suite 118
State College, PA 16803
(814) 865-3832
mlf25@psu.edu

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P.

   29(d) and 32(a)(7)(B) because:

   [X] this brief contains [6,330] words, excluding the part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P.

   32(a)(5) and the type of style requirements of Fed. R. App. 32(a)(6)

   because:

   [X] this brief has been prepared in a proportionally space typeface using [*Microsoft Word 2010*] in [*14pt Times New Roman*].


Dated:  _3/5/2015_                    /s/ *Michael L. Foreman*
                                          Michael L. Foreman

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 5th day of March, 2015, a true and accurate copy of the foregoing was electronically filed with the Clerk of the Court and served on counsel using the CM/ECF system.

I further certify on the 5th day of March, 2015, I caused the required copies of the Brief of *Amici Curiae* to be filed with the Clerk of the Court, via United Parcel Service Next Day Delivery, and served upon counsel for the Appellants and Appellees, at the addresses below.

*Attorneys for Plaintiffs Pedro Lopez, et al.*:

> Harold L. Lichten
> Benjamin Weber
> Lichten & Liss-Riordan, P.C.
> 729 Boylston Street, Ste. 2000
> Boston, MA 02116

*Attorneys for John Michael Sullivan, in his capacity as Mayor of the City of Lawrence, Massachusetts*:

> Charles Dunstan Boddy, Jr.
> Richard D'Agostino
> Office of the City Attorney
> 200 Common St., Ste. 306
> Lawrence, MA 01840

*Attorneys for William Manzi, III, in his capacity as Mayor of Methuen, Massachusetts*:

>  Anne L. Radazzo
>  25 Westwind Dr.
>  Methuen, MA 01844
>
>  Kerry M. Regan
>  City of Methuen
>  Office of the City Solicitor
>  41 Pleasant St., Suite 311
>  Methuen, MA 01844

*Attorneys for Commonwealth of Massachusetts*:

>  Iraida J. Alvarez
>  Robert Lawrence Quinan, Jr.
>  Sookyoung Shin
>  Mass. Attorney General's Office
>  1 Ashburton Place, 20th Floor
>  Boston, MA 02108

*Attorneys for City of Lowell*:

>  Rachel M. Brown
>  Shaprio Haber & Urmy LLP
>  Seaport East
>  2 Seaport Lane
>  Boston, MA 02210
>
>  Christine Patricia O'Connor
>  City of Lowell
>  375 Merrimack St., 3rd Fl.
>  Lowell, MA 01852

*Attorneys for City of Worcester, MA*:

>  Daniel C. Brown
>  Joshua Ryan Coleman

Tim D. Norris
Collins, Loughran & Peloquin P.C.
320 Norwood Park South
Norwood, MA 02062

*Attorneys for City of Boston*:

Kay H. Hodge
John Matthew Simon
99 High St., Suite 1601
Boston, MA 02201

Lisa Skehill Maki
City of Boston Law Department
One City Hall Plaza
Room 615
Boston, MA 02201

Robert P. Morris
Morgan, Brown & Joy LLP
200 State St., 11th Fl.
Boston, MA 02109

*Attorneys for City of Springfield, MA and Domenic J. Sarno, Jr. in his capacity as Mayor for the City of Springfield*:

Maurice Martin Cahillane
Egan, Flanagan & Cohen PC
67 Market St.
Springfield, MA 01102

Harry P. Carroll
John Thomas Liebel
Edward M. Pikula
City of Springfield Law Department
36 Court St.
Springfield, MA 01103

William G. Cullinan

33

O'Connor Martinelli & Cohn
1391 Main St., Ste. 1022
Springfield, MA 01103

*Attorneys for MA Bay Transportation Authority*:

Kevin Sean McDermott
MBTA Law Department
10 Park Plaza, Suite 7760
Boston, MA 02116


/s/ *Michael L. Foreman*
Michael L. Foreman

34