NO. 14-1952

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

PEDRO LOPEZ, individually and on behalf of a class of individuals similarly situated; ABEL CANO, individually and on behalf of a class of individuals similarly situated; KEVIN SLEDGE, individually and on behalf of a class of individuals similarly situated;

*(See inside cover for continuation of caption)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF AMICI CURIAE MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE – NEW ENGLAND AREA CONFERENCE, URBAN LEAGUE OF EASTERN MASSACHUSETTS AND PROFESSOR MARK BRODIN IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL OF THE JUDGMENT**

Gary Klein (C.A.B. 45412)
Kevin Costello
Corinne Reed
Klein Kavanagh Costello, LLP
85 Merrimac Street, 4th Floor
Boston, MA 02114
Phone: (617) 357-5500
Fax: (617) 357-5030
Email: klein@kkcllp.com
Email: costello@kkcllp.com
Email: reed@kkcllp.com

Ray McClain, Director
Employment Discrimination Project
Lawyer's Committee for Civil Rights
Under Law
1401 New York Ave., NW, Ste 400
Washington, DC 20005
Phone: (202) 662-8600
Fax: (202) 783-0857
Email:
  RMcClain@lawyerscommittee.org

Dated: March 9, 2015
    *Counsel for Amici Curiae (additional counsel listed on signature block)*

CHARLES DEJESUS, individually and on behalf of a class of individuals similarly situated; RICHARD BROOKS, individually and on behalf of a class of individuals similarly situated; THE MASSACHUSETTS HISPANIC LAW ENFORCEMENT ASSOCIATION, individually and on behalf of a class of individuals similarly situated; ROBERT ALVAREZ, individually and on behalf of a class of individuals similarly situated; SPENCER TATUM, individually and on behalf of a class of individuals similarly situated; SHUMEAND BENFOLD, individually and on behalf of a class of individuals similarly situated; ANGELA WILLIAMS-MITCHELL, individually and on behalf of a class of individuals similarly situated; GWENDOLYN BROWN, individually and on behalf of a class of individuals similarly situated; LYNETTE PRAILEAU, individually and on behalf of a class of individuals similarly situated; TYRONE SMITH, individually and on behalf of a class of individuals similarly situated; EDDY CHRISPIN, individually and on behalf of a class of individuals similarly situated; DAVID E. MELVIN, individually and on behalf of a class of individuals similarly situated; STEVEN MORGAN, individually and on behalf of a class of individuals similarly situated; WILLIAM E. IRAOLO, individually and on behalf of a class of individuals similarly situated; JOSE LOZANO, individually and on behalf of a class of individuals similarly situated; COURTNEY A. POWELL, individually and on behalf of a class of individuals similarly situated; JAMES L. BROWN, individually and on behalf of a class of individuals similarly situated; GEORGE CARDOZA, individually and on behalf of a class of individuals similarly situated; LARRY ELLISON, individually and on behalf of a class of individuals similarly situated; DAVID SINGLETARY, individually and on behalf of a class of individuals similarly situated; CHARISSE BRITTLE POWELL, individually and on behalf of a class of individuals similarly situated; CATHENIA D. COOPER-PATERSON, individually and on behalf of a class of individuals similarly situated; MOLWYN SHAW, individually and on behalf of a class of individuals similarly situated; LAMONT ANDERSON, individually and on behalf of a class of individuals similarly situated; GLORIA KINKEAD, individually and on behalf of a class of individuals similarly situated; KENNETH GAINES, individually and on behalf of a class of individuals similarly situated; MURPHY GREGORY, individually and on behalf of a class of individuals similarly situated; JULIAN TURNER, individually and on behalf of a class of individuals similarly situated; NEVA GRICE, individually and on behalf of a class of individuals similarly situated;

*(Caption continued)*

*(Continuation of caption)*

DELORES E. FACEY, individually and on behalf of a class of individuals similarly situated; LISA VENUS, individually and on behalf of a class of individuals similarly situated; RODNEY O. BEST, individually and on behalf of a class of individuals similarly situated; KAREN VANDYKE, individually and on behalf of a class of individuals similarly situated; ROBERT C. YOUNG, individually and on behalf of a class of individuals similarly situated; ROYLINE LAMB, individually and on behalf of a class of individuals similarly situated; LYNN DAVIS, individually and on behalf of a class of individuals similarly situated; JAMES A. JACKSON, individually and on behalf of a class of individuals similarly situated; JUAN ROSARIO, individually and on behalf of a class of individuals similarly situated; LOUIS ROSARIO, JR., individually and on behalf of a class of individuals similarly situated; OBED ALMEYDA, individually and on behalf of a class of individuals similarly situated; DEVON WILLIAMS, individually and on behalf of a class of individuals similarly situated; JULIO M. TOLEDO, individually and on behalf of a class of individuals similarly situated,

Plaintiffs – Appellants,

MARISOL NOBREGA, individually and on behalf of a class of individuals similarly situated

Plaintiff,

v.

CITY OF LAWRENCE, MASSACHUSETTS; CITY OF METHUEN, MASSACHUSETTS; COMMONWEALTH OF MASSACHUSETTS; PAUL DIETL, in his capacity as Personnel Administrator for the Commonwealth of Massachusetts; JOHN MICHAEL SULLIVAN, in his capacity as Mayor of the City of Lawrence, Massachusetts; WILLIAM MANZI, III, in his capacity as Mayor of the City of Methuen, Massachusetts; CITY OF LOWELL; CITY OF WORCESTER, MASSACHUSETTS; APPOINTING AUTHORITY FOR THE CITY OF LOWELL; MICHAEL O'BRIEN, in his capacity as City Manager of the City of Worcester, Massachusetts; CITY OF BOSTON, MA; CITY OF SPRINGFIELD, MA; DOMENIC J. SARNO, JR., in his capacity as Mayor for the City of Springfield;

*(Caption continued)*

*(Continuation of caption)*

MASSACHUSETTS BAY  TRANSPORTATION AUTHORITY; DANIEL
GRABAUSKAS, in his capacity as General  Manager; BOARD OF TRUSTEES
OF THE MASSACHUSETTS BAY TRANSPORTATION  AUTHORITY,

Defendants – Appellees,

WILLIAM F. MARTIN, in his capacity as Mayor of the City of Lowell,
Massachusetts;  KONSTANTINA B. LUKES, in her capacity as Mayor of the City
of Worcester, Massachusetts,

Defendants.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Fed. R. App. P., *amici curiae* herein state that they are neither publicly held corporations nor do they have parent corporations that are publicly held.  No publically held corporation owns 10% or more of their stock.

# Table of Contents

Table of Authorities ……………………………………………………………iii

Statement of Interest ……………………………………………………..vii

Statement of Amici Curiae Pursuant to Rule 29(B)(5) …………………………..xi

I.   INTRODUCTION ............................................................................ 1

II.  SUMMARY OF ARGUMENT ...................................................... 2

III. ARGUMENT ................................................................................... 3

   A.  The Critical Importance Of A Police Force That Reflects The Demographics Of The Community........................................................................... 3

      1. Police Force Diversity Was a Primary Reason for the Extension of Title VII Coverage to State and Local Employers Because Police Bias Was Contributing to Civil Unrest. ...................................................... 3

      2. Concerns About Perceived Police Bias Remain of Paramount Importance. .............................................................................. 4

      3. The Police Forces in the Defendant Municipalities — Particularly at the Rank of Sergeant — Do Not Reflect the Demographics of the Communities They Serve.......................................................... 7

   B.  Massachusetts Police Forces Have A Long History Of Bias In Hiring And Promotion. ...................................................................... 9

   C.  The District Court's Errors of Law Require Reversal of the Judgment Below................................................................................ 14

      1. Plaintiffs Demonstrated Disparate Impact in the Consistent and Substantial Differences in Mean Test Scores Among Candidates in Boston and Statewide................................................................................ 14

      2. The District Court Misapplied Controlling Title VII Standards Regarding Validation of Testing Devices with Disparate Impact. .............................. 17

3.  The District Court's Consideration of Plaintiffs' Less Discriminatory Alternatives was Plainly Inadequate.......................................................... 21

    a.  Other Communities.................................................................. 22

    b.  Costs ........................................................................................ 24

    c.  Title VII Principles ................................................................ 27

# Table of Authorities

## Cases

*Adams v. City of Chicago*, 469 F.3d 609 (7th Cir. 2006) ...................................... 22

*Allen v. City of Chicago*, 351 F.3d 306 (7th Cir. 2003)........................................ 22

*Altizer v. City of Roanoke*, No. 7:02-CV-00484, 2003 WL 1456514 (W.D. Va. Mar. 21, 2003) ................................................................................................ 23

*Boston Chapter, N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017 (1974)...................... 9

*Boston Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13 (1st Cir. 1998)................................................................................................... 8, 9, 12

*Brackett v. Civil Serv. Comm'n*, 447 Mass. 233 (2006) ........................................ 12

*Bradley v. City of Lynn*, 443 F. Supp. 2d 145 (D. Mass. 2006)............................. 24

*Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140 (2d Cir. 1991) . 14

*Capaci v. Katz & Besthoff*, 711 F.2d 647 (5th Cir. 1983) ...................................... 17

*Castro v. Beecher*, 334 F. Supp. 930 (1971), *aff'd in part, rev'd in part,* 459 F.2d 725 (1972) .......................................................................................... 9, 11

*Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972) ...................................................... 4

*Cotter v. City of Boston*, 323 F.3d 160 (1st Cir. 2003)............................................ 9

*Donahue v. City of Boston*, 304 F.3d 110 (1st Cir. 2002) ...................................... 28

*Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627 (N.D. Cal. 2007) ...................... 17

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) .................................................... 13

*Guardians Ass'n of N.Y.C. Police Dept., Inc v. Civil Serv. Comm'n of City of N.Y.*, 630 F.2d 79 (2d Cir. 1980) ................................................................................ 19

*Hearn v. City of Jackson*, 340 F. Supp. 2d 728 (S.D. Miss. 2003)........................ 22

*Isabel v. City of Memphis,* 404 F.3d 404 (6th Cir. 2005) ...................................... 16

*Johnson v. Metro. Gov't of Nashville & Davidson*, No. 3:07-0979, 2010 WL 3342211 (M.D. Tenn. April 24, 2010) ................................................................ 23

*Knight v. City of Hartford*, No. 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006) ........................................................................................... 22

*Mass. Ass'n of Afro-American Police, Inc. v. Boston Police Dep't*, 780 F.2d 5 (1st Cir. 1985) ..................................................................................................... 9, 12

*Mass. Ass'n of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256 (2001)..................................................................................................................... 12

*Mass. Ass'n of Afro-American Police, Inc. v. Boston Police Dep't,* 973 F.2d 18 (2000) .............................................................................................................. 9

*Nash v. City of Jacksonville*, 837 F.2d 1534 (11th Cir. 1988), *op. reinstated*, 905 F.2d 355 (11th Cir. 1990)................................................................................ 10, 14

*Paige v. California*, 291 F.3d 1141 (9th Cir. 2002) ............................................. 17

*San Antonio Hispanic Police Off. Org. v. City of San Antonio*, 188 F.R.D. 433 (W.D. Tex. 1999) ................................................................................................ 23

*Sanchez v. City of Santa Ana*, 928 F. Supp. 1494 (C.D. Cal. 1995)..................... 23

*Stuart v. Roache*, 951 F.2d 446 (1st Cir. 1991) ................................................... 8, 9

*Sullivan v. City of Springfield*, 555 F. Supp. 2d 246 (D. Mass. 2008) .................... 9

*United States v. City of Montgomery*, 948 F. Supp. 1553 (M.D. Ala. 1996).......... 23

*United States v. Vulcan Society, Inc.,* 637 F. Supp. 2d 77 (E.D.N.Y. 2009) .......... 20

*Vulcan Pioneers v. N.J. Dep't of Civil Servs*., 625 F. Supp. 527 (D.N.J. 1985), *aff'd* 832 F.2d 811 (3d Cir. 1987) ............................................................................ 10

*Washington v. Davis*, 426 U.S. 229 (1976) ........................................................... 21

**Other Authorities**

*Changing Demographics in Policing*, What-When-How.com, http://what-when-how.com/police-science/changing-demographics-in-policing ............................ 4

Eric H. Holder, Jr., Op-Ed., *From Eric Holder: A Message to the People of Ferguson,* ST. LOUIS POST-DISPATCH, Aug. 20, 2014......................................... 5, 6

George C. Thornton III & David M. Morris, *The Application of Assessment Center Technology to the Evaluation of Personnel Records*, 30 PUBLIC PERS. MGMT. 55 (2001) ................................................................................................................ 10

James B. Comey, Director, Federal Bureau of Investigation, Address at Georgetown University (Feb. 12, 2015)................................................................ 5

Lorie Fridell, Robert Lunney, Drew Diamond, and Bruce Kubu, *Racially Biased Policing: A Principled Response*, Washington DC: Police Executive Research Forum (2001)........................................................................................................ 6

Mark S. Brodin, *The Role of Fault and Motive in Defining Discrimination: The Seniority Question Under Title VII*, 62 N. CARO. L. REV. 943 (1984)................ 14

Michelle A. Travis, *Equality in the Virtual Workplace*, 24 BERKELEY J. EMP. & LAB. L. 283 (2003) ........................................................................................... 27

Milton J. Valencia and Evan Allen, *Diversity in Ranks Limited, Mass. Police Try to Build Links*, BOSTON GLOBE, Sept. 2, 2014....................................................... 8

N. Schmidt, et al., *Adverse Impact and Predictive Efficiency of Various Predictor Combinations*, 82 J. OF APPLIED PSYCHOL. 719-30 (1997) ................................. 10

Richard Duckett, *Worcester NAACP President Sees 'Hope for a Better Tomorrow*,'' WORCESTER TELEGRAPH, Jan. 18, 2015 ............................................ 8

*The Black-White Test Score Gap* (Christopher Jencks and Meredith Phillips, eds., The Brookings Inst. Press 1998) ......................................................................... 10

United States Department of Justice Civil Rights Division, *Investigation of the Ferguson Police Department* (Mar. 4, 2015)......................................................... 6

Winfred Arthur Jr., Bryan D. Edwards, & Gerald V. Barrett, *Multiple-Choice and Constructed Response Tests of Ability: Race-Based Subgroup Performance Differences On Alternative Paper-and-Pencil Test Formats*, 55 PERS. PSYCHOL. 985 (2002) ....................................................................................................... 10

**Regulations**

28 C.F.R. § 14(C)(9) ................................................................... 20

28 C.F.R. § 15(C)(7) ................................................................... 20

28 C.F.R. § 5(G) .......................................................................... 20

## STATEMENT OF INTEREST

Amici in this matter are a unique group of locally based organizations together with a prominent local Law Professor who share a common interest in diversity in the police hierarchy.  Together, the amici wish to urge this Court to consider the importance of promotion choices in local police departments not just to effectively eradicate the history of employment discrimination among police forces in Massachusetts, but also to align the composition of Massachusetts' police forces with the diversity of the communities they serve, and to provide a key tool for establishing trust between local police forces and minority communities.  The amici believe that a rote memorization test is both a poor indicator of the ability to perform supervision assignments in police forces and an anachronism that has historically suppressed the number of police sergeants in communities across Massachusetts.  In addition, amici are concerned that other communities across the country have moved far past those in Massachusetts in establishing non-discriminatory testing procedures and, as a result, in promoting minority officers.

The interest of the individual amici is as follows:

### Massachusetts Association of Minority Law Enforcement Officers (M.A.M.L.E.O)

Massachusetts Association of Minority Law Enforcement Officers (MAMLEO) is a not for profit, tax-exempt, Civic Law Enforcement Association

comprised of a diverse group of sworn, retired officers and civilians who are African American, Caribbean, Hispanic, Asian, and Cape Verdean. Its membership is drawn from communities across Massachusetts, including from among the cities and towns that are Defendants in this case.

MAMLEO has a direct interest in this case because its fundamental mission is to "[a]ctively work with the Boston Police Department and other Law Enforcement Agencies to improve the recruitment, hiring, and career advancement of minority candidates and officers interested in or already working in the field of Law Enforcement." Its organizational goals include securing all legal rights and affirmative action goals and privileges for minorities. Another key goal is developing effective relations with Massachusetts communities in order to establish trust between police officers and civilians in both the minority and non-minority communities.

**National Association for the Advancement of Colored People – New England Area Conference ("NAACP-New England")**

NAACP-New England is NAACP's governing and coordinating entity for Branches, College Chapters, High School Chapters, Youth Councils and Prison Branches in the states of Rhode Island, Massachusetts, New Hampshire, Maine and Vermont. The National Association for the Advancement of Colored People was founded on the beliefs embodied in the Constitution of the United States of

America.  It supports democracy, dignity and freedom.  Its interest in this matter stems from awareness of tensions between police forces and minority communities across Massachusetts.  It believes that those tensions can be alleviated by diversity in the police force that will promote understanding in the context of community policing and by fostering police activity that is fair and impartial in communities of color.

**Urban League of Eastern Massachusetts ("ULEM")**

Founded in 1917, ULEM is a non-profit organization which is one of the oldest affiliates within the National Urban League movement.  From the time its doors opened to the at-large Boston community and surrounding metropolitan area residents, ULEM has been employing a multi-point strategy to deliver services and programs that aim to increase self-reliance, specifically in the area of workforce development.  The mission of the Urban League of Eastern Massachusetts is to be a champion of civil rights dedicated to helping people improve their lives and to build stronger communities by providing local residents with education, job training and placement at no cost.  For nearly 100 years, ULEM's programs and services have given hope to its members and made a lasting, positive impact in the community.

ULEM's participation in this case is in furtherance of this mission, because fair promotions within local police departments empowers members of the

minority community, both in the police forces themselves and in providing community role models.  ULEM is supportive of the community policing model and believe that diversity within the police hierarchy is, in turn, essential to community policing.

**Professor Mark Brodin (Boston College Law School)**

Mark Brodin is Professor and Lee Distinguished Scholar at Boston College Law School, where he teaches and publishes in the areas of evidence, procedure, and employment discrimination law.  As a staff attorney with the Lawyers Committee for Civil Rights Under Law of the Boston Bar Association in the 1970s, he served as co-counsel in numerous cases challenging promotional practices in police departments across the Commonwealth, including Boston, Cambridge, Salem, and Barnstable.  Professor Brodin has substantial expertise in employment discrimination law that bears directly on the issues in this litigation and an interest in Title VII being interpreted in accordance with its intended purpose and meaning.

## STATEMENT OF AMICI CURIAE PURSUANT TO RULE 29(b)(5)

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief. No person other than the amici curiae, their members or their counsel contributed money that was intended to fund the preparation or submission of this brief.

## I.    INTRODUCTION

Coming at a time when the issue of police force diversity could not be more important, this case presents the Court with fundamental questions about fair promotion processes for minority police officers in Massachusetts under Title VII of the Civil Rights Act of 1964.  In the decision below, the District Court adopted an overly strict view of the proof required by promotion candidates to show disparate impact; set an extraordinarily low burden for the Defendants to show job-relatedness through content validity; and adjudged the Plaintiffs' proposed less discriminatory alternatives by a stringent standard that preordained their failure. The opinion, left to stand, would invite public employers to re-institute widely repudiated paper-and-pencil tests based on memorized materials – that is, it would revive the testing regime that yielded primarily white police and fire departments in so many cities before Title VII was extended to public employers in 1972.

In Massachusetts, the historical consequence of improper testing practices has been acute.  Stunningly, minority police sergeants in each Defendant's force comprise less than half the number necessary to properly correlate with the size of the relevant minority population.  Left undisturbed, the District Court's opinion creates substantial possibility that this disparity will get worse.

## II.    SUMMARY OF ARGUMENT

There is a long history of discrimination in both hiring and promotion among police departments in Massachusetts.  The consequence of that discrimination continues to be profound.  Evidence at trial established that none of the Defendants employ a police force that is representative of the racial makeup of the community it serves.  This problem merits a remedy consistent with Title VII.  In this era of renewed and heightened concern about racially biased police activities, including unrest in Ferguson, Missouri, and in other communities, half measures to combat employment discrimination and lip service to the concerns of the minority community are insufficient.

Error infects every aspect of the District Court's decision.  Its refusal to consider widely accepted statistical techniques allowing inference of disparate impact in small communities would necessarily insulate such communities from any disparate impact challenge to their promotion practices.  The District Court also misapplied the standard for finding content validity, particularly for a test whose results are applied in strict rank order.  Finally, the District Court ignores the widespread consensus, now firmly entrenched, rejecting the blind reliance on written exams that it endorses here.  Across the country, cities successfully employ cost-effective, less discriminatory alternatives to make promotion decisions.  The

Court's failure to consider properly the Plaintiffs' proposals for similar less discriminatory alternatives is inconsistent with Title VII and merits reversal.

## III.  ARGUMENT

### A.  The Critical Importance Of A Police Force That Reflects The Demographics Of The Community.

#### 1.  Police Force Diversity Was a Primary Reason for the Extension of Title VII Coverage to State and Local Employers Because Police Bias Was Contributing to Civil Unrest.

In 1972, Congress extended the coverage of Title VII to state and local employers.  A primary reason for this change was the importance of creating opportunities for employment and advancement of minority officers in local law enforcement.[1]  The concern of Congress was fueled by riots sparked by police misconduct in African American communities in the Watts section of Los Angeles in 1965; in the Division Street section of Chicago in 1966; and over 150 civil disturbances in 1967 in more than 125 cities.  The subsequent Report of the National Advisory Commission on Civil Disorders, published on March 1, 1968, identified grievances over police practices as among the most intense contributing factors causing the riots.[2]

---

[1] Brief of Amici Curiae National Urban League and the National Association for the Advancement of Colored People in Support of Plaintiffs-Appellants and Reversal of the Judgment Below at 20, 25-26, *Lopez, et al. v. The City of Lawrence, et al.*, No. 14-1952 (1st Cir. Mar. 5, 2015).

[2] Report of the National Advisory Commission on Civil Disorders (Mar. 1, 1968), http://www.eisenhowerfoundation.org/docs/kerner.pdf.

Barely had the national dialogue prompted by the Report begun when the

nation was shaken again by riots in Washington, D.C., Chicago, Baltimore, and

more than 100 other urban areas in the wake of Dr. Martin Luther King's

assassination on April 4, 1968. Many of the riots after the King assassination were

sparked by conflict between protesters and police. With this experience in the

recent past, the need for the face of law enforcement to reflect the racial

composition of the local community was painfully evident to the Congress that

enacted the 1972 amendments to Title VII. It was well-recognized at the time that

Boston was among the cities most in need of reform.[3]

### 2. Concerns About Perceived Police Bias Remain of Paramount Importance.

This case comes to the Court in the midst of a new crisis in American

policing. The tragic deaths of Michael Brown (Ferguson, Missouri), Eric Garner

(Staten Island, New York), Tamir Rice (Cleveland, Ohio) and Antonio Zambrano-

Montes (Pasco, Washington), among others, have raised serious questions in the

---

[3] A survey conducted in 1973 by the International Association of Chiefs of Police and the Law Enforcement Assistance Administration found that only 4% of local law enforcement officers in the United States were African American. *See Changing Demographics in Policing*, What-When-How.com, http://what-when-how.com/police-science/changing-demographics-in-policing (last visited Mar. 3, 2015). In Boston, the combined percentage of African American and Spanish-surnamed officers in 1970 was 2.3%, even after a special recruitment and hiring program was pursued in 1968. *See Castro v. Beecher*, 459 F.2d 725, 730 (1st Cir. 1972).

minds of many Americans about whether police forces are representative of the communities they serve.

Writing in the St. Louis Post less than two weeks after the Michael Brown shooting in Ferguson, Attorney General Eric Holder suggested that police forces must better reflect the racial demographics of the communities they serve in order to alleviate perceptions of bias. He wrote:

> [G]ood law enforcement requires forging bonds of trust between the police and the public. This trust is all-important, but it is also fragile. It requires that force be used in appropriate ways. Enforcement priorities and arrest patterns must not lead to disparate treatment under the law, even if such treatment is unintended. *And police forces should reflect the diversity of the communities they serve.*[4]

FBI Director James B. Comey, in a recent speech made at Georgetown University, echoed and extended the Attorney General's concern:

> Unfortunately, in places like Ferguson and New York City, and in some communities across this nation, there is a disconnect between police agencies and many citizens—predominantly in communities of color.[5]

As cities and towns move to community policing, the need for a diverse force that is representative of the community is particularly acute.[6] If police forces

---

[4] Eric H. Holder, Jr., Op-Ed., *From Eric Holder: A Message to the People of Ferguson,* ST. LOUIS POST-DISPATCH, Aug. 20, 2014, at A19 (emphasis added).
[5] James B. Comey, Director, Federal Bureau of Investigation, Address at Georgetown University (Feb. 12, 2015), *available at* http://www.fbi.gov/news/speeches/hard-truths-law-enforcement-and-race.

are going to reestablish trust in the eyes of the communities they serve, it is

essential that they reflect community demographics.[7]  The Justice Department's

recent study of misconduct by the Ferguson Police department thoroughly

identifies the lack of diversity and explains at length why force diversity is a

critical factor required to restore community trust.[8]  Improved hiring practices are

among its key recommendations.[9]

In short, this case is critical because absent continued effort to create a

diverse police force, with a diverse hierarchy, every fatal police shooting or

significant confrontation between citizens and the police, in every minority

community across Massachusetts, will, rightly or wrongly, be attributed to racism.

---

[6] Lorie Fridell, Robert Lunney, Drew Diamond, and Bruce Kubu, *Racially Biased Policing: A Principled Response* 1, 7-8, Washington DC: Police Executive Research Forum (2001).
[7]  The Bureau of Justice Statistics, based on analysis of data on police-public contact collected in the 2011 National Crime Victimization Survey, reported that, "When the street or traffic stops involved residents and officers of the same race or Hispanic origin, the individuals were more likely to believe the reason for the stop was legitimate and that police behaved properly than when the stops involved residents and officers of a different race or Hispanic origin." http://www.bjs.gov/content/pub/press/pbtss11rpa11pr.cfm (last visited Mar. 3, 2015).  *See also* Holder Op-Ed., *supra* at n.4.
[8] United States Department of Justice Civil Rights Division, *Investigation of the Ferguson Police Department* 79, 88-89, 95-96 (Mar. 4, 2015) *available at* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf.
[9] *Id*. at 95-96.

**3.  The Police Forces in the Defendant Municipalities — Particularly at the Rank of Sergeant — Do Not Reflect the Demographics of the Communities They Serve.**

The history of discriminatory hiring and promotion practices among the police forces being challenged in this case have rendered those forces sadly out of step with the racial demographics of the communities they serve, particularly at the rank of police sergeant.

Table 1 below compares the racial composition of the Defendant municipalities with the composition of each respective police force, organized by patrol officer and sergeant.[10]  The disparities are striking.  In every instance the percentage of minority sergeants in the police force falls far below the percentage of minorities in the relevant community.

---

[10] The numbers are calculated as of 2010 in light of the date of trial and come from two sources, the evidentiary record available to the Trial Court and 2010 census data for the relevant communities.  All census data is available at http://factfinder.census.gov.  The census data for 2010 was not available at the time of trial.

**TABLE 1.**[11]

| Jurisdiction | Minority Population (2010 Census) | Minority Patrol Officers | Minority Sergeants (by Percent)[12] | Minority Sergeants (Number) | Total Sergeants (Number) | Source of Workforce Composition In Trial Record |
|---|---|---|---|---|---|---|
| Lawrence | 81.4% | 28.2% | 9.1% | 2 | 22 | R.3207-12 |
| Springfield | 61.1% | 37.5% | 12.5% | 5 | 40 | R.1704-05; 3008 |
| Boston | 41.9% | 36.4% | 20.4% | 57 | 280 | R.2950-3002 |
| Worcester | 32.5% | 17.2% | 7.7% | 4 | 52 | R.3012; 3080-87 |
| Lowell | 24.1% | 19.3% | 6.7% | 2 | 30 | R.1308; 3138-42 |
| Methuen | 22.7% | Not in record | 0% | 0 | 12 | R.3151-52 |

Recent published news reports make clear that the lack of representative police forces persists as a problem across Massachusetts.[13]

---

[11] As used in Table 1, and consistent with the evidence presented below, "Minority" includes African American and Hispanic racial groups, combined, without other minority groups.

[12] These numbers would be even more abysmal but for judicially ordered processes permitting bypass of the results of prior rote memorization tests in connection with promotions to sergeant. *E.g., Boston Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13, 25 (1st Cir. 1998); *Stuart v. Roache*, 951 F.2d 446, 455 (1st Cir. 1991).

[13] *E.g.*, Milton J. Valencia and Evan Allen, *Diversity in Ranks Limited, Mass. Police Try to Build Links*, BOSTON GLOBE, Sept. 2, 2014, *available at* http://www.bostonglobe.com/metro/2014/09/01/massachusetts-police-forces-lag-racial-diversity/RnEIJW5TuVki4ndotvl2GK/story.html (citing statistics); Richard Duckett, *Worcester NAACP President Sees 'Hope for a Better Tomorrow*," WORCESTER TELEGRAPH, Jan. 18, 2015, *available at*

The problem with promotions is particularly acute. Table 1 shows that in Lawrence, Lowell, and Springfield, the percentage of minority sergeants is *approximately one third* the percentage of minority police officers (in Worcester 45%), meaning there is a sharp drop in minority representation at the promotional stage. Boston has a similar disparity, reflecting significant additional barriers to minority promotions. There can be little doubt that the connection between these disparities and testing practices is both causal and direct.

### B. Massachusetts Police Forces Have A Long History Of Bias In Hiring And Promotion.

Litigation challenging hiring and promotion selection processes in the Boston Police Department ("BPD") began with *Castro v. Beecher*, 334 F. Supp. 930 (1971), *aff'd in part, rev'd in part,* 459 F.2d 725 (1972) and has relentlessly persisted since.[14] The common theme running through this long line of decisions is the gross discriminatory impact, and stark absence of job-relatedness, of the

---

http://www.telegram.com/article/20150118/NEWS/301189674/0 (last viewed Mar. 5, 2015) (citing statistics that of Worcester's 346 police officers 66 are minorities and of "81 supervisors, 5 are minorities").

[14] The history is recounted in *Sullivan v. City of Springfield*, 555 F. Supp. 2d 246, 248 (D. Mass. 2008). *See also Cotter v. City of Boston*, 323 F.3d 160 (1st Cir. 2003); *Mass. Ass'n of Afro-American Police, Inc. v. Boston Police Dep't,* 973 F.2d 18 (2000); *Boston Police Superior Officers Fed'n,* 147 F.3d 13; *Stuart*, 951 F.2d 446; *Mass. Ass'n of Afro-American Police, Inc. v. Boston Police Dep't*, 780 F.2d 5 (1st Cir. 1985). *See also Boston Chapter, N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017 (1974) (finding similar multiple-choice exams for selection of firefighters discriminatory and non-job-related).

multiple-choice exams administered by City and State officials, despite their nearly universally recognized shortcomings. Indeed, the discriminatory impact of such testing methodologies is well documented in both professional literature[15] and decisional law.[16]

The exams serve to exclude minorities from consideration while at the same time having little if any predictive value, in part because they merely test the applicant's ability to memorize texts on a designated reading list. As U.S. District Judge Charles Wyzanski observed over forty years ago, "[i]nasmuch as the [police]

---

[15] *See, e.g.,* N. Schmidt, et al., *Adverse Impact and Predictive Efficiency of Various Predictor Combinations*, 82 J. OF APPLIED PSYCHOL. 719-30 (1997); *The Black-White Test Score Gap* 57-58 (Christopher Jencks and Meredith Phillips, eds., The Brookings Inst. Press 1998); Winfred Arthur Jr., Bryan D. Edwards, & Gerald V. Barrett, *Multiple-Choice and Constructed Response Tests of Ability: Race-Based Subgroup Performance Differences On Alternative Paper-and-Pencil Test Formats*, 55 PERS. PSYCHOL. 985, 991–92 (2002); George C. Thornton III & David M. Morris, *The Application of Assessment Center Technology to the Evaluation of Personnel Records*, 30 PUBLIC PERS. MGMT. 55, 56 (2001) ("The written examination certainly provides the best way to evaluate whether a candidate knows the rules of the organization and conceptual principles of policing. That information is a basic, necessary starting point for good supervision, but it is not sufficient for success in police administration and leadership.")

[16] *See, e.g., Vulcan Pioneers v. N.J. Dep't of Civil Servs.*, 625 F. Supp. 527, 539–40 (D.N.J. 1985), *aff'd* 832 F.2d 811 (3d Cir. 1987) (multiple-choice tests are "more probative of the test-taker's ability to recall what a particular text stated on a given topic than of his firefighting or supervisory knowledge or abilities."); *Nash v. City of Jacksonville*, 837 F.2d 1534, 1538–39 (11th Cir. 1988), *op. reinstated*, 905 F.2d 355 (11th Cir. 1990) ("The best that can be said of the City's [multiple choice] test based on the evidence at trial was that it may have been valid with respect to reading materials provided to the applicants. This is immaterial, however, to whether the content of the questions related to the performance of the job [of fire lieutenant]."

civil service examinations were not job related and were discriminatory against the plaintiffs, any state or city official, *who innocently or otherwise*, used the results of those examinations to deprive a plaintiff of a job opportunity deprived him of the equal protection of the laws ... ."[17]

The City of Boston itself has acknowledged as much in a 2002 brief to this Court:

> The Boston Police Department has a long history of discrimination in its hiring and promotional practices, a history well documented in a number of decisions of this Court and of the District Court.  There was undisputed evidence before the District Court that despite the best efforts of the Department's current leadership, the effects of the Department's past discrimination continued to be felt through the period at issue, including a continuing gross statistical disparity between the selection percentage of black officers and the selection percentage of white officers.  Moreover, there was undisputed evidence that the 1996 examination on which the promotions were based was not validated and had an adverse impact on African-American officers taking the test. …
>
> It is also undisputed that the Commissioner had real and legitimate concerns that MAMLEO, individual minority officers affected by the promotional process, or others would bring suit against the City and the Department if promotions were made in strict rank order.  Given the undisputed evidence of adverse impact, such litigation would have been meritorious.

Brief of Appellee the City of Boston, *Cotter v. City of Boston,* 323 F.3d 160 (1st Cir. 2003) (Nos. 02–1404, 02–1458 and 02–1459), 2002 WL 34217275, at *7.  Not surprisingly, MAMLEO is among the *amici* here.  The problems conceded by the

---

[17] *Castro*, 334 F. Supp. at 943 (emphasis added).

City of Boston in 2002 not only remain unsolved, but were aggravated by the City's refusal in 2005 and 2008 to conduct validated promotional processes.

Despite a Consent Decree entered in 1980 (and extended for over a decade) requiring that promotional examinations be validated according to the EEOC's Uniform Guidelines (29 C.F.R. § 1607.1 *et. seq.*),[18] by 1998 the BPD had given *only one* "validated-fair" exam, and minority officers continued to suffer the consequences in their group-wide failure to be promoted.[19]

Boston was not alone in suffering a glaring underrepresentation of minority police sergeants as a result of these non-validated promotional hurdles. Prior to 2001, the City of Worcester had never had a minority police sergeant, and as of 2004, it only had one. While minorities represented 27.6% of patrol officers on the MBTA force, as late as 1996 there was only one minority sergeant. *Brackett v. Civil Serv. Comm'n*, 447 Mass. 233, 245 (2006).

Although the evidence is limited, between 1985 and the time of trial, a period of over 25 years, Boston appears to have relied solely upon the statewide multiple-choice written test on all but three occasions-- 1985, 1992, and 2002.[20]

---

[18] *See Mass. Ass'n of Afro-American Police, Inc.*, 780 F.2d at 6; *Mass. Ass'n of Minority Law Enforcement Officers v. Abban*, 434 Mass. 256, 258 n.5 (2001).
[19] *Boston Police Superior Officers Fed'n*, 147 F.3d at 15.
[20] In 1987, Boston gave a multi-component exam, but discarded the results when an allegation was made that some video scenarios had been tainted, even though

The 1985 exam resulted in no adverse impact at the passing rate. (R.3297). In 1992, an examination was given which consisted of the written multiple-choice examination and a structured oral interview. In 2000, Boston hired a company that designed a multi-component examination process. However, Boston removed the performance review component. The non-video exercise/assessment center component had a significantly lower level of disparate impact on minority candidates than the written portion of the test. (R.450, 861-63).

In 2005 and 2008, however, Boston inexplicably returned to the same multiple-choice tests that had previously functioned as "built-in headwinds"[21] against minorities. Predictably, the sergeant examinations in those years effected a severe disparate impact on minority candidates both with respect to mean score differences and selection rates. The adverse impact was so highly statistically significant that the City of Boston did not even contest the issue of adverse impact. (R.108). The District Court consequently acknowledged that "[i]t is widely recognized among organizational psychologists, including the four experts who testified at trial, that minority candidates as a group tend to perform less well relative to non-minority candidates on written multiple-choice examinations such

that was allegation was later rejected by the Civil Service Commission years after the examination results were certified. *See Carr v. Pers. Adm'r* (R.3362-92).
[21] *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).

as the HRD-prepared sergeants promotional exams given in 2005, 2006, 2007, and 2008."  (R.102).

Nevertheless, the District Court's ultimate conclusion would ensure that the Sisyphean task of creating fair access to police promotion in the Commonwealth will go on.  Boston and the other Defendants stubbornly stand among the last hold-outs by continuing to use a testing device best described as a "quasi-academic hurdle" having little relation to job success.[22]  At some point, with the past as prologue, Defendants' insistence on the continued use of such devices is akin to intentionally discriminatory conduct.[23]

## C. The District Court's Errors of Law Require Reversal of the Judgment Below.

### 1. Plaintiffs Demonstrated Disparate Impact in the Consistent and Substantial Differences in Mean Test Scores Among Candidates in Boston and Statewide.

The record established that the differences in mean scores on the test statewide, between white candidates and minority candidates, was statistically significant in every year at issue in this case.  For 2005, 2006, and 2007, the

---

[22] *Nash*, 837 F.2d at 1539 n.7.  *See also infra* Section C.3.a. (compiling testing practices from around the country).

[23] As the Second Circuit concluded in a similar situation, the City's refusal to use banding and its determination to adhere to rank-order selection "belie a claim ... that [its] incumbent practices are being employed for non-discriminatory reasons." *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140, 1148 (2d Cir. 1991).  *See also* Mark S. Brodin, *The Role of Fault and Motive in Defining Discrimination: The Seniority Question Under Title VII*, 62 N. Caro. L. Rev. 943, 978-985 (1984).

differences ranged from 3.9 to 5.0 points, and the probability of the differences occurring by chance was less than one in 10,000,000 for each year separately; for 2008, the difference was 3.4 points and the probability was less than 1 in 100.[24] (R.4313, 4315, 4319).

In addition, Plaintiffs presented evidence that the differences in mean scores for four of the seven Defendants were both greater than the state-wide differences and had statistically significant adverse impact on minority candidates for five separate city promotional processes: for Boston in 2005 (6.4 points), Boston in 2008 (6.6 points), Lawrence in 2006 (6.0 points), Lowell in 2006 (9.1 points), and Springfield in 2005 (6.9 points). (*See* R.4311 Table 2a). These tests covered all the Boston promotions and 40% (17 of 43) of the promotions outside Boston. (R.4314, 4316, 4322). Plaintiffs' evidence was so strong that the City of Boston conceded disparate impact. (R.108, 347).

The District Court recognized that differences in mean test scores can be probative of disparate impact. (R.104). But the Court completely disregarded this aggregated evidence as to the six smaller defendant jurisdictions. It did so by relying on "Simpson's Paradox" – the belief that in some instances, applying a test of adverse impact to a large group can mask the fact that there are no differences in a subset of the group. (R.105-07). This was an error of law. The defense expert

---

[24] *See* Appellants' Brief at 81, summary chart.

who described Simpson's Paradox admitted that he had not analyzed the data from any of the defendant jurisdictions to determine whether the facts present in this case established Simpson's Paradox.[25] (R.2493). Without *proof* that such a "false positive" had occurred, the smaller jurisdictions failed to rebut the evidence of disparate impact represented by the mean scores. It was error for the District Court to rely on what amounted to hypothetical testimony about a potential flaw in the data to dismiss the claims against the other jurisdictions on this basis. As in *Isabel v. City of Memphis,* 404 F.3d 404, 409-10, 412 (6th Cir. 2005), a plaintiff can still show disparate impact based on significant differences in mean scores (6.4 points in *Isabel*), even where there is no statistical significance in the passing rate. Moreover, aggregation has long been found appropriate in disparate impact cases where the statistical record provides insufficient observations to establish statistical

---

[25] In fact, for several jurisdictions and years, the evidence is undisputed that Simpson's Paradox did not occur. According to Dr. Wiesen's Table 2a (R.4311), the difference in mean scores for Lowell alone in 2006 was statistically significant (9.1); for Lawrence, in 2006 the difference was significant (6.0 points), and in 2008 the difference of 3.3 points in mean scores was almost identical to the state-wide difference of 3.4 points; for Springfield, in 2005 the difference was significant (6.9 points) and in 2007 the difference of 5.7 points was greater than the statistically significant state-wide difference of 4.5; for Methuen, in 2006 the difference was only 0.2 points, but in 2008 the difference of 5.9 points in mean scores was 5.9 points, more than the state-wide difference of 3.4; for the MBTA, the differences were not statistically significant due to the small number of test-takers, but the differences were 3.3 points in 2005 and 1.8 points in 2007. Based on Table 2a, the only jurisdiction where the evidence from mean scores might fit Simpson's Paradox is Worcester; the evidence rejects Simpson's Paradox for each of the other jurisdictions.

significance. *See, e.g., Paige v. California*, 291 F.3d 1141, 1148-49 (9th Cir. 2002) (rejecting defendant's arguments against the use of aggregated data, noting that such data is acceptable when it is more probative than subdivided data); *Capaci v. Katz & Besthoff*, 711 F.2d 647, 654-55 (5th Cir. 1983) (rejecting segmented data as an "unfair and obvious attempt to disaggregate the data to the point where it was difficult to demonstrate statistical significance"); *Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 638-39 (N.D. Cal. 2007) (accepting statistics aggregated at national level where there was evidence that the challenged policy uniformly carried out in all regions).

If the District Court's rejection of valid aggregation methods is left undisturbed and future plaintiffs are required to show adverse effects *separately* for each year of the exam, small jurisdictions would be handed license to employ a discriminatory test in perpetuity. This is because these jurisdictions *never* promote enough sergeants in one process for minority candidates to show statistical significance. None of the smaller jurisdictions that are Defendants here had more than 8 promotions based on any single test cycle. (R.4314, 44316, 4318, 4320, 4322, 4326).

## 2. The District Court Misapplied Controlling Title VII Standards Regarding Validation of Testing Devices with Disparate Impact.

The District Court found, and Boston indeed concedes, that the sergeant's promotional exams in 2005 and 2008 had "a significant adverse impact on black

17

and Hispanic test-takers." (R.108).  It went on to conclude, incorrectly as a matter of law, that the exams could nonetheless be lawfully used by Defendants because they were "minimally valid."  As discussed at more length in Appellants' brief (at 25-40) the conclusion reflects a misunderstanding of the legal requirements for validation of a device with such predictable and overwhelming disproportionate impact.

The District Court relied primarily on the testimony of Defense witness and industrial psychologist Dr. Outtz, who conceded that the exam was not a valid predictor of job performance.  He reached this conclusion because the exam could not measure skills and abilities recognized by Defendants as essential to the supervisory position, such as leadership, decision-making, communication, interpersonal relations, and command presence.  Dr. Outtz opined, however, that the process somehow crossed the "threshold of validity" because such skills were included in the Education and Experience Rating Sheet (E & E) component. (R.123-24).[26]

The fundamental — and fatal — omission of both Dr. Outtz's defense of the promotion process and of the District Court's Order is that the Defendants did not

---

[26] Dr. Outtz testified and the District Court found that "the content validity of the exams could have been improved by the use of additional test elements, such as an assessment center."  (R.124).  All the E & E rating does is inventory prior employment and academic coursework, which have little if any relation to the missing supervisory components of the job assessment.

treat the test as having "minimal validity," by using it as a hurdle before other measures were used to distinguish other important qualifications of the candidates. Instead, without any examination of technical evidence to show that scores would be reliably repeated by candidates taking the test, the Defendants used the scores for rank order promotions.[27]

The Defendants and the trial judge here made the same error made by the City of New York in the leading case of *Guardians Ass'n of N.Y.C. Police Dept., Inc v. Civil Serv. Comm'n of City of N.Y.*, 630 F.2d 79, 100-01 (2d Cir. 1980), where the Second Circuit observed:

> [C]ontent validity is not an all or nothing matter; it comes in degrees. A test may have enough validity for making gross distinctions between those qualified and unqualified for a job, yet …
>
> Permissible use of rank-ordering requires a demonstration of such substantial test validity that it is reasonable to expect one- or two-point differences in scores to reflect differences in job performance. Our prior conclusion that the test itself may have had enough validity to be used does not, therefore, lead to approval of using its results for rank-ordered selections.

An essential element of showing that "one or two point differences in the scores can reflect differences in job performance" is evidence of "reliability." As

---

[27] The Defendants have long been aware that the multiple-choice exams cannot be used to reliably predict job performance by rank-ordering candidates by score. *See, e.g., Mass. Ass'n of Minority Law Enforcement Officers*, 434 Mass. at 262 (describing that the 1992 examination did not validly distinguish among officers scoring within three points of each other, that such officers' scores must therefore be considered functionally equivalent and "banded for promotion purposes).

Dr. Wiesen testified, "'Reliability of a test' refers to the degree to which you would expect candidates to get the same score if they were tested again using a similar test." (R.457). There are professionally recognized methods for demonstrating a sufficient degree of consistency in scores, but HRD did not use such methods.[28]

Rank-ordering "satisfies a felt need for objectivity, but it does not necessarily select better performers." *United States v. Vulcan Society, Inc.,* 637 F. Supp. 2d 77, 128 (E.D.N.Y. 2009) (quoting *Guardians Assoc. of the N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n,* 630 F.2d 79, 100 (2d Cir. 1980)). Ranking is appropriate only where the user can show "that a higher score on a content valid selection procedure is likely to result in better job performance." EEOC Uniform Guidelines on Employee Selection Procedures, 28 C.F.R. §§ 5(G), 14(C)(9), 15(C)(7) (1978). No such showing was made by Defendants here.

The District Court also incorrectly relied on a completely circular theory of validation– that because incumbent sergeants did well on the challenged exam, the test is therefore job-related. (R.121). This ignores the obvious point that the incumbents got to be sergeants *by doing well on multiple-choice exams just like*

---

[28] *See, e.g.,* the discussion in *Police Officers for Equal Rights v. City of Columbus, Ohio*, 916 F.2d 1092, 1102 (6th Cir. 1990), where the court cited high reliability coefficients for an exam.

*this one*.  Their continued success is no surprise.[29]

### 3. The District Court's Consideration of Plaintiffs' Less Discriminatory Alternatives was Plainly Inadequate.

Significant disparate impact on minority candidates occurs virtually every time that a police department uses a multiple-choice test measuring job knowledge, taken from training textbooks.  To create promotional processes that reduce disparate impact, as the District Court acknowledged, "[c]ommonly, the approach has been to supplement written job knowledge tests by adding other components to the overall selection method."  (R.126).  In this vein, the *Lopez* Plaintiffs proposed specific and feasible "other components" that, in concert with the written job knowledge test, would have allowed Boston to provide an exam with a significantly lessened adverse impact.  The District Court relied on an extraordinarily narrow rationale to reject these less discriminatory alternatives, donning blinders to endow Boston's 2002 exam with inordinate weight.  This method of analysis ignored the widespread experience of other communities across the nation, misinterpreted the evidence on cost and was misguided in its singular focus on statistical outcomes.

---

[29] The circularity of similar logic was identified in *Washington v. Davis*, 426 U.S. 229 (1976) (Brennan, J., dissenting): "Where employers try to validate written qualification tests by proving a correlation with written examinations in a training course, there is a substantial danger that people who have good verbal skills will achieve high scores on both tests due to verbal ability, rather than 'job-specific ability.'" *Id.* at 261–63, 270.

### a.    Other Communities

First, the District Court's narrow reliance on the outcome of Boston's 2002 examination conflicts with the widespread experience of communities across the nation. It is *overwhelmingly* the case that authorities charged with creating police testing procedures have managed to devise selection procedures with greater validity and less adverse impact than the exam-only method used by Boston here. Evidence at trial established that assessment centers are used widely throughout the country in order to blunt the acknowledged discriminatory impact of a standalone written exam. (R.480, 839-45). Examples of jurisdictions that use multiple component tests for police sergeant promotional exams include: (1) **Bridgeport, CT** (written job knowledge test, role play exercise, in-basket exercise, and report review exercise) (R.2083-84); (2) **Chicago, IL** (written qualifying exam, assessment exercise, merit selection component) (*see Adams v. City of Chicago*, 469 F.3d 609 (7th Cir. 2006); *Allen v. City of Chicago*, 351 F.3d 306, 309 (7th Cir. 2003)); (3) **Detroit, MI** (video-based situational judgment exercise, structured oral interview, seniority) (R.2087-89); (4) **Hartford, CT** (written exam, oral exam, fitness exam) (*see Knight v. City of Hartford*, No. 3:04CV969 (PCD), 2006 WL 1438649, at *25-26 (D. Conn. May 22, 2006)); (5) **Jackson, MS** (written exam, assessment center, panel interview) (*see Hearn v. City of Jackson*, 340 F. Supp. 2d 728, 735 (S.D. Miss. 2003)); (6) **Macon, GA** (written exam, supervision exercise,

oral presentation exercise, emergency incident exercise) (R.1154-55); (7) **Miami,**

**FL** (written situational judgment exercise, oral incident command exercise, oral

group meeting exercise, oral subordinate conference exercise) (R.2410-14); (8)

**Montgomery, AL** (written exam, structured oral interview) (*see United States v.*

*City of Montgomery*, 948 F. Supp. 1553, 1561 (M.D. Ala. 1996)); (9) **Nashville,**

**TN** (written exam, assessment center) (*see Johnson v. Metro. Gov't of Nashville &*

*Davidson*, No. 3:07-0979, 2010 WL 3342211 (M.D. Tenn. April 24, 2010)); (10)

**Roanoke, VA** (written exam, assessment center, performance review) (*see Altizer*

*v. City of Roanoke*, No. 7:02-CV-00484, 2003 WL 1456514 (W.D. Va. Mar. 21,

2003)); (11) **San Antonio, TX** (video exercise) (*see San Antonio Hispanic Police*

*Off. Org. v. City of San Antonio*, 188 F.R.D. 433 (W.D. Tex. 1999)); (12) **Santa**

**Ana, CA** (written exam, oral exam, seniority) (*see Sanchez v. City of Santa Ana*,

928 F. Supp. 1494, 1508-1509 (C.D. Cal. 1995)); (13) **St. Louis, MO** (written

exam, assessment center, review board) (R.1155); (14) **Pennsylvania State Police**

(technical knowledge test, incident command component, subordinate conference)

(R.2422); (15) **Fairfax County, Virginia** (R.806-807, 814); (16) **Louden County,**

**Virginia** (R.809, 814); (17) **Montgomery County, Maryland** (R.809, 814); (18)

**Howard County, Maryland** (R.809, 814); (19) **Prince George's County,**

**Maryland** (R.809, 814); (20) **Falls Church, Virginia** (R.809, 814); (21)

**Frederick City, Maryland** (R.809, 814); (22) **Memphis, TN** (R.809, 814); (23)

**Charlotte, NC** (R.809, 814); (24) **St. Louis, MO** (R.809, 814); (25) **Alexandria, VA** (R.809, 814); (26) **Vienna, VA** (R.809, 814); (27) the **Metropolitan Washington Transit Police** (R.810, 814); (28) the **Amtrak Police** (R.810, 814); and (29) and numerous federal agencies, including the **Drug Enforcement Administration**, the **Secret Service**, the **Library of Congress Police**, the **Bureau of Engraving Police**, the **U.S. Capital Police**, and the **U.S. Park Police** (R.808, 814).

The District Court erred by failing to take account of the enormous breadth of this experience  – both geographic and temporal -- in favor of a narrow focus on the 2002 Boston exam, as the Court stated in *Bradley v. City of Lynn*, 443 F. Supp. 2d 145, 175 (D. Mass. 2006), in determining the feasibility of alternatives, the Plaintiffs may offer proof that "other jurisdictions have managed to devise selection procedures to have a less adverse impact."  Here, the evidence from other communities is entirely one-sided in favor of the feasibility of a multi-component test.

### b.    Costs

In making the 2002 Boston exam the basis for its decision, the District Court effectively created a cost-benefit analysis from whole cloth.  It analyzed the 2002 results using hypothetical scenarios in which the assessment center component was reweighted in varying amounts down to zero.  Because it concluded that these

reweighted scenarios did not substantially affect the number of minorities on the eligibility list, it unilaterally adjudged as unwise the resources invested in the 2002 exam's assessment center. Putting aside the merits of the Court's 2002 analysis itself, the utilization of a retrospective cost-benefit analysis from the 2002 exam as the sole means of passing judgment on the 2005 and 2008 tests is grounds for reversal.

Rather than limiting itself to a 2002 comparison, the Court ought to have considered cost evidence specific to the challenged exams. First and foremost, because there is no evidence that Boston attempted to develop an alternative exam in 2005 or 2008, there is no basis to conclude that such an exam was not fiscally feasible. The sole support of the District Court's conclusion that a multi-component test in 2005 and 2008 was not economically feasible is this non-specific reference with regard to the 2005 test: "Former Police Commissioner Kathleen O'Toole testified that she favored the use of an assessment center, but there were no funds available for that purpose."[30] Yet the specific evidence shows that the BPD's operating budget for fiscal year 2006 was approximately $234 million, growing over the next several years to $300 million. (R.668, 1224).

---

[30] Commissioner O'Toole's exact testimony was that after having talks with City Hall and the State Human Resources Division, "I just recall saying that I didn't think a written test alone was appropriate." (R.667). When asked what the upshot of these discussions was, she testified simply, "No money." (R. 668).

There is no evidence that a specific budgetary analysis of the feasibility of a multi-component exam process was performed by BPD or the City of Boston, either in 2005 or 2008. Nor is there any specific explanation as to why, in an era of budgetary growth, the BPD or the City could not have paid for additional components. Commissioner O'Toole's generalized characterization of her high-level discussions with city and state officials in 2005 is far too slim a reed on which to conclude that a multi-component exam was not fiscally feasible in either 2005 or 2008.

Further, the District Court took no account of cost saving measures that might have reduced the economic impact of utilizing multiple components in the challenged tests. Dr. Outtz testified that the Defendants could have used the same job analysis performed by Morris & McDaniel in 2000 to prepare the 2005 and 2008 exams, R.2018, thereby realizing significant cost savings. The District Court also ignored the ability to charge a fee to examinees in order to offset the costs, R.1220-21, or to use the written exam as a threshold criterion to identify a smaller number of applicants who might be subject to the additional components, as proposed by Plaintiffs. (R.1220-21). Each of these measures would have reduced the cost of the 2005 and 2008 additional components. None of these measures were considered by the District Court.

There can be little doubt that every municipality faced with the prospect of spending money on multi-component testing bristles at the increased cost. This type of fiscal prioritization is inherent in the administration of all complex governmental policy. But both Congress and the U.S. Supreme Court have established that Title VII claims are not subject to a generalized cost defense, and that employers often must bear significant expense to eliminate discrimination. *See* Michelle A. Travis, *Equality in the Virtual Workplace*, 24 BERKELEY J. EMP. & LAB. L. 283, 370-71 & n.454 (2003) (compiling jurisprudential, congressional and scholarly support for this proposition). This is especially true in the context of disparate impact claims, which were initially recognized as a means of destroying discriminatory inertia in workplace practices that result from management's cost decisions. *Id.* at 371 & n.455 (citing *Griggs*, 401 U.S. at 430). The evidence below is that while Boston had the type of generalized budgetary concerns all police departments face, *see, e.g.*, R.1267, there is no specific evidence that less discriminatory alternatives to the 2005 and 2008 promotions exams were economically infeasible.

### c. Title VII Principles

Even if the District Court's strict reliance on Boston's prior experience was a proper methodology for rejecting Plaintiffs' less discriminatory alternatives, it fails on its own terms. First, this Court has repeatedly identified the harm that Title

27

VII protects against as the failure to provide *equal opportunity*. *Donahue v. City of Boston*, 304 F.3d 110, 119 (1st Cir. 2002) (harm arising from adverse impact is "the inability to compete on an equal footing."). Stated differently, Title VII does not guarantee any particular outcome to minority candidates. The District Court's narrow focus on the statistical outcome of the 2002 test thus runs afoul of basic Title VII principles. *See also Connecticut v. Teal*, 457 U.S. 440, 441, 450-51, 453 n.12 (1982) (rejecting as improper a focus on the "bottom line" statistical outcome of a challenged practice in favor of analysis directed at ensuring a fair overall process).

Yet, even the Court's exclusive review of the results of prior testing remains bound to the fact that the use of a multi-component exam in 2002 actually had the effect of reducing adverse impact. (R.130-31). While it is true that the improvement was relatively modest,[31] the increase of an additional minority sergeant effected by the alternative testing represents a ten percent increase in the number of minority promotions. This improvement – however small – is undoubtedly of great importance not only to the additional minority officer who was promoted, but also to the superior officers, like Commissioner Davis, who want a more diverse group of police supervisors, as well as to the minority officers

---

[31] That result is not surprising given that the additional component that was used for the final exam scores – a video component – had a significantly lower mean score difference for minority candidates compared to the written test. (R.450).

that additional minority sergeant will supervise and mentor, the predominantly-minority communities in which he will work, and to all of the citizens who stand to gain from a more competent corps of police supervisors.

Dated: March 9, 2015

Respectfully Submitted,

| | |
|---|---|
| /s/ Gary Klein<br>Gary Klein (C.A.B. 45412)<br>Kevin Costello<br>Corinne Reed<br>Klein Kavanagh Costello, LLP<br>85 Merrimac Street, 4th Floor<br>Boston. MA 02114<br><br>Phone: (617) 357-5500<br>Fax: (617) 357-5030<br>Email: klein@kkcllp.com<br>Email: costello@kkcllp.com<br>Email: reed@kkcllp.com | Ray McClain, Director<br>Employment Discrimination Project<br>Lawyer's Committee for Civil Rights<br>Under Law<br>1401 New York Ave., NW, Ste 400<br>Washington, DC 20005<br><br>Phone: (202) 662-8600<br>Fax: (202) 783-0857<br>Email:<br>RMcClain@lawyerscommittee.org |
| /s/ Mark S. Brodin<br>Mark Brodin (C.A.B. 55660)<br>Professor and Michael & Helen Lee<br>Distinguished Scholar<br>Boston College Law School<br>885 Centre St.<br>Newton, MA 02459<br><br>Phone: (617) 552-4420<br>Fax: (617) 552-2615<br>Email: brodin@bc.edu | |

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,902 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word, Version 14.4.8 in 14 point Times New Roman type style except for Table 1 which is in 11 point Times New Roman type style to fit on one page.


Dated: March 9, 2015                    */s/ Gary Klein*
                                          Gary Klein

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2015, I electronically filed the foregoing

document with the United States Court of Appeals for the First Circuit by using the

CM/ECF system.  I certify that the following parties are registered as ECF filers

and that they will be served by the CM/ECF system:

Charles Dunstan Boddy
Jr. Richard D'Agostino
Office of the City Attorney
200 Common St., Ste 306
Lawrence, MA 01840

Ann L. Radazzo
25 Westwind Dr.
Methuen, MA 01844

Kerry M. Regan
City of Methuen
Office of the City Solicitor
41 Pleasant St., Suite 311
Methuen, MA 01844

Iraida J. Alvarez
Robert Lawrence Quinan, Jr.
Sookyoung Shin
MA Attorney General's Office
1 Ashburton Place, 20th Floor
Boston, MA 02108

Rachel M. Brown
Shaprio Haber & Urmy LLP
Seaport East
2 Seaport Lane
Boston, MA 02210

Christine Patricia O'Connor
City of Lowell
375 Merrimack St., 3rd Floor
Lowell, MA 01852

Daniel C. Brown
Joshua Ryan Coleman
Tim D. Norris
Collins, Loughran & Peloquin P.C.
320 Norwood Park South
Norwood, MA 02062

Laurence J. Donoghue
Law Office of Corinne Hood Greene
One Thompson Square, Ste. 502
Charlestown, MA 02109

Kay H. Hodge
John Matthew Simon
99 High St., Suite 1601
Boston, MA 02201

Lisa Skehill Maki
City of Boston Law Department
One City Hall Plaza
Room 615
Boston, MA 02201

Robert P. Morris
Morgan Brown & Joy LLP
200 State St., 11th Floor
Boston, MA 02109

Maurice Martin Cahillane
Egan, Flanagan & Cohen PC
67 Market St.
Springfield, MA 01102

Harry P. Carroll
John Thomas Liebel

Edward M. Pikula
City of Springfield
Law Department
36 Court St.
Springfield, MA 01103

William G. Cuillinan
O'Connor Martinelli & Cohn
1391 Main St., Ste. 1022
Springfield, MA 01103

Kevin Sean McDermott
MBTA Law Department
10 Park Plaza, Suite 7760
Boston, MA 02116

Harold Lichten
Benjamin Weber
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116

Stephen Churchill
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111

*/s/ Gary Klein*
Gary Klein