No. 14-1952

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

PEDRO LOPEZ, et al.
Plaintiffs-Appellants
v.
THE CITY OF LAWRENCE, et al.
Defendants-Appellees

On Appeal from a Judgment of the United States
District Court of Massachusetts
Case No. 07-11693
The Honorable George A. O'Toole, Jr.

**DEFENDANTS-APPELLEES CITY OF LOWELL AND APPOINTING
AUTHORITY FOR THE CITY OF LOWELL'S BRIEF**

**Counsel for Defendants/Appellees City of Lowell and
Appointing Authority of the City of Lowell,**

Christine P. O'Connor, City Solicitor, #55980
Rachel Brown, Assistant City Solicitor #123539
City of Lowell Law Department
375 Merrimack Street, 3rd Floor
Lowell MA 01852-5909
Tel: 978-674-4050
Fax: 978-453-1510
co'connor@lowellma.gov
rbrown@lowellma.gov

DATED: June 17, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iii

STATEMENT OF ISSUES PRESENTED ....................................................1

STATEMENT OF THE CASE ...........................................................................2

   1.  Procedural History...................................................................................2

   2.  Statement of Facts ..................................................................................2

SUMMARY OF ARGUMENT............................................................................9

ARGUMENT ........................................................................................................14

   1.  Applicable Legal Standard. ....................................................................14

   2.  The District Court Correctly Ruled that Alvarez Was Not Hispanic and Lacked Standing to Sue.......................................................................................15

   3.  Alvarez Failed to Show Disparate Impact Arising from Lowell's Use of the 2006 HRD Sgt. Exam. ..........................................................................20

   4.  The District Court Correctly Declined to Aggregate Across Municipalities.......27

   5.  The Promotional Examination was Job-Related and Consistent With Business Necessity and There Was Not Another Selection Device Without a Similar Discriminatory Effect That Would Also Serve The City's Legitimate Interest. ........32

       i.  The 2006 HRD Sergeant Exam Was a Bona Fide Promotional Exam that Was Job Related and Consistent With Job Necessity...................................................32

       ii.  Plaintiffs-Appellants Did Not Demonstrate the Availability of an Equally Valid, Less Discriminatory Alternative Employment Practice................................35

   6.  The City of Lowell Cannot Be Held Liable Under Title VII for Using the Statewide Civil Service Testing Regime Mandated By M.G.L. C. 31. .......................37

   7.  Lowell May Not Disregard HRD Exam Results Absent Strong Evidence of Disparate Impact..................................................................................41

CONCLUSION ...................................................................................................43

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)...........................44

CERTIFICATE OF SERVICE.........................................................................45

# TABLE OF AUTHORITIES

## Cases

*Abram v. United Parcel Serv. of Am., Inc.,* 200 F.R.D. 424 (E.D. Wisc. 2001)...................29

*Bailey v. Southeastern Area Joint Apprenticeship Committee,* 561 F. Supp. 895 (1983) ...........30

*Banks v. E. Baton Rouge Parish Sch. Bd.,* 320 F.3d 570 (5th Cir. 2003)...............................27

*Boston Chapter, N.A.A.C.P., Inc. v. Beecher,* 504 F.2d 1017, 1020-21 (1st Cir. 1974)passim

*Boston Police Superior Officers Federation v. Civil Service Commission,* 35 Mass. App. Ct. 688, 692, 624 N.E.2d 617, 620 (1993)...................................................................40

*Bradley v. City of Lynn,* 443 F. Supp. 2d 145 (D. Mass. 2006).......................................30, 31

*Calderón-Ortega v. United States,* 753 F.3d 250 (1st Cir. 2014) ......................................14

*Camacho v. Puerto Rico Ports Auth.,* 369 F.3d 570 (1st Cir. 2004)....................................37

*Castro v. Beecher,* 334 F. Supp. 930, 934 n.2 (D. Mass. 1971) ......................................passim

*Cotter v. City of Boston,* 323 F.3d 160 (1st Cir. 2003) .................................................18

*Department of Transp. v. Public Citizen,* 541 U.S. 752 (2004)............................................39

*Fudge v. City of Providence Fire Dep't,* 766 F.2d 650, 657-59 (1st Cir. 1985) ... 11, 22, 25, 29

*Gregory v. Ashcroft,* 501 U.S. 452 (1991) ...............................................................37

*Isabel v. City of Memphis,* 404 F.3d 404 (6th Cir. 2005) ...............................................26

*Jones v. City of Boston,* 752 F.3d 38 (1st Cir. 2014) ..............................................passim

*Kentucky v. Graham,* 473 U.S. 159 (1985)....................................................................9

*Kosilek v. Spencer,* 774 F.3d 63 (1st Cir. 2014) ........................................................14

*Langlois v. Abington Hous. Auth.,* 207 F.3d 43 (1st Cir. Mass. 2000)..................................26

*League of United Latin American Citizens v. Santa Ana,* 410 F. Supp. 873 (D. Cal. 1976) .31

*Lloyd's v. San Juan Towing & Marine Servs.,* 778 F.3d 69 (1st Cir. 2015)...........................14

*Lopez v. Massachusetts,* 588 F.3d 69 (1st Cir. 2009)............................................ 4, 24, 38, 41

*Munoz v. Orr,* 200 F.3d 291 (5th Cir. 2000)..................................................................21

*NAACP v. N. Hudson Reg'l Fire & Rescue,* 665 F.3d 464 (3d Cir. 2011)...........................21

*Phillips v. Cohen,* 400 F.3d 388 (6th Cir. 2005)..........................................................26

*Pratt v. Dietl,* SUVC No. 2009-01254............................................................... 9, 36

*Reynolds v. City of Chicago,* 296 F.3d 524 (7th Cir. 2002) ..............................................19

*Ricci v. DeStefano,* 557 U.S. 557 (2009).................................................................passim

*Rivera v. Wichita Falls,* 665 F.2d 531 (5th Cir. 1982).....................................................27

*Salas v. Wis. Dep't of Corr.,* 2006 U.S. Dist. LEXIS 21140 (W.D. Wis. Apr. 17, 2006) ..19

*Sullivan v. City of Springfield,* 561 F.3d 7 (1st Cir. 2009) .............................................17

*Torres v. City of Chicago*, 2000 U.S. Dist. LEXIS 6000 (N.D. Ill. Apr. 28, 2000) ............19

*United States v. 15 Bosworth St.*, 236 F.3d 50 (1st Cir. 2001) ................................14

*United States v. Bass*, 404 U.S. 336 (1971) ........................................ 37, 38

*United States v. Brown*, 298 F.3d 120 (1st Cir. 2002) ................................14

*United States v. City of New York*, 683 F. Supp. 2d 225 (E.D.N.Y. 2010).........................27

*United States v. City of New York*, 717 F.3d 72 (2d Cir. 2013) ................................27

*United States v. Maisonet-Gonzalez*, 2015 U.S. App. LEXIS 7369 (1st Cir. May 4, 2015) 14

*United States v. N.Y. City Bd. of Educ.*, 448 F. Supp. 2d 397 (E.D.N.Y. 2006) ................19

*Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Serv.*, 625 F. Supp. 527 (D.N.J. 1985) .....31

*Washington v. Davis,* 426 U.S. 229 (1976) ........................................37

*Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977 (1988) ........................................26

*Williams v. Ford Motor Co.*, 187 F.3d 533 (6th Cir. 1999)........................................33

## Statutes

29 C.F.R. § 1607.4 ........................................................................16

42 U.S.C. § 2000e-2(k)(1)(A)..............................................................passim

42 U.S.C. § 2000e-2(a)(2)................................................................40

M.G.L. c. 31.............................................................................passim

M.G.L. c. 151B..........................................................................42

M.G.L. c. 43, §1 ........................................................................9

## Treatises

CANCER IN MASSACHUSETTS BY RACE AND ETHNICITY, 2000-2004 ...........................16

*Questions and Answers on the Federal Executive Agency Guidelines on Employee Selection Procedures*, 44 Fed. Reg. 11, 996 (1979).........................................................23

THE MASSACHUSETTS CANCER REGISTRY, Massachusetts Department of Public Health, 3rd Edition, April 1999 ........................................................16

## Rules

Fed. R. App. P. 30(a)(2)................................................................3

## STATEMENT OF ISSUES PRESENTED

1. Did the District Court err in finding that a person who does not speak Spanish, was not raised in a Spanish-speaking home, and who does not originate from a Spanish-speaking country in the Western Hemisphere, is not properly classified as "Hispanic" in the context of a civil service examination administered by the Commonwealth of Massachusetts' Human Resource Division ("HRD")?

2. Did the District Court err in holding that the Plaintiff did not meet his *prima facie* burden of showing disparate impact where the Plaintiff presented no significant statistical disparity in connection with the complained-of employment practice?

3. Did the District Court err in declining to use aggregated data from multiple jurisdictions when analyzing whether there was adverse impact against Lowell's minority test-takers who took the HRD 2006 sergeant promotional exam?

4. Was the HRD 2006 sergeant promotional exam job related and consistent with business necessity and was there another selection device available with less discriminatory effect that would also serve the City of Lowell's legitimate interests?

5. Can the City of Lowell be held liable under Title VII for utilizing the statewide civil service testing regime for the promotion of police officers?

6. Can Lowell be held liable under Title VII for promoting according to the HRD 2006 sergeant promotional exam results where Lowell had no strong basis in evidence to believe that the Human Resource Division examinations had an adverse impact?

1

## STATEMENT OF THE CASE

### 1. Procedural History

The City of Lowell ("City" or "Lowell") and its Appointing Authority are Defendants-Appellees. The City is satisfied in part with the Plaintiffs-Appellants' Statement of Procedural History, but makes the following additions. Plaintiff-Appellant Robert Alvarez ("Alvarez" or "Appellant") is the sole plaintiff whose allegations pertain to Lowell; a second plaintiff, Marisol Nobrega, dismissed her case against Lowell on December 4, 2008. (Dkt. # 126, R. 36). Further, the City joined with other Defendants and filed a joint motion to dismiss the complaint on the basis that individual jurisdictions could not be held liable under Title VII for following a statewide civil service testing regime. (Dkt. # 198, R. 44). That motion was denied. (Dkt. # 210, R. 46). The City reasserted the argument, among other arguments set forth below, in its motion for a directed verdict. (Dkt. # 281, 282 R. 54). The directed verdict was dismissed as moot post-trial. (Dkt. # 329, R. 59). The argument is reasserted in this brief.

### 2. Statement of Facts

Alvarez is not Hispanic and has no standing to bring this suit. Alvarez does not speak Spanish, and he was not raised in a Spanish-speaking home. (R. 1313). On his birth certificate, his mother and father are both listed as white. The birth certificate further indicates that Alvarez's father was born in Manila, Philippines. (R. 4533). Alvarez testified that his father spoke Spanish, but Alvarez has never met or spoken

with his father. (R. 1315-15). Alvarez's sole support for his claim to be Hispanic is his paternal ancestry. (R. 1309). Nonetheless, Alvarez has at times (unrelated to this litigation) self-identified as white, even when Hispanic was an option. (R. 1324-29; 4537-40). HRD uses a definition of "Hispanic" that arises from a consent decree entered by the Federal District Court in *Castro v. Beecher*, 334 F. Supp. 930, 934 n.2 (D. Mass. 1971) ("*Castro*"). The *Castro* consent decree, which arose from efforts by HRD (through its predecessor) to remedy past discrimination against blacks and Hispanics in Civil Service appointments, has governed the practices of HRD and any municipality using HRD exams since the 1970's, and it defines "Hispanic" for Civil Service purposes under M.G.L. c. 31. (R. 113, citing Affidavit of Sally McNeely ("McNeely Aff.") ¶ 5, Ex. 205).[1] That definition of "Hispanic" is: an "individual who (or whose family) originates from a Spanish-speaking country in the Western Hemisphere and who either speaks Spanish or was raised in a household where Spanish was the primary language." *Id.* Alvarez does not meet the HRD definition of "Hispanic." If fact, HRD classifies a person whose family originates from the Philippines as Asian, not Hispanic. (R. 113, citing McNeely Aff. ¶ 6, Ex. 205). Asians are not a minority group in this litigation.

---

[1] The Affidavit of Sally McNeely was entered as trial Exhibit 205 upon the agreement of the parties in lieu of her testimony. (R. 2528-30; Dkt. # 307, R. 57). It was filed subsequent to entry of the Exhibit and Witness List (Dkt. # 295, R. 56) and was not included in the Record Appendix, but is attached to this brief as Attachment B pursuant to Fed. R. App. P. 30(a)(2).

3

The civil service law is set forth in M.G.L. c. 31. Its normative underpinnings are to recruit, hire, and promote the best candidate for the position based upon "basis merit principles," which require that appointments are fair and made without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap or religion. *Id.* §1. The civil service law creates rights, duties, and responsibilities for HRD, the Civil Service Commission ("CSC"), civil service municipalities such as Lowell through their "appointing authorities," and civil service applicants. HRD's duties include the preparation and administration of certain competitive promotional examinations. HRD has rulemaking authority regulating the recruitment, selection, training, employment and promotion of persons for civil service promotions. *Id.* §§ 3(e), 5(e). HRD is required to establish the form and content of these examinations, which must "fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required" to perform the job. *Lopez v. Massachusetts*, 588 F.3d 69, 77 (1st Cir. Mass. 2009), citing M.G.L. c. 31, §16. HRD is also responsible for determining the passing requirements of examinations and for maintaining records of examinations, eligible lists resulting from those examinations, and the results of all appointment decisions in the civil service. M.G.L. c. 31, §§ 22, 5(h). Through the *Castro* consent decree, HRD agreed to develop and administer promotional examinations that complied with the Equal Employment Opportunity Commission's (EEOC) Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines"). *Lopez*, 588 F.3d at 77.

4

Strict parameters limit Lowell's ability to promote police sergeants. As an appointing authority that uses HRD promotional examinations, Lowell is required to promote the top-ranked candidate unless it provides specific reasons for "bypass." M.G.L. c. 31, §27. Even where a municipality elects to bypass its top-ranked candidate, it is required to promote according to the "2n+1" rule, whereby HRD provides the appointing authority with a certified list in which "n" is the number of vacancies available (*e.g.*, for three vacancies, an appointing authority must promote from the first seven candidates (2x6+1)). Further, for cities or towns that have a population of 50,000 or more, such as Lowell, an applicant must have served as police officer with that specific department for three years before he or she is eligible to apply for a promotion, and in all cases promotions are made jurisdiction by jurisdiction and not on a statewide basis. M.G.L. c. 31, §59. Even apart from the requirement of prior local experience, there are significant differences among the jurisdictions that promoted from the 2006 sergeant's exam. For example, in Lowell the person promoted with the lowest written grade was "08500," but in numerous other jurisdictions significantly lower scores resulted in promotion.[2] (Ex. 75, R. 4260-74).

---

[2] These include Arlington PD "07625", Ashland PD "07500", and Athol PD "07375." *Id.* If a Lowell officer were able to be promoted in another jurisdiction, a Lowell minority officer who scored an 82 would have been certified and eligible for promotion in numerous municipalities, including but not limited to: Arlington, Ashland, Athol, Braintree, Brockton, Brookline, Cohasset, Dedham, Fairhaven, Fitchburg, Framingham, Haverhill, Hingham, Hudson, Hull and Kingston. *Id.*

5

Alvarez complains of adverse impact allegedly arising from Lowell's use of the 2006 HRD-administered exam for police sergeant ("2006 HRD Sgt. Exam") in selecting candidates for promotion to sergeant. In 2006, 43 Lowell officers, consisting of 7 minorities and 36 non-minorities, took the HRD Sgt. Exam, and 7 white officers were promoted. (R. 4266-67). Statistical significance is defined generally as a difference in outcome that is due to something other than chance. One can infer statistical significance only when the p-value (the probability of observing a difference equal to or greater than that which actually occurred, assuming equal opportunity) drops below a certain percentage; according to expert testimony in this case, that percentage is 0.05 (5%). (R. 2333-34; Appellants' Br. at 73). By Plaintiffs' expert Dr. Joel P. Wiesen's own admission, the data pertaining to Lowell was "statistically insignificant," and "[w]ith very small numbers you typically do not find statistical significance." (R. 1392). The data thus lacks evidentiary value. Indeed, according to Dr. Wiesen, the p-value is .58 in the selection rate for Lowell's promotions from the 2006 exam, which indicates a lack of statistical significance. (R. 4317). In layman's terms, one would expect Lowell's promotional results **more than half of the time** in random sampling from Lowell's numbers. In considering adverse impact, the Uniform Guidelines use a "Four-Fifths" measurement as a rule of thumb: if a selection rate differs by less than 80% there will be an inference of adverse impact, which may require additional analysis. (R. 343-44). However, in the case of small numbers, such as the numbers that pertain to Lowell, the Uniform Guidelines

6

recommend applying a "shift of one" analysis to the "Four-Fifths" rule, according to which one minority selection is added and one non-minority selection is removed, and then the same analysis is performed. Using a "shift of one" analysis, Lowell's promotional rate also complies with the "Four-Fifths" rule. (R. 2335-36; R. 4858).

The 2006 HRD Sgt. Exam was valid. A selection process is "valid" when it is job-related and consistent with business necessity. A valid testing instrument for a position should measure a candidate's knowledge, skills and abilities ("KSAs") against the actual requirements of the job in question. (R. 1892). The closer a test reflects the actual job requirements, the more content validity the test has. (*Id.*; R. 327-29). The 2006 HRD Sgt. Exam was based on a 1991 validation study and a subsequent 2002 validation study. (R. 3213-4143). According to experts in the field, it is appropriate to build a testing instrument on such prior validity studies, and this is especially true when the basic KSAs of the position of sergeant have not dramatically changed over the years. (R. 1911-12). The 2006 HRD Sgt. Exam, consisting of written job knowledge multiple choice test and an education and experience ("E&E") component, constituted a valid examination and complied with the Uniformed Guidelines. (R. 2112). Further, if an exam has content validity (i.e., it is testing job-related content), then, assuming applicants are properly studying and preparing for the examination, one should expect an individual's scores to rise over time when the individual gains additional years of training and experience. (R. 901; R. 1893-95). Prior to taking the 2006 HRD Sgt. Exam, Alvarez had previously taken the sergeant

promotional exam in 1998, 2000, and 2003. His scores tracked his reported preparation time, which indicates that when Alvarez studies he has the ability to do well on exams comprising multiple choice job knowledge tests and an education and experience worksheet, and that his disparate scores have more to do with his own preparation than any race-based bias within the test itself.[3] (R. 1330-39; R. 4541-45).

An assessment center was not a feasible alternative to the 2006 HRD Sgt. Exam. Lowell has used assessment centers for promotional purposes in the past, but always in the context of union negotiations. In 1999, Lowell utilized the delegated assessment center process for promotions for the positions of Deputy Superintendent, Captain and Lieutenant, all supervisory positions. That assessment center cost approximately $300,000.00, roughly $6,000.00 per candidate. (R. 1209-10, 1215; R. 1811-13; R. 3118-42). In Lowell, the assessment center process was eliminated in 2001 through the collective bargaining process. (R. 1215; R. 4528-31). For the position of sergeant, Lowell has always used the HRD Sgt. Exam for a variety of reasons, including that the police officers and their union prefer the HRD Sgt. Exam, and that an assessment center would be extremely costly—greater even than the cost listed above, since the number of sergeants is greater than higher supervisory ranks. (R. 1219). Furthermore, as of the time of trial in 2010, and as Plaintiff's expert

---

[3] Alvarez's scores on the HRD Open Competitive examination for the position of entry level police officer, which Alvarez took three times scoring 91, 97, and 97, also support his ability to do well on these types of tests when he puts in the requisite effort. (R. 4541-41).

8

conceded, there was still disagreement as to whether an assessment center would be effective in reducing "adverse impact" or the potential of adverse impact for the position of police sergeant. (R. 496-97; R. 1404-06; R. 1949). Neither is "banding," where scores are grouped within a certain band, a feasible alternative to the HRD Sgt. Exam. In 2009, banding was found not to be a legally viable option in Massachusetts. *Pratt v. Dietl*, SUVC No. 2009-01254, Memorandum of Decision and Order on Plaintiffs' Motion for a Preliminary Injunction, Apr. 15, 2009 (attached hereto as Attachment A).

## SUMMARY OF ARGUMENT

The District Court's judgment in favor of the City of Lowell should be affirmed.[4]  The District Court correctly held that the sole plaintiff against the City, Robert Alvarez, lacks standing in this action because he is not Hispanic.  For that reason **alone**, the District Court correctly ruled in Lowell's favor.

More particularly, the District Court found several facts supporting its conclusion that Alvarez is not Hispanic, including, but not limited to, the following:

---

[4] The District Court did not distinguish between Lowell and its Appointing Authority in its September 5, 2014 Order. Naming a government employee in his official capacity is the same thing as naming the governmental entity and the governmental entity is the real party in interest. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Further, the Appointing Authority is not a separate legal entity from the City of Lowell; it is an official governmental title bestowed upon the City Manager of Lowell under state law. *See generally*, M.G.L. c. 31 and M.G.L. c. 43, §1 (City Manager Plan "E" form of government). Accordingly, judgment as a matter of law should enter on behalf of the Appointing Authority for the City of Lowell, Massachusetts. (Dkt. # 281, 282 R. 54).

Alvarez's father was born in the Philippines; Alvarez's birth certificate lists each of his parents as white; Alvarez was born in Boston and raised by a foster family in Boston-area suburbs; Alvarez does not speak Spanish and he was not raised in a home where Spanish was the primary language; and at times, Alvarez identified himself as white, even when Hispanic was an option. These factual findings enjoy deferential review under the clearly-erroneous standard, and there is no reversible error.

The District Court appropriately applied the HRD's definition of Hispanic in finding that Mr. Alvarez lacks standing because that definition tracks the definition of Hispanic in *Castro v. Beecher*, wherein the District Court issued a consent decree to aid the HRD's effort to remedy past discrimination against blacks and Hispanics in Civil Service appointments. As the present litigation concerns civil service promotional exams administered by HRD, and as the consent decree in *Castro* addressed remedying past discrimination in civil services exams administered by HRD, it was appropriate to rely upon HRD's definition of "Hispanic." Under that definition, Alvarez is not Hispanic; indeed, his father's Filipino origin means that Alvarez is Asian, which is not a protected class in this litigation.

Notwithstanding the foregoing, even if this Court finds that the District Court erred in ruling that Mr. Alvarez lacks standing, the judgment below in favor of the City of Lowell should be affirmed because Mr. Alvarez did not present evidence of disparate impact discrimination by the City of Lowell. Indeed, Alvarez cannot make a *prima facie* showing of disparate impact discrimination because the promotional data

10

pertaining to Lowell Police sergeant candidates who took the 2006 HRD Sgt. Exam comprise a small data set that reveals no significant statistical disparity, which is a necessary element of asserting such a cause of action. *See Ricci v. DeStefano*, 557 U.S. 557, 587 (2009). Accordingly, the District Court correctly entered judgment in favor of the City of Lowell.

Alvarez cannot save his disparate impact claim against Lowell by advocating for aggregating promotional data across municipalities. The District Court appropriately rejected aggregating data in this case because a Massachusetts municipality, such as the City of Lowell, can only promote to sergeant an officer in the municipality's own police department, and there are significant differences in the respective candidate groups among the Commonwealth's various cities and towns. Thus, the candidates for promotion to sergeant are not similarly situated; further, data aggregation is statistically problematic given that promotional data for larger communities can skew promotional data for smaller communities. As a result, aggregating data across municipalities can lead to a finding of disparate impact in smaller communities when the data specific to those communities do not reveal disparate impact. Aggregating data can lead to anomalous results and this Court has declined to aggregate promotional data. *See Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 657-59 (1st Cir. 1985).

Even if Alvarez had presented sufficient evidence of disparate impact discrimination against the City of Lowell, the District Court did not commit reversible

error by ruling in Lowell's favor because the 2006 HRD Sgt. Exam was job related and consistent with job necessity. The 2006 HRD Sgt. Exam was prepared after two validation studies, a job analysis, the identification of knowledge, skills and abilities, and a test plan linking the knowledge, skills and abilities to the exam. Scoring evaluation included a job-knowledge multiple choice test and an education and experience component, and the test included subjects directly relevant to police work—constitutional and statutory laws, police supervision, community policing, and police functions. The 2006 HRD Sgt. Exam was valid and the court below correctly ruled in favor of the City of Lowell.[5]

Notwithstanding, even if this Court believes that the 2006 HRD Sgt. Exam was not job related and consistent with business necessity, the judgment below for the City of Lowell should be affirmed because Alvarez failed to show that the City of Lowell declined to adopt an equally valid, less discriminatory alternative to the promotional exam at issue. While the City of Lowell has shown a willingness to use assessment centers in evaluating candidates for promotion, the affected unions have

---

[5] Furthermore, since the District Court found that Plaintiffs had made a *prima facie* case of disparate impact only against Boston, the District Court's factual findings on the matter of business necessity and alternative procedures concerned only the Boston plaintiffs' 2005 and 2008 exams. As set forth in more detail below, Lowell submits that the same factual findings would be warranted as regards the 2006 exam; nonetheless, if this Court disagrees finds both that Alvarez has standing to bring suit and that he has established a *prima facie* case of disparate impact, Lowell submits that the proper procedure is to remand this case to the lower court to which the evidence was presented for factual findings consistent with this Court's opinion.

not supported the use of assessment centers. Further, banding was not a feasible option with respect to deciding upon sergeant promotions relative to the 2006 promotional exam. Accordingly, Lowell cannot be held liable for disparate impact discrimination, and the District Court's judgment in favor of Lowell should be affirmed.

Further, the City of Lowell should not be held liable for employment discrimination where, as here, the City simply complied with the Commonwealth's civil service testing program mandated by law. The City's compliance with that testing regime is not an employment practice on the City's part because the administration of the statewide exam falls outside the City's ambit as employer. The Commonwealth created a facially neutral, statewide testing regime for evaluating candidates for promotion to sergeant; the City complied with that regime, and the City should not be liable for discrimination because the City complied with a legally-mandated, statewide testing program whose creation and administration lie outside the City's control.

Finally, the City could not lawfully have rejected the results of the 2006 HRD Sgt. Exam because there was no substantial evidence of disparate impact discrimination. Such a decision would, by definition, be race based, and accordingly it could only be made on the basis of strong evidence of disparate impact discrimination. *Ricci,* 557 U.S. at 587. Here, Lowell did not have access to the statewide testing results or the analysis of the validation studies; even if one assumes *arguendo* that this data showed disparate impact discrimination, Lowell had no access

13

that data, and, accordingly, the City of Lowell could not lawfully have rejected the results of the subject promotional exam.

The foregoing reasons, individually and collectively, support affirming the District Court's judgment in favor of the City of Lowell.

## ARGUMENT

### 1. Applicable Legal Standard.

The District Court's findings of fact enjoy deferential appellate review under the clearly erroneous standard. *See Lloyd's v. San Juan Towing & Marine Servs.*, 778 F.3d 69, 82 (1st Cir. 2015) ("Our standards of review for a bench trial are well known; the district court's factual findings are protected by clear error review"); *Calderón-Ortega v. United States*, 753 F.3d 250, 252 (1st Cir. 2014) ("an appellate court will displace factual findings made in the aftermath of a bench trial [only] if those findings are clearly erroneous"), citing *United States v. 15 Bosworth St.*, 236 F.3d 50, 53 (1st Cir. 2001). Clear error exists **only** when, after reviewing the entire record, the court has a strong, unyielding belief that a mistake has been made. *See United States v. Maisonet-Gonzalez*, 2015 U.S. App. LEXIS 7369, *17 (1st Cir. May 4, 2015) ("We will not find clear error unless 'on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.'"), citing *United States v. Brown*, 298 F.3d 120, 122 (1st Cir. 2002). The District Court's conclusions of law are reviewed *de novo. See, e.g., Kosilek v. Spencer*, 774 F.3d 63, 84 (1st Cir. 2014). The review of "mixed"

questions of law and fact "is of a variable exactitude; the more law-based a question, the less deferentially we assess the district court's conclusion." *Id.*

### 2. The District Court Correctly Ruled that Alvarez Was Not Hispanic and Lacked Standing to Sue.

The District Court correctly found that the sole Plaintiff asserting a claim against Lowell, Robert Alvarez, was not Hispanic. On that basis **alone**, the District Court properly held that Alvarez lacked standing to allege discrimination. This Court should accordingly affirm the lower court's judgment in favor of Lowell.

The District Court found numerous facts that rebut Alvarez' minority status claim, including the following:

> The evidence indicated that Alvarez was born in Boston and raised by a foster family in Boston-area suburbs, including Somerville and Billerica. On his birth certificate, his mother and father are described as white. His birth certificate also indicates that his father, whom Alvarez apparently never met and with whom he has never spoken, was born in Manila, Philippines. Alvarez does not speak Spanish. He was not raised in a home where Spanish was the primary language. At times he has identified himself as white, even when Hispanic was an identified option. . . . (R. 112).[6]

Alvarez does not contest these factual findings, which were well supported and must be accorded deference. *See* Appellant's Br. at 91-92 (stating that according to the lower court record Alvarez's father spoke Spanish and that Alvarez has sometimes identified as Hispanic, but not contesting the factual findings provided above).

---

[6] Record references appear in place of the trial-court references cited in the opinion below.

15

Based on its factual findings, the District Court found that Alvarez was not Hispanic. In making this determination, the District Court relied on the HRD definition of Hispanic: an "individual who (or whose family) originates from a Spanish-speaking country in the Western Hemisphere and who either speaks Spanish or was raised in a household where Spanish was the primary language." (R. 113).[7]

---

[7] The City submits that the choice of which definition of "Hispanic" to adopt is a mixed question fact and of law that deserves the Court's deference, because the appropriate definition depends on a factual assessment of the context at issue (here: the context of Civil Service appointments). Nonetheless, even if the issue is reviewed *de novo*, the lower court's uncontested factual findings would deliver the conclusion that Alvarez is not Hispanic under any plausible definition. While the City contends that the HRD definition of "Hispanic" is the most appropriate definition to use in the instant circumstances, the definition of Hispanic used by the Equal Employment Opportunity Commission ("EEOC") does not support Alvarez's position either. According to the EEOC, "Hispanic" includes "persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race." *See* 29 C.F.R. § 1607.4. This definition also suggests a finding that Alvarez is not Hispanic in light of the fact that his only relevant heritage is Filipino. The District Court nonetheless found that the EEOC's definition was not helpful, standing alone, in determining whether Mr. Alvarez is Hispanic because it does not specifically address the issue of Filipino heritage, other than that employees with origins from the "original peoples" of the Philippines are classified as "Asian or Pacific Islander." (R 112-13). Further, the Commonwealth of Massachusetts does not consider Filipinos to be Hispanic in other contexts. *See* THE MASSACHUSETTS CANCER REGISTRY, Massachusetts Department of Public Health, 3[d] Edition, April 1999, p. 71 ("American Indians and Filipinos may have Spanish surnames but are *not* to be considered Spanish/Hispanic under this coding scheme.")(italic in original), available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.199.1608&rep=rep1&type=pdf; CANCER IN MASSACHUSETTS BY RACE AND ETHNICITY, 2000-2004, The Massachusetts Department of Public Health, Appendix B p. 33 ("non-Spanish; non-Hispanic (including Brazilians, Portuguese, Cape Verdeans, and Filipinos)"), available at www.mass.gov/eohhs/docs/dph/cancer/race-ethnicity.doc.

Alvarez meets **no part** of this definition, and the District Court properly determined that he is not Hispanic.

The District Court did not err in relying upon the HRD definition of "Hispanic." The HRD definition tracks the definition of "Hispanic" promulgated in *Castro v. Beecher*, which gave rise to the consent decree that has governed the practices of HRD and any municipality using HRD exams since the 1970's. *See* McNeely Aff. ¶ 5 (Ex. 205); *see also Sullivan v. City of Springfield*, 561 F.3d 7 (1st Cir. 2009) (setting forth history and scope of *Castro* consent decree). The *Castro* consent decree arose from efforts by HRD to remedy past discrimination against blacks and Hispanics in Civil Service appointments. The definition of "Hispanic" contained in the *Castro* consent decree is thus (a) stamped by the authority of the trial court (D. Mass.) in this matter, and (b) promulgated by the very agency responsible for administering the Civil Service exams at issue in this litigation. Indeed, it is the *Castro* consent decree that defines "Hispanic" for Civil Service purposes under M.G.L. c. 31. *Id.*[8] *See* McNeely Aff. ¶ 5 (Ex. 205). This litigation is fundamentally a Civil Service case, and it was proper for

---

[8] The original definition of "Hispanic" provided in *Castro*, subsequently refined through the consent decree to the language provided above, was "persons who were born or whose parents were born in Puerto Rico, Cuba, or other Caribbean countries, whose primary language is Spanish, and who have not had education and training comparable to that received by most mainstream white Americans." *See Castro*, 334 F. Supp. at 934 n.2; Consent Decree, ¶ 16, Civil Action Nos. 70-1220-W and 74-2982-C, Dkt. 281-1 (R. 54). Alvarez is not Hispanic under this definition either.

the District Court to rely upon the definition of Hispanic endorsed by the District of Massachusetts and which specifically applies to HRD.

Further, the District Court appropriately relied upon HRD's definition of Hispanic because *Castro* has withstood strict scrutiny analysis. It is well settled that racial classifications must be narrowly construed; such classifications must be narrowly tailored and serve a compelling government interest. *See, e.g., Cotter v. City of Boston,* 323 F.3d 160, 169-71 (1st Cir. 2003). As noted, the *Castro* consent decree— including its definition of "Hispanic"—was born of an effort to remedy past discrimination against minority groups. *Castro*'s ongoing validity signifies that the definition of "Hispanic" in the context of civil service employment has been and remains appropriate, which underscores that the District Court justifiably relied upon HRD's definition of Hispanic in this litigation.

As the District Court stated, HRD classifies a person whose family originates from the Philippines as Asian, not Hispanic. (R. 113). Thus, since Alvarez's father came from the Philippines, and since Alvarez does not speak Spanish and was not raised in a home where Spanish was the primary language, Alvarez cannot be deemed Hispanic for Civil Service purposes. Indeed, under the HRD's classification, Alvarez is Asian, which, in this litigation, is tantamount to being classified as white.

Alvarez's claim of error in the District Court's ruling is without merit. Alvarez offers no competing definition of "Hispanic" to guide this Court, instead citing to four cases (two unpublished) at varying procedural stages, none of which is either on

18

point or from this Circuit.[9] Appellants' Br. at 91-2. By contrast, HRD's definition of Hispanic derives directly from authority of the trial Court and applies specifically to the matter at hand: Civil Service employment.[10]

Alvarez incorrectly suggests that the City does not challenge his claim of being Hispanic. Appellants' Br. p. 92. This suggestion, however, is belied by the City's briefing in this appeal and in the proceeding below. (R. 1352-53). Indeed, at all relevant times, the City has objected to Alvarez' claim of Hispanic status in this litigation, and in prior litigation. *Id.*[11]

---

[9] None of Appellants' cases supports the argument that the District Court erred in finding, after a bench trial, that Alvarez was not Hispanic. *See Torres v. City of Chicago*, 2000 U.S. Dist. LEXIS 6000, *7 (N.D. Ill. Apr. 28, 2000) (unpublished) (finding that "Hispanic" "blur[s] the line between race and national origin discrimination" but providing no definition of "Hispanic" in the Title VII context); *Salas v. Wis. Dep't of Corr.*, 2006 U.S. Dist. LEXIS 21140, *17 (W.D. Wis. Apr. 17, 2006) (unpublished) (denying motion to dismiss Title VII claim because plaintiff designated his national origin adequately simply by alleging that he is Hispanic); *Reynolds v. City of Chicago*, 296 F.3d 524, 530 (7th Cir. 2002) (finding, in the context of whether a promoted sergeant could effectively serve as "ambassador" to a community that a community may consider a person Hispanic by virtue of parental heritage); *United States v. N.Y. City Bd. of Educ.*, 448 F. Supp. 2d 397, 422 (E.D.N.Y. 2006) (finding that employee of Italian heritage was not Hispanic, employees of Puerto Rican and Mexican heritage were Hispanic, and not addressing issue of Filipino ancestry).

[10] Alvarez relies in significant measure on self-reporting to support his claim of being Hispanic. Appellants' Br. at 92. However, as the District Court correctly found, Alvarez has at times identified himself as white, even when identifying himself as Hispanic was an option. (R. 112). Moreover, self-reporting is not dispositive under any of the competing definitions of "Hispanic."

[11] Alvarez's reliance upon a purported jury finding in another case does not support his claim of Hispanic status because the jury finding did not identify the protected class.

In sum, the District Court made numerous factual findings to support the conclusion that Alvarez is not Hispanic for the purposes of this litigation. This Court must accord deference to those factual findings under the well-settled clearly erroneous standard. The definition of "Hispanic" upon which the District Court relied was the most appropriate to the circumstances because it arose from a consent decree entered by the District of Massachusetts and the definition has been used for Civil Service purposes for decades. This Court should therefore affirm the judgment below in favor of the City of Lowell.

### 3. Alvarez Failed to Show Disparate Impact Arising from Lowell's Use of the 2006 HRD Sgt. Exam.

Even if this Court determines that the District Court erred in ruling that the sole Lowell Plaintiff was not Hispanic, the judgment that entered in favor of Lowell should nonetheless be affirmed because Alvarez failed to show that administration of the 2006 HRD Sgt. exam effectuated a disparate impact on black and Hispanic police officers in Lowell.

To show disparate impact, a plaintiff must first "isolate[e] and identify[]" the employment practice being challenged. *Jones v. City of Boston*, 752 F.3d 38, 46 (1st Cir. 2014) (citation omitted). A plaintiff then has the *prima facie* burden of showing that the identified practice "causes a disparate impact on the basis of race." *Id.* (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)). The Supreme Court has held that a threshold showing of **significant statistical disparity** is a necessary condition of a *prima facie* showing of

disparate impact. *See Ricci,* 557 U.S. at 587 (2009) ("a *prima facie* case of disparate-impact liability [is] essentially, a threshold showing of a significant statistical disparity"); *Jones*, 752 F.3d at 46 ("The Supreme Court has most recently described a *prima facie* showing of disparate impact as 'essentially a threshold showing of a significant statistical disparity . . . and nothing more.'") (citing *Ricci*, 557 U.S. at 587).[12] If a plaintiff meets his or her initial burden, an "employer may defend against liability by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Ricci*, 557 U.S. at 578, citing 42 U.S.C. § 2000e-2(k)(1)(A)(i). If a defendant meets this burden, the plaintiff may prevail only if s/he establishes that "there existed an equally valid, less-discriminatory alternative that served the [employer's] needs but that the [employer] refused to adopt." *Ricci*, 557 U.S. at 587; 42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (C).

Here, Alvarez did not meet his initial *prima facie* burden. Plaintiffs-Appellants made **<u>no showing</u>** of significant statistical disparity, and so there can be no showing of disparate impact. As the most recent U.S. Supreme Court discussion of disparate impact, *Ricci* is critically important in the current case, and Appellants' failure to cite to

---

[12] *See also NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 472 (3d Cir. 2011) (establishing statistical proof and causal relationship is necessary to establish a *prima facie* disparate-impact claim); *Munoz v. Orr*, 200 F.3d 291, 300 (5th Cir. 2000) (holding that plaintiff failed to establish a *prima facie* disparate impact claim where plaintiff did not provide evidence of racial- or gender-based disparities and stating that "[c]laims of disparate impact under Title VII must, of necessity, rely heavily on statistical proof"), citation omitted.

*Ricci* (except in passing to note that an amicus brief in that matter was authored by one of Defendants' experts) underscores the weakness of their position. The District Court properly followed *Ricci*, citing to it at length and explaining that "[d]isparate impact **is itself a statistical construct**; it is an inference of discriminatory practice from statistical evidence." (R. 94 (emphasis added), citing *Ricci*, 557 U.S. at 587).

As the District Court correctly held, the appointment data regarding Lowell officers who took the subject examination and received appointments is too small to permit an inference of disparate impact. The appointment data relevant to Alvarez's claim is as follows:

| | |
|---|---|
| Minority Test Takers: | 7 |
| Minority Appointments: | 0 |
| Minority Appointment Rate: | 0% |
| Non-Minority Test Takers: | 36 |
| Non-Minority Appointments: | 7 |
| Non-Minority Appointment Rate: | 19% |
| Adverse Impact Ratio: | 0% |

(R. 111). Looking to this Court's authority, the District Court noted that "with respect to small data sets, adverse impact ratios, standing alone, can be misleading." (R. 103, citing *Jones*, 752 F.3d at 53); *Fudge*, 766 F.2d at 657-59. In particular, "when a data set is small the shift of a single person from non-selection to selection for a job can alter an apparent conclusion regarding the presence of adverse impact." (R. 103). This analysis is called the "shift-of-one," and is applicable to small samples. Generally, if a data sample fails the "shift-of-one" analysis, the sample is an inadequate source from which to draw statistical conclusions because the analysis indicates that it is likely that

the data distribution could have been caused by chance. The "shift-of-one" analysis is

recognized by the EEOC:

> If the numbers of persons and the difference in selection rates are so small that it is likely that the difference could have occurred by chance, the federal agencies will not assume the existence of adverse impact, in the absence of other information . . . Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group.

(R. 104, citing *Questions and Answers on the Federal Executive Agency Guidelines on Employee*

*Selection Procedures*, 44 Fed. Reg. 11, 996 (1979)). The District Court applied the "shift-

of-one" analysis to Lowell's data, set forth above. Under that analysis, if one minority

test-taker and 6 minority test-takers were appointed to Sergeant, then the adverse

impact ratio would be .86, which suggests that there was no adverse impact in Lowell

under the four-fifth's rule.[13] (R. 111-12). Furthermore, the p-value (the probability of

observing a difference equal to or greater than that which actually occurred, assuming

---

[13] The four-fifths rule is a statistical "rule of thumb" suggested by the EEOC for assessing existence of disparate impact. (R. 92-93). According to the Uniform Guidelines: "A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." (R. 93). The District Court noted that "the First Circuit has counseled against too much reliance on the four-fifths rule." (R. 93, citing *Jones*, 752 F.3d at 51). That is why the District Court did not rely on the four-fifths rule *per se*, but merely noted that the small sample size for Lowell would produce different results under the four-fifths rule when the "shift-of-one" analysis was applied, indicating that the data were too small to produce significant statistical conclusions. (R. 111-12).

equal opportunity), according to plaintiffs' expert, Dr. Joel Wiesen, is .58 in the selection rate for promotions 2006 exam, which also indicates a lack of statistical significance.[14] (R. 112).

Appellants recognize that they cannot show any statistically significant disparity between the selection of minority and non-minority candidates in Lowell for the position of sergeant. Appellants Br. at 83 ("[b]ecause of the smaller numbers in some jurisdictions, some of those analyses were statistically significant and **some were not**") (emphasis added). Appellants therefore resort to arguing that under this Circuit's law "neither a finding of statistical significance nor a violation of the four-fifths rule is a required element of a plaintiff's *prima facie* case." Appellants Br. at 74. Appellants mischaracterize First Circuit law. The principal case from this Court that Appellants rely on, *Boston Chapter, N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017, 1020-21 (1st Cir. 1974) ("*Beecher*"), does not stand for the proposition, as Appellants contend, that "a finding of disparate impact can be made based on [non-statistical] evidence that an exam . . . is known to have an adverse impact." Appellants' Br. at 75, citing *Beecher*, 504 F.2d at 1020-21.

In *Beecher*, the plaintiffs alleged that a multiple-choice test administered by the Massachusetts Division of Civil Service resulted in disparate impact on minority fire-

---

[14] Statisticians usually apply the label "statistically significant" to the observed differential outcomes if the p-value is less than five percent. (R. 94). A value of .58 means that one would expect the Lowell's promotion results more than half of the time in a random sampling.

fighter employment. The District Court found that the plaintiffs had established a *prima facie* case of disparate impact. On appeal, this Court considered three sources of evidence that plaintiffs had presented in an attempt to meet their *prima facie* burden of disparate impact: census figures, indicating disproportionality in the employment of black and Spanish surnamed fire fighters; sample data regarding how minorities had fared on the test; and expert testimony that minorities "typically perform more poorly on paper-and-pencil tests of this type." *Beecher*, 504 F.2d at 1021. The third sort of data was non-statistical, but it did not, as Appellants contend, form the "basis" for this Court's conclusion that the District Court was not clearly erroneous in finding that plaintiffs had established a *prima facie* case; rather, the expert testimony "conclusively tip[ped] the scale in plaintiffs' favor" **when added to** statistical evidence that was not, in itself, conclusive. *Id.* This is consistent with requiring a "threshold" (i.e., necessary, but not sufficient) showing of statistical significance, without which a *prima facie* case of disparate impact cannot be made.

Even if *Beecher* had contemplated that a plaintiff could establish a *prima facie* case of disparate impact in the absence of presenting statistically significant data supporting such impact, later cases decided by this Court demonstrate that this proposition is not good law. *See Jones*, 752 F.3d at 46 (treating significant statistical disparity as "threshold" question in showing of disparate impact) (citing *Ricci,* 557 U.S. at 587); *Fudge*, 766 F.2d at 658 ("We think that in cases involving a narrow data base, the better approach is for the courts to require a showing that the disparity is

25

statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof."), *accord Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 996-97 (1988) (small or incomplete data sets are unreliable as basis of adverse impact showing).[15] In *Fudge,* this Court considered the very question at issue here: the case of a small data sample. The Court cautioned against "intuitive response[s]" to small data samples and required statistical analysis "to determine the likelihood an observed disparity resulted from mere chance." *Id.* Here, that analysis was not provided, a significant statistical disparity was not shown, and the District Court correctly held that Plaintiffs did not establish a *prima facie* case of disparate impact as to Lowell.[16]

---

[15] Amici argue that *Ricci* stands for "accept[ance of] statistical evidence of disparate impact without the requirement of formal statistical significance as applied by the First Circuit" because the *Ricci* court cites the EEOC's 80% rule as a showing of disparate impact. Br. of Amici Curiae National Urban League and the National Association for the Advancement of Colored People at 7, n. 4. However, *Ricci* and *Jones* each indicate that the 80% rule may in some instances be a measure of significant statistical disparity, but that it is by no means the only such measure, and that "passing" the 80% rule does not indicate that no disparate impact exists. *See Ricci,* 557 U.S. at 586-87; *Jones,* 752 F.3d at 52.

[16] Appellants other cases do not establish that a showing of significant statistical disparity was not required in this case. *See Langlois v. Abington Hous. Auth.,* 207 F.3d 43, 50 (1st Cir. 2000) (discussing the "four-fifths formula" and commenting that among statistical tests, no "single test" controls in measuring disparate impact); *Phillips v. Cohen,* 400 F.3d 388, 401 (6th Cir. 2005) (reversing order of summary judgment where the evidentiary record **coupled with statistical expert reports** created a genuine issue of material fact regarding disparate impact); *Isabel v. City of Memphis,* 404 F.3d 404, 412-413 (6th Cir. 2005) (considering "statistics beyond the four-fifths rule analysis because we prefer to look to the sum of statistical evidence to make a decision in these kinds of [disparate impact] cases"); *Banks v. E. Baton Rouge Parish Sch.*

### 4. The District Court Correctly Declined to Aggregate Across Municipalities.

The District Court correctly declined Plaintiffs' proposal to aggregate test data for each year at issue for all municipalities across the Commonwealth that participated in the promotional exams for that year. (R. 106). Although the court expressly conceded that aggregation across municipalities may be appropriate in some cases, it held that such aggregation was inappropriate in this instance.[17]  The court's principal reason, which is dispositive in this case, was that "[u]nder Massachusetts law, a municipality may promote to sergeant only officers already employed in its own police department" and "[t]here are a number of reasons why there may be substantial differences in the candidate pools in different municipalities." (R. 106). Among those reasons, the District Court listed "variations in original selection procedures and subsequent in-service training," either of which would affect candidates' performance

---

*Bd.*, 320 F.3d 570, 579 (5th Cir. 2003) (affirming district court holding that plaintiffs had failed to establish disparate impact through statistical or non-statistical means); *Rivera v. Wichita Falls*, 665 F.2d 531, 536 (5th Cir. 1982) (finding prima facie case of disparate impact established from small data set where statistical significance of difference was historical and stark); *United States v. City of New York*, 683 F. Supp. 2d 225, 240 (E.D.N.Y. 2010) ("Plaintiffs' statistics therefore made out a prima facie case of discrimination"), vacated and remanded on other grounds *United States v. City of New York*, 717 F.3d 72, 79 (2d Cir. 2013) ("finding of disparate impact was based on undisputed statistical evidence showing that black and Hispanic applicants disproportionately failed the Exams").

[17] Appellants' statement that "the district court [] reject[ed] *all* aggregated statistics, with no analysis about the relevant differences between various types of aggregation" (emphasis in original) is incorrect and is belied by the plain language of the September 5, 2014 order.

on the statewide exam. (R. 106). The result is that the pools Plaintiffs-Appellants propose aggregating consist of persons who are not similarly situated. Furthermore, only one plaintiff, Alvarez, is suing Lowell in this action (and Alvarez lacks standing to do so, *see supra*, pp. 14-20); no plaintiffs from other jurisdictions have viable claims against Lowell and Lowell should not be held liable—even indirectly—for the composition of other jurisdictions' sergeant applicant pools and/or the preparation provided or allowed in other jurisdictions for the sergeants' exam.[18] But this is exactly what would result if an aggregation were imposed on Lowell consisting of results beyond the jurisdiction over which it has control. *See also* R. 2348-50 (testimony of Jacinto Manuel Silva stating that multiple factors weigh against aggregating jurisdictional data in this case).

Furthermore, the pools of 2006 test takers among the various jurisdictions statewide were vastly different sizes, and aggregating pools of data of varying sizes is statistically problematic. (R. 2348-49). It is easy for the numbers from larger populations to skew numbers for small populations, since the statistics of the large population will dominate. In some cases, an effect known as Simpson's Paradox is created, whereby aggregating data across data pools with varying sizes can have the

---

[18] That the composition of applicant pools varied considerably was amply demonstrated on the record below. For example, in Lowell, the lowest written grade resulting in a promotion was "08500", but in numerous other jurisdictions significantly lower scores resulted in promotions. These included, but are not limited to, Arlington PD with a low score of "07625", Ashland PD at "07500", and Athol PD at "07375." (R. 4260-74).

28

cumulative effect of showing a disparate impact where it does not, in reality, exist. (R. 2350-51; 4860).[19] Where a population that does not demonstrate adverse impact (such as Lowell) is simply pooled with a greater population (whether itself single or aggregated) in which statistically significant adverse impact is present, the result is not a reliable indication of whether or not there was an adverse impact for Lowell itself.

This Court has cautioned against the sort of aggregation Appellants propose. In *Fudge v. City of Providence Fire Department*, this Court held that "dissimilarities prevent lumping [between results of tests from different years]." 766 F.2d at 657. Although *Fudge* considered differences between tests, rather than differences between jurisdictions, the principle is the same: when comparing jurisdictions of wholly different sizes and characters across the commonwealth, aggregation is inappropriate unless there is reason to believe that the jurisdictions are similar in terms of their respective pools of candidates for the sergeant's exam. The District Court made a factual finding, which is due deference, that Plaintiffs did not provide evidence suggesting such similarity. *See* September 5, 2015 Order ("Implicit in the plaintiff's aggregation argument is the assumption that there will be no difference by municipality in the composition of their respective pools of minority sergeant

---

[19] *Compare Abram v. United Parcel Serv. of Am., Inc.,* 200 F.R.D. 424, 431 (E.D. Wisc. 2001) ("If Microsoft-founder Bill Gates and nine monks are together in a room, it is accurate to say that on average the people in the room are <u>extremely</u> well-to-do, but this kind of aggregate analysis obscures the fact that ninety percent of the people in the room have taken a vow of poverty.") (emphasis in original).

candidates, particularly with respect to vulnerability to adverse impact from the test. There is no reason to suppose, and no evidence on the point was produced at trial, that the assumption will necessarily prove to be true.") (R. 106).

In particular, in cases in which aggregation is proposed across autonomous hiring units, such as Appellants propose here, courts have resisted it. *See Bailey v. Southeastern Area Joint Apprenticeship Committee*, 561 F. Supp. 895, 910 (1983) (finding aggregation across applicants "irrelevant" where local unions each hired from lists distributed to them by central hiring authority and were "autonomous, in that each gathers and maintains its own applicant list and that an applicant on one local's list may not cross over to another local's applicant list"). For the purposes of sergeant promotions, municipalities such as Lowell are similarly autonomous units. *See* M.G.L. c. 31, §§25 and 59; *contrast Bradley v. City of Lynn*, 443 F. Supp. 2d 145, 167 (D. Mass. 2006) (aggregating exam data across certain non-defendant municipalities for entry-level firefighters seeking original appointment).[20] This case is unlike *Bradley* for two reasons. First, candidates for sergeant are not entry-level and have thus benefitted from experience and training that is specific to their jurisdiction (as noted by the District Court). Second, in *Bradley* the jurisdictions whose data was aggregated were

---

[20] The *Bradley* court disaggregated data from Boston, agreeing that it was "reasonable" to believe that including Boston would "allow[] one single jurisdiction to have a major influence on the entire system leading to a conclusion of adverse impact for the entire Commonwealth when a single community is responsible for the outcome." 44 F. Supp. 2d at 165 (citing HRD expert Dr. Rick Jacobs). Plaintiffs in this matter proposed aggregation both across jurisdictions *and* across years.

not defendants; the defendant was HRD itself. Thus autonomous jurisdictions were not held indirectly accountable for the hiring practices (including the preparation for hiring) in other jurisdictions; it was HRD which was held accountable with regard to the passing rates for its own exam for entry-level candidates who had gained no experience or training from the jurisdictions in which they might subsequently work.[21, 22]

---

[21] Of Appellants' cases, only one aggregates across jurisdictions against individual cities (as opposed to aggregating certain practices of a single employer) in the manner that Appellants' propose here: *Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Serv.*, 625 F. Supp. 527 (D.N.J. 1985). (Indeed another of Appellants' cases expressly notes that "courts . . . have consistently looked to the city, *i.e.*, the **geographic area served by police and fire departments**, in considering the existence of a prima facie case [of disparate impact]." *League of United Latin American Citizens v. Santa Ana*, 410 F. Supp. 873, 896 (D. Cal. 1976) (emphasis added).) *Vulcan* is from a district court outside of this Circuit and has little persuasive value. Furthermore, like *Bradley*, *Vulcan* included a statewide defendant, the New Jersey Department of Civil Service, which devised and administered the examinations in question.

[22] If this Court concludes that the District Court erred, when assessing Lowell's liability, in declining to aggregate data across different jurisdictions, then the appropriate remedy is remand to the lower court for further factual findings consistent with this decision. For instance, the lower court made no factual findings regarding Plaintiffs' proposed aggregation of data concerning Hispanic applicants with data concerning black applicants. Further, Plaintiffs' expert Dr. Wiesen aggregated data both over jurisdictions **and** over time, which leads to additional problems, including the recounting of individuals who took multiple promotional exams. (R. 4307-11).

5. **The Promotional Examination was Job-Related and Consistent With Business Necessity and There Was Not Another Selection Device Without a Similar Discriminatory Effect That Would Also Serve The City's Legitimate Interest.**

As a preliminary matter, the District Court found that Plaintiffs had made a *prima facie* case of disparate impact against Boston **only**, and therefore that only Boston needed to proceed to demonstrate that its HRD promotional exams were job related and consistent with job necessity. Accordingly, the District Court's factual findings on this matter only concerned the Boston plaintiffs' 2005 and 2008 HRD Sgt. exams. As set forth below, the City submits that the same factual findings would be warranted as regards the 2006 exam, which is the subject of Alvarez's case against Lowell. Nonetheless, if this Court disagrees with the District Court and believes **both** that Alvarez has standing to bring suit and that he has established disparate impact, Lowell submits that the proper procedure is to remand this case to the lower court to which the evidence was presented for factual findings consistent with this Court's opinion

### i. *The 2006 HRD Sergeant Exam Was a Bona Fide Promotional Exam that Was Job Related and Consistent With Job Necessity.*

The Uniform Guidelines address when an employer's selection method is "job-related," such that its use might be justified notwithstanding some adverse impact on a particular group. (R. 94). Industrial organizational psychologists refer to a selection instrument that is job-related and consistent with business necessity as one that is "valid" for the selection process, and generally describe a selection method that

measures a candidate's knowledge, skills, and abilities (KSAs) against the actual needs of the job as a "valid" selection tool. (R. 94-95); *see also Williams v. Ford Motor Co.*, 187 F.3d 533, 538-43 (6th Cir. 1999) (a test will have content validity if there is a direct relationship between the test contents and the job contents). To establish that the contents of an employment test are job-related, the employer must show that they are "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." *Williams*, 187 F.3d at 539.

Evidence presented below demonstrated that the 2006 HRD Sgt. exam was created as a result of two validation studies, a job analysis, the identification of KSAs, a test plan linking the KSAs to the test instrument, a job knowledge multiple choice test, and an education and experience ("E&E") component. The questions on the examinations came from textbooks that police departments use and rely upon. The examination material consisted of constitutional and statutory laws, police supervision, community policing and police functions, all of which are consistent with business necessity.

Experts in this matter, including Plaintiffs-Appellants' expert Joel Wiesen, opined that if an exam had good content validity and the candidate acquired additional knowledge, skills and abilities through experience then, assuming that person studied for the examination, you would expect that the scores of prepared candidates to increase over time. Indeed, after attaining more years of service,

33

experience and knowledge, 8 Lowell candidates, who ranked between 11th and 31st (last) on the 1998 HRD Sgt. Exam, eventually scored high enough on subsequent tests to be promoted. Conversely, Alvarez who ranked 6th in 1998, did not see any increase in his score; instead, his scores decreased. According to the testimony of Alvarez's own expert witnesses, then, the most likely reason for the decrease in the scores he received was a failure to study and prepare.

Based on numerous factual findings, including several that mirrored evidence presented during trial regarding the 2006 exam, the District Court opined that the 2005 and 2008 HRD exams were valid and that "[a] selection method that is valid under the considerations discussed above can be deemed to be 'job related' and 'consistent with business necessity' under the statutory standard. 42 U.S.C. § 2000e-2(k)(1)(A)(i)." (R. 124). This Court should find the same way with regard to the 2006 exam.[23]

---

[23] The 2006 HRD Sgt. Exam was also administered and scored in within the constraints of the laws of civil service regarding eligibility lists, the "2n+1" rule, and statutory points for military veterans and police officers with 25 years of experience. While not ruling on the constitutionality of municipal law, *Ricci* noted that civil service exams had to comply with the New Haven city charter which precluded banding, required a "rule of 3," and had to use a scoring system that was the result of collective bargaining.

### ii. Plaintiffs-Appellants Did Not Demonstrate the Availability of an Equally Valid, Less Discriminatory Alternative Employment Practice.

Alvarez did not meet his burden of showing that Lowell refused to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs. *Ricci*, 557 U.S. at 578. Appellants claim that an assessment center, "banding" (whereby persons who score within a certain number of points apart (a band) on a written exam are treated as effectively equal in the promotion process), or a combination of both would reduce adverse impact and serve the needs of the defendants.

Noting that under Massachusetts law, public employers that are civil service regimes are required to use written exams as a merit selection tool, the District Court found that "[a]ssessment centers are generally used only as a supplement to, rather than a substitute for, written job knowledge exams." (R. 126); M.G.L. c. 31, § 59. Further, the Court made a factual finding that assessment centers "can require considerably more resources to administer, including both money and personnel, and thus can be cumbersome and expensive." (R. 126). On the record below, it was demonstrated that the field of industrial psychology has struggled with the effectiveness of assessments centers for years, and there is no consensus as to whether such centers improve disparate impact. Further, the evidence demonstrated that Lowell has been willing to utilize assessment centers in the promotional process, but that it will only do so after reaching an agreement with the appropriate

35

union, which has not supported the use of assessment centers. Based on all of the evidence presented below, Alvarez did not meet the burden of showing that Lowell could have created an assessment center that would have had less disparate impact and served the City's employments needs, while also complying with the constraints of M.G.L. c. 31.

Appellants are also incorrect in their claim that banding was a feasible option that Lowell should have utilized as part of its process for selecting sergeants because banding was not a legally viable option. A justice of the Massachusetts Superior Court enjoined the use of banding to score the 2008 police promotional exams on the ground that such a substantial change in HRD's rules and procedures could only be made in a formal rulemaking proceeding under Section 4 of Chapter 31 of the General Laws, which had not occurred. *Pratt v. Dietl*, SUVC No. 2009-01254, Memorandum of Decision and Order on Plaintiffs' Motion for a Preliminary Injunction, April 15, 2009. Thus just as the District Court found that banding was not actually available to Boston as an option for the 2008 exam, nor was it available to Lowell for the 2006 exam. Furthermore, *Ricci* noted that the New Haven exams had to comply with its city charter which precluded banding; like the City Charter of New Haven, the laws of civil service in the Commonwealth of Massachusetts do not permit banding.

Alvarez has thus not met his burden of demonstrating by the evidence that there was an alternative employment practice with equal validity and less adverse

impact that was available and that Lowell refused to adopt. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(ii). For this reason also, the judgment below should be affirmed.

### 6. The City of Lowell Cannot Be Held Liable Under Title VII for Using the Statewide Civil Service Testing Regime Mandated By M.G.L. C. 31.

The City of Lowell is an employer under Title VII. However, Title VII restricts employers' **employment practices**, and the HRD promotional examinations were conducted outside of Lowell's capacity as employer. As other courts have recognized, Title VII does not restrict a sovereign's exercise of its traditional police powers, including the promulgating and enforcement of testing requirements, in a non-employment capacity. *See*, *e.g.*, *Camacho v. Puerto Rico Ports Auth.*, 369 F.3d 570, 578 (1st Cir. 2004) (noting "long line of cases" holding that testing authorities are not subject to Title VII). The Constitution prohibits intentional discrimination on the basis of race in the use of the police power, but does not proscribe disparate impact. *Washington v. Davis,* 426 U.S. 229, 241-242 (1976). Indeed, in *Davis* the Court relied in part on concerns about how such liability would affect state licensing and testing statutes and other traditional state functions. *Id.* at 248. Because nothing in Title VII manifests a clear intent to impose further restrictions on the states' exercise of their sovereign police power to test or license professionals including police officers, Title VII should not be read to intrude on such matters of core state authority. *See United States v. Bass*, 404 U.S. 336, 349 (1971); cf. *Gregory v. Ashcroft,* 501 U.S. 452, 460-461 (1991) (holding that Congress's intent "to alter the usual constitutional balance

37

between the States and the Federal Government" must be "unmistakably clear in the language of the statute") (citation omitted). This is consistent with the Supreme Court's cases suggesting that intent to rework the federal-state balance should not be lightly inferred. *See, e.g.*, *Bass,* 404 U.S. at 349.

In the instant case, the state acted pursuant to its traditional police powers in performing a core state function—regulating the qualifications of its police supervisors. This Court dismissed the Commonwealth as a defendant on the grounds that it is not an "employer" under Title VII but merely acted as a licensing or regulatory authority. *Lopez v. Massachusetts*, 588 F.3d 69, 72–73 (1st Cir. 2009). However, because Lowell did not devise and did not administer the Sergeant's promotional exam in question, Lowell is **also** not liable under Title VII. It was complying with a facially-neutral state testing regime that restricts promotions to those existing employees who have complied with the Commonwealth's requirements. Specifically, Lowell must comply with the state law that requires Lowell to hire from the certified lists promulgated by HRD. Title VII does not hold a municipality responsible as an employer for policy choices that the State alone made as a licensor or regulator. Title VII restricts employers because of their control over the hiring process, but here Lowell has no control or influence over the testing body. *See generally*, M.G.L. c. 31, § 1. Like the vast majority of employers who hire professionals regulated by the state, a municipality in the civil service system should not be liable under Title VII for complying with a facially-neutral state civil service testing regime

that limits the universe of potential appointments because doing so would frustrate the state's power to regulate.

If this Court were to determine that the state-created and administered examinations had an impermissible disparate impact, it would jeopardize the state's vital interest in regulating numerous professions, including the health and safety of medical patients, teachers, firefighters and police. That traditional police power would be ill-served by subjecting employers to liability for the examinations created and administered by the states. For example, under Appellants' rationale, law firms and government legal offices could be subjected to Title VII litigation alleging that bar examinations created disparate results. Health care providers could likewise be subject to litigation alleging disparate impact liability on the basis of medical, dental, or veterinary testing requirements. The potential implications of holding employers liable under Title VII for any disparate impact stemming from a state-created and administered test are profound, and there is no evidence in the text or history of Title VII that Congress intended such effects.

To hold Lowell liable under Title VII for the consequences of a state law would also violate the general principle that "where [a defendant] has no ability to prevent a certain effect due to its limited [legal] authority over the relevant actions, the [defendant] cannot be considered a relevant 'cause' of the effect," and thus ordinarily is not liable. *Department of Transp. v. Public Citizen,* 541 U.S. 752, 770 (2004). There is no evidence that Congress intended to depart from that principle in Title VII, with the

indirect consequence of interfering with a state's ability to conduct facially-neutral exams. Moreover, though the basic liability provisions from which disparate-impact liability has been derived address an employer's effort "to limit, segregate, or classify his employees or applicants," 42 U.S.C. 2000e-2(a)(2), here it is the state's statutory provisions regarding HRD's creation, administration, and scoring of the exam, and not the actions of Lowell, that limit the pool of qualified applicants.[24]

Lowell further relies on the business-necessity defense. That defense provides an employer with a defense to a disparate impact claim if it shows that the challenged business practice is job related and consistent with business necessity. 42 U.S.C. § 2000e-2(k)(1)(A)(ii). With a mandatory state testing requirement in place, that defense is satisfied.[25] In other words, compliance with a valid facially-neutral state mandate is a business necessity to which there is no reasonable alternative. Under M.G.L. c. 31, HRD is charged with the responsibility and authority to develop examinations that "fairly test the knowledge, skills and abilities which can be practically and reliably measured." *Boston Police Superior Officers Federation v. Civil Service Commission*, 35 Mass. App. Ct. 688, 692, 624 N.E.2d 617, 620 (1993).  M.G.L. c. 31, § 16 delegates the determination of the 'form, method and subject matter' of promotional examinations

---

[24] There is no evidence that Congress contemplated requiring an employer to bear the burden in defending examinations that it did not create and did not administer. Indeed, it goes against basic issues of fairness and due process to place Defendants in such a position.

[25] Since Lowell is a City with more than 100,000 inhabitants, it is required to opt in to the Civil Service system. *See* M.G.L. c. 31 § 51.

to the Administrator of HRD. The Administrator is the skilled professional who is authorized to decide technical matters such as scoring and interpreting the examinations. M.G.L. c. 31, § 16.; *see also Lopez,* 588 F.3d at 73-81. Appellants cannot dispute that Lowell played no role in the creation, administration or scoring of any of the HRD-developed examinations. In fact, it is not in dispute that the Commonwealth does not share information with the jurisdictions that make use of its exams. The Commonwealth shares with Lowell only the results relating to persons eligible for promotion within its own police department. Lowell should not be required to prove the content or construct validity of the Commonwealth's examinations in order to prove business necessity. *See also supra*, pp. 32-34.

### 7. Lowell May Not Disregard HRD Exam Results Absent Strong Evidence of Disparate Impact.

In *Ricci,* New Haven decided **not** to utilize the results of an examination for vacant positions of Lieutenant and Captain in its Fire Department. After it created, administered and scored its own promotional examination, New Haven determined that the "racial adverse impact" of the exam was "significant" and threw out the results. *Ricci,* 557 U.S. at 586-87. New Haven's decision was challenged by non-minority employees who argued that but for the decision they would have been promoted. The Supreme Court ruled that New Haven's decision was "race based," and that it was impermissible absent a "**strong**" (not merely *prima* facie, which New

Haven had) basis in evidence, which New Haven lacked, that the employer would otherwise be liable for disparate impact discrimination. *Id.* at 587.

Here, Alvarez argues that, like New Haven, Lowell should have rejected the results of the 2006 HRD Sergeants exam developed and administered by HRD based upon the "evidence" of disparate impact, and that Lowell should be held liable under Title VII and M.G.L. c. 151B for promoting based on the exam results. But any decision by Lowell to reject the results of the examinations due to concerns regarding disparate impact upon minorities would have constituted a race-based decision that could only be justified by a strong basis in evidence of disparate impact discrimination. *Ricci,* 557 U.S. at 584 ("[an employer] may not take the . . . step of discarding the test altogether to achieve a more desirable racial distribution of promotion-eligible candidates--absent a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision"). Plainly, New Haven had significantly more information at its disposal than Lowell had prior to the 2006 HRD Sgt. exam. Unlike Lowell, New Haven administered the examination in question and, therefore, it had the data and expertise to defend its examination. Here, there is no evidence that Lowell had access to the examination data, including the validation studies or the results of the examination statewide. Therefore, it was impossible for Lowell to have a strong basis in evidence to believe that the 2006 HRD Sgt. exam had an adverse impact when

42

determining promotions to sergeant. The holding of *Ricci* controls and mandates that this Court affirm the District Court's judgment that entered in favor of Lowell.

## CONCLUSION

For the foregoing reasons, the District Court's judgment in favor of the City of Lowell should be affirmed.

June 17, 2015                    Respectfully submitted,

CITY OF LOWELL and Appointing Authority for
the City of Lowell,
By its attorneys,

*/s/ Rachel M. Brown*
Rachel Brown, Assistant City Solicitor #123539
Christine P. O'Connor, City Solicitor, #55980
City of Lowell Law Department
375 Merrimack Street, 3rd Floor
Lowell MA 01852-5909
Tel: 978-674-4050
Fax: 978-453-1510
co'connor@lowellma.gov
rbrown@lowellma.gov

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,698 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Garamond 14-point proportionally spaced typeface including serifs.

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2015, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Harold L. Lichten, C.A.B. 22114
Benjamin Weber, C.A.B. 1159650
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617)-994-5800
hlichten@llrlaw.com
bweber@llrlaw.com

Charles Dunstan Boddy
Jr. Richard D'Agostino
Office of the City Attorney
200 Common St., Ste. 306
Lawrence, MA 01840

Anne L. Radazzo
25 Westwind Dr.
Methuen, MA 01844

Kerry M. Regan
City of Methuen
Office of the City Solicitor
41 Pleasant St., Suite 311
Methuen, MA 01844

Iraida J. Alvarez
Robert Lawrence Quinan, Jr.
Sookyoung Shin
MA Attorney General's Office
1 Ashburton Place, 20th Floor

Boston, MA 02108

Daniel C. Brown
Joshua Ryan Coleman
Tim D. Norris
Collins, Loughran & Peloquin P.C.
320 Norwood Park South
Norwood, MA 02062

Kay H. Hodge
John Matthew Simon
99 High St., Suite 1601
Boston, MA 02201

Lisa Skehill Maki
City of Boston Law Department
One City Hall Plaza
Room 615
Boston, MA 02201

Robert P. Morris
Morgan, Brown & Joy LLP
200 State St.,11[th] Fl.
Boston, MA 02109

Maurice Martin Cahillane
Egan, Flanagan & Cohen PC
67 Market St.
Springfield, MA 01102

Harry P. Carroll
John Thomas Liebel
Edward M. Pikula
City of Springfield
Law Department
36 Court St.
Springfield, MA 01103

William G. Cullinan
O'Connor Martinelli & Cohn
1391 Main St., Ste. 1022

Springfield, MA 01103

Kevin Sean McDermott
MBTA Law Department
10 Park Plaza, Suite 7760
Boston, MA 02116

/s/ *Rachel M. Brown*
Rachel M. Brown, Assistant City Solicitor