Case No. 14-1952

---

# IN THE UNITED STATES
# COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

PEDRO LOPEZ, individually and on behalf of a class of individuals similarly situated; ABEL CANO, individually and on behalf of a class of individuals similarly situated; KEVIN SLEDGE, individually and on behalf of individuals similarly situated; CHARLES DEJESUS, individually and on behalf of a class of individuals similarly situated; RICHARD BROOKS, individually and on behalf of a class of individuals similarly situated; THE MASSACHUSETTS HISPANIC LAW ENFORCEMENT ASSOCIATION, individually and on behalf of a class of individuals similarly situated; ROBERT ALVAREZ, individually and on behalf of a class of individuals similarly situated; SPENCER TATUM, individually and on behalf of a class of individuals similarly situated; SHUMEAND BENFOLD, individually and on behalf of a class of individuals similarly situated; ANGELA WILLIAMS-MITCHELL, individually and on behalf of a class of individuals similarly situated; GWENDOLYN BROWN, individually and on behalf of a class of individuals similarly situated; LYNETTE PRAILEAU, individually and on behalf of a class of individuals similarly situated; TYRONE SMITH, individually and on behalf of a class of individuals similarly situated; EDDY CHRISPIN, individually and on behalf of a class of individuals similarly situated; DAVID E. MELVIN, individually and on behalf of a class of individuals similarly situated; STEVEN MORGAN, individually and on behalf of a class of individuals similarly situated; WILLIAM E. IRAOLO, individually and on behalf of a class of individuals similarly situated; JOSE LOZANO, individually and on behalf of a class of individuals similarly situated; COURTNEY A. POWELL, individually and on behalf of a class of individuals similarly situated; JAMES L. BROWN, individually and on behalf of a class of individuals similarly situated; GEORGE CARDOZA, individually and on behalf of a class of individuals similarly situated; LARRY ELLISON, individually and on behalf of a class of individuals similarly situated; DAVID SINGLETARY, individually and on behalf of a class of individuals similarly situated; CHARISSE BRITTLE POWELL, individually and on behalf of a class of individuals similarly situated; CATHENIA D. COOPER-PATERSON, individually and on behalf of a class of individuals similarly situated; MOLWYN SHAW, individually and on behalf of a class of individuals similarly situated; LAMONT ANDERSON, individually and on behalf

of a class of individuals similarly situated; GLORIA KINKEAD, individually and on behalf of a class of individuals similarly situated; KENNETH GAINES, individually and on behalf of a class of individuals similarly situated; MURPHY GREGORY, individually and on behalf of a class of individuals similarly situated; JULIAN TURNER, individually and on behalf of a class of individuals similarly situated; NEVA GRICE, individually and on behalf of a class of individuals similarly situated; DELORES E. FACEY, individually and on behalf of a class of individuals similarly situated; LISA VENUS, individually and on behalf of a class of individuals similarly situated; RODNEY O. BEST, individually and on behalf of a class of individuals similarly situated; KAREN VANDYKE, individually and on behalf of a class of individuals similarly situated; ROBERT C. YOUNG, individually and on behalf of a class of individuals similarly situated; ROYLINE LAMB, individually and on behalf of a class of individuals similarly situated; LYNN DAVIS, individually and on behalf of a class of individuals similarly situated; JAMES A. JACKSON, individually and on behalf of a class of individuals similarly situated; JUAN ROSARIO, individually and on behalf of a class of individuals similarly situated; LOUIS ROSARIO, JR., individually and on behalf of a class of individuals similarly situated; OBED ALMEYDA, individually and on behalf of a class of individuals similarly situated; DEVON WILLIAMS, individually and on behalf of a class of individuals similarly situated; JULIO M. TOLEDO, individually and on behalf of a class of individuals similarly situated

Plaintiffs – Appellants

v.

MARISOL NOBREGA, individually and on behalf of a class of individuals similarly situated

Plaintiff

v.

CITY OF LAWRENCE, MASSACHUSETTS; CITY OF METHUEN, MASSACHUSETTS; COMMONWEALTH OF MASSACHUSETTS; PAUL DIETL, in his capacity as Personnel Administrator for the Commonwealth of Massachusetts; JOHN MICHAEL SULLIVAN, in his capacity as Mayor of the City of Lawrence, Massachusetts; WILLIAM MANZI, III, in his capacity as Mayor of the City of Methuen, Massachusetts; CITY OF LOWELL; CITY OF WORCESTER, MASSACHUSETTS; APPOINTING AUTHORITY FOR THE

CITY OF LOWELL; MICHAEL O'BRIEN, in his capacity as City Manager of the City of Worcester, Massachusetts; CITY OF BOSTON, MA; CITY OF SPRINGFIELD, MA; DOMENIC J. SARNO, JR., in his capacity as Mayor for the City of Springfield; MASSACHUSETTS BAY TRANSPORTATION AUTHORITY; DANIEL GRABAUSKAS, in his capacity as General Manager; BOARD OF TRUSTEES OF THE MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

Defendants - Appellees

WILLIAM F. MARTIN, in his capacity as Mayor of the City of Lowell, Massachusetts; KONSTANTINA B. LUKES, in her capacity as Mayor of the City of Worcester, Massachusetts

Defendants.

_____

**On Appeal from a Judgment of the United States District Court of Massachusetts**

**Case No. 07-11693**
**The Honorable George A. O'Toole, Jr.**

_____

**BRIEF OF DEFENDANT-APPELLEE**
**CITY OF WORCESTER, MASSACHUSETTS,**
**MICHAEL O'BRIEN, in his capacity as City Manager of the City of Worcester, Massachusetts AND KONSTANTINA B. LUKES, in her capacity as Mayor of the City of Worcester, Massachusetts**

_____

**Counsel for Appellees**:

Tim D. Norris, C.A.B. No. 7834
Collins, Loughran & Peloquin, P.C.
320 Norwood Park South
Norwood, MA 02062
tnorris@collinslabor.com
Dated: June 17, 2015

Joshua R. Coleman, C.A.B. 1145285
Collins, Loughran & Peloquin, P.C.
320 Norwood Park South
Norwood, MA  02062
jcoleman@collinslabor.com
(781) 762-2229

# **TABLE OF CONTENTS**

I.      PROCEDURAL HISTORY ...................................................... p. 1

II.    STATEMENT OF THE ISSUES ............................................ p. 2

III.   STATEMENT OF THE CASE ............................................... p. 3

Background .................................................................. p. 3

Civil Service Examination Process ........................................ p. 3

Expert Testimony on Statistical Methods for Analyzing
Adverse Impact ............................................................. p. 6

Expert Testimony About Aggregated Data ............................. p. 9

City of Worcester Promotions From 2006 and 2008 Exam ................. p. 11

Statistical Analysis of Aggregated Data................................. p. 13

Validity of the Test ....................................................... p. 14

District Court Decision ................................................... p. 15

IV.   SUMMARY OF THE ARGUMENT .................................... p. 15

V.    ARGUMENT......................................................... p. 16

A. THE DISTRICT COURT CORRECTLY FOUND THAT
TATUM FAILED TO ESTABLISH A PRIMA FACIE
CASE OF DISCRIMINATION AGAINST WORCESTER ........... p. 16

1. Standard of Review ............................................. p. 16

a. The Clear Error Standard Applies...................... p. 16

b. Prima Facie Case of Disparate Impact
Discrimination................................................ p. 17

2. Statistical Significance Is Not Optional And Tatutm
Cannot Demonstrate A Statistically Significant
Adverse Impact In Worcester ................................. p. 18

       3.  The Record Supports The Court's Refusal To
           Aggregate Data Across Different Jurisdictional
           And Test Years ........................................................................ p. 24

    B.    THE COURT'S DETERMINATION THAT THE HRD
           PROMOTIONAL EXAMINATION WAS VALID AND
           CONSISTENT WITH BUSINESS NECESSITY WAS
           ADEQUATELY SUPPORTED BY RECORD EVIDENCE
           AND NOT CLEARLY ERRONEOUS ....................................... p. 32

       1.  Legal Standard ...................................................................... p. 32

       2.  The HRD Examination Used By Worcester Were
           Valid And Consistent With Business Necessity .................... p. 35

    C.    THE OFFICERS CANNOT PROVE THAT WORCESTER
           HAD AVAILABLE AN ALTERNATIVE SELECTION
           METHOD THAT WOULD RESULT IN LESS ADVERSE
           IMPACT THAT IT REFUSED TO USE ..................................... p. 39

    D.    WORCESTER CANNOT BE LIALBLE UNDER TITLE VII
           FOR FOLLOWING A MANDATORY STATEWIDE
           TESTING REGIME .................................................................. p. 41

VI.    CONCLUSION ...................................................................................... p. 42

# TABLE OF AUTHORITIES

**Cases**

*Albemarle Paper Co. v. Moody,*
    442 U.S. 405 (1975)..............................................................p. 32

*Anderson v. City of Bessemer City, N.C.,*
    470 U.S. 564 (1985)..............................................................p. 17

*Anthony v. Sundlun,*
    952 F.2d 603 (1st Cir. 1991) ................................................p. 17

*Banks v. Easton Baton Rouge Parish School Board,*
    320 F.3d 570 (5th Cir. 2003) ...............................................p. 22

*Boston Chapter, N.A.A.C.P., Inc. v. Beecher,*
    504 F.2d 1017 (1st Cir. 1974) ........................................p. 21, 22

*Bradley v. City of Lynn,*
    403 F.Supp.2d 161 (2006) ....................................................p. 41

*Camacho v. Puerto Rico Ports Authority,*
    369 F.3d 570 (1st Cir. 2004) ................................................p. 41

*Capaci v. Katz & Besthoff, Inc.,*
    711 F.2d 647 (5th Cir. 1983) ................................................p. 28

*City of Cambridge v. Civil Service Commission,*
    43 Mass. App. Ct. 300 (1997) ...............................................p. 5

*Cumpiano v. Banco Santander P.R.,*
    902 F.2d 148 (1st Cir. 1990) ................................................p. 16

*Eldredge v. Carpenters 46 Northern California Counties Joint
Apprenticeship and Training Committee,*
    833 F.2d 1334 (9th Cir. 1987) ..............................................p. 28

*Fudge v. City of Providence Fire Dep't.,*
    766 F.2d 650 (1st Cir. 1985) ...........................................*passim*

*Isabel v. City of Memphis,*
    404 F3d 404 (6th Cir. 2005) ................................................................... p. 22

*Johnson v. Watts Regulator Co.,*
    62 F.3d 1129 (1st Cir. 1995) .......................................................... p. 16, 33

*Jones v. New York City Human Resources Administration,*
    391 F. Supp. 1064 (S.D.N.Y. 1975) ....................................................... p. 29

*Jones v. City of Boston,*
    752 F.3d 38 (1st Cir. 2014)................................................................*passim*

*League of United Latin American Citizens v. Santa Ana,*
    410 F. Supp. 873 (C.D. Cal. 1976) ........................................................ p. 29

*Lilly v. Harris-Teeter Supermarket,*
    720 F.2d 326 (4th Cir. 1983) ................................................................. p. 28

*Lopez v. Comm. of Massachusetts, et al*
    588 F.3d 69 (1st Cir. 2009).......................................................... p. 1, 27, 41

*Mass. Ass'n of Minority Law Enforcement Officers,*
    434 Mass. 256, 748 N.E. 2d. 455 (2001) .............................................. p. 40

*N.A.A.C.P. v. Corinth,*
    83 F.R.D. 46 (N.D. Miss. 1979) ............................................................ p. 28

*Paige v. California,*
    291 F.3d 1141 (9th Cir. 2002) .............................................................. p. 27

*Phillips v. Cohen,*
    400 F.3d 388 (6th Cir. 2005) ................................................................. p. 22

*Pratt v. Dietl,*
    SUVC No. 2009-01254 ..................................................................... p. 5, 40

*RCI Northeast Services Div. v. Boston Edison Co.,*
    822 F.2d 199 (1st Cir. 1987) ................................................................. p. 16

*Ricci v. DeStefano*,
    557 U.S. 557 (2009).............................................................*passim*

*Rivera v. City of Wichita Falls*,
    665 F.2d 531 (5th Cir. 1982) ................................................ p. 22

*Smith v. F.W. Morse & Co., Inc.*
    76 F.3d 413 (1st Cir. 1996).............................................p. 16, 33

*U.S. v. City of New York*,
    683 F. Supp. 2d 225 (E.D.N.Y. 2010) .............................p. 22, 23

*United States v. Yonkers*,
    609 F. Supp. 1281 (S.D.N.Y 1984) ....................................... p. 28

*Vulcan Pioneers, Inc. v. New Jersey Dept. of Civil Service*,
    625 F. Supp. 527 (D.N.J. 1985)............................................. p. 27

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988)............................................................. p. 17

## **Statutes**

M.G.L. c. 31 ................................................................................ p. 3, 6

M.G.L. c. 31, § p1 .......................................................................... p. 3

M.G.L. c. 31, § 5(e)......................................................................... p. 4

M.G.L. c. 31, §§ 7-11.................................................................p. 4, 5, 9

M.G.L. c. 31, § 25 ........................................................................... p. 4

M.G.L. c. 31, § 27 ........................................................................... p. 5

M.G.L. c. 31, § 51 ............................................................................. 3

M.G.L. c. 31, § 59 .....................................................................p. 3, 4, 25

v

## **Other Authorities**

42 U.S.C. § 2000e-2(a) ................................................................. p. 41

42 U.S.C. § 2000e-2(k)(1)(A)(i) ...............................................p. 18, 32

42 U.S.C. § 2000e-2(k)(1)(A)(ii) ..............................................p. 32, 33

42 U.S.C. § 2000e-2(h) ...............................................................p. 35

29 C.F.R § 1607.14(C).............................................................p. 15, 36

29 C.F.R. § 1607.14(C)(1)(4) .......................................................p. 36

29 C.F.R. § 1607.14(C)(2) ............................................................p. 36

29 C.F.R. § 1607.14(C)(6) ............................................................p. 36

29 C.F.R. § 1607.14(D) .................................................................p. 7

29 C.F.R. § 1607.5(B).................................................................p. 37

Personnel Administration Rules (PAR.06)......................................p. 4

Personnel Administration Rules (PAR.08)...................................p. 4, 5

Personnel Administration Rules (PAR.09)......................................p. 5

<u>Regulations</u>

Uniform Guidelines on Employee Selection Procedures,
29 C.F.R. § 1607.14(D) .......................................................p. 7, 8

## I. __PROCEDURAL HISTORY__

The Plaintiffs/Appellants ("officers") by complaint filed September 11, 2007, sued six municipalities, including the City of Worcester ("Worcester"), the Commonwealth of Massachusetts ("Commonwealth"), and the state Human Resources Division ("HRD"), alleging disparate impact discrimination under M.G.L. Chapter 151B and Title VII of the Civil Rights Act of 1964 ("Title VII"). Only one of the officers, Spencer Tatum ("Tatum"), is employed by the Worcester Police Department. The Commonwealth and HRD were dismissed from the case. Lopez v. Comm. of Massachusetts et al, 588 F.3d 69, 90 (1st Cir. 2009). The Defendants filed a joint motion to dismiss the complaint on the basis that individual jurisdictions could not be held liable under Title VII for following a statewide civil service testing regime, (R. 44 Docket # 198), but that motion was denied. (R. 46 Docket # 210). [1]

A jury-waived bench trial was held in this matter over eighteen days between July 12, 2010 and September 17, 2010. On September 5, 2014, Judge O'Toole ruled in favor of the defendants, including Worcester, on all claims. The officers timely appealed. (R. 138).

---

[1] The citations are to the 11 volume Record Appendix (hereinafter "R. __").

II.    **STATEMENT OF THE ISSUES**

1.    Whether the district court correctly decided there was no disparate impact with respect to Worcester's use of the HRD promotional examination for sergeant in 2006?

2.    Whether the district court correctly decided there was no evidence of disparate impact, with respect to Worcester's use of the 2008 promotional exam, as Worcester promoted only one officer from this civil service list?

3.    Whether the district court correctly determined that statewide results from the HRD promotional exam should not be aggregated in analyzing Tatum's disparate impact claim?

4.    Whether the district court correctly decided the HRD exam is valid because it is job related and consistent with business necessity, and Tatum did not demonstrate there was a less discriminatory alternative available that Worcester refused to use?

5.    Whether the City can be held liable under Title VII for the results of a promotional exam created and administered by the Human Resources Division (i.e. a state mandated qualification standard)?

## III.    STATEMENT OF THE CASE

Background.  The City of Worcester Police Department is a civil service community within the Commonwealth of Massachusetts. Plaintiff Spencer Tatum (hereinafter "Appellant" or "Tatum"), is an African American who is employed as a police officer within the City of Worcester Police Department.  Tatum took the civil service promotional examination for sergeant in both 2006 and 2008.  (R. 1181). Tatum was tied for twelfth with two other police officers on the 2006 exam – there were eleven employees ranked higher than him on the list.  (R. 4147).  On the 2008 exam, he was tied for thirteenth with two other police officers and was not reachable for consideration under the civil service rules of 2n (n=number of appointments) +1, since at the time of trial, the City had promoted only one candidate from this list. (R. 4145, 4714, 4172).

Civil Service Examination Process.   Worcester and the other municipal Defendants used the Massachusetts civil service exam to make promotions. Worcester is required to adhere to M.G.L. Chapter 31 (the "Civil Service Law") in making appointments and promotions within its Police Department.  M.G.L. c. 31, §§ 51, 59.  Underlying the civil service system is the concept of "basic merit principles," the definition of which includes "recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills."  M.G.L. c. 31, § 1.  Promotional appointments in police departments are made after competitive

3

examinations.  See M.G.L. c. 31, § 59. The state's Human Resources Division is responsible for, inter alia, "conduct[ing] examinations for purposes of establishing eligible lists."  See M.G.L. c. 31, § 5(e).  Pursuant to the Personnel Administration Rules ("PAR"), "[a]ll selection procedures shall be practical in character and shall relate directly to those matters which fairly determine the relative rankings of the persons examined based on the knowledge, abilities and skills required to perform the primary duties (actual and frequent tasks) of the position, title or occupational group as determined by reliable and representative job information available to the administrator."  PAR.06(2).

M.G.L. Chapter 31, Section 25 requires HRD to prepare an eligible list of candidates "in the order of their marks on the examination based upon which the list is established."  When an appointing authority seeks to fill a position, HRD "shall, if a suitable eligible list exists, certify the names starting highest on such list in order of their places on such list, except as otherwise provided by law or civil service rules."  PAR.08(1); see M.G.L. c. 31, § 7.  An applicant is eligible for promotion only within a department in which he or she has served in the next lower title. M.G.L. c. 31, §§ 7-11; M.G.L. c. 31, § 59.

"When names have been certified to an appointing authority under PAR.08 and the number of promotional appointees actually to be made is $\underline{n}$, the appointing authority may appoint only from among the first $2n+1$ persons named in the

4

certification willing to accept appointment." PAR.09(1); <u>see</u> M.G.L. c. 31, §§ 7, 27.

"Thus, if a city needs to fill one sergeant slot it gets back from HRD, a list of the

three highest scoring candidates on the eligibility list." <u>Pratt v. Dietl</u>, Superior Court

Civil Action No. 09-01254, <u>Memorandum of Decision and Order on the Plaintiffs'</u>

<u>Motion for A Preliminary Injunction</u> (granting preliminary injunction based on

finding that HRD's banding of candidates on a civil service list violated M.G.L.

Chapter 31).[2] "If an appointing authority makes [a]…promotional appointment from

a certification of any qualified person other than the qualified person whose names

appear highest, and the person whose name is highest is willing to accept such

appointment, the appointing authority shall immediately file with the [personnel]

administrator a written statement of his reasons for appointing the person whose

name was not highest."   M.G.L. c. 31, § 27; <u>see</u> also PAR.08(4)-(5); PAR.09(2).

Applicants who are not selected despite having a higher rank than another

applicant(s), can appeal their bypass to the Civil Service Commission, which must

decide "whether the Appointing Authority has sustained its burden of proving that

there was reasonable justification for the action taken by the appointing authority."

<u>City of Cambridge v. Civil Service Commission</u>, 43 Mass. App. Ct. 300, 304, 682

N.E. 2d 923 (1997), *rev. denied*, 426 Mass. 1102, 687 N.E. 2d 642 (1997).

---

[2] <u>Appellant's Addendum</u>, pgs. 124-134.

A municipality may seek approval from HRD to create its own examination pursuant to a delegation agreement.  M.G.L. c. 31, §§ 9-11; (R. 2546, 4550).  Even when a municipality creates its own exam, the results must still be rank ordered and appointments are still subject to the same rules regarding bypass and appeal under M.G.L. Chapter 31.  (R. 100).  In 2002, Boston spent over $1.2 million dollars to hire a consultant to create its own promotional exam along with an assessment center. (R. 130).  However, even when Boston went to the considerable expense of creating its own exam with an assessment center component, the use of the test resulted in only one additional minority promotion than if Boston had not used an assessment center.[3]  (R. 130-131).

Expert Testimony on Statistical Methods for Analyzing Adverse Impact.  Dr. Jacinto Silva, Worcester's expert, has a doctorate in industrial and organizational psychology from the Pennsylvania State University and over twenty years of experience in the field of public safety testing. (R. 4854-4857).  There are several different methods for determining whether adverse impact ("AI") is present, which is defined as the difference in rates of promotion or hiring between minorities and non-minorities. (R. 2331).  The "four-fifths rule" is a rule of thumb, adopted by the Equal Employment Opportunity Commission ("EEOC"), for assessing adverse

---

[3] As the district court noted "that is a rather small payoff for the effort and money expended to achieve it." (R. 131).

impact based on statistical analysis.  Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.14(D).  This rule compares the rates of hiring (or promotions) of minority and non-minority candidates; if the resulting ratio is less than 0.8 (the rate of minority hiring or promotions is less than 80% of the rate of hiring or promotions for non-minorities) such a result may indicate that there is an adverse impact on minorities. (R. 2332).

Dr. Silva tested the reliability of the four-fifths ratio on the municipalities that made promotions based on the 2005-2008 examinations.  Dr. Silva assumed for each municipality that even if there was no mean difference in the scores between minorities and non-minorities, in most jurisdictions one would still find adverse impact occurring by chance due to the small sample sizes. (R. 2347).  Dr. Silva testified that the four-fifths rule is a "very unstable test with small numbers" and there exists a high rate of false positive results even when there is no actual adverse impact in the underlying populations being compared.  (R. 2343).  Dr. Silva explained that "it's essentially the very low selection ratios…along with sample sizes and also the fact that there's a very small number of minority test takers in many of these jurisdictions…those three aspects of the data will create this type of situation, this kind of false positive."  (R. 2346).  Dr. Silva explained that adverse impact ratios can be unstable even with sample sizes as large as 200 to 400

individuals.[4]  (R. 105, 2343-2344).  With small data sets, when there is a small number of promotions (or only one), Dr. Silva explained that "it's going to be very likely" to find adverse impact against some group, regardless of whom you promote. (R. 2370).

The EEOC guidance recommends application of what it calls the "shift of one" to determine whether a sample size is too small to provide relevant evidence under the four-fifths rule.  This guidance states in relevant part:

> Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the <u>selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group</u>.

44 Fed. Reg. 11,996 (1979); (R. 104) (emphasis supplied).  Dr. Silva applied a similar test, called a shortfall analysis, to determine how many more minority candidates an employer would need to hire to meet the 80% rule.  The shortfall in Worcester was 0.05 (5% of a whole person) for the 2006 exam and could not be calculated for the 2008 exam. (R. 4858).

Dr. Silva also used another significance test, the "Fischer's Exact P," to analyze whether observed differences in promotional rates between minorities and

---

[4] Dr. Silva noted that the EEOC guidance implicitly indicates that a small size may be 100 candidates or less, based on the example used in Question 21 of the <u>Uniform Guidelines on Employee Selection Procedures</u>. (R. 2339-2340).

non-minorities are the result of chance due to small sample sizes. (R. 2334). Fischer's Exact P tests the "null hypothesis" that there is no difference between the promotion rates for minorities and non-minorities. (R. 2335). If the null hypothesis is supported, the Fischer's exact P-value is high; the highest value is 1.0 because a probability of 1 is a certainty. (R. 2342). However, when there are greater differences in the promotion rates between minorities and non-minorities, the P-value drops; if it drops to 0.05 or below then the null hypothesis is rejected. (R. 2342). Worcester's P-values were far above the 0.05 threshold, meaning that because of the small sample size, it was very likely that the small number of promotions made would produce a false positive finding of AI. (R. 4858).

Expert Testimony About Aggregated Data. Tatum's expert, Dr. Joel Wiesen, sought to overcome the lack of statistical significance of Worcester's data by aggregating data statewide across jurisdictions within a single exam or across multiple years within a single jurisdiction. Dr. Silva testified that Dr. Wiesen's aggregation of data was flawed. Dr. Silva testified that problems with aggregation would arise where, as here, there were different sample sizes, different distributions of minority representation, and different promotion rates. (R. 2348-2349). The court agreed that Dr. Wiesen's aggregation theory was not "persuasive." (R. 108, 2378).

An additional flaw arising from aggregating data across jurisdictions is the fact that Fischer's Exact P and the adverse impact ratio tests both assume that every

individual can compete for every position available, but that is not true given that promotions are bounded by jurisdiction. (R. 2349). Stated another way, "the biggest problem is still going to be the fact that each person is only eligible for one job and not 20. The Fischer's Exact test and AI all assume that every person in the data set is eligible for <u>all jobs</u>." (R. 2356)(emphasis supplied).

Dr. Silva illustrated the problems with aggregating data by devising a hypothetical of two different jurisdictions with different sample pools, and assumed that the selection rate of minority and non-minority candidates within each jurisdiction was <u>identical</u> – no adverse impact. When the data was aggregated it created a false positive based on combining sample sizes (two different size communities) with different selection rates. (R. 2350-2351). Dr. Silva described this result as "Simpson's Paradox", which happens "when you combine data, you get a whole different picture, or an exaggerated picture, of what's truly going on compared to looking at the individual data sets." (R. 2350). Dr. Silva explained that there is a way to correctly aggregate data across different years, by accounting for repeat test takers, but Dr. Wiesen did <u>not</u> do this in his calculations. (R. 2506).

Instead, Dr. Wiesen aggregated data both over different tests and jurisdictions to analyze adverse impact but did <u>not</u> consider: (1) test-takers who took the civil service promotional examinations multiple times would be counted more than once; (2) police officers do not compete across employers or jurisdictions; (3) different

10

selection ratios (the number of appointments relative to the number of applicants competing for those appointments) and different applicant pool sizes existed in different municipalities; or the (4) different proportions of minorities to non-minorities were competing for promotion depending on the municipality.  (R. 736, 739-740, 742, 744).

City of Worcester Promotions from 2006 and 2008 Exam.  Worcester promoted seven police officers to Sergeant from the 2006 examination and promoted one officer from the 2008 examination.  The following table reflects the number of test takers and selection rates for minorities and non-minorities for the 2006 and 2008 exams for Worcester (R. 105, 4714**,** 4858, 4326):

**2006 Civil Service Promotional Exam**

| CATEGORY | Minorities | Non-Minorities |
|---|---|---|
| Test Takers | 10 | 51 |
| # of Candidates Pass Exam (Official Pass Point 70%) | 8 | 39 |
| % of Candidates Pass Exam | 73%[5] | 75% |
| Candidate Appointments | 1 | 6 |
| Candidate Appointment Rate | 12.5%[6] | 10% |

[5] This rate was based on 11 minority test takers in Worcester but there were actually only 10 minority test takers.  (R. 109).  An adjusted figure cannot be calculated since there is no evidence in the record on whether the one additional non-minority test taker passed or failed the 2006 exam.

[6] The appointment rate is based on one minority appointment/number of minorities who passed the exam (1/8).  The minority appointment rate of 9% referenced in the district court's decision for the 2006 exam appears to be an error.

| Adverse Impact in Passing Rate | .97 (minorities 1 point less than non-minorities) |
|---|---|
| Adverse Impact in Promotion Rates | .88 |

**2008 Civil Service Promotional Exam**

| CATEGORY | Minorities | Non-Minorities |
|---|---|---|
| Test Takers | 9 | 46 |
| # of Candidates Pass Exam (Official Pass Point 70%) | 9[7] | 30 |
| % of Candidates Pass Exam | 100% | 65% |
| Candidate Appointments | 0 | 1 |
| Candidate Appointment Rate | 0% | 2% |
| Adverse Impact in Passing Rate | 1.36 (minorities scored 4.3 points <u>higher</u> than non-minorities) | |
| Adverse Impact in Promotion Rates | 0 | |

Both parties' experts agreed there was no adverse impact with respect to Worcester's use of the 2006 promotional exam. (R. 776). On the 2006 exam, Tatum's own expert admitted there was *no adverse impact* for Worcester as the adverse impact factor was 0.88. (R. 389). Dr. Wiesen testified, "[i]t does not appear to be from what I see right now any indication of adverse impact there." (R. 778).

Dr. Silva also calculated the Fischer's Exact P-value for Worcester on the 2006 exam, which was 1.0 – meaning that it was impossible to reject the hypothesis that minorities and non-minorities performed equally well on this exam. Therefore,

---

[7] All minorities passed the exam. (R. 772-773). The table prepared by Dr. Wiesen showing that one minority failed the 2008 exam based on the official pass point is an error. (R. 4326).

under three alternative methods of statistical analysis, the four-fifths rule, shift of one rule and Fischer's Exact P Test, there was no finding of adverse impact with respect to Worcester's use of the 2006 exam.

Adverse impact based on promotion rates for the 2008 exam was "not calculable" since only one officer was promoted from this list at the time of trial. (R. 2369, 4325, 4327). Moreover, Dr. Wiesen acknowledged that minorities in Worcester performed better on the exam than non-minorities, scoring on average 4.3 points higher than non-minority test takers. (R. 388), and passed the exam at a higher rate as well. (R. 773).

Statistical Analysis of Aggregated Data. When Dr. Wiesen aggregated data from the 2006 and 2008 exams for Worcester, there was no adverse impact based on promotional rates, the effective passing point, or the official passing point (score of 70 or higher). (R. 2507, 4327). Dr. Wiesen calculated that the adverse impact ratio for promotions of minorities as compared to non-minorities was 0.82.[8] (R. 771, 4310). Furthermore, if you combine all Worcester police officers who took the 2006 and 2008 exam (20 minorities and 98 non-minorities), 5% of minorities and 6% of non-minorities were promoted - a mere one percentage point difference. (R. 4326).

---

[8] Dr. Wiesen acknowledged that his original calculation of AI in promotion rates of 0.79 was in error. (R. 771).

In addition, the AI in passing rates was 1.18 within Worcester - meaning minorities passed the exam at a higher rate than non-minorities over the course of the three exams (2004, 2006 and 2008). (R. 771, 4310). There was also no adverse impact with respect to passing rates statewide on either the 2006 (0.8) or the 2008 exam (0.9). (R. 4308).

Validity of the Test. Dr. Outtz, an industrial psychologist and expert witness, testified that the 2005, 2006, 2007 and 2008 police promotional exams administered by HRD were based on the 1991 validation study and the 2002 job analysis. The HRD exams utilized by Worcester and the other jurisdictions were valid because they have the same "validity underpinning as the Boston exams, and I think they are indeed valid and meet the Uniform Guidelines." (R. 2017). Dr. Outtz explained that there was "no data" to indicate any differences in the job of a police sergeant in the other jurisdictions as compared to Boston. (R. 2018). Likewise, Dr. Outtz testified that the HRD tests administered by Boston in 2005 and 2008 were "minimally valid." (R. 124).

As part of the 1991 validation study, the Department of Personnel Administration ("DPA") "developed and administered a task inventory questionnaire to identify the frequent and critical tasks and duties" and included "a knowledge, skills, abilities and personnel [sic] characteristics (KSAPs) inventory questionnaire designed to identify the important KSAPs required at time of

appointment." (R. 118). DPA also conducted a job analysis that considered the important tasks necessary to the successful performance of the job and satisfied the technical standards for content validity studies. 29 C.F.R. § 1607.14(C).

District Court Decision. After an eighteen day bench trial, Judge O'Toole dismissed the claims against all Defendants including Worcester. The judge found that there was no statistically significant evidence of adverse impact with respect to Worcester's use of the 2006 or 2008 exam.

## IV.    SUMMARY OF THE ARGUMENT

The district court correctly found that Tatum failed to establish a prima facie case of discrimination against Worcester. The undisputed testimony from experts for both Tatum and Worcester is that there was no adverse impact against minority test takers in Worcester for either the 2006 or 2008 exam. Even when the data was aggregated across exam years—which the court correctly determined was not appropriate in this case—there was no adverse impact. The HRD examinations used by Worcester were valid and consistent with business necessity. The district court's decision in favor of Worcester and the other defendants should be affirmed because it is supported by the record, and not clearly erroneous.

## V.    ARGUMENT

### A. THE DISTRICT COURT CORRECTLY FOUND THAT TATUM FAILED TO ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION AGAINST WORCESTER.

#### 1.  Standard of Review.

##### a.   The Clear Error Standard Applies.

This case arrives at the Court of Appeals after a bench trial, a procedural posture which impacts greatly the standard of review to be applied.  "Following a bench trial, the Court of Appeals reviews the trier's factual determinations for clear error, see Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990); Fed. R. Civ. P. 52(a), but affords plenary review to the trier's formulation of applicable legal rules, see  Johnson v. Watts Regulator Co., 62 F.3d 1129, 1132 (1st Cir. 1995)."  Smith v. F.W. Morse & Co, Inc., 76 F.3d 413, 420 (1st Cir. 1996).  The clear error standard prevents the Court of Appeals from deciding factual issues anew. Id.  As this Court has previously noted: "we may not disturb the district court's record-rooted findings of fact unless on the whole of the evidence we reach the irresistible conclusion that a mistake has been made."  Id.; Cumpiano, 902 F.2d at 152; RCI Northeast Services Div. v. Boston Edison Co., 822 F.2d 199, 203 (1st Cir. 1987).  The deferential clear error standard "extends not only to factual findings simpliciter but also to inferences drawn from the underlying facts."  Smith, 76 F.3d at 420.  Credibility judgments are likewise the exclusive province of the judge under

16

the clear error standard.  Id. at 423; see Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991).  "Clear error will lie only when the reviewing court is left with the definite firm conviction that a mistake has been made." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).

Proper application of the clear error standard is critical in this case, since most of Tatum's arguments are, at best, suggestions that this Court believe different witnesses and draw different inferences from the record evidence than those witnesses credited and the inferences drawn by the district court.  Although Worcester contends that the district court's decision was the only possible correct decision, all Worcester needs to show is that the district court's decision was plausibly supported by the record, and therefore, not clearly erroneous.

b.  Prima Facie Case of Disparate Impact Discrimination.

The entire theory of the Plaintiffs' case against the cities is one of disparate impact discrimination.  Tatum appeals from the district court's dismissal of his case against Worcester, after trial, based upon his failure to make out a prima facie case of discrimination under a disparate impact theory.  This Court, in Jones v. City of Boston, 752 F.3d 38, 46 (1st Cir. 2014), succinctly summarized the prima facie case as follows:

> To make a prima facie showing of disparate impact, a plaintiff starts by "isolating and identifying" the employment practice being challenged. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994, 108 S.Ct. 2777,

17

101 L.Ed.2d 827 (1988). A plaintiff must then show that the identified practice "causes a disparate impact on the basis of race." 42 U.S.C. § 2000e–2(k)(1)(A)(i). The Supreme Court has most recently described a prima facie showing of disparate impact as "essentially a threshold showing of a significant statistical disparity ... and nothing more." Ricci v. DeStefano, 557 U.S. 557, 587, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). See also Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 658 n.8 (1st Cir.1985) (holding that a prima facie case of disparate impact can be established where "statistical tests sufficiently diminish chance as a likely explanation").

As demonstrated in more detail below, the district court dismissed the case against Worcester because Tatum could not demonstrate a statistically significant adverse impact upon minorities based upon Worcester's use of the 2006 and 2008 promotional examinations. Since the court's view of the evidence is supportable in the record, and not clearly erroneous, it must be affirmed.

2. <u>Statistical Significance Is Not Optional And Tatum Cannot Demonstrate A Statistically Significant Adverse Impact In Worcester.</u>

Despite Tatum's protestation that evidence beyond statistics can (and should) be used to establish a prima facie case of discrimination, Tatum and the other officers have chosen to rely chiefly upon statistics to suggest that Worcester and other communities who used the sergeant promotional exam discriminated against minority police officers seeking promotion to sergeant. The trial court correctly found no evidence of disparate impact with respect to promotions resulting from the 2006 and 2008 exams due to the small populations of officers involved. Indeed,

only one promotion was made from the 2008 list as of the time of trial, so there was no way to calculate adverse impact.  The trial court observed that "reliance on statistical analysis to assess whether unlawful employment discrimination has occurred must be done cautiously….One problem is the case of small statistical samples."  (R. 103).

Conceding the lack of a statistically significant adverse impact of the examination on promotions in Worcester, Tatum and the other officers attempt to marginalize statistical significance as simply one of a long menu of ways in which disparate impact suit plaintiffs may demonstrate a prima facie case of discrimination in promotional examination situations like this one.  However, the law in this Circuit backs the district court's reliance on statistical significance as the measure of whether the officers could establish an adverse impact from the promotional examination.

Statistical significance is not simply one of a variety of ways of satisfying the adverse impact prong to find a prima facie case; rather, it is a requirement.  Statistical significance distinguishes between data that is meaningful and that which is not, and from which no reliable inferences may be drawn.  In Fudge v. City of Providence, this Court dismissed a challenge to a fire service entrance exam based on lack of statistical significance despite the fact that minority candidates had lower pass rates on the examination and minorities were under-represented in the fire department as

compared with the general population.  Fudge, 766 F.2d at 657-658.  The central

holding in Fudge was this: "we think that in cases involving a narrow data base, the

better approach is for the courts to require a showing that the disparity is statistically

significant, or unlikely to occur by chance, applying basic statistical tests as the

method of proof."  Id. at 658.  The Court noted that statisticians view results as

significant if the probability that chance accounted for the result is below 5%.  Id. at

658, n.8.

More recently, this Court, in Jones v. City of Boston, reaffirmed the holding

in Fudge finding statistical significance a far more powerful and persuasive tool for

determining adverse impact than the "four-fifths rule."  Jones, 752 F.3d at 51.  The

four-fifths rule, while a time honored rule of thumb first advanced in EEOC

guidelines, is by statistical standards an odd construct.   Using a percentage to

compare two other percentages, without more, is a statistically suspect practice as

illustrated by the fact that 2 out of 4 and 500 out of 1000 can both be expressed as

50%.  Yet, when one data point is added to the numerator in the first example it

becomes 75%, while the second example yields 50.1%.  For this reason, the four-

fifths rule is generally thought to be invalid in cases where the addition of one

minority hire upends the adverse impact ratio; this is referred to as "the shift of 1."

See Questions and Answers on the Federal Executive Agency Guidelines On

Employee Selection Procedures, 44 Fed. Reg. 11,996 (1979), Question 21.  This

instability in the four-fifths rule, particularly in cases where the sample sizes are small, is what has led to the First Circuit's "rejection of the four-fifths rule as suitable to trump a showing of statistical significance." <u>Jones</u>, 752 F.3d at 52.

In the face of this, the officers reach back to older cases arising in vastly different contexts to seek an alternative to statistical significance, but what they find simply does not apply to this situation.  For example, the officers cite <u>Boston Chapter, N.A.A.C.P., Inc. v. Beecher</u>, 504 F.2d 1017 (1st Cir. 1974), for the proposition that expert testimony suggesting that minorities perform poorly on the type of test at issue should be sufficient to create an adverse impact case when coupled with their population figures.  That case however, was decided in the context of an initial entrance examination that was taken by over 3,000 individuals.  It does not appear that a particularly sophisticated statistical analysis was done by either side.  Ultimately, the district court concluded based upon several factors that a prima facie showing was made.  Here again, the procedural posture of the case was crucial. The Appeals Court upheld the district court based upon the application of the "clear error" standard:  "in light of the expert testimony, we cannot say that the district court was clearly erroneous in its ultimate fact finding that plaintiffs had established a prima facie case." <u>Beecher</u>, 504 F.2d at 1021.  While it seems doubtful, in light of <u>Jones</u> and <u>Fudge,</u> that this case would be decided the same way today, it is also clear that the case cannot stand for the proposition that the existence of the types of

evidence found persuasive by the district court in <u>N.A.A.C.P. v. Beecher</u> require a reviewing court using a clear error standard to overturn the contrary judgment made by the district court in this case.

The other cases cited by the officers on this point are unpersuasive for similar reasons:  <u>Phillips v. Cohen</u>, 400 F.3d 388 (6th Cir. 2005)(de novo review of grant of employer's successful summary judgment motion where magistrate judge evaluated the credibility of expert affidavits in reaching decision, and other factors beyond statistics included evidence of disparate <u>treatment</u> discrimination in the promotion process); <u>Isabel v. City of Memphis</u>, 404 F.3d 404 (6th Cir. 2005)(court found that district court decision was not clearly erroneous for using other <u>statistically significant</u> measures apart from the four-fifths rule to determine adverse impact in a promotional examination given by a single employer); <u>Banks v. Easton Baton Rouge Parish School Board</u>, 320 F.3d 570 (5th Cir. 2003) (affirming grant of summary judgment for employer in case where female employees challenged a reading requirement for promotion to a new classification because only female employees were in the job classification eligible for promotion; no "non-statistical evidence" was presented or considered); <u>Rivera v. City of Wichita Falls</u>, 665 F.2d 531 (5th Cir. 1982) (affirming district court judgment in favor of employer after trial based on plaintiff's failure to establish that each examination of entrance process for new hires had a <u>statistically significant</u> adverse impact on minority applicants); <u>U.S. v. City of</u>

New York, 683 F. Supp. 2d 225 (E.D.N.Y. 2010) vacated and remanded, 717 F.3d

72 (2nd Cir. 2013) (pattern and practice discrimination case at summary judgment

stage which, not mentioned by Tatum, was vacated by the appeals court and

remanded to a different judge; in the section on adverse impact, the sole measure

considered was the statistical significance of the disparity in pass rates and

appointment rates involving large sample sizes for initial hire in the N.Y.C. fire

service).

Obviously, this is not an initial hiring case, it is not a case in which the district

court has accepted the officers' invitation to draw different inferences from the facts

presented, and it is not a case in which the record contains proof of intentional acts

of discrimination.  Rather it is a case based upon promotion rates in Worcester and

it turns upon the statistical significance of that data.  This is also a case in which the

court has found Worcester's expert more credible than Tatum's expert, and has

found the facts in a way that does not support Tatum's theory of liability.

As indicated above, it is undisputed that the population of candidates for

promotion to sergeant in Worcester is too small to permit a statistically significant

analysis to be performed.  Indeed, a finding of adverse impact based on random

chance is almost a certainty based upon the expert analysis of Dr. Silva credited by

the court. (R. 4858).  Given that "statistical significance means that the data casts

serious doubt on the assumption that the disparity was caused by chance," Jones,

752 F.3d at 43, the district court here correctly found no statistical significance in the data pertaining to Worcester:

> [I]n light of the small numbers involved, the difference in appointment rates between minorities and non-minorities in Worcester for both the 2006 exam and 2008 exam are not statistically significant.  According to Dr. Silva, the Fisher's Exact p-value for the 2006 exam is rounded to 1.0, suggesting that the difference in appointment rate may well be the result of random chance.

(R. 109-110).  Moreover, the promotion rates, the pass rates, and the average scores of minority as compared to non-minority candidates, do not disclose an adverse impact against minority candidates seeking promotion to sergeant in Worcester.  If anything, the figures show that in Worcester, minority police officers actually performed slightly better on the promotional examination than non-minority candidates. (R. 777).  Since Tatum's expert actually agrees that no adverse impact is present in Worcester, Tatum will be hard pressed to demonstrate that the district court's findings to this effect are clearly erroneous.

3.  The Record Supports The Court's Refusal To Aggregate Data Across Different Jurisdictions And Test Years.

Tatum attempted to solve the statistical significance problem in Worcester and the other smaller cities by aggregating examination and promotion data either across jurisdictions by year, or across years by jurisdiction.  Experts on both sides testified about the appropriateness or inappropriateness of aggregation.  In the end, the district court rejected the opinion of Tatum's expert Dr. Wiesen, and credited the opinion of

24

Dr. Silva who testified that aggregation was not appropriate under the circumstances of this case.

The district court determined that it was not "persuasive" to rely on aggregated data in the instant case, because "a municipality's promotions should be assessed with respect to the pool of candidates actually available for appointment to the rank of sergeant. That pool consists of the candidates in its own department only. What adverse impact, if any, the test might have with respect to another municipality's candidate pool is simply not relevant." (R.106). The court's decision to accept Dr. Silva's interpretation of the record evidence, and reject that of Dr. Wiesen, was not clearly erroneous.

Dr. Silva testified that differences among sample populations can lead to anomalous results when those populations are aggregated. Differences that can have an impact include, different sizes of the populations, different proportions of the populations made up by minority officers, and different promotion rates. (R. 2348-2349). In addition, many of the statistical tools used to calculate statistical significance assume that all members of the population are eligible for selection to all available positions, and the fact that this is simply not the case confounds attempts to use "P-values" and the Fischer's Exact Test to measure statistical significance. (R. 2349, 2360). As a matter of civil service law, only police officers in a given jurisdiction may compete for promotions in that jurisdiction. M.G.L. c.31, § 59.

25

This gives rise to qualitative differences among the samples, apart from the statistical differences noted above.

In aggregating statistics from the various cities sued in this case, Tatum's expert, Dr. Wiesen, admitted that he had not considered the many differences in the statistical characteristics of the different populations referenced above as well as non-statistical factors, like geographical differences, differences in selection procedures beyond the exam, and differences in what communities might be doing to achieve better examination results for minority test takers. (R. 737, 744, 778).  Dr. Wiesen also acknowledged that Simpson's paradox could result from inappropriate aggregation of dissimilar samples, leading to a false positive appearance of adverse impact. (R. 737).  Similarly, Dr. Wiesen's aggregation of Worcester's examinations over the years failed to account for test takers who took the exam more than once (R. 753-754), and inexplicably omitted 2004 data that would have been beneficial to Worcester (R. 762-763).  In short, there was no record evidence that actually supported aggregation of data, and Dr. Wiesen offered no coherent explanation for why it was a good idea to do so – other than the fact that it was necessary due to the statistical insignificance of the more pertinent data.  Under similar circumstances, the court in Fudge reversed the lower court's adverse impact determination based on its multi-year aggregation of data, finding that the record evidence showed that the

examination at issue was different from other years, thereby requiring an independent assessment of its impact on minorities.  Fudge, 766 F.2d at 657.

Tatum cites a list of cases in support of aggregation, virtually all of which arise in vastly different contexts from our case.  One such case is Vulcan Pioneers, Inc. v. New Jersey Dept. of Civil Service, 625 F. Supp. 527 (D.N.J. 1985), a case in which plaintiffs sued the state agency for violating a consent decree requiring it to create a valid promotional exam.  The propriety of aggregation was not litigated, but the court commented that it was appropriate because the test was used by the N.J. Department of Civil Service, which the court described as "the same employer." Id. at 544.  In our case, of course, the state agency (HRD) was deemed not to be an employer, and the state was dismissed from the case, in part because of the local control exercised by municipalities over the process of making promotions, and the resulting differences in how the examination was used.  Lopez v. Comm. of Massachusetts et al, 588 F.3d at 77.  Similarly, Paige v. California, 291 F.3d 1141 (9th Cir. 2002), also cited by Tatum, was a suit against the California Highway Patrol – a single employer – and the aggregation at issue concerned combining various promotional opportunities within the same agency and combining different minority groups for the purpose of statistical analysis, none of which is at issue in our case. Paige, 291 F.3d. at 1148-9.

27

Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee, also cited in support of aggregation, concerns admission to a joint labor-management apprenticeship program that was actually empowered to select apprenticeship candidates. Eldredge, 833 F.2d 1334, 1137 (9th Cir. 1987). As such, the program acted as a single employer, making aggregation appropriate in that case in a context completely absent from our case, where the employment decisions are disaggregated among six different employers. Other cases cited by the officers are unpersuasive for similar reasons: Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 336 (4th Cir. 1983)(single employer sued for pattern and practice of intentional discrimination in terminations and promotions; there was no facially neutral examination and all decisions were made by company officials in a single county in North Carolina); Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 654 (5th Cir. 1983)(suit against single employer; state-wide data aggregated because all decisions were made at the same central office; evidence of discriminatory advertising); United States v. Yonkers, 609 F. Supp. 1281, 1288 (S.D.N.Y. 1984)(single employer sued for pattern and practice discrimination; trial court decided on a motion to dismiss that plaintiff could satisfy prima face case through a combination of aggregation over years and other evidence establishing intentional discrimination by employer); N.A.A.C.P. v. Corinth, 83 F.R.D. 46 (N.D. Miss. 1979)(case involving one employer and alleging a pattern and practice of intentional

28

discrimination; there was no test, and hiring decisions were made by the same officials, justifying the aggregation over time as proof of discriminatory motivation); Jones v. New York City Human Resources Administration, 391 F. Supp. 1064 (S.D.N.Y. 1975)(single employer case in the trial court; the court found that each of the challenged examinations produced statistically significant disparities, so it was not clear that the aggregation of several examinations was essential to any holding of the case); League of United Latin American Citizens v. Santa Ana, 410 F. Supp. 873, 884 (C.D. Cal. 1976)(single employer case before trial court; given a complex set of facts, and sparse conflicting testimony about aggregability, court elected to consider test results aggregated over two years in conjunction with other factors to find a prima facie case).

In short, none of the cases relied upon by the officers supported aggregation of data state-wide in cases where the state agency was not itself both the employer and a defendant in the case. It is also worth noting that many of the cases cited were from the trial court which presents the aggregation issue in a radically different procedural posture than does this appeal. Although multi-year aggregation has been accepted in cases where the evidence supports it (see cases cited above), and rejected where it does not (see Fudge, supra), the court in this case, based on the evidence in this record, rejected aggregation both across jurisdictional and temporal lines. That determination was not clearly erroneous.

Moreover, aggregation across several years of examinations would not have assisted Tatum in proving a prima facie case against Worcester. Tatum's own expert admitted that aggregating promotion data from 2006 and 2008 would not have demonstrated adverse impact, since there was no adverse impact based on the 2006 exam (.88) and an adverse impact ratio was not calculable from the 2008 exam. The same is true when the promotion data from the 2004 exam is aggregated with the 2006 and 2008 exams. The resulting AI ratio (.82) shows that there was no adverse impact from promotions made from these three exams. (R. 768, 770-771).[9] Also, Tatum's expert conceded that minorities performed better on the examinations than non-minorities, in terms of passing rates and average scores, even when Worcester's data was aggregated over several years. (R. 771). The fact that minority candidates did better than non-minorities even without applying a shift of one, left Dr. Wiesen surprised:

> A. Right. And to some extent I was surprised by Worcester, still surprised. I don't know why statewide exam shows so clear a mean difference in test score for minorities and non-minorities in one direction and in Worcester it appears to be in the other direction. So it's somewhat confusing.

> Q. …you still testified that those results sent a mixed message, and I'm asking you what you meant by that.

---

[9] Worcester promoted two minorities from the 2004 exam. (R. 770, 4716). Dr. Wiesen acknowledged that his chart (Table 2.b.) showing no promotions by Worcester from the 2004 exam was an error (R. 4310), and that the .70 AI in promotion rates (Table 2c.) for Worcester from the 2003-2008 exams was also an error. (R. 770-771).

A. Well, looking over the data for Worcester, that the difference in favor of the non-minorities [sic] in several areas, and nothing very strongly indicating a difference in favor of non-minorities, perhaps I would like to change that evaluation. It does not appear to be from what I see right now any indication of adverse impact there.

(R. 777-778).

This demonstrates not only that aggregation across years fails to achieve any favorable objective for the officers in Worcester, it also demonstrates the sensibility of the court's refusal to aggregate across jurisdictions. Worcester's data demonstrates that all groups of minority officers are not the same in terms of their performance on the examination, despite the race-based generalizations foisted upon the court by the officers in their brief. See Appellants' Brief at 76 ("multiple choice job knowledge tests are known to have an adverse impact on minorities"). Why these differences between officers in different cities exist are unclear, however the court suggested that differences in training, and work experiences in different police departments may play a role. (R. 106). In addition, there was evidence that some police departments provided study sessions to assist officers, a practice which can also level the playing field where test preparation is a known indicator of success on the exam. (R. 240-241, 260, 1025-1026). The district court's decision not to aggregate data was more than adequately supported by the record, and was not clearly erroneous.

31

**B. THE COURT'S DETERMINATION THAT THE HRD PROMOTIONAL EXAMINATION WAS VALID AND CONSISTENT WITH BUSINESS NECESSITY WAS ADEQUATELY SUPPORTED BY RECORD EVIDENCE AND NOT CLEARLY ERRONEOUS.**

### 1. Legal Standard.

The district court never reached the question of whether the HRD examinations as used in Worcester were valid and consistent with business necessity, because, as detailed in the preceding section, the court ruled that the officers failed to establish a prima facie case. However, the court did have occasion to consider whether the City of Boston's use of HRD examinations met the appropriate legal standard, and the court correctly found that Boston did. (R.124).

This Court, in Jones, described the second and third prongs of the legal framework to be followed once a plaintiff has satisfied the requirement to demonstrate a prima facie case of disparate impact:

> Once a plaintiff has made a prima facie showing of a disparate impact, the burden shifts to the employer to show that "the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). If the employer makes such a showing, plaintiff has one final path to success, by proving the existence of an "alternative employment practice," 42 U.S.C. § 2000e-2(k)(1)(A)(ii), defined in case law as a different "test or selection device[ ], without a similarly undesirable racial effect," which "also serve[s] the employer's legitimate interest ..." Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975). If a plaintiff makes such a showing and the employer "refuses to adopt such alternative

32

employment practice," then the plaintiff prevails. 42
U.S.C. § 2000e-2(k)(1)(A)(ii).

Jones, 752 F. 3d at 54.

The second prong of the disparate impact case, pertaining to test validity and

business necessity, is inevitably a fact-bound inquiry into the manner in which the

test was constructed, and the degree to which the test reflects consideration of the

knowledge, skills and abilities required by the job to which the test pertains.  As a

result, the procedural posture of the case again plays a critical role in considering the

legal standards to be applied.  As indicated previously, the determinations made by

the district court to decide how the record evidence fits into the proper legal

framework, are judged based upon the clear error standard which prevents the

appeals court "from deciding factual issues anew."  Smith, 76 F. 3d at 420.  Given

the types of arguments made by the officers in this case, it is worth noting that "a

corollary of this proposition is that, when there are two permissible views of the

evidence, the fact finder's choice between them cannot be clearly erroneous."

Johnson v. Watts Regulator Co., 63 F. 3d 1129, 1138 (1st Cir. 1995).

The legal standard to be applied to this case is also bounded by the Supreme

Court's holding in Ricci v. DeStefano, 557 U.S. 557 (2009), a case in which the City

of New Haven was taken to task by the Supreme Court for throwing out the results

of a promotional examination, simply because the test presented a prima facie case

of disparate impact based upon the statistical results.  The Court ruled that discarding

33

the test because it would result in the promotion of too many white candidates was itself unlawful race discrimination:

> Allowing employers to violate the disparate-treatment prohibition based upon a mere good-faith fear of disparate-impact liability would encourage raced-based action at the slightest hint of disparate impact. A minimal standard could cause employers to discard the results of lawful and beneficial promotional examinations even where there is little if any evidence of disparate-impact discrimination. That would amount to a *de facto* quota system, in which a 'focus on statistics … could put undue pressure on employers to adopt inappropriate prophylactic measures.' Even worse, an employer could discard test results (or other employment practices) with the intent of obtaining the employer's preferred racial balance.

Ricci, 557 U.S. at 581 (internal quotes and citations omitted). The Ricci Court emphasized that employers are statutorily prohibited from rescoring tests on race grounds and would therefore be prohibited from discarding a test on the same grounds:

> If an employer cannot rescore a test based on the candidates' race, § 2000e – 2(l), then it follows *a fortiori* that it may not take the greater step of discarding the test altogether to achieve a more desirable racial distribution of promotion-eligible candidates— absent a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision.

Id. at 584. The Court went on to emphasize Title VII's express protection of bona fide promotional examinations by quoting from the statute:

34

> Nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discrimination because of race.

Id., quoting, 42 U.S.C. § 2000e–2(h).  The upshot of the holding in Ricci for Worcester's purposes is that even if Worcester had accepted the officers' dubious claims that the test demonstrated a disparate impact on the basis of race, Worcester would not have been free to discard the test results, or take the various remedial steps advised by the officers, without a "strong basis in evidence" to believe the test was unlawful.  Id. at 582.  Taking action on any lesser basis would have subjected Worcester to liability for race discrimination, as occurred in Ricci.  As demonstrated below, the record evidence, together with the holdings in Ricci make it clear that Worcester did not have any basis for discarding the examination.

  2. The HRD Examinations Used by Worcester Were Valid and Consistent With Business Necessity.

Test validity is not intended to be the insurmountable hurdle suggested by the officers.  The language of the statute and regulations coupled with the deferential standard of review render it extremely difficult for the officers to overturn the district court's well-reasoned decision based upon the clear error standard.  The district court relied upon expert opinion testimony to conclude that the HRD examinations at issue were valid:

35

> After consideration of the evidence as a whole, I find and conclude that Dr. Outtz's opinion rests on adequate grounds and is therefore correct:  the exams in question were minimally valid.  The exams satisfy the technical standards for content validity studies.  29 CFR § 1607.14(C).  They addressed a representative sample of the KSAs of the sergeant position.  Id. § 1607.14 (C)(1), (4).  They were based on job analyses that considered the important tasks necessary to the successful performance of the job.  Id. § 1607.14(C)(2).  They took account of prior relevant work experience as well as relevant training and education.  Id. § 1607.14(C)(6).
>
> There is no doubt that Dr. Outtz also thought that the content validity of the exams could have been improved by the use of additional test elements, such as an assessment center (see infra).  However, for assessing validity, the fact that it could have been better does not mean necessarily that it was not good enough to be deemed sufficient.  The key question regarding the content validity of a selection method is whether it reliably predicts a candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job.  I am satisfied on the evidence that Boston carried its burden of showing that the exams in question satisfied that criteria.

(R. 124).  The district court's decision demonstrates careful consideration of voluminous evidence of record pertaining to the development of the HRD examinations.  Beginning with a 1991 validity study, the DPA (predecessor to HRD) undertook a careful job analysis of the sergeant position which mirrors the "painstaking analysis" of the positions at issue in Ricci.  (R. 118); Ricci, 557 U.S. at 588.  Like the examination in Ricci, the HRD "drew the questions from source material approved by the Department."  Ricci, 557 U.S. at 588; R. 120 ("The job

knowledge questions on the exam would be based on information directly presented by materials on the reading list.").

The federal regulations do not require all aspects of job performance to be tested perfectly, as suggested by the officers. Rather, all that is required is that "the selection procedure is representative of important aspects of performance on the job for which candidates are being evaluated." 29 C.F.R. § 1607.5(B). Tatum and the other officers are pressing for a much higher standard to be imposed upon employers. For example, the officers claim that the HRD test fails to adequately test supervisory ability as contrasted with job knowledge which they deride as "rote memory examination." Appellants' Brief at 25. The officers ignore the fact that the questions do account for supervisory knowledge covered in the textbooks (R. 3385), and the fact that their own expert acknowledged that multiple choice tests regarding job knowledge are good predictors of job performance. (R. 516-517, 519). In Fudge, the court observed that "[t]here was heavy insinuation that an examination is racially discriminatory…if it measures achievement rather than aptitude. This proposition may be valid in some circumstances, but logic alone affords it no support. Only evidence, none of which was presented to the district court can sustain it." Fudge, 766 F. 2d at 656. The district court, in this case, credited Boston's witnesses who "testified at trial that it is critical to a police sergeant's ability to affectively perform as a supervisor that he or she know and understand relevant law. When patrol

37

officers need information or clarification, the first thing they do is to call their sergeant.  An effective way of testing whether a candidate for sergeant has the necessary knowledge is through a written job knowledge test."  (R. 118).

Likewise, the officers' suggestion that some higher order of validation is required in order to justify using the test as a rank order selection device, is completely unsupported.  The district court in this case accepted the opinion of Dr. Outtz, who testified that validity means that those officers who score higher on the examination are better qualified for the job.  (R. 116).  Indeed, the examination upheld in <u>Ricci</u> was a rank ordered job knowledge examination similar to the one at issue in this case.  <u>Ricci</u>, 557 U.S. at 587-589.  As a consequence, the Supreme Court rejected the dissent's explication of the exact same rank order concern raised by the officers.  <u>Ricci</u>, 557 U.S. at 637, n. 16 (dissenting opinion).

Although Worcester relies principally upon the arguments and authorities set forth in the City of Boston's brief on the question of test validity, it is clear from the foregoing and from a careful review of the district court's decision in this matter, that the court's factual findings with respect to the validity of the examinations at issue are amply supported by the record evidence and by the expert testimony credited by the court.  Accordingly, the district court's determinations were not clearly erroneous.

## C. THE OFFICERS CANNOT PROVE THAT WORCESTER HAD AVAILABLE AN ALTERNATIVE SELECTION METHOD THAT WOULD RESULT IN LESS ADVERSE IMPACT THAT IT REFUSED TO USE.

In the third and final prong of the disparate impact discrimination framework described in the preceding argument (Section B.1) the officers can prevail by showing that, despite the fact that Worcester used a valid exam that is consistent with business necessity, it could have used a selection process that would have satisfied Worcester's legitimate business needs, and had less of an adverse impact on minority officers. Jones, 752 F.3d at 54. Similar to the preceding argument, the court never reached this prong of the case for Worcester, because of the officers' failure to make out a prima facie case. However, the district court did reach this question with respect to Boston and found a complete failure of proof by the officers. (R. 134-135).

This Court, in Jones, emphasized that:

> Proving that an alternative practice will not have the impact identified by a plaintiff when that impact is small leaves little margin for error and will often require extensive data. A plaintiff who subjects a defendant's job-related practice to the sensitivity of a large sample analysis can fairly be required to show through statistical evidence, and with equal confidence, that the proffered alternative practice will have a smaller impact, except where the alternative is self-evidently incapable of causing a differential (e.g., a random selection tool).

Jones, 752 F.3d at 53.  The difficulties experienced by the officers in demonstrating a prima facie case of discrimination follows them to their attempt to establish through statistical means that an alternative selection method has less of an adverse impact than the method employed by Worcester.  Indeed, the officers provided no evidence whatsoever that any of the alternatives suggested would reliably improve upon what they viewed as the adverse impact resulting from the promotional process used by Worcester.

Many of the alternatives suggested by the officers were clearly unavailable to Worcester for the years in question, because they violated civil service laws and regulations that Worcester was bound to obey.  (R. 132-134); see PAR 09(1).[10]  The Ricci Court discussed and rejected many of the same supposed alternatives pressed by the officers in this case.  Ricci, 557 U.S. at 589-592.  With particular regard to banding of scores, the Court noted that doing so in response to the examination scores would be tantamount to rescoring the exam, a practice expressly forbidden by Title VII.  Id. at 590; see Pratt v. Dietl, SUVC No. 2009-01254.

---

[10] The district court acknowledged that if Worcester had engaged in "race conscious" promotions, by bypassing the higher scoring candidates on the civil service exam, in order to increase the number of minority sergeants, this choice "could be subject to challenge under the Massachusetts civil service statute as inconsistent with 'basic merit principles.' [Mass. Ass'n of Minority Law Enforcement Officers, 748 N.E.2d] at 461-62."  (R. 134, n.13).

The district court was on solid legal and factual ground in finding that the officers had not met their burden under the third prong of the disparate impact framework. The district court's conclusions were adequately supported by the record, and not clearly erroneous.

### D. WORCESTER CANNOT BE LIABLE UNDER TITLE VII FOR FOLLOWING A MANDATORY STATEWIDE TESTING REGIME.

The district court denied a motion filed jointly by all the defendants on the grounds that the civil service communities could not be held liable for following a statewide testing regime mandated by state law. That motion, which Worcester renews, is based upon the fact that the HRD promotional examinations were conducted outside of the employment context and cannot give rise to a cause of action under Title VII because the testing regime that lies at the center of the controversy was devised and conducted by an entity that is not an employer. See Lopez v. Comm. of Massachusetts et al, supra; 42 U.S.C. 2000e-2(a).

The First Circuit has recognized "under either the ADEA or Title VII, that state licensing and regulatory agencies generally are not regarded as employers vis-à-vis those whom they license and regulate." Camacho v. Puerto Rico Ports Authority, 369 F.3d 570, 578 (1st Cir. 2004); see Bradley v. City of Lynn, 403 F. Supp.2d 161, 168 (D. Mass. 2006)(collecting cases from other circuits). In this regard, the civil service testing scheme requiring that police officers be promoted in

connection with rank order job knowledge examinations, is akin to other regulatory and licensing schemes which may also rely upon testing and which may also produce adverse impacts, but without subjecting the employers who seek those licensed individuals to liability under Title VII.  On this basis, the suit against Worcester must be dismissed.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Defendants City of Worcester, Massachusetts, Michael O'Brien, in his capacity as City Manager of the City of Worcester, Massachusetts, and Konstantina B. Lukes, in her capacity as Mayor of the City of Worcester, Massachusetts respectfully request that this Court affirm the district court's judgment in favor of the Defendants-Appellees on all claims.

Respectfully submitted,

CITY OF WORCESTER, MASSACHUSETTS, MICHAEL O'BRIEN, in his capacity as City Manager of Worcester, Massachusetts, AND KONSTANTINA B. LUKES, in her capacity as Mayor of the City of Worcester, Massachusetts **BY THEIR ATTORNEYS,**

/s/ Tim D. Norris
Tim D. Norris, (C.A.B. 7834)
Joshua R. Coleman (C.A.B. 1145285)
Collins, Loughran & Peloquin, P.C.
320 Norwood Park South
Norwood, MA 02062
(781) 762-2229
tnorris@collinslabor.com
Dated: June 17, 2015          jcoleman@collinslabor.com

42

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.  This brief complies with the type-volume limitation (of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 10,158 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word with Times New Roman, 14-point font size.


/s/ Tim D. Norris
Tim D. Norris

43

## <u>CERTIFICATE OF SERVICE</u>

I, Tim D. Norris, hereby certify that on June 17, 2015 I electronically filed the foregoing brief with the United State Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that the following parties are registered as ECF filers and that they will be served by the CM/ECF system:

Charles Dunstan Boddy, Esq.
Richard D'Agostino, Esq.
Office of the City Attorney
200 Common Street, Suite 306
Lawrence, MA 01840

Anne L. Radazzo, Esq.
25 Westwind Drive
Methuen, MA 01844

Kerry M. Regan, Esq.
City of Methuen
Office of the City Solicitor
41 Pleasant Street, Suite 311
Methuen, MA 01844

Iraida J. Alvarez, Esq.
Robert Lawrence Quinan, Jr., Esq.
Sookyoung Shin, Esq.
MA Attorney General's Office
1 Ashburton Place, 20th Floor
Boston, MA 02108

Rachel M. Brown, Esq.
Shapiro, Haber & Urmy LLP
Seaport East, 2 Seaport Lane
Boston, MA 02210

Christine Patricia O'Connor, Esq.
City of Lowell
375 Merrimack Street, 3rd Floor
Lowell, MA 01852

Lawrence J. Donoghue, Esq.
Law Office of Corrine Hood Greene
One Thompson Square, Suite 502
Charlestown, MA 02109

Kay H. Hodge, Esq.
John Matthew Simon, Esq.
Stoneman, Chandler & Miller, LLP.
99 High Street, Suite 1601
Boston, MA 02201

Lisa Skehill Maki, Esq.
City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201

Robert P. Morris, Esq.
Morgan, Brown & Joy LLP
200 State Street, 11th Floor
Boston, MA 02109

Maurice Martin Cahillane, Esq.
Egan, Flanagan & Cohen, PC
67 Market Street
Springfield, MA 01102

Harry P. Carroll, Esq.
John Thomas Liebel, Esq.
Edward M. Pikula, Esq.
City of Springfield Law Department
36 Court Street
Springfield, MA 01103

William G. Cullinan, Esq.
O'Connor Martinelli & Cohn
1391 Main Street, Suite 1022
Springfield, MA 01103

Kevin Sean McDermott, Esq.
MBTA Law Department
10 Park Plaza, Suite 7760
Boston, MA 02116

Harold L. Lichten, C.A.B. 22114
Benjamin Weber, C.A.B. 1159650
Lichten & Liss-Riordan, P.C.
729 Boylston Street
Suite 2000
Boston, MA 02116
(617) – 994-5800
hlichten@llrlaw.com
bweber@llrlaw.com

James F. Kavanaugh, Jr.
Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP
Ten Post Office Square
Boston, MA 02109

Edward M. Pikula
City of Springfield
Law Department
36 Court Street
Springfield, MA 01103

/s/  Tim D. Norris
Tim D. Norris, (C.A.B. 7834)
Joshua R. Coleman (C.A.B. 1145285)
Collins, Loughran & Peloquin, P.C.
320 Norwood Park South
Norwood, MA 02062
(781) 762-2229