No. 14-1952

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

PEDRO LOPEZ, individually and on behalf of a class of individuals similarly situated; ABEL CANO, individually and on behalf of a class of individuals similarly situated; KEVIN SLEDGE, individually and on behalf of a class of individuals similarly situated; CHARLES DEJESUS, individually and on behalf of a class of individuals similarly situated; RICHARD BROOKS, individually and on behalf of a class of individuals similarly situated; THE MASSACHUSETTS HISPANIC LAW ENFORCEMENT ASSOCIATION, individually and on behalf of a class of individuals similarly situated;

*(See inside cover for continuation of caption)*

---

On Appeal from a Judgment of the United States
For The District Court of Massachusetts
District Court No. 07-11693-GAO
(Honorable George A. O'Toole, Jr.)

---

## BRIEF OF DEFENDANT-APPELLEE
## CITY OF BOSTON

---

### Counsel for Defendant-Appellee City of Boston

Kay H. Hodge (C.A.B. 11284)
John M. Simon (C.A.B. 86185)
Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA 02110
(617) 542-6789

Susan M. Weise (C.A.B. 5682)
Lisa Skehill Make (C.A.B. 1140641)
City of Boston Law Department
1 City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4040

DATED: June 17, 2015

Case: 14-1952    Document: 00116851498    Page: 1    Date Filed: 06/17/2015    Entry ID: 5916065

ROBERT ALVAREX, individually and on behalf of a class of individuals similarly situated; SPENCER TATUM, individually and on behalf of a class of individuals similarly situated; SHUMEAND BENFOLD, individually and on behalf of a class of individuals similarly situated; ANGELA WILLIAMS-MITHCELL, individually and on behalf of a class of individuals similarly situated; GWENDOLYN BROWN, individually and on behalf of a class of individuals similarly situated; LYNETTE PRAILEAU, individually and on behalf of a class of individuals similarly situated; TYRONE SMITH, individually and on behalf of a class of individuals similarly situated; EDDY CHRISPIN, individually and on behalf of a class of individuals similarly situated; DAVID E. MELVIN, individually and on behalf of a class of individuals similarly situated; STEVEN MORGAN, individually and on behalf of a class of individuals similarly situated; WILLIAM E. IRAOLO, individually and on behalf of a class of individuals similarly situated; JOSE LOZANO, individually and on behalf of a class of individuals similarly situated; COURTNEY A. POWELL, individually and on behalf of a class of individuals similarly situated; JAMES L. BROWN, individually and on behalf of a class of individuals similarly situated; GEORGE CARDOZA, individually and on behalf of a class of individuals similarly situated; LARRY ELLISON, individually and on behalf of a class of individuals similarly situated; DAVID SINGLETARY, individually and on behalf of a class of individuals similarly situated; CHARISSE BRITTLE POWELL, individually and on behalf of a class of individuals similarly situated; CATHENIA D. COOPER-PATERSON, individually and on behalf of a class of individuals similarly situated; MOLWYN SHAM, individually and on behalf of a class of individuals similarly situated; LAMONT ANDERSON, individually and on behalf of a class of individuals similarly situated; GLORIA KINKEAD, individually and on behalf of a class of individuals similarly situated; KENNETH GAINES, individually and on behalf of a class of individuals similarly situated MURPHY GREGORY, individually and on behalf of a class of individuals similarly situated; JULIAN TURNER, individually and on behalf of a class of individuals similarly situated; NEVA GRICE, individually and on behalf of a class of individuals similarly situated; DELORES E. FACEY, individually and on behalf of a group of individuals similarly situated; LISA VENUS, individually and on behalf of a class of individuals similarly situated; RODNEY O. BEST, individually and on behalf of a class of individuals similarly situated; KAREN VANDYKE, individually and on behalf of a class of individuals similarly situated; ROBERT C. YOUNG, individually and on behalf of a class of individuals similarly situated; ROYLINE LAMB, individually and on behalf of a class of individuals similarly situated; LYNN DAVIS, individually and on behalf of a class of individuals

*(caption continued)*

similarly situated; JAMES A. JACKSON, individually and on behalf of a class of individuals similarly situated; JUAN ROSARIO, individually and on behalf of a class of individuals similarly situated; LOUIS ROSARIO, JR., individually and on behalf of a class of individuals similarly situated; OBED ALMEYDA, individually and on behalf of a class of individuals similarly situated; DEVON WILLIAMS, individually and on behalf of a class of individuals similarly situated; JULIO M. TOLEDO, individually and on behalf of a class of individuals similarly situated,

Plaintiffs-Appellants,

v.

MARISOL NOBREGA, individually and on behalf of a class of individuals similarly situated,

Plaintiff,

V.

CITY OF LAWRENCE, MASSACHUSETTS; CITY OF METHUEN, MASSACHUSETTS; COMMONWEALTH OF MASSACHUSETTS; PAUL DIETL, in his capacity as Personnel Administrator for the Commonwealth of Massachusetts; JOHN MICHAEL SULLIVAN, in his capacity as Mayor of the City of Lawrence, Massachusetts; WILLIAM MANZI, III, in his capacity as Mayor of the City of Methuen, Massachusetts; APPOINTING AUTHORITY FOR THE CITY OF LOWELL, MICHAEL O'BRIEN, in his capacity as City Manager of the City of Worcester, Massachusetts; CITY OF BOSTON, MASSACHUSETTS; CITY OF SPRINGFIELD, MASSACHUSETTS; DOMENIC J. SARNO, JR., in his capacity as Mayor for City of Springfield; MASSACHUSETTS BAY TRANSPORTATION AUTHORITY; DANIEL GRABAUSKAS, in his capacity as General Manager; BOARD OF TRUSTEES OF THE MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendants-Appellees,

WILLIAM F. MARTIN, in his capacity as Mayor of the City of Lowell, Massachusetts; KONSTANTINA B. LUKES, in her capacity as Mayor of the City of Worcester, Massachusetts,

Defendants

# TABLE OF CONTENTS

Case: 14-1952    Document: 00116851498    Page: 4    Date Filed: 06/17/2015    Entry ID: 5916065

TABLE OF AUTHORITIES ................................................................iv

ISSUES PRESENTED FOR REVIEW ...............................................1

STATEMENT OF THE CASE ............................................................1

STATEMENT OF THE FACTS ...........................................................4

    A. The 2005 and 2008 Boston Exams For Sergeant Were
       Strictly Regulated By State Law ........................................4

    B. Prima Facie Showing Of Adverse Impact ..................................7

    C. The 2005 and 2008 Exams ........................................................7

       1. The 1991 Validation Report .............................................7

          a. The Job Analysis .....................................................8

          b. The Linkage With Critical KSAPs ...................................9

       2. The 2000 M&M Job Analysis .............................................12

          a. The Job Analysis .....................................................13

          b. The Linkage With Critical KSAPs ...................................13

       3. Validity of The 2005 and 2008 Exams And Use For
          For Rank Order Selections ...............................................14

    D. The Availability Of An Equally Valid Alternative Selection
       Method To The 2005 And 2008 Exams That Boston
       Refused To Adopt ..............................................................18

    SUMMARY OF THE ARGUMENT ...............................................22

ARGUMENT ........................................................................ 24

I.   The District Court's Findings That The 2005 and 2008
     Exams Were Valid And That Was No Equally Valid,
     Less Discriminatory Alternative Must Be Affirmed
     Unless Clearly Erroneous .......................................... 24

II.  The Court Should Affirm The District Court's
     Determination That The 2005 and 2008 Exams
     Were Job Related Consistent With Business
     Necessity, And Appropriate For Rank
     Order Selection ........................................................ 28

     A.   Use of a multiple choice, written test was
          valid and appropriate .......................................... 28

     B.   Boston Established That The 2005 And 2008 Exams
          Tested Job Related Content That Was Representative
          Of Important Aspects Of The Police Sergeant Position ... 32

          1.   Use of the 1991 Job Analysis and Validity
               Report was acceptable ................................. 33

          2.   The selection procedure tested KSAPs required of
               Boston police sergeants that were "representative
               of important aspects of performance on the job" ...... 35

          3.   The exams can be used as a rank order device
               because the District Court found that the validity
               and reliability evidence supported the inference
               that higher exam scores predict better
               job performance .......................................... 41

Case: 14-1952    Document: 00116851498    Page: 6    Date Filed: 06/17/2015    Entry ID: 5916065

III. The District Court Was Not Clearly Erroneous In Ruling
That Plaintiffs Failed To Establish An Equally Valid,
Less-Discriminatory Alternative To The 2005 and 2008
Exams That Boston Refused to Adopt ..................................... 47

    A.    Plaintiffs Failed To Propose A Specific Alternative To
The Exams At Issue ........................................................... 49

    B.    Plaintiffs Failed To Show Any Alternative That Was
Both Equally Valid And Had Less Discriminatory
Adverse Impact ............................................................... 51

    C.    Plaintiffs Did Not Meet Their Burden Of Proof
That Boston "Refused to Adopt" Their Alternative To
The 2005 and 2008 Promotional Examination ................. 59

CONCLUSION .................................................................... 60

Case: 14-1952    Document: 00116851498    Page: 7    Date Filed: 06/17/2015    Entry ID: 5916065

## Cases

Albemarle Paper Co. v. Moody, 422 U.S. 405(1975) ........................ 48

Adams v. City of Chicago, 469 F.3d 609 (7th Cir. 2006)
cert. denied, 550 U.S. 919 (2007) ................................................. 59

Allen v. City of Chicago,
351 F.3d 306 (7th Cir. 2003)............................................48, 50, 52, 53

Anderson v. City of Bessemer, 470 U.S. 564 (1985) ................... 24, 25

Andrews v. Bechtel Power Co., 780 F.2d 124 (1st Cir. 1985) ............ 26

Association of Mexican-American Educators v. California,
231 F.3d 572 (9th Cir. 2000)......................................................26, 34, 39

Banos v. City of Chicago, 398 F.3d 889 (7th Cir. 2005)........28, 31, 35

Black Law Enforcement Officers Ass'n v. City of Akron,
824 F.2d 475 (6th Cir. 1987)......................................................... 45

Boston Chapter NAACP, Inc. v. Beecher,
504 F.2d 1017 (1st Cir. 1974)....................................................... 30

Boston Police Superior Officers Federation v.
City of Boston, 147 F. 3d 13 (lst Cir. 1998) ....................................... 37

Carr v. Department of Personnel Administration,
No. G-1461 (1989) ........................................................................ 37

Clady v. County of Los Angeles,
770 F.2d 1421 (9th Cir. 1985), cert. den.
475 U.S. 1109 (1986)..............................................................45, 53

Cleghorn v. Herrington, 813 F.2d 992
(9th Cir. 1987) ............................................................................... 34

Case: 14-1952    Document: 00116851498    Page: 8    Date Filed: 06/17/2015    Entry ID: 5916065

Chrisner v. Complete Auto Transit, Inc.,
645 F.2d 1251 (6th Cir. 1981)..................................................53

Contreas v. City of Los Angeles,
656 F.2d 1267 (9th Cir. 1981)..................................................39

Craig v. County of Los Angeles,
626 F.2d 659 (9th Cir. 1980), cert. den.
450 U.S. 919 (1981)..................................................40

EEOC v. Arabian Am. Oil Co.,
499 U.S. 244 (1991)..................................................46

Fudge v. City of Providence Fire Department,
766 F.2d 650 (lst Cir. 1985)..................................................26

Griggs v Duke Power,
401 U.S. 424 (1971) ..................................................48, 55

Hearn v. City of Jackson, 340 F.Supp.2d 728,
aff'd 110 Fed. Appx. 424 (5th Cir. 2004)..................................33, 34, 35

Johnson v. City of Memphis, 770 F.3d 464
(6th Cir. 2014).................. 26, 31, 36, 40, 41, 44, 45, 48, 49, 52, 53, 55

Jones v. City of Boston,
752 F.3d 38 (1st Cir. 2014)................................2, 27, 31, 45, 48, 51, 52

Lopez v. Massachusetts,
588 F.3d 69 (lst Cir. 2009)..................................................28

Massachusetts Ass'n of Minority Law Enforcement v.
Abban, 434 Mass. 256; 748 N.E. 2d 455 (2001) ..................................7

M.O.C.H.A Society, Inc. v. City of Buffalo,
689 F.3d 263 (2nd Cir. 2012)...............25, 26, 27, 28, 31, 33, 46, 47, 49

Case: 14-1952    Document: 00116851498    Page: 9    Date Filed: 06/17/2015    Entry ID: 5916065

Police Officers for Equal Rights v. City of Columbus,
916 F.2d 1092 (6th Cir. 1990)......................................36, 40

Ricci v. DeStefano, 557 U.S. 557
(2009) ............................27, 28, 29, 44, 46, 47, 48, 49, 55, 59

Spurlock v. United Airlines, Inc.,
475 F.2d 216 (10th Cir. 1972)..................................41

Stewart v. City of St. Louis,
2007 WL 6211634*15 (E.D. MO. 2007)
Aff'd 532 F.3d 939 (8th Cir. 2008)........................47

Sullivan v. Liberty Mut. Ins. Co.,
444 Mass. 34; 825 N.E.2d 522 (2005)......................2

Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,
135 S.Ct. 831 (2015)..........................................25

Watson v. Fort Worth Bank and Trust,
487 U.S. 977 (1988)..........................................53

White v. Univ. of Massachusetts,
410 Mass 553; 574 N.E. 2d. 356 (Mass. 1991) ...............2

Zamlen v. City of Cleveland,
906 F.2d 209 (6th Cir. 1990), cert. den.
499 U.S. 936 (1981) ..........................................48

## Massachusetts Constitution, Statutes and Rules

29 C.F.R. § 1607.5 ..............................................35, 38

29 C.F.R. § 1607.14(C)..........................................17

29 C.F.R. § 1607.14(C)(1) ......................................18

vi

Case: 14-1952   Document: 00116851498   Page: 10   Date Filed: 06/17/2015   Entry ID: 5916065

29 C.F.R. § 1607.14(C)(2) ........................................................19

29 C.F.R. § 1607.14(C)(4) ........................................................18

29 C.F.R. § 1607.14(C)(6) ........................................................18

29 C.F.R. § 1607.14(C)(9) ........................................................41

42 U.S.C. § 2000e-2(k)(1) ..........................................................1

42 U.S.C. § 2000e-2(k)(1)(A)(i) ...............................................28

42 U.S.C. § 2000e-2(k)(1)(A)(ii) ...............................19, 48, 59

42 U.S.C. § 2000e-2(k)(1)(C) ...........................................48, 51

Fed. R. Civ. P. 52(a)(6) ............................................................24

M.G.L. c. 31 ..............................................................................4

M.G.L. c. 31, § 1 ..................................................................4, 30

M.G.L. c. 31, § 1(e) ...................................................................7

M.G.L. c. 31, § 7 .......................................................................6

M.G.L. c. 31, § 9-11 ..................................................................5

M.G.L. c. 31, § 16 ...................................................................56

M.G.L. c. 31, § 22 .....................................................................5

M.G.L. c. 31, § 25 .....................................................................6

M.G.L. c. 31, § 26 .....................................................................6

M.G.L. c. 31, § 27 .....................................................................6

M.G.L. c. 31, § 54 .....................................................................6

Case: 14-1952    Document: 00116851498    Page: 11    Date Filed: 06/17/2015    Entry ID: 5916065

M.G.L. c. 31, § 59 ................................................................ 5, 17, 19

M.G.L. c. 151B ...................................................................... 1, 2

M.G.L. c. 151B, § 4 ................................................................. 2

Title VII ........................................................................... 1, 2, 48

## ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court was clearly erroneous in concluding that Boston met its burden of establishing the validity of the 2005 and 2008 civil service promotional examinations under Title VII for use in making rank order selections for police sergeant.

2.    Whether the District Court was clearly erroneous in concluding that Plaintiffs failed to meet their burden to identify a specific equally valid, less racially discriminatory alternative to the 2005 and 2008 civil service promotional examinations that Boston refused to adopt, as required to show disparate impact under Title VII.

## STATEMENT OF THE CASE

Plaintiffs – 46 Hispanic and African-American police officers employed by one of the defendants (Boston, Lawrence, Lowell, Methuen, Springfield, Worcester and Massachusetts Bay Transportation Authority) – brought suit in September 2007 alleging that various civil service promotional examinations for the position of police sergeant had an illegal disparate impact based on race in violation of Title VII (42 U.S.C. § 2000e-2(k)(1), *et seq*.) and Mass. Gen. L. c. 151B.  The exams at issue – 2005, 2006, 2007 and 2008 – were developed and administered by the Massachusetts Human Resources Division ("HRD") and resulted in Plaintiffs either not being promoted or promoted only after white police

Case: 14-1952    Document: 00116851498    Page: 13    Date Filed: 06/17/2015    Entry ID: 5916065

officers from the same jurisdiction who took the same exam.  The City of Boston ("Boston") Plaintiffs are 25 African-American and two Hispanic police officers who took Boston's promotional examination in 2005 or 2008.

Following an 18-day jury-waived trial, U.S. District Court Judge George A. O'Toole issued a 47-page <u>Findings of Facts, Conclusions of Law and Order of Judgment,</u> ("Decision")[1] on September 5, 2014.  In the Decision, the District Court concluded that none of the Plaintiffs had proven their claim for disparate impact discrimination under Title VII or c. 151B.[2]  Based on the expert testimony and trial exhibits, the Court found that Boston demonstrated that the 2005 and 2008 promotional exams for sergeant were job related and consistent with business necessity, and therefore "valid," that it could be used for rank order selections, and that Plaintiffs failed to identify an available alternative selection procedure to the

---

[1]The Decision, which appears in the Record Appendix ("RA") at 89-135, is also attached hereto in the Addendum.  All citations to the Decision will therefore reference the appropriate Decision page, not the RA page.

[2]As the District Court correctly noted, "the legal analysis of a disparate impact claim of employment discrimination under Mass. Gen. Laws ch. 151B, § 4 is the same as analysis of such a claim under Title VII.  <u>See</u> <u>White v. Univ. of Massachusetts,</u> [410 Mass. 553, 557;] 574 N.E.2d 356, 358 (Mass. 1991) ("The analysis of a discrimination claim is essentially the same under the State and Federal statutes.").  <u>See also,</u> <u>Sullivan v. Liberty Mut. Ins. Co.,</u> [444 Mass. 34, 38 n. 10;] 825 N.E.2d 522, 529 n.10 (2005) (referring to federal standards for disparate impact claims under Massachusetts law)."  Decision at 2 n.2.  <u>Accord</u> <u>Jones v. City of Boston,</u> 752 F.3d 38, 41 n.1 (1st Cir. 2014).  Plaintiffs concede this point in their brief to this Court by making no separate c. 151B disparate impact argument.

exams with equal validity and less adverse impact that Boston refused to adopt.[3] See Decision at 37-47.

More specifically, the Court concluded that Boston's written, multiple choice exams coupled with Education and Experience ("E & E") were "content valid" – one of the means by which to prove validity – because they were based on comprehensive job analyses that identified the important tasks necessary for successful performance of the sergeant job. Decision at 30, 32, 36. In short, the Court concluded that the exams at issue were job related and consistent with business necessity and satisfied all of the technical standards for content validity, thereby answering content validity's key question: "…that persons who perform better under the test method are likely to perform better on the job." Id. at 36.

The Court also found that Plaintiffs failed to meet their final burden of identifying an equally valid, less adverse or discriminatory selection procedure that Boston refused to adopt. See Decision at 37-47. Although Plaintiffs suggested a number of possible alternative selection procedures Boston might have used to supplement the written job knowledge exam, they altogether failed to show "that there was a particular alternative selection method available for the years in

---

[3] The Court found that the non-Boston Plaintiffs failed to carry their initial *prima facie* burden of showing a statistically significant disparate racial impact. See Decision at 14-28.

questions [sic] about which it could confidently be said that it would have reduced adverse impact on minority candidates to promotion to sergeant in the Boston Police Department." Id. at 46-47. The Court's conclusion rested particularly on the fact Boston had, at great expense, used many of the same testing alternatives Plaintiffs identified for its previous (2002) promotional exam, and that exam yielded no less adverse impact, Id. at 47, a conclusion further supported by similar expense and test results for Boston's delegated exam in 1992. Id. at 41. The Court thus entered judgment in Boston's favor. Id.

By Notice of Appeal dated September 9, 2014, Plaintiffs appealed to this Court. RA 138-39.

## STATEMENT OF THE FACTS

### A.    The 2005 and 2008 Boston Exams For Sergeant Were Strictly Regulated By State Law.

Promotions to Boston Police sergeant are governed by Massachusetts' civil service laws and rules. See generally, Mass. Gen. L. c. 31; HRD's Office of Legal Counsel's Personnel Administration Rules ("PAR"). "The state civil service law states that the purpose of its requirements is to ensure that employees in civil service positions are recruited, chosen, and promoted based on principles of merit, not on political affiliation, race, age, gender, religion, national origin or other factors unrelated to individual ability." Decision at 8 (citing c. 31, § 1).

- 4 -

Accordingly, "...promotional appointments in police forces, including sergeants, shall be made only after competitive examinations," with exceptions not applicable here. See c. 31, § 59.

Under c. 31, municipalities may elect to use HRD's annual exam or construct one of their own through a delegation agreement with HRD. See c. 31, §§ 9-11. In 2002, Boston constructed and administered an exam under such a delegation agreement. Decision at 41. Because of the high cost of the 2002 exam, and the fact that it did not lower adverse impact, Boston decided to use HRD exams for 2005 and 2008. Id. at 44. Although prepared by HRD, the Boston exams differed somewhat from the non-Boston defendant exams in that they included some multiple choice items specifically relevant to the Boston Police Department ("BPD"). Id. at 9.

HRD's Personnel Administration Rules ("PAR") require:

> All selection procedures shall be practical in character and shall relate directly to those matters which fairly determine the relative rankings of the persons examined based on the knowledge, abilities and skills required to perform the primary duties (actual and frequent tasks) of the position, title or occupational group as determined by reliable and representative job information available to the administrator.

PAR 06(2)(a). In addition, c. 31, § 22 provides that "in any competitive examination, an applicant shall be given credit for employment or experience in

- 5 -

the position for which the examination is held." Certain military veterans and long-service employees also receive additional exam points. See c. 31, §§ 26, 54.

HRD's 2005 and 2008 Boston sergeants exams had two components: an 80 question multiple-choice written test, constituting 80% of the final score, and an "E&E" score, weighted at 20%. Decision at 9. The E&E score took into account relevant prior employment and academic coursework that a candidate had either taken or taught. Id. Based on a 100 point scale, a candidate needed a score of 70 or above to pass the exam. Id.

After giving and scoring the exams, HRD ranks participants according to their scores and prepares lists of eligible candidates for each appointing jurisdiction. c. 31, § 25; PAR 07. When an appointing authority seeks to fill a position, HRD "shall. . .certify the names starting with the highest on such list in order of their places on such list. . . ." PAR 08(1). See also, c. 31, § 7; Decision at 10.

Appointing authorities then receive from HRD a list of candidates for promotion. The total number of candidates HRD provides is determined using the "2n+1" formula: where the number of promotions to be made is n. PAR 09(1). See also, c. 31, §§ 7, 27. However, an employer is required to hire the candidate with the highest score. It is only in limited circumstances and with reasonable

Case: 14-1952    Document: 00116851498    Page: 17    Date Filed: 06/17/2015    Entry ID: 5916065

justification that an employer may "bypass" the highest scoring candidate(s) listed.[4/] Id. Although a candidate's prior misconduct might be an acceptable reason to by-pass, race or ethnicity is not. See Massachusetts Ass'n of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 264, 758 NE.2d 455, 462 (2001) ("[R]ace, a consideration specifically identified by the Legislature in G.L. c. 31, § 1(e), as inconsistent with basic merit principles, cannot be used to justify a bypass.").

Using HRD's certification lists, Boston appointed candidates to the position of sergeant based on their scores on the 2005 and 2008 exams.

## B.    Prima Facie Showing Of Adverse Impact.

Boston did not dispute that the exam results had a sufficiently adverse impact on minority promotions to warrant an inference of disparate impact discrimination. Decision at 28.

## C.    The 2005 and 2008 Exams.

### 1.    The 1991 Validation Report.

Both the 2005 and 2008 Boston sergeants examinations were rooted in a thorough study conducted in 1991 by the Massachusetts Department of Personnel Administration ("DPA") (HRD's predecessor), designed to support the job

---

[4/]Candidates with identical scores are considered tied. An employer is free to select any candidate from within the highest scoring "tie group."

relatedness – often referred to as the "validity" – of the civil service police promotional exam process. RA 3214; see also, Decision at 30-32. "Validity" refers to the accuracy of the inference that candidates with higher exam scores are more qualified for promotion than those with lower scores. Id. at 28. The Validation Report was based on "content validity," a recognized approach by industrial psychologists and adopted by the Equal Employment Opportunity Commission ("EEOC") (and several other federal agencies) as one of the methods for establishing validity under the Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines").

### a.    The Job Analysis.

In preparing the Validation Report, the DPA first "conducted a comprehensive job analysis of superior officer ranks, including...sergeant..." RA 3214. A principal feature of this analysis was "[g]athering of available job information from Massachusetts police departments, as well as job analysis reports, survey instruments and other information from jurisdictions outside the Commonwealth." RA 3216.

The Validation Report also included work by a Job Analysis Team ("JAT"). Decision at 31. The JAT initially gathered information by submitting a survey questionnaire to 34 jurisdictions throughout the country, seeking information on

- 8 -

Case: 14-1952     Document: 00116851498     Page: 20     Date Filed: 06/17/2015     Entry ID: 5916065

matters such as job analysis methodologies, selection procedure, reading lists and validity evidence. RA 3220; 3403-09; 3410-11; 3412-19. In addition, the JAT considered job analysis studies, texts and articles, as well as numerous other studies and reference materials for use in developing the Task and KSAP Inventory Questionnaires. RA 3220-21. The DPA further requested and received job descriptions from Massachusetts police departments covered by Civil Service. RA 3222.

Upon receipt and review of the above information, "the JAT developed a list of Knowledge, Skills, Abilities, Personal Characteristics ("KSAPs") that would be included in a survey to be distributed to be administered to Subject Matter Experts ("SMEs"), namely "superior officers currently serving on Massachusetts police departments." RA 3224; 3440-41; 3442-47; 3448-82. The survey sought to elicit information on the importance of each KSAP to the jobs under consideration, and whether "each KSAP was required at the time of appointment to each rank or whether it could be learned on the job after appointment." RA 3224-25.

### b.     The Linkage With Critical KSAPs.

The DPA "[d]eveloped and administered a task inventory questionnaire designed to identify, the frequent and critical tasks and duties," and "a knowledge, skills, abilities and personal characteristics (KSAPs) inventory questionnaire

- 9 -

designed to identify the important KSAPs required at the time of appointment."

RA 3216. DPA also developed a "[l]inkage of the important KSAPs to the frequent and critical tasks of these jobs from" SMEs, "designed and use[d] ...structural group discussions to gather information from SMEs about the Education and Experience (E&E) component of DPA's selection procedures," and "gather[ed] information from SMEs about the recommended reading list from which the multiple choice written examination questions for the police promotional exams are derived." RA 3217.

The Validation Report recognized that "professional standards and DPA's standard operating procedures require that a linkage between essential tasks and the KSAPs required to perform those tasks be developed. RA 3225. "In order to provide a link between the KSAPs and the tasks of the five ranks, the JAT convened a group of 9 SMEs from Massachusetts police departments to review a master list of tasks that had been identified as important and frequent through the survey." RA 3225. This effort was also undertaken to "enhance the validity of the selection procedures..." RA 3225 . "[B]y group consensus," the SMEs "identified which KSAPs had a direct relationship to each cluster of tasks" identified by DPA staff. RA 3225-26.

Case: 14-1952    Document: 00116851498    Page: 21    Date Filed: 06/17/2015    Entry ID: 5916065

Case: 14-1952    Document: 00116851498    Page: 22    Date Filed: 06/17/2015    Entry ID: 5916065

The JAT further gathered information on the "DPA's new automated Education and Experience component of the promotional examination program," which had been developed years earlier "with SME input." RA 3227. Under the E&E component, "incumbents receive points that in combination with their raw score on the written civil service exam...become the score by which they are ranked and placed on civil service eligible lists of candidates for appointment. Points are awarded based on work experience, training and education. The purpose of the structured discussion group sessions...was to obtain feedback from SMEs about areas credited through this system." RA 3227.

As set forth in Validation Report, the JAT designed a structured discussion guide to identify which degrees, certificates, licenses, training and work experience were important for the positions under consideration, including sergeant. RA 3227; 3726-38 . In addition, the JAT arranged for 24 SMEs from various Massachusetts police departments to participate in three small discussion groups regarding the E&E component, with their feedback consolidated in the Validation Report, setting forth suggestions on areas currently credited. RA 3227; 3739-46. In short, SMEs reviewed the information requested on the E&E instructions, and linked this information to the positions under consideration. RA 1885-86.

- 11 -

Case: 14-1952     Document: 00116851498     Page: 23     Date Filed: 06/17/2015     Entry ID: 5916065

The Validation Report's testability analysis demonstrates that over 50% of the KSAs required to perform the job of sergeant were tested, which was more than sufficient to meet the "representative sample" requirement of the Uniform Guidelines.  RA 1887-89.   Based on prior analyses, which included in part input from SMEs, a weight of 20% was assigned to the E&E  component.  RA 3230.

With regard to reading lists, the JAT assembled a small discussion group including 24 SMEs and representatives from the academic community.  SMEs completed individual questionnaires on the reading list , RA 3747-81,  and SME comments and recommendations were further compiled for use by staff examiners who determined the content and structure of the reading list.  The job knowledge questions on the exam would be based on information directly presented by materials on the reading list.  The purpose was to permit a candidate to study effectively for the eventual exam by reading the materials on the list.  Decision at 32.

## 2.    The 2000 M&M Job Analysis.

In 2000, Boston retained outside consultant Morris and McDaniel ("M&M") to prepare and administer a promotional exam for sergeant pursuant to a delegation

agreement with HRD.[5/]  HRD's later Boston exams – the 2005 and 2008 exams at issue here – relied upon M&M's 2000 Job Analysis, which supported and built upon the 1991 Validation Report.  Decision at 30-32.

### a.    The Job Analysis.

M&M first conducted a job analysis of the position of BPD sergeant.  RA 3988.  Like in 1991, this job analysis identified principles for the validation and use of personnel selection procedures, including "[c]over[ing] important parts of the job," but which "need not be inclusive of duties of a particular job," as "determined by pooled judgments of incumbents, supervisors or personnel specialists," all in accordance with professional standards.  RA 3994; 1920-22.  M&M "gathered available relevant job information for the job of Boston Police Sergeant, including data from past job analyses for the rank," as well as "relevant job information for the rank of Police Sergeant in other jurisdictions, such as Denver, San Antonio and Massachusetts State Police."  RA 3998.

### b.    The Linkage With Critical KSAPs.

After reviewing the data, M&M job analysts assembled a comprehensive list of tasks which could be performed by persons in the sergeant position and also

---

[5/]Under this delegation agreement with HRD, which resulted in the 2002 exam, Boston was responsible for funding and administering the exam.  Decision at 41.

Case: 14-1952     Document: 00116851498     Page: 25     Date Filed: 06/17/2015     Entry ID: 5916065

developed a list of possible knowledges, skills and abilities.  RA 3998.  Then, 11

SMEs holding the position of Sergeant or Detective Sergeant, participated in a task

rating session for the sergeant position.  RA 3999-4001.   M&M acted in

accordance with professional standards in using these SMEs.  RA 1922-23.  Out of

a total of 218 tasks identified, nine of the 11 SMEs rated 163 tasks as very

important or important, using an established formula for rating task importance.

RA 4005; 4042-56.

### 3.    Validity Of  The 2005 and 2008 Exams And Use For Rank Order Selection.

The HRD exams prepared for Boston in 2005 and 2008 were based on a test

plan that can be traced back to the 2000 M&M Job Analysis, which itself can be

traced back to the exhaustive 1991 Validation Report.  Decision at 32.  The 2005

exam tested the KSAP's identified throughout those job analyses discussed above.

Decision at 32.  Specifically, in both years, the test questions covered KSAPs and

in a variety of subjects representative of the sergeant position.  Decision at 33.

The 2005 exam included 18 questions taken directly from the assigned text

Supervision of Police Personnel, which cover multiple topics relating to

supervision and leadership.[6/]  See Record Appendix (Exhibits Filed Under Seal)

("Sealed RA") at 126-53.  Furthermore, HRD consulted with a panel of Boston

police captains (SME's) who recommended an updated reading list consistent with

the 1991 job analysis to include rules, procedures and special orders specific to

Boston.  Decision at 33.

The resulting 2005 written exam for sergeants had 53 items in common with

the exam for promotion to lieutenant.  Decision at 33.  Candidates for promotion to

lieutenant (all incumbent sergeants) had an 89% passing rate for the common

items, while the passing rate for patrol officers seeking promotion to sergeant was

only 63%.  Id.  The high passing rate for incumbent sergeants on the common

items was evidence that those items were related to sergeants' actual performance

of their jobs (and is suggestive of the test's validity):  "This fact tends to contradict

any argument that the 1991 job analysis on which the test plan was partially based

was dated and outmoded."  Id.  Decision at 33; RA 2009-2010.

In 2008, HRD prepared a test plan indicating areas of knowledge to be tested

and the number of items to be devoted to each area.  Decision at 34.  SME's

updated the reading list, reviewed test items, indicated which KSA the items was

---

[6/]While not necessarily taken from the Supervision of Police Personnel
textbook, many additional exam questions deal with supervisory issues.  See
Sealed RA at 127-53.

linked to, assessed difficulty and recommended whether or not an item should be included. Id. As with the 2005 test, a number of items were specific to the Boston police department. Id.

As was true of the 2005 exam, the 2008 exam tested KSAs identified throughout the 1991 and 2000 job analyses. Decision at 34. The 2008 test included questions on juvenile issues, crime-related issues, searches, firearm issues, police management issues, BPD rules and regulations, community policing, interrogation, illegal drugs, and the ability to read and understand charts. Id.

The 2008 exam included 15 questions taken directly from the assigned text Supervision of Police Personnel, and – like the 2005 exam – cover a myriad of topics relating to supervision and leadership.[7/] See Sealed RA at 25-49. In both 2005 and 2008, Boston engaged an outside consultant to provide extensive examination preparation, tutoring for interested candidates at no cost and similarly provided compact discs containing lectures prepared by the consultants. Decision at 34.

Importantly, both the 2005 and 2008 sergeants exams included an "Education and Experience Rating Sheet." Decision at 35. By statute, police officers must have three years' experience to be eligible to apply for promotion to

---

[7/]As with the 2005 exam, many additional exam questions deal with supervisory issues. See Sealed RA at 25-49.

sergeant. <u>See</u> c. 31, § 59. In addition, seniority – based on the number of years on the job – is generally recognized as relevant to the ability to perform well in a supervisory position such as sergeant. Decision at 35.

Other sections of the E&E Rating Sheet directly reflected areas of experience that had been identified by the SME's in 1991 as related to the sergeant position. Decision at 35. For example, candidates were asked to indicate whether they had earned various academic degrees or certification in various specified subject areas. <u>Id</u>. They were also asked to indicate if they had taught any courses above the high school level in the same subject areas for which credits is given if a degree is earned in that area. <u>Id</u>. In the Validation Report, the SME's concluded that the ability to teach a course was evidence of oral communication skills important to the position of sergeant. <u>Id</u>. Based on the above-stated facts (which will be examined in more detail in the Argument, below), the Court concluded that the exams at issue were job related and consistent with business necessity, that is, content valid. Decision at 36 (citing 29 C.F.R. § 1607.14(C)).

The expert witnesses for both sides agreed – and the District Court concluded – that properly developed written examinations are generally valid for the purpose of making promotions from police officer to sergeant. <u>Id</u>. at 37. The exams at issue were properly developed. They addressed a representative sample

of the KSAPs of the sergeant position. Decision at 36 (citing § 1607.14(C)(l), (4)). They were based on job analyses that considered the important tasks necessary to the successful performance of the job. Id. at 36 (citing § 1607.14(C)(2)). The exams took account of prior relevant work experience as well as relevant training and education. Id. (citing § 1607.14(C)(6)).

In short, as the Court ruled, the 2005 and 2008 Boston promotional exams for sergeant were content valid for rank order promotions because they "reliably predict[ed] a candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job. I am satisfied on the evidence that Boston carried its burden of showing that the exams in question satisfied that criterion." Decision at 36.

### D. The Availability Of An Equally Valid Alternative Selection Method To The 2005 And 2008 Exams That Boston Refused To Adopt.

Where, as here, an employer demonstrates that a selection method is "job related for the position in question and consistent with business necessity," plaintiffs may nonetheless succeed in their claim if they are able to meet their burden of establishing that there was an "alternative employment practice" that Boston refused to adopt that was equally valid and would have had a lesser

- 18 -

discriminatory impact. See 42 U.S.C. § 2000e-2(k)(1)(A)(ii). Plaintiffs here did not meet this burden. Decision at 47.

The experts generally agreed that minority test-takers tend to score lower on written exams than non-minorities in the aggregate. Decision at 37. As a result, industrial psychologists have been trying to develop selection methods that have the same validity as written knowledge tests, but have a lesser adverse impact on minority applicants. Id. Typically, the approach is to supplement written job knowledge tests by adding other components such as "assessment centers," which may use oral interviews, role-playing exercises, writing samples, in-basket exercises and group exercises. Id. at 38. This "supplemental" approach is most often undertaken because Massachusetts civil service law requires a competitive process as a merit selection tool (see c.31, § 59), written job knowledge tests are highly valid for assessing many KSAPs, and assessment centers require considerably more resources to administer, including money and personnel. Id.

For several decades, Boston had pursued the goal of reducing or eliminating disparate impact in its promotional methods and increased the number of minorities in all its ranks, including sergeants. Decision at 39. Most recently, in 2002, Boston hired M&M to prepare and administer the 2002 exam, which included an assessment center. Id. at 42. For this exam, Boston paid M&M more

- 19 -

Case: 14-1952    Document: 00116851498    Page: 31    Date Filed: 06/17/2015    Entry ID: 5916065

than $1.2 million dollars, and there were additional expenses for transporting, housing, and training police personnel who acted as the assessors for the assessment center exercises.  Id.

Despite the effort, time and money spent to develop the 2002 promotional exam, of the 69 candidates promoted to sergeant, 58 were white, 9 were African-American and 2 were Hispanic.  Decision at 42.  "Even with the inclusion of the assessment center in the 2002 exam process, there remained a substantial difference in the promotion rates of minority and non-minority candidates."  Id.  Moreover, because the BPD made an unprecedented offer of early retirement, in the hopes of avoiding layoffs of younger police officers in 2003,  RA 1592-93,  it had the opportunity to make more promotions off the list resulting from the 2002 exam.  RA 1647.   However, those additional positions did not increase the hiring of black and Hispanic sergeants.  Decision at 42.

By the time Boston was facing the need to develop the 2005, and then the 2008, promotional exams, it was operating under budgetary constraints.  Decision at 43.  Despite the early retirement and other cost-saving efforts Boston adopted during this time period, including reducing or eliminating various programs, the BPD continued to be plagued with financial issues.  Id.

Case: 14-1952    Document: 00116851498    Page: 32    Date Filed: 06/17/2015    Entry ID: 5916065

When BPD began preparing for the 2005 promotional exam, funds had not been budgeted to engage in a process similar to that used in 2002. Decision at 43. Consequently, the BPD decided to take part in the statewide promotional exam prepared and administered by HRD. RA 1593; 666-68. "Expending funds to design and administer exams with assessment centers or other additions to the written test under delegation authority as in 2002 was unrealistic under existing budgetary conditions. The same was true in 2008." Decision at 44.

In addition to financial costs, Boston decided to return to the HRD exam in 2005 because the multi-component exam prepared by M&M – despite is high costs – had failed to produce more minorities for promotion to sergeant. Decision at 44. Following the administration of the 2005 sergeant promotional exam, the BPD promoted the same number of African-Americans that were promoted following the 2002 promotional exam, and one additional Hispanic. RA 2489; 4312-13; 4862.

Against this backdrop, Plaintiffs failed to show that there existed an available, equally valid alternative selection method to the 2005 and 2008 exams that Boston refused to adopt. At trial, Plaintiffs merely identified a number of supplements to written tests – including assessment centers, banding, and weighting various test scores differently – that may as a general matter tend to

- 21 -

result in less adverse impact on minority groups in promotional testing. Decision at 46. However, they failed to demonstrate that there was a particular alternative selection method available, "about which it could confidently be said that it would have reduced adverse impact on minority candidates for promotion to sergeant in the years in question." Id. Perhaps more importantly, Plaintiffs presented no evidence whatsoever that any viable alternative selection method to the 2005 and 2008 exams was presented to Boston, but that Boston refused to adopt it. Id.

Based on the facts found by the District Court,[8/] the Decision should be affirmed.

## SUMMARY OF THE ARGUMENT

The District Court's Decision dismissing Plaintiffs' Title VII disparate impact claim against Boston – that the 2005 and 2008 police promotional examinations for the position of police sergeant were racially discriminatory – was proper and should be affirmed. As an overarching matter, the clearly erroneous standard of review applies to the District Court's subsidiary and ultimate factual conclusions in this case, specifically to its finding that the 2005 and 2008 exams were "job-related" and "consistent with business necessity" (i.e., "valid") under Title VII, that there was sufficient validity to support rank order selection and that

---

[8/]Additional facts will be discussed below.

Case: 14-1952    Document: 00116851498    Page: 34    Date Filed: 06/17/2015    Entry ID: 5916065

Plaintiffs failed to show there existed an equally-valid, less discriminatory alternative to the exams that Boston refused to adopt. <u>See</u> pp. 24-27 below.

Because the District Court was correct – and certainly not clearly erroneous – in determining that the 2005 and 2008 exams were job related and consistent with business necessity (i.e., "valid"), this Court should affirm that ruling. In meeting its Title VII burden of proof, Boston at trial established that the exams were content valid and were representative of important aspects of the police sergeant position. Boston did this by showing that there existed an adequate job analysis which identified important knowledges, skills, abilities and personal characteristics ("KSAPs") necessary for performing the position, that the exams tested a representative sampling of these KSAPs, and that, because higher exam scores were likely to predict better job performance, the exams could be used to rank order test takers for selection. <u>See</u> pp. 28-47 below.

The District Court was also correct – and certainly not clearly erroneous – in concluding that Plaintiffs failed to meet their final Title VII burden of showing that there existed an equally valid, less-discriminatory alternative to the 2005 and 2008 exams that Boston refused to adopt. Indeed, Plaintiffs failed to propose <u>any</u> specific alternative to the exams at issue, never mind making the required showing that any such specific proposal was both equally valid and had less discriminatory

- 23 -

adverse impact. Rather, Plaintiffs merely proffered at trial a number of vague, broad suggestions that might possibly have reduced adverse impact, a far cry from the necessary proof of equal validity and lower adverse impact.

Moreover, the fact that Boston had tried assessment centers in both 1992 and 2002 without reducing adverse impact or increasing the number of black or Hispanic sergeants made it particularly important that the Plaintiff provide proof of the validity of their specific proposal and evidence that it would reduce adverse impact. Furthermore, there was absolutely no evidence that Plaintiffs had proffered and Boston "refused to adopt" any alternative from Plaintiffs. See pp. 47-59 below. For these reasons, this Court should affirm the District Court's judgment for Boston below.

## **ARGUMENT**

I.     **The District Court's Findings That The 2005 and 2008 Exams Were Valid And That There Was No Equally Valid, Less Discriminatory Alternative Must Be Affirmed Unless Clearly Erroneous.**

The District Court's factual determinations made following a bench trial must be upheld on appeal unless they are "clearly erroneous." See Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985); Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's

- 24 -

opportunity to judge the witnesses' credibility."). This clearly erroneous standard of review "applies to both subsidiary and ultimate facts." Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc., 135 S.Ct. 831, 837 (2015).

Here, Plaintiffs' challenge to the District Court's decision is an attack on both the credibility of Boston's witnesses, especially its expert witnesses, and the weight that the District Court gave to Boston's evidence. Such arguments must be rejected as they are simply Plaintiffs' improper attempt to re-argue on appeal the merits of factual disputes on credibility and weight that the District Court has already found in Boston's favor. See Anderson, 470 U.S. at 575 (holding the parties "have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one, requiring them to persuade three more judges at the appellate level is requiring too much.")

Accordingly, the District Court's ultimate determinations that Boston's 2005 and 2008 examinations were "job-related" and "consistent with business necessity" (i.e., "valid"), and appropriately used for rank order selection are factual determinations that should be affirmed in this appeal under the clearly erroneous standard.[9/] See M.O.C.H.A Society, Inc. v. City of Buffalo, 689 F.3d 263, 275-80

---

[9/]Plaintiffs themselves apply the "clearly erroneous" standard in their brief. See, e.g., Plaintiffs' Brief at 59 ("The Court's opinion that there may not be equally valid less discriminatory alternatives is clearly erroneous.").

(2d Cir. 2012) (upholding trial court's determination that Buffalo's fire lieutenant promotional exam was valid using a clearly erroneous standard). Indeed, the Second Circuit recently noted that the Ninth Circuit had found, in an en banc decision, that <u>all</u> of the circuits to address this question determined that a trial court's ultimate findings regarding test validity are subject to review on appeal using a clearly erroneous standard. <u>M.O.C.H.A Society, Inc.</u>, 689 F.3d at 275, citing <u>Association of Mexican-American Educators v. California</u>, 231 F.3d 572, 584-85 (9th Cir. 2000) (en banc).[10]

Similarly, whether Plaintiffs have met their Title VII disparate impact burden of proving at a bench trial that "there exists an equally-valid, less discriminatory alternative that served the [employer's] needs but that the [employer] refused to adopt" is a factual determination that must also be reviewed on appeal under the clearly erroneous standard. <u>Johnson v. City of Memphis</u>, 770 F.3d 464, 473 (6th Cir. 2014).

Finally, there is no merit to Plaintiffs' argument that the District Court committed errors of law mandating reversal, as the District Court applied the

---

[10]/These decisions are in accord with this Court's longstanding application of the clearly erroneous standard to the review of a district court's ultimate determination of whether a plaintiff has met their Title VII *prima facie* disparate impact burden. <u>See</u>, <u>e.g.</u>, <u>Andrews v. Bechtel Power Co.</u>, 780 F.2d 124, 143 (1st Cir. 1985); <u>Fudge v. City of Providence Fire Department</u>, 766 F.2d 650, 657 (1st Cir. 1985).

Case: 14-1952    Document: 00116851498    Page: 38    Date Filed: 06/17/2015    Entry ID: 5916065

correct legal standards, especially in light of the Supreme Court's latest Title VII disparate impact decision, Ricci v. DeStefano, 557 U.S. 557 (2009), and the

Federal Circuit Court decisions issued since Ricci.[11] In this case, the District Court's findings are based on the evidence and there is no legal basis for requiring a different conclusion. As the Second Circuit stated in upholding a district court's finding that Buffalo's fire lieutenant promotional exam was valid: "The issue before the court, however, is not whether a fact finder could have found against Buffalo on issues on which it carried the burden, but whether the fact finder here was required by law to do so. We conclude that he was not." M.O.C.H.A. Society, Inc., 689 F.3d at 276. Hence, the Decision below should be affirmed in its entirety.

---

[11] Surprisingly, Plaintiff's brief does not cite Ricci, except for one passing reference to an amicus brief filed in support of the side that lost in Ricci. See Plaintiffs' Brief at 28. Boston expects that the Plaintiffs will argue that Ricci is a case on disparate treatment, not disparate impact, and thus has no applicability to the current matter. However, both the majority and dissenting opinions in Ricci are clear that the issue in Ricci, as in the case at bar, was whether New Haven's civil service promotional examination for fire lieutenant was illegal under Title VII's disparate impact discrimination requirements. This Court has cited to the majority opinion in Ricci as a correct statement of Title VII disparate impact law. See, e.g., Jones, 752 F.3d at 46, 52 n. 16, 55.

- 27 -

## II. This Court Should Affirm The District Court's Determination That The 2005 And 2008 Exams Were Job Related, Consistent With Business Necessity And Appropriate For Rank Order Selection. [12/]

HRD developed the 2005 and 2008 HRD promotional exams for Boston police sergeant, and included some questions with Boston-specific topics.[13/] The exams were validated using content validity, which required that "the challenged practice is job related for the position in question and consistent with business necessity."[14/] 42 U.S.C. § 2000e-2(k)(1)(A)(i); accord Ricci, 557 US at 578; 587. As shown below, the District Court's finding that Boston established that the exams were content valid (Decision at 35-36) was properly based on the expert testimony and documentary evidence and was not clearly erroneous.[15/]

### A. Use of a multiple choice, written test was valid and appropriate.

Plaintiffs and the amici object to Boston's use of a multiple choice, written test because such tests have been shown to have an adverse impact on black and

---

[12/]Boston did not contest at trial that Plaintiffs had met their *prima facie* "showing of a significant statistical disparity" based on race with respect to the two exams. See Ricci, 557 U.S. at 587; Decision at 20.

[13/]As the result this Court's decision in Lopez v. Massachusetts, 588 F.3d 69 (1st Cir. 2009), there is a separate lawsuit by Plaintiffs against HRD, which remains pending in Massachusetts Superior Court.

[14/]HRD/Boston had the right to pick any one of the three possible professionally accepted methods of making a validity showing – content, construct or criterion validity. See Banos v. City of Chicago, 398 F.3d 889, 892 (7th Cir. 2005).

[15/]The validity burden was subject at trial to a preponderance of the evidence standard. See M.O.C.H.A. Society Inc., 689 F.3d at 277-78.

Case: 14-1952    Document: 00116851498    Page: 40    Date Filed: 06/17/2015    Entry ID: 5916065

Hispanic test takers. <u>See</u> Plaintiffs' Brief at 34; Decision at 37. However, that fact alone is wholly insufficient to invalidate the 2005 and 2008 exams. <u>See</u> <u>Ricci</u>, 557 U.S. at 570-572 (upholding the legality of a job knowledge multiple choice civil service even though the undisputed evidence in that case was that black candidates always do poorly on such examinations).

Plaintiffs also object to what they term "rote memorization" from a reading list of materials. However, a person's knowledge is little more than information committed to memory.[16/] Moreover, the use of a written test format is not a sufficient basis for seeking to overturn the 2005 and 2008 examinations. Indeed, the testing found lawful in <u>Ricci</u> included the same type of multiple choice test involved in this case – a point that Plaintiffs and the United States fail to mention. <u>See</u> <u>Ricci</u>, 557 U.S. at 565-69 (upholding the legality under Title VII of a job knowledge multiple choice civil service public safety promotional examination in which the undisputed evidence was that "every one of the questions on the written examination came from the study material…. If you read the materials and studied the material, you would have done well on the test." (internal punctuation

---

[16/]Of course, a knowledge test is a valid and reasonable method to determine which test takers have the most knowledge for purposes of assessment or selection – whether the test is a second grade math test, a college history test, a driver's license test, a medical board, or an attorney's bar examination. To argue that knowledge tests are *per se* invalid is to ignore the legitimate purposes that such tests serve in our society.

omitted)). Furthermore, the fact that the answers to the written questions on the examination came from the reading materials reflects the whole purpose of the merit based civil service system – all applicants regardless of race are given a fair chance to learn and become knowledgeable in the matters to be tested. See, e.g., c. 31, § 1.

The United States incorrectly argues that the use of a written knowledge test is inherently invalid a way to pick BPD police sergeants as would be the use by the Red Sox of a knowledge test to recruit its players. See United States *Amicus* Brief at 15, quoting Boston Chapter NAACP, Inc. v. Beecher, 504 F.2d 1017, 1023 (1st Cir. 1974). This analogy totally inapplicable. Beecher involved a test given to applicants for entry firefighter positions, just as the Red Sox analogy used by this Court in Beecher related to the Red Sox recruitment of new baseball players. In sharp contrast, all of the BPD patrol officers taking the 2005 or 2008 exams had already passed all of the BPD entry physical agility and strength tests for hire and had continued to demonstrate the necessary physical skills for police work as shown by their continued BPD patrol officer employment for multiple years. Moreover, these patrol officers had their relevant experience and education for police work documented and turned into an E&E score that comprised twenty percent of their overall examination score.

- 30 -

Importantly, Boston did not have the burden of showing at trial that it chose the most valid, or even the least racially impactful testing alternative; rather, it is Plaintiffs who bear this type of comparative burden under Title VII with respect to possible alternative tests. See Johnson, 770 F.3d at 473-75; Jones, 752 F.3d at 53-55; Banos, 398 F.3d at 892; accord Decision at 7-8. All Boston had to show was that its exams were, at least, minimally valid. Thus, Plaintiffs' vague assertions in their brief that Boston should have used a more sophisticated exam format has no bearing on the question of whether the District Court committed reversible error by finding that the exams were content valid.

The fact that these exams may have been more valid with the additional use of an assessment center does not make them invalid as administered. As the District Court held, "the fact that it could have been better does not mean necessarily that it was not good enough to be deemed sufficient." Decision at 36; see generally, M.O.C.H.A. Society, Inc., 689 F.3d at 281 (upholding under a clearly erroneous standard a fire promotional exam as content related and representative when an adequate job analysis is used and the examination is based on KSAs from this analysis).

Moreover, Boston is committed to diversifying its workforce and has in the past agreed to court-ordered consent decrees to address the need for more black

Case: 14-1952    Document: 00116851498    Page: 42    Date Filed: 06/17/2015    Entry ID: 5916065

and Hispanic sergeants. As early as 1992, Boston used an assessment center and "there was no improvement in minority promotions." Decision at 40-41; RA 1583. Again in 2002, Boston expended over $1.2 million to prepare and administer a delegated civil service examination with an assessment center containing multiple components in the hope of achieving more diversity. Unfortunately, as found by the District Court, that exam did not reduce adverse impact. Decision at 41-42. Hence, Plaintiffs' implicit suggestion that the use of the written multiple choice examination is an effort to exclude black and Hispanic sergeants is completely false and must be rejected.

Title VII does not require change for change's sake. It only requires change that will meet Boston's needs and will reduce adverse impact. Plaintiffs failure to carry its burden to establish that there is a less discriminatory selection procedure that is equally content valid to the written, multiple choice HRD administered examination means that the District Court's determination should be affirmed on this appeal.

**B.    Boston Established That The 2005 And 2008 Exams Tested Job Related Content That Was Representative Of Important Aspects Of The Police Sergeant Position.**

Based on HRD's comprehensive and thorough process, described in detail in the Statement of Facts, above at 7-18, the 2005 and 2008 promotional

- 32 -

Case: 14-1952     Document: 00116851498     Page: 44     Date Filed: 06/17/2015     Entry ID: 5916065

examinations for Boston police sergeant were valid and the District Court's findings to that effect should be affirmed.[17] Decision at 30. Nevertheless, Plaintiffs make a number of arguments asserting that the examinations were flawed. Those arguments must be rejected.

### 1.    Use of the 1991 Job Analysis and Validity Report was acceptable.

HRD's use of the 1991 job analysis in 2005 and 2008 was proper as the continuing validity of this job analysis was confirmed repeatedly. In 2000, Morris & McDaniel confirmed and built upon the 1991 analysis. Decision at 32. Thereafter, HRD, through consultations with SMEs in advance of both the 2005 and 2008 exams, confirmed that both the 1991 and 2000 job analyses remained current. Decision at 33-34; RA 1917; 1935.

Plaintiffs' argument that a completely new job analysis prior to the 2005 and 2008 examinations should have been conducted is unnecessary and impractical. The position of BPD sergeant has remained essentially the same from 1991 through to the present. Hence, a new analysis was unnecessary. See, e.g., Hearn, 340 Supp.2d 728, 738, aff'd 110 Fed. Appx. 424 (5th Cir. 2004), ("...a new job analysis is only needed if one of two things is present, namely, if the [police]

---

[17] A job analysis is "an assessment of the important work behavior(s) required for successful performance and their relative importance." M.O.C.H.A. Society, Inc., 689 F.3d at 275.

- 33 -

department has changed structurally, so that positions have been added or eliminated in a way to change the duties and responsibilities of the position in question, or if the department has fundamentally changed the way it does its work."). Moreover, the District court's conclusion was also supported by testimony at trial from Dr. Outtz, who the District Court credited. Decision at 34-35.

Quite simply, "there is no requirement in the industry or the law that a new job analysis be prepared for each successive selection procedure, and an earlier-developed job analysis may appropriately be used as long as it is established that the job analysis remains relevant and accurate." Hearn v. City of Jackson, 340 F.Supp.2d 728; accord Decision at 29 ("The continuing validity over time of a job analysis and any test instrument developed in reliance on it depends on whether and to what degree the demands of the job may change over time.")

Even if, *arguendo*, the job analyses at issue had some errors in them, it would not be clearly erroneous for the District Court to rely upon them in finding the 2005 and 2008 examinations valid. See Association of Mexican-American Educators, 231 F.3d at 587 ("Validation studies 'are by their nature difficult, expensive, time consuming and rarely, if ever, free of error.'"); Cleghorn v. Herrington, 813 F.2d 992, 996 (9th Cir. 1987) ("Plaintiffs' arguments demonstrate,

at most, that [the expert's] study may not be totally free of error. But the argument does not persuade us that the district court clearly erred in relying on [the expert's] study.")

Accordingly, the District Court's finding on the sufficiency of HRD's process, including reliance on the 1991 and 2000 validation studies, was clearly correct. See Hearn, 340 F.Supp2d at 739 (upholding a city's use of a prior job analysis for a police sergeant promotional examination since the city had presented "confirmation by a few knowledgeable people in the department that the job analysis remained accurate.")

### 2. The selection procedure tested KSAPs required of Boston police sergeants that were "representative of important aspects of performance on the job."

An examination's content validity does not require that all or even most of the identified KSAPs from the job analysis are tested. Indeed, it would be impossible to test all of the KSAPs identified on a job analysis. Instead, the legal standard simply requires that a content valid examination test content that is "representative of important aspects of performance on the job." Banos, 398 F.3d at 893, quoting 29 CFR § 1607.5. Obviously, an exam that tests "representative" aspects of a job is a test of a reasonable subset.

- 35 -

Case: 14-1952    Document: 00116851498    Page: 47    Date Filed: 06/17/2015    Entry ID: 5916065

Of the 156 KSAPs found to be required for the sergeant position in the 1991 job analysis, the 2005 and 2008 exams tested or measured 60 KSAPs though the written test and another 24 KSAPs through the E&E score. RA 3127-33. Thus, and as the District Court factually found, well over half of the KSAPs were tested by each exam. Decision at 32. Obviously, over fifty percent is more than "representative" and the District Court finding on this is certainly not clearly erroneous. RA 1971, 2058. See also, Johnson, 770 F.3d at 478, citing Police Officers for Equal Rights v. City of Columbus, 916 F.2d 1092, 1099-1100 (6th Cir. 1990) ("affirming the district court's conclusion that job-relatedness 'does not require precise proportionality' between the exam content and the relative importance of job tasks.")

Moreover, the trial testimony showed that a written job knowledge exam is the best and most efficient method of determining what a candidate knows about critical content areas identified by a job analysis. RA 1872; 516-19. This is especially apparent where 625 and 504 Boston patrol officers took the 2005 and 2008 exams respectively, because a written exam is an very efficient way of testing large numbers. RA 4312.

Plaintiffs' assertion that the exams did not test for supervisory knowledge or leadership ability is simply not true. Although the 2005 and 2008 exams differed

somewhat in the issues covered, questions on both exams covered topics such as supervisory ability and leadership.  For example, the 2005 exam included 18 questions linked to the assigned text Supervision of Police Personnel, and which cover multiple topics relating to supervision and leadership.  Sealed RA at 126-53. The 2008 exam included 15 questions from Supervision of Police Personnel covering the same kinds of supervisory-related questions.  Sealed RA at 25-49.  As noted, while not necessarily from the Supervision of Police Personnel textbook, many additional exam questions deal with supervisory and leadership issues.  See Sealed RA at 25-49; 127-53.

Further, Plaintiffs wholly misconstrue the Massachusetts Civil Service Commission's decision in Carr v. Department of Personnel Administration, No. G-1461 (1989) (RA 3362-3392).  The case does not support Plaintiffs' position that a written exam cannot test for supervisory skill.[18]  See Plaintiffs' Brief at 33-34. Rather, Carr addressed only the 1989 exam and made clear that its ruling did "not mean that an assessment center is a necessary part of every police promotional

_____

[18]Plaintiffs' claim that Carr was affirmed by this Court (see Plaintiffs' Brief at 33), is also incorrect.  This Court's decision in Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 21 (1st Cir. 1998), had nothing to do with the Civil Service Commission decision at issue in Carr.

- 37 -

examination," and that "[i]t is certainly possible to develop a multiple choice exam that adequately tests for supervisory ability." (RA 3385).[19]

Each applicant's written examination score (80% of the overall score) was supplemented by that applicant's E&E score (20% of the overall score) based on the applicant's training, education and experience relevant to the sergeant position. Importantly, as the thorough 1991 job analysis determined, and as Boston's expert Dr. Outtz testified at trial, an applicant's E&E score inherently is based on KSAs for the police sergeant position such as leadership, decision making, interpersonal relations, supervision, and oral communication skills.[20] Decision at 35-36.

In deciding that Boston had met its validity burden, the District Court relied on the testimony of Boston's expert at trial, Dr. Outtz. He is one of the country's

---

[19] If Plaintiffs really believed their Carr argument had merit, they would have had to pursue it at the Civil Service Commission and/or at HRD to invalidate the 2005 and 2008 exams. Indeed, Plaintiffs provided no evidence at trial that the Civil Service Commission in the many years since this 1989 decision has overturned any other Boston police promotional exam for any reason.

[20] The fact that an E&E score might not perfectly measure KSAs such as supervision or leadership misses the point. To be valid, the E&E score need only be part of an examination that measures an applicant in such a way as to be "representative of important aspects of performance on the job." See 29 CFR § 1607.5. Moreover, Boston's ability to bypass, and therefore not promote, applicants who lacked the necessary KSAs for promotion (subject to review by the Civil Service Commission) served as a check on improper promotions.

Case: 14-1952    Document: 00116851498    Page: 50    Date Filed: 06/17/2015    Entry ID: 5916065

leading industrial organizational psychologists.    He has published extensively on the subject of employee selection procedures.    RA 4731-32; 1853-54.[21/]

Even Plaintiff's expert, Dr. Joel Wiesen, supported both Dr. Outtz's reputation, as well as the work that he has done in attempting to reduce adverse impact.[22/]  Based on his review, Dr. Outtz opined at trial that the 2005 and 2008 sergeant promotional exams for Boston met validity standards, an opinion the District Court found credible and persuasive.[23/]  Decision at 35-36; RA 1881.

---

[21/]Dr. Outtz has been invited to address the EEOC regarding employee selection procedures, and has given presentations on this subject worldwide. RA 4728; 1853-54.  Dr. Outtz's peers have recognized his significant contributions to the field by selecting him as a Fellow in the Society of Industrial and Organizational Psychology, and in the American Psychological Association.  RA 4728; 1876.

[22/]Dr. Wiesen testified that "Dr. Outtz has spent much of his career wrestling with the problem of adverse impact and trying to find ways of reducing adverse impact.  He recently edited a highly respected text book on adverse impact." RA 354.  See also, RA 539 (where Dr. Wiesen again referred to recent book of Dr. Outtz).

[23/]Contrary to the United States' claim, the passing score is irrelevant to both selection and impact with respect to Boston, and thus to the issues before this Court, since in both 2005 and 2008 many applicants passed the examination and yet had scores that were too low for selection.  In other words, if Boston had used a passing score of 40, 50 or 60, instead of 70, it would have had no effect on who was promoted based on the results of these examinations.  See Contreras v. City of Los Angeles, 656 F.2d 1267, 1284 (9th Cir. 1981) ("Where an examination is designed to rank applicants so that only the top few may be hired . . . the cutoff score is more a formality than a matter of consequence.").  Boston did not have to validate the passing score used by HRD on the 2005 and 2008 examinations.  See Association of Mexican-American Educators, 231 F.3d at 589 ("An employer is not required to validate separately the selection of particular passing scores on an

In addition, and as the District Court noted, the passing rate results of the 2005 examination for promotion to BPD lieutenant (which was taken by current BPD sergeants) further supports the fact that the 2005 examination "questions were related to the sergeants' actual performance of their jobs." Decision at 33; RA 2009-10.

Finally, other Circuit Courts have held that Federal Courts should give significant deference, especially in the police context, to the employer in deciding what content to cover on a promotional examination. For example, the Sixth Circuit recently reaffirmed that "a police department's selection of testing criteria 'is largely a matter within the professional judgment of the test writer based upon the particular attributes of the job in question.'" Johnson, 770 F.3d at 478, quoting Police Officers for Equal Rights v. City of Columbus, 916 F.2d 1092, 1099-1100 (6th Cir. 1990). Indeed, in that 2014 decision the Sixth Circuit also noted that "[w]hen the employment position involves public safety, we accord greater latitude to the employer's showing of job-relatedness and business necessity." Johnson, 770 F.3d at 478.[24/]

---

employment test."), citing Craig v. County of Los Angeles, 626 F.2d 659, 665 (9th Cir. 1980).

[24/]To that end, the Sixth Circuit in Johnson went on to quote and follow a Tenth Circuit decision that "when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are

3. **The exams can be used as a rank order device because the District Court found that the validity and reliability evidence supported the inference that higher exam scores predict better job performance.**

When the results of the selection procedure are used to rank the applicants for selection, as was true here in compliance with Massachusetts Civil Service Law, there needs to be "a separate demonstration that there is a relationship between higher scores and better job performance."  Decision at 8, citing 29 C.F.R. § 1607.14(C)(9).  The District Court specifically found that Boston satisfied this factual burden at trial.  Decision at 36 ("The key question regarding the content validity of a selection method is whether it reliably predicts a candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job.  I am satisfied on the evidence that Boston carried its burden of showing that the exams in question satisfied that criterion.")[25/]

The District Court's conclusion is supported by the Plaintiffs' own expert, Dr. Joel Wiesen.  In 2006 (just one year after the 2005 examination), Plaintiffs'

---

great, the employer bears a correspondingly <u>lighter</u> burden to show that his employment criteria are job-related."  <u>Johnson</u>, 770 F.3d at 478, quoting <u>Spurlock v. United Airlines, Inc.</u>, 475 F.2d 216, 219 (10th Cir. 1972) (emphasis added).

[25/]The United States incorrectly asserts that "the court never addressed whether Boston's use of exam results to rank applicants was valid" even though the District Court made a finding on this exact point.  <u>Compare</u> U.S. *Amicus* Brief at 7, 9 <u>with</u> Decision at 36.

- 41 -

Case: 14-1952    Document: 00116851498    Page: 53    Date Filed: 06/17/2015    Entry ID: 5916065

expert Dr. Wiesen testified in a claim brought against the BPD before the

Massachusetts Civil Service Commission by the Boston Police Superior Officers

Federation. In response to a question seeking his "opinion as to whether a straight

written exam without an assessment center or any more subjective component,

would be an appropriate way for testing for police supervisory personnel" (RA

514), Dr. Wiesen testified as follows:

> Well, the multiple choice test again, can cover a wide range of topics and
> can be done well or less well, and the literature shows that job knowledge
> are, if not the most valid test, very close to the most valid predictors of
> future job performance. So, <u>I think that the answer to your question is, yes,</u> I
> <u>think that multiple choice examinations can be used by themselves to</u>
> <u>develop a roster of people for promotion.</u>

RA 514 (emphasis added). Dr. Wiesen further testified in that proceeding that a

written test is "either the best or one of the best predictors of future job

performance." RA 516-17. On cross-examination at the current matter, Dr.

Wiesen testified that he "still think[s] that the multiple-choice is a good predictor"

of future job performance, and indeed is "one of the best" predictors, along with

assessment centers. RA 519.

In addition, one of the most important functions of the sergeant is to answer

patrol officers' questions while in the field. This fact is described not only in the

job analysis, but also the testimony of former Commissioners Edward Davis and

- 42 -

Case: 14-1952   Document: 00116851498   Page: 54   Date Filed: 06/17/2015   Entry ID: 5916065

Plaintiffs' witness, a former sergeant, Lieutenant Thomas Nolan. RA 1243-44; 229. As the District Court concluded:

> The position of sergeant in the Boston police department is a supervisory one. Sergeants are typically field supervisors for patrol officers. It is essential that sergeants be familiar with constitutional and statutory legal principles pertinent to their jurisdiction, as well as departmental regulations and policies…. [I]t is critical to a police sergeant's ability to effectively perform as a supervisor that he or she know and understand relevant law. When patrol officers need information or clarification, the first thing they do is call their sergeant. An effective way of testing whether a candidate for sergeant has the necessary knowledge is through a written job knowledge test.

Decision at 30; see RA 229; 1243-44.

The District Court's conclusion is also supported by Dr. Outtz's testimony trial that a critical aspect on the use of rank ordering is the "reliability coefficient" for the Boston and statewide exams. "Reliability" refers to the extent to which exam scores may vary by chance, RA 2141, or, put differently, the degree to which it can be expected that a candidate will receive the same score if tested again using a similar test. RA 457. The "reliability coefficient" measures, on a scale from zero to one, the extent to which a candidate would receive the same score upon retesting. RA 2143; 457-58. Dr. Outtz explained that the reliability coefficient for the exams at issue in this action (Boston and statewide) is 0.8 or higher. RA 2143. This "relatively high" value means that "there's going to be a relatively narrow range in which my score is going to vary." RA 2143.

The use of reliability coefficients at or above 0.8 in order to justify rank order validity is well established and certainly not erroneous.  See Johnson, 770 F.3d at 479-482 (upholding the validity of rank order promotions for a police promotional examination with a reliability coefficient of 0.82, and also noting that even if this coefficient had been 0.76 (as argued by Plaintiffs in that case) such a coefficient would have been high enough for rank order validity).

Plaintiffs' attacks on the Court's rank order finding have no merit.  First, Plaintiffs inappropriately seek to relitigate here trial evidence credibility and weight determinations that are within the discretion of the District Court and that are not clearly erroneous.  In fact, Ricci makes clear that rank order civil service public safety promotional exams, even ones with high adverse racial impact and based on multiple choice job knowledge tests, are lawful and not subject to attack under Title VII simply because of witness testimony that black candidates do poorly on such examinations and that the workforce at issue was not diverse.  See Ricci, 557 U.S. at 570-72.[26/]

---

[26/]The fire lieutenant civil service promotional examination upheld as valid in Ricci was a rank-order examination.  Ricci, 557 U.S. at 587-88, 590.  That examination had just two components – a 100 question multiple choice knowledge examination that counted for sixty percent of an applicants' total score and an oral examination based on three hypothetical situations that counted for the remaining forty percent.  Ricci, 557 U.S. at 564-65, 587-88.

- 44 -

Case: 14-1952    Document: 00116851498    Page: 56    Date Filed: 06/17/2015    Entry ID: 5916065

Next, Plaintiffs attempt to show that Boston may not have met all of the requirements contained in the Uniform Guidelines' description of content validity. However, perfection is not required. See, e.g., Clady v. Los Angeles County, 770 F.2d 1421, 1430-31 (9th Cir. 1985), cert. den. 475 U.S. 1109 (1986) ("It is undisputed that the County's validation studies in the present case do not meet the Guidelines' strict standards. Few validation studies do, however . . . The Supreme Court has approved validation studies which do not meet the standards of the Uniform Guidelines."). An exam's validity is determined through the use of "professionally accepted methods," not whether it strictly complies with each of the Uniform Guidelines' requirements. See Johnson , 770 F.3d at 478, quoting Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 480 (6th Cir. 1987); Jones v. City of Boston, 752 F.3d 38, 50 n. 14 (1st Cir. 2014) (employer compliance with the Uniform Guidelines in designing and then validating employee tests or examinations is not required by Title VII since "'Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations,' the agency's guidelines receive weight only to the

- 45 -

Case: 14-1952   Document: 00116851498   Page: 57   Date Filed: 06/17/2015   Entry ID: 5916065

extent of their 'power to persuade.'"), quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 257 (1991); accord Decision at 4 n. 4.[27]

Finally, Plaintiffs argument flies in the face of the essential fact that Title VII allows Boston to use content validity, as proof of job relatedness and business necessity. Boston did not have to show additionally that the exams were either criterion valid (i.e., that the examination scores predicted successful job performance) or construct valid (i.e., that the examination scores measured an applicant's possession of characteristics important for successful job performance). Plaintiffs' arguments to require that Boston show that an applicant's success on the examination was predictive of success as a police sergeant is tantamount to imposing on Boston the burden of proving criterion validity, which is not required by the Uniform Guidelines and wholly inconsistent with the state of the case law.[28] See M.O.C.H.A. Society, Inc., 689 F.3d at 281(rejecting this same argument as a

---

[27] Thus, there is no merit to Plaintiffs' flat assertion that the "requirement of demonstrating the 'validity' of the exam is governed by the Uniform Guidelines." Plaintiff's Brief at 25. The U.S.'s argument – based on Boston's alleged failure to meet all of the Uniform Guidelines' technical requirements – rests on the same fallacy. Indeed, the Supreme Court in Ricci found "no genuine dispute that the [fire lieutenant promotional] examination" at issue in that case was content valid without appearing to rely in any meaningful way upon the Uniform Guidelines. See Ricci, 557 U.S. at 587-89.

[28] Each of the three methods of validation have strengths and weaknesses. The strength of content validation is that it focuses on a job analysis and therefore on the requirements of the position.

- 46 -

matter of law since the defendant had elected to validate the examination using content validity). See also, Ricci, 557 U.S. at 587-589 (Supreme Court concludes that there was no substantial evidence that a firefighter promotional examination was invalid using only content validity principals); Johnson, 770 F.3d at 478-479 (Sixth Circuit upholds the validity of a police promotional examination based only on content validity); M.O.C.H.A. Society, Inc., 689 F.3d at 275-282 (Second Circuit upholds the validity of a police promotional examination based only on content validity); see generally Stewart v. City of St. Louis, 2007 WL 6211634 *15 (E.D. MO. 2007), aff'd 532 F.3d 939 (8th Cir. 2008) ("Most employment tests in both the public and private sector are content validated.")

Thus, this Court should affirm as not clearly erroneous the District Court's finding that the 2005 and 2008 examinations were content valid, and sufficient to support rank order selection.

## III. The District Court Was Not Clearly Erroneous In Ruling That Plaintiffs Failed To Establish An Equally Valid, Less-Discriminatory Alternative To The 2005 And 2008 Exams That Boston Refused To Adopt.

Having established that the 2005 and 2008 exams were valid, Boston was entitled to judgment unless Plaintiffs were "able to establish that there was an 'alternative employment practice' that Boston refused to adopt that was equally valid and would have had a lesser discriminatory impact." Decision at 37, citing

- 47 -

42 U.S.C. § 2000e-2(k)(1)(A)(ii) and (C), and <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 425 (1975). In other words, Plaintiffs had the burden of demonstrating that "there existed an equally valid, less-discriminatory alterative that served the City's needs but that the City refused to adopt." <u>Ricci</u>, 557 US at 587; <u>accord</u> <u>Jones</u>, 752 F.3d at 54.

The Plaintiffs' burdens of production and persuasion at this final stage of a disparate impact case are very significant and difficult to meet. "Consequently, Plaintiffs may not rest on speculation regarding the availability, validity, or less discriminatory nature of their proffered alternatives." <u>Johnson</u>, 770 F.3d at 472. "This broadest of Title VII remedies – which requires no showing of discriminatory motive, <u>see</u> <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 431 (1971) – demands evidence that plaintiffs' preferred alternative would have improved upon the challenged practice." <u>Johnson</u>, 770 F.3d at 477, citing <u>Allen v. City of Chicago</u>, 351 F.3d 306, 315 (7th Cir. 2003) ("We cannot require the City to [incorporate plaintiffs' alternative testing proposal based] on mere speculation."); <u>Zamlen v. City of Cleveland</u>, 906 F.2d 209, 220 (6th Cir. 1990) cert. den. 499 U.S. 936 (1981) (rejecting test-rescoring proposal, where plaintiffs offered only speculation of a less discriminatory impact).

Case: 14-1952   Document: 00116851498   Page: 59   Date Filed: 06/17/2015   Entry ID: 5916065

Indeed, in the context of a public safety promotional examination case, especially since <u>Ricci</u>, many plaintiffs at trial do not even attempt to meet their burden. <u>See, e.g.</u>, <u>M.O.C.H.A. Society, Inc.</u>, 689 F.3d at 274. Indeed, the Sixth Circuit recently reversed a district court's jury-waived finding that alternative selection procedures existed for a police promotional examination, holding that the plaintiffs there failed to meet their alternative procedure burdens "as a matter of law." <u>See</u> <u>Johnson</u>, 770 F.3d at 473-78.

In its Decision, the District Court first reviewed the trial evidence presented with respect to Plaintiffs' alternative selection procedure burden. Decision at 37-46. The District Court then concluded that Plaintiffs had not met their burden of proof, resulting in judgment being entered for Boston. <u>Id</u>. at 46-47. For the reasons detailed below, this finding was proper and certainly was not clearly erroneous.[29]

## A. Plaintiffs Failed To Propose A Specific Alternative To The Exams At Issue.

First, Plaintiffs failed to meet their burden at trial of unambiguously identifying and detailing their suggested "alternative employment practice" that

---

[29] Tellingly, the U.S. *Amicus* Brief "supporting Plaintiffs-Appellants" specifically mentions but does not dispute the District Court's finding that Plaintiffs did not meet their alternative employment practice burden. <u>See</u> U.S. *Amicus* Brief at 7.

- 49 -

Boston should have used in lieu of the 2005 and 2008 exams. See Johnson, 770 F.3d at 472, citing citing Allen, 351 F.3d at 316-17 (deeming insufficient "vague or fluctuating alternatives, and finding that the plaintiffs failed to substantiate their "bare assertions" of valid, less discriminatory alternatives). Nor can a plaintiff's proposed alternative practices be "broad suggestions." Johnson, 770 F.3d at 477.

Given the clear law, one would think that Plaintiffs and their experts would have proffered at trial one detailed alternative form of promotional selection for use by Boston and then attempt to show in detail why this alternative was equally valid and would have had less adverse impact. It is telling that this did not happen. Instead, Plaintiffs and their experts at trial merely mentioned in general terms a wide variety of potential alternatives and claimed (but did not make any effort to prove) that these alternatives were equally valid and would result in less adverse impact.

More specifically, as the District Court noted, Plaintiffs suggested the following as alternatives to the 2005 and 2008 examinations:

- To add an assessment center to the written knowledge test like with the 2002 examination in Boston. Decision at 42-43.

- To use the same format as the 2002 examination in Boston but to increase from 40% to 60% the weight accorded to the assessment center score. Decision at 42-43.

Case: 14-1952   Document: 00116851498   Page: 62   Date Filed: 06/17/2015   Entry ID: 5916065

- To "band" broadly together applicant scores examinations so that more applicants would be in each band and thus under consideration for promotion at any time. Decision at 44-46.

- To use "various alternatives or supplements to written multiple choice tests … [since these] as a general matter tend to result in less adverse impact on minority groups in promotional testing." Decision at 46.

In light of these "vague," "fluctuating" and "broad" proposals, the District Court was correct, and certainly not clearly erroneous, in concluding Plaintiffs had not met their burden with respect to an "alternative employment practice."

## B. Plaintiffs Failed To Show Any Alternative That Was Both Equally Valid And Had Less Discriminatory Adverse Impact.

Even had Plaintiffs proposed a detailed alternative employment practice, they still failed to meet their burden of proof. In this regard, Plaintiffs did not prove that any alternative was both equally valid <u>and</u> less-discriminatory in adverse impact.

These are two major and separate endeavors. First, Plaintiffs were obligated to validate their specific proposed alternative using the same validity standards, and level of proof, that had been imposed on Boston except that the burden of proof was now on the Plaintiffs. <u>See</u> <u>Jones</u>, 752 F.3d at 53, citing 42 U.S.C. § 2000e-2(k)(1)(C). Second, Plaintiffs had the burden of proving that their proposed

Case: 14-1952    Document: 00116851498    Page: 63    Date Filed: 06/17/2015    Entry ID: 5916065

alternative would produce less adverse impact using the same level of statistical proof required of Plaintiffs in their *prima facie* burden. <u>Jones</u>, 752 F.3d at 53; 55.

Here, Plaintiffs offered no data showing that the alternative "provide[s] equally valid and less discriminatory evaluations" and thus clearly did not meet their burden. <u>See Johnson</u>, 770 F.3d at 475-476. This is particularly true since the "'past success' of a specific testing procedure 'merely predicts, but does not establish success' in future applications" and thus does not satisfy a plaintiff's burden. <u>Johnson</u>, 770 F.3d at 475, quoting <u>Allen</u>, 315 F.3d at 315.

For example, Plaintiffs suggested that Boston give in 2005 and 2008 the same kind of exam, with an assessment center, that it offered in 2002. <u>See</u> Decision at 42-43. However, and as the District Court found, that exam failed to produce less adverse impact. Dr. Silva established that at most the 2002 exam format resulted in just one additional minority promotion (an increase from 10 to 11) as compared to the type of format used for the 2005 and 2008 exams. Decision at 43.[30/] In addition, Boston used an assessment center in 1992 and "there was no improvement in minority promotions." Decision at 40-41.

---

[30/]A showing of statistically significant adverse impact cannot be based on a sample in which a change in the race of just one promotion changes the result. Decision at 23-24. Thus, the promotion of 10 versus 11 people based on the same 2002 exam data is not statistically different for purposes of trying to show less adverse impact.

- 52 -

Case: 14-1952    Document: 00116851498    Page: 64    Date Filed: 06/17/2015    Entry ID: 5916065

Moreover, the 2002 examination cost Boston $1.2 million to create and

administer (as compared to the HRD exams, which cost Boston nothing) and the

evidence at trial was that Boston could not afford an expensive exam in 2005 and

2008 when the city was in financial crisis. Decision at 42-44. To that end, it is

settled law, as noted by the District Court (Decision at 43-44), that "factors such as

cost or other burdens of proposed alternative selection devices are relevant in

determining whether they would be equally as effective as the challenged practice

in serving the employer's legitimate business goals." Watson v. Fort Worth Bank

and Trust, 487 U.S. 977, 998 (1988) (plurality decision); accord Johnson, 770 F.3d

at 474-474 (citing and quoting Watson for the proposition that a court should

account for a city's "legitimate interests in test security and practicability in

assessing plaintiffs' proffered alternatives"), citing Allen, 351 F.3d at 314-315

(considering proposal's effect on the city-employer's financial interests); Clady,

770 F.2d at 1432 (Financial concerns are legitimate needs of the employer.");

Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1263 (6th Cir. 1981) ("Of

course, the marginal cost of another hiring policy and its implications for public

safety are factors which should not be omitted from consideration."). In short,

given the undisputed high cost of delegated exams, the financial distress Boston

- 53 -

was facing in 2005 and 2008 made the assessment center methodology unworkable, even had Plaintiffs proposed and Boston refused it.

Plaintiffs' expert Dr. Cassi Fields also suggested that Boston give an exam similar to the 2002 exam with a written knowledge test, an assessment center, and an E&E score – but to weigh it such that the written test would count 20% (rather than 40%) and the assessment center would count 60% (rather than 40%), with the final 20% being the E&E score. Decision at 42. However, in addition to all the financial problems noted above with Boston using the 2002 format in 2005 and 2008, this suggestion also does not satisfy the Plaintiffs' burdens as there was no direct evidence (1) that such "altering the weights" would be equally or more valid, or (2) that this would result in any decrease in adverse impact. To the contrary, Dr. Silva calculated that this proposed altering of exam weights would not have changed the total number of minorities promoted. Decision at 42-43.

Finally, there is no merit to Plaintiffs' argument that Boston should have "banded" the rank order scores into larger rank groupings to allow for more diverse selections. As a factual matter, it is clear that banding would not have made a significant difference in the number of black and Hispanic candidates selected for sergeants.

Case: 14-1952    Document: 00116851498    Page: 65    Date Filed: 06/17/2015    Entry ID: 5916065

Case: 14-1952    Document: 00116851498    Page: 66    Date Filed: 06/17/2015    Entry ID: 5916065

In addition, <u>Ricci</u> flatly and unambiguously ruled as a matter of law that a city cannot add banding of examination scores after a test is given. <u>Ricci</u>, 557 U.S. at 590. Here, Dr. Jacob's suggestion of banding only occurred in late March 2009 - after the 2005 and 2008 examinations. (RA 4232-33 cited in Plaintiffs' Brief at 17). Thus, such *ex post facto* banding of scores would be illegal under <u>Ricci</u>.

Moreover, banding of scores "trying to account for measurement error" is not "endorsed by the professional standards in the field of industrial and organizational psychology." <u>Johnson</u>, 770 F.3d at 484 (rejecting a plaintiff's request that a police promotional examination use score banding).

Furthermore, it is settled law that Boston must make its promotion decisions "on the basis of job qualifications, rather than on the basis of race or color." <u>See</u> <u>Ricci</u>, 557 U.S. at 579-582, quoting <u>Griggs</u>, 401 U.S. at 434. Thus, even if there were both white and black applicants in a band, Boston could not lawfully consider

race in deciding whom to promote.[31] See Decision at 46, n.13 (Boston selecting promotions from a band based on race "might also be of dubious validity under federal law") citing Ricci, 557 U.S. 557. Having more black and Hispanic candidates in a larger group with no other differentiation does not solve the problem of what to use as the selection criteria within the larger group.

In addition, banding would not reduce disparate impact as banding of scores (even if it were lawful) would not result in the promotion of applicants below the highest unexhausted band group as Boston would have to continue to promote (or bypass) people from this (larger) band until the band was exhausted. c. 31, § 16. Due to this need to exhaust each band before moving on to the next band, banding would result in the same list of people being promoted for most of the use of the examination results as band after band was exhausted. Given this, there is no basis

---

[31]On the 2005 exam Boston made its final promotion selections from a band of applicants with a score of 85 points. That 85 score band had 18 whites and 6 minority members (and thus was 25% minority). If one increased the band under consideration to five points (i.e., from 81 to 85 points), as suggested in Plaintiffs Brief at 69 n. 24, then Boston would have been making promotions from a much larger band with 93 whites and 23 minority members (or 19.8% minority). RA 2560-63. Given that Boston could not make promotion decisions based on race, there simply is no statistical basis to claim that a larger 5-point band would necessarily result in more minority promotions (and thus less adverse impact) than a 1-point band, especially since the larger band had a lower overall percentage of minorities.

Case: 14-1952    Date Filed: 06/17/2015    Page: 68    Entry ID: 5916065    Document: 00116851498

to conclude that banding inevitably would lower racial adverse impact in any statistically significant manner.

Plaintiffs' and the United States' broad suggestion that Boston could have used a testing alternative in 2005 and 2008 that was illegal under state civil service law ignores the reality that such an "illegal" exam could not have been administered in a timely or cost-effective fashion by Boston in the face of inevitable injunction state court actions brought against Boston by HRD, the Civil Service Commission, police unions, and/or other applicants. An exam format that cannot be administered and/or used for promotions by Boston due to litigation is not consistent with business necessity as required by Title VII, and thus is not a valid alternative to an HRD exam.

Finally, Plaintiffs made other vague comments at trial that certain testing alternatives could have reduced adverse impact while having equal or greater validity. However, as the District Court correctly noted, what Plaintiffs did not show at trial "is that there was a particular alternative selection method available for the years in questions about which it could confidently be said that it would

have reduced adverse impact on minority candidates for promotion to sergeant in the Boston Police Department." Decision at 46-47. Indeed and as the District Court found, Plaintiffs' suggestion that an exam with a very significant oral component would have less adverse impact is belied by the results of the 2002 examination:

> The 2002 test, which weighed an oral assessment center equally with the written test, failed to lessen adverse impact to any substantial degree or to increase other than marginally the number of minority promotions. The plaintiffs have not offered any evidence that would warrant the conclusion that repeating the experiment in 2005 or 2008 would have likely – as opposed to might possible have – reduced adverse impact and increased minority promotions. That is not enough to carry their burden on this issue.

Decision at 47.

Thus it is not surprising that Plaintiffs did not prove at trial that adding an oral component, or any other component(s), would necessarily reduce adverse racial impact. Accordingly, Plaintiffs have not met their burden of proof at this final disparate impact step, and the District Court's finding of this failure is both proper and not clearly erroneous.

**C.    Plaintiffs Did Not Meet Their Burden Of Proof That Boston "Refused To Adopt" Their Alternative To The 2005 And 2008 Promotional Examination.**

Congress explicitly burdened a plaintiff with the final showing that the employer "refuses to adopt such alternative employment practice." 42 U.S.C. § 2000e-2(k)(1)(A)(ii). See Ricci, 557 U.S. at 587. Since Ricci, this Court follows this same standard. See Jones, 752 F.3d at 54; accord Adams v. City of Chicago, 469 F.3d 609, 613 (7th Cir. 2006), cert. denied, 550 U.S. 919 (2007) ("the statutory scheme requires plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it." (citations omitted)).[32]

Plaintiffs did not present any evidence of Boston's refusal in 2005 or 2008 to use a type of exam suggested by them or anyone else. Thus, the District Court's finding that Plaintiffs failed to meet their burden of proof is both proper and not clearly erroneous. Quite simply, there is nothing improper, or clearly erroneous, in the District Court finding that the Plaintiffs did not meet their burdens as to an alternative to the 2005 and 2008 examinations. Decision at 37-47.

---

[32]Even if, *arguendo*, the "refusal" prong of Plaintiffs' burden was simply to show that the alternative selection proposed was both available and known to Boston in 2005 and 2008, Plaintiffs have not met that burden with respect to most of their alternative suggestions.

## CONCLUSION

For all of the above reasons, the Court should affirm the judgment entered for Boston by the District Court.

> Respectfully submitted,
>
> CITY OF BOSTON,
>
> By its attorneys,
>
> /s/ Kay H. Hodge
> Kay H. Hodge (C.A.B. 11284)
> John M. Simon (C.A.B. 86185)
> Geoffrey R. Bok (C.A.B. 29501)
> Stoneman, Chandler & Miller LLP
> 99 High Street
> Boston, MA  02110
> (617) 542-6789
>
> Susan M. Weise (C.A.B. 5682)
> Lisa Skehill Maki (C.A.B. 1140641)
> City of Boston Law Department
> 1 City Hall Plaza, Room 615
> Boston, MA  02201
> (617) 635-4040

Dated:  June 17, 2015

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,369 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface known as 14-point Times New Roman.

/s/Kay H. Hodge
Kay H. Hodge

## CERTIFICATE OF SERVICE

I hereby certify that I filed this Brief through the Court's Electronic Case Filing (ECF) system on June 17, 2015. I hereby certify that the following parties are registered as ECF filers and that they will be served by the ECF system:

/s/Kay H. Hodge
Kay H. Hodge

Harold Lichten
Shannon Liss-Riordan
Benjamin Weber
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116

Stephen S. Churchill
Fair Work. P.C.
192 South Street, Suite 450
Boston, MA 02111

Charles Dunstan Boddy
Raquel D. Ruano
Office of the City Attorney
200 Common Street, Suite 306
Lawrence, MA 01840

Kerry Regan Jenness
City of Methuen
Office of the City Solicitor
41 Pleasant Street, Suite 311
Methuen, MA 01844

Iraida J. Alvarez
Robert Lawrence Quinan, Jr.
Sookyoung Shin
Massachusetts Attorney General's Office
1 Ashburton Place, 20th Floor
Boston, MA 02108

Rachel M. Brown
Shaprio Haber & Urmy LLP
Seaport East
2 Seaport Lane
Boston, MA 02210

Christine Patricia O'Connor
City of Lowell
375 Merrimack Street, 3rd Floor
Lowell, MA 01852

Joshua Ryan Coleman
Tim D. Norris
Collins, Loughran & Peloquin P.C.
320 Norwood Park South
Norwood, MA 02062

Harry P. Carroll
John Thomas Liebel
Edward M. Pikula
Anthony Ivan Wilson
City of Springfield
Law Department
36 Court Street
Springfield, MA  01103

Kevin Sean McDermott
MBTA Law Department
10 Park Plaza, Suite 7760
Boston, MA  02116

James F. Kavanaugh, Jr.
Christopher K. Sweeney
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
10 Post Office Square, 4th Floor
Boston, MA  02109

Sharon M. McGowan
U.S. Department of Justice
Civil Rights Division
P.O. Box 14403
Ben Franklin Station
Washington, DC  20044-4403

Bonnie I. Robin-Vergeer
U.S. Department of Justice
Civil Rights Division
MJB 3718
950 Pennsylvania Ave NW
Washington, DC 20530-0001

Case: 14-1952    Document: 00116851498    Page: 74    Date Filed: 06/17/2015    Entry ID: 5916065

Christopher J. Petrini
Christopher Lee Brown
Peter Louis Mello
Petrini & Associates, P.C.
372 Union Avenue
Framingham, MA  01702

Michael L. Foreman
Penn State University Dickinson School of Law
Civil Rights Appellate Clinic
329 Innovation Park, Suite 118
State College, PA  16803

Mark S. Brodin
Boston College Law School
885 Centre St
Newton, MA  02459

Kevin M. Costello
Gary Klein
Corinne Reed
Klein Kavanagh Costello, LLP
85 Merrimac Street, 4th Floor
Boston, MA  02114

Ray McClain
Lawyers Committee for
    Civil Rights Under Law
1401 New York Ave., N.W., Suite 400
Washington, DC 20005-2124

Case: 14-1952     Document: 00116851498     Page: 76     Date Filed: 06/17/2015     Entry ID: 5916065

# ADDENDUM

Case: 14-1952    Document: 00116851498    Page: 77    Date Filed: 06/17/2015    Entry ID: 5916065

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-11693-GAO

PEDRO LOPEZ, et al.,
Plaintiffs,

v.

CITY OF LAWRENCE, et al.,
Defendants.

FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT
September 5, 2014

O'TOOLE, D.J.

## I.   Introduction

The individual plaintiffs are current or former police officers employed by the cities of

Boston, Lawrence, Lowell, Methuen, Springfield, or Worcester, or by the Massachusetts Bay

Transportation Authority ("MBTA"). Each of the plaintiffs is self-described as either African-

American or Hispanic. Each took at least one civil service examination administered by the

Human Resources Division ("HRD"), an agency of the Commonwealth of Massachusetts,[1] for

promotion to the rank of sergeant within his or her respective police forces during the years

2005, 2006, 2007 or 2008, and, based largely on the resulting test scores, was not promoted or

was promoted after white police officers from the same jurisdiction who took the same exam. By

this lawsuit, the plaintiffs claim that the defendants' reliance on the HRD civil service exam in

selecting candidates to promote resulted in unlawful "disparate impact" discrimination on the

basis of race or ethnicity in violation of Title VII of the Civil Rights Act of 1964 and of Chapter

---

[1]  HRD is an agency within the Executive Office of Administration and Finance.

Case: 14-1952   Document: 00116851498   Page: 78   Date Filed: 06/17/2015   Entry ID: 5916065

151B of the General Laws of Massachusetts.[2] They seek injunctive and declaratory relief, as well as appropriate compensatory damages.

## II.   Proceedings

By a prior order , this Court bifurcated this action into two stages, the first to address the defendants' respective liability claims and a second, if necessary, to determine appropriate remedies. The plaintiffs' motion for class certification was denied as to the liability stage and denied without prejudice as to the potential remedial stage.

As originally brought, this action included claims against the Commonwealth of Massachusetts and HRD, which is charged under state law with the responsibility to prepare and administer written examinations for hiring and promotion to public employer positions subject to the State's civil service law. This Court had earlier denied the state defendants' motion to dismiss the claims against them, but that ruling was reversed on appeal. See Lopez v. Massachusetts, 588 F.3d 69, 90 (1st Cir. 2009). Consistent with the direction of the Court of Appeals, the state defendants were dismissed from the suit.

The liability phase of the case was tried against the municipal and MBTA defendants in a lengthy bench trial.[3] This memorandum and order resolves the factual and legal issues presented at trial.

---

[2] The parties agree that the legal analysis of a disparate impact claim of employment discrimination under Mass. Gen. Laws ch. 151B, § 4 is the same as analysis of such a claim under Title VII. See White v. Univ. of Massachusetts, 574 N.E.2d 356, 358 (Mass. 1991) ("The analysis of a discrimination claim is essentially the same under the State and Federal statutes."); see also Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 529 n.10 (Mass. 2005) (referring to federal standards for disparate impact claims under Massachusetts law). Accordingly, the discussion herein will focus on the well-developed principles of federal law, applicable to both the federal and state claims.

Case: 14-1952   Document: 00116851498   Page: 79   Date Filed: 06/17/2015   Entry ID: 5916065

### III.   Legal Context

Before addressing and resolving disputed factual issues on the basis of the trial evidence, it will be useful to summarize pertinent principles of law.

#### A.   Disparate Impact Discrimination Generally

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, prohibits any employment practice that has "a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Unlike claims of disparate treatment, disparate impact claims do not require proof of an intent to discriminate. Ricci v. DeStefano, 557 U.S. 557, 577 (2009); Bradley v. City of Lynn, 443 F. Supp. 2d 145, 155 (D. Mass. 2006); see also, Sch. Comm. of Braintree v. Massachusetts Comm'n Against Discrimination, 386 N.E.2d 1251, 1254 (Mass. 1979) (addressing claims under Mass. Gen. Laws ch. 151B). The purpose of a disparate impact claim is to "'root[] out 'employment policies that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Bradley, 443 F. Supp. 2d at 155 (quoting EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 600-01 (1st Cir. 1995)).

There are potentially three steps involved in the proof of a disparate impact employment discrimination claim. First, a plaintiff has the initial burden of proving that a challenged employment practice has a disparate adverse impact on employees of a particular racial, ethnic or other protected group. Bradley, 443 F. Supp. 2d at 156 (citing 42 U.S.C. § 2000e-2(k)(1)(A)). Second, after a plaintiff has demonstrated such a disparate impact, the burden shifts to the employer to prove that the challenged practice is nonetheless "job-related and consistent with

---

[3] In addition to the municipal defendants and the MBTA itself, the plaintiffs have sued various officials of those entities. There is no need separately to address the individual defendants; their fates fall or rise with those of their respective entities.

Case: 14-1952   Document: 00116851498   Page: 80   Date Filed: 06/17/2015   Entry ID: 5916065

business necessity." Id. at 157 (quoting Steamship Clerks, 48 F.3d at 601-02); see also 42 U.S.C. § 2000e-2(k)(1)(A)(i) (requiring employer "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"); id. § 2000e(m) ("The term 'demonstrates' means meets the burdens of production and persuasion."). If that is shown, then the claim may be defeated. However, in a third step, if the employer has shown that a practice or policy is job-related and consistent with business necessity, a plaintiff can still prevail by demonstrating that there is "another selection device without a similar discriminatory effect that would also serve the employer's legitimate interest." Bradley, 443 F. Supp. 2d at 157. To reiterate, a claim of disparate impact discrimination does not require proof of an intent to discriminate. In fact, such a claim may be established even when the employer acts in good faith to avoid discrimination.

There is no "single test" to establish disparate impact. Langlois v. Abington Hous. Auth., 207 F.3d 43, 50 (1st Cir. 2000) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995-96 n.3 (1988) (plurality opinion)). Instead, "courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis." Watson, 487 U.S. at 995 n.3.

One frequently used benchmark for identifying and measuring disparate impact is what is commonly referred to as the "four-fifths rule," articulated in the Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines") adopted by the Equal Employment Opportunity Commission ("EEOC"). 29 C.F.R. § 1607.4(D)[4] The four-fifths rule is not really a rule but a "rule of thumb," a rough guide suggested by the EEOC for assessing the

---

[4] EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 257 (1991) (Because "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations," the agency's guidelines receive weight only to the extent of their "power to persuade." (internal citations and quotations omitted)).

4

existence of disparate impact to be addressed by enforcement actions. See <u>Watson</u>, 487 U.S. at

995 n.3. According to the EEOC's Uniform Guidelines,

> A selection rate for any race, sex, or ethnic group which is less than four-fifths ($^4/_5$) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D).

> The utility of the four-fifths rule may vary in different factual circumstances:

> Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant.

<u>Id.</u> Additionally,

> Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact.

<u>Id.</u>

The four-fifths rule was used by the parties and their experts. However, since the trial the

First Circuit has counseled against too much reliance on the four-fifths rule. <u>Jones v. City of</u>

<u>Boston</u>, 752 F.3d 38, 51 (1st Cir. 2014). For one thing, it may "lead to anomalous results." <u>Id.</u> It

is not a precise measurement tool (it was not meant to be), and its principal utility in litigation

may be to assist plaintiffs in making a sufficient prima facie demonstration of disparate impact.

See <u>Langlois</u>, 207 F.3d at 50.

Case: 14-1952   Document: 00116851498   Page: 82   Date Filed: 06/17/2015   Entry ID: 5916065

Disparate impact is itself a statistical construct; it is an inference of discriminatory practice from statistical evidence. See Ricci, 557 U.S. at 587 (describing a prima facie showing of disparate impact as "essentially a threshold showing of a significant statistical disparity . . . and nothing more"); Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 658 (1st Cir. 1985) (a prima facie showing of disparate impact exists where "statistical tests sufficiently diminish chance as a likely explanation"). In Jones, the First Circuit recently emphasized the importance of preferring the analytic rigor of statistical analysis to the imprecise rule of thumb that the four-fifths rule supplies. 752 F.3d at 43, 52.

> Statisticians, by contrast, customarily approach data such as this more precisely. They ask whether the outcomes of an employment practice are correlated with a specific characteristic, such as race, and, if so, whether the correlation can reasonably be attributed to random chance. . . .
>
> To assess the likelihood that an observed difference in outcomes resulted from mere chance, statisticians calculate the probability of observing a difference equal to or greater than that which actually occurred, assuming equal opportunity. They call this probability the "p-value." Statisticians usually apply the label "statistically significant" to the observed differential outcomes if the p-value is less than five percent . . . .
>
> Essentially, a finding of statistical significance means that the data casts serious doubt on the assumption that the disparity was caused by chance.

Id. at 43 (internal citations omitted). The difficulty that plaintiffs often face in seeking to establish statistical significance is that large sample sizes are often required to show that the disparity is statistically significant. Id. at 53. As discussed further below, the plaintiffs here have that problem with every defendant employer except Boston.

The Uniform Guidelines also address when an employer's selection method is "job-related," such that its use might be justified notwithstanding some adverse impact on a particular group. Industrial psychologists generally describe a selection method that measures a candidate's knowledge, skills, and abilities (often expressed as KSAs) against the actual needs of the job as

being a "valid" selection tool. For an employer who seeks to justify a particular selection tool as "job-related," it is important to establish the tool's "validity" in this sense. Validity refers to the accuracy of inferences that an employer seeks to make about a candidate's suitability for the job on the basis of outcome, such as a test score, from a selection instrument. For example, an employer may administer an exam and hire individuals with the highest exam scores, the inference relied on being that the candidates with higher scores are more qualified than those with lower scores.

The Uniform Guidelines address the validity of selection instruments. See 29 C.F.R. § 1607.5. Industrial psychologists and the Guidelines recognize alternate possible measures of validity: criterion validity, content validity, and construct validity. Id. § 1607.5(A). The defendants in this case rely on content validity to justify use of the written civil service exams as a tool for selecting candidates for promotion from patrol officer to sergeant.

> Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated.

Id. § 1607.5(B); see also id. § 1607.14(C). The other measures – criterion and construct validity – are not in issue.

The first step for content validation is the performance of a job analysis. Id. § 1607.14(C)(2). The next step is to ensure that there is a link between the selection procedure and the critical KSAs necessary for successful performance of the job as identified by the job analysis. Id. § 1607.14(C)(4). In addition, where a selection procedure relies on prior training or experience as a selection criterion, that criterion should be justified based on the relationship between the specific training, experience, and the job's requirements. Id. § 1607.14(C)(6). The use of a ranking device requires a separate demonstration that there is a relationship between

higher scores and better job performance. Id. § 1607.14(C)(9). A selection tool that validly assesses whether the candidate has KSAs necessary and appropriate to the job can be deemed job-related and consistent with business necessity for Title VII purposes.

As noted above, even if a selection tool is shown to be job-related and consistent with business necessity, it still may be condemned as discriminatory under the disparate impact theory if the plaintiff can show that there are other valid selection tools that generate less adverse impact on minority candidates. The inquiry then turns to specific alternate selection tools available to be used and the likelihood of reducing adverse impact by their use in place of the employer's chosen tool.

> B.    The Civil Service Regime and Written Job Knowledge Tests

The Court of Appeals summarized the Massachusetts civil service regime as it applies to Massachusetts police departments:

> Under Massachusetts law, plaintiffs' positions as city and MBTA police officers are subject to the state civil service law. See Mass. Gen. Laws ch. 31, § 48 (applying the civil service law to positions in the MBTA); id. § 51 (applying the civil service law to civil service offices in cities).

> The state civil service law states that the purpose of its requirements is to ensure that employees in civil service positions are recruited, chosen, and promoted based on principles of merit, not on political affiliation, race, age, gender, religion, national origin, or other factors unrelated to individual ability. Id. § 1. "[T]he fundamental purposes of the civil service system [are] to guard against political considerations, favoritism, and bias in governmental employment decisions . . . and to protect efficient public employees from political control." Cambridge v. Civil Serv. Comm'n, 43 Mass. App. Ct. 300, 682 N.E.2d 923 (1997).

Lopez, 588 F.3d at 74.

> By law, municipal police promotions must be made on the basis of competitive examinations, whether on the basis of the HRD examination or some other test. Mass. Gen. Laws ch. 31, §§ 59, 65. HRD is given statutory authority to establish the form and content of these examinations. Id. § 16. However, HRD's discretion in this area is bounded. By statute, all examinations must "fairly test the

Case: 14-1952    Document: 00116851498    Page: 85    Date Filed: 06/17/2015    Entry ID: 5916065

knowledge, skills and abilities which can be practically and reliably measured and which are actually required" to perform the job, a requirement that may significantly limit both the form and the substance of an examination. Id. And HRD must consult with labor representatives and professionals in the field to determine what skills and abilities are relevant for promotion to police sergeant or any other position. Id.

Id. at 77.

Massachusetts police and fire departments subject to civil service laws have two general options for promotional examinations. They may use statewide examinations developed by HRD, or they may seek approval from HRD to develop and use their own promotional exams. See Mass. Gen. Laws ch. 31 § 5(l) (giving HRD power to delegate administrative functions to cities and towns). For the years at issue, all defendants elected the first option, relying on HRD to design and administer the exams. Municipalities do not participate in the design or administration of the statewide exam in the absence of a delegation.

For each of the years in question, the HRD promotional exam for sergeants consisted of two elements: a written, closed-book exam consisting of 80 multiple-choice questions, and an "education and experience" ("E&E") rating. The E&E rating principally took account of relevant prior employment and academic coursework that a candidate had either taken or taught. The written exam accounted for 80% of the final score; the E&E component was assigned a 20% weight. Based on a 100-point scale, a candidate needed a score of 70 or above to pass the exam. In addition to the scoring of the exam, under Massachusetts law certain military veterans and long-service employees receive preference in the form of additional points that are added to their final exam score. Mass. Gen. Laws ch. 31, §§ 26 (veterans), 59 (long-service employees).

Participants in the test process are ranked by their combined score. HRD then prepares and certifies an "eligibility list" for each appointing jurisdiction, identifying those test-takers who may be considered for appointment to existing vacancies. Id. § 25. The number of names on

the eligibility list is determined by the formula 2n+1, where n is the number of vacant positions. Id. § 27. Thus, if a municipality had one job vacancy to which the list was applicable, the list would contain the candidates with the three highest scores (2x1+1=3). If there were three vacancies, the eligibility list would have the candidates with the top seven scores (2x3+1=7). In this case, it was the general practice of all employers except the MBTA to make selections in strict rank order according to the HRD eligibility list. The MBTA treated all candidates on the list as having scored equally and proceeded to make selections from that group principally on the basis of oral interviews of those candidates.

It should be noted that for statewide exams, HRD establishes an eligibility list for any municipality that requests one. Id. § 25. The list that is furnished to the municipality by HRD shows only those certified by HRD as eligible for appointment. The municipality does not receive information from HRD concerning other test-takers whose scores did not make them eligible for consideration under the 2n+1 rule. In other words, a municipality would not typically know which candidates did not score well enough to make the eligibility list, nor would the municipality know the race or ethnicity of test-takers who did not make the eligibility list. Consequently, the eligibility list alone would not ordinarily be a basis on which a municipality could determine whether there had been an adverse impact on minority test-takers or not.

Candidates may administratively appeal various issues pertaining to an examination, including "whether an examination . . . was a fair test of the applicant's fitness actually to perform the primary or dominant duties of the position for which the examination was held. . . ." Id. § 22. After administrative disposition of an appeal, further judicial review may be available. Id. § 44. Duties of the Massachusetts Civil Service Commission include adjudicating disputes concerning the content and administration of promotional examinations, any HRD decision or

10

Case: 14-1952   Document: 00116851498   Page: 87   Date Filed: 06/17/2015   Entry ID: 5916065

action that affects an applicant, and any employment action taken by an appointing authority. Id. § 2(b)-(c). The Commission also "has the power to review any rules proposed by HRD, and, if the Commission concludes that a given rule violates a merit-based approach to employment decisions, it can, upon, a three-fifths vote, disapprove of the rule." Lopez, 588 F.3d at 75.

Under some circumstances, a municipal employer may skip over, or "bypass," a candidate on the list who would, by reason of his or her exam score, otherwise be selected for the vacancy. Id. § 27. But the employer must have a defensible reason for the bypass. Id. "If an appointing authority makes [a]...promotional appointment from a certification of any qualified person other than the qualified person whose names appear highest, and the person whose name is highest is willing to accept such appointment, the appointing authority shall immediately file with the [personnel] administrator a written statement of his reasons for appointing the person whose name was not highest." Id.; see also PAR 08(4), (5); PAR 09 (2).[5] An applicant who has been thus bypassed, i.e., not selected despite having a higher score than the selected applicant, can appeal to the Civil Service Commission, which must decide "whether the appointing authority has sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority." City of Cambridge v. Civil Service Comm'n, 682 N.E.2d 923, 925 (Mass. App. Ct. 1997). A justifiable reason for a bypass might be, for example, a candidate's history of disciplinary infractions. Id. at 927 ("Prior misconduct has frequently been a ground for not hiring or retaining a police officer."). The candidate's race or ethnicity would

---

[5] PAR references are to HRD's Personnel Administration Rules. They "establish standards for the conduct of the civil service merit system of employment. In addition, these rules include standards governing state employment apart from civil service where rule making is required of the administrator by statute. They are intended to provide a system of uniform standards implementing applicable law for use by appointing authorities in the employment processes of recruitment and examination of applicants for public service positions, selection among applicants for appointment and promotion, performance evaluation and layoff." PAR 01.

ordinarily not be a justifiable reason for a bypass. <u>Massachusetts Ass'n of Minority Law</u> <u>Enforcement Officers v. Abban</u>, 748 N.E.2d 455, 461-62 (Mass. 2001) ("The commission, and the Superior Court judge on review, correctly concluded that without the consent decree's mandate, race, a consideration specifically identified by the Legislature in G.L. c. 31, § 1(e), as inconsistent with basic merit principles, cannot be used to justify a bypass.").

As noted above, municipalities may elect to design and conduct their own promotional examination pursuant to a delegation agreement between HRD and the municipality. <u>See</u> Mass. Gen. Laws ch. 31, §§ 9-11. However, even with respect to municipalities that have entered into a delegation agreement, HRD retains the right to approve the actions of the appointing authority. The appointment process after a local delegation is subject to the same rules regarding bypass and appeal or other challenge. It would also be subject to potential limitations imposed under collective bargaining agreements.

## IV.   Police Promotional Exams Litigation

The lower rates at which minority police officers in Massachusetts municipalities have been hired and promoted compared to non-minority officers has been a subject of considerable litigation over the past several decades. In 1970, black and Hispanic plaintiffs brought suit in this Court challenging hiring practices of the Boston Police Department ("BPD" or "Department"), including specifically the use of written examinations, as racially discriminatory and a denial of equal protection of the laws. After some litigation, the Court entered a consent decree requiring, among other things, that written examinations prepared and administered by the state Department of Personnel Administration ("DPA"), the predecessor to what is now HRD, be "validated in conformity with the Testing Guidelines of the Equal Employment Opportunity Commission, 29 C.F.R. §1607.1 et seq." <u>Castro v. Beecher</u>, 365 F. Supp. 655, 662 (D. Mass.

Case: 14-1952   Document: 00116851498   Page: 88   Date Filed: 06/17/2015   Entry ID: 5916065

1973); see also Castro v. Beecher, 334 F. Supp. 930 (D. Mass. 1971), aff'd in part and rev'd in part, 459 F.2d 725 (1st Cir. 1972). Because the decree was addressed to DPA, it effectively applied to any municipality that used the statewide exam in hiring new police officers. The history of the Castro consent decree is summarized in Sullivan v. City of Springfield, 555 F. Supp. 2d 246, 248-50 (D. Mass. 2008).

In 1978, an association of black police officers filed suit against BPD and DPA alleging racially discriminatory practices affecting promotions from the rank of police officer to sergeant. See Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dept., 973 F.2d 18, 19 (1st Cir. 1992) (reciting history). In 1980 this Court again entered a consent decree, pursuant to which the defendants were limited to using promotional tests that were "specially validated as anti-discriminatory and fair." Stuart v. Roache, 951 F.2d 446, 448 (1st Cir. 1991). The consent decree was to expire in 1985, but because no validated promotional exams had been given by that time, the decree was extended for another five years to 1990.

Between 1985 and 1990, BPD administered a "validated-fair" exam, but promotions still fell short of the target goals set forth in the consent decree, and so the Court extended the decree again to permit an additional "validated-fair" exam to be given in an attempt to achieve the target goals. Id. An equal protection challenge by white police officers claiming to be disadvantaged by the continuing consent decree was rejected. See id. at 455 ("[T]he race-conscious relief here at issue represents a narrowly tailored effort, limited in time, to overcome the effects of past discrimination. As such, it is lawful. . . . And, the efforts in favor of eligible black police officers that it mandates therefore do not violate any statute of the Constitution of the United States."). The consent decree finally expired by its terms in 1995.

13

Case: 14-1952    Document: 00116851498    Page: 90    Date Filed: 06/17/2015    Entry ID: 5916065

HRD administered another promotional exam for sergeants in 1996. In an effort to achieve more minority promotions, BPD bypassed some white officers on the certified list in order to promote three black officers who had scored one point lower on the exam. The white officers who were bypassed brought suit, claiming a violation of their equal protection rights. This Court rejected their claims, and the Court of Appeals affirmed, concluding that the promotions of three black officers constituted a narrowly tailored effort to overcome the continuing effects of past discrimination in hiring and was therefore not unlawful. Cotter v. City of Boston, 323 F.3d 160, 169-72 (1st Cir. 2003). A similar ruling also entered in a case involving a bypass promotion of a minority candidate to the rank of lieutenant based on a 1992 exam. See Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 19-25 (1st Cir. 1998).

Similar cases involving other police departments include Sullivan v. City of Springfield, 561 F.3d 7 (1st Cir. 2009) (City of Springfield) and Brackett v. Civil Serv. Comm'n, 850 N.E.2d 533 (Mass. 2006) (MBTA).

## V.   Disparate Impact of the Challenged HRD Exams for Sergeants

It is widely recognized among industrial organizational psychologists, including the four experts who testified at trial, that minority candidates as a group tend to perform less well relative to non-minority candidates as a group on written multiple-choice examinations such as the HRD-prepared sergeants promotional exams given in 2005, 2006, 2007, and 2008. Put in the language of disparate impact litigation, such exams are said to have an adverse impact on minority candidate pools, compared to non-minority pools. Commonly, adverse impact is assessed as the ratio of success rates of minority test-takers to the success rates of non-minority test-takers. Thus, as noted above, the EEOC has devised its "four-fifths" rule of thumb: "A selection rate for any race . . . which is less than four-fifths (4/5) (or eighty percent) of the rate

Case: 14-1952    Document: 00116851498    Page: 91    Date Filed: 06/17/2015    Entry ID: 5916065

for the group with the highest rate will generally be regarded…as evidence of disparate impact." 29 C.F.R. § 1607.4(D).[6]

For purposes of assessing adverse impact, comparisons of success for different candidate pools can be done at various points. For example, adverse impact can be assessed at selection rates: what proportion of minority candidates are selected for hiring or promotion compared to the proportion of non-minorities selected. For example, suppose 10 minority candidates and 20 non-minority candidates compete for 5 available promotions, and 1 minority and 4 non-minority candidates are ultimately selected for promotion. The selection rate for the minority pool (1 of 10 or 10%) is compared with the selection rate for the non-minority pool (4 of 20 or 20%), producing an adverse impact ratio of .10/.20 or 50%. Comparisons can be done as appropriate at other potentially significant points, such as the passing score on the test, the effective passing score (at which one is eligible as a practical matter for hire or promotion), or mean group scores (how well groups as a whole perform, comparatively).

Reliance on statistical analysis to assess whether unlawful employment discrimination has occurred must be done cautiously, consistent with the limitations of the method, and there are circumstances where statistical methods are, by reason of their inherent limitations, unreliable tools for the purpose. One problem is the case of small statistical samples. With respect to small data sets, adverse impact ratios, standing alone, can be misleading. See Jones, 752 F.3d at 53; Fudge, 766 F.2d at 657-59.

For example, when a data set is small the shift of a single person from non-selection to selection for a job can alter an apparent conclusion regarding the presence of adverse impact. To illustrate, suppose of the thirty candidates in the example above one additional minority

---

[6] The reverse is not true. A selection tool that satisfies the four-fifths test is not necessarily non-discriminatory. Jones, 752 F.3d at 52.

candidate was promoted, so that two minority candidates and three non-minority candidates were promoted. The adverse impact ratio would shift from 0.50 to 1.33 (20% minority success rate / 15% non-minority success rate). The EEOC's guidance recognizes the problem of the "shift of one":

> If the numbers of persons and the difference in selection rates are so small that it is likely that the difference could have occurred by chance, the federal agencies will not assume the existence of adverse impact, in the absence of other information . . . Generally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group.

See Questions and Answers on the Federal Executive Agency Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11, 996 (1979).

Importantly, proposed conclusions from small data sets can lack statistical significance. Assigning statistical significance is an attempt to ascertain whether apparent differences are the product of chance or of some other factor, such as a discriminatory selection method. In general, statisticians regard a selection result as statistically significant when the probability that the result is due to chance is less than 5%. Jones, 752 F.3d at 46-47, 47 n.9 (collecting cases where 5% is identified as statistically significant). It is common for small data sets to fail to produce results that are statistically significant.

Small data sets can also be statistically unstable. As defense expert Dr. Jacinto Silva explained, even where it is assumed that there are no performance differences between different groups, statistical analysis may yet indicate that there are by showing "false positive" adverse impact. (See Trial Ex. 197.) In other words, even on the assumption that there was no actual difference in the mean test scores between two groups, it can be a not uncommon consequence of the smallness of the sample sizes that adverse impact will appear. Consider an illustration from

Case: 14-1952   Document: 00116851498   Page: 93   Date Filed: 06/17/2015   Entry ID: 5916065

Exhibit 197 using a municipality not a party to this suit. One minority officer and 18 non-minority officers of the Peabody Police Department took the 2006 sergeants exam. There were two promotions, both non-minority. On the assumption that there was no difference in performance on the test between the two groups, there was, according to Dr. Silva's analysis, an 89% chance that the data, conventionally assessed, would nonetheless suggest the presence of adverse impact. Suppose, for example, that among the 19 test-takers, the one minority candidate had the tenth highest score – that is, right in the middle of all the scores. Assuming for illustrative purposes a more or less even distribution of scores, the mean score averages for the one minority and 18 non-minorities would be exactly or very close to the same. Nonetheless, there would be a strong indication of adverse selection impact. That indication would be a product of the small numbers, however, and thus unreliable as a measure of actual adverse impact.

As Dr. Silva noted, while the EEOC has not directly addressed what might constitute a problematically small sample, it has used an example in which it characterized a sample of 100 as small. According to Dr. Silva, researchers have found that adverse impact ratios can be an unstable test with samples as large as 200 to 400 individuals. By these or any other similar standards, the sample sizes for each of the municipal defendants except Boston, including the MBTA, for the test years in question would qualify as "small," and would be subject to the cautions and limitations applicable to the statistical analysis of small populations.

In an attempt to overcome this problem of proof with respect to the smaller departments, the plaintiffs propose that test data for each relevant year should be aggregated for all municipalities across the Commonwealth that participated in the promotional exams for that year. So, for example, the plaintiffs argue that to assess whether the City of Methuen's use of the

HRD-sponsored test in 2006 had an adverse impact on minority candidates for promotion to sergeant in the Methuen Police Department that year, the Court should assess whether the HRD-sponsored test had an aggregate adverse impact statewide on promotions to sergeant, across all employing municipalities.

Aggregation of data across employing municipalities may be appropriate in some cases, but it is not appropriate in this case. Under Massachusetts law, a municipality may promote to sergeant only officers already employed in its own police department. Mass. Gen. Laws ch. 31, § 59. It may not select its sergeants from the ranks of police officers employed by other municipalities. As a result, a municipality's promotions should be assessed with respect to the pool of candidates actually available for appointment to the rank of sergeant. That pool consists of the candidates in its own department only. What adverse impact, if any, the test might have with respect to another municipality's candidate pool is simply not relevant.

Implicit in the plaintiff's aggregation argument is the assumption that there will be no difference by municipality in the composition of their respective pools of minority sergeant candidates, particularly with respect to vulnerability to adverse impact from the test. There is no reason to suppose, and no evidence on the point was produced at trial, that the assumption will necessarily prove to be true. There are a number of reasons why there may be substantial differences in the candidate pools in different municipalities. Since each pool of promotional candidates is comprised of persons hired by each municipality, variations in original selection procedures and subsequent in-service training, for example, could result in substantial variance in performance on the statewide exam between municipalities. Candidates in a department with strong training programs could be expected to be better prepared than candidates in a department with lax training programs.

Like small numbers, aggregation of pools of different sizes can produce anomalies, including one that statisticians refer to as Simpson's Paradox. Dr. Silva addressed this problem in Trial Exhibit 198. That exhibit presented a table showing the promotions made by two different hypothetical jurisdictions from their respective candidate pools. The pools were of different sizes. For each jurisdiction, the selection rate for minority and non-minority candidates was assumed to be identical. In other words, the assumption was that there was no adverse impact within either jurisdiction. When the data were aggregated, however, a false positive adverse impact was indicated, the result of combining different sample sizes and different selection rates. See Federal Judicial Center, Reference Manual on Scientific Evidence 233-35 (3d ed. 2011).

The plaintiffs also propose aggregating data for particular jurisdictions across exam years. For example, the City of Lawrence used the exam in 2006 and 2008. To ameliorate the problems arising from small sample size in each of the years, the plaintiffs propose assessing the combined results of those two test cycles. While that suggestion might have some superficial appeal, it has not been shown to be a reliable analysis technique. Forty-six Lawrence officers took the promotional exam in 2006, 10 minorities and 36 non-minorities. Forty-two took the exam in 2008, 15 minorities and 27 non-minorities. The numbers cannot simply be added together to conclude that there were 88 separate test-takers of whom 25 were minority and 63 were non-minority. Rather, it is very likely that there would be overlap in the various pools, since it is not uncommon for officers to take tests more than once. What the effect would be of the same test-takers in both years would necessarily be a matter for speculation. One test taker might be simply not qualified for promotion; his presence in the pool in both years might exaggerate the likelihood of failure for an aggregated pool. Another test taker might have benefitted from a lack of success the first time and with familiarity with the process and perhaps

heightened preparation and thus succeeded in the second process. There is simply no way to adjust for the possible variations that could distort interpretation of the aggregated data.

The plaintiffs' expert, Dr. Joel Wiesen, relied on aggregated data, both over time and across jurisdictions, for most of his essential conclusions about the adverse impact of the HRD-sponsored exams. Because I reject the use of aggregated data, I find his conclusions unpersuasive.

With this background, on the basis of the evidence adduced at trial, I make the following findings regarding the existence of adverse impact in promotions to sergeant by the various defendants:

The use of the HRD-sponsored sergeant's promotional exam by the City of Boston in 2005 and 2008 in each year had a significant adverse impact on black and Hispanic test-takers. Boston does not contest, indeed concedes, this finding. It rests its defense in the case on its contention that the exam was nonetheless job-related and consistent with business necessity and that the plaintiffs are unable to demonstrate an adequate alternative that could be used with less adverse impact. Those matters are addressed further below.

On the other hand, as to each of the other municipal defendants and the MBTA, the statistical evidence relied on by the plaintiffs is not sufficient by itself – and it stands essentially by itself – to persuasively establish that the use of the HRD-sponsored exam by those employers was the cause of an adverse impact on minority promotion rates in those various jurisdictions. The principal problem is the small sizes of the relevant data sets, for the reasons discussed above.

Case: 14-1952     Document: 00116851498     Page: 97     Date Filed: 06/17/2015     Entry ID: 5916065

The plaintiffs had relied in their claims of adverse impact on the proposition that statistical data should be aggregated across jurisdictions. I have rejected that approach, as discussed above. Without aggregation, the plaintiffs' statistical case against the jurisdictions other than Boston falls apart.

A.    Worcester

Plaintiff Spencer Tatum, an African-American, participated in HRD-sponsored sergeants examinations for the Worcester Police Department in 2006 and 2008. The following table reflects the results of these exams.[7]

| Worcester | | |
|---|---|---|
| Year | 2006 | 2008[8] |
| Minority Test-Takers | 10[9] | 8 |
| Minority Appointments | 1 | 0 |
| Minority Appointment Rate | 9% | 0% |
| Non-Minority Test-Takers | 51 | 47 |
| Non-Minority Appointments | 6 | 1 |
| Non-Minority Appointment Rate | 12% | 2% |
| Adverse Impact Ratio | 0.90 | 0 |

For 2006, the ratio of minority appointments to non-minority appointments is .90, suggesting under the four-fifths rule (though not proving) the absence of adverse impact. As of the time of trial, only one appointment had been made from the 2008 exam, and an adverse impact ratio is not calculable.

In any event, in light of the small numbers involved, the difference in appointment rates between minorities and non-minorities in Worcester for both the 2006 exam and the 2008 exam

---

[7] The data in this and the following sections are generally derived from Trial Exhibit 197.

[8] The data for 2008 are from Trial Exhibit 175.

[9] In Exhibit 197, Dr. Silva had reported that in 2006 there were 11 minority test-takers and 50 non-minority test-takers. At trial, Dr. Silva corrected the data to 10 minorities and 51 non-minorities. The error was apparently due to an incorrect self-report by one of the test-takers. (Trial Tr., day 17, at 20.)

Case: 14-1952   Document: 00116851498   Page: 98   Date Filed: 06/17/2015   Entry ID: 5916065

are not statistically significant. According to Dr. Silva, the Fisher's Exact p-value for the 2006 exam is rounded to 1.0, suggesting that the difference in appointment rate may well be the result of random chance.

    B.    Springfield

Plaintiffs James A. Jackson, Juan Rosario, Louis Rosario, Jr., Obed Almeyda, Devon Williams, and Julio M. Toledo participated in HRD-sponsored sergeants exams in 2005 and 2007 for the Springfield Police Department.[10]

The 2005 and 2007 exams resulted in the following data for Springfield:

| Springfield | | |
|---|---|---|
| Year | 2005 | 2007 |
| Minority Test-Takers | 18 | 16 |
| Minority Appointments | 0 | 2 |
| Minority Appointment Rate | 0% | 12.5% |
| Non-Minority Test-Takers | 28 | 20 |
| Non-Minority Appointments | 6 | 6 |
| Non-Minority Appointment Rate | 21% | 30% |
| Adverse Impact Ratio | 0 | 0.42 |

While both the 2005 and 2007 exams indicated adverse impact as to the appointment rate under the four-fifths rule, the results were not statistically significant. The p-value for the 2005 exam was .07 and for 2007 the p-value was .26. A p-value of .05 is commonly used by social scientists as necessary to reject the "null hypothesis." Since the statistics for both years do not meet that standard, the null hypothesis – here, that there is no adverse impact – cannot be rejected on statistical calculation alone. Additionally, as Exhibit 197 indicates, for both years

---

[10] It appears that the Springfield plaintiffs did not timely file a necessary pre-suit claim with the Massachusetts Commission Against Discrimination with respect to the eligibility list from the 2005 exam, and therefore have no viable claims regarding that exam.

Case: 14-1952   Document: 00116851498   Page: 99   Date Filed: 06/17/2015   Entry ID: 5916065

there was a substantial possibility of a false positive adverse impact finding. As Dr. Silva explained, the high false positive estimate results from

> a combination . . . of the small sample size, the small number of minorities, the selection ratio. Those three things contribute to the false positive rate. . . . With a small sample size, the data is always unstable.

(Tr. 17: 44-45.)

In sum, the statistical evidence is unconvincing as to the existence of adverse impact.

It may also be significant that in the relevant years promotions to sergeant were made using the eligibility list generated from the exams, supplemented by an interview process and a review of the candidates' department work history. The evidence does not show whether or how the interviews and/or work history of applicants may have affected appointments.

C.    Lowell

Plaintiff Robert Alvarez participated in the HRD-sponsored sergeants exam in 2006 for the Lowell Police Department.

The Lowell 2006 sergeants exam resulted in the following appointment data.

| Lowell | |
|---|---|
| Year | 2006 |
| Minority Test-Takers | 7 |
| Minority Appointments | 0 |
| Minority Appointment Rate | 0% |
| Non-Minority Test-Takers | 36 |
| Non-Minority Appointments | 7 |
| Non-Minority Appointment Rate | 19% |
| Adverse Impact Ratio | 0 |

Again, because of the small numbers, the statistical evidence is not reliable to show that the use of the HRD-sponsored exam caused an adverse impact. The insufficiency of the data to support any reliable statistical conclusions is demonstrated by a shift-of-one analysis. If one minority test taker (instead of none) and 6 non-minority test-takers (instead of 7) were appointed,

23

then the adverse impact ration would be .86, suggesting no adverse impact under the four-fifths rule. Moreover, the p-value for the plaintiff's proffered adverse impact ratio (per Dr. Wiesen) in the selection rate for promotions 2006 exam is .58, indicating a lack of statistical significance.

### Status of Alvarez as an Aggrieved Plaintiff

Lowell also challenged Alvarez's standing to claim discrimination on the ground that he has not shown himself to be "Hispanic" and thus a "minority" entitled to complain about the sergeants exam's discriminatory impact on such minority officers. Although his claim would fail for the reasons just discussed, because the parties thoroughly addressed his status at trial, it is appropriate to resolve this issue.

The evidence indicated that Alvarez was born in Boston and was raised by a foster family in Boston-area suburbs, including Somerville and Billerica. (Tr. 9: 118-19, 146; Trial Ex. 136.) On his birth certificate, his birth mother and father are described as white. (Tr. 9: 126-27; Trial Ex. 136.) His birth certificate also indicates that his father, whom Alvarez apparently never met and with whom he has never spoken, was born in Manila, Philippines. (Tr. 9: 115-16; Trial Ex. 136.)

Alvarez does not speak Spanish. (Tr. 9: 113.) He was not raised in a home where Spanish was the primary language. (Id.) At times he has identified himself as white, even when Hispanic was an identified option (Tr. 9: 123-27; Trial Exs. 138, 139) and at other times he has self-identified as Hispanic. (Tr. 9: 103.)

An unambiguous definition of "Hispanic" for purposes of anti-discrimination laws has long eluded both courts and legislators. For instance, for record-keeping purposes, EEOC has used "Hispanic" in reference to "persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race." See 29 C.F.R. § 1607.4. This,

Case: 14-1952    Document: 00116851498    Page: 101    Date Filed: 06/17/2015    Entry ID: 5916065

by itself, is not helpful in resolving Alvarez's claim to be considered Hispanic on the basis of Filipino ancestry. It is of interest that the EEOC requires that employers report employees with origins from the "original peoples" of the Philippines as "Asian or Pacific Islander." EEOC Instruction Booklet for EEO-1 Report (2006). The trial record includes no evidence whether Alvarez's father had ancestors who were properly considered among the "original peoples" of the Philippines.

Definitions used by HRD provide a bit more guidance. HRD defines "Hispanic" as an "individual who (or whose family) originates from a Spanish-speaking country in the Western Hemisphere and who either speaks Spanish or was raised in a household where Spanish was the primary language." (Aff. of Sally McNeely ¶ 5 (Ex. 205) (dkt. no. 307).)[11] HRD categorizes an individual who (or whose family) originates from the Philippines as Asian, not Hispanic. (Id. ¶ 6.) Under HRD's definition, Alvarez, whose father originated in the Philippines and who does not speak Spanish and was not raised in a household where Spanish was the primary language, would not be classified as Hispanic for Civil Service purposes.

In this case, it seems appropriate to defer to HRD's understanding of the term "Hispanic." Applying that understanding, Alvarez does not qualify, and his claim would fail for this additional reason.

### D.   Lawrence

Plaintiffs Pedro J. Lopez, Richard Brooks, and Kevin Sledge took the sergeants exam in both 2006 and 2008 for the Lawrence Police Department. The results of that exam can be summarized as follows:

---

[11] The definition apparently derives from two federal consent decrees arising out of unrelated litigation involving allegations of discrimination.

Case: 14-1952    Document: 00116851498    Page: 102    Date Filed: 06/17/2015    Entry ID: 5916065

| Lawrence | | |
|---|---|---|
| Year | 2006 | 2008 |
| Minority Test-Takers | 10 | 15 |
| Minority Appointments | 0 | 0 |
| Minority Appointment Rate | 0% | 0% |
| Non-Minority Test-Takers | 36 | 27 |
| Non-Minority Appointments | 3 | 1 |
| Non-Minority Appointment Rate | 8% | 4% |
| Adverse Impact Ratio | 0 | 0 |

Again, the small data sets prevent any reliable conclusion from statistical analysis alone. A shift-of-one analysis illustrates this. If in 2006 there was one minority appointment (as opposed to none) and two non-minority appointments (as opposed to three), the resulting adverse impact ratio (2.0) would satisfy the four-fifths rule of thumb. Additionally, of course, because of the small numbers, any adverse impact ratios for either year would not be statistically significant.

### E.    Methuen

Plaintiff Abel Cano, who is Hispanic, participated in the HRD-sponsored sergeants exam in 2006 and 2008 for the Methuen Police Department. The following data summarize results from those exams.

| Methuen | | |
|---|---|---|
| Year | 2006 | 2008 |
| Minority Test-Takers | 4 | 3 |
| Minority Appointments | 0 | 0 |
| Minority Appointment Rate | 0% | 0% |
| Non-Minority Test-Takers | 19 | 15 |
| Non-Minority Appointments | 1 | 0 |
| Non-Minority Appointment Rate | 5% | 0% |
| Adverse Impact Ratio | 0 | |

There are no statistically reliable indicators that show minority applicants in Methuen were adversely affected by either the 2006 or 2008 sergeants promotional exams. The results of the adverse impact analysis by the plaintiffs' expert of the selection rates in Methuen in both the 2006 and 2008 sergeants promotional examinations were not statistically significant.

F.     MBTA

Plaintiffs Royline Lamb and Lynn Davis, who are both African-American, participated in the HRD-sponsored sergeants exam in 2005 for the MBTA Police Department, and Lamb participated also in the 2007 exam. Davis did not receive a passing score on the 2005 exam. She was informed that she did not pass the exam when the results were published by HRD several months after she took the exam. She did not take the 2007 HRD exam for promotion to sergeant. Lamb did not receive a passing score on either exam. Like Davis, he learned of his failure to pass the 2005 exam several months after its administration.

On September 24, 2008, Davis and Lamb filed charges of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") pursuant to Mass Gen. Laws, ch. 151B, §4. The applicable statute of limitations for filing a charge of discrimination at the MCAD is 300 days from the discriminatory act. Mass. Gen. Laws ch. 151B, §5. Davis did not take the 2007 HRD exam for promotion to sergeant so her claim, relating only to the 2005 exam, was untimely under applicable statute of limitations, and it must be dismissed. Allston v. Massachusetts, 661 F. Supp. 2d 117, 123 (D. Mass. 2009). For similar reasons, Lamb's claim regarding the 2005 exam is likewise time-barred.

Limitations issues aside, the existence of disparate impact has not been proven. Since neither Davis nor Lamb passed the exam, the focus for examining possible adverse impact is on the relative rates at which minorities and non-minorities passed the exam. The adverse impact ratio for passing rates for 2005, as computed by Dr. Wiesen, was .32. For 2007, it was .96. (See Trial Exs. 83, 197.) The p-value for the 2005 test was 0.31, well outside the range of statistical significance. Not surprisingly, for 2007 the p-value was 1.00.

In summary, for all jurisdictions except Boston, the plaintiffs have not carried their burden of proving a prima facie case of disparate impact from any of the challenged exams.

## VI.   Job-Relatedness / Business Necessity

As discussed above, only for Boston have the relevant plaintiffs shown sufficient adverse impact on minority promotions to warrant an inference of disparate impact discrimination. Under governing principles, the next question is whether Boston has demonstrated that the civil service examination nonetheless was job-related and consistent with business necessity, and thus lawful. See 42 U.S.C. § 2000e-2(k)(1)(A)(i). Boston bears the burden of proof as to this issue. Id.

As previously discussed, industrial organizational psychologists refer to a selection instrument that is job-related and consistent with business necessity as one that is "valid" for the selection process. Dr. James Outtz, a prominent industrial psychologist and Boston's expert witness, explained the concept of validity as it is understood in the field of industrial psychology:

> In my field, from a scientific standpoint, validity refers to the accuracy of inferences that you wish to make on the basis of scores from a selection instrument: Are those inferences accurate? For example, if you give an exam and you hire people at the – who score the highest on that exam, the inference is that those people are more qualified than people who scored lower. If you give an exam for people to get admitted into college, and you admit students whose scores are up at the upper distribution, you are making the inference they are more qualified than students who have lower scores. Validity refers to evidence that is garnered to establish the accuracy of those inferences. In a more simplistic way, it's whether a test measures what it's supposed to measure.
>
> That is the essence of validity, to allow one to predict at a level great than – significantly greater than chance as to how well someone will perform.

(Tr. 14: 15-16.)

Massachusetts Civil Service law requires promotional appointments within police departments, including the Boston police department, to be made after competitive examination. Mass. Gen. Laws ch. 31, § 59. Such examinations are ordinarily prepared by HRD. Id. § 16.

Case: 14-1952    Document: 00116851498    Page: 104    Date Filed: 06/17/2015    Entry ID: 5916065

Specifically, the examinations used by Boston in 2005 and 2008 were prepared by HRD. Such examinations must "fairly test the knowledge, skills and abilities which can be practically and reliably measured and which are actually required to perform the primary or dominant duties of the position for which the examination is held." Id. As noted, an examination that does reliably test those KSAs is deemed to be "valid" for the purpose of identifying the candidates best suited for selection.

In order to create a valid examination, it is necessary first to conduct a job analysis to determine what the job actually entails. The job analysis seeks to identify the tasks that make up the job and the KSAs required to perform these tasks. This is typically accomplished by consultation with persons familiar with the position in question, generally referred to as "subject matter experts," or SMEs.

Once the job analysis has been done, it is necessary to develop a test that will measure the necessary KSAs. While a test plan should measure as many of the pertinent KSAs as practical, under the EEOC's Uniform Guidelines on Employee Selection Procedures, see 29 CFR §§1607.14(C)(4) and 1607.15(C)(4) (pertaining to content validity), a testing instrument need only assess a representative sample of the KSAs required for the job. Once a test plan is developed, it is necessary to develop the actually content of the examination and to have it reviewed by SMEs.

The continuing validity over time of a job analysis and any test instrument developed in reliance on it depends on whether and to what degree the demands of the job may change over time. As a rule of thumb, industrial psychologists regard a job analysis performed within five to eight years of an examination to be reliable, but sometimes an older one can still be appropriate if the requirements of the job itself have remained more or less the same. Additionally, an older job analysis might be reevaluated and updated in a later review.

The position of sergeant in the Boston police department is a supervisory one. Sergeants are typically field supervisors for patrol officers. It is essential that sergeants be familiar with constitutional and statutory legal principles pertinent to their jurisdiction, as well as departmental regulations and policies. The Boston Police Commissioner and a former Boston Police lieutenant both testified at trial that it is critical to a police sergeant's ability to effectively perform as a supervisor that he or she know and understand relevant law. When patrol officers need information or clarification, the first thing they do is to call their sergeant. An effective way of testing whether a candidate for sergeant has the necessary knowledge is through a written job knowledge test.

The 2005 and 2008 written exams prepared by HRD relied in substantial part on a content validation study for a promotional exam for sergeant that was conducted in 1991 by DPA, HRD's predecessor. In preparing the Validation Report, DPA first "conducted a comprehensive job analysis of superior officer ranks, including...sergeant..." (Trial Ex. 40, Bates Stamp page 247). A principal feature of this analysis was "[g]athering of available job information from Massachusetts police departments, as well as job analysis reports, survey instruments and other information from jurisdictions outside the Commonwealth." (Id. at 249).

In addition, DPA "[d]eveloped and administered a task inventory questionnaire designed to identify the frequent and critical tasks and duties," and "a knowledge, skills, abilities and personnel characteristics (KSAPs) inventory questionnaire designed to identify the important KSAPs required at the time of appointment." (Trial Ex. 40, Bates Stamp page 249). DPA also developed a "[l]inkage of the important KSAPs to the frequent and critical tasks of these jobs from" SMEs, "designed and use[d]...structural group discussions to gather information from SMEs about the Education and Experience (E&E) component of DPA's selection procedures,"

Case: 14-1952   Document: 00116851498   Page: 107   Date Filed: 06/17/2015   Entry ID: 5916065

and "gather[ed] information from SMEs about the recommended reading list from which the multiple choice written examination questions for the police promotional exams are derived." (Id. at 250).

The preparation of the Validation Report also included work by a Job Analysis Team ("JAT"). The JAT requested and received job descriptions for sergeant from Massachusetts police departments covered by Civil Service. The JAT also submitted a task inventory questionnaire for sergeant, covering 136 task or duty statements, to a sampling of persons at 76 police departments in Massachusetts. The JAT received 824 responses, a response rate of 78%. DPA used the responses to develop task profiles for sergeants. Specifically, it developed a list of KSAs that it distributed to SMEs for their review and comment, who were generally superior officers serving in Massachusetts police departments. (Trial Ex. 40, at Bates Stamp page 257). The JAT also convened a group of nine SMEs from Massachusetts police departments to review a master list of tasks that had been identified by the general survey as important and frequently performed.

Exams to be developed after the job analysis was completed were also to include a new E&E component pursuant to which incumbents would receive points for past educational achievements and work experience that in combination with their raw score on the written civil service exam become the score by which they will be ranked and placed on civil service eligibility lists.

The JAT designed a structured discussion guide to identify what educational degrees, certificates, or licenses were important for sergeants under consideration, as well as relevant prior work experience. The JAT arranged for SMEs from various Massachusetts police

Case: 14-1952     Document: 00116851498     Page: 108     Date Filed: 06/17/2015     Entry ID: 5916065

departments to participate in discussion groups to obtain feedback regarding the E&E component.

A "testability analysis" identified KSAs that could be assessed under both the written exam and the E&E. (Attachment EE to the 1991 Validation Report, Trial Ex. 41, at Bates Stamp pages 4272-4278). The testability analysis showed that more than half of the KSAs identified as pertinent to the job of sergeant were tested. This was sufficient to meet the "representative sample" requirement of the Uniform Guidelines. (Tr. 14: 41-43.)

In addition to performing a job analysis, the JAT prepared a reading list that could be used by candidates to prepare for the exam to be given. The job knowledge questions on the exam would be based on information directly presented by materials on the reading list. The purpose was to permit a candidate to study effectively for the eventual exam by reading the materials on the list. The list was compiled based on input from SMEs.

In 2000, a consulting firm, Morris & McDaniel, performed a job analysis for the position of sergeant in the Boston Police Department, and that analysis was used in the development of Boston's subsequent 2002 sergeant exam. The job analysis was not as full a validation study as was done in 1991, but it generally supported the use of a written job knowledge test for a sergeants promotional exam.

Consistent with its prior practice in preparing other police promotional exams for Boston, the exams prepared by HRD for the position of BPD sergeant in 2005 and 2008 were based on a test plan that can be traced to the 2000 job analysis prepared by Morris & McDaniel, which itself can be traced to the 1991 job analysis, including particularly the KSAs identified in those documents.

Case: 14-1952     Document: 00116851498     Page: 109     Date Filed: 06/17/2015     Entry ID: 5916065

In the regular process of developing the 2005 exam, HRD consulted with a panel of BPD captains (i.e., SMEs), some of whom were deputy superintendents, who recommended a reading list that had been periodically updated over time, but was consistent with the 1991 job analysis. The 2005 BPD promotional exam included certain questions specific to BPD, and as a result, the reading list included BPD rules, procedures, and special orders.

The 2005 sergeants promotional exam for Boston tested KSAs identified throughout the 1991 and 2000 job analyses related to the following subject matter areas: questions 5, 6, 8, 10, 57-60, and 62-67 addressed police management issues; questions 9, 11, 14, 16, 23, and 30 addressed crime-related issues; questions 19, 20, and 26 addressed crime scene issues; questions 21, 47, 49, and 50 addressed interrogation; questions 22, 24, and 25 addressed child abduction; question 27 addressed hostages; questions 41 through 46 addressed arrest procedures; questions 51 through 54 and 56 addressed searches.

The results of the examination for promotion to lieutenant provide some further evidence of validity of the 2005 sergeants exam. The 2005 written exams for the sergeant and lieutenant positions at BPD in 2005 had 53 items in common. Candidates for promotion to lieutenant, who were necessarily all then-incumbent sergeants, had an 89% passing rate on these common questions, whereas the passing rate for patrol officers seeking promotion to sergeant on the same questions was only 63%. The high passing rate for incumbent sergeants on the common questions is evidence that those questions were related to the sergeants' actual performance of their jobs. In other words, the sergeants scored well on those questions because the questions addressed issues related to their actual work experience. This fact tends to contradict any argument that the 1991 job analysis on which the test plan was partially based was dated and outmoded.

Case: 14-1952   Document: 00116851498   Page: 110   Date Filed: 06/17/2015   Entry ID: 5916065

In the promotional process in 2008, Boston again utilized the services of HRD to prepare a sergeants promotional exam. This exam, like the 2005 exam, included BPD-specific questions. In preparation for this exam, HRD again prepared a test plan showing areas of knowledge to be tested and the number of items to be devoted to each area.

As with the 2005 exam, SMEs updated the reading list for candidates. Documents from HRD show that for the 2008 sergeant promotional exam for Boston, SMEs reviewed test items, indicated which KSA the item was linked to, assessed the difficulty level of the item, and recommended whether or not the item should be used. As with the 2005 exam, the 2008 sergeants promotional exam for Boston contained a number of questions focusing on specific rules, regulations and special orders of BPD.

The 2008 sergeants promotional exam for Boston tested KSAs identified throughout the 1991 and 2000 job analyses and related documents. (See Trial Ex. 45.) For example, questions 21 and 36 addressed juvenile issues; questions 2, 3, 33, 42, 47, 50, and 58 addressed various crime-related issues; questions 4 through 6, 22, 40, 41, and 51 addressed searches; questions 7 and 8 addressed firearm issues; questions 23 through 30, 34, 48, 49, 53, and 70 through 73 addressed police management issues; questions 9 through 16 addressed rules and regulations of BPD; questions 31, 32, 35, 37, 74, and 75 addressed community policing; questions 43 and 52 addressed interrogation; questions 54 through 57 addressed illegal drugs; and questions 76 through 80 addressed the ability to read and understand reading charts.

In an effort to assist candidates who would be taking promotional exams, in both 2005 and 2008 BPD engaged an outside consultant to provide extensive tutoring for any interested candidate. Prior to the 2005 promotional exam, BPD offered tutorials and study materials for

Case: 14-1952     Document: 00116851498     Page: 111     Date Filed: 06/17/2015     Entry ID: 5916065

candidates at no cost. Prior to the 2008 exam, BPD similarly provided compact discs containing lectures prepared by the consultant for use by officers on their own time.

For both the 2005 and 2008 promotional exams for Boston, candidates for police sergeant completed an "Education and Experience Rating Sheet" in accordance with instructions thereto. Section III of the E&E Rating Sheet asked candidates to provide information on their police experience. As a matter of statutory law, police officers must have three years' experience to be eligible to apply for promotion to sergeant. Mass. Gen. Laws ch. 31, § 59. In addition, seniority – based on the number of years on the job – is generally recognized as relevant to the ability to perform well in a supervisory position such as sergeant.

Section IV of the E&E Rating Sheet asked candidates to indicate whether they had earned various academic degrees or certifications in various specified subject areas. As part of the 1991 Validation Report, SMEs had agreed that these subject areas were related to the position of sergeant.

Section V of the E&E Rating Sheet requests candidates to indicate if they had taught any courses above the high school level in the same subject areas for which credit is given if a degree is earned in that area. The SMEs who participated in the 1991 Validation Report concluded that the ability to teach a course evidenced oral communication skills important to the position of sergeant.

Dr. Outtz, the industrial psychologist, opined at trial that the tests as administered for Boston in 2005 and 2008 were "minimally valid." He acknowledged the utility of a written job knowledge test in selecting candidates for promotion to sergeant, but noted that use of such a test by itself would not support a conclusion of validity, because it could not measure some skills and abilities (as distinguished from knowledge) essential to the position, such as leadership, decision-

Case: 14-1952     Document: 00116851498     Page: 112     Date Filed: 06/17/2015     Entry ID: 5916065

making, interpersonal relations, and the like. However, because he thought that such skills and abilities were attested to by the E&E component, the threshold of validity was crossed.

After consideration of the evidence as a whole, I find and conclude that Dr. Outtz's opinion rests on adequate grounds and is therefore correct: the exams in question were minimally valid. The exams satisfied the technical standards for content validity studies. 29 C.F.R. § 1607.14(C). They addressed a representative sample of the KSAs of the sergeant position. Id. § 1607.14(C)(1), (4). They were based on job analyses that considered the important tasks necessary to the successful performance of the job. Id. § 1607.14(C)(2). They took account of prior relevant work experience as well as relevant training and education. Id. § 1607.14(C)(6).

There is no doubt that Dr. Outtz also thought that the content validity of the exams could have been improved by the use of additional test elements, such as an assessment center (see infra). However, for assessing validity, the fact that it could have been better does not mean necessarily that it was not good enough to be deemed sufficient. The key question regarding the content validity of a selection method is whether it reliably predicts a candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job. I am satisfied on the evidence that Boston carried its burden of showing that the exams in question satisfied that criterion.

A selection method that is valid under the considerations discussed above can be deemed to be "job related" and "consistent with business necessity" under the statutory standard. 42 U.S.C. § 2000e-2(k)(1)(A)(i). I find that the City of Boston has successfully demonstrated by the evidence that that standard has been met.

36

Case: 14-1952   Document: 00116851498   Page: 113   Date Filed: 06/17/2015   Entry ID: 5916065

## VII.   Availability of an Equally Valid, Less Discriminatory Alternative

### A.   General principles

If an employer has established that its selection method is "job related for the position in question and consistent with business necessity," as I have concluded Boston has done here, the plaintiffs may nonetheless succeed in their claims of disparate impact discrimination if they are able to establish that there was an "alternative employment practice" that Boston refused to adopt that was equally valid and would have had a lesser discriminatory impact. 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C); Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975); see also Ricci, 557 U.S. at 587.

The expert witnesses for both sides in this case agreed on two propositions about the use of written job knowledge tests in making promotions from police officer to sergeant. First, they agreed that properly developed written examinations are generally valid for that purpose. Second, they agreed that, as a general matter, the scores achieved by black and Hispanic test-takers on such written examinations in the aggregate tend to be consistently lower than the scores achieved by non-minority test-takers in the aggregate. In other words, experience has demonstrated that in the aggregate the use of written exams alone tends to have an adverse impact on minority applicants for promotion. Consequently, one of the major projects for industrial psychologists in the last several decades has been to try to develop selection methods that have the same validity as written job knowledge tests – that is, methods that select the better qualified applicants for promotion over the lesser qualified – but have a lesser or no adverse impact on minority applicants in the aggregate.

Case: 14-1952     Document: 00116851498     Page: 114     Date Filed: 06/17/2015     Entry ID: 5916065

Commonly, the approach has been to supplement written job knowledge tests by adding other components to the overall selection method. A number of different options can be used to provide such supplementation. Some options that have been used include so-called "assessment centers," which may use oral interviews, role-playing exercises, writing samples, in-basket exercises, and group exercises. Explicit consideration of prior work performance is another option.[12]

Some of the municipal defendants in this case, including Boston, have utilized a number of these methods to supplement a written exam for certain hiring or promotion decisions. For example, for the purpose of selecting a chief of police in the 1990s, Lowell used a structured interview, a mock press conference, an in-basket exercise, and an essay. Springfield and MBTA interview candidates who are on the certified Civil Service list, as well as considering prior work. Boston's prior use of an assessment center is discussed below.

Assessment centers are generally used only as a supplement to, rather than a substitute for, written job knowledge exams for a couple of reasons. In the first place, civil service regimes typically require public employers to use written exams as a merit selection tool. That is true in Massachusetts for promotion within municipal police departments. See Mass. Gen. Laws ch. 31, § 59. Moreover, for many of the KSAs required for the job, written job knowledge tests are highly valid and thus preferred to other possible ways of assessing those KSAs. There are some practical reasons as well. Assessment center exercises can require considerably more resources to administer, including both money and personnel, and thus can be cumbersome and expensive. As a result, the practicality of their use tends to be inversely proportionate to the number of job candidates to be assessed. For example, it is easier and much less costly to have a multi-

---

[12] With respect to the 2002 BPD sergeants exam, consideration of prior work performance was prohibited by the applicable collective bargaining agreement. (See Trial Ex. 133 at pg. 41.)

Case: 14-1952    Document: 00116851498    Page: 115    Date Filed: 06/17/2015    Entry ID: 5916065

component selection method for chief of police where there may be a relatively small pool of candidates than it would be for the rank of sergeant where, in Boston's case, the pool of interested candidates typically numbers several hundred. That is why some jurisdictions, such as Springfield and MBTA, use assessment centers as a second step after an original pool of test-takers has been narrowed by grade ranking.

B.    Boston's Testing History

    1.    1973-1998

Prior litigation concerning claims of discrimination in hiring and promotions in the Boston Police Department has been summarized above. Throughout most of that time, and certainly from the 1980s on, the Department has pursued the goal of reducing or eliminating disparate impact in its hiring and promotional selection methods and thus increasing the number of minorities in all ranks, including sergeants. Initially, under the consent decrees, the approach had been to seek a remedy in affirmative promotion formulas. Thus, with regard to promotions to sergeant and other supervisory ranks in BPD, this Court entered a consent decree in 1979. The decree "contained various affirmative action provisions designed to increase the number of black officers promoted to sergeants." Massachusetts Ass'n. of Afro-Am. Police, Inc. v. Boston Police Dept., 780 F.2d 5, 6 (1st Cir. 1985). Under the MAAAP decree, BPD was authorized to select individual African-American candidates for sergeant out of strict rank order as determined by results from an examination process, up to a potential 20% of all promotions.

As the legal landscape shifted in more recent years, however, the emphasis turned to fine-tuning selection methods with an eye toward reducing or eliminating adverse impact of the testing methods so that the cohorts from which selections would be made would not be discriminatorily constituted. In 1987, BPD, through a delegation agreement with DPA, retained

Morris & McDaniel to prepare a sergeants and lieutenants promotional exam that would include a multiple choice written examination, an in-basket exercise, a video performance exercise, a leaderless group exercise, and an education and experience component. The in-basket, video performance, and leaderless group exercises constituted the assessment center. Unfortunately, the integrity of the assessment center component was compromised by the leak of information about its contents before the examination, and the Personnel Administrator of DPA concluded that the assessment center scores could not be used in making promotional decisions. As a result, only the multiple choice exam and the education and experience components were used.

After extension of the MAAAP decree, BPD administered a "validated-fair" exam in June 1991. After the administration of the 1991 exam, the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO") (MAAAP's successor organization) challenged the exam's validity on the ground that it did not comport with the Equal Employment Opportunity Commission's Uniform Guidelines. See Boston Police Superior Officers Fed., 147 F.3d at 15-16. MAMLEO's legal challenge was settled by means of an amendment to the MAAAP consent decree, which provided, among other things, "that the BPD would establish the next eligibility lists for promotion to sergeant...using selection procedures 'of a significantly different type and/or scope.'" Id. at 16.

In 1992, a sergeants exam was administered which consisted of a written exam and a presentation by candidates to a group of assessors, consisting of police commanders from throughout New England. Boston's costs for the 1992 exam were in the range of $500,000. After the administration of the 1992 exam, Boston bypassed some white candidates on the certified eligibility list to reach and promote some black officers who had slightly lower scores. The white officers filed a complaint with the Civil Service Commission challenging the bypasses. The

Case: 14-1952   Document: 00116851498   Page: 116   Date Filed: 06/17/2015   Entry ID: 5916065

Commission agreed that the bypasses were not justified and ruled against the promotion of the black officers. The Commission's order was ultimately upheld by the Massachusetts Supreme Judicial Court. See Massachusetts Ass'n. of Minority Law Enforcement Officers v. Abban, 748 N.E.2d 455 (Mass. 2001). Consequently, despite the inclusion of an assessment center in the selection process, there was no improvement in minority promotions. In 1998, BPD participated in the statewide promotional exam for sergeants prepared and administered by HRD. The exam did not include an assessment center.

### 2. 2002 Promotional Exam

After the 1998 exam, then Police Commissioner Paul Evans convened a committee in an effort to increase minority representation in the promotional ranks. Based on the committee's recommendation, the Department decided to include an assessment center in its next promotional process for the ranks of sergeant, lieutenant, and captain, along with a written exam, and it obtained an authorized delegation from HRD to do so. Under the delegation, BPD was responsible for funding and administering the exam, subject to HRD's oversight. BPD again retained Morris & McDaniel to prepare and administer the exam. It was in this connection that Morris & McDaniel performed the 2000 job analysis of the position of sergeant at BPD discussed in the validity section above.

Under the delegation agreement, the 2002 promotional examination for sergeant was to consist of a written test (weighted at 40% of the total score), an assessment center (32%), a performance review system (8%), and the required education and experience component (20%). The assessment center for sergeants consisted of a "situational exercise using multiple scenarios with oral responses." (Trial Ex. 151 at 3.) The performance review portion was to be based on a candidate's work history. However, the City's collective bargaining agreement with the Boston

Case: 14-1952     Document: 00116851498     Page: 117     Date Filed: 06/17/2015     Entry ID: 5916065

Case: 14-1952      Document: 00116851498      Page: 118      Date Filed: 06/17/2015      Entry ID: 5916065

Police Patrolmen's Association, the union representing patrol officers (and thus all the candidates for promotion to sergeant), prohibited the Department from using past performance as a factor in evaluating a candidate's qualification for promotion. As a result, Commissioner Davis removed the performance review portion from the exam protocol. The examination as administered consisted of a written test (40 points), an assessment center (40 points), and education and experience (20 points).

Morris & McDaniel was paid more than $1.2 million to develop and administer the 2002 promotional exams for sergeant, lieutenant, and captain. In addition, other expenses associated with the 2002 examination process included transporting, housing, and training a substantial number of police officers from throughout the county who acted as the assessors for the purpose of the assessment center exercise.

Based on the results of the 2002 promotional exam, BPD promoted 69 candidates to sergeant, consisting of 58 whites, 9 African-Americans, and 2 Hispanics. Even with the inclusion of the assessment center in the 2002 exam process, there remained a substantial difference in the promotion rates of minority and non-minority candidates.

At trial, one of the plaintiffs' experts, Dr. Cassi Fields, suggested that the adverse impact of the total scores could have been reduced if, instead of weighting the written exam and the assessment center equally at 40 points, the exam were to be weighted at 20 and the assessment center at 60 points. There is an initial problem with simply altering the weights by fiat; such jiggering with the numbers would be proper only if the revised 20/60 formula could be assessed to be just as valid as the 40/40 formula, and there is no evidence on that point. In any event, one of the defense experts, Dr. Silva, testified that he had tested Dr. Fields' proposition by comparing the test results using the two alternate weighting possibilities and found that the number of

minorities promoted did not change. Using the 40/40 formula, 9 blacks and 2 Hispanics were promoted, while using the 20/60 formula, 8 blacks and 3 Hispanics would have been promoted, but the total minority promotions in either case would have still been 11. Dr. Silva also testified that when he eliminated the oral component entirely and gave the written and E&E components their usual weights of 80% and 20%, 10 minorities would have been promoted, compared to the 11 minorities who were promoted under the original test. In other words, the addition of the assessment center component in the 2002 resulted in one additional minority promotion to sergeant than would have occurred under a test consisting of only the written exam and the E&E component. That is a rather small payoff for the effort and money expended to achieve it.

In summary, Boston made a substantial effort, including the expenditure of well over a million dollars, in devising its 2002 sergeants promotional exam under a delegation from HRD to supplement the written job knowledge test with other elements, including an oral exercise, with the objective of mitigating adverse impact on minority test-takers, but the effort did not succeed.

### 3.   Planning for 2005 and 2008 Exams

When the 2005 and 2008 promotional exams were being contemplated, BPD was operating under budgetary constraints. Former Police Commissioner Kathleen O'Toole testified that she favored the use of an assessment center, but there were no funds available for that purpose. Expense can be a legitimate consideration in evaluating the use of alternatives to a written exam. See Watson, 487 U.S. at 998 (Opinion of O'Connor, J.) ("Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.") The Department adopted various measures in order to deal with budget issues, including offers of early retirement as a means to avoid the necessity of layoffs of younger

officers, and the reduction or elimination of various programs, including its cadet and mounted unit programs. Expending funds to design and administer exams with assessment centers or other additions to the written test under delegation authority as in 2002 was unrealistic under existing budgetary conditions. The same was true in 2008.

Also significant was the failure of the 2002 test, which included an assessment center to supplement the written exam, to have resulted in a material improvement in minority promotions. That exam had been carefully designed and implemented. It was at least doubtful that expending a similar effort would have had greater success in 2005, especially when there may have been a financial incentive to cut corners on the design and execution of such an exam. In brief, the significant cost to design and administer the 2002 exam including an assessment center was not in retrospect supported by gains in the rate of minority promotions. Consequently, for the 2005 and 2008 exams, Boston returned to the prior practice of using the significantly less costly HRD prepared exams, supplemented as usual by Boston-specific questions.

C.    Banding

One other potential alternative merits some discussion: "banding." Under the Massachusetts Civil Service regime, once an eligibility list has been generated based on the final scores on the examination, a municipal employer ordinarily must promote candidates in strict rank order in accordance with the list. Thus, a candidate who has scored 89 on the exam will be appointed before a candidate who has scored 88. Critics of this strict procedure argue that for real world work purposes, persons who score one point apart on a written exam are effectively equally qualified and that effective equivalence should be realistically recognized in the promotion process.

Banding would treat scores within a certain number of points of each other as essentially the same grade. For example, if the band width were to be set at three points, then persons scoring 89, 88, and 87 on the exam would be treated as having the same score. Hypothetically, if non-minority candidates scored 89 and 88 and a minority candidate scored 87, under this banding application, the minority candidate would be selectable for promotion, having the same banded score as the others, whereas in a strict rank order regime, the minority candidate would not be selectable. The desired effect would be to increase the number of selectable minorities and thus, hopefully, the number actually selected. All the testifying experts agreed that banding can be a tool to reduce adverse impact without compromising an "employer's legitimate interest in efficient and trustworthy workmanship." Albemarle, 422 U.S. at 425 (internal quotations omitted).

The prospect of potential banding strategies does not help the plaintiffs, however, because the plaintiffs have not shown that the banding technique was realistically available as an alternative to selection in strict rank order for either of the tests in question. For the 2005 test, it does not appear it was contemplated. In contrast, in 2008 HRD actually proposed to change its practice in scoring exams for the statewide sergeants exam to employ a banding strategy, and it appears BPD supported that proposal. However, application of the banding proposal would have substantially altered the statutory "bypass" procedures, and a justice of the Massachusetts Superior Court enjoined the use of banding to score the 2008 police promotional exams on the ground that such a substantial change in HRD's rules and procedures could only be made in a formal rulemaking proceeding under Section 4 of Chapter 31 of the General Laws (encaptioned

Case: 14-1952     Document: 00116851498     Page: 121     Date Filed: 06/17/2015     Entry ID: 5916065

"New or amended rules; hearings; publication"), which had not occurred. Pratt v. Dietl, SUVC No. 2009-01254, Memorandum of Decision and Order on Plaintiffs' Motion for a Preliminary Injunction, Apr. 15, 2009. As a result, banding was not actually available as an option to BPD for the 2008 exam.[13]

D.    Conclusions Regarding an Actually Available Alternative Selection Method

To prevail, the plaintiffs must show that in 2005 and 2008 Boston had available to it an alternative method of selecting officers for promotion to sergeant that was as valid as the exams actually administered and that would have had a less discriminatory impact on minority candidates. 42 U.S.C. § 2000e-2(k)(1)(A)(ii); Albemarle, 422 U.S. at 425. The statute "requires [the] plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it." Allen v. City of Chicago, 351 F.3d 306, 313 (7th Cir. 2003) (stating that a "vague and indefinite proposal" may not qualify as an "alternative employment practice" under the statute).

What the plaintiffs have been able to demonstrate is that industrial psychologists have in their toolbox various alternatives or supplements to written multiple choice tests that as a general matter tend to result in less adverse impact on minority groups in promotional testing. What they have not been able to show is that there was a particular alternative selection method available for the years in questions about which it could confidently be said that it would have reduced adverse impact on minority candidates for promotion to sergeant in the Boston Police

---

[13] Moreover, even if banding had been allowed for the 2008 exam, it is impossible to gauge what its effect might have been in increasing the number of minority promotions. Without banding, under the state statute the employer could bypass the two higher scoring candidates and appoint the minority candidate, but the employer would have to justify its decision to the Civil Service Commission. See Massachusetts Ass'n of Minority Law Enforcement Officers, 748 N.E.2d 455. A justification that the choice was race-conscious (to increase the number of minority sergeants, for example) could be subject to challenge under the Massachusetts Civil Service statute as inconsistent with "basic merit principles." Id. at 461-62. It might also be of dubious validity under federal law. See Ricci, 557 U.S. 557.

Case: 14-1952    Document: 00116851498    Page: 122    Date Filed: 06/17/2015    Entry ID: 5916065

Department. The 2002 test, which weighted an oral assessment center equally with the written test, failed to lessen adverse impact to any substantial degree or to increase other than marginally the number of minority promotions. The plaintiffs have not offered any evidence that would warrant a conclusion that repeating that experiment in 2005 or 2008 would likely have – as opposed to might possibly have – reduced adverse impact and increased minority promotions. That is not enough to carry their burden on this issue.

I therefore conclude that the plaintiffs have not carried their burden of demonstrating by the evidence that there was an alternative employment practice with equal validity and less adverse impact that was available and that BPD refused to adopt. See 42 U.S.C. § 2000e-2(k)(1)(A)(ii). BPD is entitled to prevail on the plaintiffs' disparate impact claims.

## VIII.   Conclusions and Order for Judgment

For all the foregoing reasons, I conclude that none of the individual plaintiffs has proved at trial his or her claim for disparate impact discrimination under 42 U.S.C. § 2000e-2(k). Though the reasons vary as to different defendants, all defendants are entitled to have judgment entered in their favor.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge