# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

No. 14-1952
_____

PEDRO LOPEZ, et al.
Plaintiffs-Appellants,

v.

THE CITY OF LAWRENCE, et al.
Defendants-Appellees.

_____

ON APPEAL FROM A JUDGMENT OF UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS.
[C.A No.: 07-CV-11693-GAO]
_____

## BRIEF OF THE DEFENDANTS-APPELLEES,
## CITY OF SPRINGFIELD AND MAYOR DOMENIC SARNO.
_____

Respectfully submitted,

The Defendants/Appellees
City of Springfield and Mayor Domenic Sarno
By their attorneys

/s/ Anthony I. Wilson_____
Edward Pikula, Esq.; C.A.B. l0464
Anthony I. Wilson, Esq.; C.A.B. :1157353
John T. Liebel, Esq. C.A.B. 1029462
City of Springfield
Law Department
36 Court Street
Springfield, MA  01103
TEL (413) 787-6085
FAX (413) 787-6173

# TABLE OF CONTENTS

Table of Authorities …………………………………………………..    ii

Statement of the Issues…………………………………………………    1

Statement of the Case …………………………………………………    2

Statement of the Facts …………………………………………………    4

Summary of the Argument …………………………………………….    14

Argument

  I.  THE DISTRICT COURT'S FINDING THAT THE SPRINGFIELD PLAINTIFFS FAILED TO MEET THEIR BURDEN OF ESTABLISHING A *PRIMA FACIE* CASE OF DISPARATE IMPACT AS REQUIRED BY 42 U.S.C. § 2000E-2(K)(1)(A) WITH REGARD TO SPRINGFIELD'S USE OF THE 2005 AND 2007 HRD SPONSORED CIVIL SERVICE PROMOTIONAL EXAMINATION FOR POLICE SERGEANT ON MINORITY PROMOTION RATES IN SPRINGFIELD MUST BE AFFIRMED UNLESS CLEARLY ERRONEOUS…………………………………………………    19

  II.  THE DISTRICT COURT''S FINDINGS THAT THE EXAMS WERE VALID AND THAT THERE WAS NO EQUALLY VALID, LESS DISCRIMINATORY ALTERNATIVE MUST BE AFFIRMED UNLESS CLEARLY ERRONEOUS…………………………………    40

  III. THE DISTRICT COURT'S DETERMINATION THAT THE EXAMS WERE JOB RELATED CONSISTENT WITH BUSINESS NECESSITY, AND APPROPRIATE FOR RANK ORDER SELECTION MUST BE AFFIRMED......................................................40

Conclusion ………………………………………………………….    40

Certificate of Compliance …………………………………………..    41

Certificate of Service …………………………………………………    41

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Bessemer City,*
470 U.S. 564, 573-74 (1985)...............................................................21

*Cumpiano v. Banco Santander Puerto Rico*,
902 F.2d 148, 152 (1st Cir. 1990). ....................................................21

*Bailey v. Se. Area Joint Apprenticeship Comm.*,
561 F. Supp. 895, 901, 910 (N.D. W. Va. 1983) ...............................32

*Boston Chapter, NAACP, Inc. v. Beecher*,
504 F.2d 1017 (1st Cir. 1974) .............................................................32

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Met. Dade County*,
122 F.3d 895, 919 n.4 (11th Cir. 1997)…………………………………25

*Fudge v. City of Providence Fire Dep't,*
766 F.2d 650 (1st Cir.1985)……………………………………… 15,22,32,33

*Goncalves v. City of Boston*,
 66 Mass. App. Ct. 180, 185 (2006)………………………………… 28

*Jones v. City of Boston*,
752 F.3d 38 (1st Cir. 2014)……………………….......................... 15,15,24,25,38

*Langlois v. Abington House. Authority*,
207 F.3d 43 (1st Cir. 2000)……………………………………....................22,25

*Lewis v. City of Chicago*,
130 S. Ct. 2191, 2196-97 (2010) .........................................................30

*Lopez v. Com.*,
463 Mass. 696, 978 N.E.2d 67, 80 (2012) ...........................................2

*Lopez v. State*,
588 F.3d 69 (1st Cir. 2009) ..................................................................2

*Luciano v. Coca-Cola Enters.*,
307 F. Supp. 2d 308, 318(D. Mass. 2004) ..........................................30

*Tex. Dep't of Cmty. Affairs v. Burdine,*
450 U.S. 248, 253-54 (1981)...............................................................15

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988)…………………………………………22,23,32

iii

## Statutes

42 U.S.C.    §§ 2000e........................................................................2,19,20

M.G.L. c.    31 §1………………………………………………………………10

M.G.L. c.    31, §5(l)............................................................................8

M.G.L. c.    31, § 25...........................................................................6

M.G.L. c.    31, § 27………………………………………………………….6

M.G.L. c.    31, § 59………………………………………………………10,17

M.G.L. c.    151B…………………………………………………………….2

## Rules

Fed. R. Civ. P.   Rule 52(a)(6)........................................................... 15

Fed. R. App. P. 28(i)………………………………………………………..17

## Regulations

29 C.F.R.    § 1607.14………………………………………………………25,35

29 C.F.R.    §1607.4(D)................................................................22,23, 24

Adoption of Questions and Answers To Clarify and Provide   a  Common
Interpretation of the Uniform Guidelines on Employee Selection Procedures
44 Fed. Reg. 11996 (1979)…………………………………………......... 24

## Other Authorities

P.J. Bickel, E.A. Hammel, & J.W. O'Connell,  Sex Bias in Graduate
Admissions: Data from Berkeley, 187 Science 398 (1975). ................................ 27

9 J. Wigmore, Evidence § 2494 (3d ed. 1940)…………………………………22

Transcript of Oral Argument at 28-29, Ricci, available at
http://www.supremecourt.gov/oral_arguments/argument_transcripts/01-1428.pdf.)
………………………………………………………………………………18,38

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

I.  Whether the District Court was clearly erroneous in concluding that the Springfield Plaintiffs failed to meet their burden of establishing a *prima facie* case of disparate impact with regard to Springfield's use of the 2005 and 2007 HRD sponsored civil service promotional examination for police sergeant on minority promotion rates in Springfield as required by Title VII found in 42 U.S.C. § 2000e-2(k)(1)(A).

II. Whether the District Court was clearly erroneous in concluding that the burden of establishing the validity of the HRD civil service promotional examinations used by Defendants under Title VII for use in making rank order selections for police sergeant were met.

III. Whether the District Court was clearly erroneous in concluding that Plaintiffs failed to meet their burden to identify a specific equally valid, less racially discriminatory alternative to the HRD sponsored civil service promotional examinations that Defendant refused to adopt, as required to show disparate impact under Title VII.

# STATEMENT OF THE CASE.

## I.    PROCEDURAL HISTORY.

The Defendant-Appellees City of Springfield and Mayor Domenic Sarno (hereafter "Springfield") adopt the Procedural History as outlined in the Brief of the Defendant-Appellee, City of Boston, (hereafter "Boston") with the following additional statement:

Springfield Police Officers James A. Jackson, Juan Rosario, Louis Rosario Jr., Obed Almeyda, Devon Williams, and Julio M. Toledo (hereafter "Springfield Plaintiffs") were not parties, and Springfield was not named as a Defendant in this case, until January 9, 2009, when the 6th Amended Complaint was filed adding Springfield and the MBTA as defendants ("Complaint"). (R.48, 62-74). The initial complaint named the Massachusetts Human Resources Division ("HRD") as a defendant, but this Court ruled they were not an employer. *Lopez v. State*, 588 F.3d 69, 72–73 (1st Cir. 2009). Later, in *Lopez v. Com.*, 463 Mass. 696, 711 (2012), the SJC held that under M.G.L., c. 151B, the plaintiffs could proceed against the state defendants. That case is now pending this appeal.

The sixth amended complaint naming Springfield was served on January 13, 2009. On or about January 8, 2009, the court issued an order extending discovery to March 31, 2009. However, about two weeks later, on or about January 26, 2009, the State Defendants filed a motion to dismiss or in the alternative for summary

judgment, based on their position that the Commonwealth is not an "employer" within the meaning of Title VII, and under the Eleventh Amendment. On April 7, 2009, the Court denied the State Defendants' motion to dismiss or in the alternative for summary judgment.

On May 15, 2009, based upon a motion of the Non-State Defendants, a stay of the District Court proceedings was ordered until thirty (30) days after the mandate was to be issued by the U.S. Court of Appeals. At the time that the Court ordered the proceedings stayed, certain of the Defendants planned to file dispositive motions prior to trial. On or about December 3, 2009, the U.S. Court of Appeals reversed the denial of the State Defendants' Motion to Dismiss, for the reasons set forth in the decision of the U.S. Court of Appeals dated December 3, 2009, and ordered the State Defendants' dismissed from the case, with prejudice. The mandate of the U.S. Court of Appeals was issued on December 28, 2009. Accordingly, the stay of the U.S. District Court proceedings was lifted effective on or about January 27, 2010.  On February 1, 2010, a status conference was held before this Court, at which time the Court ordered the termination of all dispositive motions.

The trial court denied the Defendants' Joint Motion to Dismiss for lack of subject matter jurisdiction on June 11, 2010. The Joint Motion of Defendant Cities of Boston, Lawrence, Lowell, Methuen, Springfield & Worcester, and Defendant

Massachusetts Bay Transportation Authority for Reconsideration of the trial court's Ruling Terminating Dispositive Motions (dkt. no. 193) was also denied on June 11, 2010. Springfield asserted that the Springfield Plaintiffs failed to exhaust their administrative remedies necessary to file a complaint based on the 2005 Sergeant Promotional Examination, as they had failed to file a charge of discrimination either with the Equal Employment Opportunity Commission or the Massachusetts Commission Against Discrimination until September 24, 2008, alleging a "violation date: 03/04/08" (Exs. 125-130) well outside the statutory time period to challenge the an HRD exam taken in 2005. (Stipulation – Docket # 266). Defendants reasserted the argument in their motion for a directed verdict. (Docket # 277, R. 54). The trial court did find that the Springfield Plaintiffs had failed to exhaust their administrative claims as to the 2005 exam. Based on this, the Springfield Motion was dismissed as moot post-trial. (Docket # 329, R. 59).

Springfield timely requested Findings of Fact and Rulings of Law. (Docket #312). Springfield filed a response to Plaintiffs' proposed Findings of Fact (docket #319).

### STATEMENT OF FACTS.

Springfield adopts the Statement of Facts as outlined in the Brief of Boston. with the following additional statement:

Although this case was brought by a group of minority police officers (black

4

and Hispanic) (R.1, 62-74),[1] only six plaintiffs are Springfield police officers. 7th
Am. Compl. ¶¶ 43-48. None of the other Plaintiffs are employees of the City of
Springfield and the non-Springfield officers cannot bring suit against Springfield
under Title VI or M.G.L. c. 151B.

As noted in the Springfield Answer, at the time of the filing of the
complaint, two of the six Springfield plaintiffs had been previously promoted to
police sergeant utilizing the certified lists resulting from the two challenged tests
utilized by Springfield. (See trial Ex. 172 – As of April 10, 2010, Julio Toledo is a
Springfield Police Sergeant; Answer to Sixth Amd. Compl. ¶¶ 6, 10 (Docket #211)
Juan Rosario was promoted to the position of Springfield Police Sergeant ¶ 48).
Each of the sergeant's promotional examinations challenged in this case were
created, designed and administered by the Commonwealth of Massachusetts,
Human Resources Division ("HRD") 7th Am. Compl. ¶ 69-70. A factual history of
this process has been described by this court:

> For decades, HRD and its predecessor agency developed annual
> written examinations to evaluate candidates for police sergeant
> promotions. State civil service law and a consent decree to
> which HRD's predecessor agency was a party shaped the
> content and form of these examinations. That consent decree,
> entered in 1980, arose from civil rights litigation involving the
> Boston police department, but, in general terms, HRD's
> predecessor agreed to develop and administer promotional
> examinations that complied with the Equal Employment
> Opportunity Commission's (EEOC) Uniform Guidelines on
> Employee Selection Procedures (1978), 29 C.F.R. § 1607.1-18.
> The Guidelines required, inter alia, maintaining records that

> show the impact that examinations have on applicants
> according to race, sex, or ethnic group, and complying with
> stringent standards to verify that the substance and form of the
> examinations are significantly related to job performance.
> *Lopez v. Massachusetts*, 588 F.3d 69, 77 (1st Cir. Mass. 2009).

Although HRD holds state wide civil service examinations every year, the lists generated from a civil service examination are good for up to two years. *See* M.G.L. ch. 31, § 25.  Consequently only two of the four promotional tests being challenged were actually used by Springfield, specifically the 2005 and 2007 HRD exams.[1]

Civil service candidates are promoted to police sergeant based upon their relative ranking on the certified civil service list. *See* M.G.L. ch. 31, § 27. This issue is particularly significant in the case of Springfield because, as noted in the district court slip opinion, the six Springfield plaintiffs all failed to file a timely EEOC charge with respect to the 2005 examination. Each of the Springfield's plaintiffs did not file with the MCAD/EEOC until 2008; well beyond the three hundred day limitations period for contesting the 2005 police promotional examination.

The internal promotional process utilized by Springfield for police sergeant was described by Springfield Police Commissioner William

---

[1]    *See* "Table 1. Defendant Police Departments Enrolled in HRD Sergeant Exams by Exam Year, with Date List Established."  Dr. Weisen's 3rd Supp. Rpt. 5.

Fitchet. (Trial Tr. 12-58, ll. 23-25; 12-59, ll. 1-25; 12-60, ll. 1-20; *see also* Ex. 69). He testified that the personnel department petitions Civil Service for an eligibility list. Depending on the number of vacancies to be filled, the number of persons on the list will vary. "If only one position, it would be three people. If it's more than that, it's two times the number of positions plus one." As such, Springfield is not privy to who took the test, what the scores were, or any other information on non-Springfield test takers. That list is sent to the police department through the personnel department, and officers that are willing to accept that appointment will sign off on that list.

The promotional process for Police Sergeant in Springfield includes an interview process by a three-member board of command staff of the Springfield Police Department, captains or deputy chiefs or the commissioner, they interview potential candidates for the position that they're applying for by asking a series of questions and notating what their replies were and marking their replies with a numerical rating. In addition, a background check is carried out which entails a review of the officers' performance, sick time, injured-on-duty time, any internal affairs investigations, any disciplinary action, and recommendations from the commanding officers of the officers that are candidates.

Plaintiffs' expert testified that Springfield's promotional process enhanced

the content validity of the 2005 and 2007 HRD police sergeants' examinations. "Content validity is a judgmental process that evaluates how well the content of the test corresponds to the content of the job in terms of the requirements to do the important tasks and duties of the job." (Trial Tr. 4-77, ll. 6-9). Dr. Wiesen explained how the actual appointment process, like the one used by Springfield, enhances the validity of the HRD police sergeants'   promotional examinations, where, before making an appointment to police sergeant, Springfield would get recommendations from the supervisors of the candidates, used in conjunction with the structured interview used by Springfield in reviewing the certified candidates for appointment, how would have a positive impact  the validity of the exam:" It would definitely make the selections from amongst the people who were certified more informed and I think probably better decisions." (Trial Tr. 4-85, II. 15-25; 4-86, II.  1-25; 4-87, II. 1-4).

While, as a matter of law each Massachusetts community has an option of developing its own promotional exam, Mass. Gen. Law. c. 31, § 5(l), as a matter of business necessity, development of exams, creation and validation are costly expenses for each municipality, and use of the HRD test is a business reality. Springfield and the other co-Defendant municipalities could not afford to opt out of the HRD examination process.  For most Massachusetts municipalities, and Springfield in particular (emerging from a financial crisis which placed in under

financial oversight of a Control Board from 2003 through 2009) it is not financially feasible.[2] As testified to by Police Commissioner Fitchet, the Springfield Police Department operates on "a lean budget" that is "level funded" and also was asked to prepare budgets with a 5 percent reduction and with a 10 percent reduction. (Trial Tr. 12-72, 11. 22-25; 12-73, II. 1-6).

The alternatives, theoretically available Springfield, to the HRD examination, including a written examination created by Springfield or the use of an assessment center examination, cannot be done without HRD oversight, and are, as a practical manner, unavailable as a result of business necessity for Springfield, especially during the current economic climate. Plaintiffs' suggestion concerning the alternative selection device is questionable in light of the evidence regarding assessment centers in the Springfield Police Department. Springfield Police Commissioner Fitchet, who competed in an assessment center selection examination for the Springfield Police Chief s position (Trial Tr. 12-73, II. 12-25; 12-74, IL 1-25; 12-75, II. 1-3), testified that he had been dissatisfied with some of the components of the assessment center in part because it lacked any objective component (Trial Tr. 12-75, II. 8-19). (Trial Tr. 12-75, IL 21-25; 12-76, IL 5-6; 12-77, IL 1-25; 12-78, IL 1-12). Dr. Wiesen's testimony under cross

---

[2]  *See* Chapter 169 of the Acts of 2004 where the state legislature made findings that Springfield was in a "fiscal crisis" that "poses an imminent danger to the safety of citizens of the city and their property".

examination reveals a concern about the assessment center scoring process in which he has seen a 20-point swing on a 100-point scale during the rescoring of an assessment center. (Trial Tr. 10-46, II. 8-25; 10-47, II. 1- 22).

Under Massachusetts civil service laws, competition for a police promotion is not state wide; it is limited to each locality. Dr. Wiesen admitted that for promotional examinations for police sergeant in the Commonwealth of Massachusetts, those types of examinations, the competition is only within the department, stating "A promotional exam is only open to people in the department." (Trial Tr. 5-69, II. 20-24; 5-70 IL 3-25; 5-71, I. 1 ; *see also* M.G.L. ch. 31, § 1. Under the civil service laws only the names of police officers employed within each local department may appear on the eligible list issued for that employer. M.G.L. ch. 31, § 59  Consequently the only relevant data pool in terms of Springfield consists of the Springfield police officers who took the 2005 and 2007 police sergeant promotional examinations.

Under Massachusetts civil service laws, candidates who take a police promotional examination in one local policing jurisdiction are not eligible for promotion in another policing jurisdiction. Candidates in one jurisdiction cannot be promoted in another jurisdiction.  Candidates from one exam are also almost never considered with candidates from other exams.

Plaintiffs' experts used a data pool consisting of all the candidates who took

the challenged civil service examinations.  That data pool is far too deep as it includes candidates who failed the civil service examinations, candidates whose names are not on an eligible list and candidates whose names do not appear on a certified list.

Plaintiffs' expert, Dr. Wiesen, counted in his statistical analysis people who failed the exam – even if they failed the exam multiple times, if they took the exam two, three, four, five or eighteen times and failed every time.[3]  Dr. Weisen admitted counting candidates as part of his statistical analysis even if their names did not appear on an eligible list or on a certified list.[4]  Plaintiffs' expert admitted that he included in his data pool such names even though under Massachusetts civil service requirements there would be no chance they would ever be appointed to a civil service job.[5] The 2005 and 2007 exams resulted in the following data for Springfield:

| Year | 2005 | 2007 |
|---|---|---|
| Minority Test-Takers | 18 | 16 |
| Minority Appointments | 0 | 2 |
| Minority Appointment Rate | 0% | 12.5% |
| Non-Minority Test-Takers | 28 | 20 |
| Non-Minority Appointments | 6 | 6 |
| Non-Minority Appointment Rate | 21% | 30% |
| Adverse Impact Ratio | 0 | 0.42 |

---

[3]  Dr. Wiesen, Dep. 91, ll. 7-21.
[4]  Dr. Wiesen, Dep. 91, ll. 22-24; 92, ll. 1-4.
[5]  Dr. Wiesen, Dep. 92, ll. 5-8.

The proper depth of the data pool is determined by the requirement that plaintiffs confine their population data to those police officer promotional candidates who are both qualified and available for the jobs at issue, that is, the only relevant qualified labor market. Plaintiffs' own expert analysis shows that any adverse impact in the 2007 Springfield police promotional exam is, more likely than not, a random data fluctuation due to chance not an illegal act of discrimination. Both Dr. Wiesen and Dr. Fields, on cross-examination, admitted that "evaluating the standard deviation units that would not indicate adverse impact." Trial Tr. 7-92 (ll.7-25); 7-93, (ll.1-3). Similarly Dr. Wiesen admitted that the Springfield data is not statistically significant. Ex. 85A p.2; Trial Tr. 11-63 (ll. 19-25); 11-64 (ll. 1-25); 11-65 (ll. 1-25); 11-66 (ll. 1-25); 11-67 (ll. 1-19). Dr. Wiesen admitted that it is correct to say that when you look at Springfield alone and the 2007 Springfield police promotional results for the sergeant's examination, essentially, in all the categories, by either the general statistical "four-fifths" rule of thumb or the more rigorous rule analyzing standard deviation units, you find no statistical significance. Trial Tr. 11-68 (ll.18-24).

In addition, Springfield retained a firm, Analysis and Inference, lnc., which is composed of two principals who are leading experts in the field of

statistics.[6] Springfield asked Analysis and Inference, Inc. to review the proper data pool regarding appointments to sergeant[7] and the results of the sergeant exams to determine whether there is statistical evidence of discrimination in the city. (Ex. 195). The updated expert report of Analysis and Inference, Inc. reveals:

> that Springfield appointed a total of 13 sergeants based on the 2005 and 2007 exams. All of these individuals were certified to be appointed according to their scores-based primarily on exam results. In general, appointments appear to be made according to exam performance. However, some individuals were appointed, despite the fact that other individuals had better exam results.
>
> Our analysis explored the relation between exam ranking, certification, and appointments in order to determine if white people ("non-minorities") were more likely to be appointed than black or hispanic people ("minorities").

(Ex. 195, pp.3-8) (footnote omitted).

Based upon their analysis using the relevant data pool the principals of Analysis and Inference, Inc., Dr. Fairley and Dr. Salzberg, concluded that among those certified to become sergeant in Springfield:

1. The percent of minorities appointed is not statistically different

---

[6] Dr. Willian1B. Fairley's qualifications are described on pages 11-20 of Ex. 195. Dr. Alan J. Salzberg's qualifications are described on pages 21-23 of Ex. 195.

[7] The statistical analysis performed for Springfield by Dr. Fairley and Dr. Salzberg avoided a double counting error which skews the statistical analysis. (Ex. 195, pp. 4-5). "Double counting error which skews the statistical analysis. (Ex. 195, pp. 4-5). "Double counting persons therefore disfavors minorities by increasing the apparent adverse impact." (Ex. 195, p. 5) (footnote omitted).

from the percent of whites appointed.

2. Minorities were no more or less likely to be appointed once rank on exam was taken into account.

3. Minorities were no more or less likely to be appointed once rank, experience and educational background were taken into account.

4. Springfield's appointments that were out of rank order did not negatively affect minorities.

(Ex. 195, p.3).

The Mayor of Springfield is not the appointing authority in the Springfield police department and has no authority to make appointments or promotions to sergeant in the Springfield Police Department. The Revised Ordinances of the City of Springfield vests said power in the Police Commissioner. Trial Tr. 12-53 (ll. 7-22); Springfield Ex. 159.

## SUMMARY OF THE ARGUMENT

I. **THE DISTRICT COURT CORRECTLY RULED THAT THE PLAINTIFFS FAILED TO PROVE A *PRIMA FACIE* CASE AS REQUIRED BY 42 U.S.C. § 2000e-2(k)(1)(A) WITH RESPECT TO SPRINGFIELD AS THE STATISTICAL EVIDENCE RELIED ON BY THE PLAINTIFFS FAILED TO PERSUASIVELY ESTABLISH THAT THE USE OF THE HRD-SPONSORED EXAM BY SPRINGFIELD WAS THE CAUSE OF AN ADVERSE IMPACT ON MINORITY PROMOTION RATES IN SPRINGFIELD.**

At trial, Springfield challenged the evidence submitted by Plaintiffs and evidence was presented to show Plaintiffs had not met their burden of proof to show that this practice "caused a disparate impact". The trial court agreed with Springfield, finding the Plaintiffs' evidence "unconvincing". "Findings of fact,

14

whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P.  Rule 52(a)(6).

In a discrimination case, the burden of persuasion as to the ultimate issue -- whether a defendant discriminated against plaintiff -- remains at all times with the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981).  A *prima facie* showing of disparate impact exists where "statistical tests sufficiently diminish chance as a likely explanation." *Fudge v. City of Providence Fire Dep't,* 766 F.2d 650, 658 (1st Cir. 1985). The "four-fifths rule," articulated in the Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines") is inappropriate where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group.

As noted by the trial judge: the sample sizes for Springfield would qualify as "small," and would be subject to the cautions and limitations applicable to the statistical analysis of small populations." (slip opinion 17). In *Jones*, the First Circuit made clear their "rejection of the four-fifths rule as suitable to trump" a statistical showing on statistical significance using a p-value or standard deviation, preferring the analytic rigor of statistical analysis to the imprecise rule of thumb

that the four-fifths rule supplies. *Jones v. City of Boston,* 752 F.3d 38, 43,52(1st.

Cir. 2014).

  In an attempt to overcome the lack of persuasiveness of the four-fifths rule
applied to the facts here, Plaintiffs submitted a statistical analysis aggregating
HRD test data across jurisdictions statewide and over multiple years. The record
contains conflicting evidence on the accuracy of using aggregated numbers.
Defense expert, Jacinto M. Silva, Ph.D. ("Dr. Silva"), concluded that plaintiffs'
experts approach to the adverse impact ratio used by the Plaintiff was not an
accurate metric. The district court credited Dr. Silva's testimony stating that
aggregation "can produce anomalies, including one that statisticians refer to as
Simpson's Paradox. Dr. Silva addressed this problem in Trial Exhibit 198."

  Moreover, in addition to the conflicting expert testimony which the trial
court needed to choose from, the record contains other facts showing that the
decision to credit Dr. Silva's testimony is more than plausible. Under
Massachusetts civil service laws, police officers within local police departments do
not compete for promotion against police officers from other local police
departments. The competition for a police promotion is not state wide; it is limited
to each locality. Under the civil service laws only the names of police officers
employed within each local department may appear on the eligible list issued for
that employer. Consequently the only relevant data pool in terms of Springfield

16

consists of the Springfield police officers who took the 2005 and 2007 police sergeant promotional examinations.  See M.G.L. c. 31, § 59.

It is reasonable for a factfinder to conclude that plaintiffs' aggregated statistical analysis improperly conflates the racial and ethnic background and test scores of candidates who are not eligible for promotion in the Springfield police department, with the racial and ethnic background and test scores of Springfield police officers who are eligible for promotion in the Springfield police department.

While both the 2005 and 2007 exams indicated adverse impact as to the appointment rate under the four-fifths rule, as noted in the report and testimony of Dr. Silva, the results were not statistically significant under a more rigorous analysis. The p-value for the 2005 exam was .07 and for 2007 the p-value was .26. As noted by the trial court, a p-value of .05 is commonly used by social scientists as necessary to reject the "null hypothesis." Since the statistics for both years do not meet that standard, the null hypothesis – here, that there is no adverse impact – cannot be rejected on statistical calculation alone.

Reversing the finding of the trial court as to a lack of persuasive evidence as to a *prima facie* case would also exacerbate the dilemma now facing all municipalities under the holding of *Ricci v. DeStefano,* 557 U.S. 557 (2009) fearing a discriminatory impact lawsuit from minority test-takers. The Springfield Defendants contend that the Supreme Court in *Ricci* recognizes that, in certain

17

circumstances, an employer is faced with an impossible Catch-22 dilemma; "damned if you do, and damned if you don't."  During the oral argument in *Ricci*, this dilemma was recognized by Chief Justice Roberts:

> What you're saying is that the department can engage in intentional discrimination to avoid concern that they will be sued under disparate impact. Why doesn't it work the other way around as well? Why don't they say, well, we've got to tolerate the disparate impact because otherwise, if we took steps to avoid it, we would be sued for intentional discrimination? This idea that there is this great dilemma - I mean, it cuts both ways.
> (Transcript of Oral Argument at 28-29, Ricci, available at http://www.supremecourt.gov/oral_arguments/argument_transcripts/01-1428.pdf.)

Adopting the arguments of the Springfield Plaintiffs, The municipalities here, and Springfield in particular, would be caught on the horns of this dilemma.. *Ricci v. Distefano, supra* at 587. (emphasis added).

## II.   THE DISTRICT COURT''S FINDINGS THAT THE EXAMS WERE VALID AND THAT THERE WAS NO EQUALLY VALID, LESS DISCRIMINATORY ALTERNATIVE MUST BE AFFIRMED UNLESS CLEARLY ERRONEOUS

Pursuant to Fed. R. App. P. 28(i), the Springfield Defendants incorporate by reference the arguments of Boston as to this issue

## III.   THE DISTRICT COURT'S DETERMINATION THAT THE EXAMS WERE JOB RELATED CONSISTENT WITH BUSINESS NECESSITY, AND APPROPRIATE FOR RANK ORDER SELECTION MUST BE AFFIRMED

Pursuant to Fed. R. App. P. 28(i), the Springfield Defendants incorporate by reference the arguments of Boston as to this issue.

## ARGUMENT

I.   **THE DISTRICT COURT CORRECTLY RULED THAT THE PLAINTIFFS FAILED TO PROVE A *PRIMA FACIE* CASE AS REQUIRED BY 42 U.S.C. § 2000e-2(k)(1)(A) WITH RESPECT TO SPRINGFIELD AS THE STATISTICAL EVIDENCE RELIED ON BY THE PLAINTIFFS FAILED TO PERSUASIVELY ESTABLISH THAT THE USE OF THE HRD-SPONSORED EXAM BY SPRINGFIELD WAS THE CAUSE OF AN ADVERSE IMPACT ON MINORITY PROMOTION RATES IN SPRINGFIELD.**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. Title VII prohibits both, intentional discrimination (known as "disparate treatment") as well as, in some cases, practices that are not intended to discriminate, but in fact have a disproportionately adverse effect on minorities (known as "disparate impact"). *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

The Civil Rights Act of 1991 added a provision to make the burden of proof in disparate impact cases explicit:

> An unlawful employment practice based on disparate impact is established under this subchapter only if-
>
> (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate

that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.
42 U.S.C. § 2000e-2(k) (1) (A).

As to the use of a "particular employment practice" at issue here, in the district court, the Plaintiffs challenged the use by Springfield of the multiple-choice examination for candidates seeking promotion to the position of police sergeant during 2005 and 2007. The Springfield Plaintiffs alleged at trial that, because of the examination's adverse, discriminatory impact on African-American and Hispanic candidates, they were ranked lower on the list than their non-minority counterparts, despite being equally qualified. Consequently, they alleged they were denied promotional opportunities because of their race. It is undisputed that this practice constitutes a "particular employment practice" as required by the statute. 42 U.S.C. § 2000e-2(k)(1)(A)(i). However, to make a *prima facie* showing of disparate impact, a plaintiff must then show that the identified practice "causes a disparate impact on the basis of race." 42 U.S.C. § 2000e-2(k)(1)(A)(i). At trial, Springfield challenged the evidence submitted by Plaintiffs and evidence was presented to show Plaintiffs had not met their burden of proof to show that this practice "caused a disparate impact". The trial court agreed with Springfield, finding the Plaintiffs' evidence "unconvincing".

"Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P.  Rule 52(a)(6). Under this standard, the trial court's findings of fact must be affirmed unless review of the entire evidence leaves "a definite and firm conviction that a mistake has been committed."  *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). The Rule thus applies to both subsidiary and ultimate facts. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, ___ U.S. ___, 135 S. Ct. 831, 833 (2015). The function of an appeals court reviewing the findings of a " 'district court sitting without a jury . . . is not to decide factual issues *de novo*.' " *Id.* Moreover, a reviewing court may not reverse the findings of the district court simply because it is convinced that it would have decided the case differently. *Anderson v. Bessemer City,* 470 U.S. 564, 573-74 (1985); *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 152 (1st Cir. 1990). Put bluntly, "appellate review of complex, fact-dominated issues cannot be allowed to descend to the level of Monday-morning quarterbacking." *Jackson v. Harvard University*, 900 F.2d 464, 466 (1st Cir. 1990).

In a discrimination case, the burden of persuasion as to the ultimate issue -- whether a defendant discriminated against plaintiff -- remains at all times with the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981). "The

phrase "*prima facie* case" not only may denote the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue." *Id.* n. 7, citing 9 J. Wigmore, Evidence § 2494 (3d ed. 1940). Turning to an application of this standard to each of the plaintiff's arguments on appeal, Plaintiffs claim that the district court erred in its finding the Plaintiffs did not meet their burden to show a *prima facie* case.

A *prima facie* showing of disparate impact exists where "statistical tests sufficiently diminish chance as a likely explanation." *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 658 (1st Cir. 1985). There is no "single test" to establish disparate impact. *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995-96 n.3 (1988) (plurality opinion)). Instead, "courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis." *Watson*, 487 U.S. at 995 n.3.

One frequently used benchmark for identifying and measuring disparate impact is what is commonly referred to as the "four-fifths rule," articulated in the Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines") adopted by the Equal Employment Opportunity Commission ("EEOC"). 29 C.F.R. § 1607.4(D) The four-fifths rule is not really a rule but a

22

"rule of thumb," a rough guide suggested by the EEOC for assessing the existence of disparate impact to be addressed by enforcement actions. See Watson, 487 U.S. at 995 n.3.  See *EEOC v. Arabian Am. Oil Co*., 499 U.S. 244, 257 (1991) (Because "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations," the agency's guidelines receive weight only to the extent of their "power to persuade.") According to the EEOC's Uniform Guidelines:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.
> 29 C.F.R. § 1607.4(D).

The Springfield Plaintiffs refer in their brief to statistics which, under the four-fifths rule, supports allegations of underrepresentation of minority sergeants in Springfield: "of Springfield's 40 sergeants, only four (10%) were minorities. (R.1704-1705, 3008). In contrast, minorities constituted approximately one-third (33%) of the patrol officers in Springfield." (R.1704). However, the First Circuit has counseled against too much reliance on the four-fifths rule:

> Although the four-fifths rule may serve as a helpful benchmark in certain circumstances, both the Supreme Court and the EEOC have emphasized that courts should not treat the rule as generally decisive. We previously rejected reliance on the four-fifths rule by a plaintiff in a case in which the sample size was

small, describing the rule as "not an accurate test of discriminatory impact." And our sister circuits have both minimized the importance of four-fifths rule and criticized it directly. The four-fifths rule can lead to anomalous results. *Jones v. City of Boston*, 752 F.3d 38, 51 (1st Cir. 2014) (internal citations and quotations omitted).

The EEOC Guidelines themselves limit the application of the "four fifths" rule, as "differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant." 29 C.F.R. § 1607.4(D).  The EEOC Guidelines state:

> [g]enerally, it is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result from adverse impact against one group to a situation in which that group has a higher selection rate than the other group. On the other hand, if a lower selection rate continued over a period of time, so as to constitute a pattern, then the lower selection rate would constitute adverse impact, warranting the need for validity evidence.
> 44 Fed. Reg. 11996, 11999 (Mar. 2, 1979).

As noted by the trial judge: the sample sizes for Springfield and each of the other municipal defendants (except Boston), including the MBTA, for the test years in question would qualify as "small," and would be subject to the cautions and limitations applicable to the statistical analysis of small populations." (slip opinion 17). The trial court noted that the four-fifths rule may "lead to anomalous results" and is "not a precise measurement tool (it was not meant to be), and its principal utility in litigation may be to assist plaintiffs in making a sufficient

24

*prima facie* demonstration of disparate impact." (slip opinion 13 citing *Langlois v. Abington Hous. Auth.,* 207 F.3d 43, 50 (1st Cir. Mass. 2000)).

In *Jones*, the First Circuit made clear their "rejection of the four-fifths rule as suitable to trump" a statistical showing on statistical significance using a p-value or standard deviation value. *Jones*, 752 F.2d at 52. The First Circuit also noted that while the Supreme Court in *Ricci* did cite to the four-fifths rule, "[n]othing in that citation supported use of the test (again described as a 'rule of thumb') to trump a more scientific calculation of the actual statistical deviation." *Jones*, 752 F.2d at 52 n. 16. The First Circuit emphasized the importance of preferring the analytic rigor of statistical analysis to the imprecise rule of thumb that the four-fifths rule supplies. *Jones,* 752 F.3d at 43, 52.

> Statisticians, by contrast, customarily approach data such as this more precisely. They ask whether the outcomes of an employment practice are correlated with a specific characteristic, such as race, and, if so, whether the correlation can reasonably be attributed to random chance. . . .
>
> To assess the likelihood that an observed difference in outcomes resulted from mere chance, statisticians calculate the probability of observing a difference equal to or greater than that which actually occurred, assuming equal opportunity. They call this probability the "p-value." Statisticians usually apply the label "statistically significant" to the observed differential outcomes if the p-value is less than five percent . . . .
>
> Essentially, a finding of statistical significance means that the data casts serious doubt on the assumption that the disparity was caused by chance.
> *Id*. at 43 (internal citations omitted).

Under the circumstances, the Plaintiffs cite cases where the "four-fifths rule has been approved by courts as the basis for establishing adverse impact under a disparate impact theory, and Plaintiffs note that even in the absence of adverse impact by use of the four-fifths rule courts have found disparate impact. (Pl. Br. 74-76). However, the possibilities suggested by Plaintiffs do not change the fact that the district court's account of the evidence is plausible in light of the record, and therefore, not subject to reversal under the clearly erroneous standard. The Plaintiffs' expert recognized the lack of credibility in using four-fifths rule and the Plaintiffs utilized a different statistical analysis in attempting to make a *prima facie* case.

Specifically, in an attempt to overcome the lack of persuasiveness of the four-fifths rule applied to the facts here, Plaintiffs submitted a statistical analysis aggregating HRD test data across jurisdictions statewide and over multiple years. In footnote six of his report, Plaintiffs' expert Dr. Wiesen acknowledged this problem explaining that "[w]ithout such aggregation, statistical analyses would be to no avail due to the small numbers. (Only from 2 to 10 minority applicants were promoted based on any of HRDs annual exams, in all municipalities combined.)" (Dr. Wiesen, October 3, 2008, Report. 9 at # 4).

The record contains conflicting evidence on the accuracy of using aggregated numbers. Defense expert, Jacinto M. Silva, Ph.D. ("Dr. Silva"),

concluded that plaintiffs' experts approach to the adverse impact ratio used by the Plaintiff was not an accurate metric.

> It more often than not leads to a false indication of adverse impact. In 82 percent of the individual jurisdictions that promotion tested for the position of police sergeant between 2005 and 2008, the likelihood of finding a false indication of adverse impact would have been very high even in the absence of a group performance difference. For the reasons cited ... a statistical significance test within each jurisdiction and exam year is the only fair process. A false indication of adverse impact occurs by design only 5 percent of the time in statistical significance testing.
> Dr. Silva, May 28, 2010, Dep. 11, #5.

The district court credited Dr. Silva's testimony stating that aggregation "can produce anomalies, including one that statisticians refer to as Simpson's Paradox. Dr. Silva addressed this problem in Trial Exhibit 198." "Simpson's Paradox" refers to "illusory disparities in improperly aggregated data that disappear when the data are disaggregated." *Eng'g Contractors Ass'n of S. Fla. Inc. v. Met. Dade County*, 122 F.3d 895, 919 n.4 (11th Cir. 1997); see also P.J. Bickel, E.A. Hammel, & J.W. O'Connell, Sex Bias in Graduate Admissions: Data from Berkeley, 187 Science 398 (1975).

Moreover, in addition to the conflicting expert testimony which the trial court needed to choose from, the record contains other facts showing that the decision to credit Dr. Silva's testimony is more than plausible.

Plaintiffs' analysis defies logic as, under Massachusetts civil service laws, police officers within local police departments do not compete for promotion against police officers from other local police departments. The competition for a police promotion is not state wide; it is limited to each locality. Under the civil service laws only the names of police officers employed within each local department may appear on the eligible list issued for that employer. Consequently the only relevant data pool in terms of Springfield consists of the Springfield police officers who took the 2005 and 2007 police sergeant promotional examinations. See M.G.L. c. 31, § 59 (providing that an "examination for a promotional appointment to any title in a police or fire force shall be open only to permanent employees in the next lower title in such force"); *see also Goncalves v. City of Boston*, 66 Mass. App. Ct. 180, 185 (2006) (stating that "promotional appointments are open to employees in the next lower title in the same force).

Plaintiffs' experts, by using a wider pool of data, consisting of every police officer from every police department with at least one minority candidate who took any of the four promotional exams, skewed the statistics to support their unfounded and unwarranted opinions relative to adverse impact. Thus, plaintiffs' expert opinions are unreliable and unpersuasive because they are grounded upon statistical evidence which can be misleading. Specifically, it is reasonable for a factfinder to conclude that plaintiffs' aggregated statistical analysis improperly

conflates the racial and ethnic background and test scores of candidates who are not eligible for promotion in the Springfield police department, with the racial and ethnic background and test scores of Springfield police officers who are eligible for promotion in the Springfield police department.

In addition, the record supports the trial court's finding due to the fact that Plaintiffs analysis is based on data aggregated across exam years. (slip opinion 19) The trial court opinion notes that while aggregation over years "might have some superficial appeal", using, for illustrative purposes, the Lawrence Police Department, the trial court noted "it has not been shown to be a reliable analysis technique:"

> Forty-six Lawrence officers took the promotional exam in 2006, 10 minorities and 36 non-minorities. Forty-two took the exam in 2008, 15 minorities and 27 non-minorities. The numbers cannot simply be added together to conclude that there were 88 separate test-takers of whom 25 were minority and 63 were non-minority. Rather, it is very likely that there would be overlap in the various pools, since it is not uncommon for officers to take tests more than once. What the effect would be of the same test-takers in both years would necessarily be a matter for speculation. One test taker might be simply not qualified for promotion; his presence in the pool in both years might exaggerate the likelihood of failure for an aggregated pool. Another test taker might have benefitted from a lack of success the first time and with familiarity with the process and perhaps heightened preparation and thus succeeded in the second process. There is simply no way to adjust for the possible variations that could distort interpretation of the aggregated data.
> (slip opinion 19-20). .[8]

---

[8] Plaintiffs acknowledge that statistics about mean score differences, passing rates, and promotion rates, are also subject to the difficulties due to small numbers and problems with aggregation. (Pl. Br. P. 83, n.48).

As to Springfield, at the time of the decision to utilize the 2007 exam, Springfield did not know about the testing data from exams in 2003, 2005, and 2007 regarding its own employee test-takers, let alone the passing rates, effective passing rates and promotional rates from other jurisdictions.[9] Springfield only knew the results of the eligibility lists provided to it by HRD. As HRD provided the lists, Springfield would have no knowledge of who took the tests or the race of those test-takers, or the results of those tests. In retrospect, after Springfield was named to the 6th amended complaint in 2009, Springfield later learned that the 2005 and 2007 exams resulted in the following data for Springfield:

| Springfield | | |
|---|---|---|
| Year | 2005 | 2007 |
| Minority Test-Takers | 18 | 16 |
| Minority Appointments | 0 | 2 |
| Minority Appointment Rate | 0% | 12.5% |
| Non-Minority Test-Takers | 28 | 20 |
| Non-Minority Appointments | 6 | 6 |
| Non-Minority Appointment Rate | 21% | 30% |
| Adverse Impact Ratio | 0 | 0.42 |

While both the 2005 and 2007 exams indicated adverse impact as to the appointment rate under the four-fifths rule, as noted in the report and testimony of Dr. Silva, the results were not statistically significant under a more rigorous

---

[9] The Springfield plaintiffs did not timely file a necessary pre-suit claim with the Massachusetts Commission Against Discrimination with respect to the eligibility list from the 2005 exam, the court ruled they have no viable claims regarding that exam. *Lewis v. City of Chicago*, 130 S. Ct. 2191, 2196-97 (2010) (citations, footnote and internal quotation marks omitted); *see also* 42 USCS § 2000e-5 (e) (1); *Luciano v. Coca-Cola Enters.*, 307 F. Supp. 2d 308, 318 (D. Mass. 2004) (stating that an "employment discrimination charge must ordinarily be filed with the EEOC or the MCAD within 180 days of an act alleged to have been discriminatory.

analysis. The p-value for the 2005 exam was .07 and for 2007 the p-value was .26. As noted by the trial court, a p-value of .05 is commonly used by social scientists as necessary to reject the "null hypothesis." Since the statistics for both years do not meet that standard, the null hypothesis – here, that there is no adverse impact – cannot be rejected on statistical calculation alone.  Additionally:

> as Exhibit 197 indicates, for both years there was a substantial possibility of a false positive adverse impact finding. As Dr. Silva explained, the high false positive estimate results from a combination . . . of the small sample size, the small number of minorities, the selection ratio. Those three things contribute to the false positive rate. . . . With a small sample size, the data is always unstable.   (Tr. 17: 44-45.) In sum, the statistical evidence is unconvincing as to the existence of adverse impact. (slip opinion 22-23)

Plaintiffs' citation to other cases where aggregated dated has been considered persuasive, does not change the fact that, based on the record in this case, the trial court's rejection of the data aggregated statewide across-jurisdictions and across years, and finding Plaintiffs' theory "unpersuasive" (R. 108) is well within the realm of plausibility, and therefore not subject to reversal under the clearly erroneous standard.  In *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 995-96 n.3 (1988) a plurality stated a case-by-case approach properly reflects the recognition that statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.' " The clearly erroneous standard would equally prohibit the reviewing court from disturbing the findings of

31

fact that a prima facie case was shown. See *Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1021 (1st Cir. 1974) ("we cannot say that the district court was clearly erroneous in its ultimate fact finding that plaintiffs had established a *prima facie* case"). As noted by the trial court, "[b]ecause [the trial court] reject[ed] the use of aggregated data, [the trial court] f[ound] Dr. Wiesen's conclusions unpersuasive." (slip opinion 20).

Plaintiffs collection of cases cited for the proposition that aggregating data can be appropriate, does not change the application of the standard of review, that the findings that aggregated data here was not "unconvincing" is not clearly erroneous. See *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 656-57 (1st Cir. 1985) (finding aggregation across years clearly erroneous where examinations were sufficiently different); *Bailey v. Se. Area Joint Apprenticeship Comm.*, 561 F. Supp. 895, 901, 910 (N.D. W. Va. 1983) (finding aggregation across localities inappropriate where each jurisdiction implemented standards autonomously). "Where the use of employment tests results in differential pass rates for blacks and whites, even an apparently substantial differential, the discrepancy may be due to chance". See *Fudge v. City of Providence Fire Dep't*, 766 F.2d 650, 657 (1st Cir. 1985). As such, aggregation of data under such circumstances has been found to be "clearly erroneous". See *Fudge, supra* at 657. ("We hold that it was clearly erroneous for the district court to find that the 1972 and 1973 results lent support to

32

a finding that a disparate impact was shown by the 1974 results)."  As noted in the *Fudge* opinion of the First Circuit authored by Justice Breyer, "intuitive response to substantiality is an insufficient basis for a finding of disparate impact."  Whether or not to accept or reject aggregated data in the face of conflicting experts, based on the record here, was not a clearly erroneous decision subject to reversal. In addition, to the statistical and logical evidence described above, the trial court noted that in Springfield, in the relevant years "promotions to sergeant were made using the eligibility list generated from the exams, supplemented by an interview process and a review of the candidates' department work history. The evidence does not show whether or how the interviews and/or work history of applicants may have affected appointments." Under these circumstances, reliance of aggregated data across jurisdictions is less likely to be persuasive.

Reversing the finding of the trial court as to a lack of persuasive evidence as to a prima facie case would also exacerbate the dilemma now facing all municipalities under the holding of *Ricci,* fearing a discriminatory impact lawsuit from minority test takers. At trial, Springfield asserted that, in its motion for a judgment at the close of Plaintiffs' evidence, that the Plaintiffs' burden of proof under the circumstances presented, required a showing of a "strong basis in evidence" citing *Ricci v. DeStefano*. Consequently plaintiffs had not, as a matter of law, met their burden of showing "a strong basis in evidence" that the 2007 HRD

police promotional examination was deficient, and their claims against Springfield must be dismissed. (Docket # 283).

In *Ricci*, when the City of New Haven learned that African American and Hispanic test takers in its fire department promotional exam had done worse than white officers, the city abandoned the civil service test results. As a result, white firefighters sued claiming disparate treatment on account of the fact that the city had made a "raced based" decision. The Supreme Court agreed, upholding the validity of the promotional exam, and holding that the city of New Haven had violated Title VII's disparate treatment provisions. Specifically, since the New Haven rejected the civil service test results because the higher scoring candidates were white, the Court said that, unless well justified, this express raced-based decision-making is prohibited. The question, as framed by the Court, was "whether the purpose to avoid disparate- impact liability excuses what otherwise would be prohibited disparate-treatment discrimination." *Ricci, supra* 557 U.S. at 580.

The racial adverse impact in the New Haven case was described by the court as "significant," and in that case it was undisputed that the city faced a *prima facie* case of disparate-impact liability. *Ricci* 557 U.S. at 585.

A prima facie case of disparate impact liability, essentially, a threshold showing a significant statistical disparity was described by the

court to be "far from a strong basis in evidence that the city would have been liable under Title VII had it certified the results," and, therefore, an insufficient basis for the city to disregard the test. The city could be liable for disparate-impact discrimination only if the examinations were not job-related and consistent with business necessity, or if there existed an equally valid, less-discriminatory alternative that the city refused to adopt; the court concluded that there was no "strong basis in evidence" to establish that the test was deficient in either of these respects.

"Fear of litigation alone," the court wrote, "cannot justify the City's reliance on race to the detriment of individuals who passed the examinations and qualified for promotions. Discarding the test results was impermissible under Title VII. . . . If, after it certifies the test results, the City faces a disparate-impact suit, then in light of today's holding the City can avoid disparate-impact liability based on the strong basis in evidence that, had it not certified the results, it would have been subject to disparate-treatment liability."

The lesson of the case appears to be that "disparate treatment" is worse than a prima facie case of "disparate impact," and disparate impact may be justified in some cases, though such cases were not expressly described by the court. The court appears to have decided that the city of New

Haven overreacted to the threat of a lawsuit based on statistical evidence that, the court held, was insufficient to justify disparate treatment, even though it was sufficient to prove a *prima facie* case of disparate impact.

In light of *Ricci*, and if the case here were to be reversed, how does a city or town know when a statistical disparity is sufficient to ignore test results and use criteria in addition to a written exam? In *Ricci*, the Supreme Court ruled that a decision to *not* use the test was a "race-based" decision and was therefore unsustainable absent a "substantial basis in evidence that the employer would be liable for disparate impact discrimination." In *Lopez v. Lawrence*, the defendants find themselves in the same shoes as the city of New Haven; by not rejecting civil service exam results developed by the Human Resources Division (or, in the case of Boston, developed with HRD assistance), the municipalities and the MBTA could be held liable under Title VII.

At trial, the municipal defendants and the MBTA found themselves defending a test they neither prepared nor administered against a claim that promotional decisions based on the test are in violation of Title VII due to the test's discriminatory impact. Unlike the city of New Haven, the defendants in *Lopez* cannot choose to abandon the test results, as the promotions have been made. Any decision by the cities or the MBTA to reject the results of the examination because of concern over whether the

results had a disparate impact on minorities would constitute a race-based decision that could only be justified if there is a "substantial basis in evidence" of disparate impact discrimination.

The plaintiffs in *Lopez* allege the civil service "examinations have, over the last twenty years, been shown to have a significant adverse impact upon minority (black and Hispanic) test takers while not having been shown to be valid predictors of job performance for a police sergeant." However, unless data is aggregated across jurisdictions and across years, if cannot meet a more rigorous analytical testing analysis. Adopting the arguments of the Plaintiffs', would only worsens the "Catch 22" that municipalities face under *Ricci*, as the lack of statistical significance of the data here does not cast serious doubt on the assumption that the disparity was caused by chance and reversal would heighten the already looming uncertainty of whether promotional decisions are discriminatory in violation of Title VII. The Springfield Defendants contend that the Supreme Court in *Ricci* recognizes that, in certain circumstances, an employer is faced with an impossible Catch-22 dilemma; "damned if you do, and damned if you don't."  During the oral argument in *Ricci*, this dilemma was recognized by Chief Justice Roberts:

> What you're saying is that the department can engage in intentional discrimination to avoid concern that they will be sued under disparate impact. Why doesn't it work the other way around as well? Why don't they say, well, we've got to

> tolerate the disparate impact because otherwise, if we took steps to avoid it, we would be sued for intentional discrimination? This idea that there is this great dilemma - I mean, it cuts both ways.
> (Transcript of Oral Argument at 28-29, Ricci, available at http://www.supremecourt.gov/oral_arguments/argument_transcripts/01-1428.pdf.)

Adopting the arguments of the Springfield Plaintiffs, The municipalities here, and Springfield in particular, would be caught on the horns of this dilemma as the statistical evidence in this case: 1) not meeting the EEOC Guidelines for use of the four-fifths rule as described in Jones; 2) not showing adverse impact with a more rigorous analysis unless an aggregation of data municipalities do not have access to is utilized; and 3) as described by the trial court as "unconvincing," would not meet the standard enunciated in *Ricci*, i.e. a "strong basis in evidence to believe that it will be subject to disparate-impact liability."

As noted in *Ricci*, even if a *prima facie* case were proven, it would not amount to a a "strong basis in evidence to believe that it will be subject to disparate-impact liability." Specifically, in *Ricci*, the existence of a "disparate impact" was acknowledged by both sides. New Haven found itself in the strange position of considering its own test as The Court in *Ricci* described a *prima facie* showing of disparate impact as "essentially a threshold showing of

38

a significant statistical disparity . . . *and nothing more*." *Ricci v. Distefano*,

*supra* at 587. (emphasis added):

> The problem for respondents is that a prima facie case of
> disparate-impact liability--essentially, a threshold showing of a
> significant statistical disparity, and nothing more--is far from a
> strong basis in evidence that the City would have been liable
> under Title VII had it certified the results.
> *Id.* (internal citations omitted)

Springfield did not know about the testing data from exams in 2003, 2005,

and 2007 regarding its own employee test-takers, let alone the passing rates,

effective passing rates and promotional rates from other jurisdictions. Springfield

only knew the results of the eligibility lists and those results proved beneficial to

the ideals of diversity. Under the circumstances, without any ""strong basis in

evidence to believe that it will be subject to disparate-impact liability" Springfield

cannot be liable for disparate impact for its use of the HRD promotional exam in

this case, and the finding that the evidence was "unconvincing" to establish a

*prima facie* case should not be disturbed.

**IV.    THE DISTRICT COURT'S FINDINGS THAT THE EXAMS WERE
VALID AND THAT THERE WAS NO EQUALLY VALID, LESS
DISCRIMINATORY ALTERNATIVE MUST BE AFFIRMED UNLESS
CLEARLY ERRONEOUS**

Pursuant to Fed. R. App. P. 28(i), the Springfield Defendants incorporate by

reference the arguments of the Defendant Appellee City of Boston as to this issue

**V.    THE DISTRICT COURT'S DETERMINATION THAT THE EXAMS
WERE JOB RELATED CONSISTENT WITH BUSINESS NECESSITY,**

**AND APPROPRIATE FOR RANK ORDER SELECTION MUST BE AFFIRMED**

Pursuant to Fed. R. App. P. 28(i), the Springfield Defendants incorporate by reference the arguments of the Defendant-Appellee City of Boston as to this issue.

## V. CONCLUSION

For the foregoing reasons, Springfield respectfully requests that this honorable court uphold and affirm the District Court's Findings Of Facts, Conclusions Of Law, And Order For Judgment in this case and dismiss the appeal.

Respectfully Submitted
Defendants-Appellees City of Springfield and its Mayor, Domenic Sarno
By their Attorneys

| /s/ Edward M. Pikula | /s/ Anthony I. Wilson | /s/ John T. Liebel |
|---|---|---|
| Edward M. Pikula, Esq. | Anthony I. Wilson, Esq. | John Liebel |
| BBO # 399770 | BBO # 682573 | BBO # 299660 |
| City Solicitor | Associate City Solicitor | Associate City Solicitor |
| City of Springfield | City of Springfield | City of Springfield |
| Law Department | Law Department | Law Department |
| 36 Court Street | 36 Court Street | 36 Court Street |
| Springfield, MA 01103 | Springfield, MA 01103 | Springfield, MA 01103 |
| (413) 787-6085 | (413) 787 – 6085 | (413) 787 – 6085 |

### Certificate of Compliance with Rule 32(a)

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,672 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 and Times Roman 14 type style font.

/s/ Anthony I. Wilson_____
Anthony I. Wilson

## CERTIFICATE OF SERVICE

I, Edward M. Pikula, hereby certify that on June 19, 2015, I electronically filed the Defendants/Appellees' Brief, with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the foregoing document filed through the CM/ECF system will be sent electronically to Plaintiff/Appellants' counsel of record and to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Anthony I. Wilson_____
Anthony I. Wilson