No. 14-1952

_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

_____

PEDRO LOPEZ, individually and on behalf of a class of
individuals similarly situated; ABEL CANO, individually and on
behalf of a class of individuals similarly situated; KEVIN
SLEDGE, individually and on behalf of a class of individuals
similarly situated; CHARLES DEJESUS, individually and on behalf
of a class of individuals similarly situated; RICHARD BROOKS,
individually and on behalf of a class of individuals similarly
situated; THE MASSACHUSETTS HISPANIC LAW ENFORCEMENT
ASSOCIATION, individually and on behalf of a class of
individuals similarly situated; ROBERT ALVAREZ, individually and
on behalf of a class of individuals similarly situated; SPENCER
TATUM, individually and on behalf of a class of individuals
similarly situated; SHUMEAND BENFOLD, individually and on behalf
of a class of individuals similarly situated; ANGELA WILLIAMS-
MITHCELL, individually and on behalf of a class of individuals
similarly situated; GWENDOLYN BROWN, individually and on behalf
of a class of individuals similarly situated; LYNETTE PRAILEAU,
individually and on behalf of a class of individuals similarly
situated; TYRONE SMITH, individually and on behalf of a class of
individuals similarly situated; EDDY CHRISPIN, individually and
on behalf of a class of individuals similarly situated; DAVID E.
MELVIN, individually and on behalf of a class of individuals
similarly situated; STEVEN MORGAN, individually and on behalf of
a class of individuals similarly situated; WILLIAM E. IRAOLO,
individually and on behalf of a class of individuals similarly
situated; JOSE LOZANO, individually and on behalf of a class of
individuals similarly situated; JOSE LOZANO, individually and on
behalf of a class of individuals similarly situated; COURTNEY A.
POWELL, individually and on behalf of a class of individuals
similarly situated; JAMES L. BROWN, individually and on behalf
of a class of individuals similarly situated; GEORGE CARDOZA,
individually and on behalf of a class of individuals similarly
situated; LARRY ELLISON, individually and on behalf of a class
of individuals similarly situated; DAVID SINGLETARY,
individually and on behalf of a class of individuals similarly
situated; CHARISSE BRITTLE POWELL, individually and on behalf of
a class of individuals similarly situated; CATHENIA D. COOPER-
PATERSON, individually and on behalf of a class of individuals
similarly situated; MOLWYN SHAW, individually and on behalf of a

class of individuals similarly situated; LAMONT ANDERSON,
individually and on behalf of a class of individuals similarly
situated; GLORIA KINKEAD, individually and on behalf of a class
of individuals similarly situated; KENNETH GAINES, individually
and on behalf of a class of individuals similarly situated;
MURPHY GREGORY, individually and on behalf of a class of
individuals similarly situated; JULIAN TURNER, individually and
on behalf of a class of individuals similarly situated; NEVA
GRICE, individually and on behalf of a class of individuals
similarly situated; DELORES E. FACEY, individually and on behalf
of a group of individuals similarly situated; LISA VENUS,
individually and on behalf of a class of individuals similarly
situated; RODNEY O. BEST, individually and on behalf of a class
of individuals similarly situated; KAREN VANDYKE, individually
and on behalf of a class of individuals similarly situated;
ROBERT C. YOUNG, individually and on behalf of a class of
individuals similarly situated; ROYLINE LAMB, individually and
on behalf of a class of individuals similarly situated; LYNN
DAVIS, individually and on behalf of a class of individuals
similarly situated; JAMES A. JACKSON, individually and on behalf
of a class of individuals similarly situated; JUAN ROSARIO,
individually and on behalf of a class of individuals similarly
situated; LOUIS ROSARIO, JR., individually and on behalf of a
class of individuals similarly situated; OBED ALMEYDA,
individually and on behalf of a class of individuals similarly
situated; DEVON WILLIAMS, individually and on behalf of a class
of individuals similarly situated; JULIO M. TOLEDO, individually
and on behalf of a class of individuals similarly situated,

Plaintiffs-Appellants,

v.

MARISOL NOBREGA, individually and on behalf of a class of
individuals similarly situated,

Plaintiff,

v.

CITY OF LAWRENCE, MASSACHUSETTS; CITY OF METHUEN, MASSACHUSETTS;
COMMONWEALTH OF MASSACHUSETTS; PAUL DIETL, in his capacity as
Personnel Administrator for the Commonwealth of Massachusetts;
JOHN MICHAEL SULLIVAN, in his capacity as Mayor of the City of
Lawrence, Massachusetts; WILLIAM MANZI, III, in his capacity as
Mayor of the City of Methuen, Massachusetts; APPOINTING

AUTHORITY FOR THE CITY OF LOWELL, MICHAEL O'BRIEN, in his
capacity as City Manager of the City of Worcester,
Massachusetts; CITY OF BOSTON, MASSACHUSETTS; CITY OF
SPRINGFIELD, MASSACHUSETTS; DOMENIC J. SARNO, JR., in his
capacity as Mayor for City of Springfield; MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY; DANIEL GRABAUSKAS, in his capacity as
General Manager; BOARD OF TRUSTEES OF THE MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,

Defendants-Appellees,

WILLIAM F. MARTIN, in his capacity as Mayor of the City of
Lowell, Massachusetts; KONSTANTINA B. LUKES, in her capacity as
Mayor of the City of Worcester, Massachusetts,

Defendants.

_____

On Appeal from a Judgment of the United States
District Court of Massachusetts

Case No. 07-11693
The Honorable George A. O'Toole, Jr.

_____

**PLAINTIFFS-APPELLANTS' REPLY BRIEF**

_____

**Counsel for Plaintiffs-Appellants**

Harold L. Lichten, C.A.B. 22114
Benjamin Weber, C.A.B. 1159650
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617)-994-5800
hlichten@llrlaw.com

DATED: July 29, 2015

Stephen Churchill, C.A.B. 30464
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3262
steve@fairworklaw.com

# TABLE OF CONTENTS

I. CONTRARY TO DEFENDANTS' ARGUMENTS, THE DISTRICT COURT COMMITTED LEGAL ERRORS IN ITS TITLE VII ANALYSIS WHICH ARE SUBJECT TO *DE NOVO* REVIEW.................................. 1

II.RICCI HAS NO BEARING ON THIS CASE AND, IF ANYTHING, SUPPORTS PLAINTIFFS' POSITION...................................... 2

III. M.O.C.H.A. DOES NOT ASSIST BOSTON'S ARGUMENT.............. 5

IV.THERE IS NO SUPPORT FOR THE DISTRICT COURT'S FINDING THAT THE SERGEANT'S EXAMS MEASURED A REPRESENTATIVE SAMPLE OF THE KSAs...................................................... 8

V. BOSTON FAILS TO SHOW HOW THE COURT COULD FIND THAT THE EDUCATION AND EXPERIENCE RATING MADE AN INVALID EXAM VALID. ........................................................ 12

VI.BOSTON HAS FAILED TO MEET ITS BURDEN TO SHOW THAT THE 2005 AND 2008 EXAMS WERE USABLE AS RANK-ORDER DEVICES........ 15

VII. THE DISTRICT COURT'S CONCLUSIONS REGARDING LESSER DISCRIMINATORY ALTERNATIVES CONSTITUTE LEGAL ERROR....... 20

VIII.….IN ARGUING THAT THERE WAS INSUFFICIENT EVIDENCE OF ADVERSE IMPACT, THE APPELLEES' NARROW FOCUS ON ISOLATED STATISTICS SERVES TO HIGHLIGHT THE DISTRICT COURT'S FAILURE TO CONSIDER THE COLLECTIVE WEIGHT OF THE EVIDENCE AS A WHOLE, WHICH ESTABLISHED AS A MATTER OF LAW THAT THE CHALLENGED EXAMS DEPRIVED MINORITY OFFICERS OF AN EQUAL OPPORTUNITY. 24

IX.MUNICIPALITIES MAY BE HELD LIABLE UNDER TITLE VII. ........ 36

CONCLUSION................................................. 38

i

# TABLE OF AUTHORITIES

**Cases**

Allen v. City of Chicago
  351 F.3d 306 (7th Cir. 2003) ........................... 21, 22
Boston Chapter NAACP v. Beecher
  371 F. Supp. 507 (D. Mass. 1974) ........................... 37
Boston Chapter NAACP, Inc. v. Beecher
  504 F.2d 1017(1st Cir. 1974) ........................... 9, 29
Boston Police Superior Officers Fed'n v. Civil Serv. Comm'n
  624 N.E.2d 617, 620-21 (1993)............................. 10
Briscoe v. City of New Haven
  654 F.3d 200(2d Cir. 2011) ........................... 3, 4, 18
Brown v. City of Chicago,
  8 F. Supp. 1095 (N.D. Ill. 1998) ........................... 23
California Federal Savings & Loan Association v. Guerra
  479 U.S. 272 (1987) ....................................... 37
Carr v. Department of Personnel Administration, Civil Service
  Commission
  No. G-1461 (Dec. 21, 1989) ................................ 10
Chrisner v. Complete Auto Transit, Inc.
  645 F.2d 1251(6th Cir. 1981) .............................. 22
Connecticut v. Teal
  457 U.S. 440(1982) ....................................... 29
Donahue v. City of Boston
  304 F.3d 110(1st Cir. 2002) .............................. 29
EEOC v. Allegheny County
  705 F.2d 679(3d Cir. 1983) ............................... 37
Guardians Ass'n of New York City Police Dep't v. Civil Serv.
  Comm'n of City of New York
  633 F.2d 232(2d Cir. 1980) ..................... 8, 15, 19, 23
Gulino v. New York State Education Department
  460 F.3d 361 (2d Cir. 2006) .............................. 37
Johnson v. City of Memphis
  770 F.3d 464(6th Cir. 2014) .................... 1, 19, 21, 22
Jones v. City of Boston
  752 F.3d 38 (1st Cir. 2014) ................... 29, 32, 33, 34
LeBlanc v. B.G.T. Corp.,
  992 F.2d 394 (1st Cir. 1993) .............................. 2
Legault v. aRusso
  842 F. Supp. 1479 (D.N.H. 1994) ...................... 12, 14

M.O.C.H.A. Soc'y, Inc. v. City of Buffalo
  689 F.3d 263 (2d Cir. 2012) ....................... 5, 6, 7, 19
Massachusetts Ass'n of Minority Law Enforcement Officers v.
  Abban
  748 N.E.2d 455 (Mass. 2001) ............................... 21
Matter of Locklin
  101 F.3d 435(5th Cir. 1996) ...................... 2, 9, 15, 18
Pratt v. Dietl,
  No. SUCV2009-1254 (Suffolk Sup. Ct. April 15, 2009) (Henry, J.)
  ........................................................... 23
Reich v. Newspapers of New England, Inc.
  44 F.3d 1060(1st Cir. 1995) ............................... 1
Ricci v. DeStefano
  557 U.S. 557 (2009) ................................... passim
Ricci v. DiStefano, (Outtz Brief, 2009 WL 796281)............. 5
United States v. City of New York
  731 F. Supp. 2d 291(E.D.N.Y. 2010) ........................ 8

**Statutes**

29 C.F.R. § 1607.14.................................. 16, 17, 18
29 C.F.R. 1607.15....................................... 12, 14
42 U.S.C. § 2000e..................................... passim
42 U.S.C. §2000(h)......................................... 36
M.G.L. c. 41, § 108L....................................... 13

I.    **CONTRARY TO DEFENDANTS' ARGUMENTS, THE DISTRICT COURT COMMITTED LEGAL ERRORS IN ITS TITLE VII ANALYSIS WHICH ARE SUBJECT TO *DE NOVO* REVIEW.**

The Defendants incorrectly argue that all of the District Court's conclusions must be reviewed under the clearly erroneous standard.  The determination of whether the parties have met their respective burdens under Title VII's three-prong analysis present mixed questions of fact and law.  In such situations, this Court has held that it must apply a "somewhat nuanced standard of review."  Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1069 (1st Cir. 1995).  The standard of review applied "to mixed questions usually depends on where they fall along the degree-of-deference continuum: the more fact dominated the question, the more likely it is that the trier's resolution of it will be accepted unless shown to be clearly erroneous."  Id. at 1069-70.  Indeed, in one of the cases relied on by Boston, the Sixth Circuit determined that a district court had committed a legal error subject to *de novo* review in its analysis of lesser discriminatory alternatives by focusing solely on the results of one prior exam.[1]  Johnson v. City of Memphis, 770 F.3d 464, 473, 475 (6th Cir. 2014) (by focusing on only one prior exam result the district court committed a legal

---

[1]    As discussed in more detail below, this is exactly what the District Court did here when it relied solely on the 2002 sergeant's exam (which employed an assessment center) in holding that an assessment center was not a less discriminatory alternative.  Decision at 44.

1

error by shifting the burden to show lesser discriminatory alternatives on to defendant).  Therefore, findings of fact regarding the data presented at trial may be subject to the clearly erroneous standard of review, but where the District Court's Title VII analysis on validity was based on a misreading or misunderstanding of applicable legal precedent, i.e. failure to adhere to the Uniform Guidelines, its rulings are legal error and are not subject to "clear error" review.  LeBlanc v. B.G.T. Corp., 992 F.2d 394, 396 (1st Cir. 1993).  Moreover, even if it were, the court's utter failure to make any subsidiary findings of fact supporting its ultimate conclusion, for example, on rank ordering, fails under both a clear error, and legal error analysis.  See Matter of Locklin, 101 F.3d 435, 438 (5th Cir. 1996) (court commits clear error where nothing in the record supports its finding).

## II.   **RICCI HAS NO BEARING ON THIS CASE AND, IF ANYTHING, SUPPORTS PLAINTIFFS' POSITION.**

Boston, and several of the smaller municipalities, rely heavily on the Supreme Court's decision in Ricci, for the proposition that the Supreme Court prohibited cities taking any remedial steps to address disparate impact racial discrimination.  See, e.g., Worcester Br. at 35, Lowell Br. at 41-42.  But Ricci says no such thing and is simply irrelevant to this case.

The sole issue in <u>Ricci</u> was whether a civil service board's "refusal to certify the [results of the exam] constituted <u>disparate treatment</u> under Title VII." <u>Briscoe v. City of New Haven</u>, 654 F.3d 200, 201 (2d Cir. 2011) (emphasis added). New Haven raised its concern that it might be subject to disparate impact liability should it be required to certify the exam.  <u>Id</u>. The Supreme Court held that such concern "can excuse an otherwise impermissible action only if supported by a 'strong basis in evidence' that the employer would have faced disparate impact liability had it acted otherwise." <u>Id</u>. (quoting <u>Ricci</u>, 557 U.S. at 585).  Following <u>Ricci</u>, New Haven minority firefighters brought an action challenging the New Haven fire promotional process (at issue in <u>Ricci</u>) as having an unlawful disparate impact upon minorities.[2] <u>Id.</u>

The City argued that the Supreme Court's decision <u>Ricci</u> precluded plaintiffs' disparate impact claim.  <u>Briscoe</u> at 203. But the Second Circuit disagreed, holding that it could not reconcile the City's argument "with the Court's actual holding in <u>Ricci</u> or longstanding fundamental principles of Title VII law." <u>Id.</u> at 206.  The Second Circuit held that the Supreme Court's statement in <u>Ricci</u> that "the employer must have a strong

---

[2]    The plaintiffs asserted that the weighting of the written and oral sections involving hypothetical questions answered before three assessors of that New Haven test, were 60% and 40% respectively, "was arbitrary and unrelated to job requirements." <u>Briscoe</u>, 654 F. 3d at 203.

basis in evidence to believe that it will be subject to
disparate impact liability if it fails to take the race
conscious discriminatory action" did not affect a disparate
impact challenge, and "to rule for the City we would have to
conclude that the Supreme Court intended to effect a substantial
change in Title VII disparate impact litigation in a single
sentence of dicta targeted only at the parties in this action."
<u>Briscoe</u>, 654 F. 3d at 208. The Court therefore concluded "after
a careful review of [<u>Ricci</u>] … and Title VII case law, we
conclude that <u>Briscoe's claim is neither precluded nor properly
dismissed</u>.  <u>Ricci</u> did not substantially change Title VII
disparate-impact litigation or preclusion principles in the
single sentence of dicta targeted at the parties in this action.
We follow the Court's clear explication of its limited holding."
<u>Id.</u> at 209 (emphasis added).

In other words, <u>Ricci</u> was concerned only with the question
of whether a city, having elected to give a promotional exam,
can, after receiving the results of such examination, scrap it
solely because it did not have enough minority candidates
reachable for promotion.  Doing that, the Supreme Court said,
was only permissible where the city had a "strong basis in
evidence" for believing that it would be subject to disparate
impact liability (as it is in this case) if it did not scrap the

4

exam.[3]  Moreover, the test in <u>Ricci</u> included an oral component

that accounted for 40% of the overall test score, and clearly

had more validity than the test at issue in this case.[4]

### III. <u>M.O.C.H.A.</u> DOES NOT ASSIST BOSTON'S ARGUMENT.

To further justify the use of a written test exclusively,

Boston relies on the Second Circuit's decision in <u>M.O.C.H.A.</u>

<u>Soc'y, Inc. v. City of Buffalo</u>, 689 F.3d 263 (2d Cir. 2012).

<u>See</u>, <u>e.g.</u>, Boston Br. at 31.  But this decision does little to

assist the City.

The Second Circuit never reached, nor did the plaintiffs

argue, the question of whether a written job-knowledge test can

be sufficiently job related for a supervisory position to be

considered valid.[5]  Rather, in a 2-1 decision, the Second Circuit

---

[3] In fact <u>Ricci</u> stands as a compelling argument as to why a promotional process needs to be designed to avoid significant adverse impact at the outset because scrapping the results after the fact is now more problematic after <u>Ricci</u>.

[4] Moreover, Boston's own expert, Dr. Outtz submitted a brief concluding that the exam at issue in <u>Ricci</u> was not valid because it failed to test for supervisory ability.  <u>Ricci v. DiStefano</u>, (Outtz Brief, 2009 WL 796281 at *10) ("The omission from the testing domain of a KSAO that is an important job prerequisite – known in I-O psychology as 'criterion deficiency' – A test that makes no attempt to measure one or more critical KSAO's cannot be validated under established standards.")

[5] Part of the reason for this was that the attorney for the plaintiffs is a solo practitioner whose brief never presented or argued the issues raised by Plaintiffs in this case.  For example, the subject heading of his brief shows that he never argued that the test lacked validity or could not be used as a rank order device.  <u>See</u> Br. of Appellants at ii (listing section headings: I.  Buffalo Did Not Prove it Performed an Adequate Job

focused on the issue of whether a job analysis which identified tasks and KSAs for firefighters in other New York cities could be used to construct a test for firefighters in Buffalo.[6] M.O.C.H.A., 689 F.3d at 267 ("Can an employer show that promotional examinations having a disparate impact on a protected class are job related and supported by business necessity when the job analysis that produced the test relied on data not specific to the employer at issue?").

Furthermore, contrary to Boston's argument, there was absolutely no discussion in M.O.C.H.A. of whether the written test was sufficiently predictive of job performance to be used as a rank-order device. The only allegation was that the exam had disparate impact at its pass-fail point. Id. at 271. Rather, the only reason the court discussed whether the written tests were themselves related to the job was to address the plaintiffs' argument that the written tests did not actually

---

Analysis; II. Buffalo Did Not Prove the Generic Subtests Tested Anything ; and III. A Jury Should Have Decided Whether the Examination Was Job Related and Consistent With Business Necessity). The plaintiffs' reply brief does not discuss validity at all. See Reply Br. of Appellants at I, 2011 WL 4015567.

[6]    The plaintiffs argued: "Buffalo did not collect reliable task or SKAP information from its employees so it could not prepare an adequate job analysis. Instead of collecting Buffalo information, Buffalo substituted information collected from other fire departments. Because the job analysis did not contain Buffalo information it was contrary to law and was not based on reliable principles and methods." Br. of Appellants, M.O.C.H.A., 2011 WL 3437857, at *29-30.

test for the knowledges that were identified in the job
analysis.  Id. at 280-81.  The plaintiffs never argued that a
written test could not measure the necessary KSAs, only that the
written tests administered by Buffalo were inadequate.  Indeed,
the Second Circuit held that the tests were job related because
a professional test developer ensured that important KSAs were
measured because KSAs were "statistically ranked and linked the
most critical tasks and SKAPs, which revealed that supervision,
training, and understanding written material were related to the
content of the job."  Id. at 281.  No such ranking occurred
here.[7]  (R.465-66).

        Finally, M.O.C.H.A. involved a firefighter's exam.  Dr.
Outtz testified at length about the significant differences
between the duties of a fire lieutenant and a police sergeant.[8]
(R.2252-56).  Thus, that it might be possible to measure the
KSAs required for supervisory firefighters would, according to

_____

[7]     To the extent that Boston attempted to give weights to
various knowledges (see, e.g., Ex. 183 at R.4787), this failed
to add to the exam's validity because it excluded all of the
skills and abilities from the test.
[8]     Dr. Outtz attempted to explain away his statements in the
Ricci brief by stating that there was no carry over from
lieutenant firefighters to police sergeants.  He testified that
"a fire lieutenant's job . . . is to use his or her sense more,
visual and smell and touch, to actually determine what is going
on and commanding units . . . to command 15, 20, 25 people"
whereas a police sergeant "comes to a scene, there may be two
officers at that scene, maybe one officer."  (R.2252-53).

Dr. Outtz, not necessarily support a similar finding for police sergeants.

## IV.  THERE IS NO SUPPORT FOR THE DISTRICT COURT'S FINDING THAT THE SERGEANT'S EXAMS MEASURED A REPRESENTATIVE SAMPLE OF THE KSAs.

Boston argues that it met its burden to show that its exams were job-related because, based on the 1991 testability analysis, the exams measured over 50% of the KSAs for the sergeant's positon.  Boston Br. 35-36.  Boston's burden, however, required it to show that its exams measures KSAs "in proportion to their relative importance on the job."  Guardians Ass'n of New York City Police Dep't v. Civil Serv. Comm'n of City of New York, 633 F.2d 232, 243-44 (2d Cir. 1980) (citation omitted).  The District Court failed to hold Boston to that burden in baldly concluding that the 1991 testability analysis showed that "more than half of the KSAs identified as pertinent to the job of sergeant were tested."  Decision at 32.  Boston was not able to find anything else in the record to support the court's finding.  Boston Br. at 36.

Boston was required to demonstrate that the exams actually tested the skills and abilities that were required for successful performance on the job.  United States v. City of New York, 731 F. Supp. 2d 291, 308 (E.D.N.Y. 2010).  As the United States points out, the testability analysis is not dispositive

because "nothing in the testability analysis indicates which KSAs were <u>actually</u> tested; it merely classified whether KSAs <u>could</u> be tested by either the written test or the E&E . . .." Am. Br. of U.S. at 13 (emphasis in original).  The 2008 Boston exam outline, for example, refers to only 12 KSAs for the sergeant's position.  (R.2640-43). It was clearly erroneous, therefore, to find that the tests actually measured more than 50% of the KSAs.  See <u>Matter of Locklin</u>, 101 F.3d at 438 (court commits clear error where nothing in the record supports its finding).

Boston argues that important supervisory skills were tested for by asking candidates to regurgitate sections of text books on supervision.  Boston Br. at 37.  As the United States highlights, this Court has already recognized that an exam that measures a candidate's knowledge of something fails to measure that candidate's actual ability to do that thing.  Am. Br. of U.S. at 15 (citing <u>Boston Chapter NAACP, Inc. v. Beecher</u>, 504 F.2d 1017, 1023 (1st Cir. 1974) (noting that Red Sox would be ill-advised to recruit knowledgeable baseball historians over less-knowledgeable, but more capable, baseball players).  Thus, memorizing sections of a book on supervision has no bearing on officer's ability to supervise.

The Massachusetts Civil Service Commission came to the same conclusion in <u>Carr v. Department of Personnel Administration</u>,

Civil Service Commission, No. G-1461 (Dec. 21, 1989)(R.3362-92),

affirmed Boston Police Superior Officers Fed'n v. Civil Serv.

Comm'n, 624 N.E.2d 617, 620-21 (1993).  Boston claims that

Plaintiffs have misconstrued Carr, but that is wrong.  Boston

Br. at 37.  The Commission expressly stated that exam questions

that derive from a textbook on supervision do not test for

supervisory skills. (R.3384). While, in dicta, the Commission

imagined that a written test could measure for supervisory

skills, this was only where the test used "hypothetical or

situational questions" that "would require that examinees apply

principles of supervision to real-life scenarios." (R.3385). The

exams at exam in this case were solely rote memory.  The

Commission expressly concluded that the "multiple choice

questions and the training and experience schedule" in 1989

could not "stand alone as a fair test for promotion."  (R.3386).

The Appeals Court agreed.  Boston Police Superior Officers

Fed'n, 624 N.E.2d at 621. ("The commission properly found that

the multiple choice and training and experience components alone

failed to constitute a fair test of supervisory skills and

ability.").  Thus, Carr supports Plaintiffs' case.

    Moreover, Boston ignores the fact that two Boston Police

commissioners testified in this case that that there was little

relationship between an officer's performance on the multiple-

choice test and their performance in a supervisory position,

such as lieutenant. (R.662, 667-71, 1241, 1244-45). Moreover,
former police commissioner Paul Evans wrote, when he was forced
to abandon his plans for a performance review system for
promotions, that the multiple-choice test was incapable of
picking the best candidates.[9] (R. 4828-29).

Boston claims that the District Court was correct in
finding that the 2000 job analysis supported validity.  Boston
Br. at 34-35.  As argued in Plaintiffs' initial brief,
Plaintiffs presented expert testimony at trial that the 2000 job
analysis was a sham because the SMEs involved expressed 100%
agreement on approximately 378 tasks and KSAs, which required
complete agreement on 20,000 total ratings, which Plaintiffs'
expert testified was statistically impossible.  (R.469).
Despite having the burden to prove that the job analysis
supported validity, Boston has put forward only the mere

---

[9]    Along the same lines, Boston points to the District Court's
finding that more incumbent sergeants taking the lieutenant's
exam achieve a passing score on common questions than candidates
seeking promotion to sergeant as evidence that the exams were
job related.  Boston Br. at 15, Decision at 33.  This is merely
a poor attempt to show criterion validity, which requires a
showing that an exam predicts future job performance.  But
passing scores do not predict job performance.  Rather, they
merely confirm that candidates who passed the exam previously,
and scored highly enough to be promoted, were still good at
taking the sergeants exam.  It did not show that they were good
at performing their jobs.  Moreover, the fact that 11 percent of
the officers who had spent several years working as sergeants
could not pass the sergeant's exam undercuts the notion that the
exam was related to the job at all.  One would expect a much
higher pass rate.

speculation of Dr. Outtz that the agreement may have been the product of a well-developed list of tasks and KSAs. Boston Br. at 14. The District Court, however, made no findings regarding these sham ratings and thus committed plain legal error.[10]

## V. BOSTON FAILS TO SHOW HOW THE COURT COULD FIND THAT THE EDUCATION AND EXPERIENCE RATING MADE AN INVALID EXAM VALID.

There is no dispute that the written test, by itself, is not content valid. The District Court's finding that adding the E&E rating made the 2005 and 2008 exams "minimally valid," however, was clearly erroneous. Where a "selection procedure purports to measure a knowledge, skill, or ability," it is "essential" that the employer produce "evidence that the selection procedure measures and is a representative sample of the knowledge, skill, or ability." 29 C.F.R. 1607.15(C)(4). Furthermore, Boston had the burden of demonstrating the weights given to the written test and the E&E rating correlated with the importance of the information being tested. Legault v. aRusso, 842 F. Supp. 1479, 1488 (D.N.H. 1994). The District Court fails

---

[10] Moreover, based on the 2000 job analysis, Morris and McDaniel, recommended that Boston give a multi-component examination with the following weights: a written examination (40%), an assessment center (32%), a performance review system (8%), and an education and experience component (20%). (R.1622-23; 4551). Neither Morris & McDaniel nor any other expert offered an opinion to support Boston's subsequent decision to abandon the assessment center and instead assign a weight of 80% to the written component of subsequent exams. (R.1623-24).

to explain how the E&E rating measures vital skills and abilities such as leadership and interpersonal skills.  Boston Br. at 20, 38; Decision at 35-36.

Statistically, it was clearly erroneous for the District Court to find that the E&E had sufficient weight to add to the validity of the exam.  The court wrongly focused on the 20% weight given to the E&E component when in fact the Plaintiffs showed that the E&E component actually had a minimal impact on final scores.  Decision at 35.

As explained in Plaintiffs' opening brief, the E&E did not differentiate between candidates because each candidate essentially received the same amount of points.  All candidates received a minimum of 14 out of 20 points by virtue of being eligible to sit for the exam. (R.2618).  While the E&E awards up to 12 points for post-secondary degrees, based on the 20% weight of the E&E this translates to a range of 0 to 2.4  Following the Quinn Bill, M.G.L. c. 41, § 108L, most officers possess at least a bachelor's degree, so the range of points is closer to 1.2 (for a bachelor's degree) to 2.4 (for a Ph.D.).  Officers gained from 0 to 0.4 points for licenses.

For courses taught, the range from one officer to the next would be infinitesimal.  The E&E rating provides between 0 points (no classes) to 1.5 points (10 classes taught). (R.2618).  Based on the 20% weight given to the E&E, this

13

results in a point spread of 0 to 0.3 points.  And since most
police officers will have taught fewer than 10 courses, the
point spread is even smaller.  Therefore, a candidate who taught
two classes would only receive 0.1 or 0.2 extra points on the
exam, showing that the E&E failed to provide any real credit for
teaching classes.

The combined effect of these four categories is a point
range of 0.84 (a police officer with three-years of experience,
no degrees, no courses taught, and no licenses) to 6.16 (a
police officer with 12-plus years of experience, a Ph.D., 10-
plus courses taught, and 2-plus licenses), resulting in a
maximum spread of 4.96 points. It was clearly erroneous for the
court to give the E&E component any weight where Boston had
failed to show that its small weight correlated with the
important skills it was supposed to measure.  Legault, 842 F.
Supp. at 1488.

Furthermore, the District Court failed to hold Boston to
its burden of showing how giving points for classes taught
correlated with oral communication skills pursuant to 29 C.F.R.
1607.15(C)(4), and Boston cannot show how such a correlation
exists.  Boston Br. at 17; Decision at 35.

Measuring oral communication skills by crediting classes
taught lacks common sense.  There was no showing of any kind
that teaching a class demonstrates better communication skills

14

and there was no evidence that people who do not teach are not good communicators.  There is simply no correlation between teaching and oral communication skills.

Furthermore, the Court made no findings and Boston has not shown, that the E&E component in 2005 or 2008 was able to measure other abilities that the 1991 report claimed were testable through the E&E, such as individual's "ability to interpret policy," "ability to be confidential," or "ability to accept responsibility."  (R.3929, 3932).  The lack of such findings further demonstrates that the court's conclusions regarding the E&E component were clearly erroneous.  See Matter of Locklin, 101 F.3d at 438.

## VI.  BOSTON HAS FAILED TO MEET ITS BURDEN TO SHOW THAT THE 2005 AND 2008 EXAMS WERE USABLE AS RANK-ORDER DEVICES.

As the Second Circuit held in Guardians, 630 F.2d at 100, a "test may have enough validity for making gross distinctions between those qualified and unqualified . . . yet may be totally inadequate" as a rank-order device.  To meet this burden, Boston had the "substantial task" of 1) making a "substantial demonstration of job relatedness and representativeness to show a sound basis for making rank-ordering hiring decisions" and 2) demonstrating "an adequate degree of reliability."  Id. at 103-04.

As the United States correctly notes, however, the District Court never performed the proper analysis for validating a rank-order device.  Am. Br. of U.S. at 22-23.  This was plain legal error.

Boston argues, however, that in one sentence the District Court managed to make the necessary findings that Boston met its burden of showing the tests were sufficiently job-related, predictive of future job performance, and reliable to justify rank ordering.  Boston Br. at 41 (citing Decision at 36).  But a closer review of the one sentence in that decision shows that the court was merely discussing general principles of content validity, and not the necessary facts justifying the use of the exam as a rank order device.

The court credits Dr. Outtz's testimony that the written test and the E&E component together are "minimally valid." Decision at 35.  The court then concludes that the exams are content valid pursuant to 29 C.F.R. § 1607.14(C)(1),(4),(6). Decision at 36.  The court then goes on the explain that even though the test could have been more valid, "the fact that [the exam] could have been better does not mean necessarily that it was not good enough to be deemed sufficient." Id.  The court then proceeds to add that, despite the potential benefit of additional elements, "[t]he key question regarding the content validity of a selection method is whether it reliably predicts a

16

candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job.  I am satisfied on the evidence that Boston carried its burden of showing that the exams in question satisfy that criterion."  Id.

Boston baldly argues that this constitutes a ruling on the necessary requirements for the use of an exam as a rank-order device under 29 C.F.R. § 1607.14(C)(9).  Boston Br. at 41.  This argument is without merit as the court was plainly discussing only content validity and never mentions rank ordering in this part of the brief.  Moreover, it make no mention of the underlying facts that would have supported its ruling and fails to even cite to 29 C.F.R. § 1607.14(C)(9), which sets out the requirements for using a test as a rank-order device.  There can be little doubt that the District Court was not talking about rank ordering here, nor in any other part of its decision, which constitutes legal error.[11]

The District Court also made no findings regarding the reliability of the exam scores to differentiate between

_____

[11]    Boston argues that written exams could be good predictors of job performance citing 2006 deposition testimony of Dr. Wiesen.  Boston Br. at 42.  Like the court, Dr. Wiesen's testimony refers to content validity not rank ordering. Moreover, Dr. Wiesen testified in this case that his views on the validity of multiple choice tests had "evolved" and that, in his expert opinion, multiple choice tests alone were not valid. (R.518).

17

candidates, which in itself was clear error.  <u>Matter of Locklin</u>,
101 F.3d at 438.  Boston argues that the 2005 and 2008 exam
results were reliable (Boston Br. at 43), but the evidence at
trial showed that Boston's own consultant, Dr. Jacobs, found
that the 2008 exam failed to differentiate between candidates
within seven-point bands.  (R.4232-33-35). This demonstrates
further that the exams were not usable as a rank-order device.

Boston argues that <u>Ricci</u> confirmed the use of rank order
devices in the civil service promotional context.  Boston Br. at
44. But as discussed above, <u>Ricci</u> said nothing about a claim for
disparate impact liability based on a rank order device.
<u>Briscoe</u>, 654 F. 3d at 208.  Moreover, the exam in <u>Ricci</u> was 60%
written and 40% oral, so if it had made such a finding, it would
be inapplicable here.  <u>Id.</u> at 203.

Boston further argues that, by using content validity, it
need not make any further showing to justify rank ordering
because that would require it to meet the stricter requirements
of criterion validity.  Boston Br. at 46.  This flies in the
face of the Guidelines that the use of rank order device
"requires a separate demonstration that there is a relationship
between higher scores and better job performance."  29 C.F.R. §
1607.14(C)(9).  Moreover, the Second Circuit held that an
employer can meet the requirements for rank ordering "without

resorting to a criterion-related study." Guardians, 630 F.2d at 103.

In support of this argument, Boston claims that other courts have ignored the requirement of a separate showing, but the cases do not support this. Boston Br. at 46-47. As discussed above, there is no discussion of rank ordering in M.O.C.H.A.. In Johnson, the Sixth Circuit agrees that the "requirements for rank ordering can be met through" a separate showing of "job-relatedness, variance in test scores, and an adequate degree of test reliability." 770 F.3d at 480 (citing Guardians, 630 F.2d at 104). Then, the Sixth Circuit made the required findings on job-relatedness, score variance, and reliability. Id. at 482-83. Moreover, the exam utilized by the City of Memphis consisted of six components, including (1) a "lowfidelity" video test with oral responses; (2) an investigative logic test; (3) an open-book job-knowledge test; (4) an application test, and (5) a written communications exam testing for grammar and clarity. Id. at 472. More importantly, the Sixth Circuit decision shows that the District Court's failure to conduct a separate analysis in its content validity analysis was plain legal error.

**VII. THE DISTRICT COURT'S CONCLUSIONS REGARDING LESSER
DISCRIMINATORY ALTERNATIVES CONSTITUTE LEGAL ERROR.**

It is undisputed that that adding test components such as
an assessment center, structured oral interview, or performance
review to an exam process increases the validity of an exam
while having less adverse impact on minorities.  Boston Br. at
19; Dec. at 46; R.439-41, 838, 846, 848-49, 2085, 2198, 2205,
2432-26, 2432-33, 2441-42, 4549).  Boston argues that Plaintiffs
failed to meet their burden of putting forward a specific less
discriminatory alternative.  Boston Br. at 49-50.  Not only is
this argument without merit, but the District Court never made
such a finding. Decision at 41-46.  Here, Plaintiffs put forward
four concrete alternatives which the experts agree add validity
while reducing adverse impact – use of written test as a hurdle,
banding, use of an assessment center or performance review in
addition to the written test, and restricting the written test
to measure understanding rather than rote memorization.  Pls.'
Br. at 66-70.  Scientific studies have documented a direct
relationship between increased validity and the addition of the
job-related components Plaintiffs have proffered.  (R.4549).

Boston argues that the use of an assessment center along
with a written test is not a less discriminatory alternative
based on the results of the 2002 exam, which included a written
test (40%), an assessment center (40%) and an E&E component

20

(20%). Boston Br. at 53-54.  Yet, in both <u>Allen v. City of</u> <u>Chicago</u>, 351 F.3d 306, 315-16 (7th Cir. 2003), and <u>Johnson</u>, 770 F.3d at 475, the courts held that the parties could not rely on the isolated results of a past examination.  Thus it was legal error to disregard the use of an assessment center based solely on 2002 results.  Decision at 42-43.

Furthermore, Boston and the District Court ignore evidence that the assessment center used in 2002 significantly reduced adverse impact on minority candidates.  (R.449-51).

The court and Boston also ignored data showing that the use of a structured oral interview in the 1992 exam significantly reduced adverse impact.  <u>See</u> <u>Massachusetts Ass'n of Minority Law</u> <u>Enforcement Officers v. Abban</u>, 748 N.E.2d 455 (Mass. 2001); Br. of Boston Police Patrolmen's Assoc., 2000 WL 34607839, *7. Furthermore, the court ignored evidence that the 1985 exam, which included multiple components, had no adverse impact at the passing rate.  (R.3297)

Boston further argues that adding components would not be economically feasible.  Boston Br. at 53.  While courts may factor in a testing component's costs into its analysis, no court has held that increased costs alone make a less discriminatory alternative unavailable.  If this were the case, it would lead to a race to bottom and prevent any use of alternative testing mechanisms.

21

Indeed, the Sixth Circuit found only that the lower court should have taken into account Memphis' concerns with test security.  Johnson, 770 F.3d at 474.  The other cases cited by Boston are inapposite.  In Allen, 351 F.3d at 314 the plaintiffs recommended that the city merely promote more people.  The court reasoned that financial considerations might make this alternative unfeasible, but by no means struck down alternative testing methods due to their added cost. And in Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1263 (6th Cir. 1981), the district court failed to perform any analysis of less discriminatory alternatives and the matter was remanded for that purpose alone.  It was clear error, therefore, for the District Court to have found more valid, less discriminatory alternatives were not available simply because they would have cost Boston more money than the status quo.  In fact, the District Court had already found that other cities in Massachusetts had used alternative testing procedures throughout the 1990s, showing that they were economically feasible.  Decision at 38.

Moreover, alternatives like banding would not cost Boston at all.  The District Court's ruling that banding was unavailable, however, constitutes plain legal error.  Decision at 45-46.  The court states that Boston could not use banding under state law.  The law, however, is crystal clear that Title VII trumps any state or local legal impediment to designing

exams that comply with Title VII Guardians, 630 F.2d at 105
(citing 42 U.S.C. § 2000e-7); Brown v. City of Chicago, 8 F.
Supp. 1095, 1112 (N.D. Ill. 1998).  This is especially true
where a state policy is perceived to prohibit banding.  See also
Ricci, 557 U.S. at 590 (a state court's prohibition of banding
"may not eliminate banding as a valid alternative under Title
VII") (citing 42 U.S.C. § 2000e-7).

The District Court further relies on the Massachusetts
Superior Court decision in Pratt v. Dietl, No. SUCV2009-1254
(Suffolk Sup. Ct. April 15, 2009) (Henry, J.).  Pratt, however,
merely enjoined immediate use of banding pending HRD utilizing
its rule-making authority to establish the banding process.  The
court did not hold that banding was prohibited in Massachusetts
under Chapter 31 and court's misreading of Pratt is legal error.

Boston further argues now that Ricci prohibited banding.
Boston Br. at 55.  While Ricci may have ruled that banding could
not be added to an exam after it was given solely to lessen
adverse impact, this argument is without merit. Plaintiffs are
not arguing that Boston add banding to the scores of the 2005
and 2008 exams now.  Rather, Plaintiffs are only arguing that
banding was an available alternative that should have been
employed in the design of the 2005 and 2008 exams and that, as a
result, would have produced an exam with less discriminatory
impact.

VIII.     IN ARGUING THAT THERE WAS INSUFFICIENT EVIDENCE OF
     ADVERSE IMPACT, THE APPELLEES' NARROW FOCUS ON ISOLATED
     STATISTICS SERVES TO HIGHLIGHT THE DISTRICT COURT'S FAILURE
     TO CONSIDER THE COLLECTIVE WEIGHT OF THE EVIDENCE AS A
     WHOLE, WHICH ESTABLISHED AS A MATTER OF LAW THAT THE
     CHALLENGED EXAMS DEPRIVED MINORITY OFFICERS OF AN EQUAL
     OPPORTUNITY.

Because Boston conceded that the officers established a
prima facie case of disparate impact, the district court
considered that issue only with respect to the remaining
jurisdictions (here, the "smaller jurisdictions").  Echoing the
district court's ruling in favor of those jurisdictions, they
now make two principal arguments on appeal: (1) there was
insufficient evidence of adverse impact when considering each
small jurisdiction separately, and (2) the district court
correctly determined that aggregation – in any form – was
improper.  And in an effort to shield the district court's
rulings from a more searching appellate review, the smaller
jurisdictions also argue that the district court's analysis was
a factual one subject to review for clear error, rather than a
legal one subject to de novo review.

As with each of the smaller jurisdictions' arguments, the
fundamental error in the district court's analysis – and it
plainly was a legal error – is that it disregarded the
fundamental nature of a court's inquiry at the first stage of a
disparate impact case, which is to determine whether the

24

*totality of the evidence* (here, the undisputed evidence plus the disputed evidence credited by the court) supports an inference that minority candidates were deprived of an equal opportunity. The district court's analysis departed from that standard and was therefore wrong as a matter of law, because it took an overly narrow view, looking only at whether *certain* evidence (that is, some forms of jurisdiction-specific evidence) was sufficient to establish an adverse impact. This overly-pinched analysis led the court to miss the unavoidable conclusion resulting from the evidence *as a whole* – i.e., that the tests at issue in this case, based on their very structure and as demonstrated by numerous pieces of undisputed evidence, provide built-in headwinds for minority candidates, depriving them of an equal opportunity for promotion.

The officers' evidence that minority candidates were deprived of an equal opportunity for promotion included the following *undisputed* evidence:

- A consensus among social scientists – including all four of the experts who testified in this case – based on decades of testing experience and social science research, that the types of pencil-and-paper, multiple-choice tests at issue here are *known* to have a disparate impact on minorities and have therefore fallen out of favor in police jurisdictions across the country.

- Statistically significant – and not just significant, but highly significant – evidence that minorities across the Commonwealth achieved substantially lower scores than non-minorities on *all six* of the multiple choice exams at issue in this case.

- Evidence that minorities across the Commonwealth passed all six exams at lower rates than non-minorities.  The passing disparities for both Boston exams and for the 2005, 2006, and 2007 statewide exams were statistically significant. For the 2008 exam, minorities again passed at lower rates than whites, but not at a level that was statistically significant for that year.

- Evidence that blacks are dramatically underrepresented at the sergeant rank within the smaller jurisdictions, following the longstanding use of similar exams.

- Evidence that when these tests are used in larger jurisdictions where bigger numbers provide more robust data, such as Boston, the adverse impact becomes profound.

- Numerous measures in the smaller jurisdictions – some statistically significant and some not (either because of small numbers or because they are not tests of statistical significance, as with the four-fifths rule) – that

demonstrate, almost without exception, that minorities performed and fared worse under these exams.

The smaller jurisdictions would have this Court ignore almost all of these individual pieces of evidence – and, even more importantly, the *collective weight* of that evidence – and focus instead on cherry-picked analyses that they contend are insufficient, standing alone, to meet the officers' burden of proof.  To be sure, there are numerous cases in which courts have determined that a plaintiff's adduced evidence was insufficient, and the smaller jurisdictions can cite them ad infinitum, but there is not a single case of which the officers are aware where a court has disregarded such an overwhelming collection of evidence to rule that there was insufficient evidence of adverse impact.

While arguing strenuously that small numbers cannot support any meaningful inferences, some of the smaller jurisdictions simultaneously rely on their own small numbers to buttress their position.  For example, Worcester points to the isolated and anomalous fact that minority candidates there performed slightly better on the promotional examination than non-minority candidates for the years in question.  (Worcester Br. at 24). But the problem with small numbers does not go away depending on how they come out; as an undisputed fact of accepted statistical science, they are unreliable, *standing alone*, to make any

27

reliable inferences.  For example, that the relatively small number of minority officers in Worcester happened to perform slightly better than the non-minority officers does not mean that they faced no built-in headwinds, for that outcome easily could have occurred by chance, and those same minority officers may have performed even better under a fair exam.  To use a simple analogy, if a minority candidate is given an extra ten-pound weight to carry during a running test, that he performs the test faster than a non-minority does not mean the test was fair.  Reasonable inferences can be made only from more robust data and a broader range of evidence, and that is exactly the point that the officers repeatedly made and the district court disregarded.

Contrary to the arguments advanced by the smaller jurisdictions, neither the Supreme Court nor this Court have ruled that plaintiffs must, as a necessary element of a prima facie case of adverse impact, satisfy any one specific test, whether a test of statistical significance, the four-fifths rule, or otherwise.[12]  On the contrary, both courts repeatedly have ruled that courts should make a broader inquiry in order to address the ultimate question of equal opportunity.  See, e.g.,

---

[12]    Indeed, a recent decision of the full Massachusetts Commission Against Discrimination found adverse impact among candidates for the sergeant's position in Worcester using a "less stringent approach" to the adverse impact analysis.  MCAD v. City of Worcester, Docket No. 94-SEM-0589, 0590.

Connecticut v. Teal, 457 U.S. 440, 450 (1982) ("In considering
claims of disparate impact…this Court has consistently focused
on employment and promotion requirements that create a
discriminatory bar to *opportunities*. This Court has never read
[Title VII] as requiring the focus to be placed instead on the
overall number of minority or female applicants actually hired
or promoted.") (emphasis in original); Donahue v. City of
Boston, 304 F.3d 110, 119 (1st Cir. 2002) (relevant harm in
adverse impact case is the "inability to compete on an equal
footing"); Beecher, 504 F.2d at 1021 (plaintiff must demonstrate
only that challenged test "is more of a hurdle for minority
members than for others;" and "question is whether the test
denied applicants equal protection of the laws by creating
'built-in headwinds'").  A district court must make a
determination about that ultimate issue of equal opportunity –
that is, whether minority candidates faced "built-in headwinds"
– by looking at the evidence as a whole, not by looking at
whether some pieces of evidence are sufficient when considered
in isolation.

The smaller jurisdictions rely heavily on Ricci and Jones
v. City of Boston, 752 F.3d 38 (1st Cir. 2014) cases abrogated
or otherwise changed settled law on the central purpose of an
adverse impact analysis or the flexibility with which it must be
conducted.  On the contrary, both cases lend support to the

29

officers' position, because they reinforce the principle that an adverse impact analysis is not intended to be a demanding or overly technical one.

In Ricci, the Court addressed whether a city's refusal to certify the results of a promotional exam, based on a belief that the results might have had a disparate impact on minority firefighters, resulted in disparate treatment discrimination against white and Hispanic firefighters.  557 U.S. at 562-63. The Court held that the city could not throw out the results of the exam unless it could demonstrate "a strong basis in evidence that, had it not taken that action, it would have been liable under the disparate-impact statute." Id. at 563.  In considering whether the city had such a strong basis in evidence, the Court had little difficulty with the first stage, concluding that "[t]he racial adverse impact was significant":

> On the captain exam, the *pass rate* for white candidates was 64 percent but was 37.5 percent for both black and Hispanic candidates.  On the lieutenant exam, the *pass rate* for white candidates was 58.1 percent; for black candidates, 31.6 percent; and for Hispanic candidates, 20 percent. The *pass rates* of minorities, which were approximately one-half the pass rates for white candidates, fall well below the *80-percent standard* set by the EEOC to implement the disparate-impact provision of Title VII. …

Id. at 586-87 (emphasis added).  As a result, the Court looked at one analysis – i.e., the passing rates using the four-fifths rule – to conclude that there was sufficient evidence of

30

"significant" adverse impact.  The Court went on to rule that
the city failed to show substantial evidence that it would be
liable under a disparate impact theory *only* because it failed to
meet its burden with respect to the second or third prongs.  Id.
at 587-92.

Some of the smaller jurisdictions wrench out of context and
misconstrue a single sentence in Ricci: "The problem for
respondents is that a prima facie case of disparate-impact
liability – essentially, a threshold showing of a significant
statistical disparity,…, and nothing more – is far from a strong
basis in evidence that the City would have been liable under
Title VII had it certified the results."  Id. at 587 (citation
omitted).  From this sentence, which emphasizes that proving
adverse impact is a modest threshold burden, the smaller
jurisdictions argue that plaintiffs must "adduce statistically-
significant proof" of an adverse impact.  (MBTA's Brief, p.13)
(citing Ricci).  Plainly, this sentence from Ricci did not
establish a requirement to adduce statistically-significant
proof, given that the Court had just stated that evidence of
disparate *passing rates* based on a *four-fifths rule* analysis
(which is plainly not a test of statistical significance, but
simply a rule of thumb adopted by the EEOC) was sufficient to
establish adverse impact.

31

In Jones, this Court considered a different situation,
where the same district court as in this case had ruled that the
plaintiffs' failure to show a violation of the four-fifths rule
precluded them from establishing an adverse impact, even though
they showed a statistically-significant, race-based difference
in drug test results.  752 F.3d at 49 (the district court
"concluded that a statistically significant imbalance does not
automatically constitute disparate impact where practical
significance is lacking, relying on the four-fifths rule as a
measure of practical significance").  This Court rejected the
district court's analysis, ruling that a showing of statistical
significance is sufficient, and that a plaintiff need not make
any showing of practical significance, through use of the four-
fifths rule or otherwise.  Id. at 52. This Court said, among
other things, that notwithstanding the four-fifths rule's
utility, "[t]here is nothing in that utility…to justify
affording *decisive* weight to the rule to negate or establish
proof of disparate impact in a Title VII case."  Id. (emphasis
added).  The central lesson from that case applies with equal
force here: adverse impact does not turn on any isolated litmus
test.

The case also provides two other lessons, both of which are
lost in the smaller jurisdictions' briefs.  First, saying that
the four-fifths rule does not have "decisive" weight is plainly

different from saying it has no weight at all, as the Court
expressly recognized.  Id. at 52 n.16 ("The fact that the four-
fifths rule is only a rule of thumb that does not always work
does not mean that it can never provide evidence of a nonrandom
disparity."), citing Ricci, 557 U.S. at 586-87.  In other words,
the Court cautioned, once again, against a formulaic analysis of
adverse impact.

Second, and likewise, while this Court ruled that a
specific statistically-significant disparity was sufficient to
establish adverse impact (regardless of the outcome of a four-
fifths rule analysis), that is far different from saying that a
specific form of statistically-significant disparity is *required*
to prove adverse impact (after all, to be sufficient is not the
same as being necessary).  It also is far different from saying
that other forms of evidence, including different statistically-
significant disparities, the four-fifths rule, historical data,
and patterns (all of which are present in this case),
individually or in combination, cannot also serve to establish
adverse impact.

Even if Ricci or Jones were read to require evidence of
statistically-significant disparities (contrary to what the
cases actually hold), the officers offered numerous
statistically-significant forms of evidence to support their
showing of adverse impact, including statistically-significant

33

disparities with respect to mean score differences and passing rates.  Nothing in Ricci or Jones establishes that these types of statistically-significant disparities are insufficient to establish adverse impact.  To the contrary, the Court in Ricci concluded there was "significant" adverse impact based on a four-fifths rule analysis (not an analysis of statistical significance) of passing rates.  557 U.S. at 586-87.  The same type of evidence that the Supreme Court found sufficient in Ricci is present throughout this case.

Recognizing that small numbers, *when isolated from any historical or broader context*, are ill suited to making any reasonable inferences, all of the smaller jurisdictions are quick to embrace the district court's anti-aggregation position. To be sure, it is undisputed that there are theoretical complications from *some* types of aggregation that may affect the weight of aggregated numbers, and the officers have never argued to the contrary.  For example, aggregating over time can result in some double counting, because the same candidates may take successive exams. Those complications may counsel against placing decisive or significant weight on some aggregated numbers, but they do not render the evidence of aggregated numbers meaningless.

In any event, there is one form of aggregation that each side's statistician *agreed* was appropriate – i.e., looking at

mean score differences across the Commonwealth for a single
exam.  (R.319, 2495).  As the smaller jurisdiction's expert
conceded when asked about that type of aggregation during cross
examination, "Right. I stand corrected, yes. In that situation,
across jurisdictions, it is appropriate to combine, and that
would be an appropriate use." (R.2495).  That concession was of
great consequence given that all of the challenged exams had
highly statistically-significant differences in the average test
scores of minority and non-minority candidates (as would be
expected from the undisputed evidence that such an outcome is
inevitable when the group is large enough to make statistically-
significant comparisons).  What more powerful evidence could
there be that minority candidates faced built-in headwinds?  The
district court had no basis in the evidence, or in the law, to
disregard that evidence, but it did.

The bottom line here is clear: virtually every piece of
evidence, when considered alone or in combination, supports the
officers' modest threshold burden of proving adverse impact.
Some of that evidence was statistically significant and some of
it was not, but it points overwhelmingly in a single direction.
There is no competing evidence that meaningfully suggests that
the 2005, 2006, 2007, or 2008 exams provided an equal
opportunity to black candidates.  As a result, based on all of

35

the evidence, the officers satisfied their burden of proving
adverse impact as a matter of law.

## IX.  MUNICIPALITIES MAY BE HELD LIABLE UNDER TITLE VII.

Several municipalities argue that they cannot be held
liable under Title VII because they were only following state
law and the testing regime administered by the Commonwealth's
Human Resources Division ("HRD").  Lowell Br. at 37-41;
Worcester Br. at 41-42; Lawrence Br. at 14; Methuen Br. at 8-9.
See also Boston Br. 4-7 (arguing Boston had no control over
testing process).  This Court, in this case, has already ruled,
however, that that the municipalities control the promotional
testing system and are employers under Title VII.  See Lopez v.
Com., 588 F.3d 69 (1st Cir. 2009).

Title VII, by its express language, preempts state laws,
policies and practices that permit disparate impact employment
discrimination.  See 42 U.S.C. §2000(h)-4.  See, e.g., Ricci,
557 U.S. at 590 (a state court's prohibition of banding "may not
eliminate banding as a valid alternative under Title VII")
(citing 42 U.S.C. § 2000e-7).  The Courts have unanimously
interpreted this provision as meaning that the strictures of
Title VII trump conflicting state laws, policies, and practices,
and therefore, an employer may not rely on such practices as a
defense.  See Gulino v. New York State Education Department, 460

36

F.3d 361 (2d Cir. 2006) (affirming Title VII liability against
New York City Board of Education as Plaintiff's employer, even
though the state agency that was responsible for administering
challenged examination); Beecher, 371 F. Supp. 507, aff'd 504
F.2d 1017 (1st Cir. 1974) (Boston Fire Department liable under
Title VII even though it relied on state-created civil service
exam which had a disparate impact); California Federal Savings &
Loan Association v. Guerra, 479 U.S. 272, 282 (1987) (explaining
Congress's intent that state laws in conflict with Title VII are
preempted); EEOC v. Allegheny County, 705 F.2d 679, 682 (3d Cir.
1983) (rejecting state law as preempted because conflicted with
the ADA).

      Moreover, the municipalities are not passive bystanders
here.  As this Court has already held, the Defendants "are *not*
required to use examinations prepared and administered by HRD."
Lopez, 588 F.3d at 76 (emphasis in original). Instead, the
cities and towns "have considerable latitude over the process by
which police officers are selected for promotion to sergeant."
Id. at 74, 76-80.  This Court specifically found that the cities
can "opt out of the HRD administered process and implement their
own promotional examinations pursuant to an agreement with HRD."
Id. Moreover, the municipalities "have flexibility in deciding
how to satisfy the regulatory requirements" concerning police
promotions" and "retained flexibility over key aspects of

                              37

promotions, including the ultimate choice among candidates."
<u>Id</u>. at 77. In short, as explained by this Court, the
municipalities have "a number of ways they can consider other
factors beyond examination scores and look beyond the top ranked
candidates on an eligibility list." <u>Id.</u> at 80.

## **<u>CONCLUSION</u>**

Thus, for these reasons, as well as those stated in
Plaintiffs' opening brief, the Court should reverse the District
Court's judgment.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.    This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,452 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). Plaintiffs have filed a motion to extend the word limit to not more than 9,500 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Microsoft Office Word with Courier New, 12-point type space.


/s/ Harold Lichten
Harold Lichten

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2015, I electronically filed the foregoing brief with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties are registered as ECF filers and that they will be served by the CM/ECF system:

Charles Boddy Jr.
Richard D'Agostino
Office of the City Attorney
200 Common St., Ste. 306
Lawrence, MA 01840

Anne L. Radazzo
25 Westwind Dr.
Methuen, MA 01844

Kerry M. Regan
City of Methuen
Office of the City Solicitor
41 Pleasant St., Suite 311
Methuen, MA 01844

Iraida J. Alvarez
Robert Lawrence Quinan, Jr.
Sookyoung Shin
MA Attorney General's Office
1 Ashburton Place, 20th Floor
Boston, MA 02108

Rachel M. Brown
Shapiro Haber & Urmy LLP
Seaport East
2 Seaport Lane
Boston, MA 02210

Christine Patricia O'Connor

City of Lowell

375 Merrimack St.,

3rd Fl.

Lowell, MA 01852

Daniel C. Brown

Joshua Ryan Coleman

Tim D. Norris

Collins, Loughran & Peloquin P.C.

320 Norwood Park South

Norwood, MA 02062

Kay H. Hodge

John Matthew Simon

99 High St., Suite 1601

Boston, MA 02201

Lisa Skehill Maki

City of Boston Law Department

One City Hall Plaza

Room 615

Boston, MA 02201

Robert P. Morris

Morgan, Brown & Joy LLP

200 State St.,11$^{th}$Fl.

Boston, MA 02109

Maurice Martin Cahillane

Egan, Flanagan & Cohen PC

67 Market St.

Springfield, MA 01102

Harry P. Carroll

John Thomas Liebel

Edward M. Pikula

City of Springfield

Law Department
36 Court St.
Springfield, MA 01103

William G. Cullinan
O'Connor Martinelli & Cohn
1391 Main St., Ste. 1022
Springfield, MA 01103

Kevin Sean McDermott
MBTA Law Department
10 Park Plaza, Suite 7760
Boston, MA 02116

                              /s/ Harold Lichten
                                 Harold Lichten