No. 14-1952

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

PEDRO LOPEZ, ABEL CANO, KEVIN SLEDGE, CHARLES DEJESUS,
RICHARD BROOKS, THE MASSACHUSETTS HISPANIC LAW
ENFORCEMENT ASSOCIATION, ROBERT ALVAREX, SPENCER TATUM,
SHUMEAND BENFOLD, ANGELA WILLIAMS-MITHCELL, GWENDOLYN
BROWN, LYNETTE PRAILEAU, TYRONE SMITH, EDDY CHRISPIN,
DAVID E. MELVIN, STEVEN MORGAN, WILLIAM E. IRAOLO, JOSE
LOZANO, JOSE LOZANO, COURTNEY A. POWELL, JAMES L. BROWN,
GEORGE CARDOZA, LARRY ELLISON, DAVID SINGLETARY, CHARISSE
BRITTLE POWELL, CATHENIA D. COOPER-PATERSON, MOLWYN
SHAW, LAMONT ANDERSON, GLORIA KINKEAD, KENNETH GAINES,
MURPHY GREGORY, JULIAN TURNER, NEVA GRICE, DELORES E.
FACEY, LISA VENUS, RODNEY O. BEST, KAREN VANDYKE, ROBERT C.
YOUNG, ROYLINE LAMB, LYNN DAVIS, JAMES A. JACKSON, JUAN
ROSARIO, LOUIS ROSARIO, JR., OBED ALMEYDA, DEVON WILLIAMS,
JULIO M. TOLEDO, individually and on behalf of a class of individuals similarly
situated,

Plaintiffs-Appellants,

v.

MARISOL NOBREGA, individually and on behalf of a class of individuals
similarly situated,

Plaintiff,

v.

CITY OF LAWRENCE, MASSACHUSETTS; CITY OF METHUEN,
MASSACHUSETTS; COMMONWEALTH OF MASSACHUSETTS; PAUL
DIETL, in his capacity as Personnel Administrator for the Commonwealth of
Massachusetts; JOHN MICHAEL SULLIVAN, in his capacity as Mayor of the

City of Lawrence, Massachusetts; WILLIAM MANZI, III, in his capacity as Mayor of the City of Methuen, Massachusetts; APPOINTING AUTHORITY FOR THE CITY OF LOWELL, MICHAEL O'BRIEN, in his capacity as City Manager of the City of Worcester, Massachusetts; CITY OF BOSTON, MASSACHUSETTS; CITY OF SPRINGFIELD, MASSACHUSETTS; DOMENIC J. SARNO, JR., in his capacity as Mayor for City of Springfield; MASSACHUSETTS BAY TRANSPORTATION AUTHORITY; DANIEL GRABAUSKAS, in his capacity as General Manager; BOARD OF TRUSTEES OF THE MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendants-Appellees,

WILLIAM F. MARTIN, in his capacity as Mayor of the City of Lowell, Massachusetts; KONSTANTINA B. LUKES, in her capacity as Mayor of the City of Worcester, Massachusetts,

Defendants.

_____

On Appeal from a Judgment of the United States
District Court for the District of Massachusetts

## PLAINTIFFS-APPELLANTS' PETITION FOR REHEEARING EN BANC

### Counsel for Plaintiffs-Appellants

Harold L. Lichten, C.A.B. 22114
Benjamin Weber, C.A.B. 1159650
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617)-994-5800
hlichten@llrlaw.com
bweber@llrlaw.com

Stephen Churchill, C.A.B. 30464
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3262
steve@fairworklaw.com

DATED:  June 15, 2016

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant,

The Massachusetts Hispanic Law Enforcement Association hereby states that its

corporate status was revoked in 2012 and it is an unincorporated association.

# **TABLE OF CONTENTS**

RULE 35(B) STATEMENT ...................................................................1

BACKGROUND .................................................................................3

BRIEF STATEMENT OF THE CASE ....................................................5

REASONS FOR GRANTING REHEARING .........................................8

   I.   The Majority's Opinion Is in Direct Conflict with Virtually Every Other Court Holding That Primary Reliance On Written Multiple Choice Tests, (That Cause Severe Adverse Impact) To Make Police Promotions Violates Title VII. ..........................................................................................8

  II.  The Panel's Decision is in Conflict with Decisions in Other Circuits Holding that Promotions Cannot Be Based on Rank Order Scores Primarily Derived from a M/C Written Test. ............................................................12

# TABLE OF AUTHORITIES

**Cases**

Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017, 1020-21 (1st Cir. 1974.................................................................................................1

Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 15 (1st Cir. 1998) .............................................................................................4

Boston Police Superior Officers Fed'n v. Civil Serv. Comm'n, 35 Mass. App. Ct. 688, 693-94, 624 N.E.2d 617, 620-21 (1993).........................................11

Br. of Industrial Organizational Psychologists as Amici Curiae in Support of Respondents ("Outtz Br."), Ricci v. DeStefano, 2009 WL 796281, at *24 (2009) .................................................................................................3, 4

Brackett v. Civil Service Commission, 447 Mass. 233, 245 (2006) .........................3

Bradley v. City of Lynn, 443 F. Supp. 2d 145, 155 (D.Mass. 2006) ......................8

Brunet v. City of Columbus, 1 F.3d 390, 410 (6th Cir. 1993)................................13

Carr v. Department of Personnel Administration, Civil Service Commission, No. G-1461 (Dec. 21, 1989) .........................................................................11

City & Cty. of San Francisco v. Fair Employment & Hous. Com., 191 Cal. App. 3d 976, 990, 236 Cal. Rptr. 716, 724 (Ct. App. 1987) ...............................10

Cotter v. City of Boston, 323 F.3d 160, 170 (1st Cir. 2003) .....................................3

EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 600-601 (1st Cir. 1995) .......................................................................................................8

Ensley Branch of NAACP v. Seibels, 616 F.2d 812 (5th Cir. 1980) .................1, 12

Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506, 511-514 (8th Cir. 1977).............................................................................. 1, 3, 9

Guardians Ass'n of New York City Police Dep't v. Civil Serv. Comm'n of City of New York 633 F.2d 232 (2d Cir. 1980)..........................................1, 13

Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York, 630 F.2d 79, 103 (2d Cir. 1980) .......................................9, 12

Guardians Association of New York City Police Department v. Civil Service Commission of New York, 633 F.2d 232, 243-244 (2d Cir. 1980) .......................8

Johnson v. City of Memphis, 770 F.3d 464, 473, 480 (6th Cir. 2014)....................13

Kirkland v. New York State Department of Correctional Services, 374 F. Supp. 1361, 1378 (S.D.N.Y. 1974) aff'd 520 F.2d 420 (2d Cir. 1975)............................9

Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dept., 973 F.2d 18, 19 (1st Cir. 1992) ...............................................................................4

Massachusetts Ass'n of Afro–American Police, Inc. v. Boston Police Dep't, 780 F.2d 5 (1st Cir.1985)................................................................................4

Nash v. Consolidated City of Jacksonville, FL, 837 F.2d 1534 (11th Cir. 1988) ...10

Officers for Justice v. Civil Service Commission of San Francisco, 371 F. Supp. 1328, 1338 (N.D. Cal. 1973) ................................................................10

Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. 393, 414 (S.D. Oh. 1985) ........................................................................................10

Smith v. City of Boston, 2015 WL 7194554 (D. Mass. Nov. 16, 2015) ......... passim

Stuart v. Roache, 951 F.2d 446, 456 (1st Cir. 1991) ...................................4

Tatum v. City of Worcester, MCAD No. 94-SEM-0589, 0590, at p. 9 (MCAD July 1, 2015) ..........................................................................................3

Title VII of the Civil Rights Act of 1964................................................1

U.S. v. City of Montgomery, 775 F. Supp. 1450, 1454 (D. Ala. 1991) ...................2

United States v. City of Chicago, 549 F. 2d. 415, 434 (7th Cir. 1977) ...................10

United States v. City of Chicago, 573 F.2d 416 (7th Cir. 1978) ..............................1

Vanguard Justice Soc., Inc. v. Hughes, 592 F. Supp. 245 (D. Md. 1984).. 2, 3, 9, 10

Vanguard Justice Society v. Hughes ("Vanguard I"), 471 F. Supp. 670 (D. Md. 1979) ....................................................................................10

Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Service, 832 F.2d 811 (3d Cir. 1987) .....................................................................................2

Vulcan Pioneers, Inc. v. New Jersey Department of Civil Service, 625 F. Supp. 527, 547 (D.N.J. 1985) aff'd 832 F.2d. at 815-816 (3d Cir. 1987) ......................10

**Statutes**

29 C.F.R. § 1607.14 ............................................................................8, 13

Title VII of the Civil Rights Act of 1964...................................................... passim

**Other Documents**

Br. of Industrial Organizational Psychologists as Amici Curiae in Support of Respondents, <u>Ricci v. DeStefano</u>, 2009 WL 796281 (2009)……………………3, 5

## RULE 35(B) STATEMENT

This case involves an issue of exceptional importance under Title VII of the Civil Rights Act of 1964. The decision of the majority 2-1 panel in this case would effectively be the death knell of "disparate impact" litigation seeking to provide equal opportunity to minority candidates seeking police and firefighter entry-level and promotional positions. By finding lawful the use of a multiple choice rote memory test as the primary determinant of police promotions, when such tests indisputably have severe disparate impact on minority candidates and are very poor indicators of performance, the panel decision opens the door to the re-segregation of police and fire departments in Boston and throughout the United States.[1] By allowing cities to rank candidates based solely on their scores, and then promote in strict rank order, this Court has erased 40 years of precedent both in this Court and in the other circuits finding that written police tests that have severe disparate impact on minorities and do not assess the supervisory abilities necessary to do the job violate Title VII.[2] For this reason, virtually all large city police departments in

---

[1]    In the Boston Police Department, the history of discrimination in the hiring and promotion of minority officers is well documented.  See Am. Br. of the Lawyer's Committee for Civil Rights Under the Law at p. 7-14 (filed on March 9, 2015); Plaintiffs' Br. at p.8, n. 7 (filed on Feb. 27, 2015).

[2]    See Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017, 1020-21 (1st Cir. 1974); United States v. City of Chicago, 573 F.2d 416 (7th Cir. 1978); Ensley Branch of NAACP v. Seibels, 616 F.2d 812 (5th Cir. 1980); Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506, 511-514 (8th Cir. 1977); Guardians Ass'n of New York City Police Dep't v. Civil Serv. Comm'n of City of New York 633 F.2d 232 (2d Cir. 1980); Vanguard Justice Soc., Inc. v.

the United States have long abandoned using such written tests as the primary tool for promotions and, as all the experts in this case agreed, such a process is both certain to result in significant adverse impact against minority candidates, while also failing to select the more qualified candidates.[3]

The majority decision ignores both the arguments made in Justice Torruella's dissent, and the detailed decision of Judge William Young, which found this identical test to violate Title VII.[4] It also rejected the Department of Justice's persuasive arguments in its amicus brief. See Am. Br. of U.S. (filed on March 9, 2015). Moreover, the panel's decision is irreconcilable with a significant number of decisions including the Eighth, Second, and Third Circuits as well as numerous district court decisions, and the EEOC's Uniform Guidelines on Employee Selection. See Dissent at p. 43-44; Smith, 2015 WL 7194554, at *25;[5]

---

Hughes, 592 F. Supp. 245 (D. Md. 1984); Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Service, 832 F.2d 811 (3d Cir. 1987); U.S. v. City of Montgomery, 775 F. Supp. 1450, 1454 (D. Ala. 1991)

[3]     The City of Boston's own experts, Dr. Jacinto Silva and Dr. James Outtz, testified that they always recommend municipalities use multi-component examinations that do not rely solely on multi-choice tests, due to the high levels of adverse impact such tests produce.  R. 2083, 2086-89, 2215, 2427-30, 2441-42.

[4]     See Smith v. City of Boston, 2015 WL 7194554 (D. Mass. Nov. 16, 2015).

[5]     "[T]he 2008 exam skipped over critical skills and abilities, including interpersonal skills, presentation skills, reasoning and judgment skills, oral communication skills, analytical skills, ability to give constructive criticism, ability to speak in front of groups, ability to counsel subordinates, ability to counsel and comfort families of victims, and ability to make sound decisions quickly." Smith, 2015 WL 7194554, at *25.

Firefighters Institute for Racial Equality v. City of St. Louis, 549 F.2d 506, 511-14 (8th Cir. 1977); Vanguard Justice Soc., Inc. v. Hughes ("Vanguard II"), 592 F. Supp. 245, 260  (D. Md. 1984).

## BACKGROUND

For more than 40 years, courts and social scientists have recognized that written multiple-choice tests cause high levels of adverse impact against minority candidates seeking police and fire positions.[6] In Massachusetts, the reliance on rote-memory multiple-choice exams has predictably caused severe under-representation of minority candidates in police supervisor ranks, just as it did in this case in the City of Boston. Brackett v. Civil Service Comm'n, 447 Mass. 233, 245 (2006) (acknowledging that no minority police officers would have been promoted to the rank of sergeant based on use of strict rank ordering); Tatum v. City of Worcester, MCAD No. 94-SEM-0589 at p. 9 (MCAD July 1, 2015) (problems promoting minorities to police sergeants where Worcester promoted only one minority in 13 years) (attached in Addendum); Cotter v. City of Boston, 323 F.3d 160, 170 (1st Cir. 2003) (Boston bypassed white police sergeant

---

[6]     Record Appendix ("R.") 314-15, 319, 359, 392, 2495; Lopez, slip op. at 14; Smith, 2015 WL 7194554, at *16 (citing record from Lopez and Smith); Br. of Industrial Organizational Psychologists as Amici Curiae in Support of Respondents ("Outtz Br."), Ricci v. DeStefano, 2009 WL 796281, at *24 (2009) ("It is well-established that minority candidates fare less well than their Caucasian counterparts on standardized written examinations, and especially multiple-choice (as opposed to "write-in" tests.)").

candidates based on disparate impact of using exam scores for strict rank ordering); Stuart v. Roache, 951 F.2d 446, 456 (1st Cir. 1991) (lack of minority police sergeants in Boston); Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dept., 973 F.2d 18, 19 (1st Cir. 1992) (BPD required consent decree to increase minority promotions).[7] Nevertheless, police unions and non-minority candidates have sought to protect the use of these written examinations.[8] Meanwhile, outside of Massachusetts, nearly all large American cities have implemented multi-component promotional procedures, including assessment centers,[9] structured oral interviews, and situational judgment tests, which all of the experts in this case acknowledged increase validity substantially,[10] (because much more of the job requirements are being assessed), while achieving less adverse impact.[11] Lopez,

---

[7]    See also R. 3207-3208 (in 2008, only two of Lawrence's 22 sergeants were minorities); R. 3142 (only two of Lowell's 30 sergeants were minorities); R. 1704-05, 3008 (only four of Springfield's 40 sergeants were minorities).

[8]    See Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 15 (1st Cir. 1998) (rejecting claims brought by white officers and superior officers union claiming reverse discrimination); Mass. Ass'n of Afro–American Police, 973 F.2d at 18 (dismissing union's 1991 challenge to consent decree); Stuart, 951 F.2d 446 (rejecting reverse-discrimination challenge to decree); Cotter, 323 F.3d at 174 (same); Mass. Ass'n of Afro–American Police, Inc. v. Boston Police Dep't, 780 F.2d 5 (1st Cir.1985) (rejecting union motion to intervene).

[9]    An assessment center involves job simulations, such as a mock press conference, role-playing exercises, or an in-basket exercise.  R. 442-43.

[10]    R. 673-75, 814, 894, 2083-89, 2423-24, 2427-30.  See also Outtz Br., 2009 WL 796281 at 32 ("It is equally well-recognized in the research literature that assessment centers reduce adverse impact on racial minorities as compared to traditional standardized tests.").

[11]    The experts testified about the nearly universal use of multi-component exams for police sergeant promotions, particularly in larger jurisdictions, and there

slip op. at 46;  R. 439-41, 454-55, 838, 846, 848-49, 2085, 2198, 2205, 2423-26,
2432-33, 2441-42, 4549.

## BRIEF STATEMENT OF THE CASE

In 2005 and 2008, the City of Boston utilized the Commonwealth's written
multiple-choice civil service examination to select police sergeants.[12] The test was
composed of 80 multiple choice questions taken directly out of textbooks and
rules. R. 2556-59. Candidates were given a reading list and the questions were
taken almost verbatim from the reading materials. R. 434-36, 2609, 2644.
Although a job analysis had identified well over 155 critical skills and abilities that
could not be tested through a written multiple choice test (R. 4058-65), no attempt
was made to test for those abilities, rather, the test only assessed certain job
knowledges which could be acquired by reading the books. R. 423-26, 556, 2640-
43, 3927-33. In addition, although the remaining 20% of the exam consisted of a
so-called education and experience ("E&E") rating, because all candidates
automatically got 14 points out of the 20 just for sitting for the exam (R.304-07,
2179), the evidence demonstrated that the E&E rating at most comprised only two
points of the total exam score (R. 2179-80), fluctuated very little among

___

was no evidence about any jurisdiction outside of Massachusetts that used only a
written, multiple-choice job knowledge test. R. 454-55, 815-16, 2215, 2423-24.
Plaintiffs also produced a list of major cities that use multi-component tests for
police sergeant exams in their proposed findings of fact filed with the District
Court.  See Lopez, ECF No. 313 at ¶ 178.
.

candidates, and added only 3-4% to the exam's validity (R. 2163).[13] In addition, because the E&E rating was the same for all ranks, and the same for the Fire Department, and had been in place for more than 40 years without change, it was not based on any study or job analysis of the essential functions of the job of a police sergeant. Judge Young concluded that the E&E did not ultimately support the exam's validity. Smith, 2015 WL 7194554, at *22, 28 n. 42. In addition, the questions on the exam were allegedly based upon a job analysis which was conducted back in 1991, some 17 years before the exam was given, and the questions were written by a layperson. R. 465-66; Lopez, slip op. at 29.

Boston arranged all the scores in rank order fashion, and made promotional selections in strict rank-order fashion -- with no interviews, assessment of past performance, community involvement, or supervisory ability being considered.[14] Although in both 2005 and 2008 many minority candidates easily passed the written test,[15] hardly any had scores high enough[16] on the list to be promoted.[17]

---

[13]  The E&E rating awarded points for: a) police work experience, b) post-secondary degrees, c) courses taught, and d) licenses held. R.2618.

[14] For example, in Lowell, one candidate, Alvarez, had been a platoon commander in the Marines but that fact did nothing to advance his candidacy. R.1303

[15] For example, in Boston, 135 minorities (63%) passed the 2008 exam and 97 passed (43%) in 2005. R. 4308, 4312.

[16] In Boston, minority candidates scored on average 6.4 points lower on the 2005 exam and 6.6 points lower on the 2008 exam.  R. 4313.

[17] In Boston, at the time of trial in 2011, only 1 minority (0.5% of minority candidates) had been promoted to the rank of sergeant from the 2008 test, while 25 non-minorities (9% of non-minority candidates) had been promoted up until that point. R. 4312.  From the 2005 test, only nine minorities were promoted (4% of

During trial in 2011, Boston conceded the severe adverse impact of the exam, and its primary expert conceded that the exam itself was not "valid" because it did not test for a representative sample of the most important aspects of the sergeant's position.[18] The court held, however, that although the written test was not valid under Title VII, the addition of the education and experience rating made the exam "minimally valid"[19] and, therefore, lawful under Title VII. Other than one opaque sentence in the opinion, the court made no specific findings about the test's use as a rank-order device, or the test having met any higher standards for rank order use. Lopez, slip op. at 36. See also Am. Br. of U.S. at 22-23.

In 2015, while this case was on appeal, Judge Young presided over a trial of a nearly identical case involving the 2008 Boston police lieutenant's exam[20] and held that the same exam violated Title VII. Smith, 2015 WL 7194554.

The Plaintiffs appealed the Lopez decision to this court, and were joined by the Department of Justice and other civil rights groups.[21] The panel issued a 2-1

_____

minority candidates), while 57 non-minorities (14% of non-minority candidates) were promoted to the rank of sergeant. Id.

[18] Lopez, slip op. at 35; R. 1892, 2111-12.

[19] The term "minimally valid" came from defendants' expert. Id.

[20] Indeed, statewide, the lieutenant's exam consisted of the 80 questions from the sergeant's exam, plus an additional 20 questions (while in Boston, the lieutenant candidates answered 68 of 100 questions from the sergeant's exam), and the E&E component was identical. Moreover, the entire evidentiary and testimonial record from this case was introduced and made part of the record evidence.

[21] Amicus briefs were also filed by the National Urban League and National Association for the Advancement of Colored People ("NAACP") (filed on April 8, 2015) and the Massachusetts Association of Minority Law Enforcement Officers,

decision affirming the District Court.  However, in dissent, Justice Torruella,

agreeing with Judge Young, found that the exam was deeply flawed because of the

defective way the exam was constructed, and that more importantly, it failed to test

for most of the important attributes necessary to be a police superior officer i.e.

"supervisory ability", nor could it, given its multiple-choice format. In this regard,

Judge Torruella and Judge Young agreed with the arguments advanced by the

Justice Department's Civil Rights Division.[22]

## **REASONS FOR GRANTING REHEARING**

**I.**   **The Majority's Opinion Is in Direct Conflict with Virtually Every Other Court Holding That Primary Reliance On Written Multiple Choice Tests (That Cause Severe Adverse Impact) To Make Police Promotions, Violates Title VII.**

For a hiring or promotional test that results in such severe adverse impact to

be lawful, it must be "job related" and consistent with "business necessity" 29

C.F.R. § 1607.14; EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594,

600-601 (1st Cir. 1995). In Title VII parlance, the exam must be "valid" utilizing

specific standards contained in the Uniform Guidelines on Employee Selection, 29

C.F.R. §1607.14(c)(2); Guardians Assoc. of N.Y.C. Police Dep't v. Civil Service

Comm'n of New York, 633 F.2d 232, 243-44 (2d Cir. 1980). In addition to

requirements for constructing the exam, the test must be able to assess a

---

New England Chapter of the NAACP, Urban League of Eastern Massachusetts, and Lawyer's Committee for Civil Rights Under Law (filed on March 9, 2015).
[22] See Dissent at p. 46-47; Smith, 2015 WL 7194554, at *23; U.S. Br. at p. 14-18.

representative sample of the most important knowledges, skills, and abilities ("KSAs") necessary for the job.[23] <u>Vanguard II</u>, 592 F. Supp. at 266; <u>Guardians</u>, 630 F.2d at 99.

The majority's decision is in direct conflict with virtually every other court that has found that the use of a police or fire promotional written multiple choice job knowledge test, without the assessment of supervisory skills, cannot be shown to be job related, precisely because it does not test for the most important attributes of a supervisory position – supervisory ability.[24] <u>Firefighters Institute for Racial Equality</u>, 549 F.2d at 511 ("captain's exam failed to test for the one major attribute that separates a firefighter from a fire captain, that of supervisory ability"); <u>Kirkland v. N.Y.S. Dep't of Correctional Services</u>, 374 F. Supp. 1361, 1378 (S.D.N.Y. 1974) <i>aff'd</i> 520 F.2d 420 (2d Cir. 1975) (written test "fails to examine a number of traits, skills and ability which witnesses for both sides signaled out as important to the sergeant job, among these are leadership, understanding, ability to

---

[23] The City relied on a content validity analysis to try to justify the exam. See 29 C.F.R. § 1607.14(C)(9). "Content validity" requires proof that, the test is actually "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job for which the candidates are being evaluated." <u>Albermarle Paper Co. V. Halifax Local</u>, 422 US 405, 431 (1975).

[24] There are numerous Title VII decisions involving police and fire promotions where the employer utilized a multi-component testing process, with a written exam comprising a fraction of the total score, or only used as a qualifier. Here, in stark contrast, no other component was used.  Accordingly, in his amicus brief in <u>Ricci</u>, Dr. Outtz stated that "a test that makes no attempt to measure one or more critical [knowledge, skills and abilities] cannot be validated under established standards." Outtz Br., 2009 WL 796281 at *10.

9

empathize with persons from different backgrounds and ability to cope with crisis situations"); U.S. v. City of Chicago, 549 F. 2d. 415 (7th Cir. 1977) (striking down police promotional tests because the tasks and abilities tested for in the examination did not "substantially represent equivalent tasks on the job."); Nash v. Consolidated City of Jacksonville, FL, 837 F.2d 1534, 1539 (11th Cir. 1988) (written promotional could not test for critical supervisory skills); Isabel v. City of Memphis, 404 F.3d 404, 413-14 (6th Cir. 2005) (striking down written promotional test that could only serve to measure job knowledge).[25]

---

[25] See also Vanguard Justice Society v. Hughes ("Vanguard I"), 471 F. Supp. 670, 737 (D. Md. 1979) ("the types of skills measured by the questions on the [written] examination, including reading ability and rote memorization do not include all or most of the skills that empirical studies have found relevant to the performance of police work: in effect, the sergeant's examination simply requires a detailed knowledge of … a dozen books. In contrast, successful performance of the sergeant's position demands a variety of skills and traits which the sergeant's examination fails to consider.") Vanguard II, 592 F. Supp. at 266 (exam with multiple choice job knowledge test, promotional appraisal and oral examination not valid because "it is reasonable to insist that the test measure important aspects of the job, at least those for which appropriate measure is feasible."); Officers for Justice v. Civil Service Comm'n of San Francisco, 371 F. Supp. 1328, 1338 (N.D. Cal. 1973) (test was invalid because "the sergeant's position demands a variety of skills and traits which the sergeant examination fails to consider."); City & Cty. of San Francisco v. Fair Employment & Hous. Com., 191 Cal. App. 3d 976, 990, 236 Cal. Rptr. 716, 724 (Ct. App. 1987) (because "supervision is the primary function for the position of fire lieutenant, an ability to supervise is not tested for the "written tests are not appropriate measures of supervisory skills."); Police Officers for Equal Rights v. City of Columbus, 644 F. Supp. 393, 414 (S.D. Oh. 1985) (striking down police sergeant's exam because the items tested did not "closely approximate the tasks being performed in the position" and did not properly "consist of suitable samples of the essential knowledge, skills or behaviors composing the job in question"); Vulcan Pioneers, Inc. v. N.J. Dep't of Civil Serv., 625 F. Supp. 527, 547 (D.N.J. 1985) aff'd 832 F.2d. at 815-816 (3d Cir. 1987)

Simply stated, a written multiple choice exam does not have the capacity to test for the necessary abilities of a good police supervisor.[26] Both Judge Young and Justice Torruella recognized that the exam did not test for well over 100 "skills and abilities" which were found to be critical to be a good police supervisor, and that these vital attributes could not be assessed through the E&E ratings.[27]

Indeed, the District Court was forced to agree that the test was not valid based on the testimony of Defendants' expert, Dr. Outtz. R. 2111-12. But the District Court then adopted Dr. Outtz's conclusion that somehow the education and experience rating made the promotional test "minimally valid"[28] because somehow the points awarded for going to school etc., could assess these missing attributes, a conclusion which lacks both common sense and any factual basis. Moreover, because so few points were allotted to the education and experience component, such supervisory abilities could not be evaluated in relation to the importance of these abilities. R. 2163. Accordingly, for these reasons, the majority's endorsement

---

(abilities tested by paper and pencil test have been "found by other courts to be inherently incapable of measuring the single attribute that most separates firefighters from fire captains – the ability to supervise").

[26] Indeed, the Massachusetts Civil Service Commission held that a Boston Police promotional exam which eliminated supervisory components, was not a valid or fair test of the necessary qualifications of the job of a superior officer. Carr v. Dep't of Personnel Admin., Civil Service Comm'n, No. G-1461 (Dec. 21, 1989) (R.3362-92), aff'd Boston Police Superior Officers Fed'n v. Civil Serv. Comm'n, 35 Mass. App. Ct. 688, 693-94, 624 N.E.2d 617, 620-21 (1993).

[27] See R. 423-26, 3927-33; Dissent at p. 48

[28] Lopez, Slip op. at p. 35-36.

of the District Court's decision must be reconsidered, as it directly conflicts with other circuits as well as the holdings of Justice Torruella and Judge Young.

## II.     The Panel's Decision is in Conflict with Decisions in Other Circuits Holding that Promotions Cannot Be Based on Rank Order Scores Primarily Derived from a M/C Written Test.

The panel's decision also conflicts with those of numerous courts, which hold that utilizing a written test to make rank order police promotions violates Title VII because a more heightened standard of validity is required when a test is used to make selections based solely on rank order scores.[29] Though the panel claims the District Court made this necessary finding, this is not the case, and if it were, is based on no record evidence.

The panel decision is in direct conflict with decisions from other circuits that have invalidated written promotional exams because they did not meet a higher standard of job relatedness when used to make rank order selections. See Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York, 630 F.2d 79, 103 (2d Cir. 1980); Ensley Branch of NAACP, 616 F.2d at 822 (use of a test for ranking "is justified only if there is a showing that

---

[29]     The plaintiffs asserted that the written exam could be used as a qualifying device, thereby establishing a pool of eligible candidates from which promotional decisions could then be made based on less discriminatory alternatives. However, here, the written score was used in strict rank order fashion. Thus while many minorities, achieved reasonably high scores on the written test, because the top scores on the exam were almost exclusively non-minority, very few minorities were reached for promotion. Thus, contrary to the majority opinion at p. 35, the use of this test as a rank order device was the cause of so few minority promotions.

those with a higher test score do better on the job than those with a lower test score"); Brunet v. City of Columbus, 1 F.3d 390 (6th Cir. 1993); Johnson v. City of Memphis, 770 F.3d 464, 473, 480 (6th Cir. 2014) ("requirements for rank ordering can be met through" a separate showing of "job-relatedness, variance in test scores, and an adequate degree of test reliability"). Indeed, where "the test scores reveal a disparate racial impact…the appropriateness of inferring that higher scores closely correlate with better job performance must be closely scrutinized." Guardians, 630 F.2d at 100 ("This close scrutiny is required because rank ordering makes such a refined use of the test's basic power to distinguish between those who are qualified to perform the job and those who are not.").[30]

Here, the majority relied on one sentence in the District Court's opinion that suggested that the court was satisfied that better scores on a written test correlate with better job performance, but this one sentence in a 60-page opinion fails to even remotely satisfy the findings necessary for rank order validity required by the case law and the EEOC Guidelines. Moreover, even if the District Court stated that higher scores correlated with better performance, there is no support for that

---

[30] See also Vanguard II, 592 F. Supp. at 267 (close scrutiny "required because a test may have enough validity for making gross distinctions between those qualified and unqualified for a job yet may be totally inadequate…to show positive correlation with job performance."); 29 C.F.R. 1607.14(C)(9) ("Where selection procedures supported solely or primarily by content validity is used to rank job candidates, the selection procedure should measure those aspects of performance which differentiate among levels of job performance.").

conclusion as Dr. Outtz, defendant's only expert on validity, <u>never</u> stated the test satisfied the higher standard for rank order validity.[31]

Based on the same evidence, Judges Young and Torruella concluded that the written test could not be used to promote in rank order because it could not distinguish between better performing candidates. Dissent at p. 47-48; <u>Smith</u>, 2015 WL 7194554, at *27.[32] Both judges found reliance on a 1991 validation report, which identified 108 critical skills and abilities that could not have been tested for in a multiple-choice format, fatal to validity. While the test may have been adequate to assess job knowledge, it was inexcusable in that it tested for "none of the critical skills and abilities necessary for the job as identified" in the validity report. Dissent at p. 44-45; <u>Smith</u>, 2015 WL 7194554, at *27.

As stated earlier, the question of minority representation in large urban police departments is of critical importance. Further, selecting the best candidates

---

[31] Dr. Outtz testified that a test could indeed be valid generally, but not valid for use as a rank-order device. R. 2138. However, Dr. Outtz did not give his opinion as to whether he thought the exams were valid for use as rank-order devices.

[32] Moreover, Judge Young found significant flaws in the "test construction" (which are the identical flaws that existed in this case but were not even mentioned by the district court and the majority). <u>Id</u>. at *23-24. Justice Torruella in his dissent, cites these serious deficiencies including subject matter expert ratings that were clearly fraudulently or incompetently put together. Judge Young found the flaws in the construction process including (1) "the quality of the test scores was not ensured by the test developer" (<u>Smith</u> at pg. 23); (2) improper administration of the test including failure to set cut-off scores properly, ranking, and weighting (<u>id</u>. at 23); (3) failure of the City to explain its decision in 1991 to weight the written portion of the exam 80% and the E&E at 20% which was not based upon any scientific methodology (<u>id</u>. at 23).

using the best and most up-to-date testing methods is equally important. As stated above, no large American city uses written multiple choice rote memory tests as the selection device of police supervisors, particularly when used as a rank order device. But if the majority decision stands untouched, a green light is given to all cities to revert back to the simple written multiple choice test, which will undoubtedly and with certainty have severe adverse impact, and which will re-segregate most large urban police departments.

## CONCLUSION

The panel decision stands in stark conflict with the rulings of numerous other courts holding that written multiple-choice promotional exams that cause severe disparate impact among minority candidates violate Title VII.  This Court should grant rehearing en banc.

Respectfully submitted,
PEDRO LOPEZ, et al.
By their attorneys,


/s/ Harold Lichten
Harold Lichten, BBO#549689
Benjamin Weber, BBO#673736
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02114
(617) 994-5800
hlichten@llrlaw.com
bweber@llrlaw.com


Stephen Churchill
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3262
steve@fairworklaw.com

DATED:  June 15, 2016

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE
AND TYPE STYLE REQUIREMENTS**

This petition complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6) because this petition has been prepared in a

proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New

Roman font.

_/s/ Harold L. Lichten_____
Harold L. Lichten, Esq.

Dated: June 15, 2016

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 15, 2016, I caused a true copy of this document

to be sent via the court's CM/ECF system to all counsel of record.

_/s/ Harold L. Lichten _____<br>Harold L. Lichten, Esq.

# ADDENDUM

# United States Court of Appeals
## For the First Circuit

---

No. 14-1952

PEDRO LOPEZ, individually and on behalf of a class of
individuals similarly situated; ABEL CANO, individually and on
behalf of a class of individuals similarly situated; KEVIN
SLEDGE, individually and on behalf of a class of individuals
similarly situated; CHARLES DE JESÚS, individually and on behalf
of a class of individuals similarly situated; RICHARD BROOKS,
individually and on behalf of a class of individuals similarly
situated; MASSACHUSETTS HISPANIC LAW ENFORCEMENT ASSOCIATION,
individually and on behalf of a class of individuals similarly
situated; ROBERT ALVAREZ, individually and on behalf of a class
of individuals similarly situated; SPENCER TATUM, individually
and on behalf of a class of individuals similarly situated;
SHUMEAND BENFOLD, individually and on behalf of a class of
individuals similarly situated; ANGELA WILLIAMS-MITCHELL,
individually and on behalf of a class of individuals similarly
situated; GWENDOLYN BROWN, individually and on behalf of a class
of individuals similarly situated; LYNETTE PRAILEAU,
individually and on behalf of a class of individuals similarly
situated; TYRONE SMITH, individually and on behalf of a class of
individuals similarly situated; EDDY CHRISPIN, individually and
on behalf of a class of individuals similarly situated; DAVID E.
MELVIN, individually and on behalf of a class of individuals
similarly situated; STEVEN MORGAN, individually and on behalf of
a class of individuals similarly situated; WILLIAM E. IRAOLO,
individually and on behalf of a class of individuals similarly
situated; JOSÉ LOZANO, individually and on behalf of a class of
individuals similarly situated; COURTNEY A. POWELL, individually
and on behalf of a class of individuals similarly situated;
JAMES L. BROWN, individually and on behalf of a class of
individuals similarly situated; GEORGE CARDOZA, individually and
on behalf of a class of individuals similarly situated; LARRY
ELLISON, individually and on behalf of a class of individuals
similarly situated; DAVID SINGLETARY, individually and on behalf
of a class of individuals similarly situated; CHARISSE BRITTLE
POWELL, individually and on behalf of a class of individuals
similarly situated; CATHENIA D. COOPER-PATERSON, individually
and on behalf of a class of individuals similarly situated;
MOLWYN SHAW, individually and on behalf of a class of

individuals similarly situated; LAMONT ANDERSON, individually
and on behalf of a class of individuals similarly situated;
GLORIA KINKEAD, individually and on behalf of a class of
individuals similarly situated; KENNETH GAINES, individually and
on behalf of a class of individuals similarly situated; MURPHY
GREGORY, individually and on behalf of a class of individuals
similarly situated; JULIAN TURNER, individually and on behalf of
a class of individuals similarly situated; NEVA GRICE,
individually and on behalf of a class of individuals similarly
situated; DELORES E. FACEY, individually and on behalf of a
class of individuals similarly situated; LISA VENUS,
individually and on behalf of a class of individuals similarly
situated; RODNEY O. BEST, individually and on behalf of a class
of individuals similarly situated; KAREN VANDYKE, individually
and on behalf of a class of individuals similarly situated;
ROBERT C. YOUNG, individually and on behalf of a class of
individuals similarly situated; ROYLINE LAMB, individually and
on behalf of a class of individuals similarly situated; LYNN
DAVIS, individually and on behalf of a class of individuals
similarly situated; JAMES A. JACKSON, individually and on behalf
of a class of individuals similarly situated; JUAN ROSARIO,
individually and on behalf of a class of individuals similarly
situated; LOUIS ROSARIO, JR., individually and on behalf of a
class of individuals similarly situated; OBED ALMEYDA,
individually and on behalf of a class of individuals similarly
situated; DEVON WILLIAMS, individually and on behalf of a class
of individuals similarly situated; JULIO M. TOLEDO, individually
and on behalf of a class of individuals similarly situated,

Plaintiffs, Appellants,

MARISOL NOBREGA, individually and on behalf of a class of
individuals similarly situated,

Plaintiff,

v.

CITY OF LAWRENCE, MASSACHUSETTS; CITY OF METHUEN, MASSACHUSETTS;
JOHN MICHAEL SULLIVAN, in his capacity as Mayor of the City of
Lawrence, Massachusetts; WILLIAM MANZI, III, in his capacity as
Mayor of the City of Methuen, Massachusetts; CITY OF LOWELL,
MASSACHUSETTS; CITY OF WORCESTER, MASSACHUSETTS; APPOINTING
AUTHORITY FOR THE CITY OF LOWELL, MASSACHUSETTS; MICHAEL
O'BRIEN, in his capacity as City Manager of the City of
Worcester, Massachusetts; CITY OF BOSTON, MASSACHUSETTS; CITY OF
SPRINGFIELD, MASSACHUSETTS; DOMENIC J. SARNO, JR., in his

capacity as Mayor of the City of Springfield, Massachusetts;
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY; DANIEL GRABAUSKAS,
in his capacity as General Manager, Massachusetts Bay
Transportation Authority; BOARD OF TRUSTEES OF THE MASSACHUSETTS
BAY TRANSPORTATION AUTHORITY,

Defendants, Appellees,

WILLIAM F. MARTIN, in his capacity as Mayor of the City of
Lowell, Massachusetts; KONSTANTINA B. LUKES, in her capacity as
Mayor of the City of Worcester, Massachusetts; COMMONWEALTH OF
MASSACHUSETTS; PAUL DIETL, in his capacity as Personnel
Administrator for the Commonwealth of Massachusetts,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

---

Harold L. Lichten and Stephen S. Churchill, with whom Benjamin
Weber, Lichten & Liss-Riordan, P.C., and Fair Work, P.C., were on
brief, for appellants.
Bonnie I. Robin-Vergeer, Attorney, Department of Justice,
Civil Rights Division, Appellate Section, with whom Sharon M.
McGowan, Attorney, Civil Rights Division, Vanita Gupta, Acting
Assistant Attorney General, P. David López, General Counsel, and
Carolyn L. Wheeler, Acting Associate General Counsel, Appellate
Services, Equal Employment Opportunity Commission, were on brief
for amicus the United States of America.
Kay H. Hodge, with whom John M. Simon, Geoffrey R. Bok,
Stoneman, Chandler & Miller LLP, Susan M. Weise, Attorney, City of
Boston Law Department, and Lisa Skehill Maki, Attorney, City of
Boston Law Department, were on brief, for appellee City of Boston,
Massachusetts.
James F. Kavanaugh, Jr., with whom Christopher K. Sweeney,
and Conn Kavanaugh Rosenthal Peisch & Ford, LLP, were on brief,
for appellees Massachusetts Bay Transportation Authority, Daniel

Grabauskas, and the Board of Trustees of the Massachusetts Bay Transportation Authority.

Rachel M. Brown, Assistant City Solicitor, City of Lowell Law Department, with whom Christine Patricia O'Connor, City Solicitor, City of Lowell Law Department, was on brief for appellees City of Lowell, Massachusetts, and Appointing Authority for the City of Lowell, Massachusetts.

Tim D. Norris, with whom Joshua R. Coleman, and Collins, Loughran & Peloquin, P.C., were on brief, for appellees City of Worcester, Massachusetts, Michael O'Brien, City Manager of Worcester, and Konstantina B. Lukes, Mayor of the City of Worcester.

Anthony I. Wilson, Associate City Solicitor, City of Springfield Law Department, with whom Edward M. Pikula, City Solicitor, and John T. Liebel, Associate City Solicitor, were on brief, for appellees City of Springfield, Massachusetts, and Mayor Domenic J. Sarno, Jr.

Raquel D. Ruano, Attorney, Office of the City Attorney, City of Lawrence, Massachusetts, and Charles D. Boddy, Jr., Attorney, Office of the City Attorney, City of Lawrence, Massachusetts, on brief for appellees City of Lawrence, Massachusetts, and Mayor John Michael Sullivan.

Kerry Regan Jenness, Attorney, Office of the City Solicitor, City of Methuen, on brief for appellees City of Methuen, Massachusetts, and Mayor William M. Manzi, III.

Michael L. Foreman, Civil Rights Appellate Clinic, Dickinson School of Law, Pennsylvania State University, on amicus brief of National Urban League and the National Association for the Advancement of Colored People.

Gary Klein, Kevin Costello, Corinne Reed, Klein Kavanagh Costello, LLP, Mark S. Brodin, Professor, Boston College Law School, and Ray McClain, Director, Employment Discrimination Project, Lawyers' Committee for Civil Rights Under Law, on amicus brief of Massachusetts Association of Minority Law Enforcement Officers, New England Area Conference of the National Association for the Advancement of Colored People, Urban League of Eastern Massachusetts, and Professor Mark S. Brodin.

Christopher L. Brown, Christopher J. Petrini, and Petrini & Associates, P.C., on amicus brief of International Municipal Lawyers Association, Massachusetts Municipal Lawyers Association, National Public Employer Labor Relations Association, Massachusetts Chiefs of Police Association, Inc., and Fire Chiefs Association of Massachusetts, Inc.

Case: 14-1952   Document: 00117001075   Page: 31   Date Filed: 05/18/2016   Entry ID: 6000844

_____

May 18, 2016

_____

KAYATTA, **Circuit Judge**.  In selecting police officers
for promotion to the position of sergeant in 2005 and 2008, the
City of Boston and several other Massachusetts communities and
state employers adapted a test developed by a Massachusetts state
agency ("HRD")[1] charged under state law with creating a selection
tool that "fairly test[s] the knowledge, skills and abilities which
can be practically and reliably measured and which are actually
required" by the job in question.  Mass. Gen. Laws ch. 31, § 16.
There is no claim in this case that defendants intentionally
selected the test in order to disadvantage any group of applicants.
To the contrary, the evidence is that the test was the product of
a long-running effort to eliminate the use of race or other
improper considerations in public employment decisions.

The percentage of Black and Hispanic applicants selected
for promotion using the results of this test nevertheless fell
significantly below the percentage of Caucasian applicants
selected.  Some of those Black and Hispanic applicants who were
not selected for promotion sued, claiming that the use of the test
resulted in an unjustified "disparate impact" in violation of
Title VII notwithstanding the absence of any intent to discriminate
on the basis of race.  42 U.S.C. § 2000e-2(k)(1)(A)(i).  After an

---

[1]    This agency is the Human Resources Division of the
Massachusetts Executive Office of Administration and Finance.
Lopez v. City of Lawrence, No. 07-11693-GAO, 2014 U.S. Dist. LEXIS
124139, at *7 n.1 (D. Mass. Sept. 5, 2014).

Case: 14-1952    Document: 00117001075    Page: 33    Date Filed: 05/16/2016    Entry ID: 6000843

eighteen-day bench trial, the district court determined, among other things, that the use of the test did have a disparate impact on promotions in the City of Boston, but that the test was a valid selection tool that helped the City select sergeants based on merit. Lopez v. City of Lawrence, No. 07-11693-GAO, 2014 U.S. Dist. LEXIS 124139, at *37, *60-62 (D. Mass. Sept. 5, 2014). The court further found that the plaintiffs failed to prove that there was an alternative selection tool that was available, that was as (or more) valid than the test used, and that would have resulted in the promotion of a higher percentage of Black and Hispanic officers. Id. at *60-79. Finding that the district court applied the correct rules of law and that its factual findings were not clearly erroneous, we affirm.

## I.    Background

The plaintiffs in this suit (the "Officers") sought promotion in the police departments operated by the Massachusetts municipalities or state agencies sued in this case. Id. at *7-8. All parties agree that affirmance of the judgment in favor of Boston would result in affirmance of the judgment in favor of the other defendants as well, so we focus our discussion for simplicity's sake on the evidence concerning Boston. Because this is an appeal of fact-finding and application of law to fact following a trial on the merits, we describe the facts in a manner that assumes conflicting evidence was resolved in favor of the

prevailing party unless there is particular reason to do otherwise. Wainwright Bank & Tr. Co. v. Boulos, 89 F.3d 17, 19 (1st Cir. 1996) ("We summarize the facts in the light most favorable to the verdict-winner [ ], consistent with record support.").

## A.    Development of the Exams Over Time

In 1971, Congress noted that the United States Commission on Civil Rights ("USCCR") found racial discrimination in municipal employment "more pervasive than in the private sector." H.R. Rep. No. 92-238, at 17 (1971). According to the USCCR, nepotism and political patronage helped perpetuate pre-existing racial hierarchies. U.S. Comm'n on Civil Rights, For All the People, By All the People: A Report on Equal Opportunity in State and Local Government Employment, 63-65, 119 (1969), reprinted in 118 Cong. Rec. 1817 (1972). Police and fire departments served as particularly extreme examples of this practice. See, e.g., Wesley MacNeil Oliver, The Neglected History of Criminal Procedure, 1850-1940, 62 Rutgers L. Rev. 447, 473 (2010) ("Officers who delivered payments to their superiors were practically assured of retention and even promotion, regardless of their transgressions."); Nirej S. Sekhon, Redistributive Policing, 101 J. Crim. L. & Criminology 1171, 1191 (2011) ("Police departments were prime sources of patronage jobs.").

Boston's police department was no exception: As far back as the nineteenth century, a subjective hiring scheme that

hinged on an applicant's perceived political influence and the hiring officer's subjective familiarity with the candidate (or the candidate's last name) was seen as the primary culprit behind a corrupt, inept, and racially exclusive police force. See, e.g., George H. McCaffrey, Boston Police Department, 2 J. Am. Inst. Crim. L. & Criminology 672, 672 (1912) ("This system worked very unsatisfactorily, however, because places on the police force were invariably bestowed as a reward for partisan activity.").

At both the state and local levels, Massachusetts officials eventually gravitated toward competitive exams as a tool to accomplish an important public policy of moving away from nepotism, patronage, and racism in the hiring and promoting of police. Boston Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017, 1022 (1st Cir. 1974) ("[C]ivil service tests were instituted to replace the evils of a subjective hiring process . . . ."); see generally League of Women Voters of Mass., The Merit System in Massachusetts: A Study of Public Personnel Administration in the Commonwealth 3-5 (1961). At the statewide level, this movement resulted in legislation and regulations aimed at ensuring that employees in civil service positions are "recruit[ed], select[ed] and advanc[ed] . . . on the basis of their relative ability, knowledge and skills" and "without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion." Mass. Gen. Laws ch. 31, § 1.

**B.    The 2005 and 2008 Exams**

Born of these purposes and shaped by decades of Title VII litigation,[2] the examinations at issue in this case allowed no room for the subjective grading of applications.  The total score of a test-taker who sat for the promotional examination in 2005 or 2008 was determined by two components: an 80-question written examination scored on a 100-point scale and an "education and experience" ("E&E") rating, also scored on a 100-point scale.  The written examination counted for 80% of an applicant's final score and the E&E rating comprised the remaining 20%.  Applicants needed an overall score of seventy to be considered for promotion.  On top of the raw score from these two components, Massachusetts law affords special consideration for certain military veterans, id. § 26, and individuals who have long records of service with the state, id. § 59.

The subject matter tested on the 2005 and 2008 examinations can be traced back to a 1991 "validation study" or "job analysis report" performed by the state agency responsible for compiling the exam.[3]  See 29 C.F.R. § 1607.14 (technical

---

[2]    The district court offered a detailed summary of this litigious history.  See Lopez, 2014 U.S. Dist. LEXIS 124139, at *24-27.

[3]    The Officers argue that Boston misrepresented its reliance on the 1991 report and that the City, in fact, used only a less-thorough report conducted in 2000.  The Officers' evidence for this consists of a comparison, in a footnote in their appellate

requirements for a content validity study under the Uniform Guidelines on Employee Selection Procedures); see also Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 991 (1988) (opinion of O'Connor, J.) ("Standardized tests and criteria . . . can often be justified through formal 'validation studies,' which seek to determine whether discrete selection criteria predict actual on-the-job performance.").

That 1991 report was prepared by the Massachusetts Department of Personnel Administration ("DPA"), the predecessor to HRD. In preparing the report, DPA surveyed police officers in thirty-four jurisdictions nationwide, issuing a questionnaire that sought to ascertain the kinds of "knowledge[], skills, abilities and personnel characteristics" that police officers across the country deemed critical to the performance of a police sergeant's responsibilities. The report's authors distilled the initial results from this survey and their own knowledge regarding professional best practices into a list of critical police supervisory traits. They then distributed this list in a second survey to high-ranking police officers in Massachusetts, who were asked to rank these traits according to how important they felt

---

brief, between three tested skill areas out of fifteen total areas on the 2008 outline of exam questions and similar language from the 2000 job analysis. We decline to find that this perfunctory, post-judgment sampling demonstrates that the district court committed clear error.

each was to a Massachusetts police sergeant's performance of her duties.  DPA further refined the ranking of key skills and traits through focused small-group discussions with police sergeants and conducted a "testability analysis" of which skills could likely be measured through the written examination or the E&E component.  In 2000, HRD engaged outside consultants to refresh the findings of the 1991 examination through a process similar to, though less thorough than, DPA's approach in 1991.

The written question and answer component of the examination consisted of multiple choice questions that covered many topic areas, including the rules governing custodial interrogation, juvenile issues, community policing, and firearm issues, to name a few.[4]  The text of individual questions was often closely drawn from the text of materials identified in a reading list provided by the Boston Police Department ("BPD") to test-takers in advance of the exams.

For example, one question on the 2008 promotional exam asked applicants to accurately complete the following statement:

> According to [a criminal investigations textbook on the reading list], a warrantless search and seizure is acceptable:
>
> A.  after stopping a vehicle for a traffic violation and writing a citation.

---

[4]    Boston supplemented the HRD-produced examination with additional jurisdiction-specific questions that sought to probe a candidate's knowledge of Boston-specific rules, orders, and regulations.

B. after obtaining the consent of the person, regardless of whether obtained voluntarily or nonvoluntarily.

C. when possible loss or destruction of evidence exists.

D. when a quick search of the trunk of a motor vehicle is desired.

In addition to completing the question and answer component of the examination, applicants listed on the E&E rating sheet their relevant work experience, their degrees and certifications in certain areas, their teaching experience, and any licenses they held.[5]  Points were assigned based on the listed education and experience.  For example, applicants could receive up to fifteen points in recognition of their educational attainment, with an associate's degree providing up to three points and a doctorate providing up to twelve.

After collecting and scoring the exams, HRD provided the municipalities with a list of passing test-takers eligible for promotion, ranked in order of their test scores.  Mass. Gen. Laws ch. 31, § 25.  Each of the municipal defendants in this case selected candidates in strict rank order based on the list they received from HRD.[6]

---

[5]  The Officers point out that the same E&E sheet was used to identify candidates for promotion among Massachusetts firefighters in 2010.
[6]  State law permitted a certain amount of flexibility for

Because many officers achieved at least the minimum
passing score of seventy and there were relatively few openings
for promotion to sergeant, all of those who were promoted scored
well above the minimum in both 2005 and 2008. In 2005, 9 of the
224 Black and Hispanic candidates who took the exam were promoted,
whereas 57 of the 401 other candidates were promoted. In 2008, 1
of the 213 Black and Hispanic test-takers was promoted, whereas 25
of the 291 other candidates were promoted. The average scores for
those who the statisticians called "minority test takers" fell
below the average scores for the "non-minority test takers" by 6.4
points in 2005 and 6.6 points in 2008.

## II.  Analysis

We recently described in another suit against Boston the
elements of a disparate impact claim. <u>Jones</u> v. <u>City of Boston</u>,
752 F.3d 38, 46, 54 (1st Cir. 2014). In a nutshell, litigation of
such a claim in a case challenging hiring or promotion decisions

---

municipalities to "bypass" a candidate who had the next-highest
score on the ranked list. Mass. Gen. Laws ch. 31, § 27. The
municipality could be held accountable to the bypassed employee
and, if challenged, would have to articulate a defensible reason
for skipping him or her over. <u>See</u> <u>City of Cambridge</u> v. <u>Civil Serv.</u>
<u>Comm'n</u>, 682 N.E.2d 923, 925 (Mass. App. Ct. 1997). No
justification "inconsistent with basic merit principles, can[] be
used to justify a bypass," including a candidate's race. <u>Mass.</u>
<u>Ass'n of Minority Law Enf't Officers</u> v. <u>Abban</u>, 748 N.E.2d 455, 462
(Mass. 2001). The Massachusetts Bay Transit Authority ("MBTA"),
a state agency and a defendant, behaved slightly differently during
the relevant years by treating all the candidates on HRD's list as
having scored equally and narrowing down their pool of candidates
by using oral interviews.

focuses on three questions:  Do the plaintiffs show by competent evidence that the employer is utilizing an employment practice that causes a disparate impact on the basis of race; If so, does the employer show that the challenged employment practice creating this disparate result is nevertheless job-related for the position in question and consistent with business necessity; If so, do the plaintiffs show that the employer has refused to adopt an alternative practice that equally or better serves the employer's legitimate business needs, yet has a lesser disparate impact?  Id. To prevail, plaintiffs require a "yes" answer to the first question, and either a "no" to the second question or a "yes" to the third question.  See id.

In this case, all parties agree that, using competent statistical analysis, the Officers have proven that Boston's use of the challenged exam in 2005 and 2008 did indeed have a marked disparate impact because the selection rates of Black and Hispanic officers for promotion to sergeant were so much lower than the selection rates of the other officers that we can fairly exclude random chance as the explanation for the difference.[7]

---

[7] The other defendants did not concede that the statistical analyses applied to the outcomes among their smaller groups of applicants established a disparate impact, and the district court agreed with the defendants.  Our disposition of this appeal does not require us to assess the correctness of that ruling.

## A.   Validity

The focus of the trial thus turned to the second question: Did Boston use a "practice [that was] 'job related for the position in question and consistent with business necessity.'" Ricci v. DeStefano, 557 U.S. 557, 578 (2009) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). The parties agree that, in the context of hiring or promotion decisions, this inquiry trains on whether the selection practice--here, the use of the exam--is "valid."  In simple terms, a selection practice is valid if it materially enhances the employer's ability to pick individuals who are more likely to perform better than those not picked.

In this case, Boston sought to carry its burden of proving the validity of its exams by demonstrating what the Equal Employment Opportunity Commission ("EEOC") refers to as "content validity" under the Uniform Guidelines on Employee Selection Procedures ("Guidelines").   See 29 C.F.R. § 1607.16(D).   The parties agree generally that establishing content validity in this context requires a "showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated."   Id. § 1607.5(B). This means that the "behavior(s) demonstrated in the selection procedure are a representative sample of the behavior(s) of the job in question or that the selection procedure provides a representative sample of the work product of the job."   Id.

§ 1607.14(C)(4). Work behavior(s) selected for measurement should either be "critical work behavior(s)" or "important work behavior(s) constituting most of the job," or both. Id. § 1607.14(C)(2).

Much of the evidence at trial and many of the arguments in the briefs on appeal focus on the Guidelines' technical testing standards. The Officers' briefs treat the Guidelines as if they were inflexible and binding legal standards that must be rigorously applied in ascertaining whether an employment selection device significantly advances the employer's business needs. For two reasons, this is not so.

First, "[b]ecause 'Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules and regulations,' the agency's guidelines receive weight only to the extent of their 'power to persuade.'" Jones, 752 F.3d at 50 n.14 (quoting E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244, 257 (1991)). In Jones itself, we rejected the Guidelines' view that plaintiffs need carry the burden of proving "practical significance" in order to establish a prima facie case of disparate impact. Id. at 50-53. And in Ricci, the Supreme Court's most recent disparate impact decision, the Court found New Haven's firefighter promotional exam job-related without mentioning the Guidelines' extensive technical criteria for assessing job-relatedness. See Ricci, 557 U.S. at 87-89.

Second, even on their own terms, the Guidelines poorly serve the controlling role assigned to them by the Officers in challenging the district court's findings. The Guidelines quite understandably provide no quantitative measure for drawing the line between "representative," 29 C.F.R. § 1607.5(B), and nonrepresentative samples of job performance and behaviors. Rather, the Guidelines point to the qualitative understandings of these concepts generally accepted by professionals who evaluate "standardized tests and other selection procedures, such as those described in the Standards for Educational and Psychological Tests prepared by a joint committee of the American Psychological Association." Id. § 1607.5(C).

All that being said, Boston did not shy away from seeking to show that its process for selecting new police sergeants in 2005 and 2008 satisfied the technical requirements of the Guidelines. To make such a showing, the City presented the testimony of Dr. James Outtz. Outtz is an industrial organizational psychologist with twenty years of experience testing and measuring employee selection systems. He has served as a consultant to numerous American municipalities and federal agencies and has assisted in the development of employment selection devices used by many public employers. Outtz has published approximately twenty academic publications in the field of industrial organizational psychology. He has worked for both

plaintiffs and defendants in challenges to the validity of exams. In Ricci, for example, Outtz co-authored an amicus brief brought on behalf of industrial psychologists arguing that the New Haven Fire Department promotional examinations for captain and lieutenant were flawed and invalid. See Br. of Industrial-Organizational Psychologists as Amici Curiae at 3, Ricci, 557 U.S. 557 (Nos. 07-1428, 08-328), 2009 WL 796281, at *3.

Outtz reviewed the development, application, substance, and results of the exams at issue in this case. He opined that the exams were based on job analyses that validly identified the critical skills used by actual police sergeants and that the tests covered a "representative sample" of the content of the job. Id. § 1607.14(C)(4). In support of this conclusion, Outtz testified that the two job validity reports relied on in composing the 2005 and 2008 exams were not too stale to serve as useful starting points for the test-makers, nor were the reports otherwise infirm from a technical standpoint. While the reports --particularly the 1991 report--were somewhat dated, Outtz testified that the relative stability of a police sergeant's responsibilities over time, combined with the presence of the 2000 study, cured any defect introduced by the passage of time.[8]

---

[8] The district court was entitled to rely on this conclusion, despite the Officers' various quibbles with the methodologies used to compile the 1991 and 2000 reports.

Outtz went on to opine that the written question and answer portion of the exam, standing alone, nevertheless did not pass muster under the Guidelines because it fell short of testing a "representative sample" of the key qualities and attributes that were identified by the two validation reports.  Id.  In Outtz's opinion, however, the addition of the E&E component effectively pushed the selection device as a whole across the finish line to show validity.  It did this, according to Outtz, because the level and extent of work and educational experience and accomplishments listed by each applicant served as a useful, if imperfect, proxy for the kinds of qualities that were deemed to be important to a sergeant's daily responsibilities, yet were insufficiently tested by the examination's question and answer component.  Outtz recognized that the gain in validity from the E&E component was, on its own, only marginal or "incremental."  As the Officers stress, many of the attributes for which the E&E assigned points (e.g., previous service as a police officer) were shared by all or most applicants.  Thus, while the E&E score range for the 2005 exam was 0-100, the actual score distribution approximated 40-94.  And when weighted to provide only 20% of the combined final score, it accounted for a range of only about 5% to 7% of a candidate's total score.[9]  Nevertheless, we cannot see how a rational

_____

    [9] The Officers place this variation slightly lower, at 1% to

- 20 -

factfinder could ignore the impact of the E&E, small or not, in evaluating the exam overall.

Outtz concluded that "at the end of the day" the combined "package" of the written examination and the E&E as administered tested a "representative sample" of the key supervisory skills identified by the 1991 and 2000 reports and was "minimally valid" or "acceptable" under the Guidelines.  Id.  He testified that the representativeness of the skills tested by the two components and the linkage of these skills to the validation reports were in line with what was contemplated by the Guidelines' technical standards for constructing a content-valid selection device.  See id. §§ 1607.5(B); 1607.14(C)(4).

This is not to say that Outtz's testimony trumpeted a wholehearted endorsement of the scheme used by Boston to identify candidates for promotion.  He agreed with the Officers that the validity of the Boston examination could have been improved, perhaps by incorporating a "well-developed assessment center" to evaluate an officer's interpersonal skills through observed social interaction, or some kind of device for measuring an applicant's oral communication skills.  Outtz was clear that his opinion solely

---

4%, relying on testimony suggesting that no candidate could reach the ceiling of the potential boost offered by the E&E.  Unguided by fact-finding on this narrow question, we note only the absence of any evidence that Outtz's opinion turned on a plainly erroneous calculation of the precise percentage.

concerned the selection device's compliance with his profession's minimum standards as translated into the EEOC's Guidelines.

The Officers challenged Outtz's conclusions on cross-examination, arguing that his testimony fell short of the mark in several respects that we will discuss, and presented the contrary opinions of their own expert, Dr. James Wiesen. Altogether, the trial testimony of these competing experts consumed the better part of nine days of the eighteen-day trial.

The district court judge who listened to these experts testify concluded that Outtz was correct: "After consideration of the evidence as a whole, I find and conclude that Dr. Outtz's opinion rests on adequate grounds and is therefore correct: the exams in question were minimally valid." Lopez, 2014 U.S. Dist. LEXIS 124139, at *60-61. Supporting this conclusion, the court found that the examinations tested a representative sample of skills that were identified by the 1991 and 2000 reports, which were themselves valid under the Guidelines. Id. at *61. Finding that Boston employed valid examinations that reliably achieved the City's stated business need, the court ruled in Boston's favor. Id. at *78.

On appeal, the Officers now ask us to set aside the district court's finding that the 2005 and 2008 exams were valid. In considering such a request, we ask whether the district court applied the correct legal standards and whether the record

contained sufficient support for its findings. See, e.g., Beecher, 504 F.2d at 1022 (affirming a finding of invalidity as "supported by the record"). Since our decision in Beecher, all circuit courts that have addressed the question have reviewed a district court's determination that a selection method was or was not valid for clear error. See M.O.C.H.A. Soc'y, Inc. v. City of Buffalo, 689 F.3d 263, 275 (2d Cir. 2012); Ass'n of Mex.-Am. Educators v. California, 231 F.3d 572, 584-85 (9th Cir. 2000) (en banc) ("The question whether a test has been validated properly is primarily a factual question, which depends on underlying factual determinations regarding the content and reliability of the validation studies that a defendant utilized."); Melendez v. Ill. Bell Tel. Co., 79 F.3d 661, 669 (7th Cir. 1996); Hamer v. City of Atlanta, 872 F.2d 1521, 1526 (11th Cir. 1989); Bernard v. Gulf Oil Corp., 890 F.2d 735, 739 (5th Cir. 1989).

With this standard in mind, we consider the Officers' critique of the district court's reliance on Outtz's opinion in finding the examinations valid. Repeatedly, the Officers suggest that Outtz's own characterization of the exams as "minimally valid" should render his opinion legally insufficient to carry the City's burden. Implicitly, the Officers ask us to read "minimally valid" as meaning, in effect, "not valid enough." Read in context, however, Outtz was plainly testifying that he found the exams to be valid, albeit not by much. Indeed, elsewhere in his testimony

he made clear that the exams were "valid" and, in his view, complied with the technical requirements of the Guidelines.

Moving more aptly from debating adverbs to discussing the law, the Officers (with the support of the United States as amicus curiae) argue that the district court misconstrued the law in finding Outtz's testimony sufficient. Specifically, they say that the district court did not reach its finding of content validity in accord with the Guidelines' statement that evidence of an exam's content validity should "consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated." 29 C.F.R. § 1607.5(B). Instead, argue the United States and the Officers, the district court simply counted up the knowledge, skills and abilities ("KSAs") called for by the job without qualitatively considering their importance.

It is true that the district court observed that "more than half of the KSAs identified as pertinent to the job of sergeant were tested," and that "this was sufficient to meet the 'representative sample' requirement of the Uniform Guidelines." Lopez, 2014 U.S. Dist. LEXIS 124139 at *54 (quoting 29 C.F.R. § 1607.14(C)(4)). The district court made this statement, though, only after first expressly citing the Guidelines standard, id. at *15-17, and after undertaking an examination of the tested KSAs "to ensure that there is a link between the selection procedure

- 24 -

and the critical KSAs necessary for successful performance of the job," id. at *16.  The court then made clear that its examination of the manner in which the exams tested KSAs trained on "the knowledge, skills and abilities which can be practically and reliably measured and which are actually required to perform the primary or dominant duties of the position for which the examination is held."  Id. at *50–51 (quoting Mass. Gen. Laws ch. 31, § 16).  The district court also cited to testimony establishing that knowledge of the constitutional and regulatory law applicable to police work is "critical to a police sergeant's ability to effectively perform as a supervisor" and to evidence that a written job knowledge test is "[a]n effective way" of testing whether a candidate possesses such critical knowledge.  Id. at *51–52.  Similarly, the district court found that the 1991 job analysis upon which the exams were based identified "the frequent and critical tasks and duties" and the "important [KSAs] required at the time of appointment."[10]  Id. at *52.  In short, in referring

---

[10]    Joined by the United States as amicus curiae, the Officers further dispute the "linkage" between these validation reports--both the 1991 and 2000 reports--and the examinations themselves. Their chief challenge on this front revolves around a "testability analysis" document prepared in connection with the 1991 report that evaluates which key skills could, in theory, be tested on a future examination but does not directly link the skills identified to actual examination or E&E content.  The defect with the Officers' reliance on this document is that it asks us to pretend that it was the only relevant evidence the district court could rely on in drawing a connection between the validation reports and

to the KSAs identified as pertinent to the job of sergeant, the
district court was plainly referring to the "critical" and
"important" KSAs that it found to have been identified in the job
analysis upon which the exams were predicated.

　　　　The district court's qualitative focus on the importance
of the factors that the exam tested was further highlighted by the
court's agreement with Outtz that the written job knowledge portion
of the test was not alone valid "because it could not measure some
skills and abilities (as distinguished from knowledge) essential
to the position."  Id. at *60.  After then agreeing with Outtz
that the E&E component of the exams adequately, albeit minimally,
filled in this gap, the district court expressly found that the
exams "were based on job analyses that considered the important
tasks necessary to the successful performance of the job."  Id. at
*61.  The district court's opinion as a whole thus makes clear
that the court trained its focus on critical and important
knowledge, skills, and abilities called for by the job, and it did
not clearly err by finding that a test that measured a large

---

the examinations as administered.  This was hardly the case.  The
district court weighed the testimony of Dr. Wiesen and Dr. Outtz,
both of whom had analyzed the examinations as well as the reports,
reviewed the testability analysis, applied their scientific
expertise, and formed their own (differing) judgments as to whether
the examinations tested the skills identified by the reports.  In
crediting Outtz's testimony, the district court did not clearly
err.

percentage of such critical and important KSAs was a test that was sufficiently "representative of important aspects of performance on the job." 29 C.F.R. § 1107.5(B).[11] Our conclusion to this effect finds further support in the absence of any quantitative measure of "representativeness" provided by the law. Rather, the relevant aim of the law, when a disparate impact occurs, is to ensure that the practice causing that impact serves an important need of the employer, in which case it can be used unless there is another way to meet that need with lesser disparate impact. We cannot see how it is an error of law to find that an exam that helps determine whether an applicant possesses a large number of critical and necessary attributes for a job serves an important need of the employer.

The Officers and the United States also contend that our 1974 opinion in Beecher, 504 F.2d 1017, mandates our reversal of this conclusion. Their reliance on Beecher fits this case awkwardly because of the burdens we have already detailed. In Beecher, the central question was whether the record supported the district court's finding of fact that a hiring exam given to would-

---

[11]    In the district court's observation that "more than half of the KSAs identified as pertinent to the job were tested," Lopez, 2014 U.S. Dist. LEXIS 124139, at *54, the Officers see clear error, pointing out that the 1991 testability analysis only identified 70 out of a total 156 critical KSAs (i.e., not quite half) that could be tested on the exam. We decline the Officers' invitation to find this difference to be so material as to constitute clear error.

be firefighters was not valid.  See id. at 1022–23.  To affirm, we needed only to find that the record did not compel a contrary finding.  Id. at 1022.  Here, by contrast, the Officers ask us to find that this record compels a finding contrary to that reached by the district court.

The Officers and the United States nevertheless seem to find much significance in one analogy we drew in Beecher.  In assessing an exam for the position of firefighter, we compared knowledge of firefighting terminology to knowledge of baseball vocabulary possessed by a potential recruit for the Boston Red Sox "who could not bat, pitch or catch."  Id. at 1023.  Here, in reviewing an exam for the supervisory position of sergeant, the more apt baseball analogy would be the hiring of a coach, who must certainly have an extensive knowledge of the rules that must be followed by those being managed.  At trial, former Boston Police Commissioner Edward Davis testified that a "sergeant really has to have a strong basis of knowledge of all the rules and regulations and constitutional protections that are afforded the citizens of the Commonwealth to do the job properly," because when officers in the field "get confused and don't understand something, the first thing they do is call the sergeant."  This "fundamental understanding" of "how things work," was a "critical component" of a sergeant's responsibilities, according to Commissioner Davis.  And, the court supportably found, those skillsets were tested by

the exam.

The Officers' reliance on <u>Beecher</u> is further undermined by the different approach taken in that case towards validation of the exam.  We stated that for an exam to be valid, the court must be satisfied that "it demonstrably selects people who will perform better the required on-the-job behaviors after they have been hired and trained." <u>Id.</u> at 1021-22.  We observed that "[t]he crucial fit is not between test and job lexicon, but between the test and job performance."  <u>Id.</u> at 1022.  This approach resembles what the Guidelines, adopted four years after <u>Beecher</u>, call "criterion-related validity."  29 C.F.R. § 1607.5(B) ("Evidence of the validity of a test or other selection procedure by a criterion-related validity study should consist of empirical data demonstrating that the selection procedure is predictive of or significantly correlated with important elements of job performance.").  Because in this case, as we have discussed, we assess validity for the most part under the separate "content validity" framework, <u>Beecher</u>'s relevance is further limited.

None of the remaining arguments advanced by the Officers seriously support any claim that the exams are not materially better predictors of success than would be achieved by the random selection of those officers to be promoted to sergeant.  The parties' arguments, instead, focus on how <u>much</u> better the exams were.  Do they test enough skills and knowledge?  Do they weigh

the answers in an appropriate, valid way?  In finding Outtz persuasive on these points, the district court as factfinder did not clearly err.[12]

## B.    Rank-Order Selection

When officials at the BPD received the results of the 2005 and 2008 sergeant promotional examinations from HRD, they selected as many police officers for promotion as there were vacancies currently available, beginning with the highest-scoring name at the top of the list and moving down the list, one at a time, in order of the score each candidate received.  The Officers argue that this method of selection--quite independently from the written examination itself--led to a disparate impact and the district court was obligated to conduct a separate analysis of its validity under Title VII.  We review the legal sufficiency of the district court's holding on this point de novo and its subsidiary fact-finding for clear error.  E.E.O.C. v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 (1st Cir. 1995).

The Officers first argue that the district court failed altogether to wrestle with the consequences of rank-order selection.  This is clearly not the case.  Citing section

---

[12]  The Officers did not move to strike any portion of Outtz's testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Hence, even if we had thought that any part of Outtz's opinion was unreliable or unsupported, we would have had to employ plain error review.  See United States v. Diaz, 300 F.3d 66, 74 (1st Cir. 2002).

- 30 -

1607.14(C)(9) of the Guidelines, the district court noted in its exegesis of the law that "[t]he use of a ranking device requires a separate demonstration that there is a relationship between higher scores and better job performance." Lopez, 2014 U.S. Dist. LEXIS 124139, at *16–17.  The court went on to find that Boston's selection method "reliably predicts a candidate's suitability for the job, such that persons who perform better under the test method are likely to perform better on the job." Id. at *61.

This finding by the district court, to the Officers, is "not enough."  Based on their reading of the Guidelines, something more is required.  The Officers argue that the use of the results of an examination that is "minimally valid" insofar as it tests job-related skills may not necessarily be valid if used to select candidates solely according to their scores on that exam.

Two provisions of the Guidelines discuss an employer's appropriate use of a rank-ordering selection method.  In the section of the Guidelines establishing "General Principles," the EEOC has advised the following:

> The evidence of both the validity and utility of a selection procedure should support the method the user chooses for operational use of the procedure, if that method of use has a greater adverse impact than another method of use.  Evidence which may be sufficient to support the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines.  Thus, if a user decides to use a

> selection procedure on a ranking basis, and
> that method of use has a greater adverse
> impact than use on an appropriate pass/fail
> basis (see section 5H below), the user should
> have sufficient evidence of validity and
> utility to support the use on a ranking basis.

29 C.F.R. § 1607.5(G) (emphasis supplied). The Guidelines also

contain a refinement of this principle specific to the use of

content validity studies in the "Technical Standards" section:

> If a user can show, by a job analysis or
> otherwise, that a higher score on a content
> valid selection procedure is likely to result
> in better job performance, the results may be
> used to rank persons who score above minimum
> levels. Where a selection procedure supported
> solely or primarily by content validity is
> used to rank job candidates, the selection
> procedure should measure those aspects of
> performance which differentiate among levels
> of job performance.

Id. § 1607.14(C)(9).

These two statements evidence some inconsistency.

Section 1607.5(G) clearly indicates that an employer need have

sufficient evidence of validity to support use of the exam on a

ranking basis "if . . . that method of use has a greater adverse

impact than use on an appropriate pass/fail basis" (emphasis

supplied). Under this guidance, if an exam is valid, one may use

it on a rank-order basis unless the use of rank ordering creates

or adds to a disparate impact. One can read section 1607.14(C)(9),

however, as requiring that, to defend rank ordering, the employer

must first show that "a higher score on a content valid selection

procedure is likely to result in better job performance"; i.e.,
one must validate the use of ranking itself if the exam as a whole
produces a disparate impact.  Other provisions of the Guidelines
support this latter reading, albeit without acknowledging the
inconsistency.  Compare, e.g., id. § 1607.5(G) ("[I]f a user
decides to use a selection procedure on a ranking basis, and that
method of use has a greater adverse impact than use on an
appropriate pass/fail basis . . . , the user should have sufficient
evidence of validity and utility to support the use on a ranking
basis." (emphasis supplied)), with Adoption of Questions and
Answers to Clarify and Provide a Common Interpretation of the
Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg.
11,996, 12,005, Question and Answer n. 62 (1979) ("Use of a
selection procedure on a ranking basis may be supported by content
validity if there is evidence from job analysis or other empirical
data that what is measured by the selection procedure is associated
with differences in levels of job performance.").

     Several courts have seemed to approach this issue by
requiring more scrutiny of the validation evidence as a whole when
rank ordering is used, particularly when the exams in question
have led to closely bunched scores.  See Johnson v. City of
Memphis, 770 F.3d 464, 479-81 (6th Cir. 2014), cert. denied, 136
S. Ct. 81 (2015); Police Officers for Equal Rights v. City of
Columbus, 916 F.2d 1092, 1102-03 (6th Cir. 1990); Guardians Ass'n

- 33 -

of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n of City of N.Y., 630 F.2d 79, 100-05 (2d Cir. 1980).

The district court in this case expressly adopted the approach most favorable to the Officers, citing 29 C.F.R. § 1607.14(C)(9), for the proposition that "[t]he use of a ranking device requires a separate demonstration that there is a relationship between higher scores and better job performance." Lopez, 2014 U.S. Dist. LEXIS 124139, at *16-17. As we have noted, supra, and as the Officers seem to ignore, the court then specifically found that it was "satisfied on the evidence that Boston carried its burden of showing" "that persons who perform better under the test method are likely to perform better on the job." Id. at *61-62. As a predicate to this finding, the district court observed that a group of incumbent sergeants who took an exam in 2005 that contained 53 of the questions asked of applicants on the sergeant's exam had a materially higher passing rate on those common questions than did the job applicants. Id. at *56-57. The district court viewed this evidence as showing that "those questions were related to the sergeants' actual performance of their jobs." Id. at *57. The Officers' only reply is to say that this evidence only shows that people who previously did well on the exam (and thus became sergeants) still did well on it. But the Officers point to no evidence that these incumbent sergeants in 2005 somehow achieved their positions by previously taking the

- 34 -

same, or more or less the same, exam that was first offered in 2005.

Even accepting the district court's opinion that added scrutiny was called for because rank ordering was used, whatever added scrutiny one need apply here certainly falls short of the added scrutiny one would apply if rank ordering had been a material contributor to the disparate impact. Although they belatedly offer on appeal, without citation to the record, counsel's own calculations that "banding" in lieu of rank order selection would have caused more Black and Hispanic applicants to be "reachable" for selection by subjective "performance" criteria, the Officers made no effort to demonstrate that an increased number of Black and Hispanic applicants likely would have been selected under such an alternative approach. Rank ordering furthers the City's interest in eliminating patronage and intentional racism under the guise of subjective selection criteria. Such a goal is itself a reasonable enough business need so as to provide some weight against a challenge that is unaccompanied by any showing that rank order selection itself caused any disparate impact in this case.[13]

---

[13] Given the absence of any showing that an equally or more valid alternative to rank-order selection would have reduced disparate impact, we need not address the Officers' arguments that any state law favoring rank order selection is unlawful or preempted.

None of this is to suggest that Boston could not have come up with an exam that did a better job of furthering its goal of selecting the best candidates for promotion to the position of sergeant. The Officers argue persuasively that Boston could have made the exam more valid. Indeed, Outtz agreed and so, too, it would appear, does the City, which, counsel tells us, has since 2008 developed a new exam that it now uses.

The point, instead, is that the record contains detailed, professionally buttressed and elaborately explained support for the district court's finding "that persons who perform better under the test method are likely to perform better on the job." Id. at *61. Given that plainly supported finding, it makes little sense to debate in the abstract how much better the exam might have been. Instead, it makes more sense to move to the next step of the inquiry to see if there is any alternative selection test that would have had less adverse impact. If so, then the court will have a meaningful gauge of validity by comparing the two tests. And if the alternative test with less adverse impact has equal or greater validity, it makes no difference how valid the employer's actual test is; the employee wins. Ricci, 557 U.S. at 578 (citing 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) and (C)). Conversely, absent proof of an equally or more valid test that has less adverse impact, there is no reason to force the employer to promote randomly if the employer has a tool that will do

- 36 -

meaningfully better than that. For this reason, once a court concludes that a selection device is materially more job-related than random selection would be, it makes sense to turn the focus sooner rather than later to the question of whether there is any alterative option that is as good or better, yet has less adverse impact. Otherwise, courts and litigants are left to engage in unpredictable qualitative assessments without any meaningful gauge as to what is enough. We therefore turn next to that question.

## C.   The Officers' Alternatives

So, the pivotal question on appellate review is whether the evidence compelled a finding "that the employer refuse[d] to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." Id. To carry this burden, plaintiffs must "demonstrate a viable alternative and give the employer an opportunity to adopt it." Allen v. City of Chicago, 351 F.3d 306, 313 (7th Cir. 2003).

Outtz explained that he thought the Officers would be unlikely to carry this burden due to the very large number of applicants for relatively few open positions in Boston. On the 2008 exam, for example, where the disparate impact was much greater than in 2005, there were only 26 openings for 504 applicants. He explained that his experience is that:

> [I]n dealing with adverse impact[,] the ball
> game is played, for the most part, in terms of
> selection ratio. If I come to--if an employer

> comes to me and says, "Look, I've got five job
> openings and I've got 5,000 people that are
> applying for those five jobs and I want you to
> develop a system that reduces adverse impact,"
> I'm just going home.

The Officers' own expert agreed that the selection ratio heavily influenced the menu of available options, offering his opinion that the degree of adverse impact caused by a selection process "depends so much on how many people you appoint."

The Officers baldly assert that the district court did not find "that Plaintiffs failed to meet their burden of putting forward a specific less discriminatory alternative." In fact, the district court precisely so found--twice. Lopez, 2014 U.S. Dist. LEXIS 124139, at *78 (holding that the Officers' showing was "not enough to carry their burden on this issue" and did not "demonstrat[e] by the evidence that there was an alternative employment practice with equal validity and less adverse impact that was available and that BPD refused to adopt").

The Officers also contend that "[i]t is undisputed that . . . adding test components such as an assessment center, structured oral interview, or performance review to an exam process increases the validity of an exam while having less adverse impact on minorities." Yet the Officers failed to offer any evidence that would have compelled the district court to find that the deployment of any of these supposedly "undisputed" solutions would have led to "a smaller racial disparity in outcomes," Jones, 752

F.3d at 55, given the selection ratios facing authorities in Boston.

Our own review of the record does disclose testimony convincingly establishing that, as a general matter, incorporation of selection tools such as use of "hurdles," banding, oral interviews, so-called assessment centers, and open ended "situational judgment" questions generally tend to result in less adverse impact than does a reliance on multiple choice exams. What is missing, though, is any rebuttal to Outtz's opinion that the low rates of job openings in the Boston sergeant ranks relative to the number of applicants made it unlikely that any alternative selection device would have materially reduced adverse impact in 2005 and 2008.

The Officers did offer evidence that the mean differentials on the oral portion of an exam Boston used in 2002 were less than the mean differentials on the written portions of that exam. But the 2002 exam as a whole still had substantially the same adverse impact as did the exams administered in 2005 and 2008.[14] And, again, the Officers provide no analysis of the effect of the selection ratios in 2005 and 2008.

Additionally, as the district court noted, Boston's prior attempt to employ assessment centers with situational

---

[14] The adverse promotional impact ratio in 2002 was calculated to be .32. In 2005, it was .28.

exercises and oral questioning in its 2002 promotional exam resulted in a cost of $1.2 million to develop the exam and the required "transporting, housing, and training a substantial number of police officers from throughout the country who acted as the assessors," id. at *70, without generating any convincing support that repeating such an approach in 2005 or 2008 would have reduced adverse impact, id. at *73. In concluding that the City was not required to again incur such costs without any demonstration that adverse impact would be materially reduced, the district court acted well within its discretion in making the judgments called for by the applicable law.[15] See Watson, 487 U.S. at 998 (opinion of O'Connor, J.) ("Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.").

Satisfying a plaintiff's burden on this point at trial "demands evidence that plaintiffs' preferred alternative would have improved upon the challenged practice," Johnson, 770 F.3d at 477, not just that such practices exist in the abstract.

---

[15] Boston had previously tried other tactics to reduce adverse impact. In 1992 and 2002 Boston experimented by integrating an assessment center component into the exam. After the 1992 exam, the City used its bypass authority to promote several Black candidates over Caucasian candidates in order to achieve compliance with a consent decree and the Guidelines. They were sued and the bypasses were reversed. See Abban, 748 N.E.2d 455.

Furthermore, securing the reversal of a trial court's factual finding that the Officers' proof on this point was not persuasive required evidence that is so compelling as to render its rejection clear error. The Officers' scattershot listing of alternatives without any developed rejoinder to Outtz's testimony concerning the challenge posed by the selection ratios in 2005 and 2008 fell short of this mark.[16]

### III. Conclusion

Given our finding that the district court applied the correct law and committed no clear error in finding persuasive the expert evidence tendered by Boston, we <u>affirm</u> the district court's order finding that the exams Boston used in 2005 and 2008 did not violate Title VII and we therefore <u>affirm</u> as well the entry of judgment in favor of all defendants.

---

[16] The Officers' failure to explain how a particular alternative would have reduced disparate impact in 2005 and 2008 --and by how much--is particularly odd given the obvious mootness of their claim for injunctive relief. Consequently, had the remedy phase of trial proceeded as the Officers would have hoped, each officer would have needed to show that, more likely than not, he or she would have been promoted had Boston used an equally or more valid selection tool with less impact. <u>See</u> 42 U.S.C. § 2000e-5(g)(1) (authorizing "back pay" remedy for Title VII violation); <u>Azimi</u> v. <u>Jordan's Meats, Inc.</u>, 456 F.3d 228, 235 (1st Cir. 2006) ("Injuries allegedly caused by the violation of Title VII . . . must be proven to the factfinder . . . which may reasonably find, within the law, that while there has been [injury], the plaintiff has not been injured in any compensable way by it."). How any officer could have made such a showing without first securing a liability finding predicated on a specific alternative selection tool that would have been equally or more valid and produced less adverse impact is entirely unclear.

- Opinion Concurring in Part and Dissenting in Part Follows -

**TORRUELLA**, <u>Circuit Judge</u>, concurring in part and **dissenting in part**. I agree with my colleagues in the majority only to the extent that the challenged tests did have a disparate impact. There is little doubt in my mind, however, that the majority's question, whether "the employer[s] show[ed] that the challenged employment practice creating this disparate result is nevertheless job-related for the position in question and consistent with business necessity," <u>supra</u> at 15, cannot be answered in the affirmative based on this record.[17] To my view, the district court committed clear error in finding that the challenged tests were valid when placed under the legal prism of Title VII, 42 U.S.C. § 2000e <u>et seq.</u> <u>M.O.C.H.A. Soc'y, Inc.</u> v. <u>City of Buffalo</u>, 689 F.3d 263, 275 (2d Cir. 2012); <u>Ass'n of Mex.-Am. Educators</u> v. <u>California</u>, 231 F.3d 572, 584–85 (9th Cir. 2000) (en banc); <u>Melendez</u> v. <u>Ill. Bell Tel. Co.</u>, 79 F.3d 661, 669 (7th Cir. 1996); <u>Hamer</u> v. <u>City of Atlanta</u>, 872 F.2d 1521, 1526 (11th Cir. 1989); <u>Bernard</u> v. <u>Gulf Oil Corp.</u>, 890 F.2d 735, 739 (5th Cir. 1989).

A review of the record shows that Boston[18] did not, contrary to the district court's finding and the majority's assertion, "show[] that the content of the selection procedure is representative of important aspects of performance on the job for

---

[17] I would also have found the Officers established a prima facie case as to all defendants, but, as the majority does not address this question, <u>supra</u> at 7, I will focus on test validity.

[18] Like the majority, <u>supra</u> at 7, I will refer primarily to Boston for the sake of simplicity.

which the candidates are to be evaluated." Supra at 16 (quoting 29 C.F.R. § 1607.5(B)); see also 29 C.F.R. § 1607.5(A). Because there is ample precedent on which to draw, see, e.g., Bos. Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974), I need not engage the majority's emphasis on the non-binding nature of EEOC Guidelines, supra at 17-18, nor rest my objection on what I would consider the Guidelines' rather overwhelming persuasiveness vis-à-vis this case. Id. at 17 (citing Jones v. City of Bos., 752 F.3d 38, 50 n.14 (1st Cir. 2014)). It is enough to say that, based on our precedent and this record, there is a solid legal basis to find that the district court's acceptance of Boston's case for content validity is clearly erroneous.

The most significant flaws in Boston's case for validity should each independently have been fatal to it: Boston failed to demonstrate (1) that the 1991 Validation Report and 2000 job analysis were applicable and reliable[19] and (2) that the exams tested "representative" and critical knowledge, skills, and abilities ("KSAs") necessary to quality for the position of police sergeant.

This first flaw stems from "the way in which the validation study was performed" and its effect on test validity.

_____

[19]  As I would find neither sufficed to support the exams' validity, it does not matter which Boston relied upon for each test, the 2000 job analysis or 1991 Validation Report. See supra at 10 n.3.

Beecher, 504 F.2d at 1025.  The Validation Report and job analysis were defective.   The district court acknowledged the "rule of thumb" that a job analysis should typically have been performed within the last five to eight years to be reliable.  López v. City of Lawrence, No. 07-11693-GAO, 2014 U.S. Dist. LEXIS 124139, at *51 (D. Mass. Sept. 5, 2014).  Yet, the 1991 job analysis and resultant Validation Report predate the first of the contested exams by fourteen years.  Neither of the two conditions noted by the district court as potentially saving an older analysis from obsolescence -- lack of change in job requirements or a later review updating the analysis -- rescue the Report.  Id.; cf. 29 C.F.R. § 1607.5(K) (explaining totality of circumstances should be considered in determining whether a validation study is outdated).

The Officers bolstered the presumption that a test more than eight years old is not reliable, and the common sense conclusion that a position changes over time, by pointing to specific evidence that defendants' police departments changed practices since the Report and analysis were performed: testimony from Commissioner Edward F. Davis that Lowell implemented a community policing model and a 2002 Boston Commissioner's memo referring to changes in policing policy and practice.  While the district court was entitled to rely on Dr. Outtz's testimony as to the unchanging nature of the position of sergeant, it clearly erred in doing so for the proposition it drew from his testimony, that

the position of police sergeant in the <u>defendant</u> departments had
not changed, as Dr. Outtz based his statement on "[his] experience
generally" regarding the position in other municipalities,
including those in other states.

The subsequent job analysis completed in 2000, within
the time range to be presumed reliable, is unreliable by virtue of
the way it was performed.  The 2000 job analysis suggests that the
eleven subject matter experts ("SMEs"), sergeants and detective
sergeants, relied upon by the testing firm to evaluate KSAs and
tasks for inclusion in the exam, were to do so individually; the
analysis details procedures for reconciling disparate results to
determine which items should make the cut.  For example, "[f]or a
KSA to be included as a [sic] important component of the Police
Sergeant position, the KSA had to be rated by nine . . . of the
eleven . . . SMEs" in a certain way across all five categories.
Yet the eleven SMEs evaluating 160 KSAs each rated all 160 KSAs'
five attributes -- job relatedness, time for learning, length of
learning, differential value to performance, and necessity[20] -- in
<u>exactly the same way</u>, although there were 72 possible ways to rate

---

[20] Job relatedness could be answered "[y]es" or "[n]o"; time
for learning, "[b]efore assignment" or "[a]fter assignment";
length of learning, "[l]onger than brief orientation" or "[b]rief
orientation"; differential value to performance, "[h]igh,"
"[m]oderate," or "[l]ow"; and necessity, "[r]equired,"
"[d]esirable," or "[n]ot required."

each KSA.  The same was true of task ratings, wherein each SME was
supposed to rate each of 218 tasks' frequency, importance,
necessity, relationship to performance, and dimensions,[21] despite
the fact that each of 218 tasks could be rated in 1,674 ways.  I
will not speculate as to how and why this total agreement occurred
but only observe that an analysis that generates a result so
unfathomably inconsistent with its proposed methods is not
reliable.[22]  As such, it was clear error to find the 2000 job
analysis supports the exams' validity.  Beecher, 504 F.2d at 1025.

Beyond these threshold issues, the resultant exams did
not test a representative portion of KSAs.  See 29 C.F.R.
§ 1607.5(B).  Nor did they test critically important KSAs "in
proportion to their relative importance on the job."  Guardians
Ass'n of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n of N.Y.C.,
633 F.2d 232, 243-44 (2d Cir. 1980) (citation omitted); see also

---

[21]  Frequency could be rated "[r]egular[]," "[p]eriodic[],"
or  "[o]ccasional[]";  importance,  "[v]ery  important,"
"[i]mportant," or "[n]ot important"; necessity, "[n]ecessary upon
entry" or "[n]ot necessary"; and relationship to performance,
"this task clearly separates the best workers," "better workers
seem to perform this better than poor or marginal workers," or
"[m]ost perform this task equally well."  Dimensions could be
answered using any combination of "[o]ral [c]ommunication,"
"[i]nterpersonal  [s]kills,"  "[p]roblem  ID  &  [a]nalysis,"
"[j]udgment," and "[p]lanning and [o]rganizing" or "all."

[22]  A second suspect aspect of this analysis, one that further
clarifies how troubling the purported across-the-board agreement
is, is in how the SMEs rated certain KSAs and tasks.  For example,
all eleven SMEs -- including two assigned to administrative roles,
-- responded that "[s]et[ting] up command posts at scenes
of[]robberies, homicides, fires, etc.," was a "daily" task.

Beecher, 504 F.2d at 1024 (noting district court did not err in finding that two significant correlations between exam and job performance components did not make "'convincing' evidence of job relatedness" (citation omitted)); see also 29 C.F.R. § 1607.14(C)(2) (an exam should measure "critical work behavior(s) and/or important work behavior(s) constituting most of the job").

The 2000 job analysis identified 163 "important tasks" and 155 "important" KSAs. The district court acknowledged that the eighty-point multiple-choice portion of the exams tested primarily the "K" of the KSAs, knowledge, and failed to measure key skills and abilities, and thus would not be independently valid. López, 2014 U.S. Dist. LEXIS 124139, at *60-61. The E&E component that purportedly compensated for the "SA" deficit, edging the exams into the realm of validity, consisted of a single sheet requiring candidates to bubble in responses as to length of work experience in departmental positions by rank, educational background, and teaching experience. As the majority concedes, this component had a minimal effect on score. Supra at 20-21.

The conclusion that more than half, López, 2014 U.S. Dist. LEXIS 124139, at *54, or nearly half, supra at 27 n.11, of applicable KSAs were or could be tested by the exams overestimates the number of KSAs tested by the E&E component. But even if that estimate were correct, relying upon this quantitative measure misses that representativeness is partly qualitative.

- 48 -

It is quite a stretch to conclude that the E&E's bubbles incorporated measures of the majority of key skills and abilities. It is even more difficult to conclude from the record that the skills and abilities measured received representative weight. Supra at 21. How, exactly, could this worksheet test, as the testability analysis suggests, "[k]nowledge of the various communities within the Department's jurisdiction and the factors which make them unique," "[s]kill in perceiving and reacting to the needs of others," or "[k]nowledge of the procedures/techniques when a major disaster occurs,"? And how, if it only affected the ultimate score by five to seven percent at most, supra at 20, could it be said that the KSAs for which the E&E ostensibly tested were adequately represented relative to those KSAs tested on the multiple-choice component?

The exam's failure to include particularly significant KSAs also precludes representativeness. See Gillespie v. Wisconsin, 771 F.2d 1035, 1044 (7th Cir. 1985) ("To be representative for Title VII purposes, an employment test must neither: (1) focus exclusively on a minor aspect of the position; nor (2) fail to test a significant skill required by the position." (emphasis added)); Guardians, 630 F.2d at 99. The exams here may have tested the knowledge a supervisor must have but omitted any meaningful test of supervisory skill, which is unquestionably essential to the position of police sergeant. López, 2014 U.S.

Dist. LEXIS 124139, at *51.  Written tests of supervisory skill
have been found by other courts to be altogether inadequate to
evaluate that attribute.  See Vulcan Pioneers, Inc. v. N.J. Dep't
of Civil Serv., 625 F. Supp. 527, 547 (D.N.J. 1985), aff'd on other
grounds, 832 F.2d 811, 815-16 (3d Cir. 1987); see also Firefighters
Inst. for Racial Equal. v. City of St. Louis, 549 F.2d 506, 513
(8th Cir. 1977).

As in Beecher, "[t]here are, in sum, too many problems
with the test . . . to approve it here."  504 F.2d at 1026.  It
cannot be anything but clear error, supra at 23, to find valid
exams based on an outdated validation report and a facially flawed
job analysis, exams that are not only unrepresentative but also
omit critical KSAs for the position of police sergeant.  To endorse
the means by which these exams were created and the exams
themselves here establishes a perilous precedent that all but
encourages corner-cutting when it comes to Title VII.

On these grounds, I respectfully dissent.

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XIV. Equal Employment Opportunity Commission
                Part 1607. Uniform Guidelines on Employee Selection Procedures (1978) (Refs & Annos)
                    Technical Standards

29 C.F.R. § 1607.14

§ 1607.14 Technical standards for validity studies.

Currentness

The following minimum standards, as applicable, should be met in conducting a validity study. Nothing in these guidelines is intended to preclude the development and use of other professionally acceptable techniques with respect to validation of selection procedures. Where it is not technically feasible for a user to conduct a validity study, the user has the obligation otherwise to comply with these guidelines. See sections 6 and 7 above.

A. Validity studies should be based on review of information about the job. Any validity study should be based upon a review of information about the job for which the selection procedure is to be used. The review should include a job analysis except as provided in section 14B(3) below with respect to criterion-related validity. Any method of job analysis may be used if it provides the information required for the specific validation strategy used.

B. Technical standards for criterion-related validity studies--

(1) Technical feasibility. Users choosing to validate a selection procedure by a criterion-related validity strategy should determine whether it is technically feasible (as defined in section 16) to conduct such a study in the particular employment context. The determination of the number of persons necessary to permit the conduct of a meaningful criterion-related study should be made by the user on the basis of all relevant information concerning the selection procedure, the potential sample and the employment situation. Where appropriate, jobs with substantially the same major work behaviors may be grouped together for validity studies, in order to obtain an adequate sample. These guidelines do not require a user to hire or promote persons for the purpose of making it possible to conduct a criterion-related study.

(2) Analysis of the job. There should be a review of job information to determine measures of work behavior(s) or performance that are relevant to the job or group of jobs in question. These measures or criteria are relevant to the extent that they represent critical or important job duties, work behaviors or work outcomes as developed from the review of job information. The possibility of bias should be considered both in selection of the criterion measures and their application. In view of the possibility of bias in subjective evaluations, supervisory rating techniques and instructions to raters should be carefully developed. All criterion measures and the methods for gathering data need to be examined for freedom from factors which would unfairly alter scores of members of any group. The relevance of criteria and their freedom from bias are of particular concern when there are significant differences in measures of job performance for different groups.

(3) Criterion measures. Proper safeguards should be taken to insure that scores on selection procedures do not enter into any judgments of employee adequacy that are to be used as criterion measures. Whatever criteria are used should represent

important or critical work behavior(s) or work outcomes. Certain criteria may be used without a full job analysis if the user can show the importance of the criteria to the particular employment context. These criteria include but are not limited to production rate, error rate, tardiness, absenteeism, and length of service. A standardized rating of overall work performance may be used where a study of the job shows that it is an appropriate criterion. Where performance in training is used as a criterion, success in training should be properly measured and the relevance of the training should be shown either through a comparison of the content of the training program with the critical or important work behavior(s) of the job(s), or through a demonstration of the relationship between measures of performance in training and measures of job performance. Measures of relative success in training include but are not limited to instructor evaluations, performance samples, or tests. Criterion measures consisting of paper and pencil tests will be closely reviewed for job relevance.


(4) Representativeness of the sample. Whether the study is predictive or concurrent, the sample subjects should insofar as feasible be representative of the candidates normally available in the relevant labor market for the job or group of jobs in question, and should insofar as feasible include the races, sexes, and ethnic groups normally available in the relevant job market. In determining the representativeness of the sample in a concurrent validity study, the user should take into account the extent to which the specific knowledges or skills which are the primary focus of the test are those which employees learn on the job.

Where samples are combined or compared, attention should be given to see that such samples are comparable in terms of the actual job they perform, the length of time on the job where time on the job is likely to affect performance, and other relevant factors likely to affect validity differences; or that these factors are included in the design of the study and their effects identified.


(5) Statistical relationships. The degree of relationship between selection procedure scores and criterion measures should be examined and computed, using professionally acceptable statistical procedures. Generally, a selection procedure is considered related to the criterion, for the purposes of these guidelines, when the relationship between performance on the procedure and performance on the criterion measure is statistically significant at the 0.05 level of significance, which means that it is sufficiently high as to have a probability of no more than one (1) in twenty (20) to have occurred by chance. Absence of a statistically significant relationship between a selection procedure and job performance should not necessarily discourage other investigations of the validity of that selection procedure.


(6) Operational use of selection procedures. Users should evaluate each selection procedure to assure that it is appropriate for operational use, including establishment of cutoff scores or rank ordering. Generally, if other factors remain the same, the greater the magnitude of the relationship (e.g., correlation coefficient) between performance on a selection procedure and one or more criteria of performance on the job, and the greater the importance and number of aspects of job performance covered by the criteria, the more likely it is that the procedure will be appropriate for use. Reliance upon a selection procedure which is significantly related to a criterion measure, but which is based upon a study involving a large number of subjects and has a low correlation coefficient will be subject to close review if it has a large adverse impact. Sole reliance upon a single selection instrument which is related to only one of many job duties or aspects of job performance will also be subject to close review. The appropriateness of a selection procedure is best evaluated in each particular situation and there are no minimum correlation coefficients applicable to all employment situations. In determining whether a selection procedure is appropriate for operational use the following considerations should also be taken into account: The degree of adverse impact of the procedure, the availability of other selection procedures of greater or substantially equal validity.


(7) Overstatement of validity findings. Users should avoid reliance upon techniques which tend to overestimate validity findings as a result of capitalization on chance unless an appropriate safeguard is taken. Reliance upon a few selection procedures or criteria of successful job performance when many selection procedures or criteria of performance have been

studied, or the use of optimal statistical weights for selection procedures computed in one sample, are techniques which tend to inflate validity estimates as a result of chance. Use of a large sample is one safeguard: cross-validation is another.

(8) Fairness. This section generally calls for studies of unfairness where technically feasible. The concept of fairness or unfairness of selection procedures is a developing concept. In addition, fairness studies generally require substantial numbers of employees in the job or group of jobs being studied. For these reasons, the Federal enforcement agencies recognize that the obligation to conduct studies of fairness imposed by the guidelines generally will be upon users or groups of users with a large number of persons in a job class, or test developers; and that small users utilizing their own selection procedures will generally not be obligated to conduct such studies because it will be technically infeasible for them to do so.

(a) Unfairness defined. When members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences in scores are not reflected in differences in a measure of job performance, use of the selection procedure may unfairly deny opportunities to members of the group that obtains the lower scores.

(b) Investigation of fairness. Where a selection procedure results in an adverse impact on a race, sex, or ethnic group identified in accordance with the classifications set forth in section 4 above and that group is a significant factor in the relevant labor market, the user generally should investigate the possible existence of unfairness for that group if it is technically feasible to do so. The greater the severity of the adverse impact on a group, the greater the need to investigate the possible existence of unfairness. Where the weight of evidence from other studies shows that the selection procedure predicts fairly for the group in question and for the same or similar jobs, such evidence may be relied on in connection with the selection procedure at issue.

(c) General considerations in fairness investigations. Users conducting a study of fairness should review the A.P.A. Standards regarding investigation of possible bias in testing. An investigation of fairness of a selection procedure depends on both evidence of validity and the manner in which the selection procedure is to be used in a particular employment context. Fairness of a selection procedure cannot necessarily be specified in advance without investigating these factors. Investigation of fairness of a selection procedure in samples where the range of scores on selection procedures or criterion measures is severely restricted for any subgroup sample (as compared to other subgroup samples) may produce misleading evidence of unfairness. That factor should accordingly be taken into account in conducting such studies and before reliance is placed on the results.

(d) When unfairness is shown. If unfairness is demonstrated through a showing that members of a particular group perform better or poorer on the job than their scores on the selection procedure would indicate through comparison with how members of other groups perform, the user may either revise or replace the selection instrument in accordance with these guidelines, or may continue to use the selection instrument operationally with appropriate revisions in its use to assure compatibility between the probability of successful job performance and the probability of being selected.

(e) Technical feasibility of fairness studies. In addition to the general conditions needed for technical feasibility for the conduct of a criterion-related study (see section 16, below) an investigation of fairness requires the following:

(i) An adequate sample of persons in each group available for the study to achieve findings of statistical significance. Guidelines do not require a user to hire or promote persons on the basis of group classifications for the purpose of

making it possible to conduct a study of fairness; but the user has the obligation otherwise to comply with these guidelines.

(ii) The samples for each group should be comparable in terms of the actual job they perform, length of time on the job where time on the job is likely to affect performance, and other relevant factors likely to affect validity differences; or such factors should be included in the design of the study and their effects identified.

(f) Continued use of selection procedures when fairness studies not feasible. If a study of fairness should otherwise be performed, but is not technically feasible, a selection procedure may be used which has otherwise met the validity standards of these guidelines, unless the technical infeasibility resulted from discriminatory employment practices which are demonstrated by facts other than past failure to conform with requirements for validation of selection procedures. However, when it becomes technically feasible for the user to perform a study of fairness and such a study is otherwise called for, the user should conduct the study of fairness.

C. Technical standards for content validity studies--

(1) Appropriateness of content validity studies. Users choosing to validate a selection procedure by a content validity strategy should determine whether it is appropriate to conduct such a study in the particular employment context. A selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the content of the job. Selection procedures which purport to measure knowledges, skills, or abilities may in certain circumstances be justified by content validity, although they may not be representative samples, if the knowledge, skill, or ability measured by the selection procedure can be operationally defined as provided in section 14C(4) below, and if that knowledge, skill, or ability is a necessary prerequisite to successful job performance.

A selection procedure based upon inferences about mental processes cannot be supported solely or primarily on the basis of content validity. Thus, a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure traits or constructs, such as intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability. Content validity is also not an appropriate strategy when the selection procedure involves knowledges, skills, or abilities which an employee will be expected to learn on the job.

(2) Job analysis for content validity. There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job.

(3) Development of selection procedures. A selection procedure designed to measure the work behavior may be developed specifically from the job and job analysis in question, or may have been previously developed by the user, or by other users or by a test publisher.

(4) Standards for demonstrating content validity. To demonstrate the content validity of a selection procedure, a user should show that the behavior(s) demonstrated in the selection procedure are a representative sample of the behavior(s) of the job in question or that the selection procedure provides a representative sample of the work product of the job. In the case

of a selection procedure measuring a knowledge, skill, or ability, the knowledge, skill, or ability being measured should be operationally defined. In the case of a selection procedure measuring a knowledge, the knowledge being measured should be operationally defined as that body of learned information which is used in and is a necessary prerequisite for observable aspects of work behavior of the job. In the case of skills or abilities, the skill or ability being measured should be operationally defined in terms of observable aspects of work behavior of the job. For any selection procedure measuring a knowledge, skill, or ability the user should show that (a) the selection procedure measures and is a representative sample of that knowledge, skill, or ability; and (b) that knowledge, skill, or ability is used in and is a necessary prerequisite to performance of critical or important work behavior(s). In addition, to be content valid, a selection procedure measuring a skill or ability should either closely approximate an observable work behavior, or its product should closely approximate an observable work product. If a test purports to sample a work behavior or to provide a sample of a work product, the manner and setting of the selection procedure and its level and complexity should closely approximate the work situation. The closer the content and the context of the selection procedure are to work samples or work behaviors, the stronger is the basis for showing content validity. As the content of the selection procedure less resembles a work behavior, or the setting and manner of the administration of the selection procedure less resemble the work situation, or the result less resembles a work product, the less likely the selection procedure is to be content valid, and the greater the need for other evidence of validity.

(5) Reliability. The reliability of selection procedures justified on the basis of content validity should be a matter of concern to the user. Whenever it is feasible, appropriate statistical estimates should be made of the reliability of the selection procedure.

(6) Prior training or experience. A requirement for or evaluation of specific prior training or experience based on content validity, including a specification of level or amount of training or experience, should be justified on the basis of the relationship between the content of the training or experience and the content of the job for which the training or experience is to be required or evaluated. The critical consideration is the resemblance between the specific behaviors, products, knowledges, skills, or abilities in the experience or training and the specific behaviors, products, knowledges, skills, or abilities required on the job, whether or not there is close resemblance between the experience or training as a whole and the job as a whole.

(7) Content validity of training success. Where a measure of success in a training program is used as a selection procedure and the content of a training program is justified on the basis of content validity, the use should be justified on the relationship between the content of the training program and the content of the job.

(8) Operational use. A selection procedure which is supported on the basis of content validity may be used for a job if it represents a critical work behavior (i.e., a behavior which is necessary for performance of the job) or work behaviors which constitute most of the important parts of the job.

(9) Ranking based on content validity studies. If a user can show, by a job analysis or otherwise, that a higher score on a content valid selection procedure is likely to result in better job performance, the results may be used to rank persons who score above minimum levels. Where a selection procedure supported solely or primarily by content validity is used to rank job candidates, the selection procedure should measure those aspects of performance which differentiate among levels of job performance.

D. Technical standards for construct validity studies--

(1) Appropriateness of construct validity studies. Construct validity is a more complex strategy than either criterion-related or content validity. Construct validation is a relatively new and developing procedure in the employment field, and there is at present a lack of substantial literature extending the concept to employment practices. The user should be aware that the effort to obtain sufficient empirical support for construct validity is both an extensive and arduous effort involving a series of research studies, which include criterion related validity studies and which may include content validity studies. Users choosing to justify use of a selection procedure by this strategy should therefore take particular care to assure that the validity study meets the standards set forth below.

(2) Job analysis for construct validity studies. There should be a job analysis. This job analysis should show the work behavior(s) required for successful performance of the job, or the groups of jobs being studied, the critical or important work behavior(s) in the job or group of jobs being studied, and an identification of the construct(s) believed to underlie successful performance of these critical or important work behaviors in the job or jobs in question. Each construct should be named and defined, so as to distinguish it from other constructs. If a group of jobs is being studied the jobs should have in common one or more critical or important work behaviors at a comparable level of complexity.

(3) Relationship to the job. A selection procedure should then be identified or developed which measures the construct identified in accord with subparagraph (2) above. The user should show by empirical evidence that the selection procedure is validly related to the construct and that the construct is validly related to the performance of critical or important work behavior(s). The relationship between the construct as measured by the selection procedure and the related work behavior(s) should be supported by empirical evidence from one or more criterion-related studies involving the job or jobs in question which satisfy the provisions of section 14B above.

(4) Use of construct validity study without new criterion-related evidence--

(a) Standards for use. Until such time as professional literature provides more guidance on the use of construct validity in employment situations, the Federal agencies will accept a claim of construct validity without a criterion-related study which satisfies section 14B above only when the selection procedure has been used elsewhere in a situation in which a criterion-related study has been conducted and the use of a criterion-related validity study in this context meets the standards for transportability of criterion-related validity studies as set forth above in section 7. However, if a study pertains to a number of jobs having common critical or important work behaviors at a comparable level of complexity, and the evidence satisfies subparagraphs 14B (2) and (3) above for those jobs with criterion-related validity evidence for those jobs, the selection procedure may be used for all the jobs to which the study pertains. If construct validity is to be generalized to other jobs or groups of jobs not in the group studied, the Federal enforcement agencies will expect at a minimum additional empirical research evidence meeting the standards of subparagraphs section 14B (2) and (3) above for the additional jobs or groups of jobs.

(b) Determination of common work behaviors. In determining whether two or more jobs have one or more work behavior(s) in common, the user should compare the observed work behavior(s) in each of the jobs and should compare the observed work product(s) in each of the jobs. If neither the observed work behavior(s) in each of the jobs nor the observed work product(s) in each of the jobs are the same, the Federal enforcement agencies will presume that the work behavior(s) in each job are different. If the work behaviors are not observable, then evidence of similarity of work products and any other relevant research evidence will be considered in determining whether the work behavior(s) in the two jobs are the same.

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92–261); 42 U.S.C. 2000e–8, 2000e–12.

Notes of Decisions (72)

Current through Feb. 12, 2015; 80 FR 7966.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

*Commonwealth of Massachusetts*
*Commission Against Discrimination*
*One Ashburton Place*
*Boston, Massachusetts 02108*
Phone: *(617) 994-6000*
Fax: *(617) 994-6161*

July 1, 2015

Harold L. Lichten, Esq.
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116

Tim D. Norris, Esq.
Collins, Loughran & Peloquin
320 Norwood Park South
Norwood, MA 02062

RE: <u>MCAD and Spencer Tatum and Andrew Harris   v.   City of Worcester Police Department</u>
MCAD Docket Number: 94-SEM-0589/94-SEM-0590

Dear Counsel:

Enclosed please find a copy of the Decision of the Full Commission ("Decision") issued in the above-referenced matter. Any party aggrieved by this final determination may appeal the Commission's decision by filing a Complaint in Superior Court, along with a copy of the transcript of the public hearing, seeking judicial review. Such Complaint must be filed within 30 days of service of this Decision and must be filed in accordance with M.G.L. c. 30A, c. 151B, § 6, and Superior Court Standing Order 1-96 (Amended). Please note that you are obligated to provide a transcript, or portions thereof, to the Superior Court if alleging that the Decision is not supported by substantial evidence or is arbitrary or capricious, or is an abuse of discretion.

All requests for acquiring a transcript of the MCAD public hearing shall be directed to the Hearings Clerk, Yudelka Pena, at 617-994-6122.

Please note that the any penalty imposed in the Decision is owed to the Commonwealth of Massachusetts and should be directed to the attention of the Clerk of the Commission.

Very truly yours,

Myrna Solod
Clerk of the Commission

Enclosure

RECEIVED
JUL - 7 2015
By_____

## CERTIFICATE OF SERVICE

I, Myrna Solod, hereby certify that I have served the attached <u>Decision of the Full Commission</u> on the following parties by mailing a copy thereof by: <u>Certified Mail, Return Receipt Requested.</u>

Spencer Tatum
6 Varnum Street
Worcester, MA 01603

Andrew Harris
48 Forbes Street
Worcester, MA 01605

Harold L. Lichten, Esq.
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116

City of Worcester Police Department
9-11 Lincoln Square
Worcester, MA 01608

Tim D. Norris, Esq.
Collins, Loughran & Peloquin
320 Norwood Park South
Norwood, MA 02062

July 1, 2015
Date

Myrna Solod
Clerk of the Commission

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

MASSACHUSETTS COMMISSION
AGAINST DISCRIMINATION,
ANDREW HARRIS and SPENCER TATUM
    Complainants,

    v.

CITY OF WORCESTER POLICE DEPARTMENT,
    Respondent.

DOCKET NO. 94-SEM-0589
94-SEM-0590

## DECISION OF THE FULL COMMISSION ON REMAND

This matter comes before us on remand from the Worcester Superior Court directing the

Full Commission to review, pursuant to G.L. c. 151B, § 5 and 804 C.M.R. 1.23, the Findings of

Fact, Conclusions of Law and Order of the Hearing Officer issued April 26, 2002. In that decision,

the Hearing Officer dismissed the complaints of Andrew Harris and Spencer Tatum, who were

alleging disparate impact discrimination. After completing such review, for the reasons stated

below, the Full Commission reverses the Hearing Officer's decision and concludes that the City of

Worcester Police Department violated G.L. c. 151B's proscription against disparate impact

discrimination.

## RELEVANT PROCEDURAL HISTORY

On September 15, 1994, Complainants Tatum and Harris each filed nearly identical

complaints with the Commission, claiming that the City of Worcester Police Department violated

Massachusetts General Laws Chapter 151B when it failed to promote them to the position of

sergeant based on their race and color. After efforts at conciliation failed, the matter was Certified

1

and set for public hearing before Hearing Officer, Edward Mitnick ("Hearing Officer").

On July 10, 2001, the first of two Public Hearings was held. At this hearing, Tatum and Harris pled their case under a disparate impact theory of discrimination. Tatum and Harris alleged that the City's practice of promoting in strict order, based only on an individual's rank on the Civil Service eligibility list, following a promotional examination, had a discriminatory impact on African-American officers. In the ensuing decision, which is the subject of this Full Commission Order, the Hearing Officer dismissed Tatum's and Harris' complaints. The Hearing Officer concluded that while Tatum and Harris had established a prima facie case of disparate impact discrimination, the City had met its burden of establishing that its practice of promoting by strict rank order constituted a lawful business necessity and therefore did not violate G.L. c. 151B. The Hearing Officer further found that Tatum and Harris failed to identify less discriminatory alternatives which would not have had the same discriminatory impact on African-American officers. Pursuant to 804 C.M.R. 1.23, Tatum, and Harris appealed the Hearing Officer's decision to the Full Commission.

After review of the Hearing Officer's decision, the Full Commission on August 4, 2003 remanded the matter to the Hearing Officer to take additional evidence on the issue of disparate treatment and pretext. The Full Commission expressly noted that the Order remanding the case did not "constitute a final review of the Decision of the Hearing Officer for purposes of . . . [judicial review]."

Following the remand hearing, on August 13, 2004 the Hearing Officer issued a decision dismissing Tatum's and Harris' claims of disparate treatment. Tatum and Harris once again appealed the Hearing Officer's decision to the Full Commission. For reasons unknown, the Full Commission did not substantively address Tatum's and Harris' original appeal of the dismissal of

2

the disparate impact claim. Instead, the Full Commission focused exclusively on the issue of disparate treatment. The Full Commission, however, was unable to reach consensus on the appeal of the disparate treatment claim. As a result, the Hearing Officer's second decision, dated August 13, 2004, became the Commission's final decision, for purposes of judicial review pursuant to G.L. c. 151B, § 6 and G.L. c. 30A, § 14.

Tatum and Harris sought judicial review, in the Superior Court, of the Full Commission decision dismissing the disparate treatment claim. Despite the documented lack of administrative finality, Harris and Tatum also sought judicial review of their disparate impact claim. After review, the Superior Court affirmed the dismissal of the disparate impact claim, and remanded the disparate treatment claim to the Commission for further review.

As directed by the Superior Court, the Full Commission on November 9, 2011 issued an Order addressing its review of Tatum's and Harris's claims of disparate treatment discrimination. In a reversal of the Hearing Officer's Decision, the Full Commission concluded that the City's failure to promote Tatum and Harris violated G.L. c. 151B. The Full Commission further noted that "[a]s a result of th[e] unusual procedural history [it] has been denied an opportunity to properly review the Hearing Officer's decision on the disparate impact claim."

In accordance with G.L. c. 30A, the City filed a complaint in Superior Court requesting judicial review of Full Commission order pertaining to disparate treatment. Tatum and Harris filed a complaint seeking limited review, and requesting that the case be remanded to the Commission for a final determination on Tatum's and Harris's disparate impact claims. On August 21, 2013, the Superior Court allowed the request to remand the matter. The case was sent back to the MCAD for a final administrative review of the Hearing Officer's decision on the disparate impact claim. It is upon the Superior Court's second remand order that the following Full Commission Order is issued.

3

## STANDARD OF REVIEW

The responsibilities of the Full Commission are outlined by statute, the Commission's Rules of Procedure (804 CMR 1.00 et seq.), and relevant case law. It is the duty of the Full Commission to review the record of proceedings before the Hearing Officer. G.L. c. 151B, § 5. The Hearing Officer's findings of fact must be supported by substantial evidence, which is defined as "....such evidence as a reasonable mind might accept as adequate to support a finding..." *Katz v. MCAD*, 365 Mass. 357, 365 (1974); G.L. c. 30A. It is the Hearing Officer's responsibility to evaluate the credibility of witnesses and to weigh the evidence when deciding disputed issues of fact. The Full Commission's role is to determine whether the decision under appeal was rendered in accordance with the law, or whether the decision was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. *See* 804 CMR 1.23.

## ANALYSIS

G.L. c. 151B and Title VII, prohibit employers from using "'employment practices that [create] a disparate impact on the basis of race' unless those practices are justified by business necessity." *Jones v. City of Boston*, 752 F.3d 38, 46 (1st Cir. 2014) (quoting 42 U.S.C. § 2000e–2(k)). Disparate impact discrimination "involve[s] employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another." *Lopez v. Commonwealth*, 463 Mass. 696, 709-710 (2012) (internal citation omitted).[1] Unlike disparate treatment claims, "discriminatory motive is not a required element of proof" in disparate impact cases. *Id.*

---

[1] "Because there is relatively little case law on disparate impact claims in Massachusetts [the courts] look to Title VII for guidance, mindful that Federal interpretations are not binding on [the courts] when construing a State statute." *Lopez,* 463 Mass. at 710 (citations omitted).

Disparate impact claims follow a three-part analysis involving shifting evidentiary burdens. 42 U.S.C. § 2000e–2(k)(1)(A)(i). "To make a prima facie showing of disparate impact, a [complainant] starts by 'isolating and identifying' the employment practice being challenged." *Jones*, 752 F.3d at 46 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988), (plurality)). A complainant must then demonstrate that the challenged practice "causes a disparate impact on the basis of race, color, religion, sex, or national origin." In doing so, the complainant may rely on statistical data. *Bresnahan v. Route 114 Liquors*, 17 MDLR 1129, 1134 (1995). *See International Broth. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) (recognizing the use of statistics in proving employment discrimination). The precise impact of the identified policy need not be proved to a mathematical certainty. *Id.* "[A] prima facie showing of disparate impact [is] "essentially a threshold showing of a significant statistical disparity ... and nothing more." *Jones*, 752 F.3d at 46 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009)).

Once a complainant has established a prima facie case of disparate impact discrimination, "a respondent has two avenues of rebuttal." *Gulino v. New York State Educ. Dept.*, 460 F.3d 361, 382 (2nd Cir. 2006) (citations omitted). First, the respondent may "directly attack [complainant's] statistical proof by pointing out deficiencies in data or fallacies in the analysis." *Id.* Second, the respondent may rebut a prima facie showing by "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity." *Id.* (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). "In all events, however, a defendants' good faith is not a defense to a disparate impact claim." *E.E.O.C. v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 602 (1st Cir. 1995) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)).

"If the defendant fails in its efforts to counter the plaintiff's prima facie case, then the

5

factfinder is entitled—though not necessarily compelled to enter judgment for the plaintiff, *Steamship Clerks Union*, 48 F.3d at 602 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-10 (1971)).  Even if the respondent establishes that the challenged practice is a business necessity, the complainant may still prevail if he is able to establish that the professed rationale is pretextual. *Bradley v. Lynn*, 443 F. Supp. 2d 145, 157 (D. Mass. 2006) (citing *Steamship Clerks*, 48 F.3d at 601-02).  "The [complainant] might demonstrate, for example, that some other practice, without a similarly undesirable side effect, was available and would have served the defendant's legitimate interest equally well.  Such an exhibition constitutes competent evidence that the defendant was using the interdicted practice 'merely as a 'pretext' for discrimination.' "  *Id.* (citing *Donnelly v. R.I. Bd. of Governors for Higher Educ.*, 110 F.3d 2, 4 (1st Cir.1997) (noting that although *Steamship Clerks* addressed the legal framework as it existed prior to the 1991 amendments to the Civil Rights Act, the First Circuit continues to apply the same framework)).

***The Prima Facie Case.***

In this matter, Tatum and Harris alleged the City of Worcester's practice of strictly promoting candidates, as ranked on the Civil Service eligibility list, generated from the results of the civil service promotional exam, had a discriminatory impact on African-American police officers.  The principle that facially neutral employment practices may violate statutory anti-discrimination provisions has frequently been applied where "standardized criteria have had an adverse impact on hiring and promotion of minority candidates." *Lopez v. Com*, 463 Mass. 696, 710 (2012)(citing *Watson*, 487 U.S. at 988 (citations omitted)).

In evaluating statistical evidence, "[t]he Supreme Court has said that no single test controls in measuring disparate impact." *Bradley v. Lynn*, 443 F. Supp. 2d 145, 160 (D. Mass. 2006) (quoting *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000) (citing *Watson*, 487 U.S.

6

at 995–96 n. 3 ("[W]e believe that such a case-by-case approach properly reflects our recognition that statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances' ")(citation omitted)).  While "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group . . . [o]ur formulations ... have never been framed in terms of any rigid mathematical formula . . . "  *Id.* at 157 (citing *Watson,* 487 U.S. at 994–95).  Statistical disparities must "be sufficiently substantial . . . [to] raise . . . an inference of causation."  *Id.*

Recently, however, decisions from the United States District Court of Massachusetts and the First Circuit Court of Appeals have placed increasing significance on the statistical methodology used to demonstrate disparate impact.  *See Jones v. City of Boston*, 752 F.3d 28 (2014); *Lopez v. City of Lawrence*, No. 07-11693-GAO (D.Mass. Sept. 5, 2014) *appeal filed*, Docket #:14-1952 (1st Cir. Apr. 8, 2015).  Preferring "analytic rigor" these federal decisions suggest that in order for a complainant to prevail in demonstrating a statistically significant disparity, a large sample size is required.  *Lopez,* No. 07-11693-GAO @ 5.  The danger of applying such analytic rigor is the total exclusion of a class of cases in which an employment practice has a discriminatory impact, but the employment data set is too small to establish a prima facie case.

Although the issue has not been directly addressed by the Supreme Judicial Court, the Court intimated in *Lopez v. Commonwealth*, 463 Mass. 696 (2012) that it may adopt a less stringent approach to its assessment of statistical disparities in considering a claim of disparate impact discrimination under G.L. c. 151B.  In *Lopez*, a group of African-American and Hispanic police officers alleged that the Commonwealth's Human Resource Department engaged in racial discrimination through the preparation and administration of examinations used by candidates

7

seeking promotion to the rank of sergeant. *Id.* at 697. The group further alleged that as a result, "in the municipalities that employed them, 'few, if any, minorities had been promoted to the position of sergeant.'" The Court, citing *Commonwealth v. Arriaga,* 438 Mass. 556, 565–567 (2003), indicated that in evaluating the statistical evidence proffered in support of a prima facie case it would apply "the absolute disparity test to determine whether underrepresentation of a group is substantial." *Lopez, supra* at 700 n. 6. The Court went on to suggest that a successful claim, under the facts alleged, would include evidence of "a significant disparity . . . between the percentage ratio of African-American and Hispanic police sergeants and their numbers in entry-level police officer ranks, on the one hand, and the corresponding percentage ratio of similarly situated non-minority police officers on the other." *Id.* In applying the absolute disparity test, courts have "held that a disparity below ten percent is generally not substantial." *Arriaga,* 438 Mass. at 565 (citing *Commonwealth v. Fryar,* 425 Mass. 237, 243, cert. denied, 522 U.S. 1033 (1997) (citations omitted).[2]

In this case, after analyzing the statistical evidence proffered, the Hearing Officer concluded that Tatum and Harris successfully stated a prima facie case of disparate impact discrimination. In reaching this conclusion, the Hearing Officer examined the racial demographics of both the City of Worcester and the Worcester Police Department. Relying on 1990 census data for the City of Worcester, the Hearing Officer found Worcester's minority population was 14.1% of the general population. The census indicated that Black residents comprised 4.5% of the general population, while Hispanics comprised 9.6%. Comparing the general population data with the demographics of the Worcester Police Department, the facts revealed that for the years 1993 to 2000, the percentage of minorities serving as sworn police officers ranged from a low of 10.2% in 1993 to a high of

---

[2] Additionally, the SJC indicated that in a disparate impact challenge to a Statewide test, data aggregation across municipalities may be appropriate in certain situations to establish a prima facie case; an approach rejected by the U.S. District Court in *Lopez v. City of Lawrence,* No. 07-11693-GAO. See *Lopez v. Com., 463 Mass.* at 712-13.

12.4% in 1997. By 2000, the percentage of minorities serving in the Worcester Police Department had fallen to 11.9%.

During this same period, the City employed between 55-65 sergeants. None (0.00%) of those who held the rank of sergeant was minority. Moreover, prior to the May 2001 promotion of one minority to the rank of sergeant, the City had not promoted a minority to sergeant in more than a decade. During the thirteen-year period of 1987 to 2000, the City had promoted only one minority to a superior officer's position.[3]

In surveying promotions to the rank of sergeant, the Hearing Officer found that in 1993, the City promoted 18 white officers from the eligibility list established after the 1992 promotional exam. Using the eligibility list established after the 1994 promotional exam, in 1995, the City promoted 12 white officers to sergeant. In 1992, in addition to Tatum and Harris, one other minority police officer passed the exam. In 1994, three other minority police officers passed the exam. Although they received passing scores, none of the successful minority police officers ranked high enough to be considered for promotion under the City's policy of selecting candidates in strict order of rank on the eligibility list.

Based on this evidence, the Hearing Officer properly concluded, "a gross disparity exists between the racial composition of the officers who were eligible for promotion to sergeant and the racial composition of the officers who actually worked as sergeants in the department." The Hearing Officer went on to note "[o]ne need not be a statistician to conclude that the relevant percentages [over a seven year period] from 1993 to 2000 - 0.00% of minority sergeants in the department, 10.2-12.4% minority members in the department, and 14.1% minority population in the City of Worcester - constitutes persuasive evidence by which [it] may reasonably [be] inferred

---

[3] In the November 9, 2011 Order of the Full Commission, the Full Commission took judicial notice of the fact that the lone minority promoted to the position of sergeant, prior to 2001, received the promotion based on the City's effort to meet equal employment opportunity goals set by the EEOC.

[that] a prima facie case of unlawful discrimination in the promotion of minority officers[ exists]."

Even if the absolute disparity test noted by the SJC in *Lopez*, had been substituted for the Hearing Officer's "intuitive judicial judgment," *Fudge v. City of Providence*, 766 F.2d 650, 657-58 (1st Cir. 1985), the results would have been the same. Comparing the percentage ratio of minority Worcester "police sergeants and their numbers in the entry-level police officer ranks, on the one hand, and the corresponding percentage ratio of similarly situated nonminority [Worcester] police officer on the other," *Lopez*, 463 Mass. at 700, we find that between 1993 and 2000 the percentage difference in Caucasian sergeants and minority sergeants range between 18% to 26% - percentages sufficient to pass the absolute disparity test. After review, the Full Commission finds no error in the Hearing Officer's assessment of the statistical disparities and concludes that that Tatum and Harris set forth a prima facie case.[4]

***Business Necessity.***

Once a plaintiff has established a prima facie case of disparate impact, the employer may defend by demonstrating that its policy or practice is "job related for the position in question and consistent with business necessity." *Ricci v. DeStefano*, 557 U.S. 557, 557 (2009). "The proper standard for determining whether 'business necessity' justifies a practice which has a racially discriminatory result is not whether it is justified by routine business considerations but whether

---

[4] In rebuttal to the prima facie showing, the City attempted to point out deficiencies with the methodology of the analysis. The City began by attacking the statistical "proof head-on" arguing that the data relied upon was not numerically relevant for its purpose. Relying on *Boston Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13 (1st Cir.1988) the Hearing Officer disagreed. Next, the City attempted to rebut the prima facie case by conjecturing that test preparation time and techniques negatively impacted Tatum's and Harris' test scores. The Hearing Officer correctly rejected the City's arguments as unpersuasive for two reasons. First, neither party presented evidence regarding the correlation of study and success on the promotional examination. Nor was evidence presented on the study habits of the higher scoring candidates versus the lower scoring. Second, the Hearing Officer noted that a complainant who "presents a statistical analysis of some challenged practice in a disparate impact case need not rule out all other variables" to establish a prima facie case. *USA v. City of Warren*, 138 F.3d 1083, 1094 (6th Cir. 1998) (citations omitted). The Full Commission finds that the Hearing Officer's conclusions are supported by substantial evidence and free from error of law.

there is a *compelling* need for the employer to maintain that practice and whether the employer can prove there is *no* alternative to the challenged practice." *Id.* at 623 (2009) (quoting *Kirby v. Colony Furniture Co.,* 613 F.2d 696, 705, n. 6 (8th Cir. 1980)(emphasis in original)). "That a practice served legitimate management functions does not "suffice to establish business necessity." *Id.* at 622-623 (quoting *Williams v. Colorado Springs, Colo., School Dist.,* 641 F.2d 835, 840–841 (10th Cir. 1981)(internal quotation marks omitted).

It is here that the Full Commission and Hearing Officer part ways. Relying primarily on an interpretation of the language contained in the Commonwealth's Civil Service statute, G.L. c. 31, the Hearing Officer concluded that the City's practice of strictly promoting candidates by order of rank on the civil service eligibility list was a business necessity. Citing G.L. c. 31, § 1(e), the Hearing Officer noted that the City must adhere to "basic merit principles" when making appointments and promotions. Such adherence is necessary to assure the "fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap or religion . . . " *Id.* Thus, the Hearing Officer continued, it is by necessity that the City comply with civil service rules and procedures which ensure exclusion of political consideration, favoritism and bias in the promotional process and not deviate from the practice of strict rank order promotions. In arriving at this conclusion, the Full Commission finds that the Hearing Officer erred as a matter of law.

While the City must admittedly comply with the statutory mandate of adhering to "basic merit principles," there is no statutory prohibition against promotions made outside of strict rank order. *Brackett v. Civil Service Comm'n,* 447 Mass. 233, 253(2006) (citing *Cotter v. City of Boston,* 323 F.3d 160, 171-72 (1st Cir. 2003)). When making appointments and promotions, G.L. c. 31 provides municipalities with the option to create and administer an alternative promotional

examination, and to rest promotional decisions on factors other than the examination. *Lopez*, 463 Mass. at 705; G.L. c. 31 §§ 11 and 3(e). Although promotional appointments must generally be made "on the basis of merit as determined by examination, it need not be the only criterion to evaluate merit." *Lopez*, 462 Mass. at 706 n.13 (citing *Lopez*, 588 F.3d 69, 77-78 (2009)). Pursuant to G.L. c. 31 § 3(e), merit may also be assessed through "performance evaluation[s], seniority of service or any combination of factors which fairly test the applicant's ability to perform the duties of the position as determined by the administrator." *Id.*

As further evidence that strict rank order promotion is not mandated, "the civil service law allow[s] police departments to bypass the candidates at the top of the list, so long as the department, as the appointing authority, then provide[s] HRD with a written statement of reasons." G.L. c. 31, § 27. *Lopez*, 588 F.3d at 79 (citing *Brackett*, 447 Mass. at 253.). Reasons for bypass may include "a history of domestic violence, past criminal charges, or any other grounds pertaining to the candidate's ability to effectively perform in the job." *Id.* at 79 (citing *Crete v. City of Lowell*, 418 F.3d 54, 59 (1st Cir. 2005)).

Additionally, G.L. c. 31 allows appointing authorities to promote individuals with "special qualifications," such as specific language proficiencies. PAR.08(6).[5] "Upon the request of a municipality, HRD issues a "selective certification" comprised of the names of eligible candidates possessing both the general qualifications and the required fluency in the specific language sought. *Id.*

Finally, "municipalities that wish[ ] to hire more minority candidates could do so pursuant to . . . PAR.10." Rule PAR.10 allows police departments to make a requisition to fill positions based on race, color, national origin, or sex. Special certifications under PAR.10 require substantiation

---

[5] PAR refers to the Personnel Administration Rules originally promulgated by the Commonwealth's Department of Personnel Administration - the predecessor to the Human Resources Division ("HRD").

that the previous practices of the department, with respect to filling the identified positions, have

discriminated against members of a protected class in contravention of any Constitutional provision

or in violation of state or federal law. *Id.*

"In short, even for police departments that chose to rely upon HRD-administered written

examinations to evaluate candidates for promotion to police sergeant, these examinations were

never wholly determinative of promotion decisions. These departments had a number of ways they

could consider other factors beyond examination scores and look beyond the top-ranked candidates

on an eligibility list." *Lopez*, 588 F.3d at 80.

***Pretext/Less Discriminatory Alternative:***

In attributing error to the Hearing Officer's conclusion that the City of Worcester had

rebutted the prima facie case, the Commission is entitled to enter judgment for Tatum and Harris.

*Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 117-18 (2000). *See Steamship*

*Clerks Union*, 48 F.3d at 602 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509-10 (1971)).

We conclude that sufficient evidence exists to support a finding of disparate impact discrimination.

Additional evidence proffered at hearing further supports our conclusion that the City's practice of

making strict rank promotions was discriminatory.

In this case, as in the companion disparate treatment case, the City of Worcester cannot

escape the fact that prior to its decision to strictly adhere to its policy of strict rank order

promotions, it had actual notice that its practice had resulted in discrimination. The City's notice

was provided in the form of an EEO Agreement executed between the City and the Commission

some five years prior to promotions in question. The Agreement required the City to take

affirmative action to remediate the gross disparities that signaled a history of discrimination,

including making promotions outside the confines of strict rank order. Armed with both the

13

knowledge of past (and present) discrimination and the ability to remedy the procedures which

"operate as 'built-in headwinds' for minority groups," the City chose to take no action. *Griggs,* 401

U.S. 424, 432 (1971). Given the City's refusal to act where it was on notice of past practices

evidencing a history of discrimination, and its ability to remedy the situation, the Commission

concludes that the City's failure to act was pretext for discrimination.[6]

ORDER

For the reasons set forth above and pursuant to the authority granted to the Commission

under G. L. c. 151B, section 5, we reverse the decision of the Hearing Officer and find the City of

Worcester Police Department violated G.L. c. 151B's proscription against disparate impact

discrimination. This Order incorporates all of the damages, affirmative relief, and monitoring

requirements set forth by the Full Commission in its Order of November 9, 2011, addressing

Tatum's and Harris' claim of disparate treatment.

This Order represents the final action of the Commission for purposes of M.G.L. c. 30A.

Any party aggrieved by this final determination may contest the Commission's decision by filing a

complaint in Superior Court seeking judicial review within 30 days of service of this decision in

accordance with M.G.L. c. 30A, c. 151B, §6, and the 1996 Superior Court Standing Order on

Judicial Review of Agency Actions. The filing of a petition pursuant to M.G.L. c. 30A does not

---

[6] Had the City "stalemated the prima facie case," the burden would have shifted to Tatum and Harris to establish that the professed rationale was pretextual. *Bradley v. Lynn*, 443 F. Supp. 2d 145, 157 (D. Mass. 2006) (citing *Steamship Clerks*, 48 F.3d at 601-02). Tatum and Harris, nonetheless, may have carried this burden by demonstrating that "some other practice, without a similarly undesirable side effect, was available and would have served the defendant's legitimate interest equally well." *Id.* "Such an exhibition" is one example of "competent evidence" available to demonstrate that the "defendant was using the interdicted practice merely as a pretext for discrimination." *Id.* (internal quotations and citations omitted). *Cf.* 42 U.S.C.A. § 2000e-2(k)(1)(A)(ii).

14

automatically stay enforcement of this Order. Failure to file a petition in court within 30 days of service of this Order will constitute a waiver of the aggrieved party's right to appeal pursuant to G.L. c. 151B, §6.

SO ORDERED this 30th day of June, 2015

Jamie R. Williamson
Chairperson

Sunila Thomas-George
Commissioner

Charlotte Golar Richie
Commissioner

15